VANITA GUPTA
Principal Deputy Assistant Attorney General
JUDITH C. PRESTON (MD Bar)
STEVEN H. ROSENBAUM (NY Bar Reg. #1901958)
CHRISTY E. LOPEZ (DC Bar #473612)
R. TAMAR HAGLER (CA Bar #189441)
CHARLES HART (NY Bar Reg. # 4282281)
NORRINDA BROWN HAYAT (DC Bar #479640 )
CARRIE PAGNUCCO (DC Bar #1000551)
KATHRYN LADEWSKI (MI Bar #P74431)
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Tel: (202) 305-3192
Fax: (202) 514-0212
Email: charles.hart@usdoj.gov
         norrinda.hayat@usdoj.gov
Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>THE COUNTY OF LOS ANGELES )<br>and THE LOS ANGELES COUNTY )<br>SHERIFF'S DEPARTMENT )<br>)<br>    Defendants. )<br>)<br>)<br>_____ ) | No. CV 15-03174<br><br>COMPLAINT |

Plaintiff the United States of America ("United States") brings this civil cause of action against Defendants the County of Los Angeles (the "County") and the Los Angeles County Sheriff's Department ("LASD" or "the Department") under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, et seq., ("the Fair Housing Act" or "FHA").  The United States brings this action to remedy a pattern or practice of conduct by law enforcement officers of LASD, an agent of the County, that deprives persons of rights, privileges, and immunities secured and protected by the United States Constitution and the Fair Housing Act.

The United States alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1345 and 42 U.S.C. § 3614(a).

2.     The United States is authorized to initiate this action against the County of Los Angeles and LASD ("Defendants") under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141") and the Fair Housing Act, 42 U.S.C. § 3614(a).   The declaratory and injunctive relief sought by the United States is authorized by 42 U.S.C. § 14141(b) and 42 U.S.C. § 3614(d).  Monetary damages for persons harmed by defendants' discriminatory practices, and a civil penalty to vindicate the public interest, are authorized under the Fair Housing Act, 42 U.S.C. § 3614(d).

3.     Venue is proper under 28 U.S.C. § 1391(b) because  Defendants are located in the Central District of California, and all of the events, actions, or omissions giving rise to these claims occurred in the Central District of California.

## PARTIES

4.     Plaintiff is the United States of America.

5.      Defendant County of Los Angeles is a municipal corporation located in the Central District of California.

6.      Defendant Los Angeles County Sheriff's Department is a law enforcement agency funded and operated by the County of Los Angeles.

7.      The Los Angeles County Sheriff's Department contracts with the Cities of Lancaster and Palmdale, among others, to provide local police protection in those municipalities.

8.      The United States of America reserves any claims it may have under the Fair Housing Act against the Housing Authority of the County of Los Angeles, the County of Los Angeles as it relates to the Housing Authority of the County of Los Angeles, the City of Lancaster and the City of Palmdale.

## FACTUAL ALLEGATIONS

9.      The Antelope Valley is a region in northern Los Angeles County and includes the Cities of Lancaster and Palmdale.

10.     LASD provides policing services to Lancaster and Palmdale pursuant to separate, identical agreements, called "City-County Municipal Law Enforcement Services Agreements."  Each agreement states that "the Sheriff or his designee shall serve as Chief of Police of the City and shall perform the functions of the Chief of Police at the direction of the City."  Section 2.1, Administration of Personnel.  The agreements provide that LASD officers "shall be deemed to be [] officer[s] or employee[s] of the City while performing such service for the City."  Section 2.6.

11.     During the time relevant to the allegations in this Complaint, LASD assigned a total of approximately 400 deputies to stations in the Cities of Lancaster and Palmdale.

12.     As set forth in the Department of Justice's June 28, 2013, findings letter, attached hereto as Exhibit A, LASD engages in a pattern or practice of misconduct by law enforcement officials in its Antelope Valley stations in the Cities of Lancaster and Palmdale ("LASD-AV").  This pattern or practice of misconduct violates the

Constitution and federal law through: pedestrian and vehicle stops that violate the Fourth Amendment; stops that appear motivated by racial bias, in violation of the Fourteenth Amendment and federal statutory law; the use of unreasonable force in violation of the Fourth Amendment; and discrimination against African-American residents of the Cities of Lancaster and Palmdale on the basis of race by making housing unavailable, altering the terms and conditions of housing, and coercing, intimidating, and interfering with their housing rights, in violation of the Fair Housing Act.

A.    **The Antelope Valley Stations of the Los Angeles Sheriff's Department Engage in a Pattern or Practice of Police Misconduct that Violates the Fourth and Fourteenth Amendments**

1. **LASD's Antelope Valley Stations Detain Individuals Without Legal Authority**

13.    LASD deputies routinely fail to articulate facts sufficient to support the predicate of reasonable suspicion required for a detention consistent with the Fourth Amendment under *Terry v. Ohio,* 392 U.S. 1, 21 (1986).  Deputy log entries instead provide conclusory statements such as:  "persons acting suspiciously," "925" (internal LASD radio code for "person acting suspiciously"), or "hanging out in narco area."

14.    In one instance, for example, a deputy detained and ran a warrant check on two individuals apparently based solely on the fact that they were in a high narcotics area.

15.    Antelope Valley deputies routinely detain community members, including domestic violence victims and minor traffic offenders, in the backseats of patrol cars without any individualized assessment of danger or suspicion, as required by the Fourth Amendment.

16.    During one encounter, for example, two Palmdale deputies handcuffed and detained a domestic violence victim in the back of a patrol car for no articulated reason.

17.     In another instance, Palmdale deputies stopped a car for a broken license plate light and detained all three passengers without apparent justification.  Two individuals were detained in the backseat of a patrol car while the deputies checked their identification. Although LASD requires documentation of the need for a backseat detention, this backseat detention was not documented at all.

18.     An LASD sergeant stated that, contrary to LASD policy, back seat detentions are conducted as a matter of course.

**2.  LASD's Antelope Valley Stations Engage in a Pattern or Practice of Unreasonable Force that Violates the Fourth Amendment to the Constitution.**

19.     LASD deputies in the Antelope Valley engage in a pattern or practice of deploying unreasonable force with respect to the use of unreasonable and/or retaliatory force against handcuffed individuals and the unnecessary use of fist strikes to the head and face of handcuffed individuals, in violation of the Fourth Amendment.

20.     In many instances, the unreasonableness of officer use of force is readily apparent from the officer's own use of force report.

21.     LASD-AV officers use excessive force against individuals who have already been taken into custody, handcuffed, or otherwise restrained and are inside of patrol cars. These uses of force are unjustified based on the diminished threat posed by the restrained suspects, and often inflict significant injuries.

22.     LASD-AV officers in the Antelope Valley use unreasonable force in retaliation for being treated disrespectfully, including using unreasonable force against individuals who are handcuffed or where the threat posed by the individual has passed.

23.     LASD-AV officers strike handcuffed individuals in the head and face without adequate legal justification unnecessarily causing serious bodily harm.

24.     This pattern or practice of excessive force pervades LASD-AV's law enforcement operations. DOJ's review of deputy statements in LASD-AV's 326 use of force reports for the period August 1, 2010 to August 1, 2011, revealed that a number

of the incidents involved force exceeding the limits prescribed by the Fourth Amendment. Examples of unreasonable force are described in Exhibit A, the Department of Justice's June 28, 2013, findings letter.

25.    Further evidence of the pattern or practice exists in other records, including accounts of excessive force contained in civilian complaints, community member interviews, and prior settled and pending civil lawsuits.

### 3. LASD Deputies Stop and Search African-American and Latino Residents in Violation of the Fourteenth Amendment

26.    LASD stops and searches of African Americans and Latinos in the Antelope Valley are based in part on impermissible consideration of race or ethnicity.

27.    Expert regression analyses of stop and search activity in the Antelope Valley indicate unlawful bias in LASD law enforcement activity.  These analyses show that African Americans and, to a lesser extent, Latinos, are more likely to be stopped or searched than whites in the Antelope Valley for reasons that appear due at least in part to race or ethnicity.

28.    With regard to pedestrian stops and searches, regression analysis of LASD data for 2011 shows that the stop rate of minority pedestrians is disproportionately high in the Antelope Valley.  In Palmdale, African-American and Latino pedestrians are stopped at a rate 33% higher than if there were no racial differences, and, in Lancaster, African-American pedestrians are stopped at a rate 38.5% higher than if there were no racial differences.

29.    The aggressive pedestrian stop rate of African Americans cannot be justified by demonstrating that the higher rate of stops resulted in discovery of more contraband.  In fact, regression analysis indicates that, in Lancaster, there is about a 50% lower rate of contraband seizure for African-American pedestrians compared to whites.  As indicated by the low contraband seizure rate for African Americans, LASD deputies in the Antelope Valley are less accurate in assessing  suspicion for searches of African Americans, and the greater frequency of searches of African Americans cannot

be explained by a greater likelihood that they are carrying contraband (such as illicit drugs or weapons).

30.     Regression analysis of LASD data for 2011 shows that, following vehicle stops, the search rate of the persons of African Americans in the Antelope Valley is 10-15 percentage points higher than that of whites, and the disparity in the search rate of Latinos in the Antelope Valley is also statistically significant.  Additionally, across the Antelope Valley, LASD searches the vehicles of African Americans at an 8-14 percentage point higher rate than whites.  The analysis also revealed that, in vehicle stops, Latinos and their vehicles are searched at a statistically significant disparate rate.

31.     The data also show a clear racial disparity for African Americans when stopped for offenses where law enforcement discretion is greatest.  Such charges include offenses such as crossing against a traffic light, jaywalking, failing to yield right of way, or walking on the wrong side of the street.  With regard to highly discretionary pedestrian stops and searches, regression analysis of LASD data for 2011 indicates that that an African-American pedestrian in Lancaster is over 25% more likely than a white pedestrian to be stopped for a discretionary offense.

32.     During the DOJ investigation, one LASD supervisor told representatives from the Civil Rights Division that all African Americans who recently moved to the Antelope Valley were gang members.  The supervisor, like other LASD supervisors, is responsible for reviewing and approving the actions of multiple deputies within his span of control.

**B.**     **LASD Enforcement of the Housing Choice Voucher Program in the Antelope Valley Reflected Bias and Violated the Fair Housing Act and the Fourth Amendment**

**1.  The Housing Choice Voucher Program and the Antelope Valley**

33.     Between 2004 and 2011, LASD devoted extensive resources to policing Antelope Valley participants of the federal Section 8 Housing Choice Voucher Program.

34.    The Section 8 Housing Choice Voucher Program ("voucher program" or "Section 8") is funded by the Department of Housing and Urban Development ("HUD") and administered by local public housing authorities.

35.    In the Antelope Valley, the voucher program is administered by the Los Angeles County Housing authority ("HACoLA" or "housing authority").

36.    The voucher program is intended to offer a choice in housing and to provide an opportunity for low-income citizens to relocate to higher opportunity neighborhoods such as those found in the Antelope Valley.

37.    HACoLA provides housing vouchers to approximately 23,000 low-income families ("voucher holders") throughout Los Angeles County.  In 2010, approximately 18% of voucher holders served by HACoLA resided in Lancaster and Palmdale.

38.    Between 2000 and 2008, the number of African-American Section 8 families in Lancaster tripled from 510 to 1530.  The number of African-American Section 8 families in Palmdale grew from 455 to 825.

39.    By 2010, 71% of Section 8 voucher holders in Lancaster and Palmdale were African American, compared to approximately 40% of Section 8 households throughout HACoLA's jurisdiction.

40.    The increase in African-American voucher-holder households coincided with a substantial shift in the racial demographics of the Antelope Valley.  According to the United States Census, between 1990 and 2010, the proportion of the population that is white decreased substantially in both Lancaster and Palmdale, from nearly 80% in each city to under 50% in each.

41.    Residents and officials in Lancaster and Palmdale were vocal in their opposition to increasing numbers of Section 8 voucher holders in their cities, particularly the increase in the number of African-American voucher holders.

2. **LASD-AV's Enforcement of the Section 8 Voucher Program Discriminates Against African Americans in Violation of the Fair Housing Act**

42.    Beginning in 2004, in response to racially-charged opposition to the growing presence of African-American voucher holders in Lancaster and Palmdale and amid a climate of tolerance for racially derogatory conduct within the LASD, LASD-AV teamed with HACoLA to pursue enforcement of the voucher program and of the administrative requirements of the contract between HACoLA and voucher holders.

43.    LASD-AV's enforcement of Section 8 targeted African-American voucher holders.

44.    LASD-AV deputies joined HACoLA investigators and acted independently to pursue enforcement efforts at voucher program households, including by intimidating, harassing, and facilitating the termination of voucher holders from the program.  LASD departed from ordinary procedures employed elsewhere in the county by:

    a. accompanying HACoLA on a disproportionately large percentage of compliance checks in the Antelope Valley as compared to other areas of Los Angeles County where HACoLA's and LASD's jurisdictions overlap;

    b.  sending deputies, sometimes as many as nine, on HACoLA compliance checks of the homes of voucher holders in the absence of any legitimate justification;

    c. questioning voucher holders about their compliance with the voucher program's rules;

    d. referring voucher holders for criminal prosecution for voucher program violations;

    e. independently using law enforcement tools, such as probation and parole checks and arrest warrants, to obtain information about voucher program violations;

f.  failing to properly issue *Miranda* warnings even when deputies had a
legitimate reason to enter voucher-holder homes; and

g.  providing confidential information about voucher holders to third parties.

45.    LASD deputies improperly comingled their law enforcement functions
with HACoLA's administrative process and participated in HACoLA investigations
without justification.

46.    As a result of these practices, LASD deputies were able to interview
people and conduct searches before the individuals understood their rights, including
that they might be incriminating themselves by participating in the housing contract
compliance check.

47.    LASD-AV deputies' questions often had no purpose other than to
substantiate voucher program violations.  LASD deputies also used information
gathered during these administrative compliance checks to further criminal
investigations based solely on the voucher holders' alleged voucher program
violations.

48.    LASD's role in the enforcement of the voucher program's rules was
motivated, at least in part, by the unsubstantiated perception among some members of
the Antelope Valley community, including public officials, press, residents and
deputies themselves, that African Americans in the voucher program had brought
increased crime to the region.

49.    LASD-AV's enforcement efforts were part of racially biased opposition
to African-American voucher holders moving to and living in Lancaster and Palmdale.

50.    As a result of LASD's role in the enforcement of the voucher program in
Lancaster and Palmdale, voucher holders in the Antelope Valley were subjected to far
more intrusive and intimidating searches of their homes, and in some cases, harsher
administrative or criminal consequences of those searches, than voucher holders
elsewhere in the county.

## C.    LASD's Inadequate Accountability Systems Help Perpetuate Unlawful Policing

51.    While many LASD policies and practices are appropriate, some poor LASD policies and practices, and a failure to adhere to good policy and training, permit and facilitate the unlawful conduct described above.   LASD's accountability systems, for instance, do not sufficiently detect or prevent unlawful conduct in the Antelope Valley, and LASD does not properly consider and resolve complaints from Antelope Valley community members who allege mistreatment by deputies. LASD's early warning system does not adequately identify or effectively respond to Antelope Valley deputies with repeated complaints or other histories indicating a need for intervention to prevent future violations of constitutional rights.

52.    Of the 180 misconduct complaints made by civilians over a one-year period in the Antelope Valley, only one was formally investigated as an administrative investigation.  That case resulted in criminal charges being filed against the involved deputy.  Among the other 179 complaints were several allegations of significant misconduct, including unreasonable force and discriminatory policing.  LASD minimized the seriousness of discrimination complaints by failing to investigate any as a serious complaint that could potentially result in discipline.

53.    Nearly all civilian complaints of misconduct by deputies are resolved at the unit level through "service reviews" rather than as formal administrative investigations.  By official policy, service reviews may not result in formal discipline unless elevated to an administrative investigation.  Only official administrative investigations, which are primarily conducted by LASD's Internal Affairs Bureau (IAB), may result in formal discipline.

54.    LASD's practice of handling complaints of serious misconduct as service reviews allows deputies, even those with histories of serious civilian complaints, to evade investigation and discipline, which fundamentally undermines meaningful accountability.

55.    Supervisors often also fail to investigate the full range of allegations referenced by a civilian in his or her complaint, despite obvious allegations of misconduct.  There are instances, for example, where a complainant specifically alleged that a deputy engaged in racially discriminatory behavior, yet the supervisor's investigation failed to address this allegation.  Allegations of unreasonable force that become apparent during the investigation of a less serious offense also are not always investigated. In one instance, for example, when the reporting party gave a more fulsome explanation of the incident subsequent to the initial complaint, he revealed that the deputy also used force by kicking and pushing him. The supervisor did not categorize the complaint as a force complaint, further investigate the allegation, and request that the investigation be categorized as an administrative investigation since a use of force policy violation could result in discipline.

56.    Despite policies that require mandatory referral of all allegations of racial discrimination to the Internal Affairs Bureau for formal investigation, the Antelope Valley stations tolerate racially derogatory conduct by failing to elevate discrimination complaints so that discipline, if the allegations are founded, can be imposed.

57.    LASD sets an inappropriately high bar even to investigate allegations of discriminatory treatment or racial bias.  Absent an admission or recording, witnessing deputies invariably state that they "did not hear" offensive language, and LASD consistently credits the deputy's version over the civilian's account, notwithstanding objective evidence.

58.    Even where supervisors find that the alleged conduct occurred, they do not sustain the complaint, instead finding only that the employee's behavior "could have been better."

59.    LASD's system for conducting service reviews perpetuates patterns of unlawful community interactions and provides disincentives with regard to LASD's policies prohibiting bias.  This has the effect of diminishing and devaluing allegations of discrimination made by civilians.  When assessed within the totality of the

circumstances, LASD's failure to appropriately handle discriminatory policing complaints provides evidence of an equal protection violation, adding to the statistical evidence of bias. LASD has not yet implemented or corrected systems as necessary to routinely detect, correct, and prevent the above-noted patterns and practices of unconstitutional conduct. The policies, training, and systems necessary to correct these patterns and practices of unconstitutional conduct are set out in the Settlement Agreement attached as Exhibit B. This Settlement Agreement will ensure that the policies, training, and accountability systems needed to correct the identified patterns and practices of unconstitutional conduct are implemented and sustained.

60.    Upon information and belief, and in part because LASD has not yet implemented the measures and systems set out in the attached Settlement Agreement, many of the patterns or practices of unconstitutional conduct in the LASD's Antelope Valley stations continue.

## FIRST CLAIM FOR RELIEF:
## DEFENDANTS' LAW ENFORCEMENT ACTIVITIES VIOLATE SECTION 14141 AND THE FOURTEENTH AMENDMENT

61.    The United States re-alleges and incorporates by reference the allegations set forth above.

62.    The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and equitable relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

63.    Defendants and their agents, including LASD deputies, have intentionally discriminated against African-American and Latino persons in Los Angeles County on the basis of their race, ethnicity, or national origin.

64.    Defendants' discriminatory law enforcement practices and those of their agents constitute a pattern or practice of depriving persons of rights protected by the

1    Equal Protection Clause of the Fourteenth Amendment of the United States

2    Constitution, in violation of 42 U.S.C. § 14141(a).

3        65.    On information and belief, unless Defendants are restrained by this Court,

4    Defendants will continue to engage in the illegal conduct averred herein, or other

5    similar illegal conduct, against African Americans and Latinos in the Antelope Valley.

6                        **SECOND CLAIM FOR RELIEF:**

7    **DEFENDANTS' LAW ENFORCEMENT ACTIVITIES VIOLATE**

8            **SECTION 14141 AND THE FOURTH AMENDMENT**

9        66.    The United States re-alleges and incorporates by reference the allegations

10   set forth above.

11       67.    The United States is authorized under 42 U.S.C. § 14141(b) to seek

12   declaratory and equitable relief to eliminate a pattern or practice of law enforcement

13   officer conduct that deprives persons of rights, privileges, or immunities secured or

14   protected by the Constitution or laws of the United States.

15       68.    Defendants and their agents, including LASD deputies, have unreasonably

16   seized numerous persons in Los Angeles County. These unreasonable seizures include

17   seizures made without probable cause or reasonable suspicion.

18       69.    Defendants and their agents, including LASD deputies, use force that is

19   objectively unreasonable against individuals.

20       70.    The unreasonable seizures made by Defendants and their agents constitute

21   a pattern or practice of conduct by law enforcement officers that deprives persons of

22   their rights under the Fourth Amendments, in violation of 42 U.S.C. § 14141(a).

23       71.    On information and belief, unless Defendants are restrained by this Court,

24   Defendants will continue to engage in the illegal conduct averred herein, or other

25   similar illegal conduct targeted against the people of the Antelope Valley.

26   ///

27   ///

28   ///

-14-

## THIRD CLAIM FOR RELIEF:
## DEFENDANTS' LAW ENFORCMENT ACTIVITIES VIOLATE
## THE FAIR HOUSING ACT

72.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

73.    The houses and apartments of voucher holders are dwellings within the meaning of 42 U.S.C. § 3602(b).

74.    The conduct of Defendants described above constitutes:

a.  A denial of housing or making housing unavailable because of race, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

b.  Discrimination in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b); and

c.  Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 804 of the Fair Housing Act, in violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617.

75.    The conduct of Defendants described above constitutes:

a.  A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, in violation of 42 U.S.C.§ 3614(a); or

b.  A denial to a group of persons of rights granted by the Fair Housing Act, which raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

76.    Persons who may have been victims of the Defendants' discriminatory practices include African-American voucher holders and members of their households in the Antelope Valley. Such persons are aggrieved persons as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of Defendant's conduct.

77.    Defendant's conduct was intentional, willful, or taken with reckless disregard for the rights of others.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court:

78.    Declare that the Defendants have engaged in a pattern or practice of conduct by LASD officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, in violation of § 14141 and the FHA;

79.    Order the Defendants, their officers, agents, and employees to refrain from engaging in any of the predicate acts forming the basis of the pattern or practice of conduct described herein;

80.    Order the Defendants, their officers, agents, and employees to adopt and implement systems that identify, correct, and prevent the unlawful conduct described herein that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States;

81.    Order the Defendants, their officers, agents, and employees to take such action as may be necessary to restore all persons aggrieved by the Defendants' discriminatory housing practices to the position they would have occupied but for such discriminatory conduct;

82.    Award monetary damages, pursuant to 42 U.S.C. § 3614(d)(1)(B), to all persons harmed by the Defendants' discriminatory practices;

83.    Assess a civil penalty against the Defendants to vindicate the public interest, in an amount authorized by 42 U.S.C. § 3614(d)(1)(C); and

84.    Order such other appropriate relief as the interests of justice may require.

///

///

///

///

Respectfully submitted this 28th day of April, 2015.

LORETTA E. LYNCH
Attorney General

_____/s/_____

STEPHANIE YONEKURA                    VANITA GUPTA
Acting United States Attorney         Principal Deputy Assistant Attorney
                                      General
                                      Civil Rights Division

LEON W. WEIDMAN
Assistant United States Attorney      _____/s/_____
Chief, Civil Division                 JUDITH C. PRESTON
                                      Acting Chief, Special Litigation Section

_____/s/_____           _____/s/_____
ROBYN-MARIE LYON MONTELEONE            STEVEN H. ROSENBAUM
Assistant United States Attorney       Chief, Housing and Civil Enforcement
Assistant Division Chief               Section
Civil Rights Unit Chief, Civil Division

                                      _____/s/_____
                                      CHRISTY E. LOPEZ
                                      Deputy Chief, Special Litigation Section

                                      _____/s/_____
                                      R. TAMAR HAGLER
                                      Deputy Chief, Housing and Civil
                                      Enforcement Section

                                      _____/s/_____
                                      CHARLES HART
                                      Trial Attorney, Special Litigation Section

                                      _____/s/_____
                                      NORRINDA BROWN HAYAT
                                      CARRIE PAGNUCCO
                                      KATHRYN LADEWSKI
                                      Trial Attorneys, Housing and Civil
                                      Enforcement Section