RODRIGO A. CASTRO-SILVA, County Counsel
CARRIE CLARKE, Deputy County Counsel
(SBN 150031) • cclarke@*counsel.lacounty.gov*
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 229-3097 · Fax: (213) 626-2105

Attorneys for
The County of Los Angeles and the
Los Angeles County Sheriff's Department

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>THE COUNTY OF LOS ANGELES<br>AND THE LOS ANGELES COUNTY<br>SHERIFF'S DEPARTMENT,<br><br>          Defendants. | CASE NO. 2:15-CV-03174-JFW-FFM<br><br>**SUBMISSION OF MONITORS'<br>TWELFTH SEMI-ANNUAL<br>REPORT** |

On May 1, 2015, the Court approved and entered the parties' Settlement

Agreement ("Agreement") to resolve the United States' claims against the County of

Los Angeles and the Los Angeles County Sheriff's Department pursuant to

42 U.S.C. 14141 (re-codified at 34 U.S.C. § 12601) and the Fair Housing Act, 42

U.S.C. 3601 *et seq*.

Paragraph 171 of the Agreement requires the Monitors to publically issue a

report every six months that details the Parties' progress in implementing the

HOA.103350015.1

SUBMISSION OF MONITORS'
TWELFTH SEMI-ANNUAL
REPORT

2:15-CV-03174

1  Agreement and achieving compliance with the Agreement.  The parties hereby

2  submit the Monitors' twelfth semi-annual report.

3  DATED: July 28, 2021                    Respectfully submitted,

4

5                                          RODRIGO A. CASTRO-SILVA
                                           County Counsel
6

7

8                                          By

9                                               CARRIE CLARKE
                                                Deputy County Counsel
10

11                                         Attorneys for
                                           The County of Los Angeles and the
12                                         Los Angeles County Sheriff's Department

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT

# Antelope Valley Monitoring Team
## 12th Semi-Annual Report



**June 2021**

# CONTENTS

I.      INTRODUCTION..................................................................................................................1

II.     SETTLEMENT AGREEMENT COMPLIANCE ........................................................................4
        A.      Compliance Status Tables .................................................................................6

III.    WORK TO DATE ...............................................................................................................6
        A.      Stops, Seizures, and Searches ..........................................................................7
        B.      Bias-Free Policing ...........................................................................................18
        C.      Enforcement of Section 8 Compliance............................................................27
        D.      Community Engagement .................................................................................30
        E.      Use of Force ....................................................................................................47
        F.      Personnel Complaint Review ..........................................................................55
        G.      Accountability.................................................................................................67

IV.     CONCLUSION .................................................................................................................72
        A.      Acknowledgements.........................................................................................73
        B.      Implications for Compliance ...........................................................................73

## APPENDICES

A.      Applying the Results of Data Analysis to Inform Practice: Probation/Parole Status
B.      Applying the Results of Data Analysis to Inform Practice: Backseat Detention
C.      The Monitoring Team
D       Antelope Valley Monitoring Website
E.      How the Parties and Monitoring Team Work
F.      Monitors' Note on the Settlement Agreement, Constitutional Policing, and
        Organizational Change

## I.     INTRODUCTION

This is the 12th semi-annual report issued by the Antelope Valley Monitors. It describes the observations of the Monitoring Team (MT) on progress of Los Angeles County and the Los Angeles County Sheriff's Department (LASD or the Department) in meeting the requirements of their Settlement Agreement (SA)[1] with the US Department of Justice (DOJ) for the Antelope Valley (AV). This report focuses primarily on work undertaken from January through June 2021, as well as the current status of work begun in previous reporting periods. The report discusses MT observations related to the goals, scope, and nature of the work; issues and obstacles that have arisen during the work; MT findings; and evaluative observations that have been shared with the Department. LASD's progress toward compliance with each section of the SA is delineated, along with steps toward compliance still to be addressed.

In the last several reports to the court, the MT has noted that while significant progress has been reached on many items in the SA, LASD continues to struggle in two key overarching areas. First, the Department has not demonstrated the capacity to collect, analyze, and monitor the appropriate data necessary to meet the requirements of the SA and adequately inform policing practices and identify trends. Second, many, if not most of the failings reported in MT reviews and audits are related not to individual deputy behavior, but to more significant gaps in management and accountability. In short, the Department has not yet institutionalized a culture of data use and accountability where the leadership is expected and has displayed the ability to consistently and thoroughly scrutinize, evaluate, or question the actions of deputies, supervisors, or even management.

During the first several years of monitoring, the Department made significant progress. In the subsequent couple of years, however, the MT observed and documented that the implementation and institutionalization of a new culture of accountability was becoming increasingly stagnant or even backsliding. There are any number of reasons for this that do not necessarily mean that the Department is resistant to the SA-required reforms. There has been repeated turnover in both the Compliance Unit and upper management, which contributed to understandable delays as new leaders on-boarded to the work. For a time, the stations suffered from shortages of deputies and sergeants. Some SA provisions present challenges due to significant expenses that have to be addressed, such as additional staff, increases in costs associated with training, data collection requirements that require upgrades in technology, and so forth. Other SA provisions, such as those that require the use of longitudinal data or implementation of new policing frameworks (community policing and problem-oriented policing strategies), need time and ongoing reinforcement to become new habits. In many ways, the fact that this is taking time is understandable.

---

[1] Settlement Agreement, No. CV 15-03174, United States v. Los Angeles County et al. (D.C. Cal. Apr. 28, 2015).

That said, at some point, delays indicated that resistance or, at least, signs of systemic apathy and de-prioritization of the SA was setting in, as noted in the last year of monitoring reports. This apathy was most apparent in years-long delays in approving important policies and inattention to the findings of stops analyses.

While the Monitors' assessment of compliance remains largely unchanged from the last reporting period to this one, we have observed signs of progress that makes us cautiously optimistic. The Monitors were encouraged by a productive meeting with the Sheriff last year and another with the newly appointed assistant sheriff. We are also encouraged by the ongoing hard work of the North Patrol Division commander and by some concrete steps taken or planned by the Department, some of which are described below.

The Monitors are optimistic that adding experienced leadership should translate into renewed progress with the Antelope Valley Settlement Agreement. Although compliance remains largely the same compared the last reporting period, we have seen indicators of progress. Recently, the Monitors witnessed an improvement in the way Executive Force Review Committees (EFRCs) are conducted. The Department has submitted revisions to the Service Comment Review (SCR) Handbook and other complaint policies that have been pending for some time and is currently engaged with the Monitors and DOJ in discussions about those matters. LASD has also developed a draft of new use-of-force training and submitted this for MT and DOJ review. The Department is considering sections of a training curriculum on principled policing that embraces principles of procedural justice and implicit bias that are required in the community engagement and bias-free policing sections. The Department has verbally indicated they will implement Corrective Action Plans to track its responses to issues identified through audits and other reviews. The Audit and Accountability Bureau (AAB) is producing audits that specifically address SA requirements and has provided increased transparency and collaboration with the MT. Further, the Department has expressed interest in pursuing the goal of having the AAB take over the role of performing the auditing functions that have thus far been handled by the MT. The command staff is leading efforts to embrace the SA requirement for regular use of data to assess disparity and inform policing practice. Both stations have committed to develop crime prevention strategies incorporating what the Department refers to as the SPATIAL model of problem solving. The Department is considering dedicating an analyst to the AV stations to provide timely exploration of stops data and support community policing approaches. Additionally, the Department leadership is exploring an upgrade in software to improve risk management, transparency, accountability, and sorely needed "early warning" capacities. If approved, these upgrades will take time to implement and, in and of themselves, do not constitute a definitive solution, but the Monitors certainly see this and all of these developments as promising steps forward.

In our work with the Department over the past year, we have stressed that it is imperative for LASD to review its strategies, think critically about whether or not the strategies employed are proving effective in moving implementation forward, recognize where barriers remain, and be open to acknowledging where change and new strategies may be required. We realize that it is equally important for the MT to undertake similar reflection and be open to needed

adjustments. To that end, the MT has undertaken some adjustments and refinements in the monitoring activities to place more emphasis on identifying organizational performance and management accountability issues that require attention.

The MT and DOJ have identified and discussed specific cases with LASD staff that are emblematic of ongoing compliance issues. These case reviews were part of MT audits and reviews conducted as per SA Paragraphs 148 and 149 and identified in reviews of the stations' Quarterly Employee Reviews (referred to as Quarterly Reports). As we walked through case examples, the MT and DOJ led discussions of the problems and tied the issues to failures of data utilization and managerial oversight. We had fruitful discussions regarding what went wrong, what should have been done differently, and the impact these types of cases have on the Antelope Valley community and its attitudes toward law enforcement. The goal of these reviews is not simply to report on the MT's assessment of compliance, but to engage the Department in a back-and-forth discussion on how managers scrutinize the information available to them—the investigations stemming from uses of force and complaints, trends data, AAB audits, Quarterly Reports, MT reviews and audits, feedback from the community, community survey, and so forth—to identify problems and respond. The MT intends for these Accountability Reviews to become a regular part of the monitoring activities, with follow-ups to previous meetings, tracking the Department's response to the findings (e.g., through Corrective Action Plans), and the presentation of new cases or issues as they arise. We have also had some turnover on the MT, which we have worked to turn into a positive development, with fresh perspectives and strategies. And finally, at the Department's request, we have engaged the Compliance Unit in discussion of the previously agreed-upon compliance metrics and have indicated an openness to LASD's interests in considering revisions to the compliance metrics in ways that might prove to better support their implementation of the SA and improved service delivery to the community.

As always, the Monitors acknowledge and appreciate the essential work of the Community Advisory Committees (CACs). The Monitors applaud their hard work and that of all the other volunteers committed to improving the Department–community relationship, improving law enforcement practices and achieving better public safety outcomes, all of which are primary goals of the Settlement Agreement.

**The Antelope Valley Settlement Agreement: Summary**

The Antelope Valley Settlement Agreement (SA) was established between the US Department of Justice, Civil Rights Division (DOJ); the Los Angeles County Sheriff's Department (LASD); and the County of Los Angeles and was filed with the US District Court for the Central District of California in April 2015. (DOJ, LASD, and the county together are referred to as the Parties.) The purpose of the SA is to ensure that residents of the Antelope Valley (AV) have police services that are lawful and fully consistent with the Constitution of the United States and contemporary policing practices. The SA specifically identifies, as individual sections, a variety of reforms and objectives to be met by LASD in the AV related to: stops, seizures, and searches; bias-free policing; enforcement of Section 8 compliance; data collection and analysis; community engagement; use of force; personnel complaint review; and accountability. The SA also stipulates that a professional monitor be selected to track and assess LASD's progress in implementing and achieving compliance with the SA, work with the Parties to address obstacles to achieving compliance, and report on the status of implementation to the Parties and the Court. As per SA Paragraph 171, the Monitor submits a semi-annual report (every six months); the first of these was issued in December 2015.

The AV lies in the northeast corner of the County of Los Angeles and includes two cities—Lancaster and Palmdale—and several unincorporated communities spread across hundreds of square miles. LASD provides law enforcement services in the unincorporated areas of the AV as well as via contracts with Palmdale and Lancaster. An LASD station serves each city, with law enforcement activities for the surrounding areas split roughly between the two.

## II.    SETTLEMENT AGREEMENT COMPLIANCE

Much of the SA involves developing or revising policies, procedures, and training; putting into place various processes (such as a plan for ensuring all new AV deputies receive training mandated by the SA); and striving to more effectively engage with community organizations and entities such as the CACs. This work is usually done collaboratively among the Parties and the MT, with documentation of the change (new policy, revised training, etc.) eventually being formally submitted to the MT and DOJ for approval. While this represents a crucial step forward, at this point the Department could only be considered to be in *partial* compliance (or "policy compliance" as the Parties have viewed it). This is because, in most cases, more steps are involved before the Department reaches full **implementation** (SA Paragraph 20, see below) and, thus, achieves the status of being in full compliance. Paragraph 149 states "Compliance with, or implementation of, a material requirement of this Agreement means that LASD has:
(a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice."

Any approved policies related to the SA must be distributed to every deputy according to SA-required procedures and, as necessary, incorporated into training curricula. An approved training curriculum will require documentation that appropriate personnel have received the training. New procedures and processes must be successfully instituted. Most importantly, each of the established improvements must prove effective and practical in the real world. That is, they are then assessed through such MT activities as reviews, audits, interviews, observation, and data analysis to establish whether they are successfully reflected in law enforcement practices and achieve the intended qualitative and quantitative impacts on the AV community.

Changes to policy and practice must also be incorporated into LASD-AV's accountability practices. The reviews, analyses, studies, and audits that the SA requires LASD to conduct must use appropriate methodologies; and, in turn, their findings must be used effectively to inform policies and practices.[2] Finally, this level of performance must be sustained for one year to reach **full and effective compliance** and to satisfy the terms of the SA (Paragraph 205). In some cases, the SA requires ongoing improvement in the delivery of services (SA Paragraph 15).

This process of achieving compliance is laid out in various provisions of the SA, especially through the following paragraphs.

- Paragraph 20. **Implementation** is defined as "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice." What is meant by "consistent and verified performance" is to be laid out in compliance metrics for each provision.

- Paragraph 205. The terms of the SA will have been met when "the County has achieved full and effective compliance with the Agreement and maintained such compliance for no less than one year."

- Paragraph 15. **Full and effective compliance** means "achieving both sustained compliance with all material requirements of this Agreement and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to the Agreement's outcome measures."

Compliance metrics or measures represent the specific quantitative and qualitative criteria by which the MT will assess full compliance with each SA provision. The written metrics, 101 out of 115 of which were finalized in 2019 or 2020, usually mirror the language of the SA, but they also

---

[2] Paragraph 171b gives a summary of the stepwise process toward compliance. Each provision of the SA needs to be "(1) incorporated into policy; (2) the subject of sufficient training for all relevant LASD deputies and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitor to have been fully implemented in practice."

ensure the Parties and MT agree on how the SA language translates into workable and measurable standards for LASD-AV policy and practice and for assessing compliance.[3]

This report addresses SA provisions where the MT considers the Department to be in compliance or to have made substantial progress toward compliance. Also discussed are provisions that require additional work, with emphasis on those that will likely require substantial time and resources for the Department to come into compliance or for the MT to effectively assess levels of compliance. When possible, this report also summarizes the sequence of activities and steps the Department must take to achieve full compliance.

## A.   Compliance Status Tables

In the last semi-annual report, the Monitors added a column in the compliance status tables that includes indicators of progress in the form of diamonds. That addition was done in response to a request from LASD and the County Counsel's office to provide a scale of progress toward SA compliance for each item rather than only providing an indication of compliance based on "Yes," "No," or "Partial." The "diamond" system developed was meant to provide an opportunity to represent the Department's iterative progress and to acknowledge the Department's significant efforts, especially on the provisions that are multifaceted, complex or longitudinal in nature. To some extent that goal was met, but the new system also created some confusion among some readers. The Department, in particular, felt indicating both work done and level of compliance in a single scale was not sufficiently clear or precise. We have decided to discontinue the use of the diamond scale in this report. Tables indicating compliance status for each provision are still included at the end of each section of the report as they have been in recent reports.

The Monitors appreciate the Department's request for the MT to include more precise measures of compliance. We will continue to refine this process with feedback from the Parties during the next reporting period.

## III.   WORK TO DATE

The work by both the Parties and the MT is iterative in nature, so providing information on activities and issues that have arisen in previous reporting periods is often necessary, and this information has been provided in order to give an accurate picture of progress and to provide the "qualitative assessment of LASD's progress in achieving the desired outcomes for each area covered by the Agreement, noting issues of concern or particular achievement," as required by SA Paragraph 171f. The evaluation as to the current state of compliance that has been achieved is sometimes based on audits or reviews that occurred in earlier reporting periods and is

---

[3] The current LASD leadership and County Counsel's office has informed the MT they want to renegotiate the compliance metrics that their predecessors developed with the DOJ and MT and approved; their proposal will be discussed in next reporting period

therefore influenced by data and information collected prior to this reporting period. The results of these reviews are still valid and relevant and often are—or should be—the primary focus of the current work being undertaken by LASD. Those prior reviews and audits that are given emphasis in this report provide an update on how the Department has or has not responded to the findings of those audits and reviews, especially on issues of greatest importance to the SA, such as enhancing the relationship between LASD-AV and "youth and communities of color" (SA Paragraph 88), use-of-force policies and training, management review of complaints, and constitutional stops practices.

### A.      Stops, Seizures, and Searches

The Stops section of the SA describes the way LASD-AV deputies must conduct and document investigative stops, detentions, and searches. Provisions in this section and others also detail many of the ways Department supervisors and managers must document, track, review, and assess these practices and hold all staff accountable to the SA, LASD policy, the law, and the AV community. The introduction to Stops, Seizures, and Searches summarizes the overall goals of this section.

> *LASD agrees to ensure that all investigatory stops, seizures, and searches are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. LASD shall ensure that investigatory stops and searches are part of an effective overall crime prevention strategy, do not contribute to counter-productive divisions between LASD and the community, and are adequately documented for tracking and supervision purposes* (SA p. 7).

The preface to the Data Collection and Analysis section emphasizes the expectations that LASD will regularly use data to identify issues related to biased, unconstitutional, or ineffective policing:

> *To identify shortcomings, assess improvement, and increase community confidence in LASD's law enforcement activity in the Antelope Valley, LASD agrees to enhance its data collection, analysis, and reporting as set out below. LASD will develop and implement a protocol for the collection and regular analysis of data to assess whether there are trends and patterns that indicate bias or practices that otherwise run counter to constitutional and effective policing (SA p. 17).*

Broadly speaking, the SA requires LASD to (1) provide direction in the form of policy to deputies, (2) train deputies on conducting Constitutional stops, (3) collect accurate data on their stops, (4) use this data and other sources of information to identify deputies or practices that have potential for bias or other unintended impacts, and (5) to inform, and track the outcomes of, any necessary corrective action and to inform community policing strategies.

In this reporting period, the Department has continued to provide stops-related training for deputies as required by SA Paragraph 57 and to compile data regarding the stops conducted in the AV as required by SA Paragraph 44. The stations have worked to develop crime prevention strategies that LASD will review and utilize to "ensure that investigatory stops and searches are part of an effective overall crime prevention strategy and do not contribute to counter-productive divisions between LASD and the community" (SA p. 7) and will provide direction in the form of priorities, goals, and consistency. In discussions with the department, the North Patrol Division and station captains have expressed that they have begun to use stops data analyses to review activities, inform practice, and meet SA requirements, but that practice needs to greatly expand. The MT will work with the Department to document the implementation of this process over the next reporting period.

1.   Full-Day and In-Service Training

a.   *Constitutional Policing and Bias-Free Policing Training*

The Constitutional Policing and Bias-Free Policing Trainings were developed to meet SA requirements for stops, seizures, and searches; bias-free policing; and housing provisions. In this reporting period, the Department continued to provide these two full-day trainings despite COVID-19 restrictions. All active LASD deputies assigned to the AV are required to receive both trainings. With most current deputies having already received the training, the Department focuses its effort on ensuring all newly assigned deputies, as well as those assigned to the AV earlier but who have thus far been unavailable or for some other reason not attended.

During this reporting period, each full-day training was offered twice. The MT worked with the Compliance Unit to verify training rosters and found both stations in compliance for the first half of 2021, each with a 99% attendance rate for available deputies assigned to the AV (SA Paragraphs 57 and 70).[4] The MT applauds the Department for successfully delivering these trainings despite COVID-19 restrictions.

Based on an agreement reached between the Parties in October 2020, LASD deputies working out of the AV stations but assigned to other commands, such as Operation Safe Streets (OSS), COPS, Parks, Narcotics, and County Services Bureau, must also attend the full-day Constitutional Policing and Bias-Free Policing Trainings. Thus far, the Department has trained approximately 93% of this group across both stations, which is also a laudable achievement. In the next reporting period, the MT and Parties will determine a reasonable timetable for expecting full (95%) compliance for these non-AV commands. We also acknowledge and appreciate that additional deputies have taken the training who are not required to attend because they are not assigned to the AV or they are not in one of the non-AV units required to attend.

---

[4] Compliance percentages for full-day trainings are calculated by dividing the total number of currently assigned deputies who have been trained by the total number of deputies assigned to the AV and available at the time of the current training.

b.      *Preventing Discriminatory Policing Quarterly Roll Call Training*

While each deputy attends the full-day Constitutional Policing Training and Bias-Free Policing Training just once, that training is then reinforced throughout the year through roll call briefings provided on an ongoing basis. These roll call briefings also address housing-related training requirements. The normal schedule is two sessions presented in each of the first three quarters of the year and one session in the fourth quarter. Each session is offered at multiple times across all shifts to give every station deputy the opportunity to attend. The roll call sessions must be taught by an LASD trainer who attended the approved train-the-trainer course.

As shown in Table 1, the MT's attendance verification of *Preventing Discriminatory Policing Exercise* for 2020 shows Lancaster in compliance for every briefing and Palmdale meeting the 95% compliance metric for four of the seven briefings.[5] Across both stations, between 96% and 99% of available deputies received the briefings, so the Department is in compliance for the delivery of this training (SA Paragraph 71).

The MT acknowledges the extra effort and creativity that were required to hold the roll call briefings—and sometimes to rearrange the regular schedule—through the COVID-19 restrictions. For some roll calls, this meant deputies attended multiple trainings in one day with unusually high numbers of deputies. While the MT certainly hopes such measures will not be required again in the coming period, in choosing among alternatives it is important that LASD managers consider that the purpose of the roll call briefings is to, on a staggered basis, refresh deputies' understanding of the key principles of the constitutional and bias-free policing trainings. Important parts of the delivery of the briefings are that they occur at intervals through the year, are relatively short to encourage retention, and are held in a setting that promotes the deputies' engagement and discussion with the instructor, which by design is the number of deputies usually present during a start-of-shift briefing. Holding more than one training in succession and having large numbers of deputies in attendance may inhibit those objectives.

---

[5] Compliance percentages for roll call trainings are calculated by dividing the total number of currently assigned deputies who have been trained by the total number of deputies assigned to the AV *and* available at the time of the current training.

| Table 21 Preventing Discriminatory Policing 2020 Quarterly Roll Call Briefings | | | |
|---|---|---|---|
| | Lancaster | Palmdale | LASD-AV |
| **Briefing A** | 98% | 95% | 96% |
| **Briefing B** | 98% | 95% | 97% |
| **Briefing C** | 99% | 93% | 97% |
| **Briefing D** | 99% | 93% | 97% |
| **Briefing E** | 99% | 98% | 99% |
| **Briefing F** | 100% | 98% | 99% |
| **Briefing G** | 99% | 92% | 96% |

2.      LASD Use of Stops Data

As discussed in the last semi-annual report and in numerous meetings with the Parties and MT, the SA requires LASD to improve their data collection, analysis, and reporting. Perhaps most importantly, several SA provisions mandate how that collected and analyzed data is used by the Department (see SA Paragraphs 46, 81–86, 120–123, 143). For instance, SA Paragraphs 84 and 85 state:

> *Through this data analysis, LASD will identify any trends or issues that compromise constitutional policing and respond accordingly. Appropriate responses may include reviewing and revising any policies or training that may be leading to problematic trends; and assessing whether any practices should be changed to ensure adherence to constitutional requirements and/or more effective policing.* (Paragraph 84)

> *This analysis will also determine whether there are reporting districts and deputies with potentially problematic trends and respond accordingly. LASD will make efforts to incorporate regular analysis of this data into its routine operational decisions.* (Paragraph 85)

The Department must use data to identify and respond to a number of potential issues, such as questions or concerns regarding the effectiveness of law enforcement strategies and practice; the positive and negative impacts of those practices on the community; potential disparity; the level of community confidence in AV's law enforcement activity; and specific deputies or units who need additional direction regarding proper enforcement tactics and practices. To build on and sustain any corrective action, the impact of any adjustments in policing practice made as a result of these reviews then needs to be tracked through subsequent data analysis. The revision of relevant policies and trainings must also be considered in light of any problematic findings.

(The compliance metrics for SA provisions requiring new or revised policies or training indicate that after implementation, those policies and trainings will be revisited if there are indications they are not achieving the outcomes required by the SA.) These types of reviews are an essential component of effective organizational systems, crime prevention strategies, community policing, and problem-oriented policing tactics, and they are established to assess and evaluate the impact that enforcement activities have not only on community safety but also on how these affect community trust and whether they are consistent with constitutional policing requirements.

The last semi-annual report included extensive discussion of the MT's expectation regarding how station and division managers need to use data to meet SA requirements. That discussion explored the type of data and information that should be collected for review, the type of questions and lines of analysis that should be pursued, the importance of receiving and incorporating community input, and the opportunity for consultation from external subject matter experts. We used the examples of backseat detentions and searches based on probation and parole status (SA Paragraph 46) to demonstrate the activities and thought processes involved (see Appendices A and B).

The MT will systematically assess LASD's efforts to use data and other information to inform practice in the next reporting period. This assessment will consider specific SA requirements and the stations' stated goals and strategies as outlined in their crime prevention strategy and other communications of station objectives. To this point, the Department has not shared any documentation that there has been a thorough internal assessment of law enforcement strategies and practices that addresses the impact on the community or possible disparities. The MT stands ready to review that documentation or participate in discussions to assist LASD in meeting this requirement.

Thus far, the MT has performed the initial data analyses on behalf of the Department. The data analyses provided by the MT were meant to provide useable data to the Department in the interim period before LASD was in a position to dedicate the internal resources to provide timely, actionable data. LASD has indicated that, in the future, LASD data systems specialists will begin reporting statistics on stops in the AV. LASD station commanders should receive such analyses regularly and use them to conduct thoughtful review of their policing strategies and to assess performance by their personnel to ensure this is consistent with the direction they are providing relative to their expectations. We are also happy to provide any technical assistance or consultation needed so that, as the Department begins to do these analyses itself, the requirements of the SA can be met.

Again, the data analyses and tabulations provided by the MT are just the first step; the Department is responsible for reviewing the analyses and any other relevant information, such as the results of other reviews like MT or AAB audits and input from the community, to identify issues and develop any necessary responses or corrective action.

Here we review some of the types of information provided by the MT thus far.

a.    *Stops Data Analyses*

To facilitate the Department's review of its stops data, the MT has presented three main types of analysis. The first we refer to as *trends analysis*. This is a type of data review the stations should do regularly—as often as monthly—to track and adjust as necessary their enforcement activities based on what the data show. In March 2021, the MT made another of its regular requests for six months of stops data for this analysis. The Compliance Unit has informed the MT that the quantity of data requested, which included more clearance codes than in the past, as well as a competing data request from Cal DOJ has led to a delay in meeting our request. We expect to see the data provided early in the next reporting period so that the analysis can be made for the Department and for inclusion in the next semi-annual report.

The second type is *disparity analysis* and is typically reported in the Bias-Free Policing section. The disparity analysis is a semi-annual analysis that centers on statistical modeling to assess "whether law enforcement activity has a disparate impact on any racial or ethnic group" (SA Paragraph 83). The MT produced the first disparity analysis report in September 2020, which found racial disparities at several levels of stops data, including stops, searches, searches based on probation and parole status, and vehicle impoundments; this report can be found at the monitoring website. The Department provided the data for a second such analysis, which the MT is currently processing. The report will be provided in the next reporting period. Again, the key is that the Department then take steps to meet its responsibilities for making use of the findings to review its policing practices and make any appropriate changes (SA Paragraph 84 and others).

The third type is *targeted analyses* of certain issues, such as taking a deeper look at searches based on probation and parole status during stops (SA Paragraph 46) or the use of backseat detentions (SA Paragraphs 47–48). The MT's stops data reports present various points of data, including stops and citations organized in relevant categories such as type of stop, station, or time frame. This may include creating "Top Ten" lists of the deputies responsible for the most stops involving certain characteristics so that station managers can assess the findings and apply corrective action if necessary or, conversely, highlight good policing practices that are consistent with constitutional standards and yielding effective results. Some, like the disparity analyses, also use statistical techniques to better understand the reasons why the results are what they are.

**The Importance of Stops Data**

A key focus of the monitoring activity for this section of the SA is on the various types of data collected by deputies as they conduct their daily operations. They record extensive information chronicling nearly every interaction with the public, including each stop or call for service; each search, detention, citation, or arrest; the dispositions of each call; and in some circumstances, short narratives. They also now record certain community engagement activities. Furthermore, stops and calls for service are by far the most common point of contact for deputies and community members and thus are, in many ways, the lynchpin of the community–Department relationship. It is essential that these data are accurate, thorough, and reliable since they serve as the foundation for most audits, analyses, and reviews conducted by both the MT and LASD.

Data collection for stops requires entering one or more alphabetical or numerical codes associated with the primary actions of the stop. Deputies can consult codebooks for these. The codes determine the other fields that appear on the screen and must be completed. Importantly, supervisors, managers, and auditors typically use these codes to retrieve information about each entry to properly supervise deputies and units, conduct risk management assessment, and monitor activities. For example, a supervisor may want to review all records from the past month for pedestrian stops, which use code 841. Such a request will retrieve only the stops recorded as pedestrian stops. Incorrectly coded stops will not appear in the search. With thousands of stops and other activities recorded in the database, it is of course very important that accurate codes are used to identify each stop type.

When a deputy stops and detains someone, however briefly, the facts and circumstances that led to that stop and detention and any subsequent action must be rigorously documented and later reviewed in an effort to assess the deputy's decision making, the legality of the deputy's actions, and compliance with LASD policy and the terms and conditions of the SA. If any adjustment through supervisorial guidance or retraining is called for, data from future stops are then used to measure the impact of any of these corrective measures. Further, it is critical for LASD to use the aggregate data collected as a means to inform and guide the evolution of their crime prevention strategy, to assess the need for revisions to policies or training, to understand where law enforcement resources should be allocated, and to assess whether disparities exist in enforcement. In short, data, the strategic plan, and other information must be used to inform and drive management decisions in the AV and assist with the formulation and delivery of fair and equitable law enforcement services in the AV.

The Department having the capacity to do these analyses internally on a regular basis is a critical factor for compliance, and the MT is hopeful that this transition can occur soon. In the meantime, the MT will continue to conduct the analysis so that we can assess outcomes and the department will have actionable data to use in their crime prevention plans, managerial reviews, etc.

b.     *LASD AAB Stops Audits*

The Compliance Unit submitted an AAB audit of stops data entitled "Lancaster Detentions of Individuals and Data Collection" (published in May 2021). The MT had discussions with the AAB regarding their previous stops audits and, for the most part, approved of its methodology. Preliminary review of the new audit indicates that AAB's audit used a similar approach as those that came before. As reported in the Complaints section, the MT was also encouraged by discussions with AAB regarding their audits of complaints. After full review and discussion with the AAB regarding methods and the content of the report and its findings, we hope and anticipate that the MT will be able to use the AAB's audits for compliance assessments moving forward, saving the redundancy and resources of parallel MT reviews and audits (SA Paragraphs 140 and 149). It does appear that under the current command staff, significant efforts are underway to make progress in this area. That process will require that the MT approve the workplan before the AAB begins the audit, that all the required variables are addressed, that the reporting is thorough and with sufficient detail, that conclusions are based on the SA and agreed upon compliance metrics, and that both stations are assessed.

3.     <u>Crime Prevention Strategy and Constitutional Stops</u>

While they also have broader implications for effective policing, crime prevention strategies provide other opportunities and means for analyzing data and using that and other information to address issues. In fact, when properly planned and executed, crime prevention strategies can be the centerpiece of those efforts for a station. They bring together nearly all the review and thought processes described above and throughout this report—including the various data analyses (analysis of trends, disparity, and specific practices), input from the community, DDWS reviews, AAB and MT audits, and so forth—that can be used to identify issues, establish goals for operational objectives and system improvements, establish clear and uniform instructions for field deputies, and measure success toward reaching those goals.

The AV station captains, with significant assistance from the Compliance Unit and divisional managers, continue work to formalize their crime prevention strategies. The MT had shared many resources and other forms of technical assistance to support the department's development of these strategies over the past several years and is looking forward to seeing those plans come to fruition.

Direct field and station observations by the MT have been hampered by COVID-19 distancing requirements, but the MT has reviewed some of the plans and documentation for these efforts and has observed several Crime Management Forums (CMFs; see more discussion in the Community Engagement section) where the station captains and the North Patrol Division managers discuss some of the crime issues to which the strategies are being applied. Crime prevention strategies were something the Department was resistant to embrace until recently, and the MT applauds the Department for beginning the process. These strategies are important elements of modern policing and will be essential to meeting many of the SA requirements related to stops, bias-free policing, and community engagement. Like any strategy or overarching policing plan, their success depends on the appropriate implementation by station personnel, the incorporation of other information besides stops data—most importantly community input—and effective managerial oversight. Ensuring those critical factors are addressed in developing the strategy greatly increases the likelihood that the goals can and will be achieved. We look forward to continued collaborative work in this area and to reviewing submitted plans and documentation.

4.      Discussion of Management Accountability Related to Stops

Meeting the terms of the SA requires active supervision of staff and providing clear coordinated direction regarding crime reduction efforts in the AV. This requires ongoing communication regarding crime reduction strategies and priorities to deputies, consistent review of stops data and other information collected, and adjustments when necessary to ensure the fair and consistent enforcement in the AV. While much work needs to be done to reach compliance, there are some hopeful signs that progress is being made.

- The AAB Lancaster audit found that LASD is collecting stops data of increasingly high quality. (There has not been a similar audit conducted recently in Palmdale.).

- In discussions with the MT, LASD command staff increasingly recognize the need to utilize those data to guide law enforcement practice and meet SA requirements for ensuring constitutional and bias-free policing in the AV; they have also verbally indicated that they are using the MT-generated data to stress to personnel the importance of understanding the unintended impacts that stops and other activities can have on the community.

- The Monitors are encouraged that the Department has started working to develop crime prevention plans for the AV. Such strategies provide departments a way to structure and manage the use of data to inform policing practice that integrates all the various analyses, reviews, problem identification, corrective actions, and outcomes tracking.

- North Patrol Division's stated intentions to hire data scientists to serve the stations and to make more use of AAB audits are also encouraging signs. Internal data processing capacity is very important, but the key is for managers to become expert users of those data to evaluate results and inform their policing practices.

The data analysis provided by the MT over the past years has been used only to a limited extent, a small part of what is expected to be a regular and robust incorporation of data into station crime prevention and intervention strategies. The MT continues to urge the Department to expand and formalize this effort to ensure all deputies are receiving clearly articulated and consistent information regarding the Department's expectations.

LASD was able to continue the Constitutional and Bias-Free Policing Trainings in the midst of the COVID-19 crisis. This represents laudable efforts by station management to maintain this important training. As has been reported in previous semi-annual reports, while the AV stations remain in compliance with the delivery of the full-day trainings, there have been instances where individual deputies are working in the AV over extended periods without having received the training. New instances of this occurring came to light in this reporting period. These deputies have justified reasons for being unavailable for the sessions, but the result is they have served in the community for up to 18 months without these essential full-day trainings. The MT understands the need for staffing in emergency situations and that other circumstances can arise, but station managers need to ensure that any deputy who misses an opportunity to attend the trainings is prioritized for the next available session.

We also want to note some other areas related to training that exemplify the sort of practice that benefits from management scrutiny. Due to COVID-19, LASD had to make up several role call briefings. Roll call briefings are intended to deliver reinforcement of principles learned in the day-long, bias-free section with relatively short, scenario-based trainings in small groups to facilitate discussion and retention of information. The roll call trainings are intentionally dispersed throughout the year so that deputies are continually reminded of the course material and the importance that they apply it in their daily practice. During this reporting period, the MT review indicated that under the pressure to make up role call trainings to achieve compliance, LASD conducted multiple scenarios (up to three) during the same roll call session with larger than usual numbers of deputies.[6] There may well have been spirited instruction and robust discussion on each scenario delivered during this roll call; the MT cannot attest one way or the other. Again, the MT considers the Department in compliance on these trainings. However, this is an example of an issue that would benefit from professional scrutiny. If the outcomes that are associated with the bias-free section are not satisfactory to the Department or to the community, managers may need to consider whether expedience should override the delivery of training as designed and intended.

---

[6] While the MT will allow this variation for this reporting period because of the difficulties of training during COVID-19 limitations, we note that deviations from previously approved training structure do require approval for compliance purposes.

Because the Department's training performance has been strong on Constitutional and bias-free training, the MT would like the department to consider incorporating SA Paragraph 166 into its routine practice. Compliance metrics have not yet been established for Paragraph 166, which requires that "all training will include *periodic testing* to ensure that employees are appropriately comprehending, retaining, and applying the knowledge and skills conveyed during the training required by the Agreement. Based on results of testing, LASD will provide additional periodic training as need to deputies, supervisors, and commanders that is sufficient in duration and scope to ensure that all deputies can consistently and effectively carry out LASD's policies." (emphasis added)

5.    Stops Compliance Status

Table 2 provides the current compliance status for each paragraph in the Stops section of the SA. The table does not reflect work done toward reaching compliance with each provision; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not.

| Table 2 | | |
|---|---|---|
| **Stops Compliance Status** | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 41 | Stops and detentions are based on reasonable suspicion. | No |
| 42 | Elements of procedural justice are incorporated into training. | Yes |
| 43 | LASD-AV does not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation as a factor in establishing reasonable suspicion or probable cause, except as part of actual and credible description(s) of a specific suspect or suspects. | Partial |
| 44 | Stops are accurately and thoroughly documented in MDC patrol logs. | Partial |
| 45 | Accurate and specific descriptive language (non-boilerplate) is used in reports. | Partial |
| 46 | Efficacy and impact on the community of searches based on probation and parole are assessed. | Partial |
| 47 | Backseat detentions require reasonable suspicion and reasonable safety concerns. | Partial |
| 48 | Backseat detentions are not conducted as a matter of course. | Partial |
| 49 | Deputies respond to complaints about backseat detentions by calling supervisor. | Partial |

| Table 2 | | |
|---|---|---|
| **Stops Compliance Status** | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 50 | Deputies do not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s). | Partial |
| 51 | Deputies do not conduct arbitrary searches. | Partial |
| 52 | • Deputies equipped with BWC record requests for consent to search<br>• Outreach is conducted about right to refuse or revoke consent.<br>• Individuals with limited English proficiency are informed in appropriate non-English language.<br>• Supervisors are notified before home-based search. | Partial |
| 53 | Reasonable number of deputies are present at a search. | Partial |
| 54 | Section 8 compliance checks require articulated safety concerns. | Yes |
| 55 | During home searches, individualized suspicion or probable cause determines who, besides subject of search, is subject to detention or search and for how long they are detained. | Partial |
| 56 | Probation and parole searches are carried out only when search conditions are established and in accordance with the Stops section. | Partial |
| 57 | Constitutional policing training is provided. | Yes* |
| 58 | Additional accountability and supervision to ensure unlawful stops and searches are detected and addressed. | Partial |
| 59 | Supervisors review CAD logs. | Partial |
| 60 | Supervisors review justification for stops and searches. | Partial |
| 61 | Supervisors and station commanders address all violations and deficiencies in stops and searches. | Partial |
| 62 | Supervisors and station commanders track repeated violations of this SA and corrective action taken. | Partial |
| 63 | AV supervisors and commanders are held accountable for reviewing reports and requiring deputies to articular sufficient rationale for stops and searches under law and LASD policy. | Partial |

*The Department is in compliance on delivery of the approved training; outcomes related to each aspect of the training are measured in other provisions.

## B.     Bias-Free Policing

The preface of the Bias-Free Policing section states "LASD agrees to deliver police services that are equitable, respectful, and bias-free in a manner that promotes broad community engagement and confidence in the department." The other paragraphs further describe expectations and describe some of the pathways to achieving that outcome, many of which are

closely linked to those in the Stops section. A key provision of the section is encapsulated in SA Paragraph 64.

> *In conducting its activities, LASD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies shall not initiate stops or other field contacts because of an individual's actual or perceived immigration status.*

The Department has revised policies and has provided ongoing training to support this objective. However, in other provisions of this section, the Department has struggled to reach compliance, especially with regard to managerial review of data and information to identify and respond to problematic or potentially problematic trends and patterns that may indicate bias or disparate impact. While there has been some progress in this regard, unit and divisional managers still do not make sufficient use of data analyses provided by the MT, and they do not consistently conduct intensive reviews of UOF and complaints investigations or other LASD processes and activities for indicators of potential bias.

1.   <u>Full-Day and In-Service Training</u>

*a.   Bias-Free Policing Training*

As reported in the Stops section, LASD continued to provide the full-day Bias-Free Policing Training for LASD deputies assigned to the AV stations. Palmdale and Lancaster Stations were both found to be in compliance at 99% of AV personnel trained (SA Paragraphs 57 and 70).

Additionally, the Department has provided the full-day trainings to 93% of LASD deputies working in the AV but assigned to other commands, such as OSS, COPS, Parks, Narcotics, and County Services Bureau. The MT applauds this progress. (See the Stops discussion for further discussion.)

*b.   Preventing Discriminatory Policing Quarterly Roll Call Training*

As described in the Stops section above, despite COVID-19 restrictions, the Department managed to offer all the required roll call briefings for 2020. These relatively brief, quarterly trainings are refreshers to the full-day constitutional and bias-free policing trainings. Well over 95% of deputies in Lancaster received all seven briefings. Table 1 shows that more than 95% of Palmdale deputies received four of the briefings and just under 95% received the other three. Across both stations, 96% or more of deputies attended each briefing, making the Department in compliance with delivery of this training (SA Paragraph 71).

2.      LASD-AV Disparity Assessment

Much of the requirements related to bias-free policing concern the collection and analysis of data and other information and, crucially, the thoughtful review of the findings of those analyses to identify and respond to potential problems. To sufficiently understand and respond to the findings of an analysis of an outcome such as a search, managers must also consider the actions and decisions that led up to the search and that followed it. The MT has provided stops trends analyses that the Department has begun to utilize to assess searches based on probation and parole status during stops as required by Paragraph 46. (The data cover a two-year period, July 2018 to June 2020, with a particular emphasis on January to June 2020. See the last semi-annual report at our website.)[7] Among the findings of this analysis was that, during a stop, Black and Latino people were more likely to be asked about probation and parole status, but no more likely to actually be on probation or parole, than White people. Further, among those searched as a condition of their probation or parole status, deputies were less likely to find contraband after searches of Black or Latino people than of White people. Asking the probation and parole question—and conducting searches based on that status—de facto impacts people of color most because they are the most likely to be stopped. So this analysis is an important part of the Department's work toward bias-free policing outcomes.

Unfortunately, the Department has not done other disparity reviews or used the MT stops analysis as a catalyst for taking other intensive, thoughtful looks at its practices. The Department has yet to establish a routine process by which programs and activities are reviewed for potential bias, as required by Paragraph 68, one of several SA provisions requiring the Department to collect and analyze qualitative and quantitative data in various decision-making processes. Paragraph 68 states:

> Within one year of the Effective Date, and annually thereafter, LASD will assess all programs, initiatives, and activities involving the Antelope Valley Stations to determine the extent of any disparate impact and to ensure that no program, initiative, or activity is applied or administered in a manner that unlawfully discriminates against individuals on the basis of race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation.

When any program, initiative, or activity is identified as having evidence of disparate impact on any sector of the community, LASD is required to conduct a further assessment and take corrective action as appropriate. The Compliance Unit has researched whether these assessments were included in annual reviews already conducted at the stations. It was found that they were not. In the absence of other existing options, the MT stressed that crime prevention strategies include the kind of collection and review of data and information entailed by Paragraph 68 so that they would be an efficient way for the Department to meet this requirement. Command reviews and other existing processes and structures do not need to be separate from crime prevention strategies; in fact, they can be part of the same overarching approach.

---

[7] All MT reports and audits can be found at our website: http://www.antelopevalleysettlementmonitoring.info/

While more work needs to be done to reach compliance, LASD has acknowledged that the stops disparity analysis showed disparity regarding certain aspects of its discretionary stops and, as discussed earlier, is beginning the process of addressing those issues in conversations with the MT and, with regard to searches based on probation and parole, in briefings at the stations regarding how often deputies ask individuals about their probation or parole status during stops and the potential negative impacts of asking the question and conducting searches on that basis. Also, the data analyses that the MT has been conducting—and the Department is discussing steps to do itself—as outlined in SA Paragraphs 81–86 require the Department to review the results, identify any issues, and document and report on its response. The MT will work with the Department in the next reporting period to address these provisions and document the Department's efforts at implementation.

In our assessment, the Department continues to be challenged in both data analysis and in utilizing data in strategic decision making. There is a growing pool of information that the managers have to work with, including the following.

- The MT has produced two years of stops trends analysis and is currently awaiting data from the Department for another six months. All told this will cover all vehicle, pedestrian, and bicycle stops from July 2018 to December 2020.

- The MT is currently performing a second disparities analysis using data provided by the Department. The results of the MT's first disparity analysis were summarized in the last semi-annual report, and the analysis is available on the AV monitoring website.[8]

- The MT is performing statistical analyses of departmental data provided by the Compliance Unit with the goal of identifying any concerning patterns, including disparities, in stops, UOF, and complaints. This analysis will be available for the Department in the next reporting period.

- The MT has produced two audits of complaints noting areas related to potential bias.

- The first quarter on-site Accountability Review and periodic follow-ups to be done by the MT to track any corrective action taken by the Department is another source of information for managers (with the assumption being that eventually LASD managers will do these type of deep dives regularly on their own).

- AAB has recently released an audit of stops in Lancaster and is starting a new complaints audit.

- A third annual Community Survey will be available in the next reporting period.

---

[8] The report title is *An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley*. It is available at http://www.antelopevalleysettlementmonitoring.info

With these various reports, we hope to work with the Department to establish next steps for developing its capacity to produce its own data reports as well as conducting deeper inquiry into the findings and for ways they may inform policing practice in the AV.

**Appendices A and B** at the end of this report provide detailed examples of how the Department can approach the intensive review of individual activities or issues. The examples provided address the probation/parole question and backseat detentions. They provide practical descriptions of using data to inform policing practice, an SA requirement that the Department has not yet sufficiently demonstrated.

External content experts are another source of information that can be incorporated into the Department's assessment of its programs and activities. Understandably, since the COVID-19 restrictions were instituted, the Department has not consulted outside experts to consider the influences of implicit bias and stereotype threat into account in department policy, trainings, or practice (SA Paragraph 64). In this reporting period, the Compliance Unit has informed the MT that they are exploring alternatives to the Museum of Tolerance as an outside consultant regarding bias-free policing and training (Paragraph 65). CAC members have also discussed with AV station personnel that the Department should consider expanding or changing their external consultants, preferably to include groups local to the AV and more representative of the community. The compliance metric for Paragraph 65 does not require outside consultation be through the Museum of Tolerance. The MT supports the effort to seek appropriate alternatives and encourages the department to continue to engage other resources and experts, including AV community members, on such topics as trainings, the crime prevention strategy, and particular initiatives such as the Zone Deputy program discussed in Community Engagement.

3.     <u>Crime Prevention Strategies and Stops Disparities</u>

As reported in the 10th Semi-Annual Report and discussed above in the Stops section, the MT conducted an extensive data analysis that identified several areas of racial disparity in stops. One way the Department plans to look more deeply into those disparities is by assessing disparities against the crime prevention strategies they are developing. The successful implementation of crime prevention strategies will advance the Department's efforts to achieve compliance with the Bias-Free Policing provisions in the SA.

As described in the Stops section, a crucial part of any crime prevention strategy is the use of stops data to identify and develop responses to crime issues and to track the impact of those responses. Stops analysis focused on disparities is of particular importance, that is, seeking to identify and explore any disparities in discretionary stops, being asked about parole/probation status, searches, backseat detentions, and arrests. The results of data analysis must then be put in the context of other information that provides a deeper understanding of what led to any disparities found, what their impact is on AV community members and the Department–community relationship, the efficacy of the related law enforcement activity, and how the disparities can be addressed.

**Crime Prevention Strategies**

Crime prevention strategies encourage an organized and consistent approach to crime intervention and prevention based on manager-driven priorities and tactics, effective and efficient allocation of resources, and accountability. They also provide a framework for gathering and incorporating community input so that community members are co-producers of public safety. No matter the knowledge, expertise, and instincts that LASD staff bring to bear on enforcement decisions, it is extremely difficult to maintain a cohesive, consistent, transparent, and accountable approach to crime reduction in a large and diverse area like the AV without a formalized crime prevention strategy or some other overarching structure in place. Although there are a variety of approaches to crime prevention strategies, at a minimum, effective strategic plans include common elements such as goals, objectives, directed activities, data collection and analysis, and designation of staff assignments and timelines for completing specific tasks. They also incorporate community perceptions and input regarding enforcement priorities and crime prevention activities. AV community members' input can be gathered through numerous avenues, including the CACs, the annual community survey, community engagement events, one-on-one engagement with community members (recorded as statistical [stat] code 755 in the AV) and designated meetings held to discuss specific issues or areas. The implementation of the plan requires the support of divisional managers but is directed and conducted at the station level.

Management must actively assess where bias may be present in station-directed enforcement efforts in the AV. Crime prevention strategies provide overarching structure and uniform methodologies to guide these assessments. They involve many of the reviews already underway, such as Deputy Daily Worksheet (DDWS) reviews, reviews of reports, and supervisory observations of deputies in the field, and the Department's recent efforts to review its searches conducted on the basis of probation and parole status. Additionally, management must supplement their efforts with the use of stops and enforcement information. This also involves more than analyzing the individual actions of deputies; it includes an analysis of the impact of larger enforcement efforts in the AV, including potential disparities. For example, the overreliance on vehicle stops in an area to address criminal behavior could have a disparate impact on a specific community. It is incumbent on LASD to make use of the data to identify disparities and address the findings. In some circumstances, there may be a reason for a disparity, but LASD must be able to clearly explain the reasons for the disparity and efforts to ensure their decision making and/or enforcement direction is free of bias or disparate impacts. Compliance with the SA requires clear evidence that LASD management both holds deputies accountable when engaging in bias-based practices and addresses LASD enforcement strategies and tactics that result in bias or disparate impacts in the community.

4.    Discussion of Management Accountability for Bias-Free Policing

Statistical reviews, audits, and input from the community in recent years show that there *are* indications of disparate impact and potential bias that warrant scrutiny.

- Community Surveys reports published in 2018 and 2020 showed that many community members feel certain groups are treated differently than others, and the attitude toward LASD is largely negative among certain community groups.

- The MT has noted increased tensions between LASD in AV and communities of color. The perception among Black and Latino people that they feel targeted is, if anything, growing based on comments at recent community meetings.

- While Black residents account for 14 percent of the AV population, half of the complainants in the most recent audit were Black. Notably, the time period used in the most recent complaint audit was *prior* to the nationwide protests in 2020.

- The MT complaints audits as well as the Accountability Review of complaint and UOF cases discussed later in this report identified several concerning patterns, including (1) allegations of racial bias not identified and investigated, (2) variation in the ways racial profiling complaints are investigated (and the lack of a policy providing guidance to investigators on such cases), and (3) cases where there was indication that bias may have played a role in the investigation. Each of these findings independently may not be cause for alarm, but taken as a whole, they merit deeper managerial inquiry.[9]

These are concerning trends that represent an opportunity for management to examine this issue closely and question whether there is something embedded in the associated policies, training or crime prevention and intervention strategies, or that might be found in patterns of deputy conduct that would account for this disparity. This is what the MT means when it says that managers need to view stops and calls for service not just as responses to crime but as ongoing and extensive opportunities and examples of community engagement; they are a primary avenue by which the Department and community members interact with one another and thus a primary mover of the quality of that relationship. This does not mean, of course, that AV deputies should stop conducting traffic stops or upholding the law. It means that the efficacy of those activities and the manner in which they are carried out should be constantly and thoughtfully scrutinized. It is also the case that data analyses cannot consider every relevant statistic that may reduce or "explain" findings of disparity. However, this is not reason to discount those findings; quite the opposite. It is reason to (1) look for other supporting or refuting quantitative *and* qualitative evidence to provide context for the findings and (2) review the associated activities and circumstances that may contribute to the findings to see what can be done. And this process must be considered within the reality that a community's trust in its

---

[9] All of the MT's audit reports can be found at http://www.antelopevalleysettlementmonitoring.info

local law enforcement is not only driven by such factors as rates of crime or the legality of police conduct but is also deeply influenced by *perceptions* of fairness and respect.

As we stressed at the first quarter onsite meetings, how Department managers respond to these trends and to the various data and information they have at their immediate disposal is crucial. And at this point, we feel the Department response has had shortcomings. In the MT's assessment, sufficient data have been available to begin this process and show greater progress in their efforts toward achieving compliance, but we do not see supporting evidence of it being done. We have seen some very limited data tabulations produced by the Department, but no indication of reviews performed or subsequent actions taken in response to disparity data with regard to SA Paragraph 68. We look forward to LASD providing documentation of this as it occurs and to observe discussions regarding findings and actions taken during CMF meetings and other forums. LASD command staff should clearly communicate to supervisors that it is expected that they routinely evaluate the available stops data and other information such as community input in light of their crime prevention strategies and community engagement activities. Additionally, in the cases previously described, neither the investigators nor the managers reviewing the investigation report raised red flags about potential bias that was fairly evident to MT and DOJ reviewers Additionally, investigations have not typically included a review of the employee's work history, which is necessary to examine in order to recognize possible similarities and patterns in cases over time. If such concerns are not raised, let alone documented, then no link can be made to similar concerns raised in other cases, and therefore patterns of issues or potential issues are not identified. (These issues are also discussed in the complaints and accountability sections.)

The ramifications of Department investigators and managers not appropriately identifying and tracking potential bias issues are multifold. In just one example, as a response to SA Paragraph 67, which requires that bias-free policing be valued in performance assessments, AV deputies' annual performance evaluations now include reference to the deputy's capacity to practice bias-free policing. However, if indicators of bias are not adequately captured or analyzed, then supervisors conducting performance evaluations will not have a thorough understanding of a deputy's history on which to base the assessment. Assessing and tracking potential bias will go a long way to show the efforts of LASD to assess potential disparities in policing programs and activities as per Paragraph 68.

The third community survey has not yet been analyzed, so we do not know whether there has been an improvement in the perceptions of the department among Black residents since the second survey. However, as will be discussed in the Community Engagement section, we do know that the Department's outreach efforts are not producing engagement with people of color at the same rate of success as with White people. This is evidenced by the fact that the survey used much the same pathways for reaching out to the community as the Department uses for all of its outreach efforts. Yet a disproportionate percentage of survey respondents were White. Making contact with the population is to some extent a practical matter. But the SA states the Department agreed not to just contact but to "strengthen partnerships within the community" and "increase community confidence in the Department" (Preface Community

Engagement section, SA p. 20), especially with "particular groups within the community, including, but not limited to, youth, and communities of color" (SA Paragraph 88). These are outcomes that the Department needs to continue to work to improve--through community engagement activities, through improvements in the handling of public complaints, and through appropriate modifications to policing practice based on the reviews described in this section. Reaching compliance in the housing-related provisions was a great step forward in these efforts, as was the implementation of the full-day and roll call constitutional and bias-free policing trainings. Improving the Department's ability to record and track stops data was also a good step forward that the Department took early on. But the indications are that more work needs to be done.

The Department's outreach efforts do not have the same success among all corners of the AV community. This is an opportunity for Department staff to engage in a critical examination of their outreach methods and to work with the CACs, other community members, and experts to think creatively and try new strategies. The in-person efforts that were successful in recruiting Black and Latino community members for the second survey may provide some ideas for those new strategies.

Finally, the SA specifies tasks and requirements to ensure Bias-Free Policing in the AV and, importantly, requires members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. This requirement for equal protection under the law applies across all practices and activities conducted by LASD in the AV. The MT will be closely tracking the Department's implementation of crime prevention strategies as they can be the answer to the need for an overarching plan to direct the enforcement activities of the LASD in the AV. This will go a long way to ensure clear direction is provided to LASD personnel and will provide a structure for LASD to systematically assess their efforts to ensure Bias-Free Policing for all of those who live and work in the AV.

5.   Bias-Free Policing Compliance Status

Table 3 provides the current compliance status for each paragraph in the Bias-Free Policing section of the SA. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not. Sustained compliance indicates the Department has been in compliance for a year or more.

| | Table 3 | |
|---|---|---|
| | **Bias-Free Policing Compliance Status** | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 64 | Members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies do not initiate stops or other field contacts because of an individual's actual or perceived immigration status. | Partial |
| 65 | Museum of Tolerance and other experts are consulted on prohibited conduct, bias-free policing, implicit bias, and stereotype threat. | Partial |
| 66 | Effective communication and access to police services is provided to all AV members, including those with limited English proficiency (LEP). | Partial |
| 67 | Bias-free policing and equal protection requirements are incorporated into personnel performance evaluation process. | Partial |
| 68 | All LASD-AV programs, initiatives, and activities are analyzed annually for disparities. | No |
| 70 | Bias-free policing training is provided. | Yes* |
| 71 | Quarterly roll call training on preventing discriminatory policing is provided. | Yes* |

*The Department is in compliance on development and delivery of the approved trainings; outcomes related to each aspect of the training are measured in other provisions.

## C.     Enforcement of Section 8 Compliance

DOJ's finding in their 2013 investigation that LASD-AV deputies—together with the Housing Authority of the County of Los Angeles and some residents and city officials—engaged in a pattern and practice of housing discrimination against primarily Black Section 8 voucher holders in Lancaster and Palmdale was pivotal to DOJ's initiation of the SA. The Monitors' 11th Semi-Annual Report found LASD in sustained compliance with all housing-related SA provisions. As described in this section, the MT's assessments during this reporting period found that LASD has maintained sustained compliance with all SA housing provisions (Paragraphs 73–80).

1.     <u>Monitoring of Housing Policy Receipts</u>

While all current deputies assigned to the AV have already received and read the housing policies (SA Paragraph 74), Paragraph 75 requires that any deputies newly assigned to LASD-AV will be provided a copy of the Housing Non-Discrimination (HND) policy forms and secure a signed acknowledgment that each deputy has read and understood the policy.

For the fourth quarter 2020 there were no newly assigned deputies to either Lancaster or Palmdale stations, and therefore, both stations remain in sustained compliance with the HND and Accompaniment policies Acknowledgment Forms requirements.

For the first quarter 2021, the MT received the Compliance Unit's housing policy receipt materials on June 24, 2021. The MT has reviewed the materials and has verified the Compliance Unit's assessment. There was one new deputy assigned to Lancaster and two new deputies assigned to Palmdale. All three of them signed the required housing policy receipts within 15 days of their assignment and, therefore, both stations are in 100% compliance with Paragraph 75 for that quarter as well.

2.    Monitoring of Housing Policy Receipts Moving Forward

While in previous years the MT has performed the analysis needed to verify housing policy receipts—comparing station rosters and policy receipt documentation received from the Compliance Unit to determine what percentage of available deputies completed the acknowledgment forms—the MT has requested the Department take over that task. The purpose of this request was twofold. First and most important, it is incumbent on the Department to establish the internal processes and related staffing needed to fulfil the SA requirements and to ensure SA reforms are carried forward following the close of the Settlement Agreement. Second, it is more cost and time effective for the Compliance Unit or stations to complete this work themselves and for the MT to simply verify the Department's findings. As reported in the last semi-annual report, the MT made this expectation clear to the Department.

3.    Monitoring of Sustained Compliance

In the next reporting period, the MT will discuss the nature and extent of future Section 8 accompaniment–related monitoring activities with the Parties. For the time being, the MT continues to attend to housing provisions in sustained compliance via ongoing monitoring actions related to other sections of the SA, including audits, community engagement activities, stops data reviews, complaints, and accountability compliance reviews. In practice, this means that, when feasible, the MT incorporates housing-related objectives into reviews for other SA sections. This is done in lieu of conducting reviews specifically designed for housing-related monitoring as it is a suitable and efficient means of assessing ongoing compliance. This process was described in detail in the Monitors' 10th Semi-Annual Report. Continued dissemination of the HND and Accompaniment policies to new deputies, continued training on the housing provisions and the federal Fair Housing Act (FHA), reporting of any housing-related community contacts, and adherence to the FHA and SA housing provisions are each tracked by the MT in this process. No housing-related issues have arisen through this process thus far; thus, the MT finds the Department has maintained sustained compliance.

In the future, any housing-related issues that may arise will be flagged during MT reviews of a wide array of sources, including LASD's own audits, reports, reviews, assessments, and meetings; reviews and observation of CAC reports and meetings; review of documentation and observation of LASD community engagement activities; and other sources from broader Los Angeles County, such as the Office of the Inspector General, the Civilian Oversight Commission, and news media. All this information is tracked, and any indication of incidents or activities that may not appear to comply with SA requirements will be explored further by the MT, beginning with the validation of the facts and circumstances of the situation. If the MT believes further attention is warranted after this initial review, the MT will conduct a more formal investigation to include any necessary document and data requests and interviews. Particular attention will be given to whether LASD accountability processes identified and responded to the issue. Findings will be discussed with the Parties, and next steps will be determined. These could include a range of responses, including no change in compliance status, additional scrutiny applied from an accountability perspective, or a return to more intensive housing monitoring.

4.  Housing Compliance Status

Table 4 shows the Department is in sustained compliance with all SA housing Paragraphs 73–80 as well as Paragraph 164 as it relates to housing. Sustained compliance indicates the Department has been in compliance for a year or more.

| Table 4 | | | |
|---------|---|---|---|
| **Housing Compliance Status** | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | **Sustained Compliance** |
| 73 | New HND policy is implemented. | Yes | Yes |
| 74 | All current deputies acknowledge receipt and understanding of HND policy. | Yes | Yes |
| 75 | All newly assigned deputies acknowledge receipt and understanding of HND policy within 15 days. | Yes | Yes |
| 76 | Policies regarding the review of requests from a housing authority for deputy accompaniment are revised. | Yes | Yes |
| 77* | Accompaniment policy regarding LASD housing investigations is implemented. | Yes | Yes |
| 78 | Deputies document all voucher holder compliance checks using stat code 787. | Yes | Yes |
| 79 | Deputies document each independent investigation for fraud based on voucher holder compliance with the voucher holder contract using stat code 787. | Yes | Yes |
| 80 | Deputies document housing-related activity using stat code 787 and do not inquire into an individual's Section 8 status. | Yes | Yes |

*The Department is also in sustained compliance concerning distributing the revised Accompaniment policy to LASD-AV personnel as per Paragraph 164.

**D.     Community Engagement**

The preface to the Community Engagement section of the SA state that LASD agreed:

- *To promote and strengthen partnerships within the community,*

- *To engage constructively with the community to ensure collaborative problem-solving and bias-free policing, and*

- *To increase community confidence in the Department.* (SA p. 20)

The SA also requires the Department's community engagement activities to "take into account the need to enhance relationships with particular groups within the community, including, but not limited to, youth, and communities of color" (SA Paragraph 88).

The term "community engagement" primarily refers to the Department's efforts to engage the community in meaningful ways *and* as a co-producer of public safety, thus building and maintaining trust and confidence in the Department among all community members, per the goals of the SA. The MT's role in the community-engagement process is to assess LASD's efforts to interact with and improve its relations and the nature of engagement with all segments of the AV community. The MT may also provide advice and technical assistance to the Department, the CACs, or community groups, as appropriate and requested.

During this reporting period, the Department has done an admirable job in maintaining the engagement of deputies with the community through available events and the tracking of 755 activities despite COVID-19 restrictions. The Community Survey is also close to completion. However, as described in detail below, the MT remains concerned with the Department's ability to productively engage with the entire AV community, especially communities of color, and an inability or hesitation to adopt and routinely integrate community-oriented policing and problem solving in regular practice. While the Department continues to put effort into reaching compliance with the training initiatives specified in SA Paragraph 89, AV station managers, supervisors and deputies are not receiving crucial community-oriented policing and problem-solving policing training. It has been noted that sentiments from some community members, as expressed in community meetings and other forums, were dominated by concerns about a lack of progress toward the SA requirements and dissatisfaction by some over these aspects of LASD's policing practices in the AV.

1.      Community Engagement Training

SA Paragraph 89 states that "LASD agrees to provide structured annual in-service training on community policing and problem-oriented policing methods and skills for all AV deputies, including station supervisors and unit commanders" and provides several elements that the training must include.

Over the past year, in response to SA Paragraph 89e (problem-oriented policing tactics), the Department began providing the Virginia Community Policing Institute (VCPI) training, a two-hour online informational training meant to ensure all AV personnel are familiar with the principles of community-oriented policing (COP) and problem-solving policing. Available personnel assigned to the AV stations are required to take the training once. The MT's preliminary review of the training verification material provided by the Compliance Unit indicates that currently, 94% of available personnel in Lancaster and 98% of available personnel in Palmdale have done so. (It should be noted a number of those personnel mistakenly took a different policing training—when those have completed the approved course, the percentages for Lancaster will approach 98% and for Palmdale 100%.)

As with the full-day constitutional and bias-free policing trainings, some of those deputies working in the AV but assigned to other commands, including OSS, COPS, Parks, Narcotics, and County Services Bureau, must also attend the online training. Currently, 92% of these non-AV command personnel have done so. Further, the MT acknowledges that many non-AV command personnel who are not required to take the course have nevertheless done so.

During this reporting period, LASD submitted a training entitled "Principled Policing: Procedural Justice & Implicit Bias" for consideration to meet the requirements of SA Paragraph 89. The MT is impressed by this Principled Policing curriculum and would like to see it implemented in the AV in part or full. However, as noted below, there are topics required by Paragraph 89 that are either not covered or are insufficiently covered, as indicated below.

(a) *Methods and strategies to improve public safety and crime prevention through community engagement.* This is partially but insufficiently covered by the Principled Policing curriculum.

(b) *Scenario-based training that promotes the development of new partnerships between the police and community targeting problem solving and prevention.* The Principled Policing training did not include any scenario-based training that covered partnerships between police and community targeting problem solving and prevention. Supplemental materials should be developed.

(c) *Leadership, ethics, and interpersonal skills.* This is covered by the proposed training in the Procedural Justice and CA Law Enforcement Code of Ethics portions. However, the curriculum is insufficient on interpersonal skills development.

(d)  *Community engagement techniques, including how to establish formal partnerships and actively engage community organizations, including youth, immigrant, and LGBT communities.* This is not covered in the Principled Policing curriculum. There is no material related to establishing formal partnerships with community organizations.

(e)  *Problem-oriented policing tactics.* This topic is not covered by the Principled Policing curriculum, although the principles are addressed in the aforementioned VCPI training

(f)  *Conflict resolution and verbal de-escalation of conflict.* This topic is not covered by the Principled Policing curriculum

(g)  *Cultural awareness and sensitivity training;* This topic is partially covered.

While this training is insufficient for compliance, the MT does believe that there is excellent material in this training. If supplemented by additional training materials, the MT believes this could be a very successful training. LASD might also have other trainings that are in development that could address some of these gaps. In June, the MT encouraged LASD to review the materials and indicate if they believed they had any Departmental trainings that could address the remaining topics.

2.    Review of LASD-AV Deputy Community Engagement Activities

Paragraph 88 of the SA requires deputies and all sworn staff in the AV stations to regularly and actively attend community events and meetings. In compliance with this provision of the SA, AV deputies are required to attend community meetings and/or conduct a certain number of "755s"— self-initiated, positive engagement activities with members of the community. LASD submitted an internal tracker that documents each deputy's attendance at meetings and events, including some virtual events, as well as 755s for the calendar year 2020. The compliance percentages will be confirmed and reported in the next reporting period. As a part of that assessment, the MT conducted a validation of the information provided by the Department to ensure the MT agreed with the Department regarding which 755s qualified to be counted toward compliance. The MT requested the detailed documentation of deputy community engagement activity for 10 deputies, selected at random, from each station and reviewed the documentation. The documentation on all 20 deputies appeared to substantiate compliance. In the next reporting period, in order to further ensure the quality of the engagement occurring meets the intentions of this section, the MT will attend meetings with deputies as well as conduct ride-alongs to observe 755s. This was for the most part not possible in this reporting period due to COVID-19 restrictions. As it has in the past, the MT will then confer with the Compliance Unit and station personnel so that expectations regarding meaningful and productive community engagement are clear. LASD's ability to self-assess in this regard will continue to be critical to ensuring full compliance and sustainability.

3.    Annual Community Engagement Report

SA Paragraph 91 requires that LASD assess the impact of its community engagement initiatives and issue a public report on station–community engagement efforts which identifies successes, obstacles, impacts, and recommendations for future improvement. The 2019 report, as was the case with the previous report, did not include an adequate assessment of successes, obstacles, and recommendations for future improvements. The Department is out of compliance on this paragraph.

LASD requested MT input on developing the 2020 Community Engagement Report. The MT provided a suggested outline and description of how the report should be completed. The 2020 Community Engagement report was submitted July 1 and is currently under review.

4.    Crime Management Forums

Paragraph 90 of the SA states: "LASD agrees to ensure that monthly Crime Management Forum meetings with the Assistant Sheriff or his designee and semi-annual Risk Management Forum (RMF) meetings include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them. LASD agrees to use techniques such as spatial mapping and scientific deployment analysis to enable the Risk Management Forum to better support and measure community and problem-solving policing efforts." Over the past two years, the MT has provided the Department very detailed input and recommendations through a series of memos, reports, and discussions on this subject. In the last semi-annual report, the MT provided a detailed discussion, including theoretical scenarios depicting how crime prevention strategies and problem-oriented policing tactics could be incorporated into these meetings.

The MT attends the monthly North Patrol Division Crime Management Forums throughout the year and has recently noted signs of progress in the Department's interest in applying problem-oriented policing principles as a component of their crime prevention and community policing strategies. In particular, over the course of recent CMF meetings, the North Patrol Division Chief has been emphasizing an expectation that the station commanders better engage with the public, and especially the CACs, to incorporate more information about community priorities into the station's presentations about their efforts to address specific crime trends and patterns, as well as other community concerns.

The stations are starting to recognize the benefits of undertaking more refined problem-solving efforts and a willingness to apply problem-oriented policing (POP) principles that have proven to be so effective across the country. POP strategies and projects often utilize multifaceted efforts that do not exclusively rely on traditional enforcement tactics. The concept aligns with and supports the community policing philosophy because it emphasizes the need for and value of working closely with community members so that the community is engaged in meaningful ways as co-producers of public safety.

Some recent examples of progress being made in this area include the following.

- Efforts to address recurring crime and quality-of-life issues in and around a nuisance motel in Lancaster by researching and applying POP tactics and information gleaned from staff having engaged with the VCPI training.

- A similar focus in Palmdale on working with management at hotels and motels that have experienced ongoing problems with certain unhoused individuals in and around those properties.

- Concentrating on the significant increase that has been experienced in both catalytic converter thefts and auto thefts, with an effort being undertaken to identify actions that can complement the Department's traditional criminal investigation measures (such as undertaking efforts to reach out to educate the community and simultaneously engage private sector resources to help reduce victimization, while also striving to utilize measures that can improve the ability to recover stolen property).

- Recognizing that the increased incidences of water thefts in the AV were not likely going to be successfully addressed or remedied if the primary tactic used was based on conducting investigations that occur after these incidents occur in the sparsely populated areas of the AV. Instead, the Department has engaged other resources (California Highway Patrol and Fish and Game personnel) as partners, while also encouraging landowners in these remote areas to adopt crime prevention and target hardening measures to reduce the opportunity for becoming victims.

- At the April CMF meeting, the acknowledgment by the Lancaster station commander that greater attention should be placed on problem solving as an effective strategy rather than simply continuing efforts to increase arrests.

The MT is pleased to note the progress shown in this area and wants to acknowledge the leadership being exercised as that is essential and a key to the Department's ability to achieve the long-term success envisioned and expected in the SA.

However, two other very important elements associated with the Department's problem-solving efforts do require more attention, and the MT hopes to see them addressed in the coming months. While there has been a noticeable improvement in efforts being made to recognize crime trends or patterns that are having an impact on the community, there is also a need (1) to improve on the analysis of those problems (contributing factors and data to help inform the discussion) and (2) to conduct ongoing assessments of the outcomes experienced. The lack of consistent attention to those areas is what typically results in short-term crime displacement rather than achieving long-term crime reduction and overall community satisfaction. We have observed a lack of analysis and exploration of the potential contributing factors surrounding

some of the issues discussed in the CMF meetings as well as a failure to monitor and revisit matters that either warranted subsequent discussion or were identified as being issues that would be revisited in subsequent meetings. Examples include the following.

- The lack of follow-up discussion concerning the outcomes of LASD efforts regarding the problem motels discussed above.

- Palmdale's assertion that 25–30% of domestic violence arrests are not leading to prosecutions based on a belief that the DA cannot get a conviction. No basis was provided to support this observation, and during the February CMF meeting the Palmdale Captain said more research would be done on this. However, that has not been followed up on in the ensuing CMF meetings.

- Mapping of DV cases in Palmdale showed an intense concentration of these incidents in the central portion of the city, but there was no discussion or probing of this, such as whether there was any effort to examine and better understand factors related to offenders or victims, or other relevant demographic considerations such as economic factors; the possible involvement of repeat offenders; whether this might involve a significant level of recurring calls for service at the same locations; and so forth.

- Observations had been made that catalytic converter thefts were tied to the unhoused population, but no data or information was provided to support that belief, nor was any effort made to probe that during the CMF.

- Discussions and information presented by the Taskforce for Regional Auto Theft Prevention (TRAP) regarding stolen vehicles noting patterns being evident in the type of vehicles being stolen; however, no discussion took place relative to whether prevention efforts or community education should be considered. The recognition that patterns are becoming evident would warrant a deeper exploration of any contributing factors as well as possible alternative strategies solutions to consider.

Despite statements by Department personnel that they are engaged in problem solving, the focus of the presentations and discussions during the CMF meetings is most often devoted to the identification of the problem and then the immediate reaction or response that will be undertaken. Those immediate responses can be based on beliefs rooted in assumptions rather than on solid data that can challenge or contradict one's assumptions. More attention needs to be placed on ensuring that a sufficient analysis of the potential contributing factors takes place. In turn, that will influence consideration of the range of resources and options that should be considered in responding to these recurring problems. The responsibility for ensuring this happens rests with management, so it is imperative that managers ensure that the critical stages of problem solving (e.g., scanning, analysis, response, and assessment) are applied on a

consistent basis. We look forward to seeing the continuing evolution and progress LASD will experience as more attention is focused on refining and applying these principles.

Overall, while LASD has begun to address the need to utilize community policing and problem-solving strategies in the Crime Management Forums (CMFs), additional benefits will be realized when problem solving is applied in the course of examining other areas that are required by the SA. The examination and analysis of trends or patterns that can be found in such things as misconduct complaints, and other community concerns can be revealing and help in the development of suitable interventions to address them. The ongoing training of station personnel via the VCPI training and the eventual implementation of approved Community Engagement training (as per SA Paragraph 89) will also improve the full adoption and regular use of these approaches. Paragraph 90 also requires the Department use spatial mapping and scientific deployment, which the MT's review of recent CMFs and Risk Management Forums found was insufficient.

5.   Community Survey

SA Paragraphs 98 and 99 require LASD to assist the Monitors in conducting an annual community survey that is reliable, comprehensive, and representative of the community and that it makes special effort to promote the inclusion of arrestees and Section 8 voucher holders, among others. Conducted by an independent survey team, the purpose of the SA mandated survey is to assess community perceptions of the relationship between LASD and the AV community and to measure how, if at all, the SA reforms are influencing that relationship. As mentioned in previous semi-annual reports, the data gathered through the first annual survey is used as a baseline and compared with data from the second, third, and future surveys to assess changes in the relationship between LASD and the community over time. The Department, DOJ, and MT have worked together to produce two such surveys and in this reporting period finished a third.

The third annual community survey launched on December 1, 2020, and remained open throughout this reporting period until June 2021. The COVID-19 pandemic presented several challenges for the survey and data collection in Year 3. All data collection in Year 3 was conducted virtually using only the online version of the survey. The CACs, LASD, individual community members, and a few community-based organizations and coalitions shared the survey via email and social media. As detailed below, while the overall numbers for the adult survey were satisfactory and will certainly provide actionable findings for the Department, the survey fell short of expectations regarding representativeness. This was disappointing to the Parties and the MT given the success and productivity of the added community-led data collection efforts in Year 2, which consisted primarily of in-person data collection using paper surveys. A significant adjustment that was made in Year 3 in light of the challenges presented by COVID-19 was to keep the survey open for an extended timeframe, six months instead of the usual three months. The participants' responses to the survey have not yet been tabulated, but the demographics of the respondents were as follows.

- 3,118 total adult survey responses at the close date of June 10, 2021.[10]

  » 84% generated through the link that LASD distributed through their website, social media channels, and other communications.

  » 16% generated through links distributed by the Palmdale and Lancaster CACs, the Monitoring Team, or CBOs.

- Total survey responses were not representative of the larger Antelope Valley community with respect to race, ethnicity, or age.[11]

  » Blacks were underrepresented: 10% of respondents versus 14% of population.

  » Latinos were underrepresented: 30% versus 45%.

  » White respondents were overrepresented: 53% versus 35%.

  » Native Americans were overrepresented: 3.7% versus 0.3%.

  » Asian/Pacific Islanders were proportional to the population: 3.3% versus 3.8%.

At the time of the Parties' onsite meeting on March 2, 2021, when approximately 2,000 surveys had been collected, the MT expressed its concerns that the majority of completed surveys had been collected through the LASD link and that the demographics were not showing adequate representativeness across the various racial and ethnic groups.

While the LASD link was very successful in recruiting a high number of survey participants, unfortunately, the demographic analysis of the participants completing the survey through the LASD link were not reflective of the entire community.

- There was greater disproportionality among those who responded through the LASD link versus the non-LASD links.

  » Again, the US Census estimates for the AV community are 14% Black, 45% Latino, and 35% White.

---

[10] Survey response statistics provided to the MT by the UCLA researchers via email on April 19, 2021, and again on June 25, 2021.

[11] US Census figures from 2020 County of Los Angeles Antelope Valley Census Profile https://lacounty.gov/wp-content/uploads/AV-Census-Profile8-15-18.pdf.

» Respondents through the LASD link were 9% Black, 29% Latino, and 56% White.

» Respondents through non-LASD links were 15% Black, 37% Latino, and 39% White.

» All links had about equal representation of Asian/Pacific Islanders and Native Americans.

It is important to recognize that this situation—with the Department's link not as successful in recruiting people of color—is a finding in itself. The Department's methods for reaching potential survey respondents are much the same as those employed for sharing important information with the community and promoting LASD community events. Therefore, shortcomings in the Department's engagement of survey respondents may reflect issues with its engagement of the AV community generally.

The non-LASD links were more successful with Black respondents but still fell short of representativeness for people who are Latino. And the CAC, CBO, and MT links received far fewer respondents overall compared to the LASD link. All these outcomes are concerning. The result is a serious gap in outreach not just for the Community Survey but for community engagement more broadly, by the Department, the MT, and CBOs. The Department's engagement practices are, of course, the most important in this regard, since it is the Department that is party to the Settlement Agreement. The Department should certainly consider making still greater effort to collaborate with the CACs and CBOs in their regular community outreach efforts, not just for the survey but for community meetings, events or informational messaging. This will help improve its reach and, hopefully, its successful engagement with a wider cross-section of the community. However, the fact that the other organizations also had trouble recruiting community survey participants through mainly electronic means indicates the Department's efforts will have to go still further and make greater use of other methods.

The Parties' and MT's experience with the previous two surveys, along with many discussions with community members, have led to several hypotheses that may inform these findings and help guide not just future surveys but the Department's outreach for other purposes. There is indication of a digital divide in the AV (just as exists across the country). There are a number of hypotheses as to why this may be the case that the Parties need to consider as possibly affecting outcomes in the AV. This is also another example of information available to the Department that they can consider as they work to meet SA requirements for constructive community engagement. People who do not have smart phones or immediate access to other connections are not likely to complete the online survey and thus may be overlooked in the data collection efforts. Some community members do not trust that the safety or anonymity of their responses will be protected, and some have expressed concerns about retaliation for their responses, so they are less likely to participate in an online process. It's also possible the various restrictions and changes to routine created by COVID-19 have affected community members'

awareness of the survey and their ability and/or inclination to participate. Alternatively, the AV community, like many of us, may simply be suffering from survey fatigue. It is most likely a combination of these factors, but the fact remains that the MT does not believe the current sample is sufficiently representative of the AV community and the populations specified in the SA.

At the onsite, as a means to increase representativeness in the, at the time, still ongoing survey the MT recommended that the Parties follow the same procedures as in previous years, including deactivating the LASD link to the survey while more targeted outreach could be conducted. (Survey researchers seeking to reach representation often remove or de-emphasize certain collection modes over others in order to increase the likelihood that representative numbers can be reached.) The MT also recommended again using incentives to reach underrepresented communities, but suggested that instead of compensating CBOs to distribute the surveys through in-person outreach efforts as was done in the second survey, the suggestion was to establish an incentive program where those who complete the survey would be eligible to receive gift cards (for instance, advertising that gift cards will be sent to the next 100 participants, or that all participants will be entered in a raffle for a gift card). While in the first two surveys the Department had supported the MT in creative approaches to carrying out the survey, there was resistance this year. Although the Department indicated they understood the need to reach the whole community and ensure as representative a sample as possible, LASD was not in favor of deactivating their link and was not supportive of using the incentives discussed to reach underrepresented communities. The Department and County Counsel's office had particular concerns about incentives given directly to survey participants on the grounds that they felt it would violate state laws against gifts of public funds. At a follow-up discussion on March 29, LASD maintained its position that it would not support the use of incentives to reach underrepresented communities. Instead, they recommended that the MT and community groups increase their efforts to use online outreach and other methods such as advertising.

Prior to closing the survey, both CACs, the MT, and LASD did some additional outreach to try to increase participation of hard-to-reach groups, particularly Black respondents. That included the MT doing outreach to some local faith-based leaders and LASD doing some targeted outreach to community leaders as well. Unfortunately, those efforts did not result in any significant increase in representativeness of the Black community. However, the Department should note that the Palmdale and Lancaster CACs were particularly effective in increasing overall survey participation during the last two months of data collection, utilizing their social media network to boost survey engagement. For the fourth annual survey, the MT hopes to return to the use of paper surveys and in-person data collection, organized and led by community members and community-based organizations, in addition to the online/digital version.

It is important for the Department and the community to understand that, while the third survey may have fallen short of ideal representativeness, this does not render the survey invalid or unhelpful for the purposes of the SA. Representativeness allows for generalization of the overall rates of responses, which is useful in assessing the perception and attitudes of the AV community as a whole. In that regard, this survey may be somewhat limited. However, the

survey will still provide important findings on each racial or ethnic group independently. The survey report will provide responses to key survey items separately by race and ethnicity, and the website made available to the public will also afford that ability. It is this information that will be compared to the two prior surveys to assess change in community attitudes over time. This will also be the information that should help inform the Department's assessment of the impact its community engagement activities and law enforcement practices are having on its relationship with the community.

Data from the community survey are currently being analyzed by the research team. A report of the findings as well as the more extensive data tables will be released to the public during the next monitoring period. Once publicly released, the MT looks forward to hearing from the Department how they will use the survey findings to inform their community engagement and crime prevention activities moving forward. Also, the Parties and MT will discuss the findings with community members as they did after the first two annual surveys.

The youth survey was launched at the end of May 2021. This survey uses a slightly different instrument and is directed at youth under 18 years of age. The research team worked with Antelope Valley Union High School District leadership to distribute the survey to any high schools that were willing to present the voluntary survey to its students. At the time of this report, the survey was still being circulated to AV high school students and data collection was in progress, but participation levels were very low. The Parties will discuss how the youth responses will be addressed once the data collection and processing is complete.


6.   Town Hall Meetings

On February 25, 2021, the MT hosted a town hall meeting to hear from members of the community to gain their perspectives and feedback on the perception of LASD's compliance with the SA as well as general relations between the community and LASD.

More than 40 members of the AV community attended the virtual town hall meeting. The MT gave a brief presentation on the history of the SA and the monitoring activities and provided an overview of the second Complaints Audit, which was published in early 2021. Following the presentations was an open comment period. As noted in recent semi-annual reports, there has been a noticeable increase in the level of concerns from community members present in community meetings, particularly regarding the treatment of people of color and the unhoused. This trend continued during this townhall. Every single comment from members from the AV community was negative toward the Department for not yet reaching compliance with the SA. Criticism was also directed at the MT and DOJ for not more quickly and firmly holding the Department accountable to the SA. The primary issues or concerns were as follows.

- Perceptions of the deputy-involved shooting death of Mr. Thomas as a criminal act and concerns that the deputy will not be held accountable.

- In reaction to the MT Complaints Audit,[12] concern that LASD was treating the Black community in the AV unfairly.

- Personal stories of being harassed by LASD deputies in the AV.

- Perceived LASD harassment or mistreatment of the unhoused, such as repeatedly moving them or arresting them for no good cause.

- Concerns and questions about the Zone Deputies plan in Lancaster, primarily regarding a lack of knowledge about the plan because the Department did not inform or consult with the community.

- Concerns and questions about the lack of representation and effectiveness of the CACs in Lancaster and Palmdale. Members of the community expressed their belief that the CACs do not properly represent the community and that they are "too close" to LASD and defend the Department rather than providing needed critiques.

- Complaints about LASD questioning community members about their probation/parole status during a routine stop.

- Complaints toward the MT and DOJ for not holding LASD accountable. Community members felt the MT was not pushing the Department hard enough to reach compliance and complained that the DOJ and MT were not bringing LASD back to court to increase the level of accountability. Some of these complaints stemmed from an assumption that the MT is an oversight body with authority over the Department, which the MT explained is not the case. Other complaints were about the MT not doing enough to advertise events, especially this particular town hall meeting.

Overall, the community sentiment was one of concern and outright anger about LASD's non-compliance with the SA and complaints against the MT for not holding the Department more accountable. There were calls for greater accountability of LASD by the MT and DOJ as well as an immediate change to the treatment of the unhoused in the AV.

Based on how it was presented to the community at the town hall, the Zone Deputies program in Lancaster has potential to be a positive, problem-oriented approach, but its initial implementation fell short in several other ways, including that it had no engagement with the CAC, community groups, or other stakeholders to review the practice; no data were provided and no assessment conducted to evaluate the need for or efficacy of the practice; there was a lack of transparency over how deputies were chosen to participate; and there was no discussion

---

[12] It was not clear if community comments on the complaints audit stemmed from the MT's overview provided at the meeting or from community members' review of the audit itself through online links, or both.

of the practice in CMF/RMF. This was an opportunity missed for the Department to meaningfully engage the community in policing strategy. These are all steps the Monitors—and Department executive leadership—should expect to see if the reforms outlined in the SA have been successfully implemented and embraced. The Department has since informed the MT that the Zone Deputy program has been used in the AV for a number of years. That being the case, the MT questions why we and the community were not previously made aware of this potentially helpful program and hopes the Department will incorporate community input into the program in the future.

On March 2, 2021, the MT attended the Lancaster CAC's quarterly town hall meeting, held via Facebook Live and hosted by three members of the Lancaster CAC. There was a review of the MT's most recent semi-annual report and presentations by LASD personnel on a variety of topics, including the mental health crisis teams (METs) and the Zone Deputies plan. There were 42 people logged in and viewing the meeting. The meeting was then opened to questions and comments from participants, who were able to type their questions into the chat function of the video conference. Many of the comments were criticisms of LASD and the CAC, similar to those made at the MT-hosted town hall meeting.

7.   <u>Increased Community Advocacy</u>

Since the summer of 2020, there has been growing community concern, advocacy, and organizing and increased criticism of LASD. Community rallies, comments at community meetings and city council meetings, have seen increased community calls for accountability and improvement of LASD. There is also a new effort to pressure the cities of Palmdale and Lancaster as well as the surrounding school districts to cancel their contracts with LASD.

The Department should genuinely listen to these community concerns and engage with the community members involved in these efforts in order to understand the nature and source of their concerns. The MT will be observing any statements made by the Department in response to these concerns, any dialogue that ensues between the Department and the community regarding the concerns and what can be done about them, any material changes made in response to the concerns, and the transparency demonstrated by the Department.

8.   <u>Discussion of Management Accountability for Community Engagement</u>

On one hand, the Department is performing well in terms of compliance with many provisions in the community engagement section (see Table 5). On the other hand, the community dissatisfaction among Black and Latino citizens seems to be increasing as measured by community surveys, CAC meetings, and other community meetings. There are many possible contributors or explanations for this paradox. No doubt, national events and concerns about police accountability do influence local perceptions. There are other likely contributors that may be directly related to the department's lack of compliance in this area. For example, the

Department has been successful in reaching compliance on administrative and procedural tasks such as creating the CAC and providing the CAC with office space. However, the Department has struggled to reach compliance with developing the Paragraph 89 training or using data to evaluate engagement strategies which may impact how community members experience policing. See below for discussions of specific items.

a.  *SA Paragraph 89*. The community engagement training that is intended to empower deputies with better skills and tools, including stronger community policing skills, community engagement strategies, interpersonal outreach skills, and conflict resolution skills. If done well, we would expect to see an improvement in deputies' problem-solving and outreach skills, the development of more effective strategies that promote and rely on community engagement, and a stronger emphasis on using data to inform and support problem-solving efforts that will effectively address and reduce chronic issues. As described in previous semi-annual reports, the history of the development of this training has been hampered by a number of issues. Primarily, the Department reported that the costs and deputy time that would be required make a full-fledged COPs and POPs training that addresses all items required under this provision untenable. The MT and DOJ agreed to consider alternatives, with the caveat that their ultimate approval depended on their ability to deliver the training required by the SA. Finding the alternatives has been difficult and time consuming. The online VCPI training that the Department has implemented is a promising start. The most recently considered Principled Policing training is also quite promising, but it needs enhancements to reach compliance. We note that the review process could have gone more quickly had Department managers scrutinized the course closely enough to recognize, as the DOJ and MT subsequently did, that not all the Paragraph 89 requirements are addressed.

b.  *SA Paragraph 90*. Leadership based on organizational values of accountability and driven by reliable data and information: focusing more attention on trends in community complaints and community concerns in the CMF/RMF to better support and measure problem solving and community satisfaction. This would communicate to the stations that critical thinking, community engagement, and problem solving are important elements of the Department's culture and policing strategies.

c.  *SA Paragraph 91*. The SA requires ongoing evaluation and reporting to the public on the effectiveness of the Department's community engagement initiatives. If done well, those reports will ensure the stations understand where and with whom current engagement strategies are working as well as where improvements need to be made. The stations could use those reports to more effectively interact with their CACs and other community stakeholders and engage them in meaningful ways and as full partners and coproducers of public safety.

To reiterate a theme, the Department is out of compliance on the items that use and evaluate data and which require critical thinking and professional scrutiny on the part of management. Without relevant training and direction/oversight from management that communicates a clear strategy and emphasis on community engagement and community-oriented policing, the deputies can end up developing their own strategies for "proactive policing," which often ends up being nothing more than conducting more "stops" and emphasizing increased enforcement activity rather than encompassing targeted prevention and intervention measures that can actually be more effective. Moreover, this sort of proactive policing is vulnerable to the influence of bias.

LASD managers, supervisors, and deputies should be mindful of and appreciate the fact that every traffic stop or pedestrian contact made *is* a form of community engagement. The number of traffic stops and responses to calls for service LASD is engaged in far exceeds the number of community events and 755s documented, so stops are an even more critical element of that relationship and should be seen by the Department as key to increasing trust and understanding between the Department and the community. This reality is illuminated in the SA, which states. that "LASD shall ensure that investigatory stops and searches are part of an effective overall crime prevention strategy [and] do not contribute to counter-productive divisions between LASD and the community" (Preface to Stops section, SA p. 7).

When stops are viewed as being representative of the routine interactions between law enforcement officers and the public, it is easy to see how and why the disparities found in the traffic stop data compiled by the MT contributes to distrust between people of color and the Department. Several important considerations should be recognized and dealt with by management.

1.  Stops and searches disproportionately impact people of color, as shown in the most recently analyzed data, January–June 2020.

    a.  For traffic stops where persons were asked their parole or probation status, 77% were Black or Latinx.

        i.  Black people constituted 34% of those stopped where the probation or parole status question was asked, while Blacks constitute 17% or less of AV residents.

    b.  While Blacks are the most likely group to be searched, searches of Blacks are consistently the least likely to result in the discovery and seizure of contraband, which speaks to the efficacy of this impactful practice. This finding could suggest that, in practice, the criteria for deciding to conduct a search of Blacks is different than the criteria applied to other racial groups. In other words, the threshold for deciding to conduct a search of Blacks appears to be lower than it is for searching persons from other racial groups.

2.   Conducting a search or asking a person whether they are on probation or parole can be a humiliating experience and be perceived as disrespectful, especially so when the person is not on probation or parole and no clear basis has been established to pursue that question. Additionally, the experiences in the AV have shown this question is being disproportionately and inappropriately posed to people of color.

3.   Stops and searches don't just impact the persons stopped. Those individuals then go on to describe their treatment to family and friends, resulting in the stopped driver, passenger, or pedestrian's resentment, distrust, or anger being expressed among the community many times over. This occurs with *any* racial or ethnic group, but due to the disproportionality noted in stops, searches, the probation/parole question, and other outcomes, it is most likely to happen with Black community members.

When one considers all of the evidence from the stop data analysis—as well as the case studies presented to the Department (see the UOF, Complaints and Accountability sections), the annual community survey, feedback from community town halls, as well as formal complaints filed by members of the community—it becomes clear that it will be difficult for LASD to achieve the bias-free policing and community engagement outcomes called for in the SA without careful review and reconsideration of many of the Department's current stops practices (see further discussion in the Stops and Bias-Free Policing sections). This review can and should include public safety considerations and data and information that may help explain the disparities, but improved communication and trust with the impacted communities must be the goal. The Department has begun those reviews (see the discussion about SA Paragraph 46 and the practice of asking about probation and parole status in the Stops section), but much work remains. Those reviews, in tandem with the Department's ongoing efforts such as implementing crime prevention strategies and developing community policing training, are at the heart of the SA because they speak to the most common and one of the most important interactions between the community and the Department, that is, the stop.

9.   Community Engagement Compliance Status

Table 5 provides the current compliance status for each paragraph in the Community Engagement section of the SA. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not.

| Table 5 | | |
|---|---|---|
| Community Engagement Compliance Status | | |
| SA Paragraph | Summary of SA Requirements | Compliance |
| 69 | Conduct organizational culture and climate survey. | Yes |
| 72 | Consult experts and the culture and climate survey to help develop training. | Partial |
| 87 | Actively participate in community engagement efforts, including community meetings; be available for community feedback; develop CACs; work with community to develop diversion programs. | Partial |
| 88 | Ensure all sworn personnel attend community meetings and events, and take into account the need to enhance relationships with particular groups within the community including, but not limited to, youth and communities of color. | Partial |
| 89 | Provide in-service training on community policing and problem-oriented policing to all AV personnel. | Partial* |
| 90 | Revise content of CMFs and RMFs to include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them using techniques to better support and measure community and problem-solving policing efforts. | Partial |
| 91 | Complete reports on the impact of community engagement efforts, identifying successes, obstacles, and recommendations for future improvement in order to continually improve police–community partnerships. | Partial |
| 92 | Seek community assistance in disseminating SA. | Yes |
| 93 | Support and work with CACs to help them meet their mission to leverage the insights and expertise of the community to address policing concerns, including, but not limited to, racial or ethnic profiling and access to law enforcement services, and to promote greater transparency and public understanding of LASD. | Yes |
| 94 | Memorialize CACs and facilitate quarterly meetings. | Yes |
| 95 | Post CAC's reports on LASD-AV website and respond to recommendations. | Yes |
| 96 | Provide administrative support and meeting space for CACs. | Yes |
| 97 | Ensure CACs have no access to non-public information. | Yes |
| 98 | Assist Monitor in annual Community Survey. | Yes |
| 99 | Cooperate with independent researcher in conducting annual Community Survey and deputy survey. | Yes |
| 100 | Cooperate with administration of the annual Community Survey and focus groups. | Yes |
| 101 | Post annual Community Survey report on LASD-AV website. | Yes |

*The Department is in partial compliance on delivery of the approved trainings because the VCPI training has been implemented. Note that after full implementation of the training, outcomes related to each aspect of the training will be measured in other provisions.

E.       **Use of Force**

Peace officers are entrusted with great responsibility, and authority, to enforce the law, make arrests and to use necessary force, including lethal force, in the performance of their duties and for the protection of the public. The SA requires the Department to implement various changes to its UOF policy, training, and practices and in how supervisors and managers review and track use-of-force incidents. While the current concerns and attention focused on peace officers' use of force across the nation is hardly unprecedented, the SA requirements have taken on even more significance and are receiving increased public and media attention in the aftermath of national and local civil unrest resulting from police use-of-force incidents. The SA requirements, once fulfilled, can position LASD to be in alignment with national best practices, and this, in turn, is expected to contribute to improvements in public trust and confidence here at the local level in LA County. Unfortunately, many important provisions in the UOF section of the SA still remain out of compliance, leaving LA County Sheriff's deputies and the communities they are entrusted to serve without up-to-date UOF policies and training, and also contributing to inadequate management oversight and accountability.

1.       Use-of-Force Policy

Four years ago, in August of 2017, the MT and DOJ first began their discussions about the use-of-force policy with the Department, As was reported in our previous semi-annual report, an agreement among the Parties and MT on a UOF policy that would be in compliance with the SA was reached April 22, 2019, pending LASD administrative review. The agreed-upon policy changes represented a significant improvement over the previous policy but the policy was never approved by Department executives, with over 18 months passing in the interim. On August 19, 2019, Governor Gavin Newsom signed Assembly Bill (AB) 392 into law, which, among other things, required that all California Law Enforcement Agencies update their use-of-force policies to redefine the circumstances under which the use of deadly force by a peace officer is deemed justifiable, and to affirmatively prescribe the circumstances under which a peace officer is authorized to use deadly force. The state required those revisions to be in place by January 1, 2021, which created a sense of urgency for the Department to produce a newly revised policy. After another period reviewing drafts, on December 14, 2020, the Department, MT, and DOJ met and agreed on some but not all of the Department's revisions to its use-of-force policy, which addressed the mandates of AB 392 as well as the SA requirements. The DOJ has not agreed to provisions regarding chokeholds, prohibited force, and improvised force that were created in response to AB 392. Additionally, the Parties and MT need to have further discussion about the policy because it contains references to other policies that have not been approved and have an impact on SA requirements regarding use of force and the investigation of force incidents in the

AV.[13] The Department informed the DOJ and MT that the new policy was published on June 16, 2021; however, the Parties and MT will meet shortly to discuss the remaining issues.

The Department remains out of compliance with the following provision of Section VIII of the SA, which governs the use of force by LASD in the AV:

> "*LASD agrees to revise its force policies and practices to reflect its commitment to upholding the rights secured or protected by the constitution of the Unites States, protecting human life and dignity of every individual, and maintaining public safety.*" (Preface, p 24.)

---

**A Note on the Policy Review Process**

Nearly all the DOJ and MT comments on new or revised LASD policies are designed to address factors that affect our determination of SA compliance. In some cases, those requirements are quite specific, such as the requirement that the Department prohibit certain conduct related to use of force or that it accepts, investigates, and adjudicates all complaints. In others, the objective is clear but the methods to achieve it are flexible, such as providing public access to complaint forms. Still other comments address clarity, consistency, or the application of best practices. Use of the Racial Identity Profiling Act (RIPA) Board's best practice suggestions is just one example. The Monitors allow flexibility where they can so the Department can implement changes that are easy for deputies to understand (and therefore to comply with). The Monitors will determine policy compliance with these items by considering the SA requirement within the context of the Department's rationale for their preferred language or approach—hence the importance of further discussions on those matters. Finally, some comments are not directly related to the SA and are offered as suggestions or questions rather than reflecting SA requirements.

---

2.   Use-of-Force Training

The Settlement Agreement (SA) contains several provisions requiring that AV deputies and their supervisors receive specific training on the use of force. Some aspects of the training are required to be provided annually, while others are to be provided biennially. The requirements outlined in SA Paragraph 119 include:

---

[13] The Body Worn Camera (BWC) policy is referenced in the draft UOF policy. As documented by MT audits and case reviews, the Department does not adequately respond to personnel complaints that arise during force investigations. The current BWC policy contradicts SA Paragraph 130 because, unless the misconduct would likely result in suspension or termination, the policy prohibits initiating an administrative investigation based on personal communications that were recorded unintentionally; precludes using recordings viewed for an audit, inspection, or administrative review as the sole basis for alleging misconduct unrelated to the incident that is the subject of the review; and limits management options in those cases to counseling, training, or a performance log entry to correct their subordinates' behavior.

*LASD shall provide all Antelope Valley deputies with annual or biennial use of force training. The topics will include the following:*

a) *proper use of force decision making, including when force may be unnecessary in response to minor resistance (biennial);*
b) *role-playing scenarios and interactive exercises that illustrate proper use of force decision making, including training deputies on the importance and impact of ethical decision making and peer intervention (annual);*
c) *principles of procedural justice, and avoiding the use of force in response to minor resistance (biennial);*
d) *de-escalation techniques that encourage deputies to make arrests without using force (annual);*
e) *threat assessment, including how race can impact deputies' threat assessments (biennial);*
f) *LASD-AV deputies will attend LASD's Tactics and Survival (TAS), also known as the Laser Village tactical firearms training (biennial); and,*
g) *supervisors shall receive initial and annual refresher training on conducting use of force investigations, how to effectively direct deputies to minimize uses of force and to intervene effectively to prevent or stop unreasonable force, using LASD's accountability and disciplinary systems after encountering a potentially unreasonable use of force, and supporting deputies who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force (annual)*

Any major change in policy inevitably results in associated training having to be updated, and that training must then actually be delivered to all personnel. SA Paragraph 199 a-g also requires additional elements be included in the Department's use-of-force training for deputies as well as supervisor training related to UOF investigations. With no new training being developed following the initial approval of the UOF policy in April 2019, the new training must be responsive to the changes stemming from the SA as well as from AB 392.

In the 11th Semi-Annual Report, we noted that in May 2020 the Department submitted multiple documents that it believed satisfied these use-of-force training mandates. However, our subsequent assessment of those documents found they do not satisfy the SA's mandates for use-of-force training. During this current reporting period, MT members had several productive meetings with the Compliance Unit and members of the Department's Training Unit to discuss training requirements related to use of force under the SA. On March 24, 2021, MT members reviewed the Department's revamped use-of-force lesson plans and expanded course outlines and found them to be improvements over the previous training materials. The Department then formally submitted those lesson plans and expanded course outlines to the Monitors and DOJ for final approval. These were submitted on May 24, 2021, and are currently under review.

3.    MT Use-of-Force Audits

The Monitoring Team has completed two audits evaluating the Department's compliance with the SA's use-of-force requirements. The first audit was for all Category 1 and Category 2 uses of force that occurred in the AV from January 1 through March 31, 2017. Category 1 uses of force consist of minor uses force, such as control holds, and the use of OC spray when the use of force does not result in an identifiable injury. Category 2 uses of force are those uses of force that result in an identifiable injury and any application of force other than those defined as a Category 1 or a Category 3 use of force. The second audit was for all Category 3 uses of force in the AV between January 1, 2015, and March 21, 2018. Category 3 force involves the most significant levels of force and includes lethal force incidents.[14]

The MT is now completing its third audit of deputy uses of force in the AV, which will be published early in the next reporting period. This audit, like the first MT UOF audit, will evaluate the Department's compliance with SA Paragraphs 102–118 with regard to Category 1 and Category 2 uses of force. This audit will provide a comparison to the first audit to see whether the Department has progressed toward compliance with some of those provisions where the Department was found to be out of compliance during the first audit, as well as to see whether compliance has been maintained for those provisions where they were found to be in compliance in that time. The audit will also be responsive to several SA requirements of the Monitor including the following.

- *[T]he Monitor will assess the County's progress in implementing, and achieving compliance with, the Agreement; report on the status of implementation to the Parties and the Court.* (Paragraph 146)

- *In order to assess and report on LASD's implementation of this Agreement and whether implementation is resulting in constitutional policing, the Monitor shall conduct compliance reviews and audits and outcome assessments as specified below.* (Paragraph 148)

- *The monitor will conduct an ongoing review and report on LASD use of force on restrained individuals, use of force in response to spitting, and use of OC spray.* (Paragraph 151)

Auditors selected an audit time-period of October 1, 2019, through December 31, 2019. This population time period was selected because a sufficient number of UOF events occurred during that time span that had been fully investigated and adjudicated. The entire population of 73 uses of force was evaluated and sampling was not utilized. Though there have been delays associated with the recent pandemic and problems related to the availability of documents, the audit is near completion and has examined all the use-of-force events, the supervisory investigations, and management's adjudication of these cases. The new Category 1 and 2 MT

---

[14] All MT reports and audits are available at http://www.antelopevalleysettlementmonitoring.info

audit report will soon be published, and its findings and recommendations included in our next semi-annual report.

In the next six months, the MT will complete and publish the Category 1 and 2 use-of-force audit. The MT suggests the Parties then evaluate the need for and appropriate approach to a second Category 3 audit. It may be most appropriate to wait for that audit until after LASD has implemented a UOF training that is responsive to the SA and when LASD expects a change in their compliance status. The MT will continue to evaluate the Department's compliance with SA-required use-of-force training of AV staff. The MT will produce its analysis and a report describing UOF data in the AV (Paragraphs 82, 84, 120-123) and will assist the Department in interpreting and applying the results of that analysis, including considering any related changes to policies, training, supervision, investigations, accountability processes, or targeted community engagement. Again, based on conversations with LASD command staff, MT is hopeful that the LASD will soon have an analyst in place to conduct their own semi-annual analysis of UOF trends as required by Paragraphs 120 and 121.

The MT will also request that the Department provide a written plan, along with a timeline for completion, for how LASD will respond to any deficiencies reported in the UOF audit. The MT will provide any assistance the Department requests as that plan is carried out. The MT agrees with the Department that these plans will be most helpful and productive if the audits and reviews to which they are responding address recent cases. It is important that audits—whether conducted by the MT or AAB—address completed cases. Time periods selected for audits thus factor in the amount of time it takes for the Department to conduct their use-of-force investigations, the time required for management review of completed investigations, and time for recordation in PRMS. In MT audits thus far, it was found that management review can exceed 100 days and recordation takes at least six months. Reducing these delays will help ensure cases audited are the most recent possible. The MT also believes that periodic "spot audits" of small samples in order to get a snapshot view of the Department's progress would be beneficial and intends to discuss this with the Parties.

4.    EFRC Reviews

An important aspect of the Department's accountability system relating to the investigation and review of serious use-of-force incidents is the Executive Force Review Committee (EFRC).The SA requires that the EFRC review all cases involving Category 3 use of force and that it specifically "review the incidents for any policy, training, or tactical concerns and/or violations" (Paragraph 114). Based on observations of several EFRC meetings and associated materials, the MT has expressed concern to the Department that the EFRC may not have, or consider, enough information about the cases it reviews to make reliable determinations. Examples of this observation were provided at the February onsite. The Department informed the MT that numerous conversations are held outside of the formal EFRC meetings, and these often include EFRC members asking investigators clarifying questions. The Department managers indicated they felt that any relevant issues not discussed during the EFRC hearing were usually addressed

in some other fashion. To assess this process, a focus of future MT reviews and audits regarding the EFRC will be ensuring the EFRC has sufficient information to make reliable decisions. The MT has also requested that the Department provide the MT with the EFRC investigation files (which are usually two or three hundred pages) sufficiently ahead of time to allow for thorough review before the meetings.

5.      Discussion of Use-of-Force Management Accountability

In addition to the challenges described in the Compliance Status section below, there are important accountability issues to which LASD management need to attend.

Department executive management needs to increase its oversight and require staff to devote more attention to achieving implementation of the SA paragraphs associated with the use of force. The length of time that it has taken the Department to update its use-of-force policies to address the SA's mandates and the legislative requirements of AB 392 represents a major risk management concern.

Additionally, the Parties and MT spent several days of the February 2021 onsite conducting detailed reviews of several cases that the MT and DOJ felt represented patterns of deficiencies in managerial oversight of UOF and complaint investigations and related accountability processes and outcomes. The MT and DOJ reviews highlighted similar themes, including the following.

- Insufficient review of deputy conduct, including failure to identify potentially problematic trends.

- Insufficient review of investigations, such as failure to question the basis for conclusions by investigators or to explore potential bias.

- Inconsistent identification of out-of-policy conduct.

- Allegations arising during investigations not being investigated as SCRs.

- Inattention to possible risk management issues.

- The lack of thorough follow-up to ensure ordered corrective action is carried out.

In several instances during the course of these discussions, the Department managers present agreed that the investigations presented had shortcomings that needed to be corrected, while in other cases the Department disagreed with the MT's or DOJ's assessment. (See the Accountability section for further discussion of the onsite case reviews.)

The MT also raised two process issues that may speak to a lack of emphasis on identifying and addressing out-of-policy conduct and problematic trends.

- In the current UOF 438 form section "Determination by Reviewer," the final determination asks whether the force used was "objectively reasonable" but not whether it was "in policy." A use of force can be "objectively reasonable" but at the same time may actually be inconsistent with Department policy. The Department indicated they will consider this and determine whether the form needs to be revised.

- The MT also questioned management's ability to appropriately adjudicate cases when the investigations don't include the employee's performance history and prior complaints. The Department indicated that the new complaint process will require the reports to include a summary of each accused employee's work history.

6.   <u>Use of Force Compliance Status</u>

Table 6 provides the status of each UOF-related SA provision. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not.

The first two MT audits found the Department in compliance with several provisions (Paragraphs 106, 107, 108, 100, etc.). Several other provisions were found to be approaching compliance (Paragraphs 102–105, 109, etc.). Other provisions are not yet close to compliance, which could be due to the findings of audits but is often due to the amount of work left to be done to reach compliance, such as the development and implementation of training or establishing a regular process for analyzing and making use of UOF data. As a whole, the table documents significant concerns with executive management's oversight of AV use-of-force incidents. For example, our second audit revealed that the Department is out of compliance with 11 SA paragraphs related to Category 3 uses of force—the uses of force that pose the highest degree of potential or actual injury to the subjects of force. These 11 provisions address investigations and adjudications as well as the use of de-escalation tactics, the reasonableness and policy compliance of the force used, and management's assessment, insight, response, and accountability.

| Table 6 | | | | |
|---|---|---|---|---|
| **Use of Force Compliance Status** | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | |
| | | **1st Audit (Cat 1 & 2)** | **2nd Audit (Cat 3)** | **Overall** |
| 102,104, 105 | The reasonable use of force | Yes | No | 85% |
| 103 | Use force as a last resort and de-escalation | Yes | No | 85% |
| 106 | Inhibiting, using force on person legally recording incident | Yes | Yes | Yes |
| 107 | Head strike with impact weapon | Yes | Yes | Yes |
| 108 | Deputies reporting force incidents | Yes | Yes | Yes |
| 109 | Accurate UOF reports without boilerplate language | Yes | No | 85% |
| 110 | Immediate supervisory notification of the use of force | Yes | Yes | Yes |
| 111 a–d | Thorough UOF investigations | Yes | Yes | Yes |
| 111 e | Supervisory review of deputies' UOF reports | Yes | No | 85% |
| 112 a | Independent supervisory UOF investigations | Yes | Yes | Yes |
| 112 b–e | Completeness of UOF investigations | Yes | Yes | 85% |
| 113 | Management review of UOF investigations | Yes | No | 62% |
| 114 | Thorough reviews by Executive Force Review Board | NA | No | 38% |
| 115 | Deputies held accountable for force that violates policy | No | No | 85% |
| 116 | Supervisors held accountable for inadequate investigation | UTD | No | 69% |
| 117 | AV commanders identify and curb problematic UOF trends | No | No | 25% |
| 118 | AV commanders ensure informal supervisory feedback does not replace formal discipline | No | No | 46% |
| 119 | Development and delivery of UOF training | No | No | Partial[*] |
| 120–123 | Annual management analysis and public report on UOF data and trends | No | No | No |

*Note that after implementation of the training, outcomes related to each aspect of the training will be measured in other provisions.

**F.      Personnel Complaint Review**

The Settlement Agreement's Personnel Complaint Review section begins with the overarching commitment that:

> *The County will ensure that all allegations of personnel misconduct are received and are fully and fairly investigated, and that all personnel who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.* (Preface, p. 29)

To achieve that goal, the Department and Los Angeles County agreed to revise its complaint policies so they are complete, clear, and consistent and to improve the Department's procedures for handling public complaints to include the following.

1.   Ensuring that the public has access to personnel complaint forms and information and that the Department accepts all complaints (Paragraphs 124 and 125).

2.   Classifying complaints accurately so each allegation receives the appropriate level of review (Paragraph 127).

3.   Ensuring that personnel complaints are not misclassified as service complaints and clearly identifying complaints that may require discipline or should be handled as an administrative investigation (Paragraphs 128 and 129).

4.   Identifying and investigating fully and fairly each substantive allegation of misconduct in a complaint, whether or not it was specifically alleged by the complainant (Paragraph 130).

5.   Holding personnel accountable when they are found to have committed misconduct (Preface).

In short, the Department committed to willingly accept complaints, thoroughly investigate them, adjudicate them based on a preponderance of evidence, and hold deputies accountable when they are found to have committed misconduct. Previous MT complaints audits found compliance with several provisions of the SA and the Department has taken steps to bring others into compliance as well. That said, after six years, the Department has not made all the changes necessary to bring them into compliance with several other important provisions for handling public complaints and has not completed the work begun in September 2016 to revise Department policies and manuals related to public complaints. The MT and Parties have devoted extensive time and attention during this six-month period to efforts to resolve the discrepancies between the SA and the draft revisions developed by the Department. Negotiations are continuing.

1.      Management Oversight and Accountability Issues Related to MT Complaints Audits

Complaints audits are the primary tool the MT utilizes to assess the Department's compliance with SA-related requirements. Two MT audits of this area have been conducted and were published in January 2018 and December 2020. (See the 6th and 11th semi-annual reports and the full audit reports.)[15] These audits found the Department out of compliance with numerous important provisions of the SA. Following the release of those audits, the Department brought itself into compliance on some of those findings, including the ability of their data systems to record more than one disposition for each employee and requiring investigators to start SCRs for allegations that arise during UOF investigations in the AV. An update on those areas where they remain out of compliance is provided here. As long as the issues described below persist, they inhibit the Department's ability to consistently hold individual employees accountable for complaints and ensure employees receive appropriate counseling, training, or other disciplinary actions that would be warranted. Further, they contribute to problems with management failing to examine and recognize patterns and trends of inappropriate conduct or policy violations among individual deputies or units. This can result in management failing to intervene and take the necessary steps to correct performance problems until a deputy's behavior becomes so egregious that major disciplinary action is unavoidable.

The systemic issues raised by the MT audits, including the inability of the Performance Recording and Monitoring System (PRMS) to record more than one disposition for each employee and the destruction of Performance Log Entries (PLEs), despite state law mandating they be preserved for five years (discussed below), were brought to the Department's attention by the MT, and, in fairness, the Department readily concurred with our findings in these critical areas and quickly moved to begin corrective action. That said, in a healthy culture with appropriate levels of professional scrutiny, management would have identified and corrected this issue. The Department's own managerial oversight and accountability, including but not limited to AAB audits, needs to be sufficiently robust, thorough, and consistent to ferret out these sorts of issues.

Importantly, at the February 2021 site visit, the Department verbally committed to generating Corrective Action Plans to track the Department's response to the issues enumerated in the MT's audits. We find this to be an encouraging step and welcome such efforts to place a focus and a sense of urgency on the Department's progress in achieving and maintaining compliance. To date, however, the MT is not aware of any Corrective Action Plan having been issued for these purposes.

---

[15] MT audits and reports are available at the Monitor's website http://www.antelopevalleysettlementmonitoring.info

2.      Update on Critical Audit Findings

Below is a summary of the most significant issues raised in the audit. These issues have been detailed in a previous report and are significantly abbreviated here in order to provide context for the ongoing discussions on the SCR Handbook and Manual of Policy and Procedures (MPP) revisions. In several cases, the Department quickly and laudably established unit orders that hastened reforms after the first two audits for the AV stations, while work regarding systemic changes continued.

While no new full-scale MT audits of complaints were conducted in this time period, most of the changes discussed here require changes to policy, procedures, and training not yet completed. Audits are initiated only after the Department has had the opportunity to correct the deficiencies identified in the previous audit, which usually involves the issuance of a new or revised policy. Station personnel must then be trained on the revised procedures and managers given an opportunity to ensure their personnel are following the new procedures. Once sufficient time has passed for the changes to take hold in the field, the MT consults with the Compliance Unit about beginning the process of conducting a follow-up audit. This avoids unnecessary costs and increases the likelihood that our audits will find improvements leading to compliance.

Meanwhile, the MT continues to assess how public complaints are being handled through its review of the Quarterly Reports and the documents presented to the Critical Incident Review Panel and investigations submitted to the Executive Force Review Committee. Each use-of-force audit also tests to determine whether substantive allegations of misconduct are being identified and an SCR initiated. Finally, the MT receives input from the AV community regarding their perception of the Department's willingness to accept complaints, investigate them thoroughly, and hold staff accountable when misconduct occurs.

a.      *Intake*

There were two key shortcomings with regard to how the Department accepts and initially handles complaints.

1.      There were several issues noted with the filing of complaints by telephone for both English and Spanish speakers, including hang-ups, an inability to leave a message, and messages not being returned. Managers simply need to monitor employee performance, ensure the systems or practices that have been established are accomplishing what was intended, and take appropriate corrective actions when deficiencies are identified by either the public or by employees.

2.      Another issue with the intake of public complaints lies with field supervisors. Field supervisors are often called to the scene when a person is dissatisfied with a deputy in the field. The supervisors are sometimes able to resolve the issue to the satisfaction of the citizen so that the citizen no longer feels the need to make a formal complaint. This

can be an appropriate means for resolving a complaint, but these occurrences should always be documented and tracked. Without some record of the concern or complaint being resolved there is no way for managers to review these cases and ensure they were handled appropriately—and that it was appropriate to not file an SCR.

After this issue was identified in the first audit, both AV stations issued a directive requiring supervisors to make an entry in the watch commander's log when they resolve a complaint without initiating an SCR. However, our second audit found no such watch commander log entries during the entire three-month audit period. The MT does not believe this was possible and saw this as an indicator that watch commander log entries were not a useful solution. The Department agreed and, as an alternative, has decided to have AV field supervisors make an entry in the CAD system. The MT has agreed to try this solution. However, the MT has noted concerns that the character limitations of the CAD system may preclude the sergeants from providing sufficient documentation of the concern and the action that was taken to resolve it. The MT will test this solution in its next complaint audit. Also, discussions among the Parties and MT regarding including this important requirement in the countywide SCR Handbook are ongoing.

*b.    Investigations and Adjudications*

Generally, complaint investigations reviewed in the audits were adequate, and most were sufficient to support a reliable determination. However, several investigations fell short of that standard, primarily because the investigator failed to identify and investigate all the substantive allegations within the complaint.

1.    The Department generally does not capture allegations of excessive or unnecessary force, or any other type of allegation, that arise during a UOF investigation. It does investigate some allegations within the Use-of-Force Investigation, but unless they result in discipline, those complaints are never entered into PRMS and therefore are never documented in a deputy's work history. These instances where allegations of misconduct were not being addressed during the investigation were also not identified and corrected during managerial review. After this issue arose in the first audit, unit orders were issued for each station, which required investigators to initiate an SCR for any allegation of misconduct that arises during the course of a UOF investigation. However, in the second audit, the MT found several use-of-force investigations with allegations of misconduct that did not result in a SCR. The allegations included excessive force and an alleged racial profiling, which is a complaint category that must be reported to the California Department of Justice.

2.    We also detected a trend wherein watch commanders sometimes displayed a lack of impartiality during their reviews, or a tendency toward bias in favor of statements made by deputies over those made by members of the public. In some cases, an overreliance on the deputy's statement seemed to be the only rationale for concluding the deputies'

conduct was reasonable. Senior managers have since reminded watch commanders to approach each complaint objectively and avoid even the appearance of bias. The MT will assess whether this is a sufficient response in the next complaints audit or case reviews and will continue to monitor the Department's delivery of the full-day Bias-Free Policing Training and the roll call Preventing Discriminatory Policing Briefings to all AV deputies.

3.   Failure to document an employee's work history when taking corrective action continues to be a major deficiency in the adjudication of complaints. The Department Manual identifies three factors to be considered in deciding how to handle a complaint: (1) the nature of the complaint; (2) the potential for employee discipline; and (3) the employee's performance history. However, complaint adjudications seldom, if ever address an employee's performance history. We have repeatedly recommended that complaint investigations include a section discussing the employee's work history in order to document the rationale for the adjudication. Supervisors and watch commanders make those judgments when they complete their reports, but they will normally be familiar with the people who work for them. However, this is less likely to be the case among the more senior managers responsible for reviewing these investigations or for deputies who are recent transfers after having worked at other patrol stations. Unit and Division managers are several organizational layers removed, yet they must review complaints and approve the corrective action recommended without necessarily having adequate insight into the employee's prior performance issues. The Department was initially reluctant to make this change but has since indicated it will incorporate that into the SCR Handbook. Text to that effect is included in the draft handbook currently under review by the Parties and MT.

4.   There were two complaints that should have resulted in discipline and therefore should have been handled as administrative investigations. One of these cases involved a deputy who conducted an illegal records search for personal reasons. The other involved a deputy with a history of problematic conduct, but there is no indication anyone recognized or addressed this clear pattern. At the first quarter onsite, Department managers agreed these cases were mishandled. The second case eventually led to criminal charges being filed against the deputy, a result that may have been avoided had managers recognized and intervened earlier and addressed the evident pattern of behavior.

c.   *Risk Management Review*

In addition to adjudicating each complaint, the SA and effective management oversight practices require that consideration of broader management issues, such as evaluating the efficacy of existing policies or the need to provide better equipment or training, be identified and resolved. Unless those broader responsibilities are addressed, employees will typically continue to make the same mistakes. The audits identified three specific risk-management issues, none of which were identified or addressed during the management review of the related complaint.

1.  In our first audit we recommended the Department establish a protocol for the investigation of racial profiling complaints. That was based on the wide disparity in the way those complaints were being handled. Our latest audit (three years later) found the same disparity resulting in our finding that three racial profiling complaints in this audit were deemed to be out of compliance. The Department does not yet have an approved protocol for investigating these highly sensitive complaints. To inform their draft protocol, the Department has agreed to review the work done in this area by the California Racial and Identity Profiling Advisory Board.[16]

2.  Likewise, our first audit found problems with the way deputies search detainees of another sex, and we recommended the Department review its policy and training. The Department responded that it had adequate policies, training, and oversight in that area. However, another complaint in the second audit involved a deputy conducting a non-emergency, non-exigent other-sex search, which resulted in an altercation when the subject of the search pulled away as her hand neared his groin. The Department has not informed the MT of any change in their perspective that their policies, training, and oversight are adequate.

3.  As we reported in our last six-month report, nearly half the people who made a complaint in the second audit were Black. Additionally, most of the Black complainants exhibited a palpable tone of animosity and distrust in the complaint process. That level of racial tension was significantly greater than was present in our first complaint audit. In developing effective community engagement and training strategies, the Department needs to consider the pattern of complaints made by the Black community as well as the manner in which some AV deputies, with the tacit approval of their supervisors, are conducting themselves in the course of providing public safety services in the AV.

*d.*   *Record Recordation and Retention*

Nearly all complaints were recorded accurately on the complaint forms. Discovery Unit continues to do consistent and reliable work in entering accurate data into PRMS. However, three systemic issues were raised.

1.  The audits found several cases where the complaint disposition approved by a unit commander was changed after the complaint was submitted for input into PRMS. Those changes were occurring because PRMS was designed to accept only one disposition per employee, even if some allegations proved to be true and others proved to be false or unfounded. The Department addressed this flaw immediately, and PRMS can now accept the dispositions approved by the unit commander. However, that does not correct decades of data entered under the old restriction, which limits the Department's ability to collect, review, and analyze historic trends that may help identify current issues.

---

[16] The Board's 2019 Annual Report (pp. 41–44) contains suggested policies and procedures, and its 2020 Annual Report (pp. 82–84) contains data collection suggestions.

2.      The second audit found that PLEs issued in conjunction with a personnel investigation were automatically being removed from the deputies' packages and destroyed after one year. PLEs are the Department's method for recording important notes about a deputy's conduct—whether positive or negative—and historically have included any corrective action assigned in the adjudication of a complaint. To destroy PLEs related to complaints is a violation of state law, Department policy, and LA County's Records Retention Schedule, all of which require that "reports or findings related to (personnel) complaints" be retained for at least five years.[17] In response, the Department has decided to eliminate the use of PLEs to record corrective action flowing from a personnel complaint and instead add a section to the complaint disposition format addressing any corrective action taken. That revision has not yet been implemented and we understand the Department continues to record corrective action on a PLE and then destroy those records after one year. The Department has located and provided to the MT some of the PLEs from previous investigations, but others were destroyed. Unfortunately, any previously destroyed PLEs are irretrievable and thus not part of the record. It should be noted that this change governing how corrective action is recorded and tracked needs to be incorporated into supervisor and manager training. The Parties and MT will discuss the Department's proposed alternative approach for recording corrective actions further in the next reporting period.

3.      The first audit found the Department used antiquated complaint dispositions that are inconsistent with the dispositions codified in the California Penal Code. The Department has since taken steps to bring its disposition categories into alignment with the state's, which will solve this issue moving forward. However, several problems will persist unless the Department reclassifies older cases retroactively. Deputy histories will have cases adjudicated under two different methods, making it difficult to review older cases to determine how they compare to and impact new cases. Tools used by the Department to assess accountability and risk management issues will also be impacted for the same reason. This practice also makes it virtually impossible to ascertain how LASD compares to other agencies in the state when examining historic complaint trends and investigations. Again, these are issues that managers should have recognized and addressed many years ago.

3.      <u>Key Directives</u>

To the Department's credit, it responded to several of the findings in the first audit by issuing unit orders that largely brought the AV stations into policy compliance. (Policies generally pertain to the entire department countywide, whereas "unit orders" are policies that only apply to specific stations or units.) This served as an expeditious method for ensuring the policy and, by extension, practice in the AV would better conform to the SA, thus providing a relatively

---

[17] Penal Code Section 832.5 (b); SCR Handbook, p. 46; and LASD Records Retention Schedule approved by the County Board of Supervisors on June 14, 2016.

quick way to improve service to the AV community and increase the likelihood of findings of compliance in the second MT audit.

Most of the reforms required by the SA only apply to the two AV stations, but in several instances they apply countywide. One of the provisions that applies countywide is Paragraph 127, which requires all complaint investigation–related policies be complete, clear, and consistent. The Department has committed to making most of the changes already made in the AV unit orders apply throughout the Department by revising the Department's MPP and SCR Handbook. The development process for these is more involved than for unit orders, since they require additional research, discussion, and approvals to ensure they will be effective and provide adequate direction to the entire Department. The Parties and MT have been in extended discussions regarding revisions to the SCR Handbook and other policy documents, which, if instituted, will address most of the recommendations, at least insofar as the policies have been revised.

For any policies and unit orders, once the changes are approved, the next step involves making sure all affected personnel understand the policy, often accomplished through training (which sometimes includes developing new training or revising existing training). Subsequently, the assessment of whether the policies are effectively written, trained to, and implemented is primarily measured through subsequent LASD and MT reviews and audits designed to assess whether the intended outcomes of the policies are evidenced in the field. For instance, after the first audit, the Department quickly and laudably issued unit orders to address Paragraph 130, which requires all allegations arising during an investigation be investigated even if the allegation is not articulated as such by the complainant. However, the second audit found that, while more allegations were identified and investigated, the Department was not yet meeting the established compliance metrics (95%) for that provision. If this persists, Management should reexamine the training or the language in the unit orders to increase compliance.

Many of the deficiencies found in MT audits are not issues that would be unique to the AV but, rather, occur throughout the Department. For instance, the Internal Affairs telephone line for receiving complaint inquiries is a countywide number, so problems found with its proper functioning affect not only the AV but the entire county. The same is true for problems with data systems, because PRMS is, again, not specific to the AV but used by the Department countywide. The MT has stressed to the Department that even when an SA requirement technically only applies to the AV, in many cases it is both more efficient and, more importantly, more beneficial to residents throughout LA County for the Department to make the change countywide.

As described above, SA Paragraph 127 requires that the Department revise several key directives to ensure they provide clear, complete, and consistent guidance to employees, supervisors, and managers on how public complaints are to be handled. Equally important, those directives serve to inform the public on the Department's standards and process for handling their complaints. This includes several critical documents, including the SCR handbook, Administrative Investigations Handbook, and MPP. The Parties decided to begin this effort with the SCR

Handbook, which was last updated on April 15, 2009. This was the major focus of complaints-related work for the Parties and MT in this reporting period.

a.    Service Comment Report Handbook

On September 26, 2016, the Department provided the DOJ and Monitor with a draft of the revised manual sections and SCR Handbook. We reviewed these and on January 28, 2017, provided the Department with a document identifying each element of those documents that did not meet the SA's requirements. Throughout the following year, numerous discussions were held to address these deficiencies.

On January 29, 2018, the Department submitted a second draft of the manual sections and SCR Handbook for our review. The Monitor and DOJ completed their reviews and, on February 20, 2018, provided the Department with a document again identifying each element of the policy that did not meet the SA's requirements. Many of those shortcomings were the same ones that had been previously identified and discussed at length in our review of the first drafts. The Monitor and DOJ's concerns were then the subject of two days of discussions during the February/March 2018 Parties onsite meeting, and again at the November 2018 onsite.

On February 22, 2021, the Department submitted a third draft of the manual section and SCR Handbook. The Monitor reviewed those documents and provided its analysis along with input from the DOJ to the Department on April 2, 2021. While this latest draft showed significant improvement in several areas, there are other areas where the proposed revisions still did not meet the requirements of the SA.

On June 2 and June 16, 2021, the MT met with the Parties to review the remaining concerns. The Department accepted some of the changes following those discussions, such as clarifying how to handle a complaint when the accused employee could not have done it; conversely, the Monitors and DOJ accepted some of the Department's positions once they better understood the rationale behind it, such as the need for a separate UOF section on the disposition form. We expect to meet again with the Parties and attempt to reach consensus while ensuring that this and other foundational policy directives fulfill the SA's requirements and "eliminate practices that resulted in DOJ's finding a pattern and practice of constitutional violations" (Paragraph 153).

Perhaps the most important of the remaining issues regards the elevation of more serious complaints and allegations to Administrative Investigations, which allow for the adjudication of discipline when necessary (SA Paragraphs 129, 130, 132). Very few (between 1% and 4%) of complaints are processed as Administrative Investigations, which are meant for more serious misconduct that may—but not necessarily will—lead to disciplinary action. The SCR policy and handbook, the Administrative Investigation policy, and the to-be-revised trainings for these processes must ensure that cases that require elevation are, in fact, elevated. Thus, the proper

classification of cases—and associated issues such as discussing those cases with the involved party—will be a particular focus during upcoming meetings and discussions with the Parties.

### b.    Manual of Policy and Procedures

Revision to LASD's MPP has a similar history. As reported in several prior semi-annual reports, the MT and DOJ reached consensus with the Department on changes to the MPP nearly three years ago, following concerted work during the second half of 2018. The changes included revising the Department's existing complaint classification categories to make them consistent with California law, and to ensure all allegations of misconduct arising during a use-of-force investigation will be investigated and retained in PRMS. The changes being discussed in the SCR Handbook revision will dramatically change the MPP section on complaints, so it is being held in abeyance pending resolution of those issues.

### c.    Administrative Investigations Handbook

This handbook is a key component for ensuring Department policies are clear, complete, and consistent. This publication contains provisions for handling Administrative Investigations, which is the process used to handle the most serious cases of misconduct. Problematically, it also contains important information on other processes, which may be confusing for personnel. For example, it contains a detailed description of the SCR process, explaining the rationale for conducting such an inquiry. But that information belongs in the SCR Handbook, as that is where employees would most likely look to find that information. According to the Compliance Unit, once the SCR Handbook is completed, efforts will be made to update the Administrative Investigations Handbook.

### 4.    LASD AAB Audits

In order to comply with the SA's requirement for internal audits (Paragraph 140), the Department needs to submit an audit work plan for Monitor approval before initiating SA compliance audits. This is necessary to ensure the completed audit will satisfy the SA's requirements. On May 7, 2021, the Audit and Accountability Bureau submitted a work plan for an audit of Lancaster Station's public complaints. The Monitoring Team reviewed the proposed work plan and found it to be a significant improvement over prior audit efforts, which were often conducted without sufficient attention to the requirements of the SA. On May 17, 2021, the Monitors returned the audit plan to AAB with comments from the MT. Our review concluded the plan was a solid approach to assessing compliance in this area but needs to be slightly expanded in a few key areas. At the request of AAB, a virtual meeting was held on June 9, 2021, to clarify some comments and provide additional background for others. The meeting was productive and concluded with AAB's commitment to revise the audit plan and resubmit it for

Monitor approval. We are very encouraged with this development and look forward to working closely with AAB in this critical area.


5.      Next Steps for Complaints Monitoring

We will continue to monitor the Department's implementation of the outstanding recommendations from the MT's complaint audits and assist the Department in developing action plans to implement those findings and recommendations. We will meet with the Parties to resolve the issues identified in our second audit report, such as clarifying compliance metrics for certain SA paragraphs and accepting the intake interview when it sufficiently addresses the issues. We will continue working with the Department on revisions to the SCR Handbook, Department Manual, and Administrative Investigations Handbook. Finally, we will review and evaluate the Department's training program to implement the revised system for handling public complaints. To assess progress and provide technical assistance, the MT may conduct periodic reviews of particular cases. When the Department feels they have fully implemented these policies, including associated training, the MT will plan and conduct its next complaints audit.


6.      Compliance Status of SA Requirements for Public Complaints

Table 7 provides the current compliance status for each paragraph in the Personnel Complaint Review chapter of the SA. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not. The table reflects compliance assessments reported in the MT's complaints audits published January 2018 and December 15, 2020.

In summary, the Department remains out of compliance with 12 of the 17 complaint paragraphs. The only three that are in compliance are the LEP portions of Paragraphs 125 and 137, ensuring that an uninvolved supervisor conducts a complaint investigation as required by Paragraph 133, and identifying everyone at scene as required by Paragraph 134. We were unable to assess compliance with Paragraph 126, which requires that discipline be imposed when a deputy impedes a complaint, as there were no such cases in the audit sample. If future audits continue to indicate this conduct has not occurred and other monitoring work gives no indication of related issues, the MT will be inclined to consider the Department in compliance. We were also unable to assess compliance on Paragraph 136, which requires the investigator to interview the complainant in person. We expect to resolve this last item following a discussion with the parties on the efficacy of allowing the investigator to rely on the intake interview provided it sufficiently addresses all the substantive issues.

| Table 7 | | | | |
|---|---|---|---|---|
| **Public Complaints Compliance Status** | | | | |
| **SA Paragraph** | **Summary of SA Requirement** | **Compliance** | | |
| | | **1st Audit** | **2nd Audit** | **Overall** |
| Preface | Complaints are fully and fairly investigated and personnel are held accountable | No | No | 72% |
| 124 | Public access to complaint forms and information | No | UTD | No |
| 125 | Accept all complaints | No | No | 50% |
| | LEP language assistance | No | Yes | Yes |
| 126 | Impeding the filing of a complaint grounds for discipline | No | UTD | UTD* |
| 127 | Revise MPP, SCR, and IAB manual so they are complete, clear, and consistent | No | No | No |
| 128 | Service versus personnel complaints | Yes | No | 92% |
| 129 | Revise MPP (various) | No | No | Partial |
| 130 | Ensure each allegation and complaint is appropriately classified at outset and review | No | No | 82% |
| | Investigate every allegation even if not specifically articulated by complainant | No | No | 77% |
| 131 | Investigations are as thorough as necessary to reach reliable and complete findings | No | No | 89% |
| 132 | Refer appropriate cases to IAB or ICIB | No cases | No | 79% |
| 133 | Investigation conducted by uninvolved supervisor | No | Yes | Yes |
| 134 | Identify all persons at scene | Yes | Yes | Yes |
| 135 | Obtain a full statement from all persons at scene | Yes | No | 92% |
| 136 | Interview complainant in person or give justification | No | UTD | UTD** |
| 137 | Interview witnesses separately | No | No | 83% |
| | Use uninvolved interpreter for people with LEP | No | Yes | Yes |
| 138 | Training on intake and investigations | MT has not reviewed | | Pending*** |
| 139 | Training on investigations | MT has not reviewed | | Pending*** |
| 140 | Adjudications consistent with a preponderance of the evidence | No | No | 90% |
| | Semi-annual audit of public complaints | No | No | 30% |

* Unable to determine compliance for Paragraph 126. There were no complaints in the audit sample with an allegation of impeding filing a complaint, but there can be other indicators, such as the lack of public access to complaint materials, so the MT will review other information to determine compliance with this provision.

** The MT did not make a determination of compliance on Paragraph 136 pending determination of a compliance metric for recording all interviews and a discussion with Parties regarding the SA requirement that investigators do their own interview with complainant when the documentation of the first interview may prove to be sufficient.

*** Note that after implementation of the trainings, outcomes related to each aspect of the trainings will be measured in other provisions.

**G.      Accountability**

Over the last several reports, the Monitor has repeatedly emphasized the need for the Department to (a) make better use of available data to track performance and evaluate results, and (b) improve managerial oversight and accountability for the performance of both subordinate staff and unit operations. Throughout the current report we have continued to note deficiencies in these areas. The Accountability section, Paragraphs 141–145, identifies some of the critical mechanisms or data systems that capture information to facilitate analysis of employee performance as well as station- and systemwide data required to ensure accountability. This section also addresses responsibilities that rest with the AV commanders and division managers for utilizing the data and ensuring the accountability requirements for each section of the SA are carried out and the intended results are achieved.

1.      LASD Data Systems

A key component of accountability addressed in SA Paragraphs 141–143 is ensuring timely and reliable information is provided and used by supervisors, managers, and executive staff. Accountability mechanisms include such things as electronic data systems and file storage, as well as the policies and procedures governing their use, which then provide a means for management to routinely review and evaluate operations and performance in real time.

It became evident early on that PRMS—LASD's primary Department decision-support system—could not be relied upon as a sole, or adequate, source for managers to make informed and timely decisions and determinations about employee and operational accountability. LASD has made several PRMS modifications to its data systems, including to allow for comparison of the activity of deputies and units, identify trends, and access relevant data to aid in determining compliance with the SA. Where PRMS does not provide adequate information for assessing progress in meeting the requirements and objectives identified in the SA, LASD has worked to develop and implement supplemental information systems. Some of these were established in response to the SA, and others predated the SA. Following an effort to catalog those processes and systems and identify how each one is used, the MT has worked with the Compliance Unit and AV stations to document how they are or can be integrated into a more reliable and effective central accountability process.

As noted in the last report, LASD has achieved partial compliance with Paragraphs 141 and 142 of the SA in the development of databases necessary to address the deficiencies and inadequacies of the PRMS. However, the MT's own data verification activities found that PRMS often does not contain accurate or current information. LASD's current data systems are not yet providing sufficiently reliable and timely data so that supervisors and managers can readily identify and correct problematic trends.

a.      *Quarterly Reports*

One of the tools that managers have begun using to help identify trends, provide deputy comparisons, and address personnel performance and station-level operational deficiencies is the Quarterly Employee Review (referred to as Quarterly Reports). The Quarterly Report provides counts and offers insights about trends for individual deputies across several important performance areas, such as: use of force incidents, citizen complaints, administrative investigations, data on stops, searches, and arrests, obstruction arrests, community engagement activities, and any corrective actions taken such as retraining or referral to the Performance Mentoring Program. Primarily a quantitative tracker, the report does provide some context for those counts and also includes summaries of trends and other observations.

On June 19, 2021, the Compliance Unit submitted the quarterly reports for the fourth quarter of 2020 and the first quarter of 2021 for MT review. The quarterly reports have proven to be helpful to the Department and the MT in our monitoring efforts. LASD has remained engaged in the process of improving the utilization of the quarterly reports and has noted that these data have been useful. However, because the data elements required in the quarterly reports are not readily accessible electronically, the Department has found this process to be extremely time consuming and labor intensive. The MT understands that the Department is pursuing other options, including a significant upgrade in data collection and analysis software with the intention of improving the accuracy of the data and timeliness in identifying and responding to trends or patterns that are being revealed. The MT understands that procuring and implementing such a system is a long process, and it may take a while for this to have an impact on compliance. The MT wants to note that command staff not only recognized the challenges here, but they have also shown initiative in addressing the limitations and trying to overcome the frustrations stemming from the limitations that have been identified. We see this as a positive sign. The MT will be evaluating the effectiveness of the Quarterly Reports in the next reporting period.

2.      <u>Impact of the SA Accountability Section</u>

The Accountability section does contain some requirements or elements that have been viewed as merely having to "check the boxes" in order to seemingly display achieving compliance with certain SA provisions. However, the emphasis here has to be placed on gathering and applying meaningful data which, when also coupled with the application of critical thinking skills and exercising professional scrutiny, is necessary to promote a culture that will reinforce the importance of accountability and will also encourage further staff development. Lacking that, subordinate staff are unlikely to learn from their errors or omissions and may fail to recognize or understand that the expectations of their superiors includes engaging in critical thinking and striving for continuous improvement. In the long run, such failures pose increased risk to staff and to the department. Moreover, problematic behavior and trends in the field are likely going to be overlooked and not corrected, which directly affects the community.

For example, gaps in the department's process for handling community complaints have a direct impact on the department's ability to implement basic accountability. The MT's first audit of public complaints found that the Department was using antiquated complaint dispositions that are inconsistent with the dispositions codified in the California Penal Code. The Department also does not capture data on allegations (or complaints) of excessive or unnecessary force, or any other type of allegation, for that matter, that can arise during a UOF investigation. We have found that the Department does investigate some of these complaints during the use-of-force investigation, but unless the investigation actually results in disciplinary action, those complaints are never entered into PRMS and therefore are never included in a deputy's work history.

These practices, and many others, essentially prevent the Department from readily identifying and holding employees accountable for conduct resulting in complaints that, if and when viewed collectively, can actually reveal a pattern of inappropriate conduct or policy violations. At times this can and has resulted in management failing to intervene and take the necessary steps to correct performance problems until a deputy's behavior has become so egregious that major disciplinary action is unavoidable. Additionally, when the Department does correct their policies and data systems so that, for instance, allegations of misconduct arising during a UOF investigation are captured in PRMS, historic trends for commands, work units, and individual deputies still cannot be analyzed unless these changes are also effected retroactively.

Audits conducted by the MT have illustrated that the department does not routinely document employees' performance history. The Department Manual requires that an employee's performance history be considered in the adjudication of an investigation. However, complaint adjudications seldom, if ever, do this. Since our first audit of the complaint process, we have recommended that complaint investigations include a section discussing the employee's work history in order to document the rationale for the adjudication. This is especially important for Unit and Division managers, who are not as familiar with station personnel as are supervisors and watch commanders. It is not appropriate for them to review complaints and approve the corrective action taken with no insight into the employee. The Department was initially reluctant to make this change but has since indicated it will incorporate that into the SCR Handbook.

3.     Accountability Review

The Parties and the Monitor participate in onsite meetings that are dedicated to working through issues, evaluating progress, discussing policy and data, and so forth. The most recent onsite primarily focused on two dominant themes that reoccur in the SA and which have been highlighted as concerns in our six-month reports and elsewhere. Those issues are:
(1) accountability, especially in regard to management identification and review of problematic trends and behavior, and (2) the use of data to track both unit and employee performance, as well as of crime prevention and intervention strategies, identify both positive and problematic trends, inform practices, and hold deputies, supervisors and managers accountable for results. The goal of that review was to support the Department in developing a culture of accountability

where the leadership is expected and willing to thoroughly scrutinize, evaluate, or question the actions of deputies, supervisors, or even management.

Topics and specific case reviews were selected because they are emblematic of the issues related to data use and accountability that have been most resistant to progress. We looked at examples of issues that require greater attention by managers or command staff and present the highlights here.

The 2018 and 2019 community engagement reports remain out of compliance even after revisions; the stations have failed to provide the required assessment of successes, obstacles, and recommendations for future improvements. This assessment is critical and essential if the station captains are to have a solid understanding of how to improve much needed outreach and engagement efforts, particularly with hard-to-reach communities. Furthermore, no one in station leadership or in the Compliance Unit caught the original omission or the inadequacy of the subsequent revisions. The MT was happy to consult with the Department on development of the 2020 report, which the Department recently submitted. The MT will provide feedback in the next reporting period.

The SA requires that all new or revised Department policies, including unit orders, related to the SA be submitted to the Monitors and DOJ prior to publication (SA Paragraph 160). The MT and DOJ have documented various instances where this has not happened despite our repeated inquiries and reminders. This issue was noted in the last semi-annual report to the court and repeatedly flagged for department administrators. Unfortunately, this issue continued during this reporting period. Palmdale circulated a Unit Order in Palmdale in February 2020 that enabled supervisory approved deployments of "The Wrap" constraint device. Palmdale station personnel had deployed use of the Wrap at least twice since June 2020 and revised the unit order in February 2021. All of this occurred without notification or circulation of this unit order to the Monitors or DOJ; the Department failed to alert us to this new practice, which clearly has SA ramifications. We have been assured that the Department will close whatever gaps enabled this to occur. However, until LASD demonstrates that this issue has been addressed and remedied, the Department is out of compliance on Paragraph 160.

The MT and DOJ utilized a number of specific case examples that exemplify these patterns and which have been discussed in previous reports and audits. Together, we explored the cases and decision points in detail with the department. Topics or issues discussed included the following.

- Insufficiently thorough and critical review of deputy conduct and investigations. including failure to inquire into potential bias being displayed in favor of the deputy or the Department, and so forth.

- Insufficient effort to identify, evaluate, and respond to problematic trends that could have been addressed via early intervention measures.

- Inconsistent identification of and response to out-of-policy conduct.

- Allegations arising during investigations not being investigated as SCRs.

- Inattention to possible risk management issues and the possible need for revising policies and training.

- The lack of thorough follow-up and due diligence to ensure ordered corrective action is carried out and effective.

The discussion was robust and thought provoking. In several instances during the course of these discussions, the Department managers present agreed that the investigations presented had shortcomings that needed to be corrected, while in other cases the Department disagreed with the MT's or DOJ's assessment. Over the next reporting period, the MT will conduct a similar compliance review on cases identified by the quarterly report with a particular focus on managers' ability to utilize the quarterly report to identify and address trends.

Not only do these issues affect the Department's ability to hold deputies accountable, but the Department is not being *accountable to deputies*. Failure to implement SA-required UOF training leaves deputies in the field without satisfactory emphasis and training on topics that are imperative to modern policing and officer safety, such as de-escalation training and expectations, proper force decision making, procedural justice, ethical decision making and threat assessment, thereby making deputies vulnerable to much more serious discipline measures.

4.    Accountability (Paragraphs 141–145) Compliance Status

Table 8 provides the current compliance status for each paragraph in the Accountability section of the SA. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not.

| Table 8 Accountability Compliance Status | | |
|---|---|---|
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 141 | • PRMS as LASD-wide decision support system<br>• Peer to peer comparisons of deputies and units<br>• AV commanders' periodic reviews of all personnel to identify trends | Partial |
| 142 | • Modifications to PRMS to access additional information<br>• Electronic PLEs<br>• PRMS accurate; accountability for errors | Partial |
| 143 | Plan for periodic review of trends at stations | Partial* |
| 144 | Modifications to Performance Mentoring Program (PMP); 30-day turnaround | Partial** |
| 145 | Coordination between Department-wide and Division PMP | Partial** |

*The "plan" needs to encompass Divisional managers' review of the way station commanders use data and other information to respond to issues. The Quarterly Reports are one aspect of this plan, as are performance evaluations, CMF/RMF, shooting reviews, EFRC, Sheriff's 11, AAB audits, etc. A purpose of the MT's compliance review is to assess the success of the plan to ensure accountability across all these tools and processes.

**The mentoring programs are established and functioning. The qualitative effectiveness of the effort to comply with SA Paragraphs 144 and 145 will be assessed in the next reporting period.

## IV.   CONCLUSION

In this reporting period, the MT has observed more signs of progress in the implementation of the reforms required by the SA. We appreciate the efforts shown by Department leaders in acknowledging the importance of and reinforcing the need to strive for better communication and collaboration surrounding the goals that were established.

Even though we have seen increased engagement and progress on several fronts, that is not yet bringing about all the desired outcomes that are intended and which will ultimately be required to achieve full compliance with the SA. However, progress is being made and, should the level of commitment we have observed continue to improve, we are hopeful that this will translate into significant advancements in LASD's compliance status as early as the next reporting period on some very important items (in particular, community engagement and managerial accountability).

The Settlement Agreement was structured to help ensure the needs of both the public and the members of LASD are being addressed. Throughout this report, we have stressed the importance of having effective managerial oversight in place along with an unequivocal organizational commitment to being accountable for both constitutional policing and achieving those public safety outcomes addressed in the SA. This commitment must include meaningful engagement of the community in defining and helping bring about those outcomes. Those

objectives also play an important role in ensuring employees gain a clear understanding of the agency's priorities so that they can then carry out their responsibilities in a manner that is consistent with organizational guidelines and community expectations. Law enforcement is under acute scrutiny, not only in the Antelope Valley but across the country, and LASD deputies, like others elsewhere, are in need of and entitled to clear direction and guidance that results from well thought-out policies, relevant training, effective supervision, and other forms of support that can be provided by strong agency leadership and through the involvement of an engaged public.

## A.        Acknowledgements

The MT wants to acknowledge and thank Lancaster Station Captain Todd Weber for his many years of dedication to the Antelope Valley and his support of the Settlement Agreement. We have always appreciated Todd's candor, positive attitude, his thoughtful participation in this work and his dedication to working with the community. Congratulations on retirement Captain Weber!

The MT would also like to express their sincere appreciation to Roger Granbo for his dedication and leadership and for the invaluable contributions he has made throughout the duration of this endeavor. He has been engaged on this matter since the inception of the project, effectively representing the interests of LASD and the County Counsel's Office. His knowledge and experience have not only served the County and LASD well, but he has also proved to be a valuable asset to the process and a great resource for the MT. We wish him well on his retirement from the Office of County Counsel.

The Monitors also send their congratulations to Captain John Lecrivain, previous lead for the Compliance Unit and now Captain Weber's replacement at Lancaster Station. We thank him for his dedicated work at the CU and wish him luck in his new role. We look forward to continuing to work with him on moving the Settlement Agreement forward.

## B.        Implications for Compliance

While these retirements and promotions are to be celebrated, they also represent additional turnover in the compliance team. As described in previous semi-annual reports, the MT believes that changes of leadership at the Compliance Unit have frequently resulted in significant delays in SA progress as the new staff "onboard" to the work. More recently, due at least in part to some of these transitions, the Monitors find ourselves in a position where we are being asked to revisit conversations and decisions from years ago. Certainly, some of this is healthy for the work—new voices and strategies can help navigate roadblocks and bring refreshed enthusiasm. We welcome this perspective and are committed to supporting the new staffing in any way appropriate. We also note that within the last year, the Department has added a commander to the compliance work. The MT is very appreciative of this development and understands that this

commander will continue to shepherd the work forward and provide some continuity. That said, there are a few issues that we urge the Department to consider.

The MT believes the Department is at a crucial juncture that has broader implications for achieving compliance with the SA. In the next reporting period, and certainly within a year, the Department has the potential for reaching compliance or at least taking the final turn toward compliance, in a number of important SA areas. The UOF policy is nearly in place, and the most recent proposed revisions to UOF training look promising. The SCR handbook negotiations have progressed with only a few important remaining issues, which will inform the completion of the MPP and other related policies and procedures. AAB is poised to begin conducting audits that can supplant the need for full audits by the MT. Employing crime prevention strategies and assigning data scientists to assist AV managers will allow the Department to complete its own stops and disparities analyses and to increase the regular use of data to inform practice and meet SA requirements. The implementation of the VCPI training and steps toward compliance with the Community Engagement training raise our level of optimism that SA mandates for improved collaboration with the community and strengthening of the Department–community relationship across all AV community members will also move more quickly in the near future.

The role of leading the Compliance Unit is critical for SA success and has a pronounced influence on the ability of the AV stations to carry out the responsibilities of the SA. We respectfully ask the Department to select a person who is experienced with the SA or other consent decrees, who is familiar with current compliance issues as well as patrol policies and practices, and who can competently and confidently navigate the work that must be done with many LASD units and administrative offices involved in the SA work. We also ask for the Department to consider expanding the Compliance Unit and the time dedicated to compliance by other units including AAB, Training Bureau, and Data Systems Bureau to ensure that internal workload issues do not interfere with compliance. As we have noted in the past, we recommend the lead of the Compliance Unit have the rank of captain or higher, as this provides the authority to move the work forward more quickly and efficiently while also indicating to LASD personnel and the AV community the importance the Department places on this work.

We appreciate the Department's consideration and look forward to working with the Department leadership on the opportunities and challenges associated with the turnover in the leadership the AV compliance unit.

**Appendix A**

**Applying the Results of Data Analysis to Inform Practice: Probation/Parole Status**

It is important to note that the MT data reports are just the very beginning of the process by which data must be used to meet SA requirements and improve law enforcement services in the AV. The crucial part of the process is whether and how the data are being used by the Department to guide and evaluate the provision of law enforcement services in the AV. Using the data, the Department needs to assess whether specific, articulated strategies are effective; whether certain units, shifts, or supervisors or some other Department entity seem to affect certain groups more than others; and whether a particular policing strategy has unintended consequences, such as reduced community trust in law enforcement. If the data show a disparity in enforcement, commanders should review the activity leading to the disparity, judge the efficacy of the practice, and provide direction to staff to mitigate the disparity where appropriate. Regular analysis and engagement with the stops data are core components of constitutionally valid policing.

This section will demonstrate the type of approach the MT expects regarding the appropriate use of stops data by LASD managers to meet SA requirements and improve policing in the AV.

During a September site visit in the AV, the SA requirement that LASD collect, analyze, and use these data to address issues was discussed, in particular regarding Paragraph 46, which states: "LASD-AV shall collect and analyze data related to searches based on probation or parole status. LASD shall assess the efficacy of this tactic and its impact on the community and make policy changes accordingly." The probation/parole question is also specifically addressed in SA Paragraphs 44, 46, 56, 57, 81, 82, 83 and 153, and is a factor in reviews and analysis discussed in several other provisions.

At this point, LASD does not regularly review data to assess the efficacy and impacts of conducting searches based on probation and/or parole status during stops and is thus not in compliance with Paragraph 46. Paragraph 83 also requires the Department to determine whether they are asking about a person's probation or parole status in a race neutral manner. Therefore, the MT discussed with station commanders the steps the stations can take to begin carrying out these and other important reviews. These steps are similar for any provision or any issue that the Department wishes to address. They include the following.

1.    Understand the purpose and scope of the issue (in this case, defined by the SA provision).

2.    Compile data and contextual information on the issue.

3.    Review those data and that information.

4.       Develop goals and specific corrective action for addressing any problematic findings.

5.       Implement that corrective action and monitor its progress, including making any adjustments based on ongoing tracking and including holding personnel accountable to the goals.

The remainder of this section demonstrates how those steps might be carried out regarding Paragraph 46. (See Appendix B for a summary of a targeted analysis of the probation/parole status question.)

The MT recognizes that circumstances arise in law enforcement that provide reasonable justification for asking a person about their probation/parole status, but it can still be counterproductive and damage community relationships when the question is asked simply as a matter of course and without recognizing that it can be unwarranted and inappropriate in many situations. It is crucial that station managers review these practices and their consequences because they can undermine perceptions of LASD's legitimacy and foster distrust within the community. Asking AV community members if they are on probation or parole has been an issue since the outset of the Settlement Agreement and continues to be so.

The recently released MT analysis of LASD-AV stops that showed the disparities on probation/parole questions continue.[18] The reports states:

> *Blacks are much more likely to be stopped, are more likely to be searched when stopped, are more likely to experience a backseat detention, and are more likely to be asked whether they are on probation or parole. Regarding the latter outcome, similar proportions of Whites, Hispanics, and Blacks asked about their community corrections status are actually on probation or parole. However, the higher rate at which this question is asked of Black people in conjunction with their relatively high stop rate indicates that a larger share of the Black population who are not on community corrections has had the recent experience of being stopped by a sheriff's deputy and asked if they are on probation or parole. (p. xii)*

---

[18] The full name of the report is *An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley.* It is available at http://www.antelopevalleysettlementmonitoring.info

The practice of asking AV community members if they are on probation or parole appears to have had a disparate and negative impact on communities of color in the AV in violation of the SA, which states:

> *LASD agrees to deliver police services that are equitable, respectful, and bias-free, in a manner that promotes broad community engagement and confidence in the department.* (Preface to Bias-Free Policing section, SA p. 13)

> *In conducting its activities, LASD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion; gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States.* (Paragraph 64)

**Appendix B**

**Applying the Results of Data Analysis to Inform Practice: Backseat Detention**

It is incumbent on LASD to understand where and why disparities are occurring in its enforcement activities and to determine how to best address them. Only through reflection on and analysis of its law enforcement strategies and practices can the Department determine critical intervention points where disparities can be addressed. This does not mean any particular enforcement actions should necessarily cease, but enforcement strategies must be questioned and scrutinized and adjustments considered. The determination as to the efficacy of any specific police practice should, among other factors, consider the impact it has on public safety *as well as* community trust in the Department—with the awareness that real or perceived disparate treatment can have a significant negative impact on community trust in law enforcement and that a lack of trust between the Department and the community can, in turn, hinder safety and effective law enforcement.

Backseat detentions are an important consideration in the SA, specifically addressed in Paragraphs 44, 47, 48, 49, 57, 81, and 153, and they are a factor in reviews and analysis discussed in several other provisions.

As an example, a finding in the disparity analysis was that Black people are more likely to experience a backseat detention than Latino and White people are. To gain an understanding of the circumstances leading to backseat detentions and to make an assessment of the legitimacy of those actions, station managers and their staff can perform a number of inquiries, such as the following.

- Review the stops disparity analysis and trends analysis.

- Conduct their own review of the stops data, including the narrative describing the reasons for each backseat detention, and arrest reports to look for patterns or anomalies.

- Explore the data to see whether backseat detentions—and specifics on the reasons for the detention—happen more often during certain types of stops, or in certain reporting districts, or certain times or shifts, or when certain deputies are involved.

- Interview deputies and their supervisors for context and thought process.

- Review the outcomes of stops involving backseat detentions to track what valuable law enforcement objectives are being met.

- Review community input on the matter through the community survey, CACs, community meetings, and planned and ad hoc conversations with community members.

- Review complaints, uses of force, and other cases involving backseat detentions.

- Review policy, training, and supervision concerning the matter.

- Gather feedback from respected subject matter experts about observed trends and possible interventions.

With this information, important questions can begin to be answered: Are the findings explained and not an issue to be concerned about? Do law enforcement objectives justify a negative impact on community trust? Could adjustments be made to meet law enforcement objectives yet reduce some of the negative impacts? Are there characteristics of certain deputies or shifts or types of stops that unnecessarily increase the use of backseat detentions? Are there issues in the community or physical environment that contribute to the backseat detentions? Are adequate policy controls in place to manage when backseat detention occurs?

Depending on the answers to these questions, station leadership can then develop a plan to address any existing disparity. This could involve several options.

- Revised policies or directives.

- New elements of training, supervision, or mentoring.

- Setting expectations of when backseat detentions should and should not be used (with tracking to hold deputies and their supervisors accountable to the expectation).

- Setting goals for reducing the use of backseat detention by a certain percentage in a certain time period (again with tracking to assess results).

- And, if initial interventions do not achieve goals, consider the Performance Mentoring Program or other supervisorial options such as temporary reassignment to remove staff from the environment and/or participation in an assignment to develop their ability to make better enforcement decisions.

The MT also recommends that the Department be inclusive and transparent about this process, sharing the data and communicating its goals with community members and LASD personnel so as to increase understanding of the Department's commitment to improving law enforcement services in the AV and maximize buy-in for any eventual changes.

**Appendix C**

**The Monitoring Team**

The court-appointed Monitors—Dr. Angie Wolf and Joseph Brann—have assembled an experienced team with credentials and skills uniquely suited to the SA work. The membership of the MT was finalized in March 2016. The two Monitors and seven team members have extensive expertise and experience in monitoring and evaluation work in policing and corrections. Additionally, most of the MT members have served in law enforcement or continue to have distinguished careers in this field, several in the Los Angeles area. Several have served in leadership positions in law enforcement or corrections agencies during the implementation of the compliance period of a settlement agreement or consent decree and therefore understand the unique challenges that large organizations face in those circumstances. The MT members also have expertise in dealing with the diverse issues addressed in the SA, such as those related to use of force, training, the FHA, data collection and analysis, survey methods, and the complexities of community engagement.

This constellation of team members was assembled to support the Monitors' philosophy of collaborative reform; it is using the principles of evaluation and technical assistance to provide an actionable assessment of LASD's progress toward implementation of the SA.

**Appendix D**

**Antelope Valley Monitoring Website**

This website allows AV community members to learn more about the SA, the backgrounds of MT members, and the monitoring activities; access documents related to the monitoring work, including each semi-annual report, each Community Survey report, MT audits, and MT data analyses; follow links to LASD's homepage and other relevant websites; and—importantly—submit questions and comments directly to the MT.

The website's URL is www.antelopevalleysettlementmonitoring.info

**Appendix E**

**How the Parties and Monitoring Team Work**

To complete the work of the SA, the Parties (US DOJ, LASD, and the County of Los Angeles) and the MT are in daily communication through a variety of means. In each six-month period, the Parties and MT hold multiple meetings at LASD headquarters; the offices of the Compliance Unit; other administrative offices; Palmdale and Lancaster stations; and various community centers, schools, and places of worship in the AV. The MT periodically meets in person with the captains of both AV stations and their staff and participates in multiple onsite meetings with LASD's Compliance Unit, usually regarding specific issues such as policy or protocol review or data system discussion. The MT also holds meetings with units or leadership from other operations that are critical to this reform work, such as the AAB or the commander in charge of training. The MT typically observes the semi-annual LASD risk management meeting and the CMF. Although some of these meetings and events are general in scope and pertain to several sections of the SA, most are related to specific sections or provisions of the SA. The Parties and MT also participate in several small- and larger-group community meetings in Palmdale and Lancaster—often with the CACs—where various topics are discussed, such as the MT semi-annual reports, LASD and CAC community engagement reports, community perceptions about LASD and its approach to policing, and other topics.

In addition to in-person meetings, a variety of conference calls take place each month, along with daily email or telephone communication among representatives of the Parties and the MT. The MT and DOJ participate in a bimonthly call to address substantive issues and planning; a similar bimonthly call involves the MT, DOJ, and the Compliance Unit; and the MT and Parties, including the Office of County Counsel and extended LASD command staff, participate in a monthly telephone conference call to discuss workflow, future events and meetings, and other salient topics. Several times per year, onsite meetings are held where most participants from the Parties and the MT spend several days together doing intensive work on various topics.

Videoconferencing is used whenever possible when all are not able to be physically present in meetings. Documents are shared extensively via email for the purposes of review and collaborative development of the various policies and procedures, training curricula, community engagement materials, audits, and other written elements of the SA. LASD shares departmental data in various formats with the MT via secure email and digital media.

**Appendix F**

**Monitors' Note on the Settlement Agreement,
Constitutional Policing, and Organizational Change**

As noted in previous reports, the MT understands and remains mindful of the many complexities encountered when a large organization undertakes broad policy changes as well as the challenges of implementing such changes. The Monitors also appreciate the considerations of LASD management in dealing with matters of this nature, such as whether the changes will be confined to the AV stations or affect the entire organization; the likelihood that other existing policies could be affected and therefore need to be revised; that evolving "best practices" and legal considerations also influence policies related to use of force, video recordings, and so on; and the need in many instances to consult with labor groups or legal resources before such policy changes can occur. Throughout the work to date, the Monitors have found the Parties to be strongly committed to ensuring that the requirements of the SA will not be weakened or overlooked because of these considerations. Based on the ongoing collaboration among the Parties, the MT believes the SA objectives can be achieved in a timely manner.

Critical to successfully implementing and sustaining the SA reforms is a commitment to constitutional policing principles. LASD's ability to meet these responsibilities is dependent on clear policies and effective training. Only when prepared with sufficient training and clarity about the purpose of the SA can deputies clearly understand what the Department expects from them in their community interactions. Only then can deputies honor Constitutional standards of policing. Department capacity is also affected by the need to have sufficient accountability systems in place to monitor and evaluate employee performance and management oversight practices.