1  RODRIGO A. CASTRO-SILVA, County Counsel
   CARRIE CLARKE, Deputy County Counsel
2  (SBN 150031) • cclarke@*counsel.lacounty.gov*
   648 Kenneth Hahn Hall of Administration
3  500 West Temple Street
   Los Angeles, California 90012-2713
4  Telephone: (213) 229-3097 · Fax: (213) 626-2105

5
   Attorneys for
6  The County of Los Angeles and the
   Los Angeles County Sheriff's Department
7

8

9              **UNITED STATES DISTRICT COURT**

10   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  UNITED STATES OF AMERICA,              CASE NO. 2:15-CV-03174-JFW-FFM

13              Plaintiff,                 **SUBMISSION OF MONITORS'
                                           THIRTEENTH SEMI-ANNUAL
14        v.                               REPORT**

15  THE COUNTY OF LOS ANGELES
    AND THE LOS ANGELES COUNTY
16  SHERIFF'S DEPARTMENT,

17              Defendants.

18

19        On May 1, 2015, the Court approved and entered the parties' Settlement

20  Agreement ("Agreement") to resolve the United States' claims against the County of

21  Los Angeles and the Los Angeles County Sheriff's Department pursuant to

22  42 U.S.C. 14141 (re-codified at 34 U.S.C. § 12601) and the Fair Housing Act, 42

23  U.S.C. 3601 *et seq*.

24        Paragraph 171 of the Agreement requires the Monitors to publically issue a

25  report every six months that details the Parties' progress in implementing the

26

27
    HOA.103535351.1                                    2:15-CV-03174
28  SUBMISSION OF MONITORS'
    THIRTEENTH SEMI-ANNUAL
    REPORT

1    Agreement and achieving compliance with the Agreement.  The parties hereby

2    submit the Monitors' thirteenth semi-annual report.

3    DATED: January 25, 2022                Respectfully submitted,

4

5                                           RODRIGO A. CASTRO-SILVA
                                            County Counsel
6

7

8                                          By _____

9                                             CARRIE CLARKE
                                              Deputy County Counsel
10

11                                         Attorneys for
                                           The County of Los Angeles and the
12                                         Los Angeles County Sheriff's Department

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT

# Antelope Valley Monitoring Team
## 13th Semi-Annual Report



**December 2021**

# CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     SETTLEMENT AGREEMENT COMPLIANCE ........................................................ 6

III.    WORK TO DATE ..................................................................................................... 8
        A.      Stops, Seizures, and Searches ................................................................. 9
        B.      Bias-Free Policing ..................................................................................... 20
        C.      Enforcement of Section 8 Compliance ................................................. 27
        D.      Data Collection and Analysis ................................................................. 30
        E.      Community Engagement ......................................................................... 33
        F.      Use of Force ............................................................................................. 44
        G.      Personnel Complaint Review ................................................................. 55
        H.      Accountability .......................................................................................... 60

IV.     CONCLUSION ....................................................................................................... 62

**APPENDICES**

A.      MT Trends Analysis: Stops and Stops Outcomes July 2018 to June 2021
B       The Monitoring Team
C       Antelope Valley Monitoring Website
D.      How the Parties and Monitoring Team Work
E.      Monitors' Note on the Settlement Agreement, Constitutional Policing, and
        Organizational Change

## I.    INTRODUCTION

This is the 13th semi-annual report issued by the Antelope Valley Monitors. It describes observations from the Monitoring Team (MT) on progress of the Los Angeles County and the Los Angeles County Sheriff's Department in meeting the requirements of their Settlement Agreement (SA) with the US Department of Justice (DOJ) for the Antelope Valley (AV). This report focuses primarily on work undertaken from July through December 2021, as well as the status of work begun in previous reporting periods.

During this reporting period, the Monitors note an increased urgency from the Department toward achieving compliance with the SA. The Compliance Unit is now led by a sergeant and is staffed by two additional sergeants, all of whom are hard-working and responsive. They have shown diligence with respect to project management in their preparation for meetings, and they are more attentive to follow-up when required. Importantly, there has been an increased level of engagement from the assistant sheriff over patrol, as well as from the commander of the North Patrol Division (NPD, also referred to as the Division).

The Monitors greatly appreciate this engagement and see positive outcomes in several areas. First, there is more collaboration and cooperation from other units of the Department. In our past assessment, the SA was viewed as an AV issue, and when engagement by another unit outside the AV was necessary, it was often lacking.

More recently, we have noted greater involvement and attention on the part of upper management. While the Parties (i.e., DOJ, LASD, and the county) and the MT continue to acknowledge and work within the boundaries of the SA, we are seeing an increased willingness to engage in the work of the SA by upper management and other units of the Department. For example, the Training Bureau is now very much involved in the development of training related to the SA and has met directly with DOJ and MT subject matter experts. Progress was made on the training requirements outlined in the community engagement and use of force (UOF) sections of the SA.

Also, as noted in previous reports, the Crime Management Forums (CMF) and Risk Management Forums (RMF), which are Division-wide in their focus, had been largely unchanged since the DOJ investigation. However, in this reporting period, the NPD commander and chief have made this a priority, and we have noted marked improvement, with more inquisitiveness from managers and an addition of discussions of trends being noted and crime prevention strategies undertaken.

We also note that this increased management support has resulted in a more efficient process for revisions of Department policies and manuals. As noted in previous reports, revisions to key policies that impacted the entire Department, such as the UOF policy and early versions of the complaints policies, could languish once they left the purview of the Compliance Unit. We also completed a UOF audit and are pleased to report that AV deputies used force and de-escalated

tense and evolving incidents without using force in manners consistent with Department policy and in compliance with the SA.

Upper management and County Counsel also have made specific requests meant to aid in implementing the SA. The Department asked us to formalize our compliance assessment methodologies for each SA provision. Such methodologies have typically been discussed and documented in separate specific work plans or reports as the work was undertaken; the Department requested that this information be incorporated in advance in a single document. We provided such a document on September 3, 2021.

Also, the Department expressed their view that many of the previously agreed-upon compliance metrics do not provide the stations with sufficient clarity and guidance on what they should be doing or what compliance would look like, partly because the compliance metrics sometimes address more than one provision at a time. The Monitors, LASD, County Counsel and DOJ negotiated compliance metrics over the first several years of the SA and attempted multiple approaches, including the one-metric-per-provision approach currently favored by the Department, before settling on the approved metrics as the most efficient and thorough. In the past, when LASD struggled with an aspect of a compliance metric and explained its position, the Monitors and DOJ worked with the Department to make appropriate changes. However, there has been a 100% turnover in the Compliance Unit and a new attorney was assigned by County Counsel; they were not part of most of those earlier discussions.

While we generally disagree with the Department's assessment of the previously approved metrics, we have worked with the Parties to reevaluate the metrics and make changes in some cases. In fact, during the past six months, the primary activity of the MT and the Parties was to revisit previously negotiated and agreed-upon metrics and to reach agreement on the approximately 14 provisions for which metrics had not yet been approved. The county has stated it is seeking distinct, simple, and clear metrics for each SA paragraph. It is the Monitors' position that as long as the Department intends to reach the outcomes outlined in the SA, and when there is something we can do to make the Department's work easier, we are eager to support that objective. We agreed to this process despite the expense and time commitment because we believe that if the Department will get behind the compliance metrics, that should translate into stronger management support, and the desired outcomes can be achieved. We share and support the county's goal that the process of revisiting compliance metrics be resolved in early 2022 so that the work toward SA compliance can again take precedence.

While the bulk of the energy in this reporting period was devoted to revisiting the compliance metrics, this report, as usual, includes an assessment of all SA sections, though some remain largely unchanged. We also dedicated significant time to completion of the MT's UOF audit, revisions to UOF policy and training, revisions to the Service Comment Report (SCR) Handbook, developing an audit work plan for many of the stops and bias-free provisions, completion of the third Community Survey and ongoing community engagement activities. We also reviewed LASD's promising new Community Engagement Training curriculum.

Progress was made; however, as documented in previous reports, the MT continues to see challenges related to management and accountability, data collection and use, and, increasingly, how the Department responds to questions, critiques, or negative feedback.

The primary themes of this report continue to be related to management review and accountability and the Department's use of data and information to inform practices, all of which have been underscored in previous reports. The last several semi-annual reports have emphasized that the Department has yet to develop the internal data management and analysis strategies to identify and correct issues. The MT has generated several audits to evaluate whether SA provisions are successfully implemented, and it has generated several data analysis reports to provide and highlight trends that are evident. Through these audits and reports, some issues have been identified, and concerning trends have emerged. Unfortunately, the MT's findings and assessments often have not been well received by Department managers, and few formal responses have taken place. When the Department is open to addressing an issue, it is usually through triage— addressing only what is absolutely necessary—which is a solution that does not always address or fix underlying issues or causative factors.

Despite the encouraging collaboration with a productive Compliance Unit and engaged NPD managers and executives, in some places we are seeing repeated and often failed attempts to fix issues in a highly circumscribed, piecemeal fashion. Because the SA is specific to the AV, it makes sense that for some issues (e.g., unit orders ending the practice of housing vouchers), the solutions are narrow, targeted, and what might be called surgical. However, we are finding that this narrow approach is sometimes counterproductive when used to address matters or areas that may require broader thinking or may impact the Department outside the AV. When the Department has been compelled to make improvements, the agreed-upon solutions tend to make very specific changes to elements of their systems, but they typically do not include a rethinking or reevaluation of the systems themselves, or the Department may decide larger-scale change is not necessary. Of course, for an agency as large as LASD, replacing data systems or accountability processes that have been in place for decades would be time- or resource-intensive However, a point may come when the cost and consequences of not revisiting these systems prove to be overwhelming.

We are grateful for the increased involvement by LASD executive leadership that we have recently observed. We do not believe that substantial compliance can be achieved without additional support and oversight of the Compliance Unit and stations. The Compliance Unit, station leadership, and Community Advisory Committees (CACs) need some additional direction from leadership, as evidenced in several ways.

The Parties, Monitors, and some community members share frustration that the work is taking long. It is the Monitors' impression that groups within the community believe the work will move more quickly if we hold the Department more accountable. The Department places some of the blame on the MT and DOJ. This position is not compelling, given that after six years, the Department has not completed work clearly laid out in the SA. While ultimate determination of compliance requires the approval of the MT and DOJ, there have been various instances when the Department was the driver of the work rather than depending on the MT or DOJ to provide reminders, explicit guidance or, for that matter, formal compliance metrics and assessment methodologies. For example, the Department had already created the Compliance Unit, made most of the SA-mandated revisions to stops policies and had written a housing policy, begun work on several trainings, engaged the Museum of Tolerance, and did extensive planning for changes to the CAD system before the MT was established. Also, the Compliance Unit developed the Quarterly Reports process almost entirely on its own, checking in periodically with the MT in order to maintain efficiency. There are several other areas where such progress could have been achieved. But the Department has not yet conducted compliant audits that they are required to conduct semi-annually, has not performed a review of all of its activities for potential disparity, has yet to implement routine testing that deputies are retaining the knowledge they gain in training, and is only now starting to develop a data analysis plan for stops and UOF, which are meant to be among the Department's routine annual practices and reports.

In our assessment, the MT, DOJ, and LASD are all working hard to keep the work moving efficiently. The Monitors regularly assess and, when necessary, adjust our own internal scheduling, staffing, and workflow practices to ensure that we do not contribute to inappropriate or unnecessary delays in the Department's progress toward compliance. We have implemented tighter timelines for LASD, the MT, and DOJ. We have stressed to the Parties the importance of providing materials ahead of any scheduled meetings in order to allow sufficient time for review. We will continue to provide any technical assistance requested by the Department. We have readily agreed to the Department's request that we provide our feedback concerning LASD work products as quickly as possible and with as much specific guidance as possible, and we are discussing with the Parties ways to better ensure that our compliance reviews and audits are conducted and provide detailed feedback to the Department as quickly as possible. However, the Monitors again stress that the key factor that will accelerate this work and result in achieving the desired objectives is LASD executives and managers making the decision to apply the attention, critical thought, and resources necessary to move the work and implement the SA-mandated reforms.

It is certainly the case that there is an increased workload for AV personnel related to the SA on top of a high volume of work at the stations. However, LASD leadership is blaming the SA too often for the workload instead of embracing the fact that the changes—besides being required for compliance with the SA, which the Department agreed to—will improve operations and lead to better outcomes and more efficiency. But it is possible that the Compliance Unit and stations need more resources, supervision, and support to stay on top of the compliance efforts.

We acknowledge that implementation of the SA now is likely more difficult for the Department in some ways than it was five years ago, for a variety of reasons. In 2021, the California DOJ launched a Department-wide pattern and practice investigation, which no doubt places additional demands on Department resources. Also, staffing shortages contribute to staff feeling overworked and demoralized. Finally, law enforcement agencies across the nation are under pressure to reform their UOF practices and to reduce racial and ethnic disparities in stops and searches while still keeping the streets safe in this stressful time of political division and the COVID-19 pandemic.

While we acknowledge that the task is challenging, we do not believe it is impossible. However, it will likely require the Department to more fully commit to improving practices. Notable progress has been made in several areas since the start of the SA, yet at this stage, the Department is spending a lot of energy on the <u>letter</u> of the SA. To fulfill the remaining areas of the SA that do not yet meet compliance, the Department will have to lean into the <u>spirit</u> of the required reforms—even embracing these efforts for no other reason than to improve police practices and effectiveness. If they do, there is no doubt that full SA compliance can be reached and the community will see the results. When the Department <u>does</u> lean into an area by looking at the big picture, honestly assessing the issue, and exploring options, it tends to have creative and effective solutions that the Monitors support, such as initiatives to apply Corrective Action Plans to MT audit results and the stations' Quarterly Reports. These efforts need to happen more often and with greater follow-through.

The Monitors appreciate the efforts undertaken by LASD-AV personnel and the Compliance Unit in striving to meet the requirements of the SA. We also acknowledge and appreciate the commitment of time and energy that the CAC members have devoted to the SA and the AV community.

**The Antelope Valley Settlement Agreement: Summary**

The Antelope Valley Settlement Agreement (SA) was established between the US Department of Justice, Civil Rights Division (DOJ); the Los Angeles County Sheriff's Department (LASD); and the County of Los Angeles, and it was filed with the US District Court for the Central District of California in April 2015. (DOJ, LASD, and the county are collectively referred to as the Parties.)

The purpose of the SA is to ensure that residents of the Antelope Valley (AV) have police services that are lawful and fully consistent with the Constitution of the United States and contemporary policing practices. The SA specifically identifies, as individual sections, a variety of reforms and objectives to be met by LASD in the AV related to stops, seizures, and searches; bias-free policing; enforcement of Section 8 compliance; data collection and analysis; community engagement; use of force; personnel complaint review; and accountability.

The SA also stipulates that a professional monitor be selected to track and assess LASD's progress in implementing and achieving compliance with the SA; work with the Parties to address obstacles to achieving compliance; and report on the status of implementation to the Parties and the Court. Per SA Paragraph 171, the Monitors submit a semi-annual report every six months; the first of these was issued in December 2015.

The AV lies in the northeast corner of the County of Los Angeles and includes two cities—Lancaster and Palmdale—and several unincorporated communities spread across hundreds of square miles. LASD provides law enforcement services in the unincorporated areas of the AV as well as via contracts with Palmdale and Lancaster. An LASD station serves each city, with law enforcement activities for the surrounding areas split roughly between the two.

## II.   SETTLEMENT AGREEMENT COMPLIANCE

Much of the SA involves developing or revising policies, procedures, and training; putting into place various processes (such as a plan for ensuring all new AV deputies receive training mandated by the SA); and striving to more effectively engage with community organizations and entities, such as the CACs. This work is usually done collaboratively among the Parties and the MT, with documentation of the change (new policy, revised training, etc.) eventually being formally submitted to the MT and DOJ for approval.

While this represents a crucial step forward, at this point the Department could be considered to be only in partial compliance (or "policy compliance" as the Parties have viewed it) because in most cases, more steps are involved before the Department reaches full <u>implementation</u> (SA

Paragraph 20, see below) and, thus, achieves the status of being in full compliance. Paragraph 149 states, "Compliance with, or implementation of, a material requirement of this Agreement means that LASD has: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice."

Any approved policies related to the SA must be distributed to every deputy according to SA -required procedures and, as necessary, incorporated into training curricula. An approved training curriculum will require documentation that appropriate personnel have received the training. New procedures and processes must be successfully instituted. Most importantly, each of the established improvements must be proven effective and practical in the real world. That is, they are assessed through MT activities such as reviews, audits, interviews, observation, and data analysis to establish whether they are successfully reflected in law enforcement practices and achieve the intended qualitative and quantitative impacts on the AV community.

Changes to policy and practice also must be incorporated into LASD-AV's accountability practices. The reviews, analyses, studies, and audits that the SA requires LASD to conduct must use appropriate methodologies, and, in turn, their findings must be used effectively to inform policies and practices.[1] Finally, this level of performance must be sustained for one year to achieve <u>full and effective compliance</u> and to satisfy the terms of the SA (Paragraph 205). In some cases, the SA requires ongoing improvement in the delivery of services (SA Paragraph 15).

This process of achieving compliance is laid out in various provisions of the SA, especially through the following paragraphs.

- In <u>Paragraph 20</u>, implementation is defined as "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice." What is meant by "consistent and verified performance" is to be laid out in compliance metrics for each provision.

- According to <u>Paragraph 205</u>, the terms of the SA will have been met when "the County has achieved full and effective compliance with the Agreement and maintained such compliance for no less than one year."

---

[1] Paragraph 171b gives a summary of the stepwise process by which the Monitors assess compliance and document their findings. Each provision of the SA needs to be "(1) incorporated into policy; (2) the subject of sufficient training for all relevant LASD deputies and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitor to have been fully implemented in practice."

- In <u>Paragraph 15</u>, full and effective compliance means "achieving both sustained compliance with all material requirements of this Agreement and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to the Agreement's outcome measures."

Compliance metrics or measures represent the specific quantitative and qualitative criteria by which the MT will assess compliance with each SA provision. The written metrics usually mirror the language of the SA, but they also ensure the Parties and the MT agree on how the SA language translates into workable and measurable standards for LASD-AV policy and practice and for assessing compliance.

It is important to note that the SA was not written in a "check the box" fashion that would require or allow each provision to stand alone and that there could be a single, straightforward compliance metric for each provision. The assessment work required to reach an intended individual outcome for one provision may very well depend upon the activities for other provisions, and therefore they are interconnected. For example, the Department cannot draw conclusions about the potential disparity in its programs and activities (SA Paragraph 68) without completing the assessments required of deputy performance, stops, community input, uses of force, and complaints (SA Paragraphs 67, 82–86, 88, 120–123, 140). Similarly, the MT's compliance assessment for one provision may partially depend on the compliance assessment for another. In short, it could be the case that for as long as the Department is not in compliance with one provision, it necessarily will be out of compliance on several other provisions.

This report addresses SA provisions where the MT considers the Department to be in compliance or to have made substantial progress toward compliance. Also discussed are provisions that require additional work, with emphasis on those that will likely require substantial time and resources for the Department to come into compliance or for the MT to effectively assess levels of compliance. When possible, this report also summarizes the sequence of activities and steps the Department must take to achieve full compliance.

## III.    WORK TO DATE

As in previous reports, work by the Parties and the MT is iterative in nature, so it is often necessary to provide information on activities and issues that have appeared in previous reporting periods. This information is provided to give an accurate picture of progress and to provide the "qualitative assessment of LASD's progress in achieving the desired outcomes for each area covered by the Agreement, noting issues of concern or particular achievement," as required by SA Paragraph 171f.

The evaluation of the current state of compliance that has been achieved is sometimes based on audits or reviews that occurred in earlier reporting periods and is therefore influenced by data and information collected prior to this reporting period. The results of these reviews are still

valid and relevant, and they often are—or should be—the primary focus of the current work being undertaken by LASD. The prior reviews and audits that are emphasized in this report provide an update on how the Department has or has not responded to the findings of those audits and reviews, especially on key issues in the SA, including enhancing the relationship between LASD-AV and "youth and communities of color" (SA Paragraph 88), use-of-force policies and training, management review of complaints, and constitutional stops practices.

A major focus of the SA is management review of not just deputy conduct but also supervisorial and management behavior and the Department's many accountability systems and processes. The expectation is that executive- and management-level personnel—with the assistance of various support units, such as the Audit and Accountability Bureau (AAB) and Discovery and Data Systems—conduct routine monitoring of all Department activities and apply professional vigilance, scrutiny, and skepticism to these reviews to ensure the accountability systems are consistent and effective.

## A.      Stops, Seizures, and Searches

The introduction to Stops, Seizures, and Searches summarizes the overall goals of this section.

> *LASD agrees to ensure that all investigatory stops, seizures, and searches are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. LASD shall ensure that investigatory stops and searches are part of an effective overall crime prevention strategy, do not contribute to counter-productive divisions between LASD and the community, and are adequately documented for tracking and supervision purposes.* (SA p. 7)

The SA requires LASD management to (1) provide direction in the form of policy to deputies; (2) train deputies on conducting constitutional stops; (3) collect accurate data on their stops; and (4) use this data and other sources of information to (a) identify deputies or practices that have potential for bias or other unintended impacts; and (b) inform, and track the outcomes of, any necessary corrective action and to inform community policing strategies.

To summarize this reporting period, the Department has continued to provide daylong constitutional stops-related training for deputies, although the required refresher roll call trainings were not offered throughout the year. The stations continue to work to improve the ways they incorporate crime prevention strategies into regular practice so that deputies have clear direction in the form of priorities, goals, and consistency and so managers can track the impact of priorities on crime and the community. While the Department took steps toward producing its own analysis of stops data, it does not yet routinely use stops data analyses to review activities, inform practice, and meet SA requirements, although these practices are still limited.

Most of the MT's efforts during this reporting period were focused on producing assessment methodology for all SA provisions in one document at the request of the Department and County Counsel, along with drafting and revising a work plan for a formal stops and bias-free audit to be conducted in the next reporting period. The Department has provided most of the data and information requested for the audit, and the MT is beginning to process those files. We also conducted another round of stops data analysis for the purposes of encouraging and facilitating the Department's application of the findings to its enforcement practices.

1.    Full-Day and Roll Call Training

a.    *Constitutional Policing and Bias-Free Policing Training*

The Constitutional Policing and Bias-Free Policing Trainings were developed to meet SA requirements for stops, seizures, and searches; bias-free policing; and housing provisions. In this reporting period, the Department continued to provide these two full-day trainings despite COVID-19. All active LASD deputies assigned to the AV are required to receive both trainings. With most current deputies having already received the trainings, the Department is focusing its effort on ensuring all newly assigned deputies receive the full-day trainings, as well as those assigned to the AV earlier but who have thus far been unavailable or unable to attend for some other reason.

During this reporting period, each full-day training was offered once, in October 2020. The MT worked with the Compliance Unit to verify training rosters. We found them in compliance for both trainings for the second half of 2021, with 98% of all available deputies having attended the Constitutional Policing Training and 97% having attended the Bias-Free Policing Training. (The most recent verification prior to this was in the first quarter of 2021, for which the rate of completion was 91% for both trainings, below the 95% compliance minimum.)

These findings include both stations as well as the embedded units, which have been included in the compliance metric since late 2020 (Operation Safe Streets, COPS, Parks, Narcotics, and County Services Bureau). The MT understands the difficulties in providing the trainings, especially during the pandemic, and it is impressed and pleased with LASD's commitment to this critical training. It is especially laudable that the Department has trained so many (89%) of the embedded units, and this helps ensure that all LASD personnel who regularly interact with AV residents have this important training.[2]

---

[2] Compliance percentages for full-day trainings are calculated by dividing the total number of currently assigned deputies who have been trained by the total number of deputies assigned to the AV and available at the time of the current training.

b.      *Quarterly Roll Call Training for Constitutional Policing, Bias-Free Policing, and Housing*

The full-day trainings are reinforced through Quarterly Roll Call Training, which his meant to refresh and instill the concepts of the full-day trainings. The approved training plan includes one of the seven segments (A–G) being offered during a single roll call, with Briefings A and B offered during two separate roll calls in the first quarter of each year, Briefings C and D in the second quarter, Briefings E and F in the third quarter, and Briefing G in the fourth quarter. These sessions are taught by LASD-AV personnel who have attended the approved Train-the-Trainer course for these roll call scenarios.

The MT's attendance verification of *Preventing Discriminatory Policing Exercise* for 2021[3] shows Palmdale and Lancaster out of compliance for 2021, as shown in Table 1.

The LASD-AV stations did not complete any roll call trainings in the first half of 2021. After discussions with the MT and DOJ, it was agreed the stations should not "squeeze" in the roll call trainings by, for example, increasing their frequency and/or offering more than one briefing per roll call, but instead provide them in the manner intended. As described in the previous semi-annual report, that approach was used earlier in the pandemic and, while approved under those extenuating circumstances, the MT and DOJ found them to be too much of a departure from the plan design.

In the second half of the year, the Palmdale station provided Briefings E and F to 98% of its assigned personnel in the third quarter. The Lancaster station again did not meet the requirements. In the third quarter, it provided the training to 15% of personnel for Briefing E and 14% for Briefing F. Lancaster station caught up somewhat by offering Briefings E and F in the fourth quarter, ultimately providing the sessions to 79% and 76% of personnel, respectively. However, we understand that Briefings E and F were given during the same roll call for nearly all of the personnel in both quarters. To date, the MT has not received any rosters for Briefing G; we will report those findings in the next six-month report.

The MT recognizes and appreciates that LASD would like a larger selection of quarterly roll call training scenarios available for staff to keep the material fresh for deputies who continue to be assigned to the AV over a period of time. The MT and DOJ have provided LASD with suggestions for additional training scenarios. The recommendations included the incorporation of video to highlight key points and new scenarios to raise additional discussion during the training sessions. In the meantime, the existing training plan should be continued until any new training is developed and finalized. The Department committed to providing draft curricula for additional roll call trainings by the end of 2021 but has since requested more time to complete those drafts.

---

[3] Compliance percentages for roll call trainings are calculated by dividing the total number of currently assigned deputies who have been trained by the total number of deputies assigned to the AV *and* available at the time of the current training.

The stations' poor performance on meeting the roll call training requirements is discouraging because now that the training exists, the routine implementation is low-hanging fruit. The Department cited no COVID-19-related issues but only some internal miscommunication. It is encouraging that the Palmdale station rebounded with great training numbers in the third quarter. Clearly, the Palmdale captain was able to identify the issue and solve it. We also understand that even in the third quarter, Briefings E and F were offered in single roll call sessions. Covering this amount of material during one roll call is not conducive to learning, and it is not the way the scenarios were developed to reinforce the concepts of the Bias-Free Policing and the Constitutional Policing full-day trainings. The MT understands LASD's efforts to catch up on the training, but this is not an optimal learning scenario. The Monitors reiterate the importance of maintaining the regular agreed-upon schedule of training so the sessions are properly spread out for optimal learning.

| Table 1 Preventing Discriminatory Policing 2021 Quarterly Roll Call Briefings | | | |
|---|---|---|---|
| | Quarter | Lancaster | Palmdale |
| **Briefing A** | Q1 | 0% | 0% |
| **Briefing B** | Q1 | 0% | 0% |
| **Briefing C** | Q2 | 0% | 0% |
| **Briefing D** | Q2 | 0% | 0% |
| **Briefing E** | Q3 | 15%/79% | 98% |
| **Briefing F** | Q3 | 14%/76% | 97% |
| **Briefing G** | Q4 | TBD | TBD |

2.      LASD Use of Stops Data

The SA requires the Department to actively use the data collected for LASD-AV stops. The use of the data provides key insight into the enforcement practices and activities of staff who interact with AV community members. There is no question discretionary stops can be a valuable tool to identify and cite or arrest offenders; however, stops also can have significant negative impacts on the community, especially when disparity in stops erodes the community's trust in the agency. It is critical for LASD to provide a significant level of supervision and review of stops. Regular reviews of stops, both at the individual deputy level and station level, are important parts of management practices to ensure policing strategies meet constitutional standards.

In this reporting period, the Department began producing data reports for LASD-AV station managers. The reports contain information about stops, such as the number of stops by race and by area of the city; the number of persons by race asked if they were on probation/parole,

the person's response, the reasons for any subsequent searches, and if contraband was seized; and the number of stops by unit that included backseat detentions, seizures, and arrests.

The Department's new statistical reports can be used to partially address several SA Paragraphs (e.g., 46, 48, 64, 68, 82–86), and we are pleased to note that the Department is beginning to provide its own analyses. The next step is to outline the subsequent steps the Department needs to take to make use of those findings. This is a requirement of the SA and a theme of the last several semi-annual reports. These include managers making further inquiries or analysis requests based on their review of the initial findings; formulating interpretations of the data, including any issues or concerning or encouraging trends; developing any needed corrective action for concerning findings; and tracking the implementation and impact of those actions. For example, if a pattern is identified related to disparity in policing strategies, it is warranted to look deeper into the issue to determine the appropriate interventions related to a specific deputy, group of deputies, or strategy used for enforcement.

The use of the data also should inform LASD in implementing problem-solving strategies. LASD has adopted the SPATIAL model to implement problem-solving strategies in the AV. All problem-solving models require analysis of the strategies and their effects on crime. This analysis involves tracking enforcement efforts as part of the problem-solving strategies. Care must be taken to ensure the strategies meet Constitutional standards and do not result in bringing about negative impacts to community relationships.

To that end, DOJ provided some of its assessment of the LASD data reports, and the Monitors will do so early in the next reporting period during in-person meetings. (Note that the data in the reports provide similar findings as those in the MT's biannual data trends analysis in the Appendix and in the MT's disparity report published in 2019.)[4]

In the Lancaster Traffic Stop Data Review, of those who indicated they were on probation or parole, 230 of 257 had their person searched. Of those, Black people were searched 129 times with 19 seizures (14.7%); Hispanic people were searched 67 times with 11 seizures (16.4%); and White people were searched 32 times with eight seizures (25.0%). The raw data show a much higher total number of Black and Hispanic people searched and an approximately 10% lower recovery percentage than that of White people.

In the Palmdale Traffic Stop Data Review, of those who admitted probation/parole status, 326 of 366 had their person searched. Of those, Black people were searched 91 times with 22 seizures (24.2%); Hispanic people were searched 157 times with 56 seizures (35.7%); and White people were searched 69 times with 24 seizures (34.8%). The raw data show a much higher total number of Black and Hispanic people searched, and the recovery rate for Black people was 10% lower compared with White people by both AV stations.

---

[4] "Analysis of LASD Stops in the AV January – July 2019" at www.antelopevalleysettlementmonitoring.info/

The station captains would probably like to know: What is the difference in recovery rates? Are there reasons why the raw number of Black and Hispanic people being searched is so much larger than White people? Are there identifiable reasons for the approximately 10% difference in recoveries between Black people and White people at both AV stations? Are there identifiable reasons why there is an approximately 10% difference for recoveries at the Lancaster station between Hispanic people and White people? These examples of findings in LASD statistical reports warrant further inspection. These questions are particularly important before Palmdale implements its new crime strategy, which was articulated during the December CMF, of conducting traffic stops as a productive means of finding illegal weapons. The strategy is based on a 1995 study that found, on average, one firearm per 28 traffic stops.

The MT will meet with the stations in the next reporting period to discuss the reports, how their content and format can be most helpful for station managers, what other analyses should be routinely done, and the process by which they request further analyses or other inquiries. The MT will walk through the reports with AV station leadership about the use of these reports and the next steps for station managers.

The MT views these reports as important steps forward for LASD-AV stations since the Department indicated it would be assigning an analyst to the stations primarily to address SA requirements. The MT looks forward to hearing how LASD will use the data to inform supervision and management of personnel and units.

**The Importance of Stops Data**

A key focus of the monitoring activity for this section of the SA is on the various types of data collected by deputies as they conduct their daily operations. They record extensive information chronicling nearly every interaction with the public, including each stop or call for service; each search, detention, citation, or arrest; the dispositions of each call; and in many circumstances, short narratives. They also now record certain community engagement activities. Furthermore, stops and calls for service are by far the most common point of contact for deputies and community members and thus are, in many ways, the linchpin of the community–Department relationship. It is essential that these data are accurate, thorough, and reliable since they serve as the foundation for most audits, analyses, and reviews conducted by the MT and LASD.

Data collection for stops requires entering one or more alpha or numerical codes associated with the primary actions of the stop. Deputies can consult codebooks for these. The codes determine the other fields that appear on the screen and must be completed. Importantly, supervisors, managers, and auditors typically use these codes to retrieve information about each entry to properly supervise deputies and units, conduct risk management assessment, and monitor activities. For example, a supervisor may want to review all records from the past month for pedestrian stops, which use code 841. Such a request will retrieve only the stops recorded as pedestrian stops. Incorrectly coded stops will not appear in the search. With thousands of stops and other activities recorded in the database, it is important that accurate codes are used to identify each stop type.

When a deputy stops and detains someone, however briefly, the facts and circumstances that led to that stop and detention and any subsequent action must be rigorously documented and later reviewed in an effort to assess the deputy's decision making, the legality of the deputy's actions, compliance with LASD policy, and the terms and conditions of the SA. If any adjustment through supervisorial guidance or retraining is called for, data from future stops are then used to measure the impact of any of these corrective measures. Furthermore, it is critical for LASD to use the aggregate data collected as a means to inform and guide the evolution of its crime prevention strategy, to assess the need for revisions to policies or training, to understand where law enforcement resources should be allocated, and to assess whether disparities exist in enforcement. In short, data, the strategic plan, and other information must be used to inform and drive management decisions in the AV and assist with the formulation and delivery of fair and equitable law enforcement services in the AV.

a.    *MT Stops Data Analyses*

The statistical reports produced by the Department in this reporting period were of the type provided by the MT for the past several years. These reports have been intended for the Department to use as the basis for SA-required reviews. For now, the MT will continue producing these reports. To that end, the current trends analysis, which includes three years of data in six-month increments, is provided in the Appendix.

Over the past several years, the MT has provided three general types of such reports.

**Trends analysis** assesses all basic stop data (reason for the stop, searches, backseat detentions, citations, arrest, etc.) according to demographic variables of interest (race, ethnicity, gender, age, etc.) and other factors station managers may find important (time of day, shift, unit, deputy, etc.) It is a type of data review the stations should do regularly—as often as monthly—to track and adjust as necessary their enforcement activities based on what the data show.

**Disparity analysis** uses similar data as the trends analysis (although it may be broader in scope to include all calls for service, searches, etc.) but focuses on racial/ethnic differences and, in some cases, uses additional variables that are factored into the analysis using regression analysis. The Department has not yet begun the SA-required semi-annual analysis that centers on statistical modeling to assess "whether law enforcement activity has a disparate impact on any racial or ethnic group" after controlling for other factors such as demographics and crime rate (SA Paragraph 83) and includes the Department's identification and response to areas of concern. According to US DOJ Office of Justice Programs, racial disparity is defined as existing in the criminal justice system when "the proportion of a racial/ethnic group within the control of the system is greater than the proportion of such groups in the general population." In particular, the disparity analyses and reviews required by the SA are meant to identify any unequal treatment by LASD-AV of similarly situated people based on race. Several factors may contribute to findings of disparities, including crime rates; geography; access to resources; city, county, and state laws; law enforcement strategies; policies and practices; and overt bias.[5]

The MT's first disparity analysis report, produced in September 2020, found racial disparities at several levels of stops data, including stops, searches, searches based on probation and parole status, and vehicle impoundments; it can be found at the monitoring website. The Department did not produce accompanying documentation (Paragraph 86) of its review and response to that report, but LASD shared that it has verbal discussions with deputies who showed up on the "top ten" list (see below).

**Targeted analysis** examines certain issues, such as taking a deeper look at the practice of inquiring about probation and parole status during stops (SA Paragraph 46) or the use of backseat detentions (Paragraphs 47–48). This may include creating "top ten" lists of the deputies responsible for the most stops involving certain characteristics so that station managers can

---

[5] See www.ojp.gov/ncjrs/virtual-library/abstracts/reducing-racial-disparity-criminal-justice-system-manual

assess the findings and apply corrective action if necessary. Some, like the disparity analyses, also use statistical techniques to better understand the reasons behind the results. The Department's statistical reports produced in this reporting period are a first step toward this requirement. Detailed demonstrations of how Department personnel can approach the data and the process of targeted analysis and interpretation were provided in the appendices of the MT's 12th Semi-Annual Report.

3.      LASD AAB Stops Audits

In the last reporting period, the MT reviewed the AAB Audit of Lancaster Detentions of Individuals and Data Collection (published in May 2021). The MT met to review the methodology with the AAB and generally approved the methodology. This is consistent with previous audits completed for detentions of individuals and data collection in the past. The audit showed high percentages of compliance as well as areas that fall short. The Lancaster station responded to the audit and provided Corrective Action Plans to mitigate the shortfalls. This is critical management and oversight practice.

The MT and the Parties spent considerable time during this period formalizing the MT's methodologies and metrics used to assess compliance with the SA. AAB leadership participated in extensive meetings and provided valuable insight. The AAB has significant expertise in auditing, and it represents an excellent potential resource to ensure the standards of the SA are regularly audited by LASD for compliance.

The MT has discussed the goal of eventually integrating regular AAB audits into compliance assessments. The MT will discuss next steps with the Compliance Unit and the bureau to support the AAB in providing timely interim assessments of compliance with the SA. Prior to the use of an AAB audit, the MT will need to review and approve the AAB audit work plans prior to the bureau beginning the audit and review and approve the audit report to ensure that all the required variables are addressed, that the reporting is thorough and provides sufficient detail, that conclusions are based on the SA and agreed-upon compliance metrics, and that both stations are assessed.

In the meantime, the MT will continue to audit for compliance and audit to identify outcomes of LASD efforts.

4.      Discussion of Management Accountability Related to Stops

LASD was able to continue the full-day Constitutional and Bias-Free Policing Trainings during the pandemic. This represents encouraging efforts by station management to maintain this important training. The roll call trainings, however, were not offered to the same extent. Station managers should not disregard the importance of these refresher trainings.

Some of the hopeful signs reported in the last semi-annual report were maintained and have grown in this reporting period. The Department has taken steps toward generating its own stops data statistical reports. The Monitors are also encouraged to see crime prevention plans and trends analysis now being discussed in the CMF. While the Monitors expect those efforts to grow and improve—including the level or extent of analysis and tracking of trends over time and that recommendations by managers are followed up in subsequent meetings—the structure now exists whereby such use of data can be a routine and valued aspect of law enforcement practice in the AV. As an aside, we also note that NPD stations outside the AV have also increased their engagement in using data to inform strategies and tactics.

As discussed earlier, regardless of whether LASD or the MT conducted the data analysis, what matters most is what LASD managers do with the data. The data analysis provided by the MT in recent years has been used only to a limited extent, a small part of what should be expected to be a regular and robust incorporation of data into station crime prevention and intervention strategies. The MT continues to urge the Department to expand and formalize this effort.

While the Department has maintained good progress in the training related to bias-free policing, we do want to note some areas that would benefit from management scrutiny and improvement. LASD completely skipped roll call Briefings A, B, C, and D during the first half of 2021. When the MT requested the rosters for the roll call briefings, the Compliance Unit discovered this lapse in training. At the beginning of the second half of 2021, the Compliance Unit stated that the roll call briefings were being made up at each station. To date, the MT has received roll call briefing rosters only for Briefings E and F. The Compliance Unit informed the MT that it has implemented a new procedure to ensure no more lapses in training occur and that proper documentation occurs. Hopefully, the MT will be able to report about this in the next six-month report.

Again, during this reporting period, the MT review found that LASD conducted multiple briefings during the same roll call session. The Monitors cautioned against this practice in the previous semi-annual report and other forums. The Department is out of compliance based on the percentage of personnel receiving the training, but even after it reaches the minimum requirements in that regard, the Department should not expect to be found in compliance if it continues to present the training outside of the approach approved by the Parties and the MT.

5.    Stops Compliance Status

Table 2 provides the current compliance status for each paragraph in the Stops section of the SA. The table does not reflect work done toward reaching compliance with each provision; it only indicates whether the Department is in compliance or partial compliance. Partial compliance indicates that some but not all steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not. Partial compliance also may refer to the fact that initial qualitative reviews

by the MT have indicated compliance, but a formal systematic audit has not yet been completed. For instance, this is the case for most Paragraphs in Table 2. The Department has implemented policies and training for these provisions. The MT has conducted ad hoc reviews and provided feedback to the Department on areas that needed improvement; however, the Department requested the MT to postpone a formal audit until it could institute those improvements. A formal audit will be conducted during the upcoming reporting period.

| Table 2 | | |
|---|---|---|
| **Stops Compliance Status** | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 41 | Stops and detentions are based on reasonable suspicion. | No |
| 42 | Elements of procedural justice are incorporated into training. | Yes |
| 43 | LASD-AV does not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation as a factor in establishing reasonable suspicion or probable cause, except as part of actual and credible description(s) of a specific suspect or suspects. | Partial |
| 44 | Stops are accurately and thoroughly documented in Mobile Digital Computer (MDC) patrol logs. | Partial |
| 45 | Accurate and specific descriptive language (non-boilerplate) is used in reports. | Partial |
| 46 | Efficacy and impact on the community of searches based on probation and parole are assessed. | Partial |
| 47 | Backseat detentions require reasonable suspicion and reasonable safety concerns. | Partial |
| 48 | Backseat detentions are not conducted as a matter of course. | Partial |
| 49 | Deputies respond to complaints about backseat detentions by calling supervisor. | Partial |
| 50 | Deputies do not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s). | Partial |
| 51 | Deputies do not conduct arbitrary searches. | Partial |
| 52 | • Deputies equipped with body-worn cameras record requests for consent to search.<br>• Outreach is conducted about right to refuse or revoke consent.<br>• Individuals with limited English proficiency are informed in appropriate non-English language.<br>• Supervisors are notified before home-based search. | Partial |
| 53 | Reasonable number of deputies are present at a search. | Partial |
| 54 | Section 8 compliance checks require articulated safety concerns. | Yes |
| 55 | During home searches, individualized suspicion or probable cause determines who, besides subject of search, is subject to detention or search and for how long they are detained. | Partial |

| Table 2 | | |
| :---: | :---: | :---: |
| **Stops Compliance Status** | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 56 | Probation and parole searches are carried out only when search conditions are established and in accordance with the Stops section. | Partial |
| 57 | Constitutional policing training is provided. | Yes* |
| 58 | Additional accountability and supervision to ensure unlawful stops and searches are detected and addressed. | Partial |
| 59 | Supervisors review computer aided dispatch (CAD) logs. | Partial |
| 60 | Supervisors review justification for stops and searches. | Partial |
| 61 | Supervisors and station commanders address all violations and deficiencies in stops and searches. | Partial |
| 62 | Supervisors and station commanders track repeated violations of this SA and corrective action taken. | Partial |
| 63 | AV supervisors and commanders are held accountable for reviewing reports and requiring deputies to articulate sufficient rationale for stops and searches under law and LASD policy. | Partial |

*The Department is in compliance on delivery of the approved training; outcomes related to each aspect of the training are measured in other provisions.

### B.     Bias-Free Policing

The preamble of the bias-free section states "LASD agrees to deliver police services that are equitable, respectful, and bias-free in a manner that promotes broad community engagement and confidence in the department." The other paragraphs further describe expectations and some of the pathways to achieve that outcome, many of which are closely linked to those in the Stops section. The primary goal of section is encapsulated in SA Paragraph 64:

> *In conducting its activities, LASD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies shall not initiate stops or other field contacts because of an individual's actual or perceived immigration status.*

The Department has maintained compliance with the full-day Bias-Free Policing Training but is out of compliance on the provision of refresher roll call training. The Department has made some strides toward compliance with the SA provisions requiring managerial review of data and information to identify and respond to problematic or potentially problematic trends and patterns that may indicate bias or disparate impact. As described in the Stops section, the

Department has begun producing its own statistical reports from which managers will be able to glean indicators of the desired and undesired impacts of Departmental enforcement strategies and practices. Their demonstration of a capacity for data analysis—the first step of those endeavors—sets the Department on the right path toward compliance with provisions that require routine review of data trends and issues, systematic reviews of all Department activities for indications of disparity, review of trends in UOF and complaints, and ongoing tracking of stops data.

1.    Full-Day and In-Service Training

a.    *Bias-Free Policing Training*

As reported in the Stops section, LASD continued to provide the full-day Bias-Free Policing Training for deputies assigned to the AV stations. Palmdale and Lancaster stations were both found to be in compliance at 98% of AV personnel trained.

Additionally, the Department has provided the full-day trainings to 89% of LASD deputies working in the AV but assigned to other commands, such as Operation Safe Streets (OSS), COPS, Parks, Narcotics, and County Services Bureau. This is significant and welcomed progress. (See the Stops section for further discussion.)

b.    *Quarterly Roll Call Training*

The required quarterly roll call trainings contain important information related to stops in the previous section and bias-free policing. As mentioned in the Stops section, both stations failed to deliver the refresher quarterly roll call trainings in the first and second quarter of 2021. In the third quarter of 2021, Palmdale station met the compliance minimums for two briefings in the third quarter, but the Lancaster station fell well behind the compliance minimums required. Thus, the LASD-AV is out of compliance on the quarterly roll call trainings in the first, second, and third quarters of this year. The fourth quarter will be evaluated in the next reporting period. See the Stops section for a full discussion of the results and MT comments on the delivery method for the courses.

2.    LASD-AV Assessments of Disparity and Other Problematic Issues and Trends

Among its requirements, the Bias-Free Policing section in particular requires LASD to ensure that all members of the public receive Constitutionally required equal protection. To accomplish this, LASD must analyze several types of data and use the results to identify problematic trends. These activities are explicit parts of bias-free policing in Paragraphs 68 (disparity review), 69, and 72 (the deputy and community surveys), and they are essential to compliance with Paragraphs

64 (equal protection) and 67 (personnel performance reviews). In this reporting period, there was some movement on these provisions, as described here.[6]

As described in the Stops section, the Department has begun to produce its own analyses of some areas of stops. As we have expressed in numerous meetings and memos and in the past several semi-annual reports, the data analysis is just the beginning of the work and provides no benefit in itself; it is how the Department uses the data that matters. Ever since an initial request by the Department for an example of how to analyze and use stops data in actionable ways, the MT has provided stops trends data analyses (see Appendix), a disparity analysis of the type required by Paragraphs 120–123, targeted "deeper dives" of certain topics like backseat detentions and probation and parole searches, and top ten lists of deputies who conduct the most of certain types of actions. The results of the community and deputy surveys are also statistical findings that the Department must make use of, per the SA.

These work products are also just the start. The MT requested documentation of any further interpretation and subsequent actions taken by the Department based on that data or on the various analyses produced by the MT, but it has received none. The same request holds for the analyses now produced by the Department. In the next reporting period, the Monitors will continue discussion with the Compliance Unit and stations about the processes they use to review the statistical reports, identify any issues, and develop any necessary Corrective Action Plans.

Besides identifying potential disparity and ways in which its practices may not promote "broad community engagement and confidence in the Department" (preface, Bias-Free Policing, p. 13), these same processes the Department uses can assess the efficacy of its enforcement practices and thereby improve the effectiveness and efficiency with which it conducts its work. Ultimately, the Monitors' review of Departmental documentation of these processes will be the basis for compliance assessment.

Paragraph 68 requires the Department to review every program, initiative, or activity involving the AV stations—essentially all LASD-AV practice—for potential disparity and to ensure that none of these activities involves unlawful discrimination. The Department took the first step of that process by producing a list of the programs, initiatives, and activities it believes applies to Paragraph 68. DOJ has provided feedback on that list, and the Monitors will do so with the Department in January 2022. Once the list is approved, the Department will present its plan for assessing each activity on the list. For activities with wide scopes, a review of statistical analysis may be required, but for most, a more limited approach will suffice. Once the Parties and Monitors agree on that methodology, the Department will begin work. This work is urgently

---

[6] In another example of the interconnectedness of the SA's sections, it is notable that the reviews that need to be conducted either by the Department or the MT or both for the Bias-Free Policing section also apply directly or are closely aligned with those required in the following sections: Stops, Seizures, and Searches (SA Paragraphs 41, 43, 46, 50, 62); Data Collection and Analysis (81–86); UOF (117, 120–123); and Accountability (141–143).

needed because the MT's stops disparity analysis[7] showed disparity in certain aspects of the Department's discretionary stops issues.

The third Community Survey will be published early in the next reporting period. With the first two surveys, the Monitors heard from the Department about how it believed the survey methods emphasized dissenting voices from the community (the Department believed that the focus groups did not represent the whole community in the first survey and that the participant recruitment methods were biased against the Department in the second) but very little about how the Department would use the findings to inform its community engagement activities or its approach to bias-free policing as required by SA Paragraph 69. The Monitors will expect a formalized plan for making productive use of the third survey after it is released.

The Department's progress in incorporating crime prevention strategies and problem-solving policing into its practice is another encouraging sign that the Department is moving toward compliance with the bias-free policing provisions in the SA because it promotes the likelihood that the majority of stops are governed by a vetted strategy. The use of stops data and other information to identify and develop responses to crime issues and to track the impact of those responses is an integral part of any crime prevention strategy.

Stops analysis focusing on disparities is of particular importance—that is, seeking to identify and explore any disparities in discretionary stops, being asked about parole/probation status, searches, backseat detentions, and arrests. The results of data analysis then must be put in the context of other information that provides a deeper understanding of what led to any disparities, their impact on AV community members and the Department–community relationship, the efficacy of the related law enforcement activity, and how the disparities can be addressed. The Monitors have seen improvement in the application and discussion of crime prevention strategies and problem-solving approaches (SPATIAL) in the CMF; these efforts need to be further refined and expanded, but the Monitors are glad to see them becoming customary. With increased opportunities to engage in person in the AV as COVID-19 continues to evolve, the MT will be observing these activities in practice in the next reporting period through ride-alongs, interviews with deputies and supervisors, observation of roll calls and of watch sergeants during their shifts, and review of documentation.

---

[7] The MT's analyses include *An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley*, the stops trends analysis in the 10th Semi-Annual Report, and the two-year stops trends analysis provided to the Department at the November onsite and summarized in Appendix A.

**Crime Prevention Strategies**

Crime prevention strategies encourage an organized and consistent approach to crime intervention and prevention based on manager-driven priorities and tactics, effective and efficient allocation of resources, and accountability. They also provide a framework for gathering and incorporating community input so that community members are co-producers of public safety.

Although there are a variety of approaches to crime prevention strategies, at a minimum, effective strategic plans include common elements such as goals, objectives, directed activities, data collection and analysis, and designation of staff assignments and timelines for completing specific tasks. They also incorporate community perceptions and input regarding enforcement priorities and crime prevention activities. Input from AV community members can be gathered through numerous avenues, including the CACs, the annual Community Survey, community engagement events, one-on-one engagement with community members (recorded as stat code 755 in the AV), and designated meetings to discuss specific issues or areas. Implementing the plan requires the support of Divisional managers but is directed and conducted at the station level.

Management must actively assess where bias may be present in station-directed enforcement efforts in the AV. This involves many of the reviews already underway, such as DDWS reviews, reviews of reports, and supervisory observations of deputies in the field. Additionally, management must supplement efforts with the use of stops and enforcement information. This involves more than analyzing deputies' individual actions; it includes an analysis of the impact of larger enforcement efforts in the AV, including potential disparities.

For example, the overreliance on vehicle stops in an area to address criminal behavior could have a disparate impact on a specific community. It is incumbent on LASD to use the data to identify disparities and address the findings. In some circumstances, there may be a reason for a disparity, but LASD must be able to clearly explain the reasons for the disparity and efforts to ensure its decision making and/or enforcement direction is free of bias or disparate impacts. Compliance with the SA is incumbent on clear evidence that LASD management both holds deputies accountable when engaging in bias-based practices and identifies and addresses any LASD enforcement strategies resulting in bias or disparate impacts in the community.

3.      Discussion of Management Accountability for Bias-Free Policing

Bias-Free policing is not exclusively connected to the paragraphs discussed in this section; rather, it is attached to the core of the SA. There can be concerns or evidence of bias or potential bias in other sections of the SA. In addition to the stops disparities report and results of the complaints audits reported in previous semi-annual reports, there are continuing signs of potential disparate impact or bias in the AV that warrant scrutiny from management. Described in the Community Engagement section, during community meetings tensions have increased between LASD and communities of color in the AV. The results of the third Community Survey show that people of color in the AV continue to have more negative views of and less trust in the Department than White people, and many believe they are treated differently because of their race/ethnicity.[8]

As discussed in the last semi-annual report, stops and calls for service are a primary avenue by which the Department and community members interact with one another and thus are a primary mover of the quality of that relationship. This needs to be factored in as deputies continue to conduct traffic stops, investigate criminal activity, and uphold the law. The efficacy of those activities and the manner in which they are carried out should be constantly and thoughtfully scrutinized.

Personnel performance reviews (SA Paragraph 67) need to include genuine assessments of a deputy's ability to effectively practice bias-free policing, and added training, supervision, and/or mentoring should be given if issues are noted. Any potential indicators of bias need to be accurately captured and readily available to supervisors conducting performance evaluations so they have a thorough understanding of each deputy's history and how that history compares with other deputies and Department norms and standards. With every stop being another instance of community engagement, deputies must be comfortable representing the Department's values of equal protection and respect.

Similarly, data and other information need to be regularly and critically reviewed across units, shifts, supervisors, etc., so the efficacy of routine enforcement practices, as well as their impact on the community, can be measured against those same values. The Department has many options regarding enforcement strategies and tactics. Which ones are chosen should factor in their likelihood to increase or decrease community trust in law enforcement.

In an ongoing management accountability issue also related to tracking data, the MT has identified two deputies who have worked in the AV for over a year without attending the required bias-free policing full-day training session (each missing three opportunities to attend). While not used to assess overall compliance with the training requirements, this issue has been noted with other deputies in previous semi-annual reports. The MT understands the need to ensure adequate staffing and that other circumstances can arise, but station managers need to

---

[8] The three Community Surveys can be found at www.antelopevalleysettlementmonitoring.info

ensure that any deputy who misses an opportunity to attend the trainings is prioritized for the next available session.

In the MT's experience, the community watches law enforcement leadership very closely to determine whether there might be indications that leadership actually values and models a commitment to bias-free and constitutional policing. Law enforcement leaders who actively engage with the community and also use the data to address disparity where possible can then share their efforts with the community and show there is a commitment to these high standards. Thoughtful and clear evaluation of the already available data will pay significant dividends in the trust-building efforts with the community.

4.    Bias-Free Policing Compliance Status

Table 3 provides the current compliance status for each paragraph in the Bias-Free Policing section of the SA. The table does not reflect work done or progress made toward reaching compliance with each provision; it only indicates whether the Department is currently in compliance.

| SA Paragraph | Summary of SA Requirements | Compliance |
|---|---|---|
| 64 | Members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies do not initiate stops or other field contacts because of an individual's actual or perceived immigration status. | Partial |
| 65 | Museum of Tolerance and other experts are consulted on prohibited conduct, bias-free policing, implicit bias, and stereotype threat. | Partial |
| 66 | Effective communication and access to police services are provided to all AV members, including those with limited English proficiency. | Partial |
| 67 | Bias-free policing and equal protection requirements are incorporated into personnel performance evaluation process. | Partial |
| 68 | All LASD-AV programs, initiatives, and activities are analyzed annually for disparities. | No |
| 70 | Bias-free policing training is provided. | Yes* |
| 71 | Quarterly roll call training on preventing discriminatory policing is provided. | No |

*Table 3 / Bias-Free Policing Compliance Status*

* The Department is in compliance on delivery of the approved training; outcomes related to each aspect of the training are measured in other provisions.

C.      **Enforcement of Section 8 Compliance**

In the 11th and 12th semi-annual reports, LASD was found in sustained compliance with all SA housing-related provisions. During this reporting period, the MT focused on determining whether sustained compliance of SA housing paragraphs has been maintained for the second and third quarters 2021 and whether the MT should recommend to the Parties, pursuant to SA Paragraph 150, that it refrain from conducting further compliance audits or reviews of SA housing paragraphs 73–80. SA Paragraph 75 is the only remaining housing provision for which LASD is required to submit compliance materials, which are in the form of housing receipts verification data and acknowledgement forms on a quarterly basis.

1.      Process for Potentially Applying SA Paragraph 150 to SA Housing Paragraphs 73–80

SA Paragraph 150 provides that, "Where the Monitor recommends, and the Parties agree, the Monitor may refrain from conducting a compliance audit or review of a requirement previously and consistently found to be in compliance by the Monitor pursuant to audit or review. Thereafter the County will be deemed to have achieved compliance with those requirements for purposes of this Agreement, absent evidence to the contrary."

There were discussions with the Parties and the MT during this reporting period in which the Department contended that it reached sustained compliance on May 31, 2020, and therefore the MT should immediately make the SA Paragraph 150 recommendation that the Department be deemed to have achieved compliance with the housing provisions. The MT reminded the Department that it was first determined to be out of compliance with SA Paragraph 75 for the second quarter of 2020 because the Compliance Unit submitted incorrect records to the MT and that accurate and timely documentation of LASD processes was an important part of compliance. When the Compliance Unit submitted corrected policy receipt data on September 15, 2020, the MT was able to find the Department in compliance with SA Paragraph 75. As a result, the period of sustained compliance began on September 15, 2021.

The MT presented the following process for making the SA Paragraph 150 recommendation to the Parties, if warranted, regarding refraining from further conducting compliance audits or reviews relating to housing paragraphs 73–80.

1.      For SA Paragraph 75, within 30 days of the end of the third and fourth quarters of 2021, LASD will send the Verification of Housing Policy Receipts Memorandum ("Memorandum") to the MT's designated administrative staff person, who will review it against the Lancaster and Palmdale stations' quarterly roster of deputies. (The Memorandums will reflect that the Department performed the analysis needed to verify housing policy receipts by comparing station rosters and policy receipt documentation to determine what percentage of available deputies properly completed the housing forms for each quarter.) If there are no discrepancies found between the data provided in the Memorandums and the rosters and the Department meets the requirements of the

Housing Non-Discrimination (HND) Policy Compliance Metric 1.C.—which states "within 15 days after each new deputy is assigned to LASD-AV (pursuant to SA Paragraph 75) or within a reasonable amount of time as determined by the MT, LASD has provided 95% of new deputies with a copy of the HND Policy and has secured the signed acknowledgment"—LASD will continue to be found in sustained compliance. If discrepancies are identified or the Department does not meet the requirements of HND Policy Compliance Metric 1.C., the MT will request a response from LASD, facts will be validated, and the MT will make additional document requests as necessary. The Parties will assess LASD's response and discuss ramifications for compliance and monitoring ("Resolution Process").

2.      If LASD remains in sustained compliance for each of the third and fourth quarters of 2021, the MT will refrain from conducting further compliance audits or reviews of the requirements of SA Paragraphs 73–80 having "previously and consistently found them to be in compliance by the Monitor" pursuant to reviews. The Department will be deemed to have achieved compliance with the requirements of SA Paragraphs 73–80 for the purpose of the SA, absent evidence to the contrary.

3.      Throughout the remaining life of the SA, LASD will have all newly assigned personnel to the AV stations complete the Housing Authority Non-Discrimination and Supplemental Policy Acknowledgement forms within 15 days of arrival at their station and the Housing Authority Investigations/Inspections FOD 12-02 form within 30 days of arrival at their assigned station.

4.      If indicators of a violation of <u>any</u> of the housing provisions arise after an SA Paragraph 150 determination that LASD has achieved compliance with paragraphs 73–80, the Monitors will proceed with the Resolution Process as set forth in Paragraph 1 above to address the alleged violation; that is, the MT will request a response from LASD, facts will be validated, and the MT will make additional document requests as necessary. The Parties will assess LASD's response and discuss ramifications for compliance and monitoring.

On August 16, 2021, LASD stated its commitment to abide by the MT process for making the SA paragraph 150 recommendation regarding Paragraphs 73–80. DOJ agreed to this process on August 31, 2021.

2.      <u>Monitoring of Housing Policy Receipts for Second and Third Quarter of 2021</u>

While all current deputies assigned to the AV have already received and read the housing policies (SA Paragraph 74), Paragraph 75 requires that any deputies newly assigned to LASD-AV will be provided a copy of the HND forms and sign an acknowledgement that the policy has been read and understood. SA Paragraph 164 requires that newly assigned deputies read and

complete the Housing Authority Investigations/Inspections FOD 12-02 form (Accompaniment Policy Acknowledgement Form) within 30 days of arrival at their assigned station.

For the second quarter of 2021, the MT received the Compliance Unit's housing policy receipts materials on August 4, 2021. The MT reviewed the materials and verified the Compliance Unit's assessment. There were three newly assigned deputies to Lancaster and seven newly assigned deputies to Palmdale. All 10 deputies signed the required Housing Non-Discrimination Policy receipts within 15 days of their assignment and the Accompaniment Policy Acknowledgement Form within the 30 days required by SA Paragraph 164.

For the third quarter 2021, the MT received the Compliance Unit's housing policy receipt materials on October 28, 2021. The MT reviewed the materials and verified the Compliance Unit's assessment. There were six newly assigned deputies and one newly assigned captain assigned to Lancaster and five newly assigned deputies to Palmdale. All 12 of these personnel signed the required Housing Non-Discrimination Policy receipts within 15 days of their assignment and the Accompaniment Policy Acknowledgement Form within the 30 days required by SA Paragraph 164.

3.   Monitoring of Housing Policy Receipts for Fourth Quarter of 2021

The Compliance Unit is expected to perform the analysis for Paragraphs 75 and 164 housing documents for the fourth quarter and submit a Memorandum to the MT within 30 days of the close of the quarter. The MT's review of that Memorandum will determine whether that recommendation will be made as per the SA Paragraph 150 process described earlier.

4.   Monitoring Sustained Compliance

The MT continues to attend to housing provisions in sustained compliance via ongoing monitoring actions related to other sections of the SA, including audits, community engagement activities, stops data reviews, complaints, and accountability compliance reviews. In practice, this means that, when feasible, the MT incorporates housing-related objectives into reviews for other SA sections. Except for the SA Paragraph 75 housing policy receipts and Paragraph 164 Accompaniment Policy Acknowledgement Forms, this is done in lieu of conducting reviews specifically designed for housing-related monitoring, which is a suitable and efficient means of assessing ongoing compliance at this stage. This process was described in detail in the 10th Semi-Annual Report.

Continued dissemination of the HND and Accompaniment policies to new deputies, continued training on the housing provisions and the federal Fair Housing Act (FHA), reporting of any housing-related community contacts, and adherence to the FHA and SA housing provisions are tracked by the MT in this process. So far, no housing-related issues have arisen through this process; as a result, the MT finds the Department has maintained sustained compliance.

In the future, any housing-related issues that may arise will be flagged during MT reviews of a wide array of sources, including LASD's own audits, reports, reviews, assessments, and meetings; reviews and observation of CAC reports and meetings; review of documentation and observation of LASD community engagement activities; and other sources from broader Los Angeles County, such as the Office of Inspector General, the Civilian Oversight Commission, and news media. All this information is tracked, and any indication of incidents or activities that may not appear to comply with SA requirements will be explored further by the MT, beginning with the validation of the facts and circumstances of the situation.

If the MT believes further attention is warranted after this initial review, the MT will conduct a more formal investigation to include any necessary document and data requests and interviews. Particular attention will be given to whether LASD accountability processes identified and responded to the issue. Findings will be discussed with the Parties, and next steps will be determined. These could include a range of responses, including no change in compliance status, additional scrutiny applied from an accountability perspective, or a return to more intensive housing monitoring.

### D.    Data Collection and Analysis

The preface to the Data Collection and Analysis section of the SA states:

> *To identify shortcomings, assess improvement, and increase community confidence in LASD's law enforcement activity in the Antelope Valley, LASD agrees to enhance its data collection, analysis, and reporting as set out below. LASD will develop and implement a protocol for the collection and regular analysis of data to assess whether there are trends and patterns that indicate bias or practices that otherwise run counter to constitutional and effective policing.* (SA p. 17)

Paragraphs 81–86 require LASD to routinely analyze a wide variety of stops-related data in order to identify any discernable disparities based on race or ethnicity and other demographic variables. The Department must then use this data to identify and address any problematic issues or trends and, on an annual basis, publish a public report that includes any issues identified and how they were addressed. The elements of Paragraphs 81–86 include the following.

- LASD conducts analysis of a wide variety of variables.

- LASD incorporates regular analysis of this data into its routine operational decisions.

- The analysis answers these questions.

- » Does LASD-AV law enforcement activity have a disparate impact on any racial or ethnic group or otherwise compromises constitutional and effective policing?

- » Are LASD-AV deputies more likely to conduct enforcement actions based on race or ethnicity?

- » Are there reporting districts or deputies with potentially problematic trends?

- The enforcement activities analyzed include the following.

  - » Ask about probation or parole status.

  - » Ask for consent searches.

  - » Stop or search, including for discretionary offenses, such as jaywalking or walking on the wrong side of the street, and non-violent offenses.

  - » Cite or arrest.

  - » Impound or store the vehicles.

- The analysis controls for other variables that may impact the findings, such as demographics and crime rates.

- The Department reviews the statistical finding and identifies any problematic issues or trends.

- For any issues or problematic trends, the Department develops corrective action. Potential responses include reviewing and revising policies or training and assessing whether any practices should be changed in order to ensure adherence to constitutional requirement and/or more effective policing.

- LASD issues an annual public report summarizing the results of the AV data collected, and the steps taken to correct problems and build on successes.

1.    Status of the Work for This Section

When the SA was signed, LASD did not have the internal capacity to produce the data required in this section; therefore, the analysis for this section was outsourced. This early effort to address these provisions was helpful, but the methodology used to conduct the analyses and prepare the report, which had not been submitted for review before the work began, was found to be

out of compliance by the MT and DOJ. After much discussion, County Counsel noted that SA Paragraph 153 requires the Monitors to produce qualitative and quantitative outcome assessments on each area of the SA and that some of those outcomes overlap considerably with the data analysis responsibilities of LASD, including those in this section.

Subsequently, as described in previous semi-annual reports, the Compliance Unit and County Counsel requested that the MT produce the analysis for Paragraphs 82, 83, and 85, which the Department would then use to address the requirements in Paragraphs 83–86 that it does its own assessment of the statistical findings for problematic issues and trends, develops and implements any necessary corrective action, and produces a report describing its activities.

The Parties and the MT discussed and came to agreement on the methods to be used for that analysis prior to the MT beginning work. Subsequently, the MT produced a statistical report in September 2020 titled *An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley*. The Parties and Monitors then held discussions on the results of that report, which found evidence of potential disparity, and how station and Division managers should use the data to fulfill the SA requirements for Paragraphs 83–85. However, the Department did not complete those assessments or a report on actions taken (other than the MT's statistical report) and therefore has remained out of compliance with Paragraphs 82–86. Recently, the Department raised concerns about the methodology used in the 2020 MT report, making it all the more important that the Parties and the MT commit to an approved work plan prior to conducting these types of analyses.

In this reporting period, the MT provided provisional compliance metrics for this section to help guide the Department in fulfilling its required assessment and action plans. Also, the Monitors have been informed that LASD is assigning a data analyst to the Compliance Unit to conduct the data analysis for Paragraphs 82–85 and has committed to beginning that work in 2022. LASD is scheduled to submit a work plan for MT and DOJ review by end of May 2022.


2.    <u>Other Issues Related to Data Analysis</u>

The MT submitted a data request to analyze outcomes associated with stops and UOF data in June 2020. After discussions with County Counsel and the Compliance Unit lieutenant at that time, we agreed to reduce the breadth of the data that we were requesting, and a new request was submitted July 29, 2020. Some data was provided in March 2021, but the dataset was insufficient for the analysis to be conducted. Additional prompts were made to procure the data, but the data were never produced. SA Paragraph 184 requires the Department to produce all necessary information and data to carry out necessary duties. LASD has not provided all of the data the MT requires to conduct the outcome analysis in Paragraph 153. We understand that the Department has limited resources and is grappling with data requests not only in this effort but other consent decrees, as well as a California DOJ investigation. However, we believe we made many compromises and good-faith efforts to encourage this request, and it has been well over a

year since the initial request was made, and the data will now be stale. The MT will make a new data request to address Paragraph 153 in 2022.

## E.      Community Engagement

The Community Engagement section of the SA states that "LASD agrees to promote and strengthen partnerships within the community, to engage constructively with the community to ensure collaborative problem-solving and bias-free policing, and to increase community confidence in the Department" (p. 20). The term *community engagement* primarily refers to the Department's efforts to engage the community in meaningful ways and as a co-producer of public safety, thus building and maintaining trust and confidence in the Department among all community members, per the goals of the SA. This includes having the Department make an extra effort to engage with certain demographic groups highlighted in the SA, such as youth and communities of color, which are often harder-to-reach or marginalized community groups. The MT's role in the community engagement process is to assess LASD's efforts to interact with and improve its relations and the nature of engagement with the AV community.

As will be discussed in this section, the Department has taken steps forward on some of the provisions. However, in a somewhat paradoxical observation, the Monitors have noted that the relationships between LASD and some segments of the AV community may be deteriorating. Community members have also expressed a lack of confidence or trust in the monitoring process. Starting on a positive note, the Department has maintained compliance with several key community outreach and engagement requirements, and it has come into compliance with the youth diversion program requirements as well as the Department's report on community engagement. LASD has made strides toward developing a training curriculum that should comply with most provisions of the training requirements in the Community Engagement section. The content presented at the CMF has improved for both stations, demonstrating a growing ability to incorporate data from a variety of sources.

### 1.      <u>Increasing Community Sentiment That LASD Is Losing Ground Toward Compliance</u>

In community meetings, town halls, and more targeted interactions with smaller groups of community members, CACs, and organizations, the MT is witnessing an increase in dissatisfaction on the part of some AV community groups, particularly regarding interactions between law enforcement and people of color and the unhoused.[9] Some of these community members also express frustration and disappointment with the monitoring process and team, as well as DOJ. We have received critiques that monitoring is taking too long, is not "going far enough," and is not leading to real change or a "difference on the streets."

---

[9] Some of the meetings and events that the MT participated in this reporting period included a Palmdale CAC Town Hall on July 1, 2021; a joint CAC meeting with the MT and DOJ on August 31, 2021; an MT meeting with community members on September 1, 2021; a Lancaster CAC meeting on September 29, 2021; a Lancaster CAC town hall on December 7, 2021; and several calls with community members (including CAC members and others).

With at least one important exception described below, one of the issues that we note throughout this report is LASD's resistance to or defensiveness regarding citizen accounts, reports, or feedback that the Department views as being critical of its efforts. And lately, a number of events have fallen into this category.

In addition to MT reports and audits, there are other reports that raise questions from AV community members, including the following.[10]

- A publication drawing attention to the disparity in arrests and uses of force against Black students in the AV, where a study found that Black teenagers accounted for 60% of the deputy contacts on campuses but made up only about 20% of the enrollment in those schools.[11]

- A Neighborhood Legal Services of LA County report, which highlights racial disparities in stops in the AV and concluded that "communities of color in the Antelope Valley are being targeted, stopped, harassed, and racially profiled by the Los Angeles County Sheriff's Department."[12]

There has been news media coverage as well as concern raised in community meetings in the past year regarding LASD-AV enforcement of city ordinances, especially of the unhoused. As voiced by advocates for the unhoused, other concerns related to the unhoused include LASD-AV stops and searches and moving of encampments.[13]

Additionally, recent community concerns have focused on two widely circulated videos of uses of force by LASD-AV deputies, one in Lancaster and one in Palmdale. A third video was widely distributed of another use of force involving a high school student while at school. The MT has not conducted a complete review of these incidents and is not commenting on their compliance with the SA at this time. Rather, this discussion is about the Department-community interaction around these issues.

What concerns us most is not that these reports and incidents exist—or, for that matter, whether the factual circumstances of each incident or the potential bias of authors have been investigated—but the Department's response, which has sometimes shown a tendency to be dismissive of the need to have a discussion of the issues with the MT and, more importantly,

---

[10] The Department reports that some of these reports were raised with Palmdale CAC members but that the CAC members did not spend much time discussing them because they found them to be biased.

[11] See the report at www.propublica.org/article/in-a-california-desert-sheriffs-deputies-settle-schoolyard-disputes-black-teens-bear-the-brunt and school-related news coverage at www.newsweek.com/students-teachers-fight-police-antelope-valley-school-california-1602562

[12] The report is available at https://nlsla.org/wp-content/uploads/2021/10/Mapping-Racially-Biased-Policing-in-the-AV_compressed.pdf

[13] See Antelope Valley Press, *ACLU files suit against LASD, Lancaster,* February 9, 2021.

with the community. The Department characterizes these reports as unverified and biased. To ask critical questions (Which segments of the community feel this way and why? To what extent might this be indicative that the community response is possibly an extension of national tension and not related specifically to LASD-AV practices? What other issues and historical narratives are these incidents associated with in the mind of community members?) is legitimate and would warrant discussion, but that is the starting point. Critical thinking and evaluation, and even internal data analysis, are important components of exploring whether any of the AV station strategies are having an impact on particular members of the community. They should be part of a long list of questions that LASD management seeks to answer through discussion with impacted community groups, data analysis, and review of LASD strategies and practices. If it is a smaller group rather than the majority of community members, this is, again, not a reason to discount those voices but relevant information for the Department to consider as it seeks input and develops any potential changes to policing or community engagement approaches.

As has been discussed in previous semi-annual reports and in multiple meetings with Department personnel, the perceptions of these issues and the narratives about them that spread among community members require a thoughtful and thorough response from the Department, regardless of whether or not the factual circumstances are verified. The questions raised in all of these incidents should be treated as opportunities for the stations to engage in earnest dialogue about how policing practices impact the community and as an avenue to empower the CACs to serve as community leaders, conduits, and facilitators for all community voices being heard with an overall goal of increasing transparency and accountability. The MT would like to see documentation being provided of the Department's analysis of the significant concerns raised by the community that is supported by the use of data and through introspection of LASD practices in the AV. The community deserves this level of attention from LASD stations.

Importantly, the Monitors were encouraged by the apparent response by one of the AV captains to the recent uses of force being discussed by community members. According to members of the CAC, the station captain openly discussed the video footage with members of the Palmdale CAC. We were told that he showed CAC members additional body cam footage and engaged in a conversation. Further, we were told that he showed the video at roll call trainings and talked to the deputies about how it would look to community members without being aware of the full context and having such an explanation. The MT was impressed with this action and notes that it has had a favorable impact on the perceptions of the CAC members in that city. We certainly hope this sort of transparency and openness becomes routine in these types of circumstances. We have also requested that, in the future, we are informed of this type of action directly by the Department and are provided documentation so that we can assess the nature of the conversations and any subsequent action or outcomes.

Finally, it is possible that LASD's failure to comply with certain related SA requirements, such as the development and implementation of the Community Engagement training (Paragraph 89, discussed below) and the lack of formalized efforts to use the results of the three Community Surveys to inform the stations' community engagement strategies (Paragraphs 88, also

discussed below) may be impacting—or at least slowing the improvement of—the relationship between the community and LASD. The Monitors are encouraged with the progress being shown toward developing an approved training, and in the next reporting period they will discuss with the Department how they intend to use the survey results.

2.    Review of LASD-AV Deputy Community Engagement Activities

Paragraph 88 of the SA requires deputies and all sworn staff in AV stations to regularly and actively attend community events and meetings. To achieve compliance with this provision of the SA, AV deputies are required to attend community meetings and/or conduct a certain number of "755s"—self-initiated, positive engagement with members of the community. The MT continues to review documentation on events attended and 755s conducted by LASD-AV personnel.

During an MT site visit on September 1, members of the MT reviewed community event logs and 755 narrative descriptions at both the Lancaster and Palmdale stations. After the site visit, the MT submitted a memo to LASD with its findings, which included the following.

- *Lancaster*

    » Although improved since we have reviewed this over the past few years, some of the 755 logs still need to describe how the interaction with the member(s) of the public was initiated. An example of a "good description" was included in our feedback with a request for the Department to follow this example.

    » Some of the events need better descriptions, especially of how deputies participated and interacted with members of the public.

    » Some of the events may not qualify as currently described, such as attending the grand opening of a gym. Perhaps with more information, the MT could understand how attending a grand opening deepens the community engagement efforts or community policing efforts.

    » Lancaster was allowing its deputies to participate in drive-by birthday celebrations of youth to qualify for attending community events because there are few events to attend due to the pandemic. But as of July 1, Lancaster no longer allows these events to qualify. The MT supports this decision. The Monitors acknowledge that COVID-19 restrictions impacted opportunities for deputy–community interactions and made concessions in some cases as to what constituted compliance. However, to be clear, deputies joining in drive-by celebrations may be a constructive community-relations activity but, as we have often explained, community

relations is not the same as community engagement; such drive-bys do not reflect the nature or depth of interactions that will hasten the trust and collaboration envisioned by the SA.

- *Palmdale*

    » A couple of cited events are arguably questionable as to whether they should qualify, such as those lacking a description that explains how deputies engaged the community, including attendance of a funeral procession of a WWII veteran.

    » On the 755s, deputies often were using "self-initiated contact with…", which is appropriate. In just a few instances, there was no description of how contact with members of the community was initiated and one 755 said the deputy was "flagged down," something the MT has specifically called out as not qualifying in the past. The MT will conduct further review to ensure the Department is not designating these instances as compliant.

    » Palmdale had a good variety and diversity of events attended by Palmdale personnel. In addition to the usual coffee with a deputy, food giveaways, and neighborhood watch meetings, there was also a Juneteenth event, a pride event, and a few events with the Muslim community.

The MT is appreciative of the station-embedded compliance sergeants and community engagement sergeants who hosted our site visit. They were open to feedback, answered questions, and were helpful.

During the next monitoring period, the MT will review the end-of-year Community Engagement Tracker report for 2021 to determine compliance with Paragraph 88; the findings will be included in the next semi-annual report. Also early in 2022, COVID-19 permitting, the MT will attend meetings with deputies and conduct ride-alongs to observe 755s to assess the requisite quality of community engagement.


3.      Annual Community Engagement Report

SA Paragraph 91 requires that LASD assess and report on the impact of its community engagement initiatives and issue a public report on station community engagement efforts identifying successes, obstacles, and recommendations for future improvement.

LASD submitted a draft of the 2020 Annual Community Engagement Report, and after a round of feedback from the MT and DOJ, LASD submitted a final report that included sufficient sections that identified successes, obstacles, and recommendations for future improvement. The MT approved that report as being in compliance with SA Paragraph 91.

4.    CAC and Town Hall Meetings

The CACs have been a mainstay in LASD even before the SA was being negotiated. Each station has its own CAC: a group of hard-working, committed volunteers who represent the community. The CACs are intended to be a conduit between LASD and the community and provide advice and recommendations to the stations. They may bring community issues to the stations for response and may assist in problem solving, and they provide feedback on what is and what is not working.

We would like to be clear that the Monitors have extraordinary appreciation for the CAC members and know very well that their role is difficult. Like LASD, the MT, and DOJ, the CACs have been receiving their share of criticism from the community. There is a sentiment by some that the CACs do not adequately represent the whole community and are dominated by defenders of the stations. Furthermore, some believe that LASD plays too strong a role in dictating CAC membership and activities.

This perception has been bolstered by the Department's role in some recent CAC turnover. In both CACs, there has been some turnover in membership, with active long-standing members resigning, being asked to resign, or being removed. The Department dismissed two long-standing members and indicated that they may make additional changes. One of those CAC members has been a leader in the movement to hold LASD more accountable, participated in protests during the summer of 2020, and is active on a coalition to hold the cities of Lancaster and Palmdale to account for the contracts each one holds with LASD. He reported that Department personnel directly questioned him about statements he made at a rally several weeks earlier, and he said he was told it would be better if he was no longer on the CAC. In a discussion with the MT and DOJ, Department leadership indicated they believed these changes were warranted and that they would lead to a more productive CAC. In the meantime, the MT encourages the Department to actively address the sentiment, expressed at CAC meetings and elsewhere, that the CACs are populated by defenders of the Department and people who will only agree with them rather than express concerns that exist in the community or who would do more to encourage that all voices of the community be heard.

The SA and Department policies emphasize the CACs as a central element of LASD's community and problem-oriented policing initiatives. The requirements and goals of the CACs are codified in unit orders for each station.[14] The Monitors will continue their review of recent actions taken by the Department with regard to CAC membership to assess whether they undermine the Department's compliance with the SA and with their own policies.

During a time of relaxed COVID-19 restrictions, the MT held an in-person meeting with the Lancaster and Palmdale CACs on August 31, which was also attended by DOJ remotely. The MT

[14] The policies and unit orders revised or created for the SA can be found on the LASD Compliance Unit website at https://lasd.org/antelopevalleycomplianceunit/#policies. The CAC unit orders are Lancaster Unit Order 72 and Palmdale Unit Order 14-07.

reviewed the role of the CACs and the requirements of the CACs in the SA. The discussion included whether the CACs are providing recommendations and feedback to LASD on improvements in community relations and engagement and whether CAC members receive input from community members that they are providing to LASD. Also, there was a robust discussion about recent turnover on the CACs.

The Palmdale CAC reported on recent changes to its structure and meeting to improve its functioning and ability to provide independent input and feedback to the station. The MT appreciates these efforts to improve the effectiveness and independence of the CAC.

The MT attended several other community meetings and CAC town hall meetings, some virtually and others in person, during this monitoring period. In this time, there has been a series of contentious CAC town hall meetings in which members of the community have attended and have raised questions or complaints critical of LASD or the CAC, and the discussion has become tense. The station anticipated that this particular meeting was going to be tense and made plans to shut down the meeting if it could not control the agenda. It goes without saying that neither the CAC nor the deputies should put themselves in situations that feel unsafe, but it does beg questions on other possible strategies that could be used to de-escalate tensions in advance of a meeting and that might prevent such an occurrence. Perhaps additional outreach strategies could be useful, such as smaller listening sessions or facilitated dialogues.

The MT finds promising a new initiative announced in the Lancaster station's second quarter 2021 Quarterly Report: "Each CAC member will host a Zoom Meeting with Lancaster Station on selected dates. Each CAC member will select residents they invite to attend, to ensure each specific community has their questions addressed. Our LGBTQ+ community may have different questions than our college students, and our Black community may have different questions than our exclusive Spanish speaking community. These individual Zoom meetings will allow us to address each community on a more personal level."

5.    Risk and Crime Management Forums

Paragraph 90 of the SA states: "LASD agrees to ensure that monthly Crime Management Forum meetings with the Assistant Sheriff or his designee and semi-annual Risk Management Forum meetings include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them. LASD agrees to use techniques such as spatial mapping and scientific deployment analysis to enable the Risk Management Forum to better support and measure community and problem-solving policing efforts."

After several years of non-compliance with this provision of the SA, multiple memos from the MT to LASD, and multiple discussions on how to comply, LASD has recently made notable progress. During the September 30 Risk Management Forum (RMF), LASD began a new practice of having a segment of the meeting to address AV trend analysis.

During the AV trend analysis portion of the meeting, the Lancaster captain discussed efforts to apply the SARA problem-solving model to examine the Quarterly Reports, risk management data (UOF, accidents, etc.), and other areas typically covered in the RMF. He identified some of the findings that revealed areas of concern, such as an increase in UOF among Lancaster deputies. Vehicle pursuits had increased as well, and there were several out-of-policy findings associated with the pursuits. The Palmdale captain similarly examined available data to identity challenges and develop new strategies. It was good to see management bring more critical thinking into their role, using readily available data and then making further inquiries about what steps can be taken to improve their strategies.

Overall, this meeting reflected some definite improvements and strides made by LASD in meeting the expectations of the SA. LASD showed a stronger interest in using and applying data, making more efforts to identify and examine trends and patterns that warrant attention, and showing a greater willingness to engage in critical thinking.

The RMF and Crime Management Forum (CMF) still need to increase and improve the identification of community priorities and the development of strategies to address them. On several occasions, there have been comments from LASD executive staff that they want to hear more from the station captains about the impact of the strategies that are being employed and what refinements might be required as a result of ongoing assessments of their endeavors. Similarly, as the stations implement new strategies, they will need to consider the potential for disparate impact, especially in light of continuing feedback from community members who say they perceive that there could be a disproportionate number of stops of AV community members of color. However, to date, there has been no reporting back on such activities in any of the subsequent RMF or CMF meetings or further inquiries being made during the meetings about the state of these previously discussed matters. If this were to be incorporated into these meetings as a routine feature, it could provide valuable learning opportunities for all involved and reinforce the importance of using data to inform and drive policing strategies.


6.    <u>Community Engagement Training</u>

Paragraph 89 of the SA requires LASD to "provide structured annual in-service training on community policing and problem-oriented policing methods and skills for all AV deputies, including station supervisors and unit commanders." Paragraph 89 also lists several subjects that must be covered in the trainings.

After years of non-compliance and slow progress toward this provision of the SA, LASD has recently made strides toward compliance. LASD's Department-wide Training Unit is working to modify a course on principled community policing that includes information and modules intended to result in compliance with Paragraph 89. Both the MT and DOJ acknowledged the high quality of the training curriculum that was submitted. However, a few subject areas identified in the SA are not included, and portions of the training curriculum only reflected

placeholders. LASD will need to address those in the next version. LASD will implement the training once it is approved.

7.    <u>Community Survey</u>

SA Paragraphs 98 and 99 require LASD to assist the Monitors in conducting an annual Community Survey that is reliable, comprehensive, and representative of the community and makes a special effort to promote the inclusion of arrestees and Section 8 voucher holders, among others. The purpose of the SA-mandated survey, which is conducted by an independent survey team, is to assess community perceptions of the relationship between LASD and the AV community and to measure how the SA reforms are influencing that relationship, if at all.

As mentioned in previous semi-annual reports, the data gathered through the first annual survey is used as a baseline and compared with data from the second, third, and future surveys to assess changes in the relationship between LASD and the community over time. The Department, DOJ, and the MT have worked together to produce three such surveys, with the third being completed in this reporting period.

Data from the third annual Community Survey (Year 3) were analyzed. The findings report, as well as the more extensive online data tables, will be released in January 2022.

The youth survey was launched at the end of May 2021 and concluded in June 2021. Due to participation levels being very low, data from the youth survey were de-emphasized in the written report but are included in the online data tables.

Once the survey is publicly released, the MT looks forward to hearing from the Department about how it will use the survey findings to inform community engagement and crime prevention activities moving forward.

8.    <u>Year 3 Survey Findings Overview</u>

The information here, taken from the findings report, briefly highlights a few key items about community perceptions of LASD and public safety. For a more in-depth and comprehensive analysis of the data collected, the MT encourages the public to review the findings report at www.antelopevalleysettlementmonitoring.info. The direct link to the data tables is https://bit.ly/AVComSurYr3.

There were 3,243 survey respondents in Year 3, about 95% of whom were adults and 5% of whom were youth. As shown in Table 4, the representation of Black and Black multiracial respondents decreased by 9 percentage points from Year 2 to Year 3, and Latino representation also decreased by 9 percentage points. These changes seem to be associated with a decrease from Year 2 to Year 3 in the participation of CBOs in the survey recruitment and administration

processes and in the fact that, due to COVID-19, there were no paper or in-person surveys. The representation of other racial and ethnic groups remained relatively similar or identical in Year 3 compared with Year 2 and Year 1. (Please note that the race/ethnicity terms used in this report reflect the terms used in the survey.)

Whether or not the survey reaches perfect representativeness, it remains a valid and useful survey. Moreover, it is important to consider the separate responses and perceptions of various community groups, especially those singled out in the SA—including youth, people of color, Section 8 participants, and the formerly detained. The written report provides some such analysis, and, as described earlier, the online data tool allows readers to do extensive further analysis of their own.

| Table 4 | | | | |
|---|---|---|---|---|
| Race/Ethnicity of Respondents by Survey Year and Census Estimates | | | | |
| Race or Ethnicity | Year 1 | Year 2 | Year 3 | Census[15] |
| Asian/Pacific Islander | 2% | 2% | 2% | 4% |
| Black/Black-Multiracial | 13% | 18% | 9% | 14% |
| Hispanic/Latino | 46% | 42% | 33% | 48% |
| Multiracial | 3% | 2% | 2% | 2% |
| Native American | 1% | 1% | 1% | < 1% |
| Other | 4% | 4% | 6% | < 1% |
| White | 32% | 31% | 47% | 31% |

Generally, the data from Year 3 continue to reflect evidence of differences across race and ethnicity regarding community perceptions of LASD. Black AV residents and residents of color continue to have more negative experiences with and perceptions of LASD than White AV residents. The online data visualizations allow viewers to see more detailed comparisons of the perceptions of LASD across different racial groups and between survey years.

Overall, 67% of all participants reported agreeing or strongly agreeing that they have confidence in the Sheriff's Department deputies, an increase from the previous year, when 43% agreed or strongly agreed. In addition, 57% indicated having a good relationship with the Sheriff's Department deputies, and 57% of the respondents agreed or strongly agreed that the Sheriff's Department deputies are responsive to the concerns of their neighborhoods.

---

[15] 2015–2019 ACS 5-year estimates, US Census Bureau, American Community Survey, 2019. For the ACS estimates, "Multiracial" contains anyone who selected multiple racial categories or specifically selected "multiracial."

Up 23 percentage points from Year 2, 45% of participants agreed or strongly agreed that if they "witnessed a crime in [their] neighborhood, [they] would notify the Sherriff's Department." Broken down by race, 50% of respondents who identify as White agreed or strongly agreed, but participants who identify as Hispanic/Latino (42%) or Black (41%), were less likely to agree.

Up from Years 1 and 2, when reporting their level of confidence that LASD "fully investigates allegations of misconduct by its employees," 42% of Hispanic/Latino respondents, 41% of Black respondents, and 49% of Asian/Pacific Islander respondents answered that they agree or strongly agree, while 50% of White respondents continued to agree or strongly agree with that statement.

The fourth annual Community Survey will launch in 2022. The MT is hopeful that by the time data collection begins, challenges presented by the COVID-19 pandemic and its variants will not inhibit in-person data collection and the use of paper surveys. These methods helped boost survey participation in Year 2 but were not feasible in Year 3 due to public health concerns. The MT will also continue to work with various community-based organizations, individual community members, the CACs, and LASD to collect survey data via online methods in Year 4. The Parties and the MT plan to monitor the survey response rate and implement any changes as necessary to maximize community participation.

9.    Community Engagement Compliance Status

Table 5 provides the current compliance status for each paragraph in the Community Engagement section of the SA. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not.

| Table 5 | | |
|---|---|---|
| **Community Engagement Compliance Status** | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** |
| 69 | Use experts and the community survey to study organizational culture and climate in the AV stations to aid in development of the Bias-Free Policing section. | Partial |
| 72 | Use experts and the community survey to study organizational culture and climate in the AV stations to aid in development of training. | Partial |
| 87 | Actively participate in community engagement efforts, including community meetings, being available for community feedback, developing CACs, and working with the community to develop diversion programs. | Yes |

| Table 5 | | |
|---|---|---|
| Community Engagement Compliance Status | | |
| SA Paragraph | Summary of SA Requirements | Compliance |
| 88 | Ensure all sworn personnel attend community meetings and events, and take into account the need to enhance relationships with particular groups within the community, including, but not limited to, youth and communities of color. | Partial |
| 89 | Provide in-service training on community policing and problem-oriented policing to all AV personnel. | Partial |
| 90 | Revise content of CMFs and RMFs to include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them using techniques to better support and measure community and problem-solving policing efforts. | Partial |
| 91 | Complete reports on the impact of community engagement efforts, identifying successes, obstacles, and recommendations for future improvement in order to continually improve police–community partnerships. | Yes |
| 92 | Seek community assistance in disseminating SA. | Yes |
| 93 | Support and work with CACs to help them meet their mission to leverage the insights and expertise of the community to address policing concerns, including, but not limited to, racial or ethnic profiling and access to law enforcement services, and to promote greater transparency and public understanding of LASD. | Yes |
| 94 | Memorialize CACs and facilitate quarterly meetings. | Yes |
| 95 | Post CAC's reports on LASD-AV website and respond to recommendations. | Partial |
| 96 | Provide administrative support and meeting space for CACs. | Yes |
| 97 | Ensure CACs have no access to non-public information. | Yes |
| 98 | Assist Monitors in annual Community Survey. | Yes |
| 99 | Cooperate with independent researcher in conducting annual Community Survey and deputy survey. | Yes |
| 100 | Cooperate with administration of the annual Community Survey and focus groups. | Yes |
| 101 | Post annual Community Survey report on LASD-AV website. | Yes |

## F.    Use of Force

The circumstances leading up to the use of force (UOF), along with the type and degree of force used, are often the subject of intense public debate. No other law enforcement action garners more community and judicial scrutiny—or, for that matter, the scrutiny of law enforcement managers.

Increased access to technologies such as body-worn cameras and the ubiquitous presence of cell phones with video have in many ways helped the law enforcement–community relationship by affirming that most peace officers conduct themselves professionally and courageously, even in the face of life-threatening dangers. These technologies can also help identify situations where officers demonstrate a lack of training and/or professionalism as well as shortcomings in force investigation, review, and adjudication processes.

The SA requires the Department to implement many changes to its UOF policy, training, and practices to ensure that deputies have the knowledge and training to de-escalate UOF whenever possible and provide sufficient guidance for deputies to safely use force when unavoidable. It also requires that supervisors adequately investigate UOF by AV deputies and, of equal importance, how LASD managers review, adjudicate, and track UOF incidents.

1.   Use-of-Force Policy

Section VIII of the SA encapsulates the UOF requirements the Department has agreed to implement, beginning with revisions to policy (p. 24):

> *LASD agrees to revise its force policies and practices to reflect its commitment to upholding the rights secured or protected by the Constitution of the Unites States, protecting human life and dignity of every individual, and maintaining public safety.*

Our previous reports documented that in April 2019, the Parties and Monitors reached a tentative agreement on a UOF policy pending review by LASD managers. The agreed-upon policy represented a significant improvement over the Department's previous policy, including, among other important changes, emphasizing the use of de-escalation. However, Department executives never approved or implemented the new policy. At the end of 2020, the Department updated its UOF policy to comply with a new state law, AB 392, but did not include all of the revisions approved in 2019. The Department implemented the new UOF policy in January 2021 to be in compliance with state law but without concurrence from the Monitors or DOJ as required by the SA.

Over the past six months, the Parties and Monitors have had numerous meetings and exchanged multiple drafts of the Department's UOF policy. In August, the Department submitted an updated policy, which has been reviewed by the Monitors and DOJ. After several more discussions and reviews of draft policies, the Department was provided with the Monitors and DOJ's assessment of the proposed updated policy on December 8, 2021.

Unfortunately, as we have repeatedly reported, the Department continues to remain out of compliance. While the published UOF policy is a significant improvement, several areas require additional clarification by the Department. Those include, but are not limited to, the following,

which are required by California law and the SA:[16] reporting of uses of force that involve the intentional pointing of a firearm by a Department employee at a person and the duty for Department employees to intercede if they see a clearly excessive UOF by a Department employee. DOJ has expressed other concerns as well.


2.     Use-of-Force Training

The SA contains numerous provisions requiring that AV deputies and their supervisors receive specific training on UOF. The requirements outlined in SA Paragraph 119 include:

> *LASD shall provide all Antelope Valley deputies with annual or biennial use of force training. The topics will include the following:*
>
> a)   *proper use of force decision making, including when force may be unnecessary in response to minor resistance (biennial);*
>
> b)   *role-playing scenarios and interactive exercises that illustrate proper use of force decision making, including training deputies on the importance and impact of ethical decision making and peer intervention (annual);*
>
> c)   *principles of procedural justice, and avoiding the use of force in response to minor resistance (biennial);*
>
> d)   *de-escalation techniques that encourage deputies to make arrests without using force (annual);*
>
> e)   *threat assessment, including how race can impact deputies' threat assessments (biennial);*
>
> f)   *LASD-AV deputies will attend LASD's Tactics and Survival (TAS), also known as the Laser Village tactical firearms training (biennial); and,*
>
> g)   *supervisors shall receive initial and annual refresher training on conducting use of force investigations, how to effectively direct deputies to minimize uses of force and to intervene effectively to prevent or stop unreasonable force, using LASD's accountability and disciplinary systems after encountering a potentially unreasonable use of force, and supporting deputies who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force (annual).*

---

[16] See California Commission on Peace Officer Standards and Training guidelines at https://post.ca.gov/Portals/0/post_docs/publications/Use_Of_Force_Standards_Guidelines.pdf and see Figueroa v. Mazza et al., No. 14-4116 (2d Cir. 2016).

In our last six-month report, we reported that in May 2021, the Department submitted multiple UOF training lesson plans and expanded course outlines to the Monitors and DOJ for approval. In July 2021, the MT and DOJ met with the Department and County Counsel to discuss the MT and DOJ's concerns with Department's updated UOF lesson plans and expanded course outlines. Since that time, the Department's Training Bureau has been working on an updated training that addresses the SA as well as state law. Members of the MT have provided the Department suggested scenario-based role playing exercises.

In September 2021, LASD provided to the MT and DOJ a revised Department-wide training. LASD has been conducting this training which it believes addresses all the provisions with the SA and current law. The Department requested that the MT and DOJ attend the training before providing feedback on the current curriculum.

The Compliance Unit undertook much appreciated efforts for members of the MT and DOJ to view the training virtually, as the timing unfortunately coincided with a COVID-19 surge. This occurred in December 2021. The MT found it to be an improvement over the previous version of the UOF training curricula submitted for compliance. The MT and DOJ will submit interim feedback to the Department in order to facilitate revisions. After that process, the MT and Monitors will observe multiple days of the training and discuss feedback with the Training Bureau at the end of each day. Once the training is approved, the Department will have to ensure AV staff are trained in any aspect of training they have already received that may be determined not to meet the requirements of the SA.

Involving the Training Bureau personnel in the discussions with the Parties and the MT and allowing the training experts to interact directly with the MT's force expert and DOJ has been a good strategy of the NPD commander. We appreciate the advancements that have been achieved by the Training Bureau and Compliance Unit with the newly developed UOF training materials.


3.      Use-of-Force Audits

The SA requires that the Monitor do the following.

- *The Monitor will assess the County's progress in implementing, and achieving compliance with, the Agreement; report on the status of implementation to the Parties and the Court.* (Paragraph 146)

- *In order to assess and report on LASD's implementation of this Agreement and whether implementation is resulting in constitutional policing, the Monitor shall conduct compliance reviews and audits and outcome assessments as specified below.* (Paragraph 148)

- *The monitor will conduct an ongoing review and report on LASD use of force on restrained individuals, use of force in response to spitting, and use of OC spray.* (Paragraph 151)

The MT has completed three audits evaluating the Department's compliance with the SA's UOF requirements. The first audit was for all Category 1 and Category 2 uses of force that occurred in the AV from January 1 through March 31, 2017. The second audit was for all Category 3 uses of force in the AV between January 1, 2015, and March 21, 2018. Category 1 uses of force consist of minor uses of force, such as control holds, when UOF does not result in an identifiable injury. Category 2 uses of force result in an identifiable injury and any application of force other than those defined as a Category 1 or a Category 3 UOF. Category 3 uses of force involve the most significant levels of force and includes lethal force incidents. [17]

The MT completed its third audit of deputy uses of force in the AV and submitted its report to the Parties on July 26, 2021. This audit, like the first UOF audit, evaluated the Department's compliance with SA Paragraphs 102, 104–107, 108–112, 113, 115, 116, 130, and 142 with regard to Category 1 and Category 2 uses of force. On September 7, the Department submitted a written response to the audit's findings. The Department subsequently requested a formal audit exit conference, which took place December 13, 2021.

The Monitors' previous audits have documented extensive delays in the Department's investigation and management review of UOF cases. In MT audits thus far, it was found that management review can exceed 100 days, and recordation in the Department's PRMS database takes at least six months. In addition to being a risk management issue, these delays extend the interval between audits. Reducing these delays will help ensure cases audited are the most recent possible.

For this audit, auditors had to select an audit period of October 1 through December 31, 2019, to ensure sufficient time was provided for the investigations to be completed and adjudicated, along with any reforms based on previous audits to be fully implemented in the AV, thereby providing a reliable and sufficient population to support the audit's findings.

The audit assessed compliance in the following areas.

- Compliance with Department policy and SA requirements for UOF (Paragraphs 102, 104–107)

- Using force as a last result and de-escalating tense and evolving situations (Paragraph 103)

- Reporting uses of force (Paragraphs 108–110)

---

[17] All of the MT's completed audits reports are available at www.antelopevalleysettlementmonitoring.info

- Investigating UOF (Paragraphs 111 and 112)

- Management review of UOF and the implementation of remedial training (Paragraphs 113, 115, 116, 130, 133, and 142)

- Management analysis of UOF data (Paragraphs 117 and 118)

- Departmental analysis of UOF trends (Paragraphs 82, 120–123)

We are pleased to report that this audit documented that in 95% of the cases we reviewed, AV deputies used force in a manner consistent with Department policy and the SA's UOF requirements. The audit also documented that in 92% of the cases, deputies satisfied the SA's requirements to de-escalate tense and evolving incidents without using force. As result, the Department was found in compliance with the SA's provisions for deputy use and de-escalation of force.

However, the MT's review found LASD managers' evaluation of the uses of force and their investigations to be out of compliance. There were four cases where the Monitors concluded that the force used was *not* consistent with Department policy and the SA, whereas Department managers had concluded all 72 cases, including these four, *were* in policy. The audit also found that Department management failed to ensure the Department's policy on providing and documenting Taser warnings prior to the use of a Taser was followed; and, of greater concern, the Department still consistently fails to comply with its SA-mandated policy on the initiation of investigations for substantive allegations of misconduct discovered during UOF investigations. Fifteen of the 73 investigations contained a substantive allegation of misconduct: Investigations were initiated in all eight of the Palmdale cases, but in only two of the seven Lancaster cases. Each of these errors constituted critical deficiencies in the investigation and adjudication of uses of force. The Department was in compliance with 89% of management review of Category 1 uses of force and 59% of managerial review of Category 2 uses of force, resulting in the Department being out of compliance for the management review of force.[18] (For a description of those cases, please see the audit report, which can be found on the Monitors' website.)[19]

Department management failed to recognize that the uses of force documented in this audit were inappropriate and failed to initiate investigations into clear allegations of misconduct associated with uses of force that should have been identified and acted on. The Department has informed the Monitors that it disagrees with the audit's key findings. In the meantime, the shortcomings identified in the audit resulted in the Department being found out of compliance for numerous SA paragraphs associated with management's review of UOF incidents, a finding consistent with previous MT audits and other MT and DOJ reviews.

---

[18] The compliance metric for management review of force is 93% for Category 2 and 90% for Category 1.

[19] All MT reports can be found at www.antelopevalleysettlementmonitoring.info

4. <u>Departmental Response to MT Audits</u>

The Parties and the MT have been discussing a number of concerns raised by the Department about the MT's audits of UOF. The Department believes the long length of time between audits reduces the usefulness of the findings, that the cases reviewed are no longer current, and therefore the Department cannot rely on that information to improve practice. The Department is also concerned because it disagrees with some of the MT findings of non-compliance, such as for the managerial review of UOF investigations. It also did not agree with some of the professional assessments made in the audit and believes some of the provisions assessed in the audit should be assessed through other means. A management-level LASD employee also asserted to the MT and DOJ that the Monitors' UOF audits and analysis of disparities related to stops are cultivating or <u>causing</u> distrust of LASD by the community.

The Department's proposed solution to these issues is to have the Department's internal audit bureau, the AAB, take over responsibility for conducting these audits. In a recent meeting with DOJ, Monitors, Compliance Unit, and Divisional managers, the AAB explained how it would use audit methodologies that it believes would likely lead to less disagreement regarding compliance and that it can work more quickly since it is embedded in the Department.

The MT has made it clear to the Parties that for the foreseeable future, the MT will continue to rely on its own audits to assess compliance as required by SA Paragraphs 146, 148, 153, and others. The Monitors have consistently indicated that they expect the Department to conduct its own compliance audits in stops, UOF, and complaints, and this is something that should ultimately become a responsibility of the Department. This is an essential element in ensuring that the SA reforms are a permanent part of LASD operations, with AAB audits confirming there is no slippage to pre-SA practices after external monitoring is completed and the court case is closed.

However, a few factors currently preclude the MT from confidently relying on LASD's internal audits as SA compliance assessments. First, the Monitors and DOJ need to be confident that management is creating a culture where critical thinking, professional scrutiny, and accountability are welcomed and have those become the norm—and this culture would need to extend to the AAB. Second, as the MT has discussed with the Department on multiple occasions over several years, any compliance audit conducted by the AAB must be approved by DOJ and the MT. Such approval will include DOJ and the MT assessing the audit plan, then the audit findings report, and any necessary supporting materials for professional methodology, thoroughness, transparency, and independence (see SA Paragraph 149). Third, the SA requires that the Department conduct semi-annual randomized audits of the AV's complaint system (Paragraph 140), but this has not occurred.[20] We hesitate to rely exclusively on the AAB for compliance audits related to UOF when it has not shown the capacity to conduct those audits already required of the LASD by the SA. Fourth, while the SA does not require the Department

---

[20] Since monitoring began, the AAB has conducted one complaints-related audit of each station but it was not designed for the purpose of assessing compliance with the SA and was not approved by the MT or DOJ.

to do compliance audits related to UOF per se, it does require the Department to conduct analysis of UOF data and outcomes. As noted in the section below, this has not been done to date. Fifth, the SA explicitly requires that the MT conduct certain audits pursuant to Paragraphs 149–154.

The Monitors agree, of course, that a quicker turnaround for their findings could provide the Department the opportunity to begin developing and implementing any needed corrective action more quickly. To that end, the Monitors have been discussing with the Parties ways to ensure the MT auditing process both reliably assesses compliance and provides timely feedback to the Department. It is also foreseeable that AAB audits of UOF, complaints, or stops provide interim feedback to the Department in between or in parallel with MT compliance audits. This has already occurred to some extent with AAB audits of stops. On a related note, the Monitors also continue to encourage the Department to improve the timeliness with which UOF investigations are approved by managers and entered into PRMS and the timeliness with which effective Corrective Action Plans based on audit findings are implemented. (See discussion of Corrective Action Plans in the Complaints section.)

5.      Executive Force Review Committee Reviews

As stated previously, SA Paragraphs 102–123 define the SA's requirements for uses of force. Among other things, those paragraphs require that deputies use persuasion whenever possible (Paragraph 103), use force only in proportion to the threat or resistance posed by the subject (104), and de-escalate force immediately as resistance decreases (103). The SA also requires that supervisory UOF investigations are thorough and complete and that management's findings are supported by a preponderance of evidence (111–113). Finally, the SA requires that deputies be held accountable for using force in violation of Department policy (115) and supervisors be held accountable for not detecting, adequately investigating, or responding to force that is unreasonable or contrary to Department policy (116).

Department policy and the SA clearly document that the Executive Force Review Committee (EFRC) is the Department's management entity charged with the review and adjudication of all Category 3 UOF investigations. The EFRC is responsible for oversight of the most significant uses of force, including, but not limited to, deputy-involved shootings, force resulting in the subject's hospitalization, and force resulting in skeletal fractures.[21]

---

[21] Those cases are assigned to the IAB Force/Shooting Response Team.

The MT used metrics approved by the Parties to assess compliance in our first audit of EFRC cases published in November 2019.[22] The audit found the Department out of compliance with SA Paragraph 114 and made 11 recommendations to improve the EFRC process and ensure that Category 3 uses of force are sufficiently reviewed for policy, training, and tactical concerns. Our findings were discussed extensively with Department managers, including the managers who regularly served on the EFRC, and with County Counsel.

Since that audit was published, the MT has continued monitoring the EFRC's reviews of these most significant uses of force.

Our review includes monitoring the Critical Incident Review Panel's (CIRP's) preliminary review of those cases. The CIRP is tasked with conducting a "preliminary risk management and professional best practice analysis of critical incidents"[23] within a week or two of each major incident. All incidents reviewed by the CIRP are later reviewed by the EFRC once the investigation has been completed. When a deputy is involved in a third shooting or a shooting needs immediate assessment of tactics, training, or risk management, the CIRP activates the Shooting Advisory Committee (SAC), which reports its findings to the CIRP. While it originally provided SAC reports, the Department then decided to deny the Monitors access to the SAC reports despite the SA's requirement that the Monitors have access to all documents and processes, including "critical incident reviews, Executive Force Review Committee meetings and disciplinary hearings" (Paragraph 181). More recently, the Department has indicated the Monitors can have access to the report, but we have not received any SAC reports since July 2020.

While we have not yet conducted a second formal audit of EFRC cases, we continue to find problems with the way these cases are being reviewed. For example, since our last audit, we have found at least one case that was reviewed beyond the statute of limitations for taking administrative action; another case was inexplicably downgraded to a Category 2 UOF days before the EFRC was scheduled to hear it; and a case listed as a Category 3 UOF on the Department's transparency website apparently has not been tracked for EFRC review. We have also noted several EFRC reviews that appear to have significant deficiencies that the EFRC did not identify or address, including the following.

---

[22] On August 1, 2019, the Department, DOJ and Monitors finalized the compliance metrics for uses of force including the EFRC. Specifically, the agreed upon metrics require that the EFRC ensure the investigation is sufficiently thorough to support a reliable adjudication and that the adjudication is based on a preponderance of the evidence. The compliance metric bifurcated errors into those that are "critical" and those that are "non-critical" and established a 95% compliance rate for cases with a critical error(s) and 85% for those with a non-critical error(s). Category 3 UOFs, which go through the EFRC process, were not included in the first or third MT audits because of inadequate sample size. Because the Category 3 cases are more rare and go through a distinct investigative managerial review process, it is important that the audit methodologies be specific for those cases and that the sample size is large enough for the MT to make assessments of that unique process.

[23] MPP 3-09/330.00 Critical Incident Review Panel

- Failing to determine if deputies attended the training they were directed to receive by the CIRP.

- Cases involving tactical and/or investigative errors not identified or addressed by the EFRC.

- Repeated cases of deputies on field probation (trainees) who were not working with a field training officer as required by Department policy.[24]

- Deputies deploying in a manner that created a crossfire hazard.

In each of these cases, the MT made inquiries through the Compliance Unit, and those inquiries clearly identified our areas of concern.

However, we have recently observed substantial improvements in the functioning of the EFRC. Midway through this reporting period—likely due to the efforts of the executive leadership that provides oversight to the EFRC—a new chair was assigned, and the Committee began taking a much more critical review of these cases. We are also heartened to see an increased cooperation and a willingness to engage in constructive dialogue around the MT's findings and recommendations. Leadership is now setting expectations that staff try to find solutions rather than setting up obstacles or excuses to justify maintaining the status quo. We understand, but have not yet verified, that the backlog for entering cases into PRMS has been dramatically reduced, if not eliminated. Similar efforts are being made to reduce the investigative backlog by having the EFRC chair adjudicate some of the more straightforward cases, such as unintentional discharge with no injuries and no previous similar incidents. This dramatically reduces the time-consuming process needed for these simple cases to be reviewed.

While these changes are encouraging, developing a management culture that values critical thinking takes time and practice. We agree with the Department that conducting another EFRC audit at this critical juncture would only serve to document the past, and everyone agrees this needs to be improved. The MT will continue to monitor EFRC cases and provide the Department with constructive interim feedback. Once Patrol Operations and NPD have had enough time to make additional improvements and believe they are in compliance, we will initiate our second formal audit of Category 3 UOF, including the EFRC process. That process will include developing an audit plan and submitting it to the Parties for input.

It is also important to note that, amid this progress, the Department has attempted to limit the Monitors' ability to assess the review and adjudication of Category 3 uses of force. Despite the Parties' approved metric from 2019, LASD now postulates that the compliance metric for SA Paragraph 114 should be limited to only determining if the required cases are being referred to

---

[24] There may be instances where deputies on field probation can work alone in a vehicle while still under the supervision of a field training officer, but there was no indication that the EFRC took steps to assess whether policy was being followed in these cases.

and reviewed by the EFRC. This would eliminate the Monitors' ability to determine if the most serious uses of force occurring in the AV are adequately investigated and if managers thoroughly reviewed those cases for compliance with Department policies, the adequacy of those policies, the effectiveness of Department training, and SA mandates. We are continuing to discuss this issue with the Parties and consider the Department's position. However, our current understanding of the Department's interpretation of the SA's provisions would severely eliminate the Monitors' ability to review these major cases, which is unacceptable.

6.   LASD UOF Analysis

As mentioned earlier, in Paragraphs 120–123, the SA requires that the Department analyze UOF data, identify trends, and make adjustments to departmental policy and training as appropriate. It also requires that this analysis be published. While LASD currently remains out of compliance on these items, LASD made progress on Paragraph 120 in this reporting period. Specifically, a work plan was produced that included a strategy for analyzing 2020 UOF data. The Monitors and DOJ provided feedback on that work plan. LASD has committed to providing a work plan for 2021 UOF data by the end of March 2022 and a public report by the end of June 2022.

7.   UOF Compliance Status

Table 6 provides the status of each UOF-related SA provision. Partial compliance indicates that some but not all of the steps required of the provision are in compliance. As a whole, Table 6 documents significant concerns with management's oversight of UOF incidents in the AV.

| Table 6 | | | | | |
|---|---|---|---|---|---|
| Use of Force Compliance Status | | | | | |
| SA Paragraph | Summary of SA Requirements | Compliance | | | |
| | | 1st Audit (Cat 1 & 2) | 2nd Audit (Cat 3) | 2nd Audit (Cat 1 & 2) | Overall |
| 102,104, 105 | The reasonable use of force | Yes | No | Yes | No |
| 103 | UOF as a last resort and de-escalation | Yes | No | Yes | No |
| 106g | Inhibiting, using force on person legally recording incident | Yes | Yes | Yes | Yes |
| 107 | Head strike with impact weapon | Yes | Yes | Yes | Yes |
| 108 | Deputies reporting force incidents | Yes | Yes | Yes | Yes |
| 109 | Accurate UOF reports without boilerplate language | Yes | No | Yes | No |

| Table 6 | | | | | |
| Use of Force Compliance Status | | | | | |
| SA Paragraph | Summary of SA Requirements | Compliance | | | |
| | | 1st Audit (Cat 1 & 2) | 2nd Audit (Cat 3) | 2nd Audit (Cat 1 & 2) | Overall |
| 110 | Immediate supervisory notification of UOF | Yes | Yes | Yes | Yes |
| 111 a–d | Thorough UOF investigations | Yes | Yes | No | No |
| 111 e | Supervisory review of deputies' UOF reports | Yes | No | No | No |
| 112 | Independent supervisory UOF investigations | No | Yes | No | No |
| 112 b–e | Completeness of UOF investigations | Yes | Yes | No | No |
| 113 | Management review of UOF investigations | Yes | No | No | No |
| 114 | Thorough reviews by Executive Force Review Committee | NA | No | NA | No |
| 115 | Deputies held accountable for force that violates policy | No | No | No | No |
| 116 | Supervisors held accountable for inadequate investigation | UTD | No | No | No |
| 117 | AV commanders identify and curb problematic UOF trends | No | No | No | No |
| 118 | LASD and AV unit commanders will regularly review and track "training and tactical reviews" | No | No | No | No |
| 119 | Development and delivery of UOF training | No | No | No | No |
| 120–123 | Annual management analysis and public report on UOF data and trends | No | No | No | No |

## G.      Personnel Complaint Review

The Personnel Complaint section of the SA requires that the Department improve its handling of public complaints so that complaints are willingly accepted, thoroughly investigated, and adjudicated using a preponderance of evidence and that deputies are held accountable when they are found to have committed misconduct.

1.      SCR Handbook Revision

The Department has reached a major milestone with the approval of a draft of the Service Comment Report (SCR) Handbook, which provides the primary policies and procedures for receiving, investigating, and responding to complaints from the public. SA Paragraph 127 requires that the Department's policies and procedures for public complaints be revised so they provide clear, complete, and consistent guidance to employees, supervisors, and managers on how public complaints are to be handled. In addition to providing internal guidance, those manuals also serve to inform the public of the Department's standards and process for handling complaints. Besides the SCR Handbook, the documents include the Manual of Policies and Procedures (MPP) and several Internal Affairs Bureau (IAB) policy manuals.

The MT assessed the handbook to be technically in compliance with the SA and approved it with one caveat: The department provides a remedy to the draft to ensure that "discrimination" remains as a complaint category along with a category to capture "racial profiling" complaints.[25] We also note that we have concerns that the surgical approach to the handbook may not achieve the sought-after outcomes. Specifically, DOJ and the MT continue to be concerned that some complaints that should be elevated to an Administrative Investigation remain at the SCR level where formal discipline cannot take place.[26] An Administrative Investigation is initiated for the most serious allegations and/or for chronic behavior, and it may, but does not have to, result in formal discipline. The last MT complaint audit identified two cases that should have been elevated to an Administrative Investigation and were not: One involved a potential Criminal Offender Record Information violation, and the other involved a young deputy with a lengthy history of discourtesy and UOF complaints. These concerns notwithstanding, on November 2, 2021, DOJ agreed to allow the SCR Handbook to move forward but with the provision that:

> In an attempt to move through this impasse, DOJ is willing to agree to not withhold approval of the SCR Handbook pursuant to Paragraphs 160–163 with the understanding that the Parties will revisit these structural concerns and revise SCR policies and the SCR Handbook should future Monitor audits (i.e., those after the Handbook goes into effect) reveal that LASD is out of compliance with provisions of Paragraphs 127–132. Please let us know in writing if LASD agrees to this good faith compromise.

In a December 16 meeting, LASD stated that they agreed to this compromise. As the Department moves to publish and implement the new handbook, the Parties and the MT will begin reviewing these other manuals, the revisions of which will flow from those made to the handbook. It is important for policies addressing such closely related topics to have consistent

[25] The Department proposes to eliminate the complaint category of discrimination and substitute the category of racial profiling to capture all discrimination complaints. However, racial profiling can occur only during a discretionary "stop" [13519.4(e) PC] while discrimination can occur under many other circumstances.

[26] At most, an SCR classified as Could Have Been Better or Should Have Been Different can result in counseling, either verbal or written on a Performance Log Entry.

direction and language. We anticipate that work on the MPP and IAB manuals will be significant in the next reporting period. While we are not aware of a specific need at this time, we have pointed out to the Department that our review of the IAB policy manuals may make it necessary to revisit the language of the SCR Handbook.

2.      MT Audits and Reviews

The implementation of the revised policies and procedures manuals requires a series of additional processes, beginning with the related forms and processes that need to be revised and the development and implementation of training for deputies, supervisors, and managers. Once these steps are complete and the new practices have time to take root, the MT can conduct a third reliable, useful, and cost-effective compliance audit to assess their full implementation and effectiveness.[27] AAB audits, spot audits, and ad hoc reviews of cases that arise through other monitoring activities can occur in the meantime to measure and inform progress. At this point, because they are not part of MT formal audits, complaints identified in those reviews are not used to formally assess compliance with the complaint paragraphs; the information derived from them is often used to provide the Department with feedback on how they are being handled by the AV stations. As discussed in the UOF section, AAB audits may play an important and helpful role in facilitating the implementation process and hasten eventual SA compliance. Future audits will pay particular attention to the key issues highlighted in the SCR Handbook discussions and in previous audits and semi-annual reports, including LASD management's failures to initiate an SCR when someone alleges misconduct, failures to address obvious substantive allegations when an SCR is initiated, and failures to elevate complaints to an Administrative Investigation when warranted.

3.      LASD's Corrective Actions to Identified Issues in MT Audits

The MT has always chosen to delay conducting audits until the Department has had time to fully implement changes to policy, training, supervision, and/or practice. However, the Department generally fails to make use of that time. Most of the same provisions were out of compliance in the first and second MT complaints audit despite them being conducted over two years apart. At the February 2021 site visit, the Department committed to generating Corrective Action Plans to track the Department's response to the issues identified in the MT's audits. We believed this to be an encouraging step and welcome any such efforts to place a focus and sense of urgency on the Department's progress in an organized and documented response to MT, DOJ and internal LASD reviews and with the objective of achieving and maintaining compliance.

---

[27] The MT has conducted two audits of the Department's intake, investigation, and adjudication of public complaints. The first audit was published in January 2018 and the other in December 2020. Both audits found the Department out of compliance with all but a few of the SA's complaint provisions. The full audit reports and the sixth and 11th semi-annual reports, which include summaries of the audit findings, can be found at www.antelopevalleysettlementmonitoring.info.

A key reason the MT audits are spaced apart is to allow the Department time to implement changes and to let those changes take hold in practice. Corrective Action Plans provide a way to hasten the implementation of changes and a way to track their progress so that audits can be scheduled accordingly. Of course, this becomes irrelevant if corrective action is not pursued. Unfortunately, we have yet to receive the Corrective Action Plan report despite repeated outreach to the Department. In the meantime, there has been no documented response to most of the findings of the audit published in December 2020.

4.    LASD Audits

The AAB, LASD's internal audit division, is required to conduct semi-annual, randomized audits of the complaints process. These have not been produced; however, we do believe there is much to learn from regular internal audits and look forward to reviewing proposed work plans when the Department is ready to take these on.

5.    Next Steps for Complaints Monitoring

We will continue to monitor the Department's implementation of the outstanding recommendations from the MT's complaint audits and review the Department's Corrective Action Plan for implementing the audit's findings and recommendations. Now that the SCR Handbook is in compliance, we eagerly await updated drafts of the MPP and IAB manuals for MT/DOJ review. We will also review and evaluate the Department's training program to implement the revised system for handling public complaints. Once those changes are in place and training has been provided, we will consider initiating our third audit of public complaints.

6.    Compliance Status of SA Requirements for Public Complaints

As has been commented on earlier in this report, a great deal of focus has fallen on the metrics used to assess compliance with the SA's provisions. It is significant to note that no issue has been raised about the metrics used to assess compliance with the SA's complaint provisions.

In summary, the Department remains out of compliance with 12 of the 17 complaint paragraphs. The only three in compliance are the limited English language (LEP) portions of Paragraphs 125 and 137, ensuring an uninvolved supervisor conducts a complaint investigation as required by Paragraph 133, and identifying everyone at scene as required by Paragraph 134. We have been unable to assess compliance with Paragraph 126, which requires that discipline be imposed when a deputy impedes a complaint, as we have encountered no such cases in either audit sample and will discuss next steps with the Parties. We are also unable to assess compliance with Paragraph 136, which requires the investigator to interview the complainant in person, because we have recommended that the investigator be allowed to rely on the intake interview,

provided it sufficiently addresses all substantive issues. We expect to resolve that issue after further discussion with the Parties.

Table 7 provides the current compliance status for each paragraph in the Personnel Complaint Review chapter of the SA. The table reflects compliance assessments reported in the MT's first Complaints Audit (published January 2018) as well as the current audit approved for publication on December 15, 2020.

| Table 7 | | | | |
|---------|---|---|---|---|
| **Public Complaints Compliance Status** | | | | |
| **SA Paragraph** | **Summary of SA Requirement** | **Compliance** | | |
| | | **1st Audit** | **2nd Audit** | **Overall** |
| Preamble | Complaints are fully and fairly investigated and personnel are held accountable | No | No | No (72%) |
| 124 | Public access to complaint forms and information | No | UTD | No* |
| 125 | Accept all complaints | No | No | No (50%) |
| | LEP language assistance | No | Yes | Yes |
| 126 | Impeding the filing of a complaint grounds for discipline | No | UTD | UTD** |
| 127 | Revise MPP, SCR, and IAB manual so they are complete, clear, and consistent | No | No | No |
| 128 | Service vs. personnel complaints | Yes | No | No (92%) |
| 129 | Revise MPP (various) | No | No | Partial |
| 130 | Ensure each allegation and complaint is appropriately classified at outset and review | No | No | No (82%) |
| | Investigate every allegation even if not specifically articulated by complainant | No | No | No (77%) |
| 131 | Investigations are as thorough as necessary to reach reliable and complete findings | No | No | No (89%) |
| 132 | Refer appropriate cases to IAB or Internal Criminal Investigations Bureau | No cases | No | No (79%) |
| 133 | Investigation conducted by uninvolved supervisor | No | Yes | Yes |
| 134 | Identify all persons at scene | Yes | Yes | Yes |
| 135 | Obtain a full statement from all persons at scene | Yes | No | No (92%) |
| 136 | Interview complainant in person or give justification | No | UTD | UTD*** |
| 137 | Interview witnesses separately | No | No | No (83%) |
| | Use uninvolved interpreter for people with LEP | No | Yes | Yes |
| 138 | Training on intake and investigations | No | No | No |

| Table 7 | | | | |
|---------|---|---|---|---|
| **Public Complaints Compliance Status** | | | | |
| **SA Paragraph** | **Summary of SA Requirement** | **Compliance** | | |
| | | **1st Audit** | **2nd Audit** | **Overall** |
| 139 | Training on investigations | No | No | No |
| 140 | Adjudications consistent with a preponderance of the evidence | No | No | No (90%) |
| | Semi-annual audit of public complaints | No | No | No |

\* Unable to determine compliance with Paragraph 124 in second audit due to COVID-19 restrictions, but based on the previous audit and partial review, overall compliance has not been reached.

\*\* Unable to determine compliance for Paragraph 126. There were no complaints in the audit sample with an allegation of impeding filing a complaint, but there can be other indicators, such as the lack of public access to complaint materials, so the MT will review other information to determine compliance with this provision. After these reviews, if there remains no indication that complaints are being impeded, then the Monitors will be inclined to assess the Department in compliance with Paragraph 126.

\*\*\* The MT did not make a determination of compliance on Paragraph 136 pending determination of a compliance metric for recording all interviews and a discussion with the Parties regarding the SA requirement that investigators do their own interview with complainant when the documentation of the first interview may prove to be sufficient.

## H.     Accountability

Over the last several reports, the Monitors have repeatedly emphasized the need for the Department to (a) make better use of available data to track performance and evaluate results; and (b) improve managerial oversight and accountability for the performance of both subordinate staff and unit operations. Throughout the current report, we have continued to note deficiencies in these areas. The Accountability section, Paragraphs 141–145, identifies some of the critical mechanisms or data systems that capture information to facilitate analysis of employee performance as well as station wide and systemwide data required to ensure accountability. This section also addresses responsibilities that rest with the AV commanders and Division managers for using the data and ensuring the accountability requirements for each section of the SA are carried out and the intended results are achieved.

The MT intended to begin a systematic review of the Quarterly Reports and the Performance Mentoring Program (PMP) to assess compliance in with Paragraphs 141–145 during this reporting period. We did not do so because the Parties and the MT prioritized the discussions of the re-examination of the compliance metrics. While we are open to allocate some additional time in the upcoming reporting period, we do not intend for those discussions to be ongoing through 2022. Work on the accountability section that focuses on the Quarterly Reports and

PMP will resume in the spring, when we intend to review Quarterly Reports with the Department and assess their effectiveness.

All compliance assessments of Paragraphs 141–145 remain unchanged from the previous semi-annual report. Please see that report for a robust discussion of progress and compliance.

1.       Accountability (Paragraphs 141–145) Compliance Status

Table 8 provides the current compliance status for each paragraph in the Accountability section of the SA. The table does not reflect work done toward reaching compliance; it only indicates whether the Department is currently in compliance or partial compliance. Partial compliance indicates that some but not all of the steps required of the provision are in compliance (for example, a new policy was written, approved, and distributed, but deputies have not yet received the associated training) or that some part(s) of a multipart provision are in compliance while others are not.

| Table 8 | | |
|---|---|---|
| Accountability Compliance Status | | |
| SA Paragraph | Summary of SA Requirements | Compliance |
| 141 | • PRMS as LASD-wide decision support system <br> • Peer-to-peer comparisons of deputies and units <br> • AV commanders' periodic reviews of all personnel to identify trends | Partial |
| 142 | • Modifications to PRMS to access additional information <br> • Electronic PLEs <br> • PRMS accurate; accountability for errors | Partial |
| 143 | Plan for periodic review of trends at stations | Partial* |
| 144 | Modifications to Performance Mentoring Program (PMP); 30-day turnaround | Partial** |
| 145 | Coordination between Department-wide and Division PMP | Partial** |

* The plan needs to encompass NPD managers' review of the way station commanders use data and other information to respond to issues. The Quarterly Reports are one aspect of this plan, as are performance evaluations, CMF/RMF, shooting reviews, EFRC, Sheriff's 11, AAB audits, etc. A purpose of the MT's compliance review is to assess the success of the plan to ensure accountability across all these tools and processes.

** The mentoring programs are established and functioning. The qualitative effectiveness of the effort to comply with SA Paragraphs 144 and 145 will be assessed in the next reporting period.

IV.     **CONCLUSION**

In this reporting period, the MT has observed progress in the implementation of the reforms required by the SA in several key areas, including the community engagement training, the SCR Handbook, and the UOF policy. Crucially, the Department has engaged a data analyst, and we expect to see significant progress on providing appropriate data to inform decision making, identify problematic trends, and provide remedies related to stops and UOF in the next reporting period.

COVID-19 permitting, we anticipate spending more time in the AV with deputies in ride-alongs, observations of roll call trainings, Department performance at community engagement events, and generally assessing the culture and climate within the AV. And, in response to community concerns, we will also redouble efforts to connect with a wide swath of community members.

We further anticipate that the Department will continue to make progress on the development of SA-required trainings related to UOF and community engagement and that those trainings will be implemented during the next reporting period. We have been advised that LASD will be submitting drafts of the MPP and IAB manuals that reflect changes made in the SCR Handbook.

MT priorities include a formal audit of stops and a thorough review of the Quarterly Reports to assess compliance with many provisions in the Stops and Accountability sections. We will continue to review the Department's proposed changes to compliance metrics into the new year and expect that process to be concluded well before the end of the next reporting period.

The SA was structured to help ensure the needs of both the public and the members of LASD are being addressed. As with previous reports, we have stressed the importance of having effective managerial oversight along with an unequivocal organizational commitment to being accountable for both constitutional policing and achieving those public safety outcomes addressed in the SA.

This commitment must include meaningful engagement of the whole community in defining and helping bring about those outcomes. Those objectives also play an important role in ensuring employees gain a clear understanding of the agency's priorities so that they can then carry out their responsibilities in a manner consistent with organizational guidelines and community expectations. Law enforcement is under acute scrutiny, not only in the AV but across the country, and LASD deputies, like others elsewhere, are in need of and entitled to clear direction and guidance that results from well-thought-out policies, relevant training, effective supervision, and other forms of support that can be provided by strong agency leadership and through the involvement of an engaged public.

The MT wants to acknowledge and thank the CACs for their dedication to the AV and the improvement of community and law enforcement relationships. We also want to thank the members of the Compliance Unit and their command staff, who have worked so hard on the discussions of compliance metrics, the various policy and training documents, data requests,

training rosters, and support of the MT's audits, among other things. We also want to acknowledge AV deputies for their openness to learning and growing as individual deputies and as an agency. We greatly appreciate the input from many community members who keep us all focused on what matters most: constitutional, unbiased delivery of policing services that improve the safety and well-being of the community.

**Appendix A**

**MT Trends Analysis: Stops and Stops Outcomes, July 2018 to June 2021**

The MT stops analysis compared key AV stops data in six consecutive six-month time periods from July 2018 through June 2021: July–December 2018, January–June 2019, July–December 2019, January–June 2020, July–December 2020, and January–June 2021. This represents a cumulative report: The 2018 and 2019 data were first discussed in previous semi-annual reports and with the Parties.

This report provides data and tabulations prepared by the MT meant to provide the Department with data tabulations they can use to address some of the requirements of Paragraphs 43, 44, 46, 50, 51, 56, 64, 68, and others, as well as explore some of the outcomes required in Paragraph 153. It does not include the Department's assessment of what is concerning or encouraging in the tabulations, any further analysis conducted by the Department, any action steps taken by the Department to address earlier findings (July 2018 through December 2020) or the measured impact of those action steps, or planned action steps based on these latest findings. The Department should address that in a separate report.

Each section of this summary provides a table of the primary findings, some summary discussion of those findings, and results of some further analysis (of other available data) of the type the Department may choose to do when it takes on this work internally. In some cases, we also indicate the number of people that the percentages represent. To shed light on potential actual or perceived disparities, these analyses focus on race/ethnicity. (The names of race/ethnicity groups in theses analyses reflect the terms used in the data collection process.) The Department has the option to do analyses based on other demographic variables as well.

**Overall Stops**

The number of stops increased by 11% compared with the last six-month reporting period; however, it is considerably lower than the first half of 2019 (Table A1).

- A total of 16,155 stops were conducted in the AV in the first half of 2021, compared with 14,992 stops in the first half of 2020 and 20,484 stops in the first half of 2019 (seasonally comparable time periods).

- Since stops can involve more than one person, the stops in the first half of 2021 represented 17,843 individuals stopped.[28]

The reason for most stops (more than 89% in each review period) is vehicle code violations. Other common reasons in January–June 2021 (and typically in each reporting period) were warrants on license plate (2.0%) and penal code (1.8%). The percentage of stops conducted because of reasonable suspicion has been declining slightly, accounting for 1.8% in July–December 2018, 1.4% in the next three six-month periods, 1.1% in July–December 2020, and 1.0% in January–June 2021.

Among traffic stops for July–December 2020, the percentage of stops for hazardous citations (such as speeding) was 29% Black, 39% Latino, 41% White, and for non-hazardous citations (such as missing license plate), the percentage was 8.8% Black, 10.7% Latino, and 9.4% White.

| Table A1 | | | | | | |
|---|---|---|---|---|---|---|
| Overall Stops Characteristics | | | | | | |
| Characteristics | July – December 2018 | January – June 2019 | July – December 2019 | January – June 2020 | July – December 2020 | January – June 2021 |
| Number of stops | 16,554 | 20,484 | 18,748 | 14,992 | 14,513 | 16,155 |
| Number of people stopped[29] | 18,313 | 22,485 | 20,578 | 16,850 | 16,056 | 17,843 |
| Range of stops per month | 2,455–3,191 | 2,805–4,665 | 2,485–3,663 | 1,783–3,227 | 1,836–2,618 | 2,208–3,169 |
| Type of Stops | | | | | | |
| Vehicle stops | 87% | 89% | 88% | 87% | 94% | 95% |
| Pedestrian stops | 10% | 7% | 9% | 9% | 5% | 4% |
| Bicycle stops | 3% | 3% | 4% | 4% | 1% | 1% |

Note: In all tables, totals may not add to 100% due to rounding.

---

[28] There are a number of limitations to the data for multiple-person stops. In particular, the data for multiple-person stops do not specifically describe individuals who were only asked for their information for documentation purposes present at the stop or if the person was not free to leave the stop based on a detention.

[29] The number of people stopped is greater than the number of stops because of stops involving multiple passengers. Also, these do not represent counts of unique people. If one person is stopped multiple times, that person is counted multiple times.

**Stops by Demographics**

Latino people account for most stops across the race/ethnicity groups while Black people are overrepresented among stops relative to the general population (Table A2).

- In the first half of 2021, Latino people represented 47% of stops, Black people 31%, White people 19%, Other 2%, and Asian 1%.

    » The corresponding racial and ethnic proportions in the AV population for this analysis are Latino 48%, Black 17%, White 29%, and Asian 5%.[30]

    » Therefore, Black people are overrepresented compared with their proportion in the general population while the other groups are underrepresented.

- These patterns were largely consistent during the two-year review period, although between the first half of 2020 and the second half of 2020, the percentage of stops rose for Latino people (up 5%) and fell for Black people (down 3%). There was little difference between the second half of 2020 and first half of 2021.

Over the two-year review period, there was a rise in the proportion of stops of men.

| Table A2 | | | | | | |
|---|---|---|---|---|---|---|
| **Demographics of Individuals Stopped** | | | | | | |
| **Demographic** | **July – December 2018** | **January – June 2019** | **July – December 2019** | **January – June 2020** | **July – December 2020** | **January – June 2021** |
| Latino | 43% | 44% | 46% | 43% | 48% | 47% |
| Black | 33% | 32% | 32% | 34% | 31% | 31% |
| White | 22% | 22% | 21% | 21% | 20% | 19% |
| Other | 1% | 1% | 1% | 1% | 1% | 2% |
| Asian | <1% | <1% | <1% | <1% | <1% | 1% |
| Male | 65% | 67% | 68% | 72% | 72% | 73% |
| Ages 20–34 years | 48% | 50% | 49% | 50% | 50% | 49% |

Note: The corresponding racial and ethnic proportions in the AV population for this analysis are Latino (48%), Black (17%), White (29%), Asian/Pacific Islander (5%), Native American (<1%).

---

[30] US Census Bureau, American Community Survey, 2019. Census track–level data from the American Community Surveys of 2014 through 2018 were used to measure the demographic composition of all sheriff-reporting districts in the AV.

**Backseat Detentions**

Although the differences are small, Black people were most likely to be placed in a backseat detention during a stop, followed by Latino people and White people (Table A3).

- In the first half of 2021, the backseat detention rates were 8.6% for Black people, 8.1% for Latino people, 6.5% for White people, and 7.8% overall. There was a total of 677 detentions of Latino people and 477 detentions of Black people compared with 225 detentions of White people.

- These backseat detention rates have declined slightly since 2018; White people have consistently had the lowest backseat detention rates.

| Table A3 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Backseat Detentions: Percent of People Stopped Who Were Held in a Backseat Detention | | | | | | |
| Outcome | July – December 2018 | January – June 2019 | July – December 2019 | January – June 2020 | July – December 2020 | January – June 2021 |
| % held in BSD, all | 9.0% | 8.5% | 7.9% | 9.4% | 7.1% | 7.8% |
| % held in BSD, Black | 10.2% | 8.9% | 8.6% | 9.5% | 7.7% | 8.6% |
| % held in BSD, Latino | 9.8% | 8.7% | 8.2% | 10.2% | 7.4% | 8.1% |
| % held in BSD, White | 6.6% | 7.9% | 6.8% | 8.1% | 5.9% | 6.5% |

**Searches**

Black people were more likely than Latino or White people to be searched (person or vehicle) during a stop (Table A4).

- In the first half of 2021, the search rates were 33% for Black, 29% for Latino, 28% for White, and 29% overall.

- While the rates among people stopped are similar, the difference in number of people who experience these outcomes is substantial: Two and a half times as many Latino people (n = 2,419) were involved in a search compared with White people (n = 954), and nearly twice the number of Black people (n = 1,833) were involved in a search compared with White people (n = 954).

- Despite rising search rates since 2018, there has been a decline in search rates since the first half of 2020 for each race or ethnicity. The largest percentage decline was among White people, resulting in larger disparities between Black and Latino people and White people.

- Over the three-year period, Black people were consistently most likely to be involved in a search (person or vehicle).

Over the first four review periods, the most common reason for a person search was consistently "incident to arrest." However, since the second half of 2020, "condition of parole/probation" was the most common reason (25% of all person searches in the second half of 2020 and 23% in the first half of 2021). The most common reason for conducting a vehicle search has consistently remained "condition of probation or parole" (31% of all vehicle searches since the second half of 2020).

| Table A4 | | | | | | |
|---|---|---|---|---|---|---|
| Searches: Percent of People Stopped Who Were Searched | | | | | | |
| Outcome | July – December 2018 | January – June 2019 | July – December 2019 | January – June 2020 | July – December 2020 | January – June 2021 |
| Any search: Stops involving any search (person and/or vehicle) | | | | | | |
| % any search, all | 26% | 27% | 30% | 36% | 31% | 29% |
| % any search, Black | 30% | 30% | 32% | 38% | 35% | 33% |
| % any search, Latino | 25% | 26% | 28% | 35% | 30% | 29% |
| % any search, White | 23% | 26% | 30% | 36% | 30% | 28% |
| Person searches: Stops involving a person search | | | | | | |
| % person searched, all | 22% | 24% | 26% | 33% | 29% | 27% |
| % person searched, Black | 25% | 26% | 28% | 34% | 33% | 30% |
| % person searched, Latino | 22% | 23% | 25% | 33% | 28% | 26% |
| % person searched, White | 20% | 24% | 27% | 32% | 28% | 26% |
| Vehicle searches: Stops involving a vehicle search | | | | | | |
| % vehicle searched, all | 15% | 16% | 18% | 23% | 23% | 22% |
| % vehicle searched, Black | 17% | 18% | 19% | 25% | 26% | 24% |
| % vehicle searched, Latino | 15% | 15% | 18% | 23% | 22% | 22% |
| % vehicle searched, White | 12% | 14% | 17% | 21% | 22% | 20% |

**Contraband Seizures**

Black and Latino people were less likely to have a stop result in the seizure of contraband than White people (Table A5).[31]

- In the first half of 2021, the seizure rates were 18% for Black, 25% for Latino, 29% for White, and 23% overall.

- Over the six reporting periods, the rates were the highest in the second half of 2020 and have declined in the first half of 2021.

Notable trend: Black people are consistently most likely to be searched, yet consistently have the lowest incidence of contraband being seized.

| Table A5 | | | | | | |
|---|---|---|---|---|---|---|
| **Seizures: Percent of People Searched (Person and/or Vehicle) Who Had Contraband Seized** | | | | | | |
| **Outcome** | **July – December 2018** | **January – June 2019** | **July – December 2019** | **January – June 2020** | **July – December 2020** | **January – June 2021** |
| % with seizure, all | 21% | 20% | 20% | 23% | 30% | 23% |
| % with seizure, Black | 16% | 16% | 16% | 15% | 23% | 18% |
| % with seizure, Latino | 24% | 22% | 20% | 25% | 32% | 25% |
| % with seizure, White | 22% | 25% | 27% | 31% | 39% | 29% |

**Response to Question of Probation and Parole Status[32]**

Black people were the most likely to be asked if they were on probation and parole during a stop, followed by Latino people (Table A6).[33]

---

[31] Due to data system limitations, when multiple people are involved in a stop, it is difficult to determine who was in possession of the contraband or which type of search yielded the discovery of contraband.

[32] A person's response to this question may not be indicative that the person is, in fact, on probation or parole.

[33] It should be noted that vehicle searches conducted as a result of probation and parole status cannot be directly tied to the individual when multiple people are involved in a stop; therefore, it is difficult to determine whom the probation/parole search pertains to. Similarly, contraband seizure is not linked to the individual or the type of search (person or vehicle) that resulted in the seizure. Appendix A in the 12th Semi-Annual Report provides the results from additional analyses such as restricting to single-person stops, to gain more clarity on the outcomes of individuals stopped. See www.antelopevalleysettlementmonitoring.info/

- In the first half of 2021, the rates at which the question was asked were 39% for Black people, 31% for Latino people, 29% for White people, and 33% overall. This statistic declined substantially for all racial/ethnic groups since the first half of 2020, and the overall rate declined by over 30 percentage points.

- Black people were 10% more likely than White people to be asked about their probation and parole status in the most recent reporting period. More than double the number of Black and Latino people stopped were asked about their probation and parole status (2,168 and 2,575 people, respectively) compared with White people (1,020 people).

- Black people and White people were about equally as likely to respond "yes" (22%) and slightly more likely than Latino people (19%) among those who were asked about their probation and parole status.

- Seventy-four percent (888 people) of the 1,197 people who were asked about their probation/parole status and responded "yes" had a person and/or vehicle search done as a condition of their parole. There has been a steady increase from the first reporting period in 2018 (62%).

- In the most recent reporting period among people who indicated they were on probation or parole when asked, Black and Latino people were more likely than White people to have had a person or vehicle search conducted as a condition of their probation and parole status: 358 Black and 369 Hispanic people had a probation or parole search conducted, compared with 157 White people.

- Over the past three years among people who indicated they were on probation or parole when asked AND who had a search conducted as a condition of their probation and parole status, the searches of Black and Hispanic people were consistently less likely to yield contraband than searches of White people.

Notable trends: The percentages of people being asked about their probation and parole status have considerably declined for all race groups in the past year. Despite the overall drop in the question being asked, disparities persist among who gets asked while there are little differences by race for people who answer "yes."

| Table A6 | | | | | | |
|---|---|---|---|---|---|---|
| **Probation and Parole Status** | | | | | | |
| **Outcome** | **July – December 2018** | **January – June 2019** | **July – December 2019** | **January – June 2020** | **July – December 2020** | **January – June 2021** |
| **Percent of people stopped asked if they were on probation or parole** | | | | | | |
| % asked, all | 39% | 49% | 53% | 64% | 44% | 33% |
| % asked, Black | 46% | 55% | 57% | 69% | 49% | 39% |
| % asked, Latino | 38% | 49% | 53% | 63% | 43% | 31% |
| % asked, White | 34% | 44% | 51% | 59% | 40% | 29% |
| **Percent of people stopped asked if they were on probation or parole AND answered "Yes"** | | | | | | |
| % answered "Yes," all | 18% | 15% | 13% | 16% | 20% | 21% |
| % answered "Yes," Black | 19% | 16% | 14% | 16% | 20% | 22% |
| % answered "Yes," Latino | 17% | 14% | 12% | 15% | 20% | 19% |
| % answered "Yes," White | 20% | 16% | 14% | 15% | 20% | 22% |
| **Percent of people stopped asked if they were on probation or parole, answered "Yes," AND searched as condition of probation/parole** | | | | | | |
| % searched, all | 62% | 64% | 66% | 69% | 68% | 74% |
| % searched, Black | 61% | 63% | 64% | 69% | 66% | 74% |
| % searched, Latino | 66% | 65% | 69% | 71% | 70% | 75% |
| % searched, White | 55% | 62% | 65% | 66% | 68% | 71% |
| **Percent of people stopped asked if they were on probation or parole, answered "Yes," searched as condition of probation/parole, AND had contraband seized** | | | | | | |
| % contraband seized, all | 15% | 17% | 15% | 17% | 24% | 21% |
| % contraband seized, Black | 11% | 12% | 11% | 9% | 18% | 16% |
| % contraband seized, Latino | 20% | 19% | 15% | 21% | 26% | 24% |
| % contraband seized, White | 13% | 19% | 20% | 19% | 30% | 27% |

**Vehicle Impoundment**

Although the differences are small, Latino people were most likely to have their car impounded after a stop, followed by Black and White people (Table A7).[34]

- In the first half of 2021, the impoundment rates were 3.4% for Latino, 3.2% for Black, 2.8% for White, and 3.1% overall.

- These rates declined slightly for all race and ethnic groups.

| Table A7 | | | | | | |
|---|---|---|---|---|---|---|
| Vehicle Impoundments: Single-Person Stops Resulting in Vehicle Impoundment | | | | | | |
| Outcome | July – December 2018 | January – June 2019 | July – December 2019 | January – June 2020 | July – December 2020 | January – June 2021 |
| % with impoundment, all | 3.7% | 3.0% | 3.2% | 4.3% | 3.1% | 3.2% |
| % with impoundment, Black | 4.3% | 3.7% | 4.1% | 5.3% | 4.0% | 3.2% |
| % with impoundment, Latino | 3.9% | 3.1% | 3.2% | 3.6% | 3.1% | 3.4% |
| % with impoundment, White | 2.5% | 2.0% | 2.3% | 4.3% | 2.2% | 2.8% |

**Citations and Arrests**

Black people were the most likely to be arrested and the least likely to be cited after a stop (Table A8).[35]

- In the first half of 2021, the arrest rates were 22.1% for Black people (978 out of 4,428 stops), 19.5% for Latino people (1,351 out of 6,907 stops), and 19.1% for White people (546 out of 2,854 stops).

---

[34] Vehicle impoundment is a stop-based measure rather than specific to the person stopped. In the event of multiple people being stopped, the impoundment code is the same for everyone stopped. The following results are from vehicle stops only (excluding pedestrian and bicycle stops) and limited to single-person stops for a more direct racial comparison of outcomes.

[35] The citation and arrest data are limited to single-person stops for a more direct racial comparison of outcomes.

- In the first half of 2021, the citation rates were 55.3% for White people (1,577 out of 2,854 stops), 53.6% for Latino people (3,699 out of 6,907 stops), and 41.6% for Black people (1,840 out of 4,428 stops).

Across the two years of data, Black people are consistently most likely to be arrested, and White people are consistently most likely to be cited.

| Table A8 | | | | | | |
|---|---|---|---|---|---|---|
| Citations and Arrests | | | | | | |
| Outcome | July – December 2018 | January – June 2019 | July – December 2019 | January – June 2020 | July – December 2020 | January – June 2021 |
| **Arrests** | | | | | | |
| % stops leading to arrest, all | 20% | 21% | 24% | 27% | 24% | 20% |
| % stops leading to arrest, Black | 26% | 26% | 30% | 30% | 28% | 22% |
| % stops leading to arrest, Latino | 19% | 21% | 22% | 25% | 24% | 20% |
| % stops leading to arrest, White | 16% | 18% | 21% | 26% | 22% | 19% |
| **Citations** | | | | | | |
| % stops leading to citation, all | 59% | 55% | 50% | 40% | 54% | 51% |
| % stops leading to citation, Black | 51% | 48% | 47% | 33% | 45% | 42% |
| % stops leading to citation, Latino | 63% | 57% | 57% | 43% | 57% | 54% |
| % stops leading to citation, White | 62% | 59% | 57% | 44% | 59% | 55% |

**Limitations of the Analysis in the Stops Data**

It is important to note that some outcomes are specific to the reasoning and circumstances of the stop, while others are specific to individuals involved in the stop. Therefore, the percentages presented here may have different denominators. Additionally, where multiple people are involved in a stop, making racial comparisons of stop-based outcomes becomes nuanced because it is difficult to determine specific outcomes to specific persons in the stop. Restrictions in the CAD data-entry process result in several limitations in analyzing the data.

Other key limitations include the following: (1) Only two people can be entered in any one stop record. If more people are stopped, deputies must create a new incident and link the incident using a reference tag ID; errors and inconsistencies in the use of reference tags can result in missing information from a stop; (2) Some outcomes that are specific to individuals are summarized across the stop when multiple people are listed in the stop, preventing direct comparisons of outcomes across race and ethnicity groups; (3) Assisting unit narratives and other data fields are often missing information, likely because the information is already recorded in the original stop report; and (4) Contraband seizure is not tied to search method.

**Appendix B**

**The Monitoring Team**

The court-appointed Monitors—Dr. Angie Wolf and Joseph Brann—have assembled an experienced team with credentials and skills uniquely suited to the SA work. The membership of the MT was finalized in March 2016. The two Monitors and seven team members have extensive expertise and experience in monitoring and evaluation work in policing and corrections.

Additionally, most of the MT members have served in law enforcement or continue to have distinguished careers in this field, several in the Los Angeles area. Several have served in leadership positions in law enforcement or corrections agencies during the implementation of the compliance period of a settlement agreement or consent decree and therefore understand the unique challenges that large organizations face in those circumstances. The MT members also have expertise in dealing with the diverse issues addressed in the SA, such as those related to UOF, training, the FHA, data collection and analysis, survey methods, and the complexities of community engagement.

**Appendix C**

**Antelope Valley Monitoring Website**


This website allows AV community members to learn more about the SA, the backgrounds of MT members, and the monitoring activities; access documents related to the monitoring work, including each semi-annual report, each Community Survey report, MT audits, and MT data analyses; follow links to LASD's homepage and other relevant websites; and, importantly, submit questions and comments directly to the MT.

The website's URL is www.antelopevalleysettlementmonitoring.info

**Appendix D**

**How the Parties and Monitoring Team Work**

To complete the work of the SA, the Parties (US DOJ, LASD, and the County of Los Angeles) and the MT communicate daily through a variety of means. In each six-month period, the Parties and the MT hold multiple meetings at LASD headquarters; the offices of the Compliance Unit; other administrative offices; Palmdale and Lancaster stations; and various community centers, schools, and places of worship in the AV. The MT periodically meets in person with the captains of both AV stations and their staff and participates in multiple onsite meetings with LASD's Compliance Unit, usually regarding specific issues such as policy or protocol review or data system discussion.

The MT also holds meetings with units or leadership from other operations that are critical to this reform work, such as the AAB or the commander in charge of training. The MT typically observes the semi-annual LASD risk management meeting and the CMF. Although some of these meetings and events are general in scope and pertain to several sections of the SA, most are related to specific sections or provisions of the SA. The Parties and the MT also participate in several small- and larger-group community meetings in Palmdale and Lancaster—often with the CACs—where various topics are discussed, such as the MT semi-annual reports, LASD and CAC community engagement reports, community perceptions about LASD and its approach to policing, and other topics.

In addition to in-person meetings, a variety of conference calls take place each month, along with daily email or telephone communication among representatives of the Parties and the MT. The MT and DOJ participate in a bimonthly call to address substantive issues and planning; a similar bimonthly call involves the MT, DOJ, and the Compliance Unit; and the MT and the Parties, including the Office of County Counsel and extended LASD command staff, participate in a monthly telephone conference call to discuss workflow, future events and meetings, and other salient topics. Several times per year, onsite meetings are held where most participants from the Parties and the MT spend several days together doing intensive work on various topics.

Videoconferencing is used whenever possible when all are not able to be physically present in meetings. Documents are shared extensively via email for the purposes of review and collaborative development of the various policies and procedures, training curricula, community engagement materials, audits, and other written elements of the SA. LASD shares departmental data in various formats with the MT via secure email and digital media.

**Appendix E**

**Monitors' Note on the Settlement Agreement,
Constitutional Policing, and Organizational Change**

As noted in previous reports, the MT understands and remains mindful of the many complexities encountered when a large organization undertakes broad policy changes as well as the challenges of implementing such changes. The Monitors also appreciate the considerations of LASD management in dealing with matters of this nature, such as whether the changes will be confined to the AV stations or affect the entire organization; the likelihood that other existing policies could be affected and therefore need to be revised; that evolving "best practices" and legal considerations also influence policies related to UOF, video recordings, and so on; and the need in many instances to consult with labor groups or legal resources before such policy changes can occur.

Throughout the work to date, the Monitors have found the Parties to be strongly committed to ensuring that the requirements of the SA will not be weakened or overlooked because of these considerations. Based on the ongoing collaboration among the Parties, the MT believes the SA objectives can be achieved in a timely manner.

Critical to successfully implementing and sustaining the SA reforms is a commitment to constitutional policing principles. LASD's ability to meet these responsibilities is dependent on clear policies and effective training. Only when prepared with sufficient training and clarity about the purpose of the SA can deputies clearly understand what the Department expects from them in their community interactions. Only then can deputies honor constitutional standards of policing. Department capacity is also affected by the need to have sufficient accountability systems in place to monitor and evaluate employee performance and management oversight practices.