DAWYN R. HARRISON Interim County Counsel
CARRIE CLARKE, Senior Deputy County Counsel
(SBN 150031) • cclarke@*counsel.lacounty.gov*
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 972-5768 · Fax: (213) 626-5578

Attorneys for
The County of Los Angeles and the
Los Angeles County Sheriff's Department

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THE COUNTY OF LOS ANGELES<br>AND THE LOS ANGELES COUNTY<br>SHERIFF'S DEPARTMENT,<br><br>　　　　　Defendants. | CASE NO. 2:15-CV-03174-JFW-FFM<br><br>**SUBMISSION OF MONITORS' 15th SEMI-ANNUAL REPORT** |

On May 1, 2015, the Court approved and entered the parties' Settlement

Agreement ("Agreement") to resolve the United States' claims against the County of

Los Angeles and the Los Angeles County Sheriff's Department pursuant to

42 U.S.C. 14141 (re-codified at 34 U.S.C. § 12601) and the Fair Housing Act, 42

U.S.C. 3601 *et seq*.

Paragraph 171 of the Agreement requires the Monitors to publically issue a

report every six months that details the Parties' progress in implementing the

1    Agreement and achieving compliance with the Agreement.  The parties hereby

2    submit the Monitors' 15th semi-annual report.

3

4    DATED: January 25, 2023

5

6

7                                                       Respectfully submitted,

8                                                       DAWYN R. HARRISON
                                                        Interim County Counsel
9

10

11                                          By _____

12                                                      CARRIE CLARKE
                                                        Senior Deputy County Counsel
13

14                                                      Attorneys for
                                                        The County of Los Angeles and the
15                                                      Los Angeles County Sheriff's Department

16

17

18

19

20

21

22

23

24

25

26

27

28   HOA.103995329.1

     SUBMISSION OF MONITORS' 15th        -2-
     SEMI-ANNUAL
     REPORT

                                                                2:15-CV-03174

# Antelope Valley Monitoring Team
# 15th Semi-Annual Report



### December 2022

## CONTENTS

I.     INTRODUCTION................................................................................................1

II.    WORK TO DATE ................................................................................................6
       A.     Monitoring Activities in this Reporting Period ....................................6
       B.     Stops, Seizures, and Searches .................................................................7
       C.     Bias-Free Policing..................................................................................22
       D.     Enforcement of Section 8 Compliance..................................................30
       E.     Data Collection and Analysis ................................................................32
       F.     Community Engagement .......................................................................35
       G.     Use of Force ...........................................................................................47
       H.     Personnel Complaint Review ................................................................58
       I.     Accountability........................................................................................65

III.   CONCLUSION .................................................................................................71

## TABLES

Table 1: Stops, Seizures, and Searches Compliance Status
Table 2: Bias-Free Policing Compliance Status
Table 3: Enforcement of Section 8 Compliance Status
Table 4: Data Collection and Analysis Compliance Status
Table 5: Community Engagement Compliance Status
Table 6: Use-of-Force Compliance Status
Table 7: Personnel Complaint Review Compliance Status
Table 8: Accountability Compliance Status

## APPENDICES

A.     Monitoring Team and Website
B.     How the Parties and Monitoring Team Work
C.     Settlement Agreement Compliance
D.     Supplemental Information for Each SA Paragraph

## I.     INTRODUCTION

During this reporting period on the Settlement Agreement (SA) between the County of Los Angeles and the Los Angeles County Sheriff's Department (LASD or the Department) and the US Department of Justice (DOJ) for the Antelope Valley (AV), Robert Luna was elected sheriff, running on the goals of restoring public trust and reform with an emphasis on the community-centered practices established by President Barack Obama's Task Force on 21st Century Policing. As documented in this and previous reports, these ideals have not been evident in our recent work with LASD; however, the Monitors of the LASD-AV Settlement Agreement are hopeful that under Sheriff Luna's leadership, LASD will approach the SA with a sense of urgency and integrity that we have not seen since prior to former Sheriff Alejandro Villanueva's tenure.

In July 2020, halfway into the Villanueva administration, we included letters to the Sheriff and to Judge John F. Walter to draw attention to several crucial SA requirements still unfinished and to the lack of sufficient LASD leadership regarding the implementation of the SA, which we found to be the main cause of the delays. Two years later, in our July 2022 report, we documented that progress had continued to stall or backslide and that those crucial tasks were still not completed. The Monitors' frustrations with the delays were at an all-time high, compelling us to request that DOJ, LASD, and the County (collectively referred to as the Parties in these reports) seek judicial involvement in the case. Faced with a department and county that were unsupportive if not outright resistant to the reforms outlined in the SA, and a void of leadership willing or able to prioritize the SA, the Monitors felt that judicial involvement was necessary to motivate LASD to implement the SA. We cited the following factors as critical failures by LASD and the County with the implementation of the SA.

1.     Lack of leadership and executive involvement.
2.     Lack of attempts to undertake or prioritize required SA-related work.
3.     Lack of urgency.
4.     Insufficient resources allocated to the SA-related work.
5.     Insufficient use of data and a lack of a culture of transparency.
6.     Lack of progress on LASD internal audits.

While we have since noticed more executive involvement and incremental improvement in some areas, the critical failures listed above remain. As will be noted later in this section and throughout the report, LASD made very little progress toward compliance in the last six months. Despite direct and much appreciated interventions undertaken by the Assistant Sheriff for Patrol and, increasingly, the North Patrol Division (NPD) chief, we have seen little evidence that overall LASD leadership was willing or committed to turning things around and stressing the importance of undertaking the needed reforms under former sheriff Villanueva's leadership.

That said, we want to again acknowledge the Compliance Unit (CU) for their continued efforts to move the Department along despite inadequate resources, support, or direction. We continue to note an earnest effort from the CU to carry out the SA-required work.

One of the strategies employed by the CU this reporting period was to narrow their focus and concentrate on a smaller number of goals that LASD felt could be accomplished by the end of 2022. As expressed by NPD leadership and the CU, the idea was to concentrate attention and resources on a limited number of activities, demonstrate that progress could be made, and then build on those successes in the next reporting period.

To support the CU's intentions and efforts, the Monitoring Team (MT) reflected LASDs' priorities and timelines in our Monitoring Plan, which included completion of or significant progress on several key tasks. The Parties and MT also instituted monthly status meetings where LASD personnel provide updates on LASD's prioritized issues to their executive leadership, DOJ and the MT. The purpose of these regular meetings is not only to identify progress but also to identify barriers that require attention and intervention by executive staff.

The prioritized tasks for this reporting period (through December 2022), work completed, and compliance status are as follows:

1. Use of Force Policy ....................................................................................***Incomplete***
2. Use of Force training curriculum for 119 (a–e) ...............................................***Incomplete***
3. LASD Use of Force Data Analysis Report for 2020 .........................................***Incomplete***
4. Division Order on the review of BWC footage.................................................**Complete**
5. 2021 LASD Community Engagement Report....................................................**Complete**
6. WCSCR Handbook .....................................................................................***Incomplete***
7. MPP sections related to complaints...............................................................***Incomplete***
8. Administrative Investigations Handbook.........................................................***Incomplete***
9. Revised and new compliance metrics ...........................................................***Incomplete***

As shown, LASD made progress in a few areas, such as its Community Engagement Report and the dissemination of the Central Patrol Division order related to review of body-worn camera (BWC) footage to the Northern Patrol Division. LASD also maintained their responsibilities to carry out various ongoing SA-related tasks, such as the Constitutional policing and bias-free policing trainings, deputies' community engagement activities, the Crime Management Forum (CMF) and Risk Management Forum (RMF), participation in the Community Survey, quarterly reports, and other regular activities.

We note for the community, the Court, and Sheriff Luna that no substantive progress was made on the use-of-force (UOF) policy, training, or analysis, nor did the Department meet their own goals for complaint-related policies or training. Despite the Compliance Unit's identification of priorities and some additional executive involvement, LASD continues to plod along unsuccessfully in these areas essential to the SA, essential to effective risk management, and essential to the provision of Constitutional policing in the AV.

To date, the Parties have not reached agreement on seeking the involvement of the Court, although the Monitors continue to think it would be helpful. We are hopeful that the new Sheriff will take the SA seriously, allocate the needed resources for implementing rather than avoiding and delaying the required reforms, and hold management at the stations and other key divisions, including the training bureau and those responsible for policy development,

responsible to the court orders of the Settlement Agreement.

From that vantage point, we want to stress some overarching issues that we believe Sheriff Luna will want to take immediate action to remedy.

1. The overall pace of progress is woefully insufficient. In this reporting period, the MT supported LASD's approach and desire to focus on a small list of key goals with timelines that LASD proposed as realistic so that the department could demonstrate some success and gather some momentum. As noted above, LASD was able to accomplish few of these goals. There is no reason why LASD should not be able to come into compliance with the SA objectives during this term of Sheriff Luna's administration. To accomplish this, LASD must set internal implementation timelines for the critical components of the SA, provide the resources and staffing necessary to meet those timelines, and ensure the implementation plan is closely monitored by the upper echelons of the organization.

2. LASD needs to stop approaching the implementation of the SA as being strictly an Antelope Valley issue. It is not. While the monitoring is focused on the AV stations, the behavior of AV deputies and managers is governed by the Department's policies and manuals as well as the organizational culture. AV staff are highly mobile. LASD personnel are routinely transferring in and out of AV stations, so expecting that AV deputies would or should possess skills, training, and supervision that is unique only to the AV is a serious logistical problem at best and an approach that undermines the spirit of the SA—and 21st century policing—at worst.

3. Midlevel management has proven to be a barrier to the SA. There is a continued culture of resistance to the SA, defensiveness and justification surrounding behaviors and poor performance, and resistance to accountability that permeates the stations. Station leadership seem empowered if not encouraged to malign the SA. There have been some particularly egregious examples of this in the Palmdale station.[1] Several members of the community quoted the captain as referring to the SA as a "piece of s***" at a community meeting—an incident that the MT has shared with LASD executives. A sergeant—whose job responsibilities included management of SA compliance work—was heard mocking a member of

---

[1] The issue with attitudes toward the SA and the Monitors is not new. In our 14th Semi-Annual Report, we noted that there was a narrative among some within LASD that the lack of progress is the "Monitors' fault." We wrote: "The Monitors are concerned that this attitude among line staff may be reflective of the messaging they receive from some station and divisional managers. Anyone in the Department who perpetuates this false narrative is hindering LASD's progress and undermining the requirements of the SA. The MT has also found that this attitude is sometimes expressed to Community Advisory Committees (CACs) members and the general community. This represents a failure of executive leadership and station managers, as well as of the Department's community engagement efforts. The MT encourages LASD-AV leadership to provide consistent messaging supporting the goals of the SA—which includes ensuring that LASD-AV deputies are best prepared to provide safe, effective, and Constitutional policing in the AV— and regular updates on the SA to Lancaster and Palmdale stations to keep all ranks informed and to increase deputy morale." (Page 14)

the Monitoring Team and making derogatory references during a video meeting that included DOJ, LA County Counsel, and an LASD commander.

4.      LASD relationships with some parts of the Antelope Valley community, especially among those identified in the SA such as people of color, have not shown sufficient improvement since the start of the SA. While many in the AV continue to support the Department, the Monitors have heard from a growing number of community members voicing concerns about such issues as the complaints process and potential disparities in enforcement practices—as supported by community perceptions and by published reports and articles such as those from OIG and the *Los Angeles Times*—and basic trust in the Department. They also perceive the Department as lacking a genuine commitment to supporting the mission of the Community Advisory Committees (CACs) or to engaging in genuine collaboration with the community in pursuit of solutions. Many have expressed dissatisfaction with the pace of reform, for which they blame not just the Department but the Monitors and DOJ, citing an inability to hold the Department accountable, and requesting Court intervention.

Monitoring the implementation of the SA is expensive. LASD and the County bear the direct responsibility for the cost of the monitoring, County Counsel expenses, and the fees for the outside law firm supporting County Counsel. LASD and the county will also incur substantial costs related to developing and implementing training, procuring a new early warning data system, hiring data analysts and external consultants, adequately staffing the Compliance Unit, and so forth. However, resisting the implementation of the SA is much more costly in the long run—both for the Department and the community, not only because the resistance has led to a lack of progress, which prolongs the direct costs of the monitoring, but more importantly, it is costly in terms of the damage to the relationship between the LASD and the community and to public safety. The commitment of time and energy of the CAC members and other community members is another cost that may be squandered if the Department fails to hold up its end of the agreement. Not having compliant use of force policies and trainings also leads to lawsuits. And not providing adequate support, training, and supervision to deputies leads to lowered morale, inhibited career trajectories, greater risk of injury, and costly missed work and turnover in an agency already challenged by staff shortages. Finally, the majority of the reforms required by the SA will benefit the Department countywide and would be incurred anyway as the Department gradually institutes the technologies and best practices expected of all modern law enforcement agencies.

**Format of this Semi-Annual Report**

This report varies from previous reports in the formatting of the material. In short, we concentrate our assessments on those areas that LASD committed to achieving by the close of 2022. Each section will begin with an indication of which priorities were identified by the CU and County Counsel and an assessment of any related progress achieved. We also note areas in which LASD maintained ongoing activities, such as the Constitutional policing and bias-free policing trainings, deputies' community engagement activities, and others. We then describe the key activities that were not prioritized and where the Department remains out of compliance. As in the last report, the compliance assessment of each SA paragraph is included in a compliance status table for each section, and additional and far more detailed information is provided in the related appendix. We also describe additional work conducted by the MT to assess compliance and identify obstacles to compliance with each section.

**The Antelope Valley Settlement Agreement: Summary**

The Antelope Valley Settlement Agreement (SA) was established between the US Department of Justice, Civil Rights Division (DOJ); the Los Angeles County Sheriff's Department (LASD); and the County of Los Angeles, and it was filed with the US District Court for the Central District of California in April 2015. (DOJ, LASD, and the County are collectively referred to as the Parties.)

The purpose of the SA is to ensure that residents of the Antelope Valley (AV) have police services that are lawful and fully consistent with the Constitution of the United States and contemporary policing practices. The SA specifically identifies, as individual sections, a variety of reforms and objectives to be met by LASD in the AV related to stops, seizures, and searches; bias-free policing; enforcement of Section 8 compliance; data collection and analysis; community engagement; use of force; personnel complaint review; and accountability.

The SA also stipulates that a professional monitor be selected to track and assess LASD's progress in implementing and achieving compliance with the SA; work with the Parties to address obstacles to achieving compliance; and report on the status of implementation to the Parties and the Court. Per SA Paragraph 171, the Monitors submit a semi-annual report every six months; the first of these was issued in December 2015.

The AV lies in the northeast corner of the County of Los Angeles and includes two cities—Lancaster and Palmdale—and several unincorporated communities spread across hundreds of square miles. LASD provides law enforcement services in the unincorporated areas of the AV as well as via contracts with Palmdale and Lancaster. An LASD station serves each city, with law enforcement activities for the surrounding areas split roughly between the two.

## II.    WORK TO DATE

### A.  Monitoring Activities in this Reporting Period

The MT's assessment of current LASD compliance with the requirements they agreed to when they entered into the SA is based on a number of factors, including formal MT compliance assessments and audits, the MT's ongoing reviews and observations that it conducts before and in between formal audits, and the MT's ongoing assessment of LASD's efforts to address shortcomings and areas of non-compliance identified by MT and DOJ reviews. Formal compliance audits are typically spaced so as to provide the Department with the opportunity to correct deficiencies that have been identified and then ensure adequate time has elapsed that will allow for a realistic and accurate assessment of the impact of any changes/improvements made. The results of previous audits remain valid and relevant, especially when key SA-compliant policies and trainings have not been implemented or when there continues to be evidence that shortcomings identified in the audits have yet to be addressed.

To inform compliance assessments of all areas of the SA, the Monitoring Team conducted a variety of work activities in this reporting period, including regular meetings with the Parties, the CACs, and community members; site visits; ongoing telephone and electronic communications with the Parties and with community members; observations of the Crime Management Forum and the Risk Management Forum, including review of accompanying materials; verification of stops, bias-free policing, and housing training; review of deputy community engagement activities; and review of LASD efforts to conduct data analysis and use the findings to inform practice.

Two site visits were conducted during this reporting period. A primary purpose of the site visits was to discuss and assess the extent to which the stations are embracing SA reforms with a particular emphasis on the use of data and reports, community engagement and CACs, and management review of quarterly reports. The MT also reviewed and contributed to the discussion of UOF cases selected by DOJ.

During this reporting period the MT conducted site visits to the Antelope Valley August 16–18 and November 1–3. The MT conducted ride-a-longs with deputies in both the Lancaster and Palmdale stations and observed interactions with the community, hosted community meetings in English and Spanish, met individually with community members, audited the Community Tracker of both stations that documents compliance with community engagement requirements, interviewed deputies and sergeants at both stations, and met with the LASD Compliance Unit as well as leadership of Lancaster station and the compliance lieutenant representing the Palmdale station. The MT also observed CAC meetings through the reporting period.

Also during this reporting period, the MT addressed LASD's concerns regarding our sampling for the stops audit in writing and had a fruitful discussion with the LASD Audit and Accountability Bureau (AAB), CU, and counsel and resumed our formal compliance assessment (i.e., the MT

stops audit). We also produced a detailed monitoring plan for the upcoming year; the Parties have provided feedback that will be further discussed at our first Parties meeting in the new reporting period. The MT launched the Community Survey, with data collection continuing into 2023. We held discussions regarding the remaining concerns with LASD's UOF policy, and LASD proposed revision to a compliance metric in the Community Engagement section of the SA. We continued ongoing monitoring of UOF cases and set a timeline for the next UOF audit, reviewed quarterly reports and provided feedback, observed monthly CACs and provided feedback, and also observed the NPD's risk management forum. The MT produced a plan to begin the assessment of the Performance Mentoring Program (PMP). We reviewed BWC footage and UOF reports in preparation for DOJ's case reviews as well as for those cases examined in the Executive Force Review Committee (EFRC) forums.

When requested, the MT also provided input on the development of a video introduction of the Constitutional policing and bias-free trainings by an LASD executive.

## B. Stops, Seizures, and Searches

1. <u>Progress on Department Priorities in this Reporting Period</u>

The Department did not establish any specific priorities regarding the Stops section for this reporting period;[2] however, they did continue the following work.

- Continue providing full-day Constitutional policing and roll call trainings.

- Continue development of the Department's data analysis capacity and its use of stops and calls-for-service (CFS) data to inform practice and enforcement strategies.

- Continue providing support to the MT's stops audit by fulfilling data and information requests.

a. *Constitutional Policing Training*

- *The Department is in compliance for the full-day Constitutional policing training for this reporting period.*

---

[2] Please see Appendix D—Stops, Seizures, and Searches and the 14th Semi-Annual Report at our website for description of work history and more details on status of each paragraph. MT website: http://www.antelopevalleysettlementmonitoring.info/

The Constitutional policing full-day training was offered twice in 2022.[3] In June 2022, LASD reached 95% attendance, and this rose to 98% attendance for the training in November 2022, exceeding the compliance minimum. (Detailed compliance percentage charts are included in the appendix for Paragraph 57).

To maintain compliance, the Department must consider revising the Constitutional policing training or providing refresher training if evidence arises that deputies are not complying with its subject matter. To that end, the Parties and Monitors have discussed that body-worn camera (BWC) videos recently reviewed by the MT and DOJ raised concerns about the need for additional or refresher training on certain aspects of the Constitutional and bias-free policing trainings. The possible need for refresher training is also being assessed in the MT's ongoing stops and bias-free policing audit. (See the discussions of UOF case reviews in the UOF and Accountability sections.)

As reported in the last semi-annual report, the MT suggested that the North Patrol Division Chief provide a video introduction to the full-day trainings in an effort to create a consistent message and establish clear expectations for all LASD-AV deputies. The chief agreed to record the video, and the MT worked with the LASD Compliance Unit to craft the introductory message. The MT and DOJ are currently reviewing a script for the introductory message provided by the Compliance Unit.

b.   *Quarterly Refresher Roll Call Training*

- *The Department is not in compliance for the refresher training.*

LASD is required to provide continuing refresher roll call trainings that address Constitutional policing, bias-free policing, and housing requirements on a quarterly basis to those deputies assigned to the AV stations. While the stations did meet the attendance compliance minimums for this training in the quarters under review in this report (the second and third quarters of 2022), they did so using an unapproved methodology. Specifically, two of the quarterly trainings were provided on the same day, which is not how the trainings were designed and does not follow the training delivery plan approved by the MT and DOJ. More importantly, providing multiple sessions on the same day does not meet the objective of providing periodic and effective reinforcement of the importance of Constitutional and bias-free policing practices. The Monitors have noted the same violation of the training protocol previously but have not held the Department out of compliance. Instead, we discussed the importance of the issue in meetings and in the 12th, 13th, and 14th semi-annual reports with the understanding that the practice would not be continued. Unfortunately, it occurred again in this reporting period, and the Department made no attempt to troubleshoot this issue with the MT. The Monitors thus have no choice but to hold the Department out of compliance; we hope this will be impetus for

---

[3] As the training in June was held too late to detail in our 14th Semi-Annual Report, this current report addresses both of the 2022 training sessions.

station managers to establish a plan to permanently resolve this issue. (Detailed compliance percentage charts are included in Appendix D for Paragraph 71.)[4]

The MT notes that the Palmdale station did not provide their required quarterly roll call training during the second quarter of 2022. However, the MT did not hold the Department out of compliance in this case because the Department identified and proactively addressed the issue in a timely fashion. This is the type of attentiveness and corrective action we want to encourage.

It should also be noted that in 2020, LASD expressed a desire to provide additional quarterly roll call training scenarios with fresh content. Most AV deputies had participated in each of the training sessions multiple times, and personnel at the stations have noted that the trainings have become stale. DOJ and the MT readily agreed and provided suggestions for additional scenarios. However, the Department decided to postpone development of new briefings until 2023 with the intent to achieve compliance with the minimum thresholds for compliance, so no progress was made on this effort in this reporting period.

c. *LASD-AV Analysis of Stops Data and Application of Findings*

- *Further progress was made in this reporting period, but the Department is not yet in compliance with the data analysis and reporting provisions as outlined in various provisions of the SA, including Paragraphs 46, 51, and 68, and in the preface to the Stops section, which states: "LASD shall ensure that investigatory stops and searches are part of an effective overall crime prevention strategy, do not contribute to counter-productive divisions between LASD and the community, and are adequately documented for tracking and supervision purposes." (SA p. 7)[5]*

i. *LASD Use of Stops Data*

The use of data includes four basic elements: collection, analysis, interpretation or assessment of the findings, and application. Each of these activities also needs to be documented, including data analysis methodology, findings, summary of management's assessment, corrective action taken, and tracking the impact of any action taken through subsequent data analysis.

---

[4] In the 14th semi-annual report, the Compliance Unit informed us that they implemented a new practice to ensure the roll call training was being delivered in a more consistent manner, by which the training sessions are offered during the first two months of each quarter and then any deputies who have not yet attended are assigned to attend during the final month of the quarter. It appears this method has helped the stations improve consistent roll call training attendance.

[5] Similar data activities also apply to the Data Collection and Analysis section (SA Paragraphs 82–86) and UOF (Paragraphs 110–123).

LASD has been **collecting** most SA-required data for several years; the thoroughness and reliability of that data, and the capacity and functionality of current LASD data systems are currently being formally assessed in various ways, including through the MT stops and bias-free policing audit and the MT review of AV quarterly reports. Additionally, the AAB has committed to complete a detentions audit in 2023, and the Department is currently exploring revamping their computer-aided dispatch (CAD) system and adding an early warning system (EWS) (see discussion below).

The Department has recently begun producing some of the data **analysis** required to meet SA provisions. Since the end of 2021, the station captains have received monthly reports prepared by an LASD crime analyst detailing stop enforcement activity of deputies in the AV.[6] In this reporting period, the AV station captains also received a draft analysis report covering all 2021 stops, an initial effort to create an in-depth review of stops that have taken place in each of the AV stations. The reports provided an overview of stops-related factors such as: (1) traffic collision locations and stops, (2) the outcomes of certain kinds of stops, (3) population demographics, (4) types of stops and characteristics of those being stopped, and (5) age of vehicles stopped.

Furthermore, LASD informed the MT they had an assessment underway to determine what internal resources and expertise would be required for them to consistently produce the reports and level of analysis needed by management and required by the SA and to determine if external support was needed. The LASD-generated stops reports and the efforts to assess and broaden capacity for the analysis of data are positive steps forward toward compliance.

**Interpreting** or assessing the data findings refers to the process by which the Department determines what the data results show about law enforcement practice in the AV and how those results can help the Department understand and evaluate the effects of AV station enforcement decisions, not only on enforcement objectives and public safety but also on such related issues as community engagement and trust and any potential negative impacts like disparities or "counter-productive divisions between the LASD and the community" (SA p. 7). A key aim of this assessment is to establish whether adjustments may be necessary to better align stops and calls for service activity with the stations' enforcement strategies and SA requirements. The next step is to **apply** the findings, that is, to implement any adjustments or changes that stem from the interpretation process. (See the Bias-Free section for more discussion.)

As described here and elsewhere in this report, the Department has increased its efforts to interpret and apply data findings. These efforts are at their early stages. Importantly, the Department has not begun the sort of disparity analysis contemplated by the SA in Paragraphs

---

[6] Before LASD began conducting its own analysis, the MT provided the Department stops data reports biannually. We also provided technical assistance and demonstrations regarding the steps managers should take to interpret, conduct further inquiry, and begin to develop responses to the information in these types of reports. In particular, the 14th semi-annual report discussed management use of the reports in the Stops and Bias-Free sections of the report as well as SA Paragraph 89. See also Appendix A of the 13th semi-annual monitor report for the most recent MT stops report.

68 or 81–86 or the routine application of data findings in the assessment of crime prevention strategies or community policing activities as addressed elsewhere in the Stops and Community Engagement sections. We note that during discussions at the November site visit, the Lancaster captain raised questions seeking to understand why certain disparities were evident in the LASD 2021 stops data report; we look forward to more discussions on the topic and, especially, on how the Department will address those crucial SA requirements.

While building the proficiency to make effective use of the data findings—to interpret and apply the results—will require regular practice as well as leadership to build a culture that recognizes the importance and usefulness of the process, some progress has been made. The MT asked the AV station managers to discuss the ways they use the LASD stops data reports to inform the work of their station personnel. Lancaster station supervisors and managers reported posting the 2021 stops report in the briefing room and using the data in discussions with their staff. In our observations during our onsite work, it appears the Lancaster captain has shown a willingness and taken steps to improve efforts to integrate data into policing practices. Specifically, he reported using the 2021 stops report to ask questions of the deputies about their enforcement decisions. He stressed linking stops to crimes being reported to LASD. The extent or depth of those conversations remains unclear, or whether instructions were provided that linked crime prevention priorities to the data results, but this appears to reflect more interest in actively using data to inform decision-making and station priorities. In parallel data work, the Lancaster captain has been working to reduce wait times for 911 response (calls for service) and has been reminding staff of the importance of choosing when to engage in self-initiated activities so as not to impact call response times negatively.

As of November 2022, the Palmdale station captain had not established how his station would use the 2021 data report, but the Palmdale lieutenant assigned to SA compliance reported meeting with supervisors to discuss trends in the monthly data reports and how they can be used to focus attention on locations with higher numbers of traffic collisions or crime.

An integral aspect of using data to inform practice is documenting the efforts and strategies implemented after analyzing data and other information so those efforts can be evaluated and adjusted to improve performance. During an on-site meeting with LASD in August 2022, the MT was asked for the best way for LASD to document LASD station managers' discussions with staff regarding stops information and the findings from stops data analyses. The MT suggested a memo be written by the compliance lieutenant to the station captain to document this important and required work. This will allow station managers to track what topics are discussed, what instructions or guidance are given, and the results of any subsequent changes to practice or actions taken. It will also allow the MT to track this work in addition to SPATIAL forms and observation of CMF meetings. The suggestion appeared to be well-received by staff, but to date, the MT has not been provided such documentation.

*ii.   SPATIAL and Community Policing Plans*

As reported in previous semi-annual reports, the stations have adopted an approach to problem-solving policing they call SPATIAL (Scanning, Prioritizing, Analyze, Tasks, Intervene, Assess, and Learn). Station personnel can apply SPATIAL (or SARA, the model on which it is based) to specific problem-solving efforts such as reduction of a certain type of theft or increasing community trust among a certain community group. Data analysis is an important element of SPATIAL. Data analysis plays a role in (1) identifying issues that may benefit from a problem-solving approach, (2) characterizing and understanding issues, (3) developing potential solutions, and (4) tracking whether deputies' efforts are having the intended results. The MT has also stressed that station managers can and should apply SPATIAL to issues they identify through their assessment of data findings, since it can provide a framework and practical steps to follow as the stations develop and implement interventions.

Implementation of SPATIAL and its incorporation into routine station operations has been slow. The MT has seen references made by the station captains to the use of their SPATIAL model during the Crime Management Forum (CMF) meetings, but only in an overview form and without probing questions into the SPATIAL process, how it is being applied, or any assessments of results. The Palmdale captain indicated there was minimal use of the SPATIAL forms at his station, noting that his staff needs additional training in the use of the forms, which will be provided in the community engagement training currently under development. In this reporting period, the MT reviewed a few SPATIAL forms and gave the stations some initial thoughts, including encouraging them to apply SPATIAL to issues that arise through the assessment of data findings and, conversely, to use SPATIAL to identify areas to which data analysis processes may be applied. The MT is now in the process of closely reviewing those forms and related materials. The Lancaster station captain indicated that our feedback would be most helpful if it is provided in conversation instead of in written form. We appreciated the request and will be scheduling meetings with both stations early in the next reporting period.

Relatedly, the MT has also asked LASD to provide the community policing plans that are required by their own LASD policy (MPP 301-110-00) but has yet to receive these. Like the use of data and SPATIAL, those plans and the community policing policy can and should be integral parts of ensuring Constitutional policing and building community trust in the AV.

*d.   MT Stops and Bias-Free Policing Compliance Assessment*

As reported in the last semi-annual report, since 2016, the MT has conducted periodic stops data reviews and discussed its findings and observations, including preliminary determinations of compliance, with the Department so that the Department could take corrective action, inform training at the stations, and increase the likelihood that the eventual formal MT stops and bias-free policing audit would find compliance. Particular focus was placed on thorough and accurate data entry and narratives to ensure MT reviews would be based on reliable information. From its own reviews and based on AAB audits, the Compliance Unit had significant concerns that the

CAD data were not accurate or reliable; therefore, the CU implemented further training at the stations to correct this. It was agreed that a formal MT audit would not occur until the Department had time to respond to the MT's early reviews and the Compliance Unit's training. In the second half of 2021, LASD indicated it felt it was ready for the MT's formal review. The MT presented to the Parties our draft compliance assessment plan for the Stops and Bias-Free Policing sections on October 18, 2021. We received written comments from LASD (via County Counsel's outside counsel) on October 22 and from DOJ on November 3, followed by extensive discussions on the plan at the October 2021 onsite visit. We then submitted a revised plan November 20, 2021.

In late June 2022, several months after the MT had begun the audit and several months after the SA-designated time frame for commenting on the revised work plan,[7] the external lawyers supporting County Counsel submitted a letter alleging the MT's audit methodology was flawed in several ways and questioning the MT's auditing expertise and independence. In attempting to provide evidence for their position, County Counsel's letter contained critical data processing errors and misconstrued communications between the MT and AAB. Several members of the MT, including the Monitors, spent a significant amount of time and resources responding to these claims, which included reconfirmation of the accuracy of our data analysis, identifying the specific errors that led to inaccurate findings in the letter, responding to related requests for information, and meeting several times with the Parties on the issues raised. The assessment process was paused for several months, which resulted in a significant delay in the MT completing our stops and bias-free compliance review. Ultimately, the Parties agreed to our restarting the audit with no changes to the methodologies, except for one aspect of our sampling strategy, which will be somewhat altered in the next audit.

At this stage, the MT's compliance assessment continues. It addresses stops and other contacts that occurred during the third quarter of 2021. As the audit plan lays out, several more document requests remain for this audit. Moving forward, the speed of this work will be dependent on the timeliness and thoroughness of the information received from LASD for each request.

2.  Status of Other Stops-Related Work

This section describes work completed and compliance status for some of the important SA provisions that were not among LASD's prioritized work described above. See also Appendix D for detailed descriptions of status for every SA paragraph.

---

[7] SA Paragraph 159: "At least 45 days prior to initiation of any outcome measure assessment of compliance review, the Monitor shall submit a proposed methodology for the assessment or review to the Parties. The Parties shall submit any comments or concerns regarding the proposed methodology to the Monitor within 15 days of the proposed date of assessment or review. The Monitor shall modify the methodology as necessary to address any concerns, or shall inform the Parties in writing of the reasons s/he is not modifying the methodology as proposed."

*a.   MT Field Observations*

The MT had two visits to the AV stations for purposes of observing LASD deputies' stops and activities in the field: in Palmdale on August 29 and November 2, 2022; and in Lancaster on August 28 and November 1, 2022. One of the goals was to assess how station leadership was using data to inform, alter, or deploy policing strategies as discussed above. MT members participated in ride alongs, conducted interviews with watch commanders and sergeants, and had the opportunity to sit with them to observe day-to-day operations as well as read incident reports that were being submitted by deputies and observe BWC footage. MT members were able to observe deputies interact with community members via calls for service, at the scene of traffic collisions, and stopping for refreshments; with other units, such as Homicide; and with other agencies, such as the fire department and the coroner's office. We had the following observations from those visits.

- Most deputies we interacted with were assigned to the stations from a detentions rotation or had a few years in patrol.

- Overall, we found the deputies' familiarity with the Settlement Agreement and MT semi-annual reports varied, from not having read them to having read portions. Most deputies were aware of the SA but also had no experience in AV patrol prior to the SA, so had no basis for comparison. Despite a lack of familiarity with our reports, most deputies and sergeants nonetheless expressed concerns such as "the MT holds LASD out of compliance for the smallest things" or that "the MT expects us to be perfect," but they were largely unaware of our frequently documented concerns regarding Department delays in developing critical SA requirements such as a SA-compliant UOF policy, UOF training, and complaints policy, or regarding ongoing shortcomings that had been repeatedly noted relating to insuffient management reviews and accountability.

- The deputies receive their priorities for addressing crime during their shifts as well as via other opportunities and requirements for additional training that are the result of emails, posted bulletins at the roll call briefings, discussions with station investigators, reports from station crime analysts, and reports from other patrol deputies.

- Throughout the interactions the MT observed, the communications with community members and other law enforcement professionals were professional and respectful.

- Some deputies were observed applying non-enforcement-related skills when interacting with youth by being friendly, engaging, and inquisitive in a nonthreatening manner. This was in line with the principles of Procedural Justice (i.e., Voice, Neutrality, Respect, and Trustworthiness).[8]

- Deputies all spoke highly of the Mental Evaluation Team (MET) and noted the importance of working with therapists trained to work with law enforcement, and the unique role they play when responding to calls for service involving individuals with mental and/or behavioral health issues.[9] All expressed a need for increased availability of the MET.

- All deputies we spoke to indicated they appreciate using body-worn cameras to help clarify any misunderstanding or allegation made by community members, and to also refresh their recollections when needed. They understood that community members also like the BWC for similar purposes, including transparency and accountability.

3.   Obstacles and Successes

As discussed above, the MT acknowledges and appreciates the incremental progress that LASD has made this year with regard to the use of data. This includes working to evaluate and utilize data in ways they have not historically done and in exploring upgrades to their data systems and assistance from external experts. We are optimistic that still further progress will be made in the coming reporting periods. As that work continues, there are several issues that the Monitors feel are crucial for LASD leadership to keep in mind.

In this reporting period, the North Patrol Division Chief informed the MT that a process is underway for acquiring a new CAD system as well as an EWS. The importance of upgrading the current CAD system cannot be overstated. LASD's abilities to analyze data and apply what is learned are currently hampered by the archaic technology used to collect and process data related to stops and calls for service. LASD continues to use an antiquated CAD system to record information related to stops, and this has significant limitations, such as insufficient space for narrative data entry, poor automated reporting capabilities, and little capacity for expansion as the Department's data recordation and analysis needs grow. Deputies find the limitations on the number of characters allowed by the CAD system to be cumbersome and a barrier to completing accurate and swift reporting, which then impedes their ability to return to the field in a timely manner. The system is incapable of capturing sufficient data and providing the necessary, timely reports required for accountability by the SA and, for that matter, by any contemporary policing agency. Although the Department believes development could take a

---

[8] See https://law.yale.edu/justice-collaboratory/procedural-justice

[9] The MET is staffed with mental health professionals partnered with specially-trained deputies who work in the field and respond to calls for service involving mental health crises.

number of years, this would be a significant step forward given the widespread concerns and acknowledgment of the existing deficiencies and limitations with the current CAD system. Designed carefully, a new system would provide greatly improved abilities to document and gather information on encounters with the public (such as calls for service and stops and detentions), and significantly increase management's ability to access and conduct timely analysis of data to assess performance, evaluate the effectiveness of their programs and strategies, and better direct and deploy their resources to meet community needs and expectations. (See also discussions in the Bias-Free Policing, Data Collection and Analysis, and Accountability sections.)

Similarly, the implementation of a modern, automated early warning system is essential to achieving timely compliance with several areas of the SA, including identifying and addressing deputy performance and other risk management issues addressed in the Stops, Bias-Free Policing, Data Collection and Analysis, UOF, and Accountability sections.

There has been insufficient effort in the AV stations to formalize crime strategies and to connect deputy activities to established problem-oriented policing strategies. For instance, the MT has seen little evidence of the field deputies receiving specific direction to support problem-solving efforts using their SPATIAL strategy. Properly using SPATIAL will assist LASD in gauging effectiveness of their efforts and make improvements where and when appropriate. The use of SPATIAL should also be incorporated into the community engagement training in development.

The LASD and Compliance Unit have multiple demands and expectations to contend with at any one time and this has resulted in extended delays in producing required documents. This hinders MT work and interferes with the Department's progress toward SA compliance. An improved CAD system along with related data processing capacity will help. In the meantime, LASD should find ways to supplement existing staffing and overcome these obstacles if they are to improve their ability to meet the SA requirements and obligations for furnishing requisite data and documents in a timely fashion.


4.   Next Steps

The MT will continue to verify LASD training participation, and we expect to complete the first phase of the MT stops compliance assessment by February 2023, contingent upon timely responses from LASD to MT data requests. The MT expects the following to be the focus of LASD's efforts in the next reporting period.

The MT will continue to monitor and provide technical assistance (TA), as needed or when requested, in order for the LASD to make effective use of stops information to address any concerning patterns and trends associated with the impacts of enforcement activities.

County Counsel recently informed the MT of the Department's intention to have the AAB submit a work plan for a stops audit of each AV station in February 2023 to the MT and DOJ for review. AAB stops audits are not required by the SA, but they do represent a good management practice to ensure stops are documented according to policy. The MT is pleased that County Counsel also indicated that the work plans would reflect comments received from the MT previously and that the audit would proceed only after AAB received further comment from the MT and DOJ.

Although the Department indicated development could take a number of years, the MT will expect updates on progress in the upcoming reporting period, and, in fact, the CU has invited the MT to quarterly status meetings in 2023 regarding development of the new CAD system.


5.  Stops Compliance Status Table

Table 1 provides the compliance status for each paragraph in the Stops section. (See Appendix D for more detailed information about the status of each paragraph.)

<table>
<tr><th colspan="7">Table 1<br><br>Stops, Seizures, and Searches Compliance Status</th></tr>
<tr><th rowspan="2">SA Paragraph</th><th rowspan="2">Summary of SA Requirements</th><th colspan="4">Compliance</th></tr>
<tr><th>Policy</th><th>Training</th><th>Implementation</th><th>Sustained</th></tr>
<tr><td rowspan="2">41</td><td>Stops and detentions are based on reasonable suspicion.</td><td>Yes<br>05/15/17</td><td>Partial</td><td>Partial</td><td>No</td></tr>
<tr><td colspan="5">**Notes:** The MT has seen no indication of recurring or systematic violations of this provision, and the MT has found the Department in partial compliance pending an ongoing formal assessment that began January 2022. The delivery of the training is measured in SA Paragraphs 57, 70, and 71.</td></tr>
<tr><td rowspan="2">42</td><td>Elements of procedural justice are incorporated into training.</td><td>NA</td><td>Yes<br>06/15/17</td><td>Yes<br>08/17/18</td><td>Yes<br>08/17/19</td></tr>
<tr><td colspan="5">**Notes:** The principles of procedural justice are incorporated in the eight-hour bias-free policing training. The delivery of the training is measured in Paragraph 70. DOJ's case review has indicated significant concerns about deputies not complying with this provision and that a refresher may need to be implemented; this issue will be discussed in 2023.</td></tr>
<tr><td rowspan="2">43</td><td>LASD-AV does not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation as a factor in establishing reasonable suspicion or probable cause, except as part of actual and credible description(s) of a specific suspect or suspects.</td><td>Yes<br>05/15/17</td><td>Partial</td><td>Partial</td><td>No</td></tr>
<tr><td colspan="5">**Notes:** See Paragraph 41.</td></tr>
<tr><td rowspan="2">44</td><td>Stops are accurately and thoroughly documented in MDC patrol logs.</td><td>Yes<br>05/17/17</td><td>Yes<br>08/16/18</td><td>Partial</td><td>No</td></tr>
<tr><td colspan="5">**Notes:** The delivery of the training is measured in SA Paragraphs 57 and 70. See also Paragraph 41.</td></tr>
<tr><td rowspan="2">45</td><td>Accurate and specific descriptive language (non-boilerplate) is used in reports.</td><td>Yes<br>05/03/16</td><td>Yes<br>08/16/18</td><td>Partial</td><td>No</td></tr>
<tr><td colspan="5">**Notes:** The delivery of the training is measured in Paragraphs 57 and 70. See also Paragraph 41.</td></tr>
<tr><td rowspan="2">46</td><td>Efficacy and impact on the community of searches based on probation and parole are assessed.</td><td>NA</td><td>NA</td><td>Partial</td><td>No</td></tr>
<tr><td colspan="5">**Notes:** LASD has begun tabulating statistics related to the number of parole and probation searches. LASD needs to show documentation of its assessments of the data and how it addresses problems identified. The MT has found the Department in partial compliance pending completion of its ongoing formal compliance assessment.</td></tr>
</table>

| Table 1 Stops, Seizures, and Searches Compliance Status | | | | | |
|---|---|---|---|---|---|
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **47** | Backseat detentions require reasonable suspicion and reasonable safety concerns. | Yes 05/15/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** MT ad hoc reviews and AAB audits found compliance with some of the elements of Paragraph 47. The MT has found the Department in partial compliance pending completion of its ongoing formal assessment. The delivery of the training is measured in SA Paragraph 57. | | | | |
| **48** | Backseat detentions are not conducted as a matter of course. | Yes 05/17/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** See Paragraph 47. | | | | |
| **49** | Deputies respond to complaints about backseat detentions by calling supervisor. | Yes 05/15/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** See Paragraph 47. | | | | |
| **50** | Deputies do not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s). | Yes 05/17/17 | Partial | Partial | No |
| | **Notes:** See Paragraph 41. | | | | |
| **51** | Deputies do not conduct arbitrary searches. | Yes 05/17/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** The delivery of the training is measured in SA Paragraph 57. See also Paragraph 41. | | | | |
| **52a** | Deputies equipped with BWCs record requests for consent to search. | Yes 05/03/16 | Yes 08/16/18 | Partial | No |
| | **Notes:** The MT has found the Department in partial compliance pending completion of a formal assessment. LASD comprehensively deployed Axon body cameras to both AV stations by July 2021. The MT received access to the system and is assessing compliance with this provision in its ongoing review. The delivery of the training is measured in Paragraph 57. | | | | |
| **52b** | Outreach is conducted about the right to refuse or revoke consent. | NA | NA | Yes 02/19/19 | Yes 02/19/20 |
| | **Notes:** This requirement was completed with the CACs' assistance and a brochure that is written in English and Spanish. | | | | |

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| **Table 1** | | | | | |
| **Stops, Seizures, and Searches Compliance Status** | | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Policy** | **Training** | **Implementation** | **Sustained** |
| **52c** | Individuals with limited English proficiency (LEP) are informed in appropriate non-English language. | Yes 04/08/18 | Yes 08/17/18 | Partial | No |
| | **Notes:** LASD implemented the SA-compliant LEP plan on April 8, 2018. The MT has assessed this provision through complaint reviews, ride-alongs, and community input. The MT has found the Department in partial compliance pending completion of its ongoing formal assessment. The delivery of the training is measured in SA Paragraph 70. | | | | |
| **52d** | Supervisors are notified before home-based search. | Yes 05/15/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** With regard to housing-related searches, the Department is in compliance with this provision. The MT has begun assessing other home searches in its ongoing formal assessment. The delivery of the training is measured in SA Paragraph 57. | | | | |
| **53** | Reasonable number of deputies are present at a search. | Yes 05/03/16 | Yes 08/16/18 | Partial | No |
| | **Notes:** With regard to Section 8 housing–related searches, the Department is in compliance with this provision. The MT is assessing other home searches in its ongoing formal assessment. The delivery of the training is measured in Paragraphs 57 and 70. | | | | |
| **54** | Section 8 compliance checks require articulated safety concerns. | Yes 03/14/18 | Yes 08/16/18 | Yes 05/31/19 | Yes 02/28/22 |
| | **Notes:** LASD-AV included this requirement in policy and training and was found to be in implementation compliance based on the lack of any indication of housing-related enforcement activity. See the Housing section for more information. The delivery of the training is measured in Paragraphs 57 and 70. | | | | |
| **55** | During home searches, individualized suspicion or probable cause determines who, besides subject of search, is subject to detention or search and for how long they are detained. | Yes 05/03/16 | Yes 08/16/18 | Partial | No |
| | **Notes:** The MT has found the Department in partial compliance pending completion of its ongoing formal assessment. The delivery of the training is measured in Paragraphs 57 and 70. | | | | |
| **56** | Probation and parole searches are carried out only when search conditions are established and in accordance with the Stops section. | Yes 05/15/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** The MT has found the Department in partial compliance pending completion of its ongoing formal assessment. The delivery of the training is measured in Paragraph 57. | | | | |

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| | | Policy | Training | Implementation | Sustained |
| 57 | Constitutional policing training is provided. | NA | Yes 06/14/17 | Yes 06/14/22 | No |
| | **Notes:** The Department has been in continual compliance with Paragraph 57 since August 16, 2018, for deputies assigned to the AV stations, and since June 14, 2022, for both AV-assigned deputies and embedded deputies from specialized units. The outcome of this training is measured through the practice provisions of this section of the SA. The Department must also consider changes to the curriculum and/or refresher training if evidence of the need arises. | | | | |
| 58 | Additional accountability and supervision to ensure unlawful stops and searches are detected and addressed. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** The MT has found the Department in partial compliance pending completion of its ongoing formal assessment. Although there were no AAB audits provided to the MT this reporting period, over the last several years, the MT ad hoc reviews and AAB audits have found compliance with some of the requirements of Paragraphs 58–63. | | | | |
| 59 | Supervisors review CAD logs. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** See Paragraph 58. | | | | |
| 60 | Supervisors review justification for stops and searches. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** See Paragraph 58. | | | | |
| 61 | Supervisors and station commanders address all violations and deficiencies in stops and searches. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** See Paragraph 58. | | | | |
| 62 | Supervisors and station commanders track repeated violations of this SA and corrective action taken. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** See Paragraph 58. | | | | |
| 63 | AV supervisors and commanders are held accountable for reviewing reports and requiring deputies to articulate sufficient rationale for stops and searches under law and LASD policy. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** See Paragraph 58. | | | | |

**Table 1**

**Stops, Seizures, and Searches Compliance Status**

Note: See Appendix D for more details on work completed, compliance status, and work remaining for each paragraph.

## C.  Bias-Free Policing

1.  <u>Progress on Department Priorities in this Reporting Period</u>

The Department did not establish any specific priorities regarding the Bias-Free Policing section;[10] however, they did continue the following work.

- Continue providing full-day bias-free policing and roll call training.

### a.  *Full-Day Training*

- *The department is in compliance for bias-free policing training as of this reporting period.*

Bias-free policing full-day training was offered on June 15 and November 8, 2022.[11] LASD had 95% attendance in June 2022 and 98% in the November 2022 training, exceeding the compliance minimum. (Detailed compliance percentage charts are included in the appendices.)

To maintain compliance, the Department must consider revising the bias-free policing training or providing refresher training if evidence arises that deputies are not complying with its subject matter. To that end, the Parties and Monitors have discussed that body-worn camera (BWC) videos recently reviewed by the MT and DOJ raised concerns about some deputies violating the procedural justice aspect of the training (Paragraph 42) and the possible need for additional or refresher training. The possible need for refresher training is also being assessed in the MT's ongoing stops and bias-free policing audit. (See the discussions of UOF case reviews in the UOF and Accountability sections.)

### b.  *Quarterly Refresher Roll Call Training*

- *The Department is not in compliance for the refresher training.*

See discussion in Stops section.

---

[10] Please see Appendix D—Bias-Free Policing and the 14th Semi-Annual Report at our website for description of work history and more details on status of each paragraph. MT website: http://www.antelopevalleysettlementmonitoring.info/

[11] Because the second quarter training was held too late to detail in our 14th Semi-Annual Report, both of the 2022 training sessions are discussed in this report.

2.   Status of Other Bias-Free Policing Work

This section describes work completed and compliance status for some of the important SA provisions that were not among LASD's prioritized work described above. See also Appendix D for detailed descriptions of status for every SA paragraph.

a.   *Assessment for Disparities of LASD-AV Programs, Initiative, and Activities*

- *The Department is not in compliance for the review of their programs, initiatives, or activities for possible disparities. (SA Paragraph 68)*

During this reporting period, LASD decided to postpone further work on Paragraph 68 until 2023. LASD has not made any progress on this provision since late 2021. (See Appendix D for an in-depth discussion of this requirement and MT recommendations.)

b.   *LASD Use of Data to Assess Potential Disparity*

The Stops section describes the Department's recent efforts in the analysis and use of data and in the use of the SPATIAL problem-solving model. Thus far, these efforts have been focused on crime reduction and deputy deployment issues like traffic enforcement at dangerous intersections, catalytic converter thefts, or CFS response times. Those are important areas to consider, but to meet compliance with the bias-free policing provisions, station leaders must take seriously the responsibility to use the data to identify potential disparities and to respond to those findings. This involves similar data analysis and assessment processes, but adds other elements as well, such as the need for the Department to honestly self-assess and to consider the efficacy of its enforcement practices against the impact of those practices on the quality of the Department–community relationship. Not all disparity in enforcement means there is disparate treatment, but there must be an analysis of why the disparity exists, its impact on community safety, and its impact on community perceptions of the Department. When appropriate, LASD must then initiate the development and implementation of strategies to effectively resolve issues caused by identified disparities.

3.   Obstacles and Successes

The Compliance Unit has indicated that an annual stops report—an enhanced version of the 2021 draft report produced in this reporting period—may eventually be used to address SA Paragraphs 68 and 82–86 or other SA requirements to use data to identify potential issues that need remediation. Making such an effort successful will require clear direction from leadership that data are important and useful as well as a commitment to look introspectively to

understand and, when necessary, address apparent disparities.[12]

As we expressed in the Stops section, the Monitors are pleased at recent Department efforts regarding using data. Significantly, the Lancaster captain has begun introducing probing questions into the conversation, a positive development, but this is not the norm. For instance, in one discussion, a senior-level manager said the 2021 stops data report mainly helped stations decide the busiest traffic collision locations are where they should concentrate their enforcement efforts. Addressing traffic safety concerns and other enforcement issues is an appropriate use of the data, but it cannot be the only use of the important information contained in the data reports.

We stress that it is essential that NPD executives play an active leadership role to continue these developments and to reach the goal of the regular and proficient use of data to understand and guide Department activities. This role will include introducing improved data systems and training to ensure managers can become savvy users of data, applying the inquisitiveness and professional skepticism required to interpret the data findings, delve further into the data when necessary, make connections between the data findings and other information, and seek solutions.

Beyond these basic tools and knowhow, Department executives need to create a culture where the intensive and forthright use of data is integral to station operations. This will require they lead the way—via policy, instructions, behavior modeling, and mentoring—in reversing the defensiveness the MT has noted, which has been characterized by efforts to discount any potential issues identified in data and to justify Department decisions and practices rather than taking the opportunity to understand, assess, and improve.

The Department needs to engage not only with its own internal data reports but with data findings from analyses conducted by external sources, such as the OIG. The 14th semi-annual report Bias-Free Policing section discussed some non-LASD reports and the Department's response. The Parties and MT had further discussions about those reports in this reporting period. During these discussions, station management provided some helpful insights as to the steps they have taken to respond to some of those reports, including engaging in dialog with some of the involved parties and an internal assessment of the data, both of which the MT supported. The NPD and station managers present committed to responding constructively to any future external reports and to genuinely engage with relevant data analysis to better inform and improve practices.

As part of their response to the external reports regarding school resource officers, the Department discovered that some of the numbers concerning LASD-AV contacts at local schools may have been inflated due to a CAD data entry limitation, which they subsequently took steps

---

[12] See *Crime Prevention Strategies* box, which says, "It is incumbent on LASD to use the data to identify disparities and address the findings. In some circumstances, there may be a reason for a disparity, but LASD must be able to clearly explain the reasons for the disparity and efforts to ensure its decision making and/or enforcement direction is free of bias or disparate impacts."

to change. To be useful, data need to be accurate and reliable, so the MT appreciated that LASD conducted this assessment. Unfortunately, the motivation for this particular assessment that revealed the CAD issue—to defend the Department against claims of disparate treatment of youth of color—was consistent with the Department's response to other such reports and data findings. We would expect the Department to be as conscientious and proactive when confronted with other issues, not just shortcomings in their data systems but potential issues in policy, training, management review, and, most importantly, law enforcement practice and its positive and negative impacts on community trust.

**Crime Prevention Strategies**

The Settlement Agreement states:

"LASD shall ensure that investigatory stops and searches are part of an effective overall crime prevention strategy, do not contribute to counter-productive divisions between LASD and the community, and are adequately documented for tracking and supervision purposes." (Page 7)

Crime prevention strategies facilitate an organized and consistent approach to crime intervention and prevention based on manager-driven priorities and tactics, data-guided decision making, effective and efficient allocation of resources, and accountability. They also provide a framework for gathering and incorporating community input so that community members are co-producers of public safety.

Although there are a variety of approaches to crime prevention strategies, at a minimum, effective strategic plans include common elements such as goals, objectives, directed activities, data collection and analysis, and designation of staff assignments and timelines for completing specific tasks. They also incorporate community perceptions and input regarding enforcement priorities and crime prevention activities. Implementing the plan requires the support of Divisional managers but is directed and conducted at the station level.

Input from AV community members can be gathered through numerous avenues, including the CACs, the annual Community Survey, community engagement events, one-on-one engagement with community members (recorded as stat code 755 in the AV), and designated meetings to discuss specific issues or areas. LASD's SPATIAL problem-solving model and its policy for Community Policing and Engagement (MPP 301-110-00) are tools the Department already has in place that can help in providing a framework as well as documentation procedures for these efforts.

Crime prevention strategies can serve as a structure as management begins to actively assess where bias may be present in station-directed enforcement efforts in the AV (SA Paragraph 68). This involves many of the reviews already underway, such as Deputy Daily Work Sheet (DDWS) reviews, reviews of reports, and supervisory observations of deputies in the field. Stops and call-for-service data and other enforcement information need to play a key role. This involves more than analyzing deputies' individual actions; it includes an analysis of the impact of larger enforcement efforts in the AV, including potential disparities.

For example, the overreliance on vehicle stops in an area to address traffic safety issues or criminal behavior could have a disparate impact on a specific community. It is incumbent on LASD to use the data to identify disparities and address the findings. In some circumstances, there may be a reason for a disparity, but LASD must be able to clearly explain the reasons for the disparity and efforts to ensure its decision making and/or enforcement direction is free of bias or disparate impacts. Compliance with the SA requires clear evidence that LASD management both holds deputies accountable for engaging in bias-based practices and identifies and addresses any LASD enforcement strategies that result in bias or disparate impacts in the community.

4.  <u>Next Steps</u>

In addition to the work we describe in the above section on stops, the MT expects the following to be the focus of LASD's attentions and efforts related to this topic during the next reporting period.

- The MT will continue verification of LASD bias-free and roll call trainings and continue the work on its formal compliance assessment of stops and bias-free policing with the Departments' continuing assistance in providing data and information to facilitate that process. The MT will provide feedback to the LASD regarding the use of the SPATIAL forms.

- LASD will continue providing the stops data analysis to the station captains. The station captains will continue to improve their processes for reviewing the information with their staff and making any appropriate changes to enforcement practices, community engagement activities, or other efforts. The MT is waiting for documentation of this process from LASD. The MT will also provide feedback on improving the content of the stops data reports and application of its findings.

- The MT also awaits documentation from LASD that will show how the LASD data reports are used, if at all, to address disparities in enforcement when warranted. Particular attention will be given to the use of probing questions related to disparate treatment and the use of the data to inform practice. LASD will restart its work on the disparity analysis required by Paragraph 68 beginning with the list of programs, activities, and initiatives to be considered.

5.  Bias-Free Policing Compliance Status Table

Table 2 provides the compliance status for each paragraph in the Bias-Free Policing section. (See Appendix D for more detailed information about the status of each paragraph.)

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| | | Policy | Training | Implementation | Sustained |
| **64** | Members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies do not initiate stops or other field contacts because of an individual's actual or perceived immigration status. | Yes 05/15/17 | Partial | Partial | No |
| | **Notes:** Although data analyses reflect disparities that have not yet been addressed by the Department, in its informal assessments on a case-by-case basis, the MT has seen no indication of recurring or systematic violations of this provision and has found the Department in partial compliance pending an ongoing formal assessment that began January 2022. The delivery of the training is measured in SA Paragraphs 57, 70, and 71. | | | | |
| **65** | Museum of Tolerance and other experts are consulted on prohibited conduct, bias-free policing, implicit bias, and stereotype threat. | NA | NA | No | No |
| | **Notes:** LASD and the Museum of Tolerance had a working relationship previously, but in spring 2021, LASD requested to replace the Museum of Tolerance with an organization with more local, relevant expertise. In this reporting period, LASD suggested contracting with another national organization. The MT and DOJ have indicated they are amenable to this change pending LASD's efforts to identify and establish a relationship with a suitable external expert. | | | | |
| **66** | Effective communication and access to police services is provided to all AV members, including those with limited English proficiency (LEP). | Yes 04/08/18 | Yes 08/16/18 | Partial | No |
| | **Notes:** LASD implemented the SA-compliant LEP plan on April 8, 2018. The MT currently assesses this provision through complaint reviews, ride-alongs, and community input and has found the Department in partial compliance pending a formal review. | | | | |
| **67** | Bias-free policing and equal protection requirements are incorporated into the personnel performance evaluation process. | Yes 05/03/16 | NA | No | No |
| | **Notes:** In previous semi-annual reports, the Department was previously found in partial compliance with this paragraph. However, the MT and Parties continue to discuss how LASD will use enforcement statistics for stops as a part of their performance evaluation process. LASD has indicated it may be more appropriate to address this provision in other types of reviews rather than the annual performance evaluations. As part of the MT's stops and bias-free policing audit, the MT is meeting with the Parties to discuss and identify an appropriate sample to assess compliance. | | | | |

Table 2

Bias-Free Policing Compliance Status

| Table 2 | | | | | | |
|---|---|---|---|---|---|---|
| **Bias-Free Policing Compliance Status** | | | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** | |
| **68** | All LASD-AV programs, initiatives, and activities are analyzed annually for disparities. | NA | NA | No | No | |
| | **Notes:** In February 2022, the MT provided comments to LASD's draft list of programs, initiatives, and activities to be included in the annual reviews, which consolidated DOJ's December 2021 comments to that list, into a proposal to advance monitoring in this area. The list and methods for review need to be further discussed. | | | | | |
| **70** | Bias-free policing training is provided. | NA | Yes 08/16/18 | Yes 06/15/22 | No | |
| | **Notes:** The Department has been in continual compliance with Paragraph 57 since August 17, 2018, for deputies assigned to the AV stations, and since June 15, 2022, for both AV-assigned deputies and embedded deputies from specialized units. The outcome of this training is measured through the practice provisions of this section of the SA. DOJ's case review has indicated concerns about deputies not complying with some aspects of this training and that a refresher may need to be implemented; this issue will be discussed in 2023. | | | | | |
| **71** | Quarterly roll call briefings on preventing discriminatory policing are provided. | NA | Yes 02/01/19 | No | No | |
| | **Notes:** Approved briefings began February 1, 2019, but have not been consistently in compliance based on MT quarterly review of training verification documentation and LASD delivery of the training not being consistent with the SA-compliant plan (i.e., providing the refresher sessions quarterly rather than grouped on a single day). DOJ's case review has indicated a need to consider revising or enhancing this training; this issue will be discussed in 2023. | | | | | |

Note: See Appendix D for more details on work completed, compliance status, and work remaining for each paragraph.

**D.  Enforcement of Section 8 Compliance**

As reported in the 14th semi-annual report, the Department has been deemed to have achieved sustained compliance with the SA housing provisions and, absent evidence to the contrary, the MT will no longer monitor SA Paragraphs 73–80 (and Paragraph 164 as it regards housing-related training) moving forward.[13]

1.  Housing Compliance Status Table

Table 3 provides the compliance status for each paragraph in the Housing section. (See Appendix D for more detailed information about the status of each paragraph.)

---

[13] Pursuant to the DOJ and LASD approval of MT SA Paragraph 150 Recommendation re. Housing Paragraphs 73-80 and 164 v2-28-22.

| | | Table 3 | | | | |
|---|---|---|---|---|---|---|
| | | **Enforcement of Section 8 Compliance Status Table** | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** | **Paragraph 150** |
| **73** | New housing non-discrimination (HND) policy is implemented. | Yes 2/23/18 | Partial | Yes 05/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| **74** | All current deputies acknowledge receipt and understanding of HND policy. | Yes 2/23/18 | Partial | Yes 5/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| **75** | All newly assigned deputies acknowledge receipt and understanding of HND policy within 15 days. | Yes 2/23/18 | Partial | Yes 5/31/18 | Yes 09/14/20 | Yes 02/28/22 |
| **76** | Policies regarding the review of requests from a housing authority for deputy accompaniment are revised. | Yes 03/14/18 | Partial | Yes 5/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| **77** | Accompaniment policy regarding LASD housing investigations is implemented. | Yes 03/14/18 | Partial | Yes 05/15/18 | Yes 05/31/19 | Yes 02/28/22 |
| **78** | Deputies document all voucher holder compliance checks using Stat Code 787. | Yes 03/14/18 | Partial | Yes 05/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| | **Notes:** The Parties and MT agreed that if there was no indication that LASD participated in housing-related enforcement actions, including Section 8 compliance checks, they would be found in compliance with Paragraphs 78, 79, and 80. On this basis, the MT found the Department in compliance after review of several years of community input and Department documentation of stops, arrests, and other actions indicated no such actions occurred. | | | | | |
| **79** | Deputies document each independent investigation for fraud based on voucher holder compliance with the voucher holder contract using Stat Code 787. | Yes 03/14/18 | Partial | Yes 5/31/18 | Yes 5/31/19 | Yes 02/28/22 |
| **80** | Deputies document housing-related activity using Stat Code 787 and do not inquire into an individual's Section 8 status. | Yes 03/14/18 | Partial | Yes 05/31/18 | Yes 5/31/19 | Yes 02/28/22 |

Notes:

- The MT submitted a memo dated February 28, 2022, subsequently approved by the Parties, invoking Paragraph 150 for Paragraphs 73–80.
- The SA-mandated training related to housing is monitored in the bias-free policing training (Paragraph 70, in compliance) and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A–G (Paragraph 71, not in compliance).
- See Appendix D for more details on work completed and compliance status for each paragraph.

**E.  Data Collection and Analysis**

1.  <u>Progress on Department Priorities in This Reporting Period</u>

Despite assigning a full-time data analyst to the Compliance Unit over a year ago, LASD did not identify Paragraphs 81–86 as a priority in this reporting period. LASD remains out of compliance for Paragraphs 81–86. The SA provides a detailed and thorough description of the work that needs to be completed for this section, especially with regard to the particular data that need to be collected and how that data needs to be analyzed.

2.  <u>Status of Other Data Collection and Analysis Work</u>

Apart from continuing to collect the data addressed in Paragraph 81, the reliability of which is being assessed in the MT's stops audit, LASD has made some limited progress work related to Paragraphs 81–86 in this reporting period. The CU has started identifying both internal and external data sources that can be used to develop a compliant data report. Additionally, the CU is exploring the option of bringing in a consultant to conduct the required analysis. The CU has produced a sample of a monthly data report intended to provide the station captains with a timely snapshot of their station's stops data to assist them in their patrol duties. (See Stops section for further discussion)

3.  <u>Obstacles and Successes</u>

As discussed at length in the Stops and Bias-Free Policing sections and in previous reports, LASD faces a number of obstacles to achieving compliance with Paragraphs 81–86. First and foremost is that the data collection system is antiquated, inflexible, and insufficient. Another significant barrier is that LASD does not have a robust culture of using data to inform practices.

4.  <u>Next Steps</u>

The CU will continue to explore the data sources and assess whether changes must be made to data collection systems to be in compliance. Also, the CU is going to convene a quarterly meeting regarding an early warning system and is considering the stops data that should connect to that system. LASD has indicated a desire to engage a qualified consultant to produce the SA-required data analysis and a report including an exploration of trends in the next year.

5.  <u>Data Collection and Analysis Compliance Status Table</u>

Table 4 provides the compliance status for each paragraph in the Data Collection and Analysis section. (See Appendix D for more detailed information about the status of each paragraph.)

| Table 4 | | | | | |
| :---: | :---: | :---: | :---: | :---: | :---: |
| **Data Collection and Analysis Compliance Status** | | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **81** | LASD collects data related to bicycle stops, backseat detentions, probation and parole stops and searches, consent searches, and vehicle impoundments. | NA | NA | Partial | No |
| | **Notes:** LASD has been collecting the required data for several years and is in partial compliance pending completion of an ongoing formal assessment of the accuracy and thoroughness of the data collection. | | | | |
| **82** | LASD conducts semi-annual analysis of various data documenting stops, searches, seizures, backseat detentions, arrests, vehicle impoundments, uses of force, civilian complaints, and Section 8 voucher compliance checks. | NA | NA | No | No |
| | **Notes:** LASD initially committed to producing a inaugural draft report by May 31, 2022. No draft report has been produced. LASD's current goal is to deliver a work plan, written in conjunction with an external consultant, by May 2023. | | | | |
| **83** | LASD's semi-annual data analysis includes regressions, including appropriate controls, to determine if law enforcement activity has a disparate impact on any racial or ethnic group. | NA | NA | No | No |
| | **Notes:** See Paragraph 82. | | | | |
| **84** | From the analysis, LASD identifies any trends or issues that compromise Constitutional policing and respond accordingly by, for instance, reviewing and revising as necessary policy, training or practice. | NA | NA | No | No |
| | **Notes:** LASD should also examine, publicly respond to, and potentially use to inform practice the analysis provided by the Monitors and the reports presented by OIG, local universities, and ProPublica. Also see Paragraph 82. | | | | |
| **85** | LASD's analysis identifies any problematic trends among reporting districts or deputies and takes appropriate corrective action. LASD's analysis is incorporated into routine operational decisions. | NA | NA | No | No |
| | **Notes:** LASD has not incorporated the required data analysis and assessment into routine operational decisions. Also see Paragraph 82. | | | | |

| Table 4 |||||
| :---: | :---: | :---: | :---: | :---: | :---: |
| **Data Collection and Analysis Compliance Status** |||||
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** ||||
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **86** | LASD produces a semi-annual report summarizing the results of the analysis and steps taken to correct problems and build on successes. The report is publicly available in English and Spanish and posted on LASD's website. | NA | NA | No | No |
| | **Notes:** No report has been produced, accepted, or published for compliance. |||||

Note: See Appendix D for more details on work completed and compliance status for each paragraph

**F.  Community Engagement**

1.  <u>Progress on Department Priorities in This Reporting Period</u>

LASD's community engagement-related priority for this reporting period was to complete the following task by the end of 2022:

- LASD Community Engagement Report

Additionally, LASD continued the following activities during this reporting period:

- Community Engagement Tracker
- CACs and Community Engagement
- Crime Management Forum (CMF)
- Risk Management Forum (RMF)
- Community Survey

*a.  Annual Community Engagement Report*

- *The Department is in compliance for its annual Community Engagement Report.*

LASD submitted the 2021 Community Engagement (CE) Report for reviewing during this monitoring period. The MT and DOJ provided feedback and comments, noting the draft was not in compliance. On November 21, 2022, LASD re-submitted the 2021 CE Report addressing the MT and DOJ's response. LASD revisions adequately addressed all of the MT and DOJ's concerns, and the report was determined to be in compliance.

*b.  Review of LASD-AV Deputy Community Engagement Tracker*

- *The Department is in partial compliance for deputy involvement in community engagement activities (SA Paragraph 88).*

LASD continues to make progress toward sustained compliance with this provision of the SA in terms of sworn personnel attending the required number of community events or conducting 755s (contacts that are self-initiated, positive engagements with members of the community). The MT provided feedback to LASD regarding its community engagement activities. Some of the 755 logs need to better describe how the interaction with members of the public was initiated. There were a few questionable community engagement events. There was some missing documentation or inaccurate tracking where the calculations did not match the number of forms showing community events for individual deputies. The MT also pointed out some examples of very good community engagement events and resident interactions.

During the next monitoring period, the MT will review the end-of-year Community Engagement Tracker report for 2022 to determine compliance with Paragraph 88; the findings will be included in the next semi-annual report. It is our hope that during Sheriff Luna's administration, given his understanding of 21st-century policing, the Compliance Unit and/or the compliance lieutenants at the stations will be in a better position to review deputy community engagement efforts and provide ongoing feedback to deputies and their supervisors on their engagement activities and how to better tailor those activities to fit with and inform the stations' community policing strategies.

c.   *CACs and LASD Community Engagement*

- *The Department is out of compliance with Paragraph 87b regarding being available for community feedback, but is in compliance with the various provisions for facilitating the CACS (Paragraphs 87a, 87c, 93, 94, 96, 97).*

On November 1, the MT hosted a community meeting at a church in Lancaster whose pastor is a former member of the Lancaster CAC. Approximately 50 people were in attendance, filling the modest-size church, including CAC representatives, members of LASD, the MT, and DOJ representatives. Most attendees were members of the AV community. The MT provided a brief overview of the SA, the monitoring process, and the current status of LASD's efforts. There were also brief introductions made by CAC members of both Palmdale and Lancaster. The remainder of the meeting was dedicated to open discussion about policing in the AV.

Several AV community members shared their specific complaints and concerns about incidents they had experienced or were aware of involving LASD. Overall, the room was full of AV community members whose prevailing sentiment was largely one of concern, frustration, and anger toward LASD and the MT for not holding LASD more accountable, as well as similar frustrations with the county government and school system. Some CAC members and attendees were critical of the MT and our reports, specifically, that the MT does not credit the CACs for all of their hard work, that the reports are too lengthy and difficult to follow, and the reports do not separate compliance out by station. They also asked for earlier notice of our future meetings.

While the Department is currently in compliance with Paragraph 93 and the other provisions regarding facilitation of the CACs, improvements must be implemented in order for compliance to be maintained and, most importantly, to ensure the CACs effectively function in the manner envisioned by the SA. As we discuss below, LASD needs to improve its outreach for representation on the CACs and for meeting attendance, and both LASD and the CACs need to improve their documentation and tracking of community input.

The MT acknowledges that it is unlikely that every community meeting ends with universally satisfied and content constituents. However, we see evidence that LASD is not fostering an environment that allows for the consistent and candid sharing of concerns, collaboration and transparency expected by the CACs, and actionable strategies to build relationships with critics

in the community and are therefore holding the Department out of compliance in this area. To our knowledge, neither CAC is empowered by the stations to document and track all community concerns over time, and both are suffering from significant turnover, with departing members often raising concerns that LASD leadership is not open to criticism. Exiting and current CAC members have reported to the MT that they feel their concerns and ideas are not truly heard or followed-up on. The Department does not routinely document and track input it receives from the community either through the CACs or through its other community events and interactions; nor does it track its response to that input. Non-CAC members have reported a loss of confidence and trust in the CACs and their ability to successfully fulfill their mission, which includes "leverage the insights and expertise of the community to address policing concerns, including . . . racial or ethnic profiling and access to law enforcement services," "work with the Sheriff and station commanders to establish and carry out community public safety priorities," and "receive and convey to LASD public comments and concerns" (Paragraph 93). In fact, some members of the community have expressed their interest in forming a separate group because they do not feel the present CACs have enough independence from the Department.

The MT very much appreciates the hard work and dedication of the CAC members, all of whom are volunteering their time to building and strengthening relationships between the stations and the community. We note concerns in this area not to be critical of the talented group of individuals that make up the CACs, but to underscore their importance to this work.

To reach and maintain compliance in this area, both stations must work hard to expand their CACs to include AV residents who represent the diversity of the valley, including members who are vocal critics of the Department. The stations need to increase their efforts to hear and respond constructively to all CAC members and the community voices they represent. Station leadership needs to work more closely with the CACs to reach both the over-policed and under-policed communities in the AV and to enhance relationships with particular groups, such as youth and communities of color; to open lines of communication and build trust; and to seek—and document—more input from the community to inform crime prevention and community policing goals. The Department certainly has general support from many parts of the AV community, but the SA requires that community engagement efforts extend across all community groups.

Discussions were held during the site visits regarding strategies for improving general community attendance and participation in the CAC meetings. The MT acknowledges the compliance teams at the stations are also concerned about attendance and are putting effort into improving attendance. We will follow up on this issue in the next reporting period.

In our last report, we challenged both LASD and CACs to improve their documentation of issues, concerns, and problems identified during community outreach efforts and to track those concerns and the Departmental response over time. We also asked that monthly CAC meetings include time dedicated to discussion of these issues, and that the meeting minutes or notes document LASD's responses and intentions, with follow-up on outcomes and lessons learned in subsequent meetings. This process, routinized as a practice, would impact many compliance

provisions. We have not seen any evidence that this is happening in any formal way, but we continue to believe this practice is important and would be helpful to LASD and the CACs by improving trust and transparency with the community as well as serve the SA's requirements of expanding outreach efforts and informing their community policing strategies.

d.  *Crime Management Forum*

- *The Department is in partial compliance with Paragraph 90 regarding CMF meetings.*

Members of the MT observe all monthly CMF meetings for the North Patrol Division, which includes Lancaster and Palmdale. The MT also attends the semi-annual RMF meetings. The MT has provided two memos over the past three years advising LASD of where non-compliance with this provision of the SA has been noted and providing examples and recommendations on how the Department can come into compliance. The MT has re-sent those memos to new personnel transferred into the Compliance Unit.

Although recent progress has been made by LASD, particularly in the Lancaster station, one area where the AV stations are still deficient in the CMF meetings is the need to engage with the community in efforts to support and measure community and problem-solving policing efforts. While the stations are identifying problem-solving activities that are being driven internally, there has been little to no documentation of how or whether any of these efforts are being undertaken based on community input and identification of their priorities, or that the community has been actively engaged as a co-producer of public safety where those opportunities are present. This is an area that needs to improve for LASD to come into full compliance with this provision of the SA.

e.  *Risk Management Forum*

- *The Department is in partial compliance with Paragraph 90 regarding the RMF.*

The Department conducts semi-annual Risk Management Forum meetings to evaluate the performance of stations in every Division. The MT has been engaged in observing all the North Patrol Division RMF sessions so as to assess compliance with various SA provisions, such as those related to conducting an analysis of trends in misconduct complaints and community priorities, the development of needed interventions, and improving the application of analytics to assess their deployment strategies to better support community policing and problem-solving efforts.

The MT has noted recent improvement regarding the content of the material covered during these meetings. Of note, we have found the NPD RMF has allocated additional time during the meetings for AV station captains to present information on issues and trends that are

consequential and related to the SA. This was not previously done. During the early years of the SA the presentations concerning the station's data and trends were rarely probed by executive staff, and even when such a probe may have occurred, any explanations provided by the station captains were passively accepted as being sufficient. Executive staff have recently displayed a greater interest in and willingness to probe and evaluate the station captain's explanations about crime trends and patterns that have become evident as well as the policing strategies that are being employed to address those matters. The MT finds this to be a sign of progress and consistent with the SA objectives.

What the MT has not yet observed and where more attention must be devoted in the near term in order for LASD to achieve compliance in this area is to have the station captains routinely present information on whether and how community concerns and priorities are identified, using that information to help inform and tailor each station's policing strategies, and then ensure the results are also being constantly evaluated for their impact. Those are specific requirements of the SA that can best be achieved when command staff and station managers practice, and model for their own subordinates, the application of critical thinking skills that are undertaken for the purpose of developing and refining increasingly effective crime reduction strategies and engaging in the range of problem-solving efforts that the community is seeking.

   *f.   Community Survey*

   - *The Department is in compliance for the Community Survey.*

Prior to launching this year's Community Survey, the MT and the Parties met to discuss certain revisions to the Year 4 data collection process, including discontinuing survey administration at AV high schools due to low response rates in the past. The survey was modified to ensure the perspectives of younger AV residents are still captured in the general survey. Some additional minor revisions were made to the survey questions in order to improve the quality of data being collected.

Data collection for the fourth annual Community Survey began in mid-November 2022. At this point, data collection is primarily being done virtually through an online survey, with a limited amount of paper surveys being made available to community members attending community meetings or upon request. LASD, both CACs, and a handful of community-based organizations and individual community members are currently distributing the survey to their networks. Data collection will continue into 2023 until data have been collected from a representative sample of respondents.

2.   Status of Other Community Engagement Work

This section describes work completed and compliance status for some of the important SA provisions that were not among LASD's prioritized work described above. See also Appendix D

for detailed descriptions of status for every SA paragraph.

LASD did not make progress on the following activities:

- Community Engagement Training
- Deputy Survey

a.    *Community Engagement Training*

- *The Department remains out of compliance with the required Community Engagement Training, Paragraph 89.*

LASD has previously made progress toward developing a training curriculum that will comply with most but not all the provisions of the training requirements in the CE section. The Department remains out of compliance until the training is approved and implemented. In August 2022, the Department indicated they would not be able to finish the next draft of the training in 2022 and chose to priortize other work. The MT and DOJ disagreed with this decision, stressing the importance of the training and urging the Department to build on the momentum it had established. In December, County Counsel also proposed a revision to the established compliance metric associated with Paragraph 89, which will be further discussed in the next reporting period.

The MT provided an updated review of the proposed Community Engagement training curriculum and submitted a memo to LASD on June 7, 2022. The memo included the MT's assessment that the updated curriculum complied with most of the sub-provisions required by Paragraph 89 of the SA.[14] To their credit, both station captains have asked for this training to be implemented because they have identified that deputies in their stations need exposure to these topics and that they will help with implementation of SPATIAL.

Additionally, DOJ's case review highlighted that deputies would benefit from greater attention to several aspects of Paragraph 89, including leadership, ethics, and interpersonal skills; principles of procedural justice; conflict resolution and verbal de-escalation of conflict; and cultural awareness and sensitivity training. (See UOF and Accountability sections for further discussion of the case reviews.)

---

[14] Paragraph 89 of the SA requires LASD to "provide structured annual in-service training on community policing and problem-oriented policing methods and skills for all AV deputies, including station supervisors and unit commanders" and lists several specific subjects which must be addressed in the trainings, including (a) methods and strategies to improve public safety and crime prevention through community engagement; (b) scenario-based training that promotes the development of new partnerships between the police and community targeting problem-solving and prevention; (c) leadership, ethics, and interpersonal skills; (d) problem-oriented policing tactics; (e) community engagement techniques, including how to engage with youth, immigrant, and LGBTQ communities; and (f) conflict resolution and verbal de-escalation of conflict.

b. *Deputy Survey*

- *The Department is in partial compliance with the deputy survey, pending their decision to revise the instrument (SA Paragraphs 69 and 72).*

The Department has conducted two deputy surveys in the past (see Appendix). In this reporting period, the Department expressed a desire to make changes to the Deputy Survey instrument to make it more informative and useful to station captains. The MT and DOJ agreed to review their proposed changes. The Department later indicated it would provide those proposed changes in 2023, so no additional discussions or review occurred in this reporting period.

3. Obstacles and Successes

Based on community meetings observed and communications received, while LASD is in technical compliance with the majority of the provisions in this section of the SA, the MT continues to have great concern regarding how segments of the AV community, especially communities of color, are treated and how they perceive LASD. In addition, data analyses reflect disparities that have not yet been addressed by the Department (see the Stops and Bias-Free Policing sections of this report).

As mentioned in previous reports and in other sections, LASD continues to struggle with collecting, scrutinizing, and utilizing data and information, particularly community feedback. LASD continues to not use community feedback to set priorities for the Crime Management Forum. The MT continues to receive concerns and complaints from members of the AV community, including CAC members, that LASD is backsliding on compliance and/or is not interested in positively engaging with all segments of the community. Community members have expressed frustration at the slow pace of progress made by LASD to fully comply with the SA, and they have complained that the MT has not been able to compel compliance from LASD.

4. Next Steps

During the next monitoring period, the MT will review the end-of-year Community Engagement Tracker report for 2021 to determine compliance with Paragraph 88; the findings will be included in the next semi-annual report. MT will continue to hold community meetings and continue our offer to provide assistance or training to the CACs. LASD has committed to producing another iteration of the community engagement training to meet the requirement of Paragraph 89. We anticipate that the Community Survey data will be analyzed and published in the next reporting period, as will LASD's 2022 Community Engagement Report. We are hopeful that, under the new administration and consistent with Sheriff Luna's stated goals of prioritizing community policing, the stations and the CACs will begin to routinize a practice of documenting and following up on community concerns, and the stations will institutionalize their COP and POP practices, including the integration of the community engagement training, articulated

crime prevention strategies, SARA/SPATIAL activities, and data analysis into daily practice.

5.   <u>Community Engagement Compliance Status Table</u>

Table 5 provides the compliance status for each paragraph in the Community Engagement section. (See Appendix D for more detailed information about the status of each paragraph.)

| Table 5 | | | | | |
|---------|---|---|---|---|---|
| **Community Engagement Compliance Status** | | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **69 (In Bias-Free Section)** | Annual organizational culture and climate study including using experts and the Community Survey to study organizational climate and culture in the AV stations to aid in developing the requirements in the section. Personnel will be allowed to confidentially provide information for the study. | NA | NA | Partial | No |
| | **Notes:** The survey was administered in 2019 and 2020 but the Department has not informed the MT or provided documentation of how it uses the Community Survey to inform community engagement activities (see Paragraph 88). In December 2021, the MT asked to schedule a time to discuss LASD revisions to the previous Deputy Survey instrument and other methodological considerations. The Parties and MT subsequently discussed the Deputy Survey in 2022, which led to the Department requesting additional time to consider revisions they feel would make it more useful. | | | | |
| **72 (In Bias-Free Section)** | LASD agrees to use experts and a survey to study organizational climate and culture in the AV stations to aid in developing bias-free policing training requirements. | NA | NA | Partial | No |
| | **Notes:** See Paragraph 69. | | | | |
| **87a** | Actively participate in community engagement efforts, including community meetings. | Yes 12/11/19 | NA | Yes 09/21 | No |
| | **Notes:** The mechanisms for deputy participation in community engagement efforts are in place; the extent and quality of that participation are measured in Paragraph 88. | | | | |
| **87b** | Be available for community feedback. | Yes 12/11/19 | Partial | No | No |
| | **Notes:** As described in this section, the MT has observed indications that Department managers may not be open to all feedback. The MT has provided guidance on how to better document feedback received and responded to. The eventual community engagement training (Paragraph 89) will address productive Department–community interactions. | | | | |
| **87c** | Develop CACs. | Yes 12/11/19 | NA | Yes 06/16 | Yes |
| | **Notes:** The CACs existed before the SA but were implemented in accordance with the SA in 2016 and have been maintained ever since. | | | | |

| Table 5 | | | | | |
|---|---|---|---|---|---|
| **Community Engagement Compliance Status** | | | | | |
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **87d** | Work with the community to develop diversion programs. | Yes 12/11/19 | NA | Yes 09/21 | No |
| | **Notes:** The MT found the Department in compliance with the diversion program provision through the review of LASD documentation, direct observation, and discussion with community members. | | | | |
| **88** | Ensure all sworn personnel attend community meetings and events, and take into account the need to enhance relationships with particular groups within the community including, but not limited to, youth and communities of color. | Yes 1/10/19 | Partial | Partial | No |
| | **Notes:** LASD published an approved Attendance Work Plan (January 10, 2019; revised April 1, 2020). The MT assesses this provision through review of LASD documentation of events/755s, direct observation, and discussion with deputies and community members. The MT, which has not yet formally assessed the qualitative requirement to genuinely engage in events/755s, has found LASD:<br><br>• In compliance with the quantified metrics for deputy attendance at events and/or 755s for 2021; 2022's compliance will be determined in March 2023 and included in the next MT Report<br>• Out of compliance with the qualitative requirements to account for the need to enhance relationships with particular groups<br>• Out of compliance with using the annual Community Survey to inform changes to the attendance plan, if needed. | | | | |
| **89** | In-service training on community policing and problem-oriented policing is provided to all AV personnel. | NA | Partial | No | No |
| | **Notes:** LASD previously implemented a portion of Community Engagement training: the Virginia Center For Policing Innovation (VCPI) training, a two-hour online introduction to COP/POP, but that implementation was not continued in this reporting period. The Department postponed additional work on the full-day training until 2023. After full implementation of the training, outcomes related to each aspect of the Community Engagement training will be measured in other provisions. | | | | |

| Table 5 | | | | | |
| --- | --- | --- | --- | --- | --- |
| Community Engagement Compliance Status | | | | | |
| SA Paragraph | Summary of SA Requirements | Compliance | | | |
| | | Policy | Training | Implementation | Sustained |
| 90 | Revise content of CMF and RMF to include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them using techniques to better support and measure community and problem-solving policing efforts. | NA | NA | Partial | No |
| | **Notes:** The MT observes every RMF and CMF and found that the meetings have shown progress with the usage of data, examination of trends, probing of responses, and expectations for follow-up to be conducted. Each of those activities needs to be further developed to reach compliance. Other areas needing further development include the identification and prioritization of community expectations, addressing those via community policing and problem-solving strategies, routinely assessing intended and unintended consequences of strategies employed, and ensuring follow-up is conducted on matters discussed in previous meetings, with time to discuss outcomes, lessons learned, and improvements to implement. | | | | |
| 91 | Complete annual reports on the impact of community engagement efforts, identifying successes, obstacles, and recommendations for future improvement in order to continually improve police–community partnerships. | NA | NA | Yes | No |
| | **Notes:** The MT and DOJ provided feedback on drafts of the 2021 LASD Community Engagement Report and have approved it for publishing. | | | | |
| 92 | Seek community assistance in disseminating SA. | NA | NA | Yes | Yes |
| 93 | Support and work with CACs to help them meet their mission to leverage the insights and expertise of the community to address policing concerns, including, but not limited to, racial or ethnic profiling and access to law enforcement services, and to promote greater transparency and public understanding of LASD. | Yes 9/27/14 2/11/15 | NA | Yes | No |
| | **Notes**: The Department continues to support and work with the CACs but must make improvements to remain in compliance and to ensure the CACs effectively function in the manner envisioned by the SA. LASD needs to improve its outreach for representation on the CACs and for meeting attendance. LASD and the CACs need to improve their documentation of issues, concerns, and problems identified during community outreach efforts and to track those concerns over time. Monthly CAC meetings should include time dedicated to discussion of these issues and meeting minutes should document LASD's responses, with follow-up on outcomes and lessons learned in subsequent meetings. | | | | |

| Table 5 Community Engagement Compliance Status | | | | | |
|---|---|---|---|---|---|
| **SA Paragraph** | **Summary of SA Requirements** | **Compliance** | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **94** | Memorialize CACs and facilitate quarterly meetings. | Yes 02/11/15 | NA | Yes 02/11/15 | Yes |
| | **Notes:** See the notes for Paragraph 93 for the MT's expectations of improved documentation of the CAC meetings and communications with Department between meetings. Also, in the next reporting period the stations will need to put greater effort into ensuring youth representation on the CACs. | | | | |
| **95** | Post CAC reports on LASD-AV website and respond to recommendations. | NA | NA | Partial | No |
| | **Notes:** The MT has posted most CAC reports on their website, but in past reporting periods, the Department's responses to those reports were not posted. | | | | |
| **96** | Provide administrative support and meeting space for CACs. | Yes | NA | Yes | Yes |
| **97** | Ensure CACs have no access to non-public information. | Yes | NA | Yes | Yes |
| **98** | Assist the Monitors in annual Community Survey. | NA | NA | Yes | Yes |
| **99** | Cooperate with independent researcher in conducting annual Community Survey and Deputy Survey. | NA | NA | Yes | Yes |
| **100** | Cooperate with administration of the annual Community Survey and focus groups. | NA | NA | Yes | Yes |
| **101** | Post annual Community Survey report on LASD-AV website. | NA | NA | Yes | Yes |

Notes:

- Training is monitored in Paragraph 89.
- See Appendix D for more details on work completed, compliance status, and work remaining for each paragraph.

**G. Use of Force**

1. <u>Progress on Department Priorities in This Reporting Period</u>

The UOF-related tasks that LASD chose to prioritize in this reporting period were:

- SA-Compliant UOF Policy
- SA-Compliant UOF Training
- Continued EFRCs
- Division Order on BWC Review by Managers
- UOF Data Analysis

Unfortunately, the UOF policy, training, and data analysis remain out of compliance. The Parties and MT exchanged comments on the UOF policy, but no progress was made on training and analysis. The Department continues to hold EFRCs for Category 3 uses of force but remains out of compliance for SA Paragraph 114. The Parties and MT had fruitful discussions on the Division Order, and it was published.[15]

a. *Use-of-Force Policy—SA Preface*

- *The Department is out of compliance on its UOF policy.*

Following multiple exchanges of drafts and related discussions over the past three years, the Parties and MT continued to discuss the Department's UOF policy during this reporting period.[16] LASD has failed to update the UOF policy in alignment with the SA to date. As we have previously reported, in April 2019, DOJ, the Monitors, and LASD representatives reached a tentative agreement on an updated UOF policy. However, the Department's executive management team was unresponsive to that version, and it was never approved by the Department. Subsequent versions of the policy submitted by the Department did not contain all the previously tentatively agreed-upon text, and some of those same areas remain unresolved today.

Another reason progress toward compliance on policies and other SA requirements can be drawn out is when the Parties have disagreements on particular subject matter. The Monitors believe the involvement of the Court, which we have been requesting for some time, would help resolve some of these disputes more quickly, as long as the Department makes every effort to produce carefully considered drafts that address all relevant SA requirements and that address all the MT and DOJ feedback previously provided so that any points of disagreement can be

---

[15] Please see Appendix D—Complaints and the 14th Semi-Annual Report at our website for description of work history and more details on status of each paragraph. MT website: http://www.antelopevalleysettlementmonitoring.info/

[16] SA Paragraph 160 describes the process for policy approval.

promptly identified and given the attention needed.

On July 22, 2022, Monitors and the DOJ received from County Counsel the Department's response to its comments on the latest draft UOF policy. On August 6, 2022, the parties virtually met and discussed the Department's policy and the remaining concerns of the MT and DOJ. Several more meetings with the Department, Monitoring Team, and DOJ occurred over the next few months, the last of which was on November 21, 2022. Unfortunately, seven significant aspects of the policy remain unresolved:

1.  The Department's policy for the investigation, review, and adjudication of uses of force involving the intentional pointing of a firearm by deputies;

2.  The definition of proportionality and how that can affect a deputy's duty to intervene if they witness excessive force by another deputy;

3.  The guidance regarding de-escalation and force reduction principles;

4.  DOJ's position that the Department include the definition of "Necessary Force" to non-lethal uses of force;

5.  The definition of "totality of the circumstances";

6.  The definition of improvised weapons and techniques, and the categorization, investigation, and adjudication of deputies' uses of force that involve the use of improved weapons and/or improvised techniques; and

7.  Department members may display a drawn firearm if they reasonably believe it will help establish or maintain control in a potentially dangerous situation.

In November 2022, the Department indicated that the soonest it could provide the MT and DOJ the next draft use-of-force policy would be February 16, 2023. The Department has also indicated it would now prioritize the related TASER policy, which the DOJ and MT last provided feedback on in May 2022.

b.  *Use-of-Force Training – SA Paragraphs 119a–e*

- *The Department is out of compliance on its UOF training.*

Since early 2021, LASD has been working to revise its UOF training to meet SA requirements for Paragraph 119a–e. The MT and DOJ have reviewed several iterations of the curriculum, observed trainings, and given feedback to the Department.[17] In our last six-month report, the Department

---

[17] SA Paragraph 160 describes the process for training approval. See also Appendix D.

indicated it would soon provide a newly revised curriculum and that intention was reiterated during this reporting period. The Department did not meet this goal. The Department has set a new goal to provide an updated training draft in February 2023.

In previous reports, the MT and DOJ review of the current UOF training identified a number of significant problems including but not limited to inadequate emphasis on the de-escalation of tense and evolving incidents with the goal of resolving those incidents without having to resort to the UOF.

Also, LASD has not developed training that would achieve compliance with SA Paragraph 119f, deputy tactics training, and 119g, mandated annual supervisory UOF investigation training. LASD intends to submit a training for compliance assessment in May 2023.

c.  *Executive Force Review Committee (EFRC) Reviews*

- *The Department remains out of compliance with the SA requirement that the EFRC review the most serious uses of force for "any policy, training or tactical concerns and/or violations."*

EFRCs are composed of three area commanders, one of whom is designated as the chairperson by the Professional Standards Division Chief. EFRCs are held to evaluate the most serious uses of force (Category 3).[18] During this reporting period, the MT assessed three EFRCs that addressed a deputy-involved shooting, a use of force resulting in serious injury, and a use of force involving an in-custody death. In these reviews, the Department executives' questions were more probing than in the past, and they did identify some violations and other concerns, but they failed to adequately identify or address several serious violations of Department policy, including the failure to acquire a target before shooting in one case and the pointing of a firearm when the subject did not present an imminent threat in another case. The EFRC also did not raise concerns about important procedural issues such as trainees working in the field without the supervision of a Field Training Officer and a sergeant giving ambiguous instructions.

Additionally, the effectiveness of one EFRC was deeply impaired by the fact that it was held almost five years after the incident. This was because the Internal Affairs Bureau (IAB) does not investigate a case until any associated district attorney criminal investigation of deputy conduct is resolved. Four years after the incident involving this in-custody death, the district attorney's office issued their finding that the deputies used reasonable force and were not criminally responsible for the death. At that time, IAB began its own investigation, but one of the two deputies was no longer working for the Department and did not respond to repeated requests

---

[18] Category 3 uses of force involve the most significant types of force, including deputy-involved shootings, skeletal fractures, and/or force resulting in significant injury. They are investigated, reviewed, and adjudicated with a different process than Category 1 and 2 uses of force. EFRCs are held to evaluate Category 3 but not Category 1 or 2 force. (Technically, EFRCs are held to evaluate every shooting and force incident wherein the activation of an IAB Force/Shooting Response Team is required to investigate the use of force.)

for an IAB interview. The other involved deputy, the sergeant, and several key witnesses had understandable difficulty recalling specifics for the event. The EFRC eventually recommended disciplinary action in the case; however, corrective action taken five years after the incident eliminates its effectiveness and is grossly unfair to the involved parties. As we have discussed in MT audits and previous EFRC reviews, these kinds of lengthy delays critically compromise, if not totally prevent, the Department's ability to conduct thorough, SA-compliant investigations and, when warranted, administer discipline or make necessary changes to policy or training in a timely manner. The vast majority of law enforcement agencies in California do not have such lengthy delays in adjudicating cases like this. The MT recommends that IAB conduct its investigation concurrent with the criminal investigation. This would allow for a timely administrative review and appropriate corrective actions to be undertaken without unnecessary delay.[19]

i.   *UOF Case Reviews*

During this reporting period, DOJ presented in-depth UOF case reviews, including BWC footage, of a number of cases for discussion with LASD managers. The cases stemmed from deputies listed in the quarterly reports produced by the AV stations.[20] The case reviews found, as has each MT UOF audit and our EFRC reviews, failures on the part of investigators and managers, including executive managers, to identify important issues, including clear allegations of misconduct, and apply corrective action.[21] Included in the review were cases where LASD policy was violated—sometimes multiple times in the same event—but those violations were not identified or addressed by either the investigators or senior LASD management as required by the SA. The violations included missed opportunities for de-escalation, excessive force involving the use of pepper spray on a handcuffed subject, the out-of-policy pointing of a firearm, and others. The cases also highlighted a need for the Department to re-emphasize and/or increase its training in Procedural Justice (SA Paragraphs 42, 57e, 70i, and 71) and on its BWC activation policies. The DOJ presented multiple incidents in which traffic stops quicky escalated to UOF incidents.

These findings highlight once again the crucial need to have in place an SA-compliant and implemented UOF policy and training in the use of force, de-escalation techniques, and comprehensive requirements governing the investigation, review and management adjudication of force incidents. Along with the implementation of new policy and training, there needs to be

---

[19] This was an opportune case for the EFRC to raise concerns at the executive level about the need to correct the harmful effects of the 1991 Gates/Johnson Settlement Agreement with ALADS and how this negatively impacts employees and the agency due to the ongoing failures in bringing timely resolution on administrative investigations because these cases are delayed for years.

[20] See the Accountability section for further discussion of the DOJ UOF case reviews and of the quarterly reports.

[21] At the time of the last MT UOF audit in July 2021, body-worn camera (BWC) footage, which can provide a much more robust understanding of what occurred in the field, was not available. Future MT audits will include BWC review.

a stronger commitment on the part of LASD executives to (1) provide deputies with the training and guidance they need and to then hold them accountable for subsequent policy violations, and (2) hold supervisors and managers accountable for the thorough investigation, review, and adjudication of uses of force.

On November 30, 2022, DOJ sent a follow-up email to the Department identifying specific remedies the Department should implement in order to address the issues raised in the case reviews, to wit:

1. LASD Policy Must Include Pointing a Firearm as a Reportable Use of Force;

2. Provide Additional Training on Procedural Justice;

3. Provide Additional Training on De-Escalation and Force Decision-Making;

4. Provide Additional Training on Waiting for Backup;

5. Body-Worn Camera Policy Should Require Activation Upon Dispatch or Development of Reasonable Articulable Suspicion; and

6. Ensure Accountability Through Supervisory Review of Use-of-Force Incidents.

In a reply to DOJ, County Counsel indicated the Department was amenable to DOJ's list of remedies. The MT expects the Department to accomplish those objectives in 2023 and will request status updates on the Department's efforts in this regard in the next reporting period.


*d.  Divisional Directive Regarding Manager Review of BWC Footage for Category 2 Force Incidents*

During the previous reporting period, North Patrol Division (NPD) management requested MT and DOJ feedback on a draft of a Central Patrol Division order which NPD was considering mirroring for its personnel. The Parties and MT had fruitful discussions on the order and agreed that the final version would be circulated in the NPD, which occurred as of Sept 15, 2022. The MT appreciates the proactive outreach from the NPD Chief to the MT to review the CPD before it was distributed in the Antelope Valley.


*e.  LASD Use-of-Force Data Analysis: SA Paragraphs 120-123*

- *The Department is out of compliance on its UOF analysis.*

In this reporting period, the Department intended to prioritize the production of the first of its annual analyses of use-of-force data, but in November 2022, they informed us they will instead provide the first draft of their report in June 2023. They also intend to provide the draft of their

second annual UOF analysis in October 2023.


2.  Obstacles and Successes

For seven and a half years, LASD has failed to develop and publish a UOF policy and related training that satisfies SA mandates. This failure reduces the preparedness of deputies during stressful encounters and their ability to successfully resolve those tense and evolving situations without having to resort to force, and when that is not possible, to tactically resolve those incidents using lower levels of force. It is inevitable that the types of tactical errors, policy violations, and inadequate investigations found in the MT's EFRC reviews, MT audits, and DOJ's UOF case reviews will continue without clear guidance to deputies and managers through policy and training. The Department owes its deputies, and the communities they serve, the very best integrated UOF policy and training, which should include effective communications, assessments, de-escalation, and tactics. Research has shown that integrated de-escalation and UOF training can lower the number of UOF incidents by up to 26% and lower injuries to law enforcement officers by up to 36%.[22] Our audits have also documented that the Department has failed to adequately train sergeants in how to competently investigate the UOF by deputies; watch commanders in how to review UOF investigations; and management in how to adjudicate those investigations.[23] This continual managerial carelessness in achieving compliance with the SA's UOF requirements is critical and must be addressed with a sense of urgency.


3.  Next Steps

LASD has stated its UOF-related goals for 2023 include the following.

- The Department will produce new versions of its UOF and Taser policies.

- The Department will produce the next version of its UOF training, both for the use of force in the field and its investigation by Department managers.

- The Department will produce its first and second annual analyses of UOF data.

The Department also needs to provide the MT and DOJ updates on any corrective action taken in response to DOJ's requests related to the UOF case reviews it presented at the November 2022 site visit. These should include the following.

---

[22] https://www.uc.edu/news/articles/2022/01/police-training-reduces-certain-incidents-study-says.html

[23] MT website: http://www.antelopevalleysettlementmonitoring.info/

- Departmental review of other law enforcement agencies' policies and procedures associated with the investigation and review of deputies intentional pointing of a firearm and will publish an updated policy and develop and deliver associated training.

- Enhanced or additional training on Procedural Justice.

- Departmental evaluation of additional de-escalation training.

- Departmental evaluation of the development of an annual refresher UOF training course for its supervisors that includes conducting through UOF investigations.

The Parties and MT will discuss the methodology for the MT's next UOF audit, and then we will conduct that work. The scheduling of a UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be reached on a revised Department UOF policy and associated training. Although that has not occurred, Monitors will submit an audit work plan to the parties in the first quarter of 2023, with the audit work to begin as soon as the audit sample, including body-worn camera recordings, is provided to the audit team. The Parties and MT will decide which uses of force—non-categorized force (NCI), Category 1, Category 2, and/or Category 3—will be addressed in each MT audit.[24] In addition, the MT will verify attendance at UOF trainings once they are approved and implemented.

4.   UOF Compliance Status Table

Table 6 provides the compliance status for each paragraph in the UOF section. (See Appendix D for more detailed information about the status of each paragraph.)

---

[24] In 2018, Category 1 force was split into two categories: non-categorized force incidents (NCIs) and Category 1; the definition of Category 1 remained the same, except that the lowest levels of force were now categorized as NCI. The MT's first Category 1 and 2 audit (2018) was conducted before this change. The second MT Category 1 and 2 audit (2021) addresses NCIs and Category 1 force separately.

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **Table 6** | | | | | |
| **Use-of-Force Compliance Status** | | | | | |
| **102, 104, 105** | LASD to revise use-of-force policy. | No | No | Cat 1 and 2: Yes Cat 3: No | No |
| | **Notes:** DOJ's targeted case reviews provide evidence that LASD is not in compliance with several UOF provisions. MT will conduct a UOF audit that has available BWC footage to assess. | | | | |
| **103** | Use de-escalation techniques before resorting to force and reduce force as resistance decreases. | No | No | Cat 1 and 2: Yes Cat 3: No | No |
| | **Notes:** See notes for Paragraphs 102, 104, 105. | | | | |
| **106g** | Prohibit using force on a person legally recording an incident. | No | No | Cat 1 and 2: Yes Cat 3: Yes | No |
| **107** | Prohibit head strike with impact weapon unless deadly force is justified, and report unintentional head strikes | No | No | Cat 1 and 2: Yes Cat 3: Yes | No |
| **108** | Deputies will report force incidents. | No | No | Cat 1 and 2: Yes Cat 3: Yes | No |
| **109** | UOF reports will be without boilerplate language, and deputies held accountable for omissions or inaccuracies. | No | No | Cat 1 and 2: Yes Cat 3: No | No |
| **110** | Deputies will notify supervisors immediately of the use of force. | No | No | Cat 1 and 2: Yes Cat 3: Yes | No |
| **111a–d** | Perform thorough UOF investigations. | No | No | Cat 1 and 2: No Cat 3: Yes | No |
| | **Notes:** See notes for Paragraphs 102, 104, 105. | | | | |
| **111e** | Supervisors will thoroughly review deputies' UOF reports. | No | No | Cat 1 and 2: No Cat 3: No | No |
| | **Notes:** See notes for Paragraphs 102, 104, 105. | | | | |
| **112a** | Supervisors will thoroughly report their independent review of UOFincidents. | No | No | Cat 1 and 2: No Cat 3: Yes | No |
| | **Notes:** See notes for Paragraphs 102, 104, 105. | | | | |

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **112b–e** | Supervisor's UOF investigation reports will be complete. | No | No | Cat 1 and 2: No Cat 3: Yes | No |
| **113** | Management will review thoroughness of UOF investigations. | No | No | Cat 1 and 2: No Cat 3: No | No |
| | **Notes:** See notes for Paragraphs 102, 104, 105. | | | | |
| **114** | Executive Force Review Board will thoroughly review Category 3 force. | Yes | Yes | Cat 1 and 2: NA Cat 3: No | No |
| | **Notes:** LASD has policies in place for the EFRC review process. Paragraph 114 was not in implementation compliance for the Category 3 audit. (Paragraph 114 does not apply to Category 1 or 2 uses of force.) Ongoing reviews of EFRC processes have shown an improvement, but the Department remains out of compliance pending a compliance audit which is under discussion with the parties. | | | | |
| **115** | Deputies held accountable for force that violates policy. | No | No | Cat 1 and 2: No Cat 3: No | No |
| | **Notes:** See notes for Paragraphs 102, 104, 105. | | | | |
| **116** | Supervisors held accountable for inadequate investigation. | No | No | Cat 1 and 2: No Cat 3: No | No |
| | **Notes:** DOJ's targeted case reviews provide evidence that LASD is not in compliance with several UOF provisions. The MT will conduct a UOF audit that has available BWC footage to assess. Paragraph 116 was not in compliance for the second Category 1 and 2 audit or the Category 3 audit. In the first Category 1 and 2 audit, the MT was unable to determine compliance. | | | | |
| **117** | AV commanders identify and curb problematic UOF trends. | NA | UTD | Cat 1 and 2: No Cat 3: No | No |
| | **Notes:** DOJ's targeted case reviews provide evidence that LASD is not in compliance with several UOF provisions. MT will conduct a UOF audit that has available BWC footage to assess. The MT has attended several RMF meetings, which review uses of force, including deputy-involved shootings and unintentional discharges, and other risk management issues for each command. The Monitors are unable to make a determination as to compliance with Paragraph 117 at this time pending our formal review of the RMF process and the establishment of a compliance metric by the Parties. | | | | |

*(Table 6 — Use-of-Force Compliance Status)*

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **118** | LASD and AV unit commanders will regularly review and track "training and tactical reviews." | Yes | No | Cat 1 and 2: No<br>Cat 3: No | No |
| | **Notes:** The Parties and the MT have not agreed to a compliance metric for this paragraph. The MT has not found indication that informal supervisory feedback was replacing the need for formal discipline, but all three audits found that LASD data systems were not able to store the training and tactical review section of UOF reports. The Department has previously reported it has developed a plan for tracking this information; however, as of the submission of this report it has not been provided to the Monitors. | | | | |
| **119** | Updated UOF training is provided. | No | No | No | No |
| | **Notes:** Since early 2021, LASD has been working to revise the UOF training to meet SA requirements for Paragraph 119a–e. The MT and DOJ have reviewed iterations of the curriculum, observed trainings, and given feedback to the Department. The Department did not achieve its goal of submitting a new draft of the 119-a–e curriculum for review in this reporting period. The Department has set a new goal to provide an updated training draft in February 2023. The Department also intends to submit draft training materials for 119f–g in May 2023. | | | | |
| **120–123** | LASD to produce annual management analysis and public report on UOF data and trends. | NA | NA | No | No |
| | **Notes:** The Department did not meet its goal to submit its first UOF analysis report by November 2022. The Department has set a new goal to provide an initial report in June 2023. The Department also intends to submit a draft work plan for a second UOF analysis in October 2023. Once that plan is approved, the Department will conduct the analysis and submit a full report that, once determined to be SA-compliant, will be made available to the public. | | | | |

**Table 6**

**Use-of-Force Compliance Status**

Notes:

- The MT has done two audits of the lesser uses of force (Categories 1 and 2) and one audit of the most serious use of force (Category 3).
  - » 1st Category 1 and 2 Audit: October 2018
  - » 2nd Category 1 and 2 Audit: July 2021
  - » 1st Category 3 Audit: November 2019

- In 2018, Category 1 force was split into two categories: non-categorized force incidents (NCIs) and Category 1; the definition of Category 1 remained the same except that the lowest levels of force were now categorized as NCI. The MT's first Category 1 and 2 audit (2018) was conducted before this change. The second MT Category 1 and 2 audit (2021) addresses NCIs and Category 1 separately but combine them in determinations of compliance.
- Any reference to Category 1 in this semi-annual report includes NCI.
- The existing UOF policy addresses many of the SA requirements, but policy compliance is based on the Department having an MT and DOJ approved policy in place.
- Training is monitored in Paragraph 119
- See Appendix D for more details on work completed, compliance status, and work remaining for each paragraph.
- .

## H.  Personnel Complaint Review

1.  <u>Progress on Department Priorities in This Reporting Period</u>

LASD's complaints-related priorities for this reporting period[25] were to achieve significant progress in the following areas by the end of 2022:

- Service Comment Review (SCR) Handbook
- Manual of Policies and Procedures (MPP) Section on Complaints
- Administrative Investigations (AI) Handbook

The SCR Handbook, MPP, and AI Handbook govern the intake, investigation, and adjudication of complaints for the Department.[26] As described below, the SCR Handbook was given conditional approval in November 2021, with a revised conditional version approved in August 2022, but the MPP and AI Handbook remain out of compliance.

*a.    SCR Handbook*

- *The SCR Handbook was approved by the MT and DOJ and is currently pending publication and implementation.*

A version of the SCR Handbook was approved by the Monitors and DOJ on November 3, 2021, on the condition by DOJ that the Parties will revisit any structural concerns identified and revise SCR policies and the SCR Handbook should future Monitor audits reveal that LASD is out of compliance with the SA's requirements. Department representatives subsequently indicated additional changes were required and committed to submission of a revised draft by June 30, 2022. They did not make that date, but a draft was submitted August 9, 2022. DOJ approved the draft on August 23, 2022, as did the Monitors on August 24, 2022. At that time, a decision was made to hold off publishing the handbook until the related MPP sections and AI Handbook were finalized so all three could be published concurrently. The three documents address similar issues and contain overlapping material that would best be addressed through simultaneous training.

---

[25] Please see Appendix D—Complaints and the 14th Semi-Annual Report at our website for description of work history and more details on status of each paragraph. http://www.antelopevalleysettlementmonitoring.info/

[26] SA Paragraph 127 requires that the Department revise its complaint-related policies, including the SCR Handbook, MPP 3-04, and IAB policy manuals, to ensure they are complete, clear, and consistent. When the SCR Handbook, MPP, and AI Handbook are finally published, in addition to meeting SA requirements, it will bring the Department's classification of complaints into compliance with California Penal Code section 832.5 and will facilitate compliance with PC 13012.

*b.   Department Manual of Policies and Procedures (MPP)*

- *The MPP remains out of compliance.*

On August 12, 2022, the Department submitted its latest draft of the MPP section on complaints. The Monitoring Team reviewed that draft and found it to be inconsistent with the procedures agreed to in the SCR Handbook. Most notably, the classification of complaints (e.g., sustained, not sustained, exonerated and unfounded) was inconsistent with both the definitions agreed upon for the SCR Handbook and the language in the California Penal Code. Several other critical issues of concern were identified, including the standard to assess witness credibility and the use of a preponderance of evidence for complaint dispositions. The Monitors returned the draft to the Department on August 29, 2022, with those observations and other comments pointing out a lack of clarity and/or a lack of consistency. LASD circulated revisions on November 28, 2022. DOJ provided comments on December 9 and the Monitors provided comments on December 14, 2022.

*c.   Administrative Investigations Handbook*

- *The AI Handbook remains out of compliance.*

The Department submitted a revised version of the AI Handbook on October 27, 2022. The MT reviewed the draft and found the same critical flaws as the draft MPP section; that is, it was not consistent with the certain key areas of the already-approved SCR Handbook, such as those involving complaint classifications, standards for assessing credibility, and using a preponderance of evidence to adjudicate complaints. Additionally, the new draft AI Handbook did not, as required by SA Paragraph 129, "clarify and strengthen" its policies regarding which cases require an administrative investigation and which cases must be handled by IAB rather than at the unit level. Administrative investigations address the more serious cases that may lead to disciplinary action, so it is crucial the Department comply with this requirement. On November 10, 2022, the MT returned the draft to the Department with our concerns documented. DOJ provided comments regarding the AI Handbook on November 25, 2022.

2.   <u>Status of Other Complaints-Related Work</u>

Not included in the Department's list of priorities for this reporting period was conducting the internal complaints audits required by SA Paragraph 140. Also not prioritized were publishing the SCR Handbook and developing and implementing training on the SCR Handbook. These tasks will await finalization of the other complaints policies. 0. Each of these important objectives therefore remain incomplete and out of compliance.

3. <u>Obstacles and Successes</u>

The Department continues to struggle with a slow pace of revisions and, even after DOJ and MT approval, the slow pace of internal approvals and publication of these crucial policies. These delays have cascading effects: delays in finalizing the SCR Handbook delayed revisions to the MPP and AI Handbook; development of training cannot be completed without approved policies in place; and MT auditing to determine SA-compliance requires all of those pieces to be in place in order to assess if their intended outcomes are being met.

Once the policies are approved and implemented, the Department must develop and implement training on those new policies. After the policy and training have been given sufficient time to become regular practice in the field, the Monitors will then be able to conduct a thorough assessment of compliance. As it currently stands, the Department remains in only partial compliance with the Complaints section of the SA.

The Monitors note that, while the new policies and training are critical, the bottom line is that Department managers must be accountable for any failure within their commands to ensure public complaints are willingly accepted, adequately investigated, and fairly adjudicated and for ensuring personnel who commit misconduct are held accountable for their actions. These fundamental requirements are the responsibility of any law enforcement agency, not just those subject to a settlement agreement. Prior MT audits have found the Department <u>not</u> in compliance with those basic requirements.


4. <u>Next Steps</u>

On November 11, 2022, the Department provided the Monitor with a list of priorities for the next reporting period and expected due dates. For complaints, that included:

- *Update/finalize the Manual of Policies and Procedures (MPP)* —December 15, 2022

- *Finalize the Administrative Investigations (AI) Handbook*—January 27, 2023

- *Submit draft training materials on the new complaint policies and procedures—April 20, 2023*

- *LASD AAB complaints audit work plans (both stations)*—January 6, 2023

The MT strongly encourages the Department to expedite development of training on the new complaint policies. Already extraordinarily delayed, the new plan for submitting draft training curriculum is 1½ years after the Monitor and DOJ approved the SCR Handbook. And meeting that schedule is based on an assumption the Department will meet its own deadlines for publishing these policies, which thus far has not occurred.

The Department has indicated the AAB will produce two audits of public complaints in 2023 (one for each station) and will submit work plans for MT and DOJ review in January. The MT also reminds the Department that, for an audit to meet SA compliance, the MT and DOJ need to review and approve an audit plan prior to the work being conducted. As reported in the Stops section, the Department has reported it will also produce two detentions audits in the next reporting period.

The Parties and MT will meet to establish a timeline for the next MT audit of complaints. Generally, we allow sufficient time for an organization to implement and train its personnel on a new procedure before auditing compliance. However, in this case an earlier audit may be possible. While the revised standards for handling public complaints will be new to the rest of the Department, most of these requirements were implemented in the AV through a Divisional Order issued several years ago. Complaint classifications will be new, but we can take that into consideration in our audit findings.

5. <u>Personnel Complaints Compliance Status</u>

Table 7 provides the compliance status for each paragraph in the Complaints section. (See Appendix D for more detailed information about the status of each paragraph.)

| Table 7 | | | | | |
|---------|---|---|---|---|---|
| **Personnel Complaint Review Compliance Status** | | | | | |
| **SA Paragraph** | **Summary of SA Requirement** | **Compliance** | | | |
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **Preface** | Complaints are fully and fairly investigated and personnel are held accountable. | Partial | Partial | No | No |
| | **Notes:** The preface was not in compliance on either audit. | | | | |
| **124** | Public has access to complaint forms and information. | Partial | Partial | Partial | No |
| | **Notes:** LASD was not in compliance for the first audit, and the MT was unable to assess compliance in the second audit due to COVID-19 restrictions. During a site visit this reporting period, the MT documented that complaint forms were available in six of seven locations. Our third audit is on hold pending publication of the SCR Handbook., | | | | |
| **125** | Accept all complaints. | Partial | Partial | No | No |
| | LEP language assistance. | Partial | Partial | Partial | No |
| | **Notes:** LASD was not in compliance with regard to accepting all complaints in either audit. The requirement for providing language assistance was not in compliance for the first audit but was in compliance for the second audit. | | | | |
| **126** | Impeding the filing of a complaint is grounds for discipline. | Partial | Partial | UTD | No |
| | **Notes:** The Department was not in compliance for the first audit. In the second audit, the MT identified no complaints that alleged a complainant was impeded, and we were unable to determine compliance. Should no such cases arise in the next audit, the Parties and MT will discuss how to proceed with compliance assessment. Training for this area is monitored in Paragraphs 138–139. | | | | |
| **127** | Revise MPP, SCR, and IAB manual so they are complete, clear, and consistent.* | No | No | No | No |
| | **Notes:** The Monitors and DOJ authorized the Department to move forward with the revised SCR Handbook on November 3, 2021, but the Department did not publish it. Additional minor changes to the handbook were conditionally approved by DOJ and MT in August 2022. The Department has since indicated it wants to publish all three policies simultaneously. The drafts of the MPP section and the Administrative Investigations Handbook they have submitted are inconsistent with the language agreed upon in the SCR Handbook. | | | | |
| **128** | Ensure personnel complaints are not misclassified as service complaints. | Partial | Partial | No | No |
| | **Notes**: LASD was found to be in compliance for the first audit but not in compliance for the second audit. | | | | |

| Table 7 |||||||
|---|---|---|---|---|---|---|
| Personnel Complaint Review Compliance Status |||||||
| SA Paragraph | Summary of SA Requirement | Compliance ||||
| | | Policy | Training | Implementation | Sustained |
| **129** | Revise policies for allegations requiring IAB investigation and behavior requiring formal discipline. | No | No | No | No |
| | **Notes:** The Monitors and DOJ approved the draft SCR Handbook on November 3, 2021, but the Department has not published it. |||||
| **130** | Ensure each complaint is appropriately classified at outset and review. | Partial | Partial | No | No |
| | Investigate every allegation even if the complainant did not specifically articulate it. | Partial | Partial | No | No |
| | **Notes:** Not in compliance for either audit. |||||
| **131** | Investigations are as thorough as necessary to reach reliable and complete findings. | Partial | Partial | No | No |
| | **Notes:** Not in compliance for either audit. |||||
| **132** | Refer appropriate cases to IAB or Internal Criminal Investigations Bureau (ICIB). | Partial | Partial | No | No |
| | **Notes:** Compliance could not be determined in the first audit because there were no relevant cases in the audit population. There were two such cases in the second audit and neither one was referred as required. Training is monitored in Paragraphs 138–139. |||||
| **133** | Investigation conducted by uninvolved supervisor. | Partial | Partial | Yes 12/15/20 | No |
| | **Notes:** Not in compliance in the first audit but in compliance in the second audit. |||||
| **134** | Identify all persons at scene. | Partial | Partial | Yes 12/15/20 | No |
| | **Notes:** In compliance for both audits. Training is monitored in Paragraphs 138–139. |||||
| **135** | Obtain a full statement from all persons at scene. | Partial | Partial | No | No |
| | **Notes:** In compliance in the first audit but not in compliance in the second audit. |||||
| **136** | Investigator interviews complainant in person or gives justification. | UTD | UTD | UTD | No |
| | **Notes:** In our second audit, we were unable to determine compliance, and a discussion is pending with the Parties about our recommendation that the investigator be allowed to rely on the intake interview providing it addresses the key issues. |||||

| Table 7 |||||||
|---|---|---|---|---|---|---|
| **Personnel Complaint Review Compliance Status** |||||||
| **SA Paragraph** | **Summary of SA Requirement** | **Compliance** |||||
| | | **Policy** | **Training** | **Implementation** | **Sustained** ||
| **137** | Interview witnesses separately. | Partial | Partial | No | No ||
| | Use uninvolved interpreter for people with LEP. | No | No | Yes 12/15/20 | No ||
| | **Notes:** Not in compliance in either audit with regard to interviewing witnesses separately. Also, the Department was not in compliance for the first audit but was in compliance for the second audit with regard to using an uninvolved interpreter. ||||||
| **138** | Provide supervisor and deputy training on intake and investigations. | NA | Partial | Partial | No ||
| | **Notes:** Directives were issued in 2018, and watch commanders have been trained in those directives. After publishing the SCR Handbook, the MT will assess whether any changes need to be made to annual and refresher trainings and will verify that all appropriate personnel have received those trainings. ||||||
| **139** | Provide supervisor training on misconduct investigations. | NA | Partial | Partial | No ||
| | **Notes:** See Paragraph 138. ||||||
| **140** | Conduct semi-annual audit of public complaints. | NA | NA | No | No ||
| | **Notes:** The Department has produced three complaint audits in the past seven years (not the 14 required), and none of the three audits complied with the SA's requirements. The Department has indicated it will provide a Complaints audit plan for MT and DOJ review in January, 2023. ||||||

Notes:

- Complaints-related training is monitored in Paragraphs 138–139.
- See Appendix D for more details on work completed, compliance status, and work remaining for each paragraph.

\* On November 3, 2021, DOJ stated: "DOJ is willing to agree to not withhold approval of the SCR Handbook pursuant to Paragraphs 160–163 with the understanding that the Parties will revisit these structural concerns and revise SCR policies and the SCR Handbook should future Monitor audits (i.e., those after the Handbook goes into effect) reveal that LASD is out of compliance with provisions of Paragraphs 127–132." In December 2021, LASD agreed to this compromise.

## I.   Accountability

1.   <u>Progress on Department Priorities in This Reporting Period</u>

The Department did not establish any specific priorities regarding the Accountability section; however, they continued the following work:

- Quarterly reports
- Performance Mentoring Program

*a.*   *Quarterly Reports*

- *The Department's quarterly reports continue to improve, and the Department is in partial compliance with SA Paragraphs 141 and 142.*

The MT conducted detailed reviews of the quarterly reports for the fourth quarter of 2021 (see the 14th semi-annual report) and for the first quarter 2022 and provided their findings and recommendations to the Parties.

The MT found that the quarterly report process of reviewing each station's deputies and identifying those who exceed an established threshold gives managers the opportunity to review the deputies' performance as well as the supervision they receive. From that, managers can take whatever remedial action they deem necessary, such as additional training, supervision, or mentoring.

The quarterly report system has proven to be capable of identifying patterns and trends that warrant closer attention, whether for possible remedial action or to assess where and why any improvements occurred. However, the MT has encouraged the Department to significantly enhance and extend this aspect of the reports. Some of that feedback has focused on the process of gathering and aggregating the data. For example, the MT recommended separating NCI cases from the other UOF tabulations so patterns of the more significant uses of force can be more readily identified.[27] We have also noted a need for a deeper analysis of the information—examples include the following.

- The analysis of the quarterly data is narrowly focused on individual deputies rather than on identifying patterns of consequence that may be evident within and between various work groups. For example, eight of the deputies found on one station's quarterly reports are all assigned as School Resource Officers. This is a unique concentration of deputies who appear to require closer attention and

---

[27] For implementation of any change to how the quarterly reports address NCI uses of force, the Parties will need to agree to the plan and a revised unit order, to include the new thresholds for inclusion in the report for each type of force.

performance monitoring, yet they are assigned to work with youth—one of the SA's focus populations. There may very well be a logical explanation for assigning deputies who fall under the quarterly report criteria to work primarily with adolescents, but none was provided. More importantly, the concentration of deputies in this type of sensitive assignment was not noted or addressed in the management review at the station or division levels particularly in light of the OIG report regarding the SROs (see the 14th semi-annual report for discussion).

- The quarterly reports for the first quarter of 2022 reflected a significant decrease (15%) in the number of deputies listed on the reports but no management insight or assessment was provided for this striking reduction. While it is possible such a decline might be the result of closer supervision and increased management attention being devoted to addressing performance issues (which would be commendable), it is also possible this could be the result of data entry or classification errors, transfers, changes in assignment, or some other factor. No matter what the possible influences may have been, this is an example of a pattern that should have been noted and commented upon during the review process.

The MT also identified recordation errors and inconsistencies in the quarterly reports. We encouraged the stations to take extra steps to review the reports and to record any issues with source data. The MT notes that, given the lack of automated systems for producing the data and analyses in the reports, the process relies on station personnel to collect and tabulate the information from multiple primary sources—a process that is both time consuming and prone to error, despite the committed effort of staff.

The most important issue regarding accuracy and reliability stems from the source data upon which the quarterly reports are based. When the source data are unreliable, the quarterly reports are unreliable as well, impacting the conclusions drawn and contributing to failures among managers to recognize and address performance deficiencies and other risk issues.[28] In our review of the quarterly reports and in our UOF and complaints audits, the MT has described PRMS reliability issues that impacted the reliability of those reviews. Serious reliability issues—as well as broader issues with the Department's accountability processes—were further demonstrated by the DOJ's review of case files for a number of deputies appearing on recent quarterly reports. These reviews are described in the UOF section and are summarized here.

---

[28] The information and conclusions from various investigative reports (e.g., reports for UOF and complaints) are entered into PRMS. In turn, PRMS is the main source of information for the quarterly reports along with other sources for some subject areas like deputy CAD data entry (DDWS), obstruction arrests, and community engagement. The quarterly reports can only be as reliable as those other sources.

*b. Quarterly Report UOF Case reviews*

In the last reporting period, we reported conducting a "spot audit" of 11 use-of-force reports cited in the fourth-quarter 2021 report. That review showed that in one of those reports, the watch commander wrote that the force used was "out of policy," but the captain changed it to training rather than disciplining the deputy for violating the Department's use-of-force policy. To compound matters, that use of force was erroneously shown on the Quarterly Report as having "no issues."

The misclassification of force incidents arose again in this reporting period as the result of DOJ's in-depth review of 12 UOF incidents included in the reports for the third- and fourth-quarters of 2021. Those incidents involved nine deputies (four in Lancaster; five in Palmdale). The findings from these reviews were greatly concerning, particularly because of patterns of deficiencies in critical thinking and thoroughness by management during their reviews and approval processes. A few of the most striking cases included the following.

- In two cases, the deputies' BWCs clearly showed the force used was unnecessary and/or excessive; yet, in both cases the Unit Commander found the force to be consistent with Department policy and the Division Commander concurred with that finding.

- In one of those two cases, the reporting supervisor hypothesized that the deputy may have experienced "stress induced time distortion" and cited that as a rationalization for the deputy spraying the subject with oleoresin capsicum (OC) four separate times from about a foot away into the face of a handcuffed 50-year-old man who was already secured in the back seat of a patrol vehicle. That explanation as well as the force used should have been challenged at multiple levels during the review of the case.

Taken together, the MT and DOJ reviews of LASD's quarterly reports and the case information on which the quarterly reports are built indicate that the reports are not being used in a sufficient or reliable manner, and the managerial reviews of these reports are also insufficient. The monitors do not expect deputies' behavior to be perfect, nor do we expect the quarterly reports to be perfect. However, managers should be required to identify and correct obvious mistakes. That is not happening on a reliable basis. The MT has determined that LASD is in partial compliance on these provisions because of the hard work that goes into aggregating all the information. Full compliance can only be achieved once LASD is reliably and consistently using this information to identify and correct mistakes or deficiencies. These failings indicate a need for remedial steps to be taken regarding the performance deficiencies found among deputies, supervisors, and station managers as well as possible changes needed in policy or training.

c.   *Performance Mentoring Program*

- *The Department is in partial compliance with SA Paragraphs 144 and 145.*

The Performance Mentoring Program (PMP) has been operational for several years and is
guided by two handbooks: one for Unit level PMP and the other for Department level PMP. The
MT has developed a three-phase workplan to review PMP's compliance with SA Paragraphs 144
and 145, and that plan has been agreed to by the Parties. The first phase consists of reviewing
the two handbooks to identify the key components of each and then assessing their
compatibility with one another and their compliance with the SA's requirements. From that
initial review, we will develop a workplan for the second phase, which is a review of the AV
Stations' PMP use. This will be followed by a third phase or stage, which involves a review of the
Department PMP. We intend to have the PMP review completed in the next reporting period.


2.   Status of Other Accountability-Related Work

This section describes work completed and compliance status for some of the important SA
provisions that were not among LASD's prioritized work described above. See also Appendix D
for detailed descriptions of status for every SA paragraph.


3.   Obstacles and Successes

As has been a theme through each of our semi-annual reports, there are continuing signs and
evidence that management has not been sufficiently attentive to information that is at their
disposal. The lack of thorough and consistent management reviews has been evidenced in the
quarterly reports as well as in other important risk management spheres, including the
investigation and adjudication of uses of force—such as in the EFRCs—and complaints. While
the quarterly report process can provide managers with insightful information on the
performance and quality of service being provided by their deputies and work groups, this is
wholly dependent on the reports containing reliable data and thorough assessments, which the
MT has found to be insufficient on both fronts. Devoting more funding to developing a reliable,
automated early warning system (see below) will be helpful in many ways—including saving
time and reducing the unavoidable human error involved when reports are completed
essentially "by hand" as quarterly reports are—but it will not in itself compensate for managers
misclassifying incidents as "consistent with Department standards" when those incidents involve
egregious tactics and questionable, if not out of policy, uses of force. NPD managers—
commanders and above—must hold captains accountable for those obfuscations and ensure
deficiencies are identified and corrected. Identifying deputies who engage in substandard
behavior and the supervisors who allow it are responsibilities that require increased attention
and follow-up by station and NPD management. LASD needs to prioritize accountability,
because identifying and remediating problematic deputy behavior benefits not only the
community but the deputy themself by giving them the guidance and training they need to

safely and effectively serve the community. Further, tracking and responding to issues includes considering whether changes are needed to be made to the policies and training that govern these crucial Department–community interactions.

4.   <u>Next Steps</u>

Starting in January 2023, the CU intends to hold quarterly meetings with the Department's Data Services Bureau and external programmers as they undertake the development of a revised early warning system to replace PRMS. The MT looks forward to attending those meetings and providing TA as appropriate.

The MT is encouraged by this development. Since the start of the SA, the MT and DOJ have repeatedly expressed concern about the lack of such a system for identifying risk and for giving Department managers ready access to the data and information they need (see discussion in the Stops section and in the 14th semi-annual report). Also, the quarterly reports were always meant as a temporary fix pending a more automated alternative. Crucial in the development of such a system will be the Department having clearly articulated expectations of what functionality it requires and exactly how the system will be used. More broadly, the Department will need to have a clear idea of what problems or shortcomings it expects the system to solve and, for that matter, which SA paragraphs it will address.

The MT expects the following to be the focus of our monitoring efforts in the next reporting period.

- The MT will be meeting with the Parties to come to a consensus on the MT's quarterly report recommendations and to further refine the quarterly report process.

- The Monitoring Team, in consultation with the Parties, will review the Performance Mentoring Program to assess its compliance with the SA.

- The Monitoring Team will conduct a review of the Risk Management Forum (RMF) which the AV stations participate in to assess whether and how they utilize the PRMS, quarterly reports, and other programs to meet the SA requirements for documenting and responding to the community concerns and input unique to the respective stations (SA Paragraph 143).

5.   <u>Accountability Compliance Status Table</u>

Table 8 provides the compliance status for each paragraph in the Accountability section. (See Appendix D for more detailed information about the status of each paragraph.)

| SA Paragraph | Summary of SA Requirements | Compliance | | | |
|---|---|---|---|---|---|
| | | **Policy** | **Training** | **Implementation** | **Sustained** |
| **141** | • Establish PRMS as LASD-wide decision support system.<br>• Modify system to allow peer-to-peer comparisons of deputies and units.<br>• AV commanders will conduct periodic reviews of all personnel to identify trends. | Partial | Partial | Partial | No |
| | **Notes:** North Patrol Division published an order in 2019 requiring each AV unit commander to prepare a Quarterly Report designed to satisfy the elements of Paragraphs 141–143 not provided for by PRMS. The MT reviews of the reports have found them in partial compliance. | | | | |
| **142** | • Modify PRMS to access additional info.<br>• Maintain PLEs in electronic format.<br>• Ensure PRMS is accurate and that there is accountability for errors. | Partial | Partial | Partial | No |
| | **Notes:** See Paragraph 141. | | | | |
| **143** | LASD will establish a plan for periodic review of trends at stations. | Partial | TBD | Partial | No |
| | **Notes:** The quarterly reports are one element of this plan, as are performance evaluations, RMF, UOF and complaint reviews, EFRC, AAB audits, etc. A purpose of the MT's ongoing compliance review is to assess the success of the plan to ensure accountability across all these tools and processes. Results thus far indicate partial compliance. | | | | |
| **144** | Make modifications to Performance Mentoring Program (PMP); ensure 30-day turnaround. | Partial | TBD | Partial | No |
| | **Notes:** The mentoring programs appear to be established and functioning. During this period, the MT began a review of the qualitative effectiveness of those programs and the degree to which they comply with SA Paragraphs 144 and 145. | | | | |
| **145** | Coordinate between Department-wide and Division PMP. | Partial | TBD | Partial | No |
| | **Notes:** See Paragraph 144. | | | | |

Table title (above table):

**Table 8**

**Accountability Compliance Status**

Notes

• Training is monitored in Paragraphs 138–139.
• See Appendix D for more details on work completed, compliance status, and work remaining for each paragraph.

III.     **CONCLUSION**

The Monitors have high expectations for LASD's new administration and are looking forward to working more closely with Sheriff Luna's executive team in achieving the SA priorities that have been established. We are optimistic that under Sheriff Luna's leadership, his values and past experiences with community-based, 21st-century policing principles will be integrated into LASD's culture, and that the community will begin to see that the SA goals are being embraced throughout the organization and diligently pursued. As we have stated in previous reports, once the agency's executive leadership, managers, and supervisors have fully implemented the SA reforms that were mutually agreed upon, the community should expect to see immediate and ongoing results demonstrated in the field. However, this requires more than mere expressions of support for the concepts involved: Personnel at all levels must be held accountable for the outcomes sought under the SA. The goals that were agreed to in the SA cannot be achieved when staff resist committing to modern policing practices, ongoing and effective data collection and utilization, meaningful community engagement, procedural justice, transparency, and accountability.

**Appendix A**

**Monitoring Team and Website**

Monitoring Team

The Court-appointed Monitors—Dr. Angie Wolf and Joseph Brann—have assembled an experienced team with credentials and skills uniquely suited to the SA work. The membership of the MT was finalized in March 2016. The two Monitors and seven team members have extensive expertise and experience in monitoring and evaluation work in policing and corrections.

Additionally, most of the MT members have served in law enforcement or continue to have distinguished careers in this field, several in the Los Angeles area. Several have served in leadership positions in law enforcement or corrections agencies during the implementation of the compliance period of a settlement agreement or consent decree and therefore understand the unique challenges that large organizations face in those circumstances. The MT members also have expertise in dealing with the diverse issues addressed in the SA, such as those related to UOF, training, the Fair Housing Act, data collection and analysis, survey methods, and the complexities of community engagement.

**Antelope Valley Monitoring Website**

This website allows AV community members to learn more about the SA, the backgrounds of MT members, and the monitoring activities; access documents related to the monitoring work, including each semi-annual report, each Community Survey report, MT audits, and MT data analyses; follow links to LASD's homepage and other relevant websites; and, importantly, submit questions and comments directly to the MT.

The website's URL is www.antelopevalleysettlementmonitoring.info

**Appendix B**

**How the Parties and Monitoring Team Work**

To complete the work of the SA, the Parties (US DOJ, LASD, and the County of Los Angeles) and the MT communicate daily through a variety of means. In each six-month period, the Parties and the MT hold multiple meetings at LASD headquarters; the offices of the Compliance Unit; other administrative offices; Palmdale and Lancaster stations; and various community centers, schools, and places of worship in the AV. The MT periodically meets in person with the captains of both AV stations and their staff, and participates in multiple onsite meetings with LASD's Compliance Unit, usually regarding specific issues such as policy or protocol review or data system discussion.

The MT also holds meetings with units or leadership from other operations that are critical to this reform work, such as the AAB or the commander in charge of training. The MT typically observes the semi-annual LASD risk management meeting and the CMF. Although some of these meetings and events are general in scope and pertain to several sections of the SA, most are related to specific sections or provisions of the SA. The Parties and the MT also participate in several small- and larger-group community meetings in Palmdale and Lancaster—often with the CACs—where various topics are discussed, such as the MT semi-annual reports, LASD and CAC Community Engagement Reports, community perceptions about LASD and its approach to policing, and other topics.

In addition to in-person meetings, a variety of conference calls take place each month, along with daily email or telephone communication among representatives of the Parties and the MT. The MT and DOJ participate in a bimonthly call to address substantive issues and planning; a similar bimonthly call involves the MT, DOJ, and the Compliance Unit; and the MT and the Parties, including the Office of County Counsel and extended LASD command staff, participate in a monthly telephone conference call to discuss workflow, future events and meetings, and other salient topics. Several times per year, onsite meetings are held where most participants from the Parties and the MT spend several days together doing intensive work on various topics.

Videoconferencing is used whenever possible when all are not able to be physically present in meetings. Documents are shared extensively via email for the purposes of review and collaborative development of the various policies and procedures, training curricula, community engagement materials, audits, and other written elements of the SA. LASD shares departmental data in various formats with the MT via secure email and digital media.

## Appendix C

### Settlement Agreement Compliance

Much of the SA involves developing or revising policies, procedures, and training; putting into place various processes (such as a plan for ensuring all new AV deputies receive training mandated by the SA or additional accountability mechanisms to facilitate peer comparisons); assessing data and information to guide the implementation of required reforms and to determine their effects; and striving to more effectively engage with community organizations and entities, such as the Community Advisory Committees (CACs). This work is usually done collaboratively among the Parties and the MT, with documentation of the change (new policy, revised training, etc.) eventually being formally submitted to the MT and DOJ for approval.

For most provisions, several steps are involved before the Department can reach full **implementation** (SA Paragraph 20) and thus achieve the status of being in full compliance. Paragraph 149 states, "Compliance with, or implementation of, a material requirement of this Agreement means that LASD has: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice."

Any approved policies related to the SA must be distributed to every deputy according to SA-required procedures and, as necessary, incorporated into training curricula. An approved training curriculum will require documentation that appropriate personnel received the training. New procedures and processes must be successfully instituted. Most importantly, each of the established improvements must be proven effective and practical in the real world—that is, they are assessed through MT activities such as reviews, audits, interviews, observation, and data analysis to establish whether they are successfully reflected in law enforcement practices and achieve the intended qualitative and quantitative impacts on the AV community. Paragraph 153 lays out several qualitative and quantitative outcome assessments the MT will do "to measure whether LASD's implementation of this Agreement has eliminated practices that resulted in DOJ's finding a pattern and practice of constitutional violations."

Changes to policy and practice also must be incorporated into LASD-AV's accountability practices. The reviews, analyses, studies, and audits that the SA requires LASD to conduct must use appropriate methodologies, and, in turn, their findings must be used effectively to inform policies and practices.[29] Finally, this level of performance must be sustained for one year to achieve **full and effective compliance** and to satisfy the terms of the SA (Paragraph 205). In some cases, the SA requires ongoing improvement in the delivery of services (Paragraph 15).

---

[29] Paragraph 171b gives a summary of the stepwise process by which the Monitors assess compliance and document their findings. Each provision of the SA needs to be "(1) incorporated into policy; (2) the subject of sufficient training for all relevant LASD deputies and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitor to have been fully implemented in practice."

This process of achieving compliance is laid out in various provisions of the SA, especially through the following paragraphs.

- In <u>Paragraph 20</u>, implementation is defined as "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice." What is meant by "consistent and verified performance" is to be laid out in compliance metrics for each provision.

- According to <u>Paragraph 205</u>, the terms of the SA will have been met when "the County has achieved full and effective compliance with the Agreement and maintained such compliance for no less than one year."

- In <u>Paragraph 15</u>, full and effective compliance is defined as "achieving both sustained compliance with all material requirements of this Agreement and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to the Agreement's outcome measures."

Compliance metrics or measures represent the specific quantitative and qualitative criteria by which the MT will assess compliance with each SA provision. The written metrics reflect the language of the SA, but they also ensure the Parties and the MT agree on how the SA language translates into workable and measurable standards for LASD-AV policy and practice and for assessing compliance.

It is important to note that the SA was not written in a "check the box" fashion that would require or allow each provision to stand separately such that it would then be evaluated based on a single, straightforward compliance metric for each provision. The assessment work that is required to evaluate the intended outcome for one provision is sometimes dependent upon the activities of and relationship to other provisions, and therefore they are interconnected. For example, the Department cannot draw conclusions about the potential disparity in its programs and activities (SA Paragraph 68) without completing the assessments required of deputy performance, stops, community input, uses of force, and complaints (SA Paragraphs 67, 82–86, 88, 120–123, 140). Similarly, the MT's compliance assessment for one provision may partially depend on the compliance assessment for another. In short, in some cases, as long as the Department is not in compliance with one provision, it necessarily will be out of compliance on one or more other provisions.

**Appendix D**

**Supplemental Information for Each SA Paragraph**

A.     Stops, Seizures, and Searches
B.     Bias-Free Policing
C.     Enforcement of Section 8 Compliance
D.     Data Collection and Analysis
E.     Community Engagement
F.     Use of Force
G.     Personnel Complaint Review
H.     Accountability

## A. STOPS, SEIZURES, AND SEARCHES

### Paragraph 41

*LASD-AV deputies shall only conduct investigatory stops or detentions where the deputy has
reasonable suspicion that a person has been, is being, or is about to be engaged in the commission
of a crime.*

<u>Work Conducted</u>

Since 2016, the MT has conducted periodic ad hoc stop data reviews and has discussed its
findings and observations, including preliminary determinations of compliance, with the
Department so that the Department could take corrective action and inform training at the
stations. The reviews included reviews of documentation related to these and other SA items,
reviewing CAD data extracts, observations of the Watch Sergeants, ride-alongs, interviews of
deputies, review of AAB audits (per Paragraph 149), listening to community comments regarding
LASD and LASD activities, and noted observations in previous reports. Particular focus was
placed on thorough and accurate CAD data entry and narratives to ensure MT reviews would be
based on reliable information. From their own reviews and based on the audits by the
Accountability and Audit Bureau (AAB), the Compliance Unit had significant concerns that the
CAD data were not accurate or reliable and implemented further training at the stations. The MT
and the Parties agreed that a formal systematic compliance review would not occur until the
Department had time to respond to the MT's early reviews and the Compliance Unit training.

The MT provided our work plan to the Parties on October 18, 2021. The MT received written
comments from LASD's Compliance Unit on October 22 and from DOJ on November 3, 2021,
followed by extensive discussions on the plan at the October 2021 onsite. Based on those
comments and discussions, we submitted a revised plan November 20, 2021, regarding which
we received written comment from DOJ on December 3, 2021. In a letter about the revised plan
dated December 22, 2021, LASD provided comments on the stops and bias-free policing
compliance metrics included in the plan.

The MT began its data and information requests for the assessment in November 2021, and
LASD had been providing data through the last reporting period. However, while this work was
ongoing, the external lawyers supporting County Counsel submitted a letter alleging the MT's
audit methodology was flawed in several ways and questioned the MT's auditing expertise and
independence. In attempting to provide evidence for their position, County Counsel's letter
asserted critical data processing errors and misconstrued communications between the MT and
AAB. The MT spent a significant amount of time and resources responding to these claims,
which included reanalysis of data to ensure accuracy of our numbers, identifying the specific
errors that led to inaccurate findings in the letter, responding to related requests for
information, and meeting several times with the Parties on the issues raised. The assessment
process was paused for several months, which resulted in a significant delay in the MT

completing our stops and bias-free compliance review. Ultimately, these issues were found to be without merit and the Parties agreed to us restarting our audit with no changes to the methodologies, save for one aspect of our sampling strategy, which will be somewhat altered in the next audit.

This was a delay and a distraction from the work associated with the compliance assessment. As a result, the data period selected, third quarter of 2021 will not be as timely as the MT would have preferred. The MT has received the first round of data to assess the reasonable suspicion related to stops. The MT has conducted the initial assessment of CAD data for these stops and related reports and documentation. The MT has evaluated 100 stops for reasonable suspicion, to include reviewing CAD data and associated reports and, as of the first week of December 2022, is reviewing BWC footage of these stops. The Monitoring Team has also reviewed 100 CAD entries for stops where there was a backseat detention (BSD); subsequent document requests will be submitted to the LASD. Pursuant to the agreed-upon audit plan with the Parties, the MT has reached out to LASD and DOJ to identify population samples for specifically identified audit objectives; further requests for data will be sent after that meeting.

LASD advised the MT that responses to requests may take time because of their staffing levels. Thus far, the pace has varied but is generally somewhat slow. As an example, one request for stops data needed for the audit was submitted to LASD on September 22, 2022, but was not fulfilled until November 1, 2022. In another example, we sent a request for BWC footage that the Compliance Unit was able to provide in two weeks.

The MT is viewing the body-worn camera footage for stops where the MT believes the documentation does not provide adequate justification for the stop or the MT wants to better understand what took place at the outset or during the stop. If the documents are received promptly from the LASD, the MT anticipates sending a draft of the audit to the parties in late January 2023 or early February 2023.


Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the MPP 5-09/520.00 "Constitutional Policing and Stops'' and 5-09/520.05 "Stops, Seizures, and Searches" policies, which address Paragraph 41. LASD published these policies on May 15, 2017, and began disseminating them to deputies. LASD distributes policies in orientation packets for new patrol deputies and deputies newly assigned to one of the AV stations. Verification of compliance that all appropriate personnel received and understood policies is addressed in SA Paragraph 164.


Training Compliance: **Partial Compliance**

Training for this provision is addressed in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings, addressed in the appendices for SA Paragraphs 57, 70

and 71, respectively. (See those paragraphs in Appendix D.) The Department was found to be in partial compliance because although they are in compliance with the Constitutional and bias-free policing trainings, they are not in compliance for roll call briefings.

Implementation Compliance: **Partial Compliance**

As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending completion of its ongoing formal assessment that began in January 2022 described in the "work conducted" of this paragraph.

Overall Assessment of Progress Toward Compliance

LASD continues to review a sample of CAD entries for accuracy and completeness. AAB has committed to auditing samples of CAD to ensure compliance with the SA in early 2023.

Recommendations to Achieve Full Compliance

The MT recommends LASD-AV deputies and supervisors work diligently to ensure they only conduct stops or detentions where there is reasonable suspicion that a person has been, is being, or is about to be engaged in a crime; to record accurate and thorough documentation of all stops and calls for service; to conduct thorough supervisory review; and to incorporate the routine use of data to analyze and track their stops data for the purposes of ensuring Constitutional policing practices and providing clear guidance to deputies.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable to Constitutional policing. LASD will also cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 42**

*LASD agrees to incorporate the following elements in its training of Antelope Valley deputies:*

1. *Introducing themselves at the initiation of contact with a civilian when reasonable and practical;*
2. *Stating the reason for an investigatory stop or detention as soon as practicable;*
3. *Ensuring that an investigatory stop or detention is no longer than necessary to take appropriate action; and*
4. *Acting with professionalism and courtesy throughout the interaction.*

Work Conducted

See Appendix D, Paragraph 70.

Policy Compliance: **NA**

There is no policy component associated with this provision.

Training Compliance: **In Compliance**

The principles of Procedural Justice are incorporated in the approved eight-hour bias-free policing training. (See Appendix D, Paragraph 70.)

Implementation Compliance: **In Sustained Compliance**

The Department provides the approved full-day bias-free policing training to all available LASD-AV personnel assigned to the AV stations and to embedded personnel assigned to other units. (See Appendix D, Paragraph 70.) Outcomes for this provision are measured in other SA provisions.

Overall Assessment of Progress Toward Compliance

LASD has been taking the appropriate steps necessary to continue to comply with this provision, putting themselves in a position to ensure Constitutional policing in the AV and to build a more positive and trusting Department–community relationship.

Recommendations to Achieve Full Compliance

LASD must continue to provide bias-free training twice a year to all required AV personnel and to consider changes to the curriculum and/or refresher training if evidence of the need arises.

Work to Be Completed During the Upcoming Reporting Period

Though the MT finds the Department in sustained compliance with adding elements of procedural justice into their trainings, the Department will continue to provide this training and comply with this provision as required by the SA and facilitate the MT's compliance assessments.

The DOJ UOF reviews showed several instances of deputies not complying with the procedural justice–related requirements of this provision. NPD managers indicated they had similar concerns, and the Parties and MT have begun discussions regarding the possible need for refresher training on the topic or revisions to the existing trainings. The possible need for refresher training is also being assessed in the MT's ongoing stops and bias-free policing audit. (See the discussions of UOF case reviews in the UOF and Accountability sections.)

For discussion of other work to be completed by the MT, please refer to this section of Paragraph 41.

**Paragraph 43**

*LASD-AV deputies shall not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause, except as part of actual and credible description(s) of a specific suspect or suspects in any criminal investigation.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the MPP 5-09/520.00 "Constitutional Policing and Stops'' and 5-09/520.05 "Stops, Seizures, and Searches" policies, which address this provision. LASD published these policies on May 15, 2017, and began disseminating them to deputies.

Training Compliance: **Partial Compliance**

Training for this provision is addressed in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings, addressed in the appendices for SA Paragraphs 57, 70, and 71, respectively. The Department was found to be in partial compliance because although they are in compliance with the Constitutional and bias-free policing trainings, they are not in compliance for roll call briefings.

Implementation Compliance: **Partial Compliance**

As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending a full assessment.

Overall Assessment of Progress Toward Compliance

LASD has not been deemed compliant as this area has not yet been fully assessed by the MT. As discussed in the work conducted section above, prior to 2021, LASD agreed where significant shortfalls in the documentation of stops in CAD and attempted to remedy these shortfalls.

Recommendations to Achieve Full Compliance

To reach full compliance, LASD must continue to ensure LASD-AV deputies have received the policies related to this provision and received the required training.

LASD must ensure the following.

- Deputies are following this provision in practice.

- Supervisors and commanders actively look for and detect/address violations of this provision. (The reviews of investigatory stops and detentions primarily occur via the weekly Deputy Daily Worksheet [DDWS] at the stations by supervisors. LASD supervisors and commanders must also regularly review reports and other documentation when completed for stops to ensure the deputies comply with this provision. Although mentioned here, the supervisory requirement for review of report, documentation and DDWS compliance is measured for compliance in other areas of the SA.)

- LASD leadership actively uses enforcement information and data analysis to track and address patterns that may show a violation of this provision.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also cooperate with the MT's assessments of compliance, and further develop its use of data to identify and respond to potential unconstitutional practices. See this section of Paragraph 41 for further discussion.

**Paragraph 44**

*LASD-AV deputies shall document the following information about patrol activity in their MDC patrol logs:*

a.  *the deputy's name;*
b.  *the date and time of the stop;*
c.  *the location of the stop;*
d.  *the race/ethnicity of each individual stopped, detained, or searched;*
e.  *the disposition of the stop, including whether a citation was issued or an arrest made;*
f.  *a concise narrative articulating specific facts and circumstances that support reasonable suspicion or probable cause for investigative stops and detentions consistent with the radio clearance code (Noting a radio clearance code, or the code for the resulting citation or other result, will not be deemed sufficient articulation of legal support for the stop or search.);*
g.  *whether they asked an individual about his/her probation or parole status, and what the answer was;*
h.  *where a backseat detention was conducted, a narrative articulating a reason, consistent with LASD policy and the law, as to why each backseat detention was necessary, as well as the reasonable suspicion for the investigation;*
i.  *the length of any backseat detention;*
j.  *whether a consent search of an individual was conducted, and if so, the reason for seeking consent; and*
k.  *whether a vehicle was impounded and the justification for the impoundment.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the MPP 5-09/520.00 "Constitutional Policing and Stops'' and 5-09/520.05 "Stops, Seizures, and Searches" policies, which address these

provisions. LASD published these policies on May 15, 2017, and began disseminating them to current and newly assigned LASD-AV deputies.

Training Compliance: **In Compliance**

Deputies are provided a review of these policies in their orientation packets when they arrive at the AV stations. Training for this provision is addressed in two trainings, Constitutional policing and bias-free policing, and addressed in the appendices for SA Paragraphs 57 and 70, respectively.

Implementation Compliance: **Partial Compliance**

MT ad hoc reviews and AAB audits found compliance with some of the aspects of Paragraph 44, but not all. The MT has found the Department in partial compliance pending a full assessment which began in January 2022. See Paragraph 41 for discussion.

Overall Assessment of Progress Toward Compliance

In past reporting periods, the MT reviewed the AAB audit of CAD data related to stops made in the AV. The AAB audits are completed for each station. This is consistent with previous audits completed for detentions of individuals and data collection in the past. The recent audits showed higher percentages of compliance as well as areas that fall short. Additionally, the MT has conducted ad hoc reviews of wider sources of information and found LASD in partial compliance across several provisions in the Stops and Bias-Free Policing SA sections. These additional sources of information include complaint and incident reports.

The AAB audits focus on the review of data related to backseat detentions, exclusively. The MT has discussed the goal of eventually integrating regular AAB audits into compliance assessments. The MT will discuss next steps with the Compliance Unit and the bureau to support the AAB in providing timely interim assessments of compliance with the SA. Prior to the use of an AAB audit, the MT will need to review and approve the AAB audit work plans before the bureau begins its audit and review and approve the audit report to ensure that all the required variables are addressed, that the reporting is thorough and provides sufficient detail, that conclusions are based on the SA and agreed-upon compliance metrics, and that both stations are assessed.

Recommendations to Achieve Full Compliance

To reach full compliance, LASD must continue to ensure that LASD-AV deputies have received both the policies related to this provision and the required training. LASD must ensure that

deputies follow this provision in practice, supervisors and commanders actively look for and detect/address violations of this provision, and LASD leadership actively uses enforcement information to track and address patterns that may show a violation of this provision. LASD must continue to ensure deputies enter data into CAD correctly. For the reasons stated above in the Implementation Compliance section, LASD's antiquated CAD system may serve as an obstacle for the LASD to reach compliance with this provision. The reviews of investigatory stops and detentions primarily occur via the weekly DDWS at the stations by supervisors. LASD supervisors and commanders must also regularly review reports and other documentation when completed for stops to ensure the deputies comply with this provision.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will continue to cooperate with the MT's assessments of compliance, and further develop its use of data to identify and respond to potential unconstitutional practices.

County Counsel has indicated that LASD AAB will complete detention audits for each station in early 2023 and will circulate the work plans to DOJ and MT for compliance.

**Paragraph 45**

*LASD-AV deputies shall use accurate and specific descriptive language and not rely solely on "boilerplate" or form language in any reports describing factual circumstances of investigatory stops, detentions, and searches.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 68 and Palmdale Unit Order 14-05, which state, "Deputies shall use accurate and specific descriptive language and not rely solely on 'boilerplate' or form language in any reports describing factual circumstances of investigatory stops, detention, and searches." LASD published the policy approved by DOJ and the MT on May 3, 2016. LASD distributes policies in orientation packets for current deputies and deputies newly assigned to one of the AV stations.

Training Compliance: **In Compliance**

Deputies are provided a review of these policies in their orientation packets when they begin work at the AV stations. Training for this provision is addressed in two trainings: Constitutional policing and bias-free policing, addressed in the appendices for SA Paragraphs 57 and 70, respectively.

Implementation Compliance: **Partial Compliance**

MT ad hoc reviews found no routine violation of this provision. MT has found the Department in partial compliance pending a full assessment.

Overall Assessment of Progress Toward Compliance

LASD has not been deemed compliant as this area has not yet been assessed by the MT. As discussed in the work conducted section for Paragraph 41 above, there were significant shortfalls in the documentation of stops inputted in CAD. The MT will continue to rely on reviewing reports.

Recommendations to Achieve Full Compliance

LASD must ensure that deputies follow this provision in practice, supervisors and commanders actively look for and detect/address violations of this provision, and LASD leadership actively uses enforcement information to track and address patterns that may show a violation of this provision. LASD must continue to ensure deputies use accurate and specific descriptive language and not rely solely on "boilerplate" or form language in any reports describing factual circumstances of investigatory stops, detentions, and searches. The reviews of investigatory stops and detentions primarily occur via the weekly DDWS reviews station supervisors. LASD supervisors and commanders must also regularly review reports and other documentation when completed for stops to ensure the deputies comply with this provision.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also cooperate with the MT's assessments of compliance, and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 46**

*LASD-AV shall collect and analyze data related to searches based on probation or parole status. LASD shall assess the efficacy of this tactic and its impact on the community and make policy changes accordingly.*

<u>Work Conducted</u>

See Appendix D, Paragraph 41.

<u>Policy Compliance:</u> **NA**

After a review process, the MT and DOJ approved the MPP 5-09/520.00 "Constitutional Policing and Stops'' and 5-09/520.05 "Stops, Seizures, and Searches" policies, which address this provision. LASD published these policies on May 15, 2017, and began disseminating them to current and newly assigned LASD-AV deputies.

<u>Training Compliance:</u> **NA**

This training component for this provision is the same as SA Paragraph 44 regarding accurate and thorough data entry, but there is no specific training requirement for this provision.

<u>Implementation Compliance:</u> **Partial Compliance**

The MT has found the Department in partial compliance pending a formal assessment of the assessment and potential corrective action required of this provision.

<u>Overall Assessment of Progress Toward Compliance</u>

The Department has assigned staff to create the monthly reports, which allow station managers to track relevant information for LASD-AV deputies. The stations have reported using this data as a basis for informal training on the issue with deputies. The key is that managers use that information routinely to inform practice and comply with the SA. For MT review purposes and, more importantly, for the Department to track the impact of any additional supervision, training or other corrective action, station managers must document their findings, interventions, and outcomes.

Additionally, the MT is waiting to receive a formal community policing plan from LASD (per LASD's policy 3-01/110.00–Community Policing and Engagement). This will help the MT

understand the priorities of LASD in how the use of parole or probation searches fits into those plans. The lack of a formalized community policing plan makes it very difficult to assess the efficacy or impact of a tactic in the community.

Recommendations to Achieve Full Compliance

LASD will not reach compliance until it 1) has an approved plan to assess the efficacy of this tactic and its impact on the community and make policy changes accordingly; and 2) implements this plan.

The stations can approach this and other data-based mandates in a variety of ways. An example that the stations have used to some extent is Top Ten lists, which can be used by the Department to assess deputies conducting certain types of enforcement activities. For example, determining which deputies conduct the most probation/parole searches may result in an analysis if the parole/probation searches are over target at one racial group versus another. For more information about the MT's recommendation in applying data analysis to inform practice, see Appendix A from the MT's 12th semi-annual report. (The report may be found at antelopevalleysettlementmonitoring.info)

Additionally, LASD leadership can assess whether this high level of activity is supporting LASD's overall crime prevention strategy in place. LASD's efforts on this provision has positive implications for other provisions for the SA requiring the collection, analysis, and use of data and other information to inform action to address efficacy and impacts of efforts in the AV. (For examples, see Appendix D, Paragraphs 46, 68, 81–86.) See also Appendix D, Paragraph 68, for a detailed discussion of how data must be used to assess bias-free policing efforts.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and will provide data and information to the MT. LASD will also cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices. LASD will need to show documentation of the assessments required for this provision, use of data and how they address problems identified.

The MT has yet to o receive a plan from LASD on how it intends to use data related to searches based on probation or parole status to assess this tactic's efficacy. The impact on the community must be clearly explained. After approval of said plan, LASD must then implement it.

**Paragraph 47**

*LASD will revise its policy and training about backseat detentions to ensure that they only occur when a LASD-AV deputy has individualized reasonable suspicion that justifies the detention and when a deputy can articulate reasonable deputy safety concerns, and to ensure that supervisors understand how to assess the reasonableness of a backseat detention.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the backseat detentions policy on May 15, 2017. The policy covers this provision by specifically stating that backseat detentions "shall not be used except when the deputy has individualized reasonable suspicion . . . and an articulable reasonable belief." LASD distributes policies in orientation packets for current deputies and deputies newly assigned to one of the AV stations.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. See Appendix D, Paragraph 57.

Implementation Compliance: **Partial Compliance**

The MT considers SA Paragraph 47 to be primarily a policy and training requirement whose outcomes are addressed by SA Paragraphs 48 and 49. The MT has found the Department in partial compliance pending an ongoing formal assessment.

Overall Assessment of Progress Toward Compliance

These requirements for backseat detentions have been incorporated into policy and training.

Recommendations to Achieve Full Compliance

The requirements of this provision will be measured in SA Paragraphs 48 and 49.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue to ensure the training remains incorporated in the training as required. The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 48**

*LASD-AV deputies may not conduct backseat detentions as a matter of course during routine traffic stops or domestic violence situations. When LASD-AV deputies do conduct backseat detentions, LASD shall continue to require deputies to explain to civilians in a professional and courteous manner why they are being detained in the backseat of patrol cars. LASD will not permit backseat detentions based on unreasonable or factually unsupported assertions of deputy safety. Backseat detentions shall not be used except where the deputy has an objectively reasonable belief that the detained person may pose a threat or be an escape risk. In instances where the backseat detention is premised on weather conditions or the detainee's articulated desire for privacy or personal safety, the deputy will inform the individual that the detention is optional.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

See Appendix D, Paragraph 47.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. See Appendix D, Paragraph 57.

Implementation Compliance: **Partial Compliance**

MT ad hoc reviews and AAB audits found compliance with some of the aspects of Paragraph 44. The MT has seen no indication of recurring or systematic violations of this provision. MT has found the Department in partial compliance pending a full assessment, which began in

January 2022, See Paragraph 41 for description.

Overall Assessment of Progress Toward Compliance

As discussed in the Work Conducted section above, there were significant shortfalls in the documentation of stops in CAD. AAB audits have shown improvement, and the MT began the formal assessment of this provision in January 2022. The MT notes that this assessment began at this later date to accommodate LASD and give them time to adjust procedures and generate more reliable data to analyze.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 49**

*LASD policy will specify that if an individual complains about being detained in the backseat of a patrol car, the LASD-AV deputy shall call for a field sergeant to respond to the scene and take the individual's complaint. If the individual does not want to wait for the field sergeant to respond to the scene, the deputy shall provide the individual with a complaint information brochure, currently called "Procedures for Public Comment" and the deputy's business card.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the backseat detentions policy on May 17, 2017. The policy covers this provision by specifically stating in instances "where an individual

complains about being detained in the backseat, the deputy shall call for a field sergeant to respond." LASD distributes policies in orientation packets, to include the backseat detentions policy, for current deputies and deputies newly assigned to one of the AV stations.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. See Appendix D, Paragraph 57.

Implementation Compliance: **Partial Compliance**

As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending the ongoing formal assessment. The MT has conducted observations during site visits, observations of the Watch Sergeants, ride-alongs, and reviews of documentation related to other SA items. In all work, the MT is mindful of the SA provisions related to Constitutional policing requirements. For example, if during the complaints audit there is a concern about the legality of an enforcement stop by a deputy, the MT assesses the propriety of that stop and consults with the MT member who monitors that area. The assessments of the stops determined to be problematic are shared with the Parties.

Overall Assessment of Progress Toward Compliance

During site visits, ride-alongs, and time spent with the Watch Supervisors, the MT has not seen any systematic violations of this provision. The complaint audits conducted by the MT did not find LASD in violation of this provision.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing policies, training, supervising, and ensuring deputies remain aware of the requirement of this SA requirement.

**Paragraph 50**

*LASD-AV deputies shall not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, sexual orientation, or gender identity in exercising discretion to conduct a search, except as part of an actual and credible description of a specific suspect or suspects in any criminal investigation.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

See Appendix D, Paragraph 41.

Training Compliance: **Partial Compliance**

Training for this provision is addressed in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings. For compliance status and other details regarding these trainings, see Appendix D, Paragraph 57, 70, and 71. The Department is found to be in partial compliance because even though the Constitutional and bias-free policing trainings are in compliance, the quarterly roll call briefings remain not in compliance.

Implementation Compliance: **Partial Compliance**

The MT has conducted observations during site visits, observations of the Watch Sergeants, ride-alongs, and reviews of documentation related to other SA items. In all work, the MT is mindful of the SA provisions related to Constitutional policing requirements. For example, if during the complaints audit there is a concern about the legality of an enforcement stop by a deputy, the MT assesses the propriety of that stop and consults with the MT member who monitors that area. The assessments of the stops determined to be problematic are included in the audit report and shared with the Parties. As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision. The MT has found the Department in partial compliance pending a formal assessment.

Overall Assessment of Progress Toward Compliance

The MT's formal assessment of this provision and other related paragraphs began in January 2022. The MT notes that this assessment began at this later date to accommodate LASD

and give them time to adjust procedures and generate more reliable data to analyze. As discussed in the work conducted section above, there were significant shortfalls in the documentation of stops in CAD. The AAB audits began in 2016, and the most recent audits occurred in 2020. The audits have shown higher percentages of compliance with the entry of stop information related to backseat detentions than in the previous AAB audits of backseat detention stops.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance, and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 51**

*LASD-AV deputies shall not conduct arbitrary searches. The request to conduct a consent search must be reasonable and a deputy must be able to articulate a valid reason under law and LASD policy for initially having stopped the individual.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

See Appendix D, Paragraph 41.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. See Appendix D, Paragraph 57.

Implementation Compliance: **Partial Compliance**

As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending completion of a formal assessment.

Overall Assessment of Progress Toward Compliance

MT ad hoc reviews have found the Department in partial compliance pending a full assessment.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance, and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 52a**

*All LASD-AV deputies equipped with a body worn audio or video recorders shall record all requests for consent to search and the individual's response.*

Work Conducted

As part of its ongoing formal assessment, the MT sent requests in November 2022 to LASD to review BWC footage. We appreciated the hard work on the part of the Compliance Unit to get the MT and DOJ access.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 68 and Palmdale Unit Order 14-05 on May 3, 2016, stating that "deputies equipped with LASD issued body worn audio or video recorders . . . shall record all requests for consent to search and the individual's

response." LASD distributes policies in orientation packets for current deputies and deputies newly appointed to an AV station.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. See Appendix D, Paragraph 57.

Implementation Compliance: **Partial Compliance**

The MT's formal review began in January 2022. LASD comprehensively deployed Axon body cameras to both AV stations by July 2021. The MT has received access to the system and is assessing compliance with this provision in its formal review.

Overall Assessment of Progress Toward Compliance

The MT has tested the BWC footage access system by requesting three consent search incidents and ensuring we are able to retrieve all the documents and footage for consent searches in the AV.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 52b**

*LASD agrees to work with Community Advisory Committees (CACs) to conduct outreach to explain to AV residents their right to refuse or revoke consent before or during a search. This outreach will include a one-page written explanation of an individual's right to refuse or revoke consent. This written explanation will be posted on the LASD-AV website and provided at community meetings.*

Work Conducted

The MT has recently confirmed the availability of brochures about what to do in case one is stopped by a deputy in the AV. The MT observed the informational brochures at libraries, courts, and sheriff stations in the AV. The MT also verified access for the information forms on the LASD Compliance Unit website at https://lasd.org/antelopevalleycomplianceunit/. The brochures are available in English and Spanish.

Policy Compliance: **NA**

There is no policy requirement for this provision.

Training Compliance: **NA**

There is no training component required for this provision.

Implementation Compliance: **In Sustained Compliance**

This requirement was completed in February 2019, when the brochure about residents' rights was published by LASD. The brochure is available in English and Spanish in most of the AV's libraries, courthouses, and LASD stations.

Overall Assessment of Progress Toward Compliance

Department is in compliance with this provision.

Recommendations to Achieve Full Compliance

LASD should continue working with the CAC to conduct outreach to explain to AV residents their right to refuse or revoke consent before or during a search and continue to make the brochures accessible to the public on the website.

Work to Be Completed During the Upcoming Reporting Period

LASD will provide documentation that they continue to work with the CAC to conduct outreach to explain to AV residents their right to refuse or revoke consent before or during a search and will keep the brochure available on their website.

The MT will periodically inspect locations to ensure brochures are available to the community and expects regular updates from LASD regarding their work with the CACs to conduct outreach to explain to AV residents their right to refuse or revoke consent before or during a search.

**Paragraph 52c**

*Where a subject is Limited English Proficient, the deputy shall affirmatively inform the subject in the appropriate non-English language.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

In December 2017, the MT and DOJ approved MPP Section 3-09/004.0 "Limited English Proficiency and Language Assistance Plan," which mandates the Department "to provide accurate and effective communication with members of the public regardless of their level of English proficiency." LASD published this policy on April 8, 2018. LASD distributes policies, including this LEP plan, in orientation packets for new patrol deputies and deputies newly appointed to an AV station.

Training Compliance: **In Compliance**

The LEP plan is discussed in the full-day bias-free policing training, which was approved June 15, 2017. (See Appendix D, Paragraph 70 for discussion of training compliance.) The MT has found the Department in partial compliance pending completion of a formal assessment that began in January 2022.

Implementation Compliance: **Partial Compliance**

LASD implemented and the MT and DOJ approved the LEP plan on April 8, 2018. The MT assesses this provision through reviews of complaint investigations, ride-alongs, community input, and interviews. As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending a formal assessment.

Overall Assessment of Progress Toward Compliance

The MT has not formally assessed that each deputy has received this policy, but the MT is aware that the LEP plan is included in the packet of policies provided to staff upon assignment to an AV station.

Recommendations to Achieve Full Compliance

- LASD must ensure the deputies receive and understand the LASD LEP plan.

- LASD deputies must take reasonable steps to provide timely, meaningful language-assistance services to LEP individuals.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

The MT will formally verify the LEP Plan receipt by current and incoming deputies in the next reporting period. The Parties and the MT will establish the methodology for a formal implementation assessment. The MT will look for documents showing an individual was in need of translation in another language.

**Paragraph 52d**

*An LASD-AV deputy shall immediately notify a supervisor when considering a home search based on consent, and the supervisor shall approve the search before it is conducted.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved MPP 5-09/520.05 "Stop, Seizures, and Searches," and LASD published it May 15, 2017, and began disseminating it to current and newly assigned LASD-AV deputies.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. (See Appendix D, Paragraph 57).

Implementation Compliance: **Partial Compliance**

As of December 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending a formal assessment.

Overall Assessment of Progress Toward Compliance

The MT has focused on assessing home searches involving Section 8 housing, which has specific requirements for supervisor approvals. During site visits, ride-alongs, and time spent with the Watch Supervisors, the MT has not seen recurring or systematic violations violations of this provision.

Recommendations to Achieve Full Compliance

To reach full compliance, LASD must continue to ensure LASD-AV deputies have received the policies related to this provision and received the required training. LASD must ensure that deputies are following this provision in practice, supervisors and commanders actively look for and detect/address violations of this provision, and LASD leadership actively uses enforcement information to track and address patterns that may show a violation of this provision.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 53**

*In conducting searches, particularly searches related to Section 8 compliance checks, LASD-AV will use only the number of deputies reasonably necessary for efficacy and officer safety based on the circumstances of the search. A supervisor must approve the use of more than two deputies for any consent search. If a supervisor is not available within a reasonable amount of time, a supervisor will review the documentation or recording of consent as soon after the search as possible.*

Work Conducted

See Appendix C, Paragraph 41. It should be noted that the Department has been found in compliance with provisions associated with the Section 8 housing enforcement. (See the Housing section and Appendix D, Paragraphs 73–80.)

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 68 and Palmdale Unit Order 14-0.5 and LASD published the policy on May 3, 2016, and began disseminating it to current and newly assigned LASD-AV deputies.

Training Compliance: **In Compliance**

Training for this provision is addressed in trainings for Constitutional policing and bias-free policing. (See Appendix D, Paragraphs 57 and 70.)

Implementation Compliance: **Partial Compliance**

The Department is in compliance with this provision related to Section 8 housing related searches. During site visits, ride-alongs, and time spent with the Watch Supervisors, the MT has not seen recurring or systematic violations violations of this provision. The MT has found the Department in partial compliance pending a formal assessment.

Overall Assessment of Progress Toward Compliance

Other than the components related to Section 8, the MT has found the Department in partial compliance pending a formal assessment.

<u>Recommendations to Achieve Full Compliance</u>

To reach full compliance, LASD must continue to ensure LASD AV deputies have received the policies related to this provision and received the required training. LASD must ensure that deputies follow this provision in practice, supervisors and commanders actively look for and detect/address violations of this provision, and LASD leadership actively uses enforcement information to track and address patterns that may show a violation of this provision.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also continue to cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

**Paragraph 54**

*LASD-AV deputies shall only be involved with a Section 8 compliance check where the housing authority agent has sufficiently articulated legitimate safety concerns.*

<u>Work Conducted</u>

See Appendix D, Paragraph 41. It should be noted that the Department has been found in compliance with provisions associated with the Section 8 housing enforcement. (See the Housing section and Appendix D, Paragraphs 73–80.)

<u>Policy Compliance</u>: **In Compliance**

After a review process, the MT and DOJ approved the Field Operations Directive 12-02, "Housing Authority Non-Criminal Investigations/Inspections," and LASD published it on March 14, 2018, and began disseminating it to current and newly assigned LASD-AV deputies.

<u>Training Compliance</u>: **In Compliance**

Training for this provision is addressed in the Constitutional policing and bias-free policing trainings. (See Appendix D, Paragraphs 57 and 70.)

Implementation Compliance: **In Sustained Compliance**

LASD-AV included this requirement in policy and training and was found to be in implementation compliance based on the lack of any indication of housing-related enforcement activity. The Department was found to be in compliance on May 31, 2019. (See the Housing section and Appendix D, Paragraphs 73–80.)

Overall Assessment of Progress Toward Compliance

LASD has stopped playing a role in inspections for Section 8 housing. The MT will look to see if there are any more instances where LASD accompanied the Housing Authority on home searches to assess compliance with the provision.

Recommendations to Achieve Full Compliance

LASD reached sustained compliance with this SA paragraph on February 28, 2022.

Work to Be Completed During the Upcoming Reporting Period

The MT encourages LASD to continue its current practice in this area.

**Paragraph 55**

*When LASD-AV deputies conduct searches or Section 8 compliance checks and individuals other than the subject of the search are present, the individuals shall not be detained longer than reasonably necessary to conduct the search and secure the area, and the individuals shall not be subject to frisk or search without the legally requisite level of individualized suspicion or probable cause.*

Work Conducted

See Appendix D, Paragraph 41. It should be noted that the Department has been found in compliance with provisions associated with the Section 8 housing enforcement. (See the Housing section and Appendix D, Paragraphs 73–80.)

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 68 and Palmdale Unit Order 14- 05, LASD published the policy approved by the DOJ and MT on May 3, 2016, and began disseminating it to current and newly assigned LASD-AV deputies.

Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing and bias-free policing trainings. (See Appendix D, Paragraphs 57 and 70.)

Implementation Compliance: **Partial Compliance**

The MT has found the Department in partial compliance due to ad hoc reviews, observations made, and interviews done during site visits, pending a full assessment.

Overall Assessment of Progress Toward Compliance

LASD has stopped playing a role in inspections for Section 8 housing. The MT will look for instances where LASD accompanied the Housing Authority on home searches to assess compliance with the provision. In all work, the MT is mindful of the SA provisions related to Constitutional policing requirements. For example, if during the complaints audit there is a concern about the legality of an enforcement stop by a deputy, the MT assesses the propriety of that stop and consults with the MT member who monitors that area. The assessments of the stops determined to be problematic are included in the audit report and shared with the Parties.

During site visits, ride-alongs, and time spent with the Watch Supervisors, the MT has not seen any recurring or systematic violations of this provision.

Recommendations to Achieve Full Compliance

To reach full compliance, LASD must continue to ensure LASD-AV deputies have received the policies related to this provision and received the required training. LASD must ensure that deputies follow this provision in practice, supervisors and commanders actively look for and detect/address violations of this provision, and LASD leadership actively uses enforcement information to track and address patterns that may show a violation of this provision.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also cooperate with the MT's assessments of compliance, and further develop its use of data to identify and respond to potential unconstitutional practices.

The MT will work on the assessment of compliance for this provision in the next reporting period. The MT will review LASD documentation of searches through various means, potentially including entry and search waiver forms, search warrants, CAD data, parole and probation checks, incident reports, arrest or stop documentation, BWC footage, recordings, and other relevant documentation and reports of stops related to those cases. MT will request and review the minimum number of sources to make a determination of compliance.


**Paragraph 56**

*LASD-AV deputies shall only conduct searches of individuals on probation or parole in accordance with the provisions of this section and when knowledge of a probation or parole search condition has been established.*


Work Conducted

See Appendix D, Paragraph 41.


Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the MPP 5-09/520.00, "Constitutional Policing and Stops'' and 5-09/520.05, "Stops, Seizures, and Searches" policies, which established that investigatory stops and detentions shall be initiated and carried out based on the tenets of Constitutional policing and bias-free policing. LASD published the policy on May 15, 2017, and began disseminating it to current and newly assigned LASD-AV deputies.


Training Compliance: **In Compliance**

Training for this provision is addressed in the Constitutional policing training. See Appendix D, Paragraph 57.

Implementation Compliance: **Partial Compliance**

During site visits, ride-alongs, and time spent with the Watch Supervisors, the MT has not seen any recurring or systematic violations of this provision. A formal MT review began in January 2022 to assess compliance.

Overall Assessment of Progress Toward Compliance

The AAB audits have shown improvement and the MT began the formal assessment of this provision in January 2022.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will continue the practices of distributing SA-associated policies, training, supervising, recording stops data, and reviewing data and reports to hold deputies accountable for engaging in Constitutional policing, and provide data and information to the MT. LASD will also cooperate with the MT's assessments of compliance and further develop its use of data to identify and respond to potential unconstitutional practices.

The MT will continue to work on the assessment of compliance for this provision, which began in 2022.

**Paragraph 57**

*LASD shall provide all Antelope Valley deputies with training on stops, searches, and detentions, including the requirements of this Agreement. Such training shall be taught by a qualified legal instructor with significant experience in Fourth Amendment issues, and shall:*

*a.  ensure officers understand Fourth Amendment and related legal restrictions on searches and seizures, including consent searches, backseat detentions, probation and parole searches, and Section 8 related activity, as well as additional limitations under LASD policy;*
*b.  address the differences between various police contacts by:*
   *1.  the scope and level of police intrusion,*
   *2.  differences between probable cause, reasonable suspicion, and mere speculation, and*
   *3.  true voluntary consent;*

c. *provide guidance on the facts and circumstances in addition to legal and policy limitations, that should be considered in initiating, conducting, terminating, and expanding a stop or search, including consent searches, probation and parole searches, backseat detentions, and Section 8- related activities;*

d. *incorporate role playing scenarios and other adult-learning mechanisms to facilitate deputy ability to exercise good judgment about whether and how to stop and search individuals; and*

e. *provide guidance on stopping and/or searching individuals for discretionary and non-violent offenses, including providing guidance about procedural justice, alternatives to conducting investigatory stops and searches, and the impact on civilians of conducting apparently arbitrary stops and searches.*

<u>Work Conducted</u>

The trainings were developed and, after a review process, approved by the MT and DOJ. The training began on June 14, 2017, for deputies assigned to the AV stations. AV deputies and managers participate in the eight-hour Constitutional policing course and complete a required test at the end of the full-day training. To verify implementation of the training, on a quarterly basis the MT reviews signed training attendance sheets and compares them against station personnel rosters to assess whether at least 95% of available AV personnel have received the approved training. As agreed to by the Parties and MT, this training is offered twice per year. Each AV deputy (including all ranks) is required to take the eight-hour training once.

The Constitutional policing content was created through discussions with the parties and nationally respected trainers. A trainer was selected and agreed to by the Parties and MT, and the training was offered to LASD deputies in the AV. After an accelerated period of training at the start of the program because of the large number of people to train, the full-day training sessions are offered twice per year in the AV.

The AV provided two full day Constitutional policing trainings in 2022, which occurred on June 14 and November 7, 2022. The instructor provided the agreed-upon curriculum to the students. The instruction provided updated legal requirements related to the Fourth Amendment as it relates to LASD deputy enforcement activity, such as contacts, backseat detentions, probation/parole searches, stops based on reasonable suspicion and/or probable cause, searches of persons/property, and seizures of property. The CU monitors the courses throughout the days to ensure each student remained present for the entire course and completed/passed the required test at the end of each day. The Compliance Unit shared attendance sheets with the MT after the completion of the full training.

The DOJ UOF reviews conducted in this reporting period showed several instances of deputies not complying with the procedural justice–related requirements of this provision. NPD managers indicated they had similar concerns, and the Parties and MT have begun discussions regarding the possible need for refresher training on the topic or revisions to the existing trainings. The possible need for refresher training is also being assessed in the MT's ongoing stops and

bias-free policing audit. (See the discussions of UOF case reviews in the UOF and Accountability sections of report.)

Policy Compliance: **NA**

A policy is not required for this paragraph.

Training Compliance: **In Compliance**

There is no training component for this paragraph because the implementation for this paragraph is the implementation of a training program.

Implementation Compliance: **In Compliance**

The Department began providing the approved Constitutional policing training to all available personnel assigned to the AV on June 14, 2017. Based on MT quarterly review of training verification documentation, the Department has been in continual compliance with Paragraph 57 since August 16, 2018, for deputies assigned to the AV stations. (By agreement, compliance assessment for the full-day training sessions were suspended during the first half of 2021 due to COVID-19 restrictions.)

After discussion with the Parties and MT, the Department began providing the trainings to embedded units—deputies assigned to non-AV station units but working in the AV on a regular basis. To allow time for the Department to adjust, training receipt verification was initially calculated separately for deputies from embedded units, and they were not included in compliance assessment. In June 2022, the Department provided the MT with attendance rosters that include the embedded units. Because the training took place late in the previous reporting period, the MT is reporting on both 2022 training sessions in this report. In June 2022, LASD reached 95% compliance and rose to 98% for the training in November 2022. See compliance percentage charts below. The outcomes related to this training are measured in other provisions.

| Table D1 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Constitutional Policing June 2022 | | | | | | |
| | Total Assigned | Total Trained | Total Unavailable | Total Available | Total Not Trained | % |
| Lancaster | 196 | 182 | 2 | 194 | 12 | 94% |
| Palmdale | 178 | 169 | 2 | 176 | 7 | 96% |
| Embedded Units | 53 | 47 | 4 | 49 | 2 | 96% |
| **Combined** | **427** | **398** | **8** | **419** | **21** | **95%** |

| Table D2 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Constitutional Policing November 2022 | | | | | | |
| | Total Assigned | Total Trained | Total Unavailable | Total Available | Total Not Trained | % |
| Lancaster | 188 | 187 | 1 | 187 | 0 | 100% |
| Palmdale | 173 | 172 | 0 | 174 | 1 | 99% |
| Embedded Units | 50 | 40 | 2 | 48 | 8 | 8339% |
| **Combined** | **411** | **399** | **3** | **409** | **9** | **98%** |

Overall Assessment of Progress Toward Compliance

If the Department continues to consistently provide the bias-free policing training and have AV personnel participate in these required trainings, they will be in a position where they will be better equipped to build a more positive and trusting relationship with the community. It is the hope of the MT that LASD heed the advice of the training instructor and incorporate this training on a regular basis moving forward, beyond the SA requirements.

Recommendations to Achieve Full Compliance

In order to reach sustained compliance with this provision, LASD must continue to provide the bias-free policing training to all required AV personnel through June 15, 2023. Even after LASD reaches sustained compliance for this provision, they must continue giving the training until the termination of the Settlement Agreement. The Department must also consider changes to the curriculum and/or refresher training if evidence of the need arises.

Work to Be Completed During the Upcoming Reporting Period

The MT applauds the Department's implementation compliance with this provision and is hopeful LASD will continue complying to reach full compliance in June 2023. The MT will continue to assess the delivery of this critical training. DOJ's case review has indicated concerns about deputies not complying with some aspects of the training and that a refresher may need to be implemented; this issue will be discussed in 2023.

**Paragraph 58**

*LASD agrees to implement additional accountability and supervision practices outlined below in the Antelope Valley, and ensure that existing policies are followed, to ensure that unlawful stops, searches, and seizures are detected and effectively addressed.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 69, "Supplemental Supervisory Responsibilities," and Palmdale Unit Order 14-06, "Supplemental Supervisory Responsibilities," which established the required additional accountability requirements. LASD published the policy on May 3, 2016, and began disseminating it to current and newly assigned LASD-AV deputies.

Training Compliance: **Partial Compliance**

Supervisors are provided a review of these policies in their orientation packets when they arrive at the AV stations. The foundation for the supervisors to conduct the assessments under this provision comes from attending and participating in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings, addressed in the appendices for SA Paragraphs 57, 70 and 71, respectively. The Department was found to be in partial compliance because although they are in compliance with the Constitutional and bias-free policing trainings, they are not in compliance for roll call briefings.

Implementation Compliance: **Partial Compliance**

MT ad hoc reviews and AAB audits found have found progress on this provision. The MT has

found the Department in partial compliance pending a full assessment.

<u>Overall Assessment of Progress Toward Compliance</u>

Although there were no AAB audits provided to the MT this reporting period, over the last several years, the MT ad hoc reviews and AAB audits have found compliance with some of the requirements of Paragraphs 58–63. This assessment remains unchanged otherwise.

<u>Recommendations to Achieve Full Compliance</u>

See Appendix D, Paragraph 43.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

The Department will hold AV supervisors and commanders accountable for ensuring that existing policies are followed, and ensure that unlawful stops, searches, and seizures are detected and effectively addressed. Department will also provide timely access to assessment related information upon request.

**Paragraph 59**

*Sergeants assigned as raters shall regularly audit their assigned deputies' stop, search, and seizure documentation in addition to arrest reports and citations for completeness, accuracy, and legal sufficiency. Sergeants shall audit at least one CAD log for each deputy under their supervision each week. Sergeants shall conduct further review as indicated by weekly audits, PPI information and other indicia.*

<u>Work Conducted</u>

See Appendix D, Paragraph 41.

<u>Policy Compliance: **In Compliance**</u>

See Appendix D, Paragraph 58.

Training Compliance: **Partial Compliance**

See Appendix D, Paragraph 58.

Implementation Compliance: **Partial Compliance**

See Appendix D, Paragraph 58.

Overall Assessment of Progress Toward Compliance

See Appendix D, Paragraph 58.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will hold AV supervisors and commanders accountable for failure to comply with this provision. LASD-AV will provide data and information to the MT in cooperation with the MT's assessments of compliance.

The MT continues to work on the assessment of compliance for this provision.

**Paragraph 60**

*If a deputy's stop, search, or seizure documentation does not provide sufficient detail or articulate sufficient legal and policy justification for the action, the supervisor shall review the action with the deputy to determine whether there was sufficient legal and LASD policy justification.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

See Appendix D, Paragraph 58.

Training Compliance: **Partial Compliance**

See Appendix D, Paragraph 58.


Implementation Compliance: **Partial Compliance**

See Appendix D, Paragraph 58.


Overall Assessment of Progress Toward Compliance

See Appendix D, Paragraph 58.


Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.


Work to Be Completed During the Upcoming Reporting Period

The Department will hold AV supervisors and commanders accountable for failure to comply with this provision. LASD-AV will provide data and information to the MT in cooperation with the MT's assessments of compliance.

In the next reporting period, the MT will continue to work on the assessment of compliance for this provision.


**Paragraph 61**

*Antelope Valley supervisors and commanders shall take appropriate action to address all violations or deficiencies in stops, searches, or seizures including non-disciplinary corrective action for the involved deputy, and/or referring the incident for disciplinary action.*


Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

See Appendix D, Paragraph 58.

Training Compliance: **Partial Compliance**

See Appendix D, Paragraph 58.

Implementation Compliance: **Partial Compliance**

See Appendix D, Paragraph 58.

Overall Assessment of Progress Toward Compliance

See Appendix D, Paragraph 58.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will hold AV supervisors and commanders accountable for failure to comply with this provision. LASD-AV will provide data and information to the MT in cooperation with the MT's assessments of compliance.

In the next reporting period, the MT will continue to work on the assessment of compliance for this provision.

**Paragraph 62**

*Antelope Valley supervisors and commanders shall track repeated violations of the provisions of this agreement or deficiencies and the corrective action taken, if any, in PPI.*

Work Conducted

See Appendix D, Paragraph 41.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 69 "Supplemental Supervisory Responsibilities," and Palmdale Unit Order 14-06, "Supplemental Supervisory Responsibilities," which established the required additionally accountability requirements. LASD published the policy on May 3, 2016, and began disseminating it to current and newly assigned LASD-AV deputies.

Training Compliance: **Partial Compliance**

Deputies are provided a review of these policies in their orientation packets when they arrive at the AV stations. Training for this provision is addressed in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings, addressed in the appendices for SA Paragraphs 57, 70, and 71, respectively. The Department was found to be in partial compliance because although they are in compliance with the Constitutional and bias-free policing trainings, they are not in compliance for roll call briefings.

After discussion with the Parties and MT, the Department began also providing the trainings to embedded units—deputies assigned to non-AV units but working in the AV on a regular basis. These embedded units were initially not included in the assessment of compliance. They are now included in the regular verification process.

Implementation Compliance: **Partial Compliance**

MT ad hoc reviews and review of quarterly reports have found progress on this provision. MT has found the Department in partial compliance pending a full assessment.

Overall Assessment of Progress Toward Compliance

LASD-AV supervisors track repeated violations of the SA provisions in different ways. One of the ways supervisors hold deputies accountable for compliance is by reviewing DDWS. In this reporting period, the AAB has not conducted audits of these DDWS. Supervisors at the stations provide review of incident reports and documentation to ensure compliance with the law and SA provisions. In the past, the MT has observed the supervisors engaged in these important reviews.

Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.

Work to Be Completed During the Upcoming Reporting Period

The Department will hold AV supervisors and commanders accountable for failure to comply with this provision. LASD-AV will provide data and information to the MT in cooperation with the MT's assessments of compliance.

In the next reporting period, the MT will continue to work on the assessment of compliance for this provision.


**Paragraph 63**

*LASD agrees to hold accountable supervisors and Antelope Valley commanders for appropriately and thoroughly reviewing reports and documentation related to stops, searches, and seizures, and requiring deputies to articulate sufficient rationale under law and LASD policy.*


Work Conducted

See Appendix D, Paragraph 41.


Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Lancaster Unit Order 69, "Supplemental Supervisory Responsibilities," and Palmdale Unit Order 14-06, "Supplemental Supervisory Responsibilities," which established the required additionally accountability requirements. LASD published the policy on May 3, 2016, and began disseminating it to current and newly assigned LASD-AV deputies.


Training Compliance: **Partial Compliance**

Deputies are provided a review of these policies in their orientation packets when they arrive at the AV stations. Training for this provision is addressed in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings, addressed in the appendices for SA Paragraphs 57, 70, and 71, respectively. The Department was found to be in partial compliance because although they are in compliance with the Constitutional and bias-free policing trainings, they are not in compliance for roll call briefings.

After discussion with the Parties and MT, the Department began also providing the trainings to embedded units—deputies assigned to non-AV units but working in the AV on a regular basis. These embedded units were initially not included in the assessment of compliance. They are now included in the regular verification process.

Implementation Compliance: **Partial Compliance**

MT ad hoc reviews and AAB audits found have found progress on this provision. MT has found the Department in partial compliance pending a full assessment.


Overall Assessment of Progress Toward Compliance

See Appendix D, Paragraph 63.


Recommendations to Achieve Full Compliance

See Appendix D, Paragraph 43.


Work to Be Completed During the Upcoming Reporting Period

The Department will hold AV supervisors and commanders accountable for failure to comply with this provision. LASD-AV will provide data and information to the MT in cooperation with the MT's assessments of compliance.


## B. BIAS-FREE POLICING

### Paragraph 64

*In conducting its activities, LASD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies shall not initiate stops or other field contacts because of an individual's actual or perceived immigration status.*


Work Conducted

This is a wide-reaching provision, and the MT assesses it through a variety of methods. Throughout the course of monitoring, the MT has conducted observations during site visits, observations of the Watch Sergeants, and ride-alongs, reviews of documentation related to other SA items, and it has listened to community comments regarding LASD and LASD activities and noted observations in previous reports. See also Appendix D, Paragraph 41.

The MT has also produced, at the request of the Department, several analyses and Top Ten lists that can be used by the Department and the MT to assess LASD's compliance with this

provision. (See Appendix D, Paragraphs 46, 68, and 81–86.) The Department has developed monthly reports that allow station managers to track relevant information for LASD-AV deputies. (See the Accountability section and Appendix C, Paragraphs 141–143). In 2020, the MT produced "*An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley,*" which showed that Black people were stopped at higher rates and at disproportionate rates than other race/ethnicity groups in the AV.

The MT provided our work plan related to the stops audit to the Parties on October 18, 2021. The MT received written comments from the Compliance Unit on October 22, 2021, and from DOJ on November 3, 2021, followed by extensive discussions on the plan at the October 2021 onsite visit. Based on those comments and discussions, we submitted a revised plan November 20, 2021, and we received written comment from DOJ on December 3, 2021. In a letter about the revised plan dated December 22, 2021, LASD provided comments on the stops and bias-free policing compliance metrics included in the plan. The MT began its data and information requests for the assessment in November 2021, and LASD had been providing data through the last reporting period. The MT also began its processing and review of the data provided in the last reporting period. The MT assessment uses both quantitative and qualitative methods and includes a detailed review of samples of stops, searches, backseat detentions, and so forth, as well as reviews of several other sources of information such as disparity analyses, stops trends analysis, and community input.

On November 20, 2021, the MT submitted a revised stops and bias-free policing audit workplan to the LASD. Then in late June 2022, several months after the MT had begun its stops and bias-free policing audit, and many months after the SA designated time frame for commenting on the audit work plan, the external lawyers supporting County Counsel submitted a letter alleging the MT's audit methodology was critically flawed and questioned the MT's auditing expertise and independence. In attempting to provide evidence for their position, County Counsel's letter asserted critical data processing errors and misconstrued communications between the MT and AAB. The MT spent a significant amount of time and resources responding to these claims, which included reanalysis of data to ensure the accuracy of our numbers, identifying the specific errors that led to inaccurate findings in the letter, responding to related requests for information, and meeting several times with the Parties on the issues raised. The assessment process was paused for several months, which resulted in a significant delay in the MT completing our stops and bias-free compliance review. Ultimately, these assertions were found to be without merit, and the Parties agreed to us restarting our audit with no changes to the methodologies, save for one aspect of our sampling strategy, which will be somewhat altered in the next audit.

After months of back and forth with LASD and its counsel, the MT has returned to the stops audit and is proceeding with making requests for data from LASD, and there will be rounds of data to request and receive from LASD. The MT has received the first round of data to assess the reasonable suspicions related to stops. The MT has conducted the initial assessment of CAD data for these stops and related reports and documentation. The MT is watching the body-worn camera footage for stops where the MT believes the documentation does not provide adequate

justification for the stop or the MT wants to better understand what took place at the outset or during the stop. The speed of this work is dependent on the speed at which the MT receives information from LASD for each request. LASD advised the MT that responses to requests may take time because of staffing levels. As an example, one request for stops data needed for the audit was submitted on September 22, 2022, to LASD, and the MT received the documents on November 1, 2022. In another example, we sent a request for BWC footage, and the Compliance Unit was able to provide us with them in two weeks. As the audit plan lays out, there are several more document requests remaining for this audit.

Policy Compliance: **In Compliance**

The Parties agreed to a division order in 2017. LASD published a new bias-free policing policy on July 22, 2021, but LASD did not provide it to the MT and DOJ until August 31, 2021, for the first time after it was published. The MT and DOJ stated that it was in conflict with the Division Order from 2017. LASD advised that if there is conflict between the MPP and the Division Order, that the DO trumps the MPP. Thus, LASD has taken the position that the MPP does not need to be approved by the Parties. The MT had planned to assess both the Division Order and policies in this reporting period to determine continued compliance with the SA; however, due to the ongoing stops audit, the MT will assess this issue in the next reporting period.

Training Compliance: **Partial Compliance**

Training for this provision is addressed in three trainings: Constitutional policing, bias-free policing, and quarterly roll call briefings, addressed in Paragraphs 57, 70, and 71, respectively. As of June 2022, the Department, including AV deputies and deputies from embedded units, is found to be in compliance with the full-day Constitutional and bias-free policing trainings. The most recent full-day trainings of Constitutional and bias-free policing occurred June 14–15, and November 7-8, 2022. The training in June occurred late in the previous reporting period, which did not allow the MT to do a full assessment until mid-July of this reporting period. As such, both trainings are covered in this report.

Implementation Compliance: **Partial Compliance**

LASD is in partial compliance with the provision based on having some mechanisms in place to assess data where bias or disparity is present in their enforcement efforts, but LASD continues to fall short on the level of critical analysis required for compliance with this provision. LASD assigned a dedicated analyst to generate regular reports for the AV stations in November 2021. In this reporting period, the analyst has created a 2021 stops report for each of the Lancaster and Palmdale stations. During a site visit in November 2022, the MT and Parties discussed the purpose of the new 2021 stops report as being to assist station leadership with using provided data to understand enforcement patterns for strategic purposes. Although this is a step forward,

we have not seen evidence that LASD-AV station leadership is making sufficient progress in implementing data into its law enforcement efforts and strategies.

Overall Assessment of Progress Toward Compliance

Stops data analyses conducted by the Department and by the MT have shown disparities that have not yet been evaluated and addressed by the Department. Compliance will be achieved when there is a regular review of data, a real and documented effort to identify issues, and evidence of taking appropriate corrective action when warranted. There have been indications based on various MT-generated analyses, as well as those conducted by external organizations, that LASD-AV enforcement activity reflects possible racial and ethnic disparity. Despite this evidence, the MT has found no indication that the Department has (a) made a genuine effort to assess these various findings and identify any strategies or practices that should be adjusted in order to reduce the disparities; and (b) taken action; or (c) provided any convincing explanation or justification that the disparities are an unavoidable consequence of necessary law enforcement activity.

SA Paragraph 84 requires that

> *"LASD will identify any trends or issues that compromise constitutional policing and respond accordingly. Appropriate responses include revising policy or training . . . and assessing whether any practices should be changed to ensure adherence to constitutional requirements and/or more effective policing."*

Courts have adopted a three-part test to determine whether a recipient's policy or practice violates the Title VI disparate impact regulations. First, does the adverse effect of the policy or practice disproportionately affect members of a group identified by race, color, or national origin? Some courts refer to this first inquiry as the "prima facie" showing. If so, can the recipient demonstrate the existence of a substantial legitimate justification for the policy or practice (*N.Y. Urban League,* 71 F.3d at 1036)? A violation is still established if the record shows the justification offered by the recipient was pretextual. (*See Elston v. Talladega Cty. Bd. of Educ.,* 997 F.2d 1394, 1407 [11th Cir. 1993], citing *Georgia State Conf. v. Georgia,* 775 F.2d 1403, 1417 [11th Cir. 1985]). Finally, is there an alternative that would achieve the same legitimate objective but with less of a discriminatory effect? If such an alternative is available to the recipient, even if the recipient establishes a justification, the policy or practice will still violate disparate impact regulations. (See https://www.justice.gov/crt/fcs/T6Manual7.)

The MT's previous reports provided stops analysis for six consecutive six-month time periods, from July 2018 through June 2021. These MT reports identified areas where Black people were stopped at higher rates. Each of these findings represents a place to start further exploration. Yet, again, while these findings were presented and discussed with the Department in the previous period, the MT has not found any further assessment conducted by Department management or that any steps to reconsider strategies and practices were taken.

Recommendations to Achieve Full Compliance

To reach full compliance, LASD must continue to ensure LASD-AV deputies have received, read, and understood the policies related to this provision and received the required training. LASD must ensure that deputies follow this provision in practice, supervisors and commanders actively and consistently look for and detect/address violation of this provision, and LASD leadership actively uses enforcement information to track and address patterns that may show that this provision has been violated.

Compliance with this task requires that LASD leaders, both at the station and leaders of the North Patrol Division, be fully engaged with the various sources of data related to their enforcement efforts. This will help them analyze the efficacy of their overall enforcement efforts in the community, as well as help them assess whether all members of the AV community are receiving equal protection under the law.

LASD must regularly consider all community complaints regarding bias and conduct research on these complaints to determine whether intervention or change of enforcement strategy is needed.

As discussed in the Crime Management Forum discussion in the Community Engagement section of this report (Paragraph 90), meaningful analysis will require the AV stations to have an articulated Crime Strategy Plan.

In the 12th semi-annual report, the MT provided LASD with examples for using the data to address identified areas of concerns with disparate treatment.


Work to Be Completed During the Upcoming Reporting Period

There is a wide array of activities LASD must conduct to ensure compliance, such as a reviewing and synthesizing relevant material—including reports, CAD data, community complaints, and data—to identify and address problematic trends. The MT will continue to assess how consistently LASD identifies issues and responds to trends that might indicate disparate impact or unequal protection under the law.

The MT will continue to assess compliance with this provision in the SA and examine how LASD is using data in a practical manner to inform its activities and strategies. The MT will continue to meet with LASD to discuss ways to more fully engage with the stops data, review crime reduction plans, and measure the impact or results.

**Paragraph 65**

*LASD agrees to continue to consult with the Museum of Tolerance personnel and others to ensure clear guidance for LASD-AV deputies, through policy, training, and supervision, on prohibited conduct, including selective enforcement or non-enforcement of the law and the selection or rejection of particular tactics or strategies, based upon stereotypes or bias. LASD agrees to consult with experts to ensure that the manner in which guidance is provided to personnel takes into account the influences of implicit bias and stereotype threat.*

Work Conducted

In February 2018, the MT met with the Compliance Unit and a representative of the Museum of Tolerance. The representative reported that deputies from various LASD stations, including the AV and the Training Bureau, have participated in Museum of Tolerance's cultural awareness and implicit bias training. In February 2020, the Museum of Tolerance staff observed the training session for bias-free policing, but the MT is not aware of any further collaboration between the Museum of Tolerance and LASD as a result from attending the training.

In spring 2021, for the purpose of achieving compliance with this provision, LASD requested to replace the Museum of Tolerance with a local organization that has more relevant expertise. On November 17, 2022, LASD presented the MT and DOJ with their intent to work with a qualified outside consultant to support this work. On November 30, 2022, the MT and DOJ indicated they were amenable to this change.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

The Department remains Not in Compliance with this section; however, they have made a big step forward by reaching out to an independent research and consulting firm and drafting an MOU to partner with them. Due to this partnership between the consultancy and LASD-AV being in its nascent stages, a signed agreement has not been obtained. The incoming Sheriff must also be informed and approve this moving forward. It is anticipated that the work will be seen favorably due to the fact that other LASD stations have existing working relationships with the consultancy.

Overall Assessment of Progress Toward Compliance

LASD has identified an independent research and consulting firm as a new partner to work with in furtherance of this provision; the MT and DOJ indicated they were amenable to them working with the consultancy.

Recommendations to Achieve Full Compliance

LASD-AV has identified an independent research and consulting firm as a new partner and after receiving proper approval from the Department, it can restart the process toward compliance with this provision.

Work to Be Completed During the Upcoming Reporting Period

LASD must work internally to obtain proper approval to enter into a MOU with an independent research and consulting firm. Once approval is obtained, it can restart the process towards compliance.

**Paragraph 66**

1. *LASD agrees to effectively communicate with and provide timely and meaningful access to police services to all members of the Antelope Valley community, regardless of their limited ability to speak, read, write, or understand English. To achieve this outcome, LASD agrees to:*
   a. *develop and implement a language assistance plan and policy that 4 complies with Title VI of the Civil Rights Act of 1964, as amended, (42 5 6 7 8 U.S.C. § 2000d et seq.) and other applicable law, and comports with best practices and current professional standards; and*
   b. *ensure that all LASD personnel shall take reasonable steps to provide timely, meaningful language assistance services to LEP individuals they encounter.*

Work Conducted

The MT has reviewed policies and conducted interviews of deputies during site visits and engaged in ride-alongs, paying particular attention to deputy–community interactions. The MT is making a qualitative assessment of LASD's compliance with this provision in its ongoing formal stops and bias-free audit.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved the "Limited English Proficiency and Language Assistance Plan" (LEP Plan) in December 2017; LASD published the policy on April 8, 2018. LASD distributes policies in orientation packets that include the LEP plan.

Training Compliance: **In Compliance**

The LEP plan is discussed in the full-day bias-free policing training. (See Appendix D, Paragraph 70 for discussion of training compliance.)

Implementation Compliance: **Partial Compliance**

LASD implemented the MT- and DOJ-approved LEP plan on April 8, 2018. The MT assesses this provision through reviews of complaint investigations, ride-alongs, community input, and interviews. As of June 1, 2022, the MT has seen no indication of recurring or systematic violations of this provision; however, this is based on informal and preliminary assessment. The MT has found the Department in partial compliance pending its formal ongoing assessment.

Overall Assessment of Progress Toward Compliance

Overall, the MT believes that LASD has made considerable progress. Policies have been agreed to and implemented. Policies and acknowledgment forms required by the policies, to include the LEP plan, are provided in a packet deputies receive and sign for upon assignment to the AV.

The MT has found the Department in partial compliance based on observations and interviews during site visits, which have revealed no violations. Full compliance will be determined pending formal review.

Recommendations to Achieve Full Compliance

The MT recommends that LASD include this provision in regular audits of AV stations' practices.

Work to Be Completed During the Upcoming Reporting Period

The MT will formally verify the LEP plan receipt by current and incoming deputies in the next reporting period. The MT will continue its assessment of this provision in accordance with the audit plan.

**Paragraph 67**

*LASD-AV agrees to incorporate requirements regarding bias-free policing and equal protection into its performance assessment processes, including giving significant weight to an individual's history of sustained bias-related violations, as well as using all available methods to assess the individual's ability to effectively practice bias-free policing.*

Work Conducted

Since 2016, the Department has included language in each annual performance evaluation that indicates it is the supervisors' determination that the deputy can effectively practice bias-free policing. During recent discussions regarding compliance metrics and the MT's audit of stops and bias-free policing, the Parties and the MT discussed the methodologies that may be used to assess whether "significant weight" is given to the deputy's work history and whether all available methods are used in the assessment.

Policy Compliance: **In Compliance**

After a review process, the MT and DOJ approved Palmdale Unit Order 14-06 and Lancaster Unit Order 69, titled "Supplemental Supervisory Responsibilities," in January 2016. These unit orders address this provision. LASD published the policy on May 3, 2016, and began disseminating it to current and newly assigned LASD-AV deputies.

The MT has found LASD in policy compliance with this provision since May 3, 2016.

Training Compliance: **NA**

Agreement will need to be reached as to the scope of this assessment in the performance evaluation, prior to determining what supervisor training may be needed to carry out the assessment of this provision in the course of performance evaluations.

Implementation Compliance: **Not in Compliance**

In previous semi-annual reports, the Department was found in partial compliance with this paragraph based on confirmation that on May 3, 2016, LASD required summaries be entered into the performance evaluations. The MT finds the Department out of implementation compliance for this provision because LASD has yet to provide the MT with evidence that it is using "all available methods to assess the individual's ability to effectively practice bias-free policing," including using deputies' statistics for stops and other enforcement actions, and how they fit into the stations' enforcement activities and strategies. The Parties and the MT need to

create a method for establishing an appropriate sample that the MT will use to assess compliance. Also, LASD has indicated it may be more appropriate to address this provision in other types of reviews rather than the annual performance evaluations because the annual evaluation is not as in depth as the reviews conducted when a potential problem is identified. A specific plan will provide supervisors with a significant tool to measure a deputy's performance and ability to practice bias-free policing.

Overall Assessment of Progress Toward Compliance

The Parties are discussing the best way to measure compliance with this provision. This section requires the use of "all available methods to assess the individual's ability to effectively practice bias-free policing." The methods may include annual evaluations, the quarterly reports, Sheriff's 11, Top Ten lists, and regular supervision. Additionally, this section is closely tied to LASD creating formal crime reduction/community policing plans. The plans are the way staff receive direction for enforcement efforts and are critical for determining whether deputies are working toward the goal of LASD in a coordinated fashion.

Recommendations to Achieve Full Compliance

LASD must ensure all reasonable available methods to assess compliance with this provision are identified and used. This includes the following.

- Identifying methods to assess the individual's ability to effectively practice bias-free policing, such as DDWS reviews; review of police reports, arrest reports, complaints, and other relevant supplemental reports; review of Watch Commander logs and sergeant field activity logs; regular day-to-day supervision; feedback from peers; community feedback; annual performance evaluations and, when applicable, unit level performance reviews; supervisory and management reports, including PLEs and PRMS; and results of LASD deputy-specific disparity analysis as described in Paragraph 85.

- Ensuring deputies are aware of their role and expectations as a part of the overall crime reduction efforts and they are provided clear direction of their responsibilities in the plans.

- The personnel evaluations must contain documentation of the required assessment for this provision. If warranted, there must be documentation of action taken to reward the deputies for their efforts and/or interventions made to address violations of this provision.

LASD executives and management should take steps to reinforce a bias-free culture. Management can regularly highlight deputies who are performing their duties in alignment with

community policing and problem-solving endeavors and who do so without indication of bias. Conversely, LASD can provide thoughtful direction and reinforce expectations with deputies, sergeants, and management alike when potentially biased language seeps into meetings and discussions or interactions with the public.

Work to Be Completed During the Upcoming Reporting Period

As in the last reporting period, LASD has submitted no documentation that this is occurring, and while there have been discussions with the Parties and the MT regarding how to appropriately assess compliance for this provision, a method for establishing an appropriate sample has not been agreed upon. The MT requested the plans as required by LASD policy for Community Policing and Engagement (MPP 3-01/110/00). As of the date of this report, the MT has not received the community policing plans.

**Paragraph 68**

*Within one year of the Effective Date, and annually thereafter, LASD will assess all programs, initiatives, and activities involving the Antelope Valley Stations to determine the extent of any disparate impact and to ensure that no program, initiative, or activity is applied or administered in a manner that unlawfully discriminates against individuals on the basis of race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation.*

Work Conducted

In the prior reporting period, covered in the 14th semi-annual report, the Parties and the MT discussed the full list of programs, initiatives, and activities that should be included in the Paragraph 68 disparity assessment. That represented the first work the Department had done on this paragraph in more than seven years. The LASD did not engage in actions this reporting period to move this work forward.

Policy Compliance: **Not in Compliance**

LASD must establish a process related to this provision, which may or not be to establish a policy. Prior to any implementation, DOJ and the MT will review the plan for consistency with this paragraph.

Training Compliance: **Not in Compliance**

After LASD creates an approved policy or plan, LASD will have to create an associated DOJ- and MT-approved training plan.

Implementation Compliance: **Not in Compliance**

Overall Assessment of Progress Toward Compliance

Paragraph 68 requires the Department do a disparity assessment of all the key activities its personnel take part in. In more than seven years, the Department has not conducted such an assessment. The disparity analysis conducted by the MT provided statistics on disparities related to stops—certainly one of the most important and impactful LASD activities—but Department management has failed to follow up the analysis with an assessment of disparity and of any needed corrective action so that there is no unlawful discrimination. In previous reporting periods, the Department provided a list of other programs, initiatives, and activities that it proposed including in the assessment. Establishing the list is an initial step toward compliance, but it is important to note that the Department should not need discussion with DOJ or the MT in order to identify the vast majority of activities that would fall under this provision. Also, it is the Department's responsibility to put forth a proposed methodology for conducting the assessments. To that end, the MT proposed a tiered approach to account for the fact that some programs have more potential for disparate impact than others. The Department has yet to submit a plan, proposal, or an example of an approach.

Recommendations to Achieve Full Compliance

The Monitors recommend that LASD dedicate significant time to developing a plan or pilot an approach for how it would conduct this work. To reach full compliance, LASD must develop the ability to do regular internal assessments. Throughout this report and previous reports, the MT has noted enough examples of LASD rejecting the opportunity to review its practices in light of potential recognized disparities that we suspect developing this ability will require culture change. To start this process, the MT recommends that LASD send clear messages from the top and lean into the opportunity to launch this work and refine it through practice. To reach full compliance, LASD must develop the ability to do this kind of regular assessment.

It should be noted that the assessment is dependent on the accurate collection of data as measured in other provisions in the SA, community input or surveys, and available sources "to ensure that no program, initiative, or activity is applied or administered in a manner that unlawfully discriminates against individuals on the basis of race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation" (Paragraph 68).

<u>Work to Be Completed During the Upcoming Reporting Period</u>

On February 25, 2022, the MT sent LASD a memorandum with suggestions for compliance with this provision. On May 16, 2022, the Compliance Unit advised the MT that work on this topic was underway and a response would be provided soon. The Department intends to prioritize this work in the coming year.

**Paragraph 70**

*LASD will continue to conduct regular training for deputies, training deputies, supervisors, and command staff regarding discriminatory policing. In addition to LASD's current state-mandated training for Antelope Valley deputies, LASD will provide training that emphasizes how bias may occur in law enforcement activity, and the impact of biased policing on effective crime prevention and police legitimacy. This training further shall include:*

a. *methods and strategies for more effective policing that relies upon non-discriminatory factors;*
b. *police and community perspectives related to discriminatory policing;*
c. *constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;*
d. *the protection of civil rights as a central part of the police mission and as essential to effective policing;*
e. *the requirements of the FHA, with specific emphasis on discrimination on the basis of race;*
f. *the existence and impact of arbitrary classifications, stereotyping, and implicit or subconscious bias;*
g. *instruction in the data collection protocols required by this Agreement, including reasons for data collection/analysis;*
h. *identification of key decision points where prohibited discrimination can take effect at both the incident and strategic-planning levels; and*
i. *methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies.*

<u>Work Conducted</u>

The bias-free trainings were developed and, following a review of the curriculum and pilot process, approved by the MT and DOJ. The training began June 15, 2017, for deputies assigned to the AV stations. AV deputies and managers participate in the eight-hour bias-free policing course and complete a required test at the end of the full-day training. To verify implementation of the training, on a quarterly basis the MT reviews signed training attendance sheets and compares them against station personnel rosters to assess whether at least 95% of available AV personnel have received the approved training. As agreed to by the Parties and the MT, this training is offered twice per year. Each AV deputy (including all ranks) is required to take the eight-hour training once.

LASD-AV held its most recent bias-free training on November 8, 2022. The training included bias-free policing concepts, prevention of housing discrimination, stereotyping, and techniques to address/prevent implicit bias. The Compliance Unit monitored the course throughout the day to ensure each student remained present for the entire course and completed/passed the required test at the end of each day. The Compliance Unit shared with the MT attendance sheets after the completion of the full training.

Policy Compliance: **NA**

Training Compliance: **In Compliance**

LASD has developed a training curriculum that has been approved by DOJ and the Monitors.

Implementation Compliance: **In Compliance**

The Department began providing the approved bias-free policing training to all available personnel assigned to the AV on June 15, 2017. Based on the MT's quarterly review of training verification documentation, the Department has been in continual compliance with Paragraph 70 since August 17, 2018, for deputies assigned to the AV stations. The outcomes related to this training are measured in other provisions.

After discussion and agreement with the Parties and the MT, the Department began providing this training in October 2020 to deputies in embedded units—deputies assigned to non-AV commands but who work in the AV on a regular basis. To allow time for the Department to adjust, training receipt verification was initially calculated separately for deputies from embedded units, and they were not included in compliance assessments.

A bias-free policing full-day training was offered on June 15, 2022. Because this training occurred too late to report on in the 14th semi-annual report, this report includes the training held in June and on November 8, 2022. To maintain compliance, the LASD must ensure 95% of all available personnel assigned to the AV stations, including embedded specialized units, receive this training. For June 2022, the LASD reached 95% compliance and rose to 98% in the November 2022 training. See compliance percentage charts below.

| Table D3 | | | | | |
|---|---|---|---|---|---|
| **Bias-Free Policing June 2022** | | | | | |
| | **Total Assigned** | **Total Trained** | **Total Unavailable** | **Total Available** | **Total Not Trained** | **%** |
| Lancaster | 196 | 181 | 3 | 193 | 12 | 94% |
| Palmdale | 178 | 169 | 1 | 177 | 8 | 95% |
| Embedded Units | 53 | 48 | 3 | 50 | 2 | 96% |
| **Combined** | **427** | **398** | **7** | **420** | **22** | **95%** |

| Table D4 | | | | | |
|---|---|---|---|---|---|
| **Bias-Free Policing November 2022** | | | | | |
| | **Total Assigned** | **Total Trained** | **Total Unavailable** | **Total Available** | **Total Not Trained** | **%** |
| Lancaster | 188 | 186 | 1 | 187 | 1 | 99% |
| Palmdale | 173 | 171 | 1 | 172 | 1 | 99% |
| Embedded Units | 50 | 40 | 2 | 48 | 8 | 83% |
| **Combined** | **411** | **397** | **4** | **407** | **10** | **98%** |

<u>Overall Assessment of Progress Toward Compliance</u>

If the Department continues to consistently provide bias-free policing training and ensure that all personnel assigned to the AV participate in these required trainings, they will be in a position where they will be better equipped and positioned to ensure the deputies experience a more positive and trusting relationship with the community they serve. It is the hope of the MT that LASD heeds the advice of the training instructor and incorporate this training on a regular basis moving forward.

<u>Recommendations to Achieve Full Compliance</u>

In order to reach sustained compliance with this provision, LASD must continue to provide the bias-free policing training to all required AV personnel. Assuming LASD continues to comply with this provision, the AV station would reach sustained compliance on June 15, 2023. Even after LASD reaches sustained compliance for this provision, they must continue giving the training until the termination of the Settlement Agreement. The Department must also consider changes to the curriculum and/or refresher training if evidence of the need arises.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

LASD will continue to provide the bias-free policing training to new deputies or new deputies to the AV and document attendance. The MT will continue to verify the training attendance against the station rosters.

**Paragraph 71**

*LASD-AV will conduct roll call trainings at least quarterly to emphasize the importance of preventing discriminatory policing. These roll call sessions will include scenario-based discussions of real and hypothetical situations.*

<u>Work Conducted</u>

For the roll call briefings, seven distinct scenarios were developed and, after a review process, approved by the MT and DOJ and began in February 2019. The Department also developed a train-the-trainer course whereby supervisors develop their skills and an understanding of expectations about how to conduct this training during regular roll call sessions. Only approved supervisors who attend the train- the-trainer course may provide the roll call briefing. Each available deputy receives two of the briefings in each quarter (with only one provided in the fourth quarter), so they receive all seven each year.

In 2020, LASD indicated the need to develop additional roll call trainings because the existing material was getting stale for deputies receiving the training multiple times over the years. DOJ provided several videos that could be the basis of additional trainings. Drafts were exchanged in 2020 and 2021, but as was the case in the last reporting period, those have not been finalized. Those drafts have remained with the Department for further review, edits, or development. And those will need to be approved by DOJ and the MT.

The MT has found the Department in compliance in several quarters since implementation, but such compliance has not happened consistently. During site visits, the MT attends roll call briefings to assess whether the briefings are delivered in the agreed-upon manner. The MT has also conducted observations during site visits, observations of the watch sergeants, ride-alongs, and reviews of documentation related to other SA items, and has listened to community comments regarding LASD and LASD activities. In the previous reporting period, LASD instituted new practices and a tracking system to ensure deputies are provided with these important briefings This new practice consisted of offering training sessions the first two months of the quarter and have the third month serve as an opportunity for deputies to receive the training if they were unable to attend the initial sessions. The MT recognizes this problem-solving work. We recommend LASD modify the training practice further in order to ensure the quarterly roll call training sessions are not offered on the same day as it would be inconsistent with the intent behind having quarterly refresher sessions.

Policy Compliance: **NA**

Training Compliance: **In Compliance**

LASD has developed a training curriculum that has been approved by DOJ and the monitor.

Implementation Compliance: **Not in Compliance**

The Department was found to be in compliance in several quarters since the rollout of the quarterly roll call briefings on February 1, 2019; however, the Department has not maintained regular consistent compliance. LASD was found to be out of compliance in 2021 because not all the required training was provided each quarter. The MT received and reviewed attendance rosters and associated memos regarding LASD's completion of briefings C and D that were completed in the third quarter of 2022. See tables below for detailed percentages for the roll call training briefings.

| Table D5 | | | | | |
|---|---|---|---|---|---|
| Briefing C: Quarter 2 2022 | | | | | |
| | Total Assigned | Total Briefed | Total Unavailable | Total Available | Total Not Briefed | % |
| Lancaster | 176 | 155 | 17 | 159 | 5 | 97% |
| Palmdale | 167 | 147 | 14 | 153 | 6 | 96% |
| **Combined** | **343** | **302** | **31** | **312** | **11** | **97%** |

| Table D6 | | | | | |
|---|---|---|---|---|---|
| Briefing D: Quarter 2 2022 | | | | | |
| | Total Assigned | Total Briefed | Total Unavailable | Total Available | Total Not Briefed | % |
| Lancaster | 176 | 154 | 17 | 159 | 5 | 97% |
| Palmdale | 167 | 145 | 17 | 150 | 5 | 97% |
| **Combined** | **343** | **299** | **34** | **309** | **10** | **97%** |

The MT received and reviewed attendance rosters and associated memos from LASD, and in November 2022 found the stations to be in compliance with briefings E and F as shown in the tables below.

| Table D7 | | | | | |
|---|---|---|---|---|---|
| **Briefing E: Quarter 3 2022** | | | | | |
| | **Total Assigned** | **Total Briefed** | **Total Unavailable** | **Total Available** | **Total Not Briefed** | **%** |
| Lancaster | 188 | 169 | 14 | 174 | 5 | 97% |
| Palmdale | 173 | 150 | 18 | 155 | 5 | 97% |
| **Combined** | **361** | **319** | **32** | **329** | **10** | **97%** |

| Table D8 | | | | | |
|---|---|---|---|---|---|
| **Briefing F: Quarter 3 2022** | | | | | |
| | **Total Assigned** | **Total Briefed** | **Total Unavailable** | **Total Available** | **Total Not Briefed** | **%** |
| Lancaster | 188 | 171 | 14 | 174 | 3 | 98% |
| Palmdale | 173 | 155 | 18 | 155 | 0 | 100% |
| **Combined** | **361** | **326** | **32** | **329** | **3** | **99%** |

Overall Assessment of Progress Toward Compliance

The LASD is out of compliance for the quarterly refresher training (aka roll call trainings) because two quarterly trainings were provided on the same day, which is not how the trainings were designed to work nor does it follow the MT and DOJ approved training delivery plan. The MT discussed this practice in its 12th and 13th reports. In the 14th semi-annual report, we state, "We do reiterate the importance of maintaining the regular, agreed-upon roll call briefing schedule and delivering the training as approved and intended so sessions are properly spread out for optimal learning and reinforcement" (p.16).

Recommendations to Achieve Full Compliance

With the new procedures instituted at the AV stations to ensure deputies attend the roll call briefings, the MT expects LASD's ability to achieve consistent progress toward compliance will improve. Additionally, the MT emphasizes that LASD must no longer provide multiple quarterly briefings on the same day. The Department must also consider enhancements to the roll call trainings if evidence of the need arises.

Work to Be Completed During the Upcoming Reporting Period

At the Compliance Unit's request, LASD was to develop additional quarterly roll call briefings so that the material does not get stale; this has not been done but should be done in the next

reporting period. The MT will continue to observe current briefings and review any newly developed scenarios. The MT will ensure the scenarios include the SA-required subject matter for the briefings. The MT will observe current roll call briefings during site visits and review any newly developed scenarios.

## C. ENFORCEMENT OF SECTION 8 COMPLIANCE

### Paragraph 73

*LASD shall implement a Housing Non-discrimination Policy which reflects LASD's commitment to the requirements of the FHA and explains how to file a complaint of housing discrimination.*

<u>Work Conducted</u>

There has not been MT work on this policy since the Department reached compliance February 23, 2018. The Department reached sustained compliance May 31, 2019, and SA Paragraph 150 compliance February 28, 2022.

In 2017, the Parties and the MT engaged in a series of discussions that led to the Department drafting a Housing Non-discrimination (HND) Policy. The Parties and the MT discussed revisions, and ultimately, the MT and DOJ approved the policy after LASD internal reviews and approvals. The policy was subsequently published February 23, 2018.

<u>Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked</u>

The HND Policy, FOD 18-001, was published February 23, 2018, after approval from the MT, DOJ, and internal Department, and it was disseminated Department-wide. (HND policy receipt verification is addressed in Paragraphs 74 and 75.) Policy development compliance was based on a qualitative assessment in which the Parties worked with the MT to draft and refine the policy to meet the SA requirements and provide for its practical use by the Department.

<u>Training Compliance: **Partial Compliance**</u>

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A–G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70 and 71.)

Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

In addition to development and dissemination of the policy itself, Paragraph 73 also requires implementation, which includes "consistent and verified performance of that policy or procedure in actual practice" (SA Paragraph 20). To assess if the HND policy was reflected in the field, the MT reviewed and assessed LASD stat code 787 data, complaints, administrative investigations, Watch Commander logs, and interviewed community members regarding any incidents of LASD accompaniment of housing authority workers. The MT consistently found no indication of violations of the policy or other housing-related SA requirements; thus, the Department was consistently found in compliance since 2018 therefore SA Paragraph 150 has been invoked.

Overall Assessment of Progress Toward Compliance

LASD has been in sustained compliance with SA Paragraph 73 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75, the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

Recommendations to Achieve Full Compliance: **None**

Work to Be Completed During the Upcoming Reporting Period: **None**

**Paragraph 74**

*LASD shall provide a copy of the Housing Non-discrimination Policy to all sworn LASD-AV deputies. The LASD shall secure signed statements from each individual subject to this paragraph acknowledging that he or she has received and read the Housing Non-discrimination Policy, has had the opportunity to have any questions answered, and agrees to abide by the relevant provisions of this order and the Housing Non-discrimination Policy.*

Work Conducted

There has not been any MT work on this provision during the past six-months because the Department is in sustained compliance and SA Paragraph 150 has been invoked.

After the February 23, 2018, publication of the HND policy, LASD developed an internal process for distributing and documenting deputy receipt of the policies. This process included the HND Policy Acknowledgment Form and Supplemental Policy Acknowledgment Form to document appropriate personnel received, understood, and agreed to abide by the HND policy. These

forms were approved by the MT and DOJ. The MT and LASD also developed a process for MT verification of LASD documentation of deputy receipt of the policies, which included the MT reviewing Department-provided forms and rosters of deputies assigned to the AV stations.

Policy Compliance: **In Sustained Compliance, SA Paragraph 150 Invoked**

The MT reviewed policy receipt documentation and determined that the personnel currently assigned to the AV stations have received, executed, and returned the HND Policy Acknowledgment Form in conformity with the approved metric (at least 95% of available personnel) as of May 25, 2018. (The development of the HND policy is described in SA Paragraph 73 appendix. Receipt of policies by newly assigned personnel is addressed in Paragraph 75.)

Training Compliance: **Partial Compliance**

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A-G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix C, Paragraphs 70 and 71.)

Implementation Compliance: **In Sustained Compliance, SA Paragraph 150 Invoked**

This provision focuses on receipt of the HND policy by current LASD-AV deputies; see policy compliance above.

Overall Assessment of Progress Toward Compliance

LASD has been in sustained compliance with SA Paragraph 74 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75, the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

Recommendations to Achieve Full Compliance: **None**

Work to Be Completed During the Upcoming Reporting Period: **None**

**Paragraph 75**

*During the term of this SA, within 15 days after each new deputy is assigned to LASD-AV, LASD shall provide the individual with a copy of the Housing Non-discrimination Policy and shall secure the same signed acknowledgment.*

Work Conducted

There has not been any MT work on this provision during the past six-months because the Department is in sustained compliance and SA Paragraph 150 has been invoked.

Following the process established in 2018, for the fourth quarter 2021, the MT received the Compliance Unit's housing policy receipts materials January 21, 2022. The MT reviewed the materials and verified the CU's assessment that there were 10 newly assigned deputies to Lancaster and eight newly assigned deputies to Palmdale. All 18 of the deputies signed the required housing policy receipts within 15 days of their assignment, and the Accompaniment Policy Acknowledgment Forms within the 30 days required by SA Paragraph 164. LASD has been in sustained compliance with SA Paragraph 75 since September 14, 2020. With the fourth-quarter 2021 compliance determination, the February 28, 2022, Monitors' recommendation that deemed the Department in compliance with housing provisions 73–80 and 164 as it relates to housing pursuant to SA Paragraph 150 was issued.

Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

The MT reviewed policy receipt documentation on a quarterly basis and determined that personnel newly assigned to the AV stations received, executed, and returned the HND Policy Acknowledgment Form in conformity with the approved metric (at least 95% of available personnel) beginning May 31, 2018, with sustained compliance beginning September 14, 2020. (The development of the HND policy is described in the SA Paragraph 73 appendix.)

Training Compliance: **Partial Compliance**

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A-G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70 and 71.)

<u>Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked</u>

This provision focuses on receipt of the HND policy by newly assigned LASD-AV deputies; see policy compliance above.

<u>Overall Assessment of Progress Toward Compliance</u>

LASD has been in sustained compliance with SA Paragraph 75 since September 14, 2020. With Paragraph 75 in sustained compliance—the last element of the housing section provisions to reach that status—the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

<u>Recommendations to Achieve Full Compliance</u>: **None**

<u>Work to Be Completed During Reporting Period</u>: **None**

**Paragraph 76**

*LASD shall revise its policy regarding the review of requests from a housing authority for deputy accompaniment on compliance checks in Field Directive 12-02. The revised policies shall, among other things, specifically outline the factors to be considered when assessing the need for deputy accompaniment and the number of deputies necessary for accompaniment.*

<u>Work Conducted</u>

There has not been any MT work on this provision since the Department reached policy compliance March 14, 2018. The Department reached sustained compliance May 31, 2019, and SA Paragraph 150 compliance February 28, 2022.

In 2017 the Parties and the MT engaged in a series of discussions that led to the Department drafting a revised Housing Authority Investigations/Inspections (Accompaniment) Policy. The Parties and the MT discussed revisions and, ultimately, the MT and DOJ approved the policy after LASD internal reviews and approvals. The policy was subsequently published March 14, 2018.

<u>Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked</u>

Policy development compliance was based on a qualitative assessment in which the Parties

worked with the MT to revise and refine the Accompaniment Policy to meet the SA requirements. The Accompaniment Policy, FOD 12-002, was published March 14, 2018, after MT, DOJ, and internal Department approval, and it was disseminated Department-wide. The MT reviewed policy receipt documentation and determined that the personnel assigned to the AV stations have received, executed, and returned the Supplemental Policy Acknowledgment forms in conformity with the agreed-upon metrics (at least 95% of available personnel) and SA Paragraph 164 as it relates to housing.

Training Compliance: **Partial Compliance**

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A–G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70 and 71.)

Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

In addition to revision and dissemination of the policy itself, Paragraph 76 also requires implementation, which includes "consistent and verified performance of that policy or procedure in actual practice" (SA Paragraph 20). To assess if the Accompaniment policy was reflected in the field, the MT reviewed and assessed LASD stat code 787 data, complaints, administrative investigations, Watch Commander logs, and interviewed community members regarding any incidents of LASD accompaniment of housing authority workers. The MT consistently found no indication of violations of the policy or other housing-related SA requirements and, in fact, found that LASD-AV deputies did not participate in Section 8 voucher compliance checks; thus, the Department was consistently found in compliance since 2018.

Overall Assessment of Progress Toward Compliance

LASD has been in sustained compliance with SA Paragraph 76 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75, the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

Recommendations to Achieve Full Compliance: **None**

LASD has been deemed in compliance with housing Paragraphs 73–80 and 164 as it relates to

housing pursuant to MT SA Paragraph 150 recommendation since February 28, 2022.

Work to Be Completed During the Upcoming Reporting Period: **None**

**Paragraph 77**

*LASD shall institute policies regarding LASD's own independent investigations upon referral of a housing authority of allegations of fraud on the voucher program to ensure that those investigations are not being used to harass residents in their homes or motivate residents to relocate from their homes. LASD's policies shall be revised to include guidance on proper procedures for sharing information with a housing authority and guidelines for referral of cases for criminal prosecution for fraud based solely on compliance with the Section 8 contract.*

Work Conducted

There has not been any MT work on this provision since the Department reached policy compliance March 14, 2018. The Department reached sustained compliance May 31, 2019, and SA Paragraph 150 compliance February 28, 2022.

Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

Paragraph 77 was addressed in the revised Housing Authority Investigations/Inspections (Accompaniment) Policy. For details, see Appendix C, Paragraph 76.

Training Compliance: **Partial Compliance**

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A–G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70 and 71.)

Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

For details, see Appendix D, Paragraph 76.

<u>Overall Assessment of Progress Toward Compliance</u>

LASD has been in sustained compliance with SA Paragraph 77 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75 the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

<u>Recommendations to Achieve Full Compliance</u>: **None**

Work to Be Completed During the Upcoming Reporting Period: **None**

**Paragraph 78**

*LASD shall require all deputies to document all voucher holder compliance checks using stat code 787 pursuant to Field Operations Directive 12-02.*

<u>Work Conducted</u>

There has not been any MT work on this provision during the past six-months because the Department is in sustained compliance and SA Paragraph 150 has been invoked.

<u>Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked</u>

Paragraph 78 was addressed in the revised Housing Authority Investigations/Inspections (Accompaniment) Policy. For details, see Appendix d, Paragraph 76.

<u>Training Compliance: **Partial Compliance**</u>

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A–G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70 and 71.)

Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

See Appendix D, Paragraph 76.

Overall Assessment of Progress Toward Compliance

LASD has been in sustained compliance with SA Paragraph 78 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75, the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

Recommendations to Achieve Full Compliance: **None**

Work to Be Completed During the Upcoming Reporting Period: **None**

**Paragraph 79**

*LASD shall require all deputies to document each independent investigation for criminal fraud based on voucher holder compliance with the voucher contract using stat code 787.*

Work Conducted

There has not been any MT work on this provision during the past six-months because the Department is in sustained compliance and SA Paragraph 150 has been invoked.

Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

Paragraph 79 was addressed in the revised Housing Authority Investigations/Inspections (Accompaniment) Policy. For details, see Appendix D, Paragraph 76.

Training Compliance: **Partial Compliance**

The Department is in compliance on the bias-free policing training and not in compliance on the quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A-G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70

and 71.)

Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

For details, see Appendix C, Paragraph 76.

Overall Assessment of Progress Toward Compliance

LASD has been in sustained compliance with SA Paragraph 79 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75, the MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022, which LASD approved on March 4, 2022, and DOJ approved on May 4, 2022.

Recommendations to Achieve Full Compliance: **None**

Work to Be Completed During the Upcoming Reporting Period: **None**

**Paragraph 80**

*LASD shall require all deputies to document calls, observations, or incidents involving voucher holders using state code 787. Nothing in this paragraph shall authorize deputies to inquire into an individual's Section 8 status during routine law enforcement activity.*

Work Conducted

There has not been any MT work on this provision during the past six-months because the Department is in sustained compliance and SA Paragraph 150 has been invoked.

Policy Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

Paragraph 80 was addressed in the revised Housing Authority Investigations/Inspections (Accompaniment) Policy. For details, see Paragraph 76 appendix.

Training Compliance: **Partial Compliance**

The Department is in compliance on the bias-free policing training and not in compliance on the

quarterly roll call trainings.

Training for the HND policy is incorporated into the bias-free policing training and the quarterly roll call trainings, Preventing Discriminatory Policing Parts A–G; accordingly, training compliance for SA Paragraph 74 is assessed with SA Paragraphs 70e and 71. (See Appendix D, Paragraphs 70 and 71.)

Implementation Compliance: In Sustained Compliance, SA Paragraph 150 Invoked

For details, see Appendix D, Paragraph 76.

Overall Assessment of Progress Toward Compliance

LASD has been in sustained compliance with SA Paragraph 80 since May 31, 2019. After the Department reached sustained compliance with Paragraph 75, the Parties and MT invoked SA Paragraph 150 regarding housing provisions 73–80 on February 28, 2022.

Recommendations to Achieve Full Compliance: **None**

Work to Be Completed During the Upcoming Reporting Period: **None**

## D. DATA COLLECTION AND ANALYSIS

**Preface**

To identify shortcomings, assess improvements, and increase community confidence in LASD's law enforcement activity in the AV, LASD agrees to enhance its data collection, analysis, and reporting as set out below. LASD will develop and implement a protocol for the collection and regular analysis of data to assess whether there are trends and patterns that indicate bias or practices that otherwise run counter to Constitutional and effective policing.

Work Conducted

When the SA was signed, LASD acknowledged it did not have the internal capacity to produce the data required in this section; therefore, the analysis for this section was outsourced. This early effort to address these provisions was helpful, but the methodology used to conduct the analyses and prepare the report, which had not been submitted for review before the work began, was found to be out of compliance by the MT and DOJ. After much discussion, in 2017

County Counsel noted that SA Paragraph 153 requires the Monitors to produce qualitative and quantitative outcome assessments on each area of the SA and that some of those outcomes overlap considerably with the data analysis responsibilities of LASD, including those in this section.

Subsequently, as described in semi-annual reports, the Compliance Unit and County Counsel requested that the MT produce the analysis for Paragraphs 82, 83, and 85, which the Department would then use to address the requirements in Paragraphs 83–86 that it does its own assessment of the statistical findings for problematic issues and trends, develops and implements any necessary corrective action, and produces a report describing its activities.

The Parties and the MT discussed and came to agreement on the methods to be used for that analysis prior to the MT beginning its work. Subsequently, the MT produced a statistical report in September 2020 titled *An Analysis of Racial/Ethnic Disparities in Stops by Los Angeles County Sheriff's Deputies in the Antelope Valley*. The Parties and the Monitors then held discussions on the results of that report, which found evidence of potential disparity, and how station and Division managers should use the data to fulfill the SA requirements for Paragraphs 83–85.

However, the Department did not conduct any of the required managerial assessment of the findings presented in the MT's report. The Department also did not request that the MT produce the analysis on a semi-annual basis and has produced no analysis themselves.

In the 14th report, the MT noted that provisional compliance metrics for this section had been provided to help guide the Department in fulfilling its required assessment and action plans. LASD requested changes to those metrics, but no proposed metrics have been proposed since that request.

In the 14th report, the MT noted that LASD assigned a data analyst to the Compliance Unit to conduct the data analysis for Paragraphs 82–85 and committed to submitting a work plan for MT and DOJ review by end of May 2022. LASD did not meet this goal, but is currently seeking an external contractor because the SA-required work may be out of the scope of the LASD data analyst.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Out of Compliance**

Apart from the data collection related to Paragraph 81 (which is largely the same as data collection required for Paragraph 44), LASD has made no substantive progress on this section

even though LASD has assigned a full-time data analyst dedicated to analytics required by the SA.

Overall Assessment of Progress Toward Compliance

LASD has made minimal effort on conducting the required work. Because LASD assigned a full-time data analyst dedicated to the analytics required by the SA, the MT has expected there to be progress on this section in this reporting period. However, no analysis or methodology or protocol has been developed or implemented. LASD does not routinely review and assess stops trends and patterns that indicate bias or practices that otherwise run counter to Constitutional and effective policing, nor does management seem open to doing so. Outside analysis offering data that may be used to identify potential disparate practices have been rejected. See 14th semi-annual report for more discussion.

Recommendations to Achieve Full Compliance

The MT recommends that LASD executives and the county Board of Supervisors aggressively adopt modern data collection and management systems. In addition to technological upgrades, the MT recommends that LASD executives institute a culture that embraces the effective utilization of data. They could do this by developing and implementing a protocol and practice for the regular review of stops data by NPD and station managers and also by providing positive reinforcements to station leaders who consistently probe and use stops data to inform their practice. These reviews should expand the station's recent use of data to regularly assess whether there are trends and patterns that indicate bias or practices that otherwise run counter to Constitutional and effective policing and should include connecting the assessments to crime prevention strategies, the exploration of probing questions about the findings, applying potential corrective action where warranted, and tracking the outcomes of any interventions implemented. For more discussion of this issue, see the 14th semi-annual report.

Work to Be Completed During the Upcoming Reporting Period

The Department needs to produce a work plan for completing the analysis, assessment, potential corrective actions, and report required by this section. With a DOJ- and MT-approved plan, the Department will need to begin the analysis and assessment work.

The monitoring plan distributed to the Parties in October 2021 and updated and shared on May 4, 2022, reflected a deadline for LASD to submit an analysis plan for the Paragraphs 82–86 by May 31, 2022. The MT has updated the monitoring plan to reflect a deadline of August 1, 2022, for the analysis plan. During our August site visit, the LASD indicated they would not conduct this work during 2022 and is considering their capacity to do it in 2023.

**Paragraph 81**

*LASD will continue to collect data currently required by the Statistical Code Guide, Radio Code Book, and related policies and shall create new statistical codes and/or data fields requiring documentation of the following in the MDC patrol log system and Regional Allocation of Police Service (RAPS) database:*

a. *bicycle stops;*
b. *backseat detentions;*
c. *probation or parole stops and searches;*
d. *consent searchers;*
e. *and vehicle impoundments.*

Work Conducted

See Appendix D, Data Collection and Analysis Preface.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Partial Compliance**

The MT has assessed Paragraph 81 in parallel with its assessment of Paragraph 44. The MT has conducted observations during site visits, observations of the Watch Sergeants and ride-alongs. The AAB conducted audits of each of the LASD-AV stations and found compliance with some of the requirements of SA Paragraph 44 and 81. The MT reviewed AAB audits of this requirement and delayed formal assessment of these provisions because key compliance metrics had not been reached; as such, the Department was found to be in partial compliance. The MT's formal assessment for this provision began in January 2022.

Overall Assessment of Progress Toward Compliance

LASD established new procedures and policies to ensure the necessary data were collected by deputies. The MT's preliminary assessment of the thoroughness of that data entry found the Department in partial compliance.

Recommendations to Achieve Full Compliance

If the MT's compliance assessment identifies any issues with data entry, the Department will need to issue Corrective Action Plans. Otherwise, entry of the required data by deputies and supervisorial review of that documentation will need to continue.

Work to Be Completed During the Upcoming Reporting Period

The Department needs to continue to require deputies to enter the required information for each stop. The MT's compliance assessment for the Stops section will also measure the thoroughness of data collection related to Paragraph 81.

**Paragraph 82**

*LASD will conduct at least semi-annual analysis of, at minimum, the following AV data:*

a. *stop, search, contraband seizure, and arrest data including backseat detentions, probation and parole searches, and consent searches;*
b. *stops, searches, and/or arrests for discretionary offenses such as jaywalking, crossing against a traffic light, failing to yield right of way or walking on the wrong side of the street;*
c. *uses of force, including force associated with obstruction arrests and similar violations.*
d. *arrest for California Penal Codes 69 (felony obstruction or resisting arrest), 148(a) (misdemeanor obstruction or resisting arrest), and 243(b) (battery on a peace officer or other public officer without infliction of injury);*
e. *vehicle impoundments;*
f. *civilian complaints, by category; and*
g. *Voucher Holder compliance checks involving LASD personnel.*

Work Conducted

See Appendix D, Data Collection and Analysis Preface for this description.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

See Appendix D, Data Collection and Analysis Preface.


Overall Assessment of Progress Toward Compliance

See Appendix D, Data Collection and Analysis Preface.


Recommendations to Achieve Full Compliance

See Appendix D, Data Collection and Analysis Preface.


Work to Be Completed During the Upcoming Reporting Period

See Appendix D, Data Collection and Analysis Preface.


**Paragraph 83**

*LASD agrees to base its analysis on accurate, complete, and reliable data. Analysis of this data will include a regression analysis to determine whether law enforcement activity has a disparate impact on any racial or ethnic group. This regression analysis will control for factors other than race, including but not limited to demographics and crime rates, in describing and potential disparate impact. The regression analysis will include determining whether, after controlling for alternate explanations:*

a.  *LASD deputies working in the AV are more likely to stop, cite, search, or arrest based on race or ethnicity;*
b.  *LASD deputies working in the AV are more likely to ask persons of certain races or ethnicities for consent searches, and about their probation or parole status;*
c.  *LASD deputies working in the AV are more likely to stop or search persons of certain races or ethnicities for discretionary or non-violent offenses; and*
d.  *LASD deputies working in the AV are more likely to impound or store the vehicles of personas of certain races or ethnicities.*


Work Conducted

See Appendix D, Data Collection and Analysis Preface for this description.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

See Appendix D, Data Collection and Analysis Preface.

Overall Assessment of Progress Toward Compliance

See Appendix D Data Collection and Analysis Preface.

Recommendations to Achieve Full Compliance

See Appendix D, Data Collection and Analysis Preface.

Work to Be Completed During the Upcoming Reporting Period

See Appendix D, Data Collection and Analysis Preface.

**Paragraph 84**

*Through this data analysis, LASD will identify any trends or issues that compromise constitutional policing and respond accordingly. Appropriate responses may include reviewing and revising any policies or training that may lead to problematic trends; and assessing whether any practices should be changes to ensure adherence to constitutional requirements and/or more effective policing.*

Work Conducted

See Appendix D, Data Collection and Analysis Preface.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

See Appendix D, Paragraph 83.


Overall Assessment of Progress Toward Compliance

In addition to the text provided in the preface of this section, the MT also stresses that not only has the Department not conducted the required data analysis, including regressions, but LASD also has refused to consider the review of the findings from other reputable sources, including the OIG. While including data analysis from outside sources is not a direct requirement in this section, the immediate rejection and criticism of these sources is notable. For more discussion of this issue, see the Data Collection and Analysis section of this report.


Recommendations to Achieve Full Compliance

In addition to the recommendations included in the preface, the MT recommends that LASD acknowledge and consider data from other reputable sources. The OIG is tasked with an oversight function by the Board of Supervisors, and the results of its analysis should be considered and responded to thoughtfully. We also recommend that LASD make use of the analysis of outside sources to start building a data culture until LASD is able to produce its own data analysis for this section. We also recommend that LASD shares how it is responding to data publicly to assure the public that the Department is invested in using data to inform policing and community engagement.


Work to Be Completed During the Upcoming Reporting Period

See Appendix D, Data Collection and Analysis Preface.


**Paragraph 85**

*This analysis will also determine whether there are reporting districts and deputies with potentially problematic trends and respond accordingly. LASD will make efforts to incorporate regular analysis of this data into routine operational decisions.*


Work Conducted

See Appendix D, Data Collection and Analysis Preface.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

In addition to the information provided in the preface, the MT notes that no analysis has been proposed that includes reporting districts. See Appendix D, Paragraph 83.

Overall Assessment of Progress Toward Compliance

See Appendix D, Data Collection and Analysis Preface.

Recommendations to Achieve Full Compliance

See Appendix D, Data Collection and Analysis Preface.

Work to Be Completed During the Upcoming Reporting Period

In addition to the information provided in Appendix C, Data Collection and Analysis Preface, the MT notes the expectation that analysis examines differences by reporting districts.

**Paragraph 86**

*On a semi-annual basis for the first year of the agreement and annually thereafter, LASD agrees to issue a report summarizing the results of the AV data collected, and the steps taken to correct problems and build on successes. The report will be publicly available in English and Spanish and posted on LASD's website.*

Work Conducted

See Appendix D, Data Collection and Analysis Preface.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

See Appendix D, Data Collection and Analysis Preface and Paragraph 83.

Overall Assessment of Progress Toward Compliance

See Appendix D, Data Collection and Analysis Preface.

Recommendations to Achieve Full Compliance

In addition to the annual report, the results of this work should be integrated with the work in the Stops, Bias-Free Policing, and Community Engagement sections. Sharing information about the efforts the Department does and does not take to ameliorate any potential issues is an important part of the process and can build trust in itself. There must be documentation of any changes to practice implemented in an effort to address identified disparity or documentation of the reason no change was implemented and why. The documentation serves multiple purposes: station managers can better understand, develop corrective action, and track progress—and hold deputies and units accountable to bias-free policing requirements—and the community can understand that the Department is making a concerted effort and provide feedback to the process. Documentation is also necessary for the Monitors to assess progress and compliance with the SA. Documented methodology and assessment process, thoroughly completed and reviewed SPATIAL forms, and community policing plans implemented according to MPP 301-110-00 will facilitate station managers' understanding of whether their policing practices are having a desired and intended impact on the community or whether it might also be having unintended and harmful effects such as disparate impacts on a particular population or neighborhood, or even policing services that fail to promote "broad community engagement and confidence in the department" (SA page 13; see also Paragraph 168 and the SA's Data Collection and Analysis section).

In addition to the recommendations provided in the preface, in order to achieve full compliance on this provision, the MT recommends that LASD begin to procure a translation service that specializes in translating this kind of data analysis of potential disparate impact into Spanish so that when the report is approved, the lack of translation services will not be a barrier to compliance.

Work to Be Completed During the Upcoming Reporting Period

In addition to the information provided in the preface, once approved, the aforementioned

stops report needs to be made publicly available in both English and Spanish.


### E. COMMUNITY ENGAGEMENT

**Paragraph 69**

*LASD agrees to utilize experts and the community survey outlined below to study organizational climate and culture in the Antelope Valley stations to aid in developing the requirements of this section. Personnel will be allowed to confidentially provide information for the study. LASD will conduct longitudinal climate and culture studies during the course of this Agreement.*


Work Conducted

The Parties and MT have developed an online Deputy Survey that has been administered twice, the first time by Evident Change and the second by the Department. The MT has produced a report describing the methods and tabulating findings. After the first administration, the Department informed the MT and DOJ that the results of the survey were submitted to the station managers who reviewed them. The MT has seen no documentation of that or any further action.

This provision also pertains to the Community Survey. See Appendix D, Paragraph 98–101.


Policy Compliance: **NA**


Training Compliance: **NA**


Implementation Compliance: **Partial Compliance**

The MT considers LASD in partial compliance with annually conducting the Deputy Survey because the survey has been conducted, but LASD has not informed or attempted to demonstrate the ways it uses the survey to study organizational climate and culture in the AV stations or to aid in the development of the bias-free policing or community engagement provisions. Likewise, the Department has not informed the MT or provided documentation of how it uses the Community Survey to inform community engagement activities (Paragraph 88).


Overall Assessment of Progress Toward Compliance

The Department has been cooperative and resourceful in the administration of the Deputy

Survey, but had not made use of the surveys. See also Appendix D, Paragraph 98–101.

Recommendations to Achieve Full Compliance

The Department should develop a plan for utilizing the results of both the Deputy Survey and the Community Survey. See also Appendix D, Paragraphs 98–101.

Work to Be Completed During the Upcoming Reporting Period

On December 6, 2021, LASD submitted a revised survey instrument to conduct the 2021 Deputy Survey. On December 8, 2021, the MT asked to schedule a time to discuss LASD's revisions to the survey instrument. The Parties and MT discussed the Deputy Survey in 2022, which led to the Department requesting additional time to consider revisions that would make it more useful. The survey was administered in 2019 and 2020, but not in 2021 or 2022. LASD has indicated that a new plan for the Deputy Survey will be submitted by May 18, 2023. Once this approach is approved by the MT, the Department can proceed with the next administration.

The MT continues data collection for the Community Survey and will evaluate whether additional outreach methods should be employed in this reporting period. See also Appendix D, Paragraphs 98–101. To date, the Department has not informed the MT or provided documentation of how it uses the results of the Community Survey to inform community engagement activities (see Paragraph 88).

**Paragraph 72**

*LASD agrees to utilize experts and the survey below to study organizational climate and culture in the Antelope Valley stations to aid in developing these training requirements.*

Work Conducted

See Appendix D, Paragraphs 69 and 98–101.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Partial Compliance**

See Appendix D, Paragraphs 69 and 98–101.


Overall Assessment of Progress Toward Compliance

See Appendix D, Paragraphs 69 and 98–101.


Recommendations to Achieve Full Compliance

The Department should develop a plan for utilizing the results of both the Deputy Survey and the Community Survey, including to determine whether they may indicate a need for revisions to the Department's training related to bias-free policing or community engagement. See also Appendix D, Paragraph 98–101.


Work to Be Completed During the Upcoming Reporting Period

LASD requested the third administration of the Deputy Survey be deferred pending a discussion with the MT and DOJ regarding the survey instrument and the Department's plan for using the survey to inform their SA-related work. LASD has indicated that a new plan for the Deputy Survey will be submitted by May 18, 2023. Once this approach is approved by the MT, the Department can proceed with the next administration. The MT continues data collection for the Community Survey and will evaluate whether additional outreach methods should be employed in this reporting period. See also Appendix D, Paragraphs 98–101.


**Paragraph 87**

*LASD agrees to actively participate in community engagement efforts in the Antelope Valley including*

a.   *participating in local community meetings,*
b.   *making itself available for community feedback,*
c.   *developing the Community Advisory Committees (CAC), and*
d.   *working with the community on the development of diversion programs.*


Work Conducted

The substantive issues identified in this paragraph are covered in other provisions of the Community Engagement section, with the exception of the requirement to develop a diversion

program. As such, monitoring of this provision is solely based on LASD developing a diversion program. The MT reached out to the diversion programs used by the Lancaster station (the Asian Youth Center) and the Palmdale station (the Soledad Enrichment Action) to confirm they are receiving referrals from each station.

Policy Compliance: **In Compliance**

LASD issued an updated policy, 2019-044-02, in December 2019 allowing for diversion of juveniles.

Training Compliance Status: **Partial Compliance**

Issues observed of late by the MT suggest the need for training station managers and deputies regarding interacting with and accepting feedback from community members. The planned community engagement training should benefit the stations in this way. See Appendix D, Paragraph 89.

Implementation Compliance: **Partial Compliance**

*In Compliance for 87a*. The mechanisms for deputy participation in community engagement efforts are in place and functioning. The extent and quality of deputy participation in community events and/or 755s are measured in Paragraph 88.

*In Partial Compliance for 87b*. As described in the Community Engagement section of the report, the MT has observed indications that Department managers may not make themselves open to all feedback and that, at least, documentation would be useful to track and monitor the exchange of information between the community and LASD.

*In Sustained Compliance for 87c*. The CACs have been in place and the Department and CAC members have been working to fulfill the SA mandate since 2016. As described in this report, CAC membership and representation have been somewhat floundering. It is our expectation that LASD stations will take steps to support the CACs, expand membership, and support trust building between LASD, CACs, and the community.

*In Compliance for 87d*. In September 2021, the MT received confirmation and documentation about the diversion programs from both the Asian Youth Center and the Soledad Enrichment Action.

Overall Assessment of Progress Toward Compliance

The Department is in compliance with most aspects of this provision. Reports from CAC members have indicated the stations are not always receptive to input from CAC members or the community. CAC members, for their part, have not always documented their communications with the Department, which limits both the ability of the Department to hold their personnel accountable to meet SA requirements and the ability of the MT to monitor these exchanges.

Recommendations to Achieve Full Compliance

The Monitors have asked both LASD and the CACs to improve their documentation of issues, concerns, and problems identified during community outreach efforts and track those concerns over time. We have also suggested that time be dedicated in regular meetings to discuss these issues, including any follow-up by either the CACs or the Department and lessons learned regarding both the issues and the exchange process.

Work to Be Completed During the Upcoming Reporting Period

LASD and the CACs should develop protocols for sharing, documenting, and tracking written exchanges of information and feedback between the CACs, other community members, and LASD. The CACs should also discuss how to incorporate and document discussions of this exchange into regular meetings.

The Asian Youth Center and the Soledad Enrichment Action will continue to submit documentation that appropriate referrals continue. As of September 2022, LASD is in sustained compliance with this provision of the SA.

**Paragraph 88**

*All sworn personnel at the Antelope Valley stations shall actively attend community meetings and events. LASD agrees to develop a plan for such attendance based on the results of annual community satisfaction surveys and feedback from the civilian panel, discussed below. The plan shall indicate the number and types of events to be attended on a regular basis and take into account the need to enhance relationships with particular groups within the community, including, but not limited to, youth, and communities of color*

Work Conducted

After a prolonged negotiation between the Parties, it was agreed that the following quantitative

measures would be used to establish compliance for this provision of the SA.

LASD deputies are meaningfully participating in community engagement as evidenced by the 755 stat code log and the monthly community meetings report submitted by LASD-AV showing every deputy assigned to an AV station attends (at a 95% compliance rate) community meetings and engages in voluntary, positive, self-initiated community contacts at the following intervals for every calendar year.

- For deputies assigned to the AV for six months or more, one of the following:

  - » *2 and 2*: Two community meetings/events and two voluntary, positive, self- initiated community contacts; or 1 and 6: one meeting/event and a minimum of six voluntary, positive, self- initiated community contacts; or

  - » *3 and 0*: Three community meetings/events and zero voluntary positive, self- initiated community contacts.

- For deputies assigned to the AV for less than six months but more than three months, one of the following:

  - » *1 and 1*: One community meeting/event and one voluntary, positive, self-initiated community contact; or

  - » *0 and 3*: Three voluntary, positive, self-initiated community contacts and zero community meetings/events; or

  - » *2 and 0*: Two community meetings/events and zero voluntary positive, self- initiated community contacts.

- For deputies assigned to the AV for three months or less but more than six weeks, one of the following:

  - » One community meeting/event; or
  - » One voluntary, positive, self-initiated community contact.

- There is no requirement for deputies assigned to the AV for six weeks or less.

- For deputies who transfer out of an AV station less than 30 days after one of the above time-in-station designations, their requirements will be monitored at the previous benchmark level. For instance, a deputy who transfers out of an AV station after being there for six and a half months would not be held to the six-month requirements of 2 and 2, 1 and 6, or 3 and 0 community events/755s, but would be held to the lower standard of 1 and 1, 0 and 3, or 2 and 0. A deputy who transfers out after seven months or longer (that is, at least six months plus

30 days) would be held to the six-month standard of 2 and 2, 1 and 6, or 3 and 0.

- Voluntary, positive, self-initiated community contacts will be logged using stat code 755. The AV stations will provide a Watch Briefing to deputies on how to use the 755 stat code and regularly review deputies' logs to ensure the 755 stat code is being used correctly.

- At community meetings, LASD-AV personnel are actively engaged in the community meetings and when the opportunity arises, deputies are expected to engage in discussions and activities with community members.

The MT regularly reviews and audits the Community Engagement Tracker maintained by each station, which includes information of each sworn staff assigned to the station and how many community events they have attended and how many 755s they have performed. Over the past four years, the MT has provided a series of memos to the stations providing guidance on appropriate events and 755s and those that are not acceptable. The MT has also met with station leadership and Compliance Unit members to review these memos.

In this reporting period, on November 2, 2022, the MT visited the Lancaster station and reviewed the Community Engagement Tracker and backup documentation, which includes community event descriptions, sign-in sheets, and 755 descriptions from CAD conducted by Lancaster sworn personnel. The MT provided detailed feedback to the station and the Compliance Unit. The MT also received documentation from the Palmdale station that was later reviewed, and feedback was provided to the station in December 2022. These reviews are regular preliminary assessments to provide feedback to the stations prior to the formal assessment that will occur by March 2023 which will determine compliance with this provision of the SA for 2022.


Policy Compliance: **In Compliance**

LASD published an approved Attendance Work Plan (January 10, 2019; revised April 1, 2020)


Training Compliance Status: **Partial Compliance**

Although AV station personnel were provided with information on how to complete 755s, the community engagement training related to this section of the SA has not yet commenced. The Virginia Center for Policing Innovation (VCPI) training provides some background to guide deputies in their community engagement efforts, but full community training will be necessary for deputies to have a thorough sense of the objectives of the community engagement activities and of the techniques they are expected to use.

Implementation Compliance: **Partial Compliance**

- The Department remains in compliance, based on the review of 2021 documentation, with the quantified metrics for deputy attendance at events and/or 755s. A formal review of 2022 will be conducted by March 2023.

- The Department is not in compliance with the qualitative requirements to account for the need to enhance relationships with particular groups.

- The Department is not in compliance with using the annual Community Survey to inform changes to the attendance plan, if needed.

Overall Assessment of Progress Toward Compliance

LASD continues to make progress toward sustained compliance with this provision of the SA. The following feedback has been provided to LASD regarding the Community Engagement review conducted by the MT in November and December 2022:

- Although improved since we have requested this over the past few years, some of the 755 logs still need to describe how the interaction with members of the public was initiated. The MT has provided examples of good descriptions of community engagement.

- Palmdale uses a new Community Event report face sheet that is very good, especially the checklist with the specifics of the SA provisions.

- There were a few questionable community engagement events, including tours of the stations that included 16–19 deputies and walking around the farmers market.

- There was some missing documentation or inaccurate tracking where the calculations didn't match the number of forms showing community events for individual deputies.

- The MT also point out the examples of very good community engagement events and resident interactions.

Reviews of 755s and community meetings reveal significant efforts are being made to promote public relations and foster a positive impression of the agency; simply being present and visible at these community events is not sufficient. The MT has consistently encouraged LASD to do more to proactively engage in relationship building through ongoing dialogue, such as can be accomplished through cooperative problem-solving endeavors where the community members would be encouraged and expected to take on an active role in carrying out solutions and

activities they help design.

Recommendations to Achieve Full Compliance

LASD should ensure that deputies are trained in and understand how to best engage community members using the criteria established for 755 documentation. Emphasis should be placed on self-initiated, positive engagement with residents of the AV. Such engagement should be deliberate and meaningful, of sufficient duration, and significant enough to advance one or more of the principles outlined in the LASD Community Engagement Attendance Work Plan. The MT also encourages the stations to revisit more structured and professionally facilitated community meetings that provide additional deputies and community members opportunities to communicate and build relationships (e.g., Days of Dialogue).

Work to Be Completed During the Upcoming Reporting Period

LASD should ensure it is in compliance with this provision of the SA by having all sworn personnel attend the required number of events and/or conduct the number of 755s and continue to impart to station personnel the importance of active and meaningful engagement with a wide variety of community members. LASD should also submit the Community Engagement Tracker quarterly and complete documentation by February 28, 2023.

The MT will continue to conduct regular audits of the Community Engagement Tracker, including reviewing backup documentation for community events attended and 755s conducted by sworn staff of the AV stations.

The MT will also observe community meetings attended by LASD-AV personnel to assess if they are actively engaging in the meetings as required by the SA.

**Paragraph 89**

*LASD agrees to provide structured annual in-service training on community policing and problem-oriented policing methods and skills for all AV deputies, including station supervisors and unit commanders. This training shall include: (a) methods and strategies to improve public safety and crime prevention through community engagement; (b) scenario-based training that promotes the development of new partnerships between the police and community targeting problem solving and prevention; (c) leadership, ethics, and interpersonal skills; (d) community engagement techniques, including how to establish formal partnerships and actively engage community organizations, including youth, immigrant, and LGBT communities; (e) problem-oriented policing tactics; (f) conflict resolution and verbal de-escalation of conflict; and (g) cultural awareness and sensitivity training*

Work Conducted

The MT has reviewed and provided detailed suggested edits to the relevant training material, including having designed recommended scenarios for consideration; observed trainings; and met with LASD trainers in an effort to support LASD's compliance with this provision. DOJ provided comments and suggestions for improvement on June 6, 2022, and recommended that the next steps would be to prepare the training for delivery. The MT provided an updated review of the proposed Community Engagement training curriculum and submitted a memo to LASD on June 7, 2022. The memo included the MT's assessment that the updated curriculum, when implemented, would comply with all but two of the sub-provisions required by Paragraph 89 of the SA. The MT also agrees with the DOJ that there are areas of the curriculum that could be enhanced with additional material.

Policy Compliance: **NA**

Training Compliance Status: **Partial**

LASD is in partial compliance on delivery of the approved trainings because the VCPI training, a two-hour online introduction to COP/POP, was implemented in 2020. As noted earlier, when the updated curriculum developed by LASD's Training Bureau is approved and implemented, all sections of Paragraph 89, except (d) and (f), should be in compliance.

Implementation Compliance: **Not in Compliance**

The primary training related to this provision of the SA has not been implemented.

Overall Assessment of Progress Toward Compliance

Progress on this provision of the SA has been very slow. There was initial, significant disagreement among the Parties on the definition of "in-service" training referred to in Paragraph 89. Then LASD attempted different trainings that only partially complied with all of the enumerated requirements in Paragraph 89. There was also a delay in the implementation of the VCPI online training, which includes problem-oriented policing tactics (89e). Eventually, LASD's Training Bureau developed a Community Engagement training that as very promising and attended to most of the requirements of Paragraph 89.

Two remaining subjects are not addressed in the new training material, Paragraph 89 (d) and (f). LASD has reported there are potentially two other existing Department trainings that may suffice to meet the requirements for those subjects. The MT is awaiting that training material to review and assess whether that would be the case.

<u>Recommendations to Achieve Full Compliance</u>

- LASD provides to the MT the training material to address (d) and (f).

- Once approved, LASD trains all sworn staff in the AV in the new Community Engagement training.

- LASD develops and provides quarterly refresher trainings at roll calls.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

*LASD:*

- Provide training material and curriculum for trainings it submits that are in compliance with sections (d) and (f).

- Begin training AV staff on all of the required training, after receiving DOJ and MT approval, observation, and feedback.

*MT*:

- Review training material LASD submits for compliance with sections (d) and (f) of Paragraph 89.

- Observe and provide feedback on the pilot trainings of the new Community Engagement training.

- Observe pilot of trainings using the new Community Engagement training.

**Paragraph 90**

*LASD agrees to ensure that monthly Crime Management Forum meetings with the Assistant Sheriff or his designee and semiannual Risk Management Forum meetings include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them. LASD agrees to use techniques such as spatial mapping and scientific deployment analysis to enable the Risk Management Forum to better support and measure community and problem-solving policing efforts*

Work Conducted

Members of the MT attend every monthly CMF meeting for the Northern Patrol Division, which includes Lancaster and Palmdale. The MT also attends the semi-annual RMF meetings. The MT has provided two memos over the past three years advising LASD of its non-compliance with this provision of the SA and providing examples and recommendations on how the Department can come into compliance. The MT has re-sent those memos to new personnel transferred into the Compliance Unit.

Policy Compliance: **NA**

Training Compliance Status: **NA**

Implementation Compliance: **Partial Compliance**

LASD consistently holds monthly CMF meetings and semi-annual RMF meetings. The quality of these meetings has improved in the past few years, and LASD has implemented some the MT's recommendations. In RMF meetings, LASD has long been engaged in monitoring its risk exposure and trends in risk management categories that include such topics as shooting incidents, use of force, misconduct and service complaints, and litigation costs associated with these and other areas of risk.

More recently, the Department has begun incorporating additional data and information, which is required under the SA for the AV stations, to include review of data and assessment of trends in additional areas such as arrests made for obstructing, delaying, or interfering with a peace officer and evaluating not only whether there might be indications of disparity shown but also whether risk mitigation efforts are proving to be effective or other improvements should be considered.

One area where the AV stations are still deficient relates to the CMF meetings and the need to engage with the community in efforts to support and measure community and problem-solving policing efforts. While the stations are identifying problem-solving activities that are driven internally, there has been little to no documentation of how or whether any of these efforts are being undertaken based on community input and identification of their priorities, or that the community has been actively engaged as a co-producer of public safety where those opportunities are present. This is the area that needs to improve for LASD to come into full compliance with this provision of the SA.

<u>Overall Assessment of Progress Toward Compliance</u>

Progress has been made in the CMF meetings toward compliance with Paragraph 90 of the SA, but the two stations still lack adequate identification of community priorities and the development of strategies to address them. Additionally, the MT has suggested that LASD use more of its community policing models to make the CMF more productive, particularly increased analysis and assessment of challenges and community priorities in order to develop, implement, and assess appropriate responses. During the CMF on both September 26 and October 24, 2022, the Lancaster and Palmdale stations portion of the meetings were less than 20 minutes each. There was little to no discussion about the Captains receiving information about community priorities and how the stations were addressing the community concerns.

<u>Recommendations to Achieve Full Compliance</u>

The AV stations should broaden their efforts to routinely engage with all segments of the community, seek out and consider community input on policing priorities and strategies where feasible, and ensure feedback is provided to affected stakeholders so that they are made aware of results. Doing this promotes transparency and enhances confidence and trust, while discussing these activities and outcomes in the CMF meetings also promotes both accountability and organizational awareness throughout the ranks. LASD also needs to document and track these efforts.

The MT has provided this same example before: The Lancaster CAC raised an issue in the past about community members complaining about what was perceived as a recent rise in unnecessary stops in the Park Circle apartments. At the CMF it was decided that the Lancaster captain would review recent stops as well as hold a community meeting in or near the Park Circle area to hear the community's concerns, discuss the station's data and activities in that area to date, and discuss possible activities in which the Department and the community (independently and/or jointly) could engage to address the problem. Once this information is gathered, LASD needs to report back to the community on their response or next steps.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

*LASD*:

- Broaden their efforts to routinely engage with all segments of the community, seek out and consider community input on policing priorities and strategies where feasible, and ensure feedback is provided to affected stakeholders so that they are made aware of results.

- Use the example given above.

*MT*:

- Continue to attend all CMF and RMF meetings.

- Provide feedback and recommendations after the meetings.

- Assess LASD's progress toward compliance and offer technical support as needed.

**Paragraph 91**

*To continually improve police-community partnerships, LASD will assess and report on the impact of community engagement initiatives. LASD will issue public reports on the Antelope Valley stations' community engagement efforts, identifying successes, obstacles, and recommendations for future improvement*

Work Conducted

LASD submitted the 2021 Community Engagement Report for review during this monitoring period. The MT and DOJ provided significant feedback and comments, noting the draft was not in compliance. On November 21, 2022, LASD re-submitted the 2021 CE Report addressing the MT and DOJ's response. LASD revisions adequately addressed all of the MT and DOJ's concerns, and the report is determined to be in compliance.

Policy Compliance: **NA**

Training Compliance Status: **NA**

Implementation Compliance: **In Compliance**

As noted above, the 2021 CE Report has been found in compliance.

Overall Assessment of Progress Toward Compliance

On December 5, the MT approved the 2021 CE Report as being in compliance.

Recommendations to Achieve Full Compliance

The MT recommended that LASD review community engagement activities on an ongoing or quarterly basis so that the report is less onerous at the end of the year. We also recommend that the report be submitted to the MT and DOJ no later than March 31 of each year to allow time for MT and DOJ review and more importantly, the implementation of the "recommendations for future improvement" within the year of publication. To promote transparency and accountability to the community, we would also like to see a section in the report dedicated to how recommendations from the previous year were implemented in the reported year.

Lastly, we would like to see continued improvements in proficiency in LASD's assessment of successes, obstacles, and recommendations for future improvement of LASD community engagement, especially with youth and communities of color, and adjustments in plans and strategies accordingly.

Work to Be Completed During the Upcoming Reporting Period

*LASD*:

- Complete 2022 annual report by March 31, 2023.

- Continue to improve detailed analysis on successes, obstacles, and recommendations for future improvement of LASD community engagement, especially with youth and communities of color.

**Paragraph 92**

*LASD agrees to seek the assistance of community advocates in widely disseminating to the public, in English and Spanish, the requirements of this Agreement*

Work Conducted

LASD has been in compliance with this provision of the SA since December 2015.

Policy Compliance: **NA**

Training Compliance Status: **NA**

Implementation Compliance: **In Sustained Compliance**

After the first year of the SA, LASD produced brochures in English and Spanish explaining the SA, and the brochures were distributed at community meetings and events. LASD also has details about the SA on its website. The CACs also continue to discuss the SA and the latest MT report at quarterly town hall meetings.

Overall Assessment of Progress Toward Compliance

Although LASD has remained in sustained compliance with this provision of the SA for several years, the Department would benefit from ongoing efforts to educate newer community members and the youth who are maturing in the community so that they become more invested in sustaining the work that has been accomplished.

Recommendations to Achieve Full Compliance

LASD is in compliance.

Work to Be Completed During the Upcoming Reporting Period

This provision of the SA is no longer under active monitoring.

**Paragraph 93**

*LASD will continue to support Lancaster and Palmdale's CACs to advise and provide feedback to the LASD's Antelope Valley stations. The panel will leverage the insights and expertise of the community to address policing concerns, including, but not limited to, racial or ethnic profiling and access to law enforcement services, and promote greater transparency and public understanding of LASD. The civilian panel shall be authorized to: (a) advise the Sheriff and the station commanders on strategies and training to improve community relations, bias-free policing, and access to the civilian complaint system; (b) work with the Sheriff and station commanders to establish and carry out community public safety priorities; (c) provide the community with information on the Agreement and its implementation; and (d) receive and convey to LASD public comments and concerns*

Work Conducted

The MT has attended or observed Lancaster and Palmdale CAC quarterly town hall meetings, reviewed CAC meeting minutes, met with CAC members, and received and responded to

numerous emails and calls from CAC members.

Policy Compliance: **In Compliance**

On September 27, 2014, the LASD Palmdale station issued a unit order codifying the CAC in full compliance of the SA. On February 11, 2015, the Lancaster station issued Unit Order 72, with the same information.

Training Compliance Status: **NA**

Implementation Compliance: **In Compliance**

LASD has maintained the CACs at both AV stations throughout the time of the SA.

Overall Assessment of Progress Toward Compliance

LASD has maintained the CACs at both AV stations throughout the time of the SA. The quality and engagement of the CACs have varied widely at different times and among the stations, but they have existed and operated throughout the SA. We would like to challenge LASD and the CACs to improve their own documentation of issues, concerns, and problems identified during community outreach efforts and track those concerns over time. We ask that monthly CAC meetings include time dedicated to discussion of these issues, and that the meeting minutes or notes document LASD's responses and intentions, with follow-up on outcomes and lessons learned in subsequent meetings. This process, routinized as a practice, would impact many compliance provisions.

In both stations, the CAC membership has dwindled somewhat. Lancaster has been down to only three members during parts of this monitoring period. The MT has continued to encourage LASD to select new CAC members, at both stations, who can provide LASD with constructive critique and sincere community sentiment.

During the November 1 community meeting held by the MT, members of the Palmdale CAC requested that the Palmdale station be assessed separately from the Lancaster station by the MT in the semi-annual reports.

Recommendations to Achieve Full Compliance

In this report, the MT notes significant concerns that LASD is not sufficiently working with CACs to facilitate a trusting relationship between LASD, the CACs, and the broader community. To our

knowledge, neither CAC is empowered by the stations to document and track all community concerns over time, and both are suffering from significant turnover, with departing members often raising concerns that LASD leadership is not open to criticism. We believe the station leadership can and should make more of an effort to engage with and include critics of LASD on the CACs; to work more closely with the CACs to reach both the over-policed and under-policed communities in the AV and to enhance relationships with particular groups, such as youth and communities of color; to open lines of communication and build trust; and to seek more input from the community to inform crime prevention and community policing goals.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

*LASD*:

- Allow the CACs as a body and its members to provide genuine input and feedback.

- Provide substantive response to that feedback.

- Provide the space and support for the CACs to operate with a level of independence and to encourage the CACs to seek out information, feedback, and suggestions from members of the community, especially youth and communities of color.

*MT*:

- Attend CAC meetings.
- Provide the CACs any needed or desired support and technical assistance.
- Stay in consistent communication with members of the CACs.

**Paragraph 94**

*LASD will memorialize the CACs into LASD-AV policy within 90 days of the Effective Date. The policy will establish the number of members and a mechanism to ensure that membership is representative of the diverse communities in the Antelope Valley, including members from each station, faith communities, minority, ethnic, and other community organizations. LASD shall include student or youth organizations on the CACs or create a separate advisory committee made up of youth representatives. LASD will facilitate quarterly public meetings of the CAC to discuss the Monitors' reports and to receive community feedback about LASD's progress or compliance with the Agreement*

Work Conducted

The MT has attended Lancaster and Palmdale CAC quarterly town hall meetings, reviewed CAC meeting minutes, met with CAC members, and received and responded to numerous emails and calls from CAC members.

Policy Compliance: **In Compliance**

On September 27, 2014, the LASD Palmdale station issued a unit order codifying the CAC in full compliance of the SA. On February 11, 2015, the Lancaster Station issued Unit Order 72, with the same information.

Training Compliance Status: **NA**

Implementation Compliance: **In Sustained Compliance**

Both LASD-AV stations issued unit orders memorializing the CACs. The CACs have consistently held quarterly town hall meetings, even during the height of the COVID-19 pandemic, and the town hall meetings regularly have portions of the agenda dedicated to the most recent MT six-month report.

Overall Assessment of Progress Toward Compliance

LASD has maintained the CACs at both AV stations throughout the time of the SA. The quality and engagement of the CACs have varied widely at different times and among the stations, but they have existed and operated throughout the SA. Quarterly town hall meetings are held regularly and provide members of the community an opportunity to share their experiences and perspectives with the CACs and LASD.

The MT has worked closely with the CAC. The MT has conducted trainings for the CAC, provided feedback, held frequent meetings, and responded to frequent communication from CAC members.

To maintain compliance, in the next reporting period the stations will need to put greater effort into ensuring youth representation on the CACs.

Recommendations to Achieve Full Compliance

LASD is currently in compliance, but to maintain that status, the stations will need to put greater effort into ensuring youth representation on the CACs. The Monitors acknowledge that there are particular obstacles for youth to consistently attend meetings and to maintain their CAC membership over time, so we give the Department some leeway on this issue, but the SA requirement must be pursued.

Work to Be Completed During the Upcoming Reporting Period

*MT*:

- Continue to attend CAC meetings.
- Provide the CACs any needed or desired support and technical assistance.
- Stay in consistent communication with members of the CACs.

*LASD*: Ensure youth representation on the CACs.

**Paragraph 95**

*The CAC's reports and recommendations will be posted on LASD-AV's website. LASD will consider and respond to the civilian panel's recommendations in a timely manner*

Work Conducted

The CACs submit annual reports covering their activities between July 1 and June 30. The reports for 2020/2021 were submitted, reviewed, and feedback given in the previous reporting period; the next reports will be submitted and reviewed in the next monitoring period.

The MT has monitored whether LASD has posted the CAC reports on its website and if LASD has provided a response, which has not always been the case.

Policy Compliance: **NA**

Training Compliance Status: **NA**

Implementation Compliance: **Partial Compliance**

Both the Lancaster and Palmdale stations issued reports for the time period from July 1, 2020, to June 30, 2021. LASD posted both reports on its website and provided a response to the Palmdale report but not for the Lancaster report, as of June 13, 2022 (see https://lasd.org/lancaster/#community_advisory_reports).

Neither CAC has submitted reports for the period covering July 2021 to June 2022.

LASD has previously been found to be in compliance with this provision of the SA.

Overall Assessment of Progress Toward Compliance

For the first few years of the SA, the CACs were not issuing reports. The MT worked with each CAC and provided a recommended report outline. The CACs began issuing reports toward the end of 2017 but those first reports did not include all the necessary sections. The reports issued toward the end of 2019, covering the period July 1, 2018, through June 30, 2019, did include all of the necessary sections, including recommendations to LASD. LASD also responded to those reports and their recommendations, coming into compliance with this provision of the SA in 2020. LASD has not maintained compliance as it has yet to provide and post a response to the Lancaster CAC's report for the period of July 1, 2020, to June 30, 2021.

Recommendations to Achieve Full Compliance

- Both CACs submit updated reports; LASD considers and responds to reports and post the response on the LASD website.

- Consider and respond to CAC recommendations and post both the recommendations and responses on the LASD website.

Work to Be Completed During the Upcoming Reporting Period

*LASD*:

- Work with the CACs to support submission of their July 2021 – June 2022 reports.
- Post the response to the reports on the LASD website.

*MT*:

- Provide feedback and approve the annual CAC reports when submitted.

- Review LASD's response and monitor whether the Department posts both the CAC reports and the responses on its website.

**Paragraph 96**

*The County will provide the CAC with reasonable administrative support, including meeting space. In addition, the Monitor may provide advice and technical assistance to the CAC*

Work Conducted

The MT has attended Lancaster and Palmdale CAC quarterly town hall meetings, reviewed CAC meeting minutes, met and routinely engaged with CAC members, and continued to receive and respond to numerous emails and calls from CAC members.

Policy Compliance: **Yes**

On September 27, 2014, the LASD Palmdale station issued a unit order codifying the CAC in full compliance of the SA. On February 11, 2015, the Lancaster Station issued Unit Order 72, with the same information.

Training Compliance Status: **NA**

Implementation Compliance: **In Sustained Compliance**

Both CACs are provided with space to meet at each respective station, and each CAC has a liaison at the station to assist them with administrative needs.

Overall Assessment of Progress Toward Compliance

Since the beginning of the SA, LASD has provided both CACs with space to meet at each respective station, and each CAC has a liaison at the station to assist them with administrative needs.

The MT has worked closely with the CACs, conducted trainings for them, provided feedback, held frequent meetings, and responded to inquiries and requests for assistance and guidance from CAC members. The MT has supported the CACs in the development of their annual reports and conducted presentations at their quarterly town hall meetings.

Recommendations to Achieve Full Compliance

LASD is in full compliance with this provision.


Work to Be Completed During the Upcoming Reporting Period

The MT will continue to attend CAC meetings, provide the CACs with any needed or desired support and technical assistance, as well as stay in consistent communication with members of the CACs.


**Paragraph 97**

*The CAC will not have access to any non-public information regarding an individual deputy or allegation of misconduct or disciplinary action*


Work Conducted

The MT has attended Lancaster and Palmdale CAC quarterly town hall meetings, reviewed CAC meeting minutes, met with CAC members, and received and responded to numerous emails and calls from CAC members. There is no evidence of non-public information being provided to the CAC.


Policy Compliance: **In Compliance**

On September 27, 2014, the LASD Palmdale station issued a unit order codifying the CAC in full compliance of the SA, including a provision of the unit order that states that CAC members will not have access to any non-public information regarding an individual deputy or allegation of misconduct or disciplinary action. On February 11, 2015, the Lancaster station issued Unit Order 72, with the same information.


Training Compliance Status: **NA**


Implementation Compliance: **In Sustained Compliance**

Palmdale and Lancaster stations issued the CAC unit orders prohibiting the CAC members from having access to information regarding an individual deputy or allegation of misconduct or disciplinary action. There have been no reports of CAC members ever receiving or having access to such information.

<u>Overall Assessment of Progress Toward Compliance</u>

LASD has maintained compliance with this provision since the beginning of the SA.

<u>Recommendations to Achieve Full Compliance</u>

LASD is in full compliance with this provision.

<u>Work to Be Completed During the Upcoming Reporting Period</u>

The MT will continue to attend CAC meetings, provide the CACs with any needed or desired support and technical assistance, as well as stay in consistent communication with members of the CACs.

**Paragraphs 98–101**

*LASD agrees to assist the Monitor in conducting a reliable, comprehensive, and representative annual survey of members of the Antelope Valley community regarding their experiences with and perceptions of LASD and of public safety (Paragraph 98).*

*To conduct the annual community survey, the Monitor shall retain an individual or entity that shall:*

*(a) develop a baseline of measures on public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters; (b) design, conduct, and analyze baseline and subsequent annual surveys of a representative sample of Antelope Valley residents, law enforcement personnel, Section 8 voucher holders, and detained arrestees; (c) review and consider prior law enforcement surveys in the Antelope Valley and other cities (including recent community policing surveys in Palmdale and Lancaster), as well as current or recent concerns in the Antelope Valley, in designing the survey; (d) engage in informal conversation with Antelope Valley residents, LASD deputies and command staff, and DOJ representatives, and observe community meetings; (e) ensure that the resident and arrestee surveys are designed to capture a representative sample of Antelope Valley residents including members of each demographic category; (f) conduct the survey in English and Spanish as necessary to ensure representation of the entire Antelope Valley community; and (g) formally discuss the survey methodology with LASD supervisors and DOJ, and consider these opinions in development of the initial survey and improvements to subsequent surveys (Paragraph 99).*

*LASD agrees to cooperate with the design and conduct of the survey by, for example, helping to organize focus groups of deputies and obtaining and providing previous survey instruments and data (Paragraph 100).*

*The report of the baseline survey and subsequent annual surveys shall be publicly distributed and posted on the LASD-AV website (Paragraph 101).*

<u>Work Conducted</u>

The Parties have worked with an independent research team to conduct three annual community surveys in the AV. In addition to the general community surveys, a youth survey has been administered each year, and during the first year of the survey, and a series of focus groups were conducted as well. Survey data have primarily been collected online, although paper surveys were available prior to the COVID-19 pandemic. Community Survey data have been made available online, and an accompanying narrative report was produced each year as well. Both can be found through the MT's website.

There was no data collection for the Community Survey during this reporting period. However, the research team did determine that Year 4 Community Survey data collection will begin in fall 2022. To prepare for data collection, the research team will meet with the MT and the Parties to discuss a couple of potential revisions to the Year 4 data collection process, including discontinuing survey administration at AV high schools due to low response rates in the past. The research team and the MT will be considering other strategies to ensure the perspectives of younger AV residents are still captured in the general survey. During the next reporting period, the Community Survey will be administered and the data analysis and accompanying report are expected to be completed by the end of the calendar year.

To our knowledge, LASD has not done much with the results of the survey. We have not seen evidence of its application or been provided any documentation. SA Paragraphs 69, 72, 88, 143, and 153 have ramifications for how LASD should be using the Community Survey data, along with other data sources, in bias-free policing, community policing, and community engagement efforts. LASD did request the raw data so that it could conduct its own analysis, but we have not seen the results of that analysis and do not know their intentions in doing so.

<u>Policy Compliance: In Compliance:</u> **NA**

<u>Training Compliance Status:</u> **NA**

Implementation Compliance: **In Sustained Compliance**

LASD has complied with cooperating with the design of the survey and supporting data collection in each of the previous three years the survey has been administered. LASD has consistently shared the survey with its network via social media and its website, and has publicized the survey at its meetings and events.

Overall Assessment of Progress Toward Compliance

Overall, LASD has made significant progress toward compliance with the Community Survey provisions of the SA. It has cooperated with the design of the survey and supported data collection in each of the previous three years the survey has been administered. LASD has consistently shared the survey with its network via social media and its website, and has publicized the survey at its meetings and events.

Recommendations to Achieve Full Compliance

LASD is in compliance with these provisions.

Work to Be Completed During the Upcoming Reporting Period

During the next reporting period, the Community Survey will be administered, and the data analysis and accompanying report are expected to be completed by the end of the calendar year.

## F. USE OF FORCE

**SA Paragraphs 160 and UOF Preface**

*LASD agrees to revise its force policies and practices to reflect its commitment to upholding the rights secured or protected by the constitution of the United States. (SA Use-of-Force Preface)*

*LASD will submit policies, training curricula, and lesson plans required to be written, revised, or maintained by the Agreement to the Monitor and DOJ prior to publication and implementation. The Parties will share draft policies and meet and confer as needed to reach agreement on whether revised policies and training materials are in compliance with the requirements of the Agreement, the Constitution, federal and statutory law, best practices, and current professional standards. (SA Paragraph 160)*

Work Conducted

The Department has achieved minimal progress since our last six-month report in the development of a Use of Force (UOF) policy, and the Department is still operating without a policy that is consistent with SA mandates. As we have previously reported, in April 2019, the DOJ, Monitors, and Department representatives reached a tentative agreement on an updated UOF policy. However, the Department's executive management team was unresponsive to the tentatively agreed-upon policy, and it was never approved. In July 2020, the Department provided a draft UOF policy that significantly departed from the tentatively agreed upon policy. The Department, Monitors, and DOJ exchanged written comments and met several times to discuss the draft policy. But in December 2020, the Department indicated that it needed to publish and implement the policy by January 2021 to comply with California law, which it did on June 16, 2021, without complying with *SA Paragraph 160, "LASD will submit policies, training curricula, and lesson plans required to be written, revised, or maintained by the Agreement to the Monitor and DOJ prior to publication and implementation."* Despite the policy and related training being unilaterally implemented, the Parties and MT proceeded to revisit the policy, with many subsequent exchanges of policy drafts. On September 16, 2021, the Department, Monitors, and DOJ again discussed the UOF policy. On November 8, 2021, the Department provided a revised UOF policy that included changes to reflect new California laws. The Monitors and DOJ provided comments to that draft policy on December 8, 2021. The Department agreed to meet and discuss the updated UOF policy in February 2022, but at the last minute the Department postponed the meeting stating it did not have sufficient time to review the policy.

On March 23, 2022, the Department submitted a revised UOF policy that still did not include many of the agreed upon changes. The Monitors and DOJ provided comments on April 18, 2022. Then on April 21, 2022, the Parties again met and discussed the policy. A week later, County Counsel submitted a revised policy, as well as an email agreeing to many, but not all, of the previously agreed upon policy changes.

On May 25, 2022, the Monitors and DOJ provided comments to the latest revised policy. The Department, Monitors, and DOJ were scheduled to meet to discuss the policy on June 8, but the Department cancelled the meeting. Then on July 22, 2022, Monitors and the DOJ received, from County Counsel, the Department's response to its latest draft UOF policy. On August 6, 2022, the parties virtually met and discussed the Department's UOF policy associated with the intentional pointing of a firearm by deputies. Then, on August 17, 2022, the parties again virtually met and discussed the UOF policy and reached agreement on several areas, including but not limited to issues associated with positional and compressional asphyxia, the definition of de-escalation of force, the inclusion of the term "force reduction," and the definition of exigent circumstances.

On October 4, LASD provided draft language about the de-escalation and force reduction principles section. On November 16, DOJ provided comments and edits to that section of the policy. On December 5, LASD wrote: "LASD will consider DOJ's proposed additions to this portion of the policy but needs additional time to consult with various units within the Department."

The last of several meetings between the Parties and MT was on November 21, 2022. Unfortunately, nothing was accomplished, and the following seven significant aspects of the policy remain unresolved:

1. The Department's policy for the investigation, review, and adjudication of uses of force involving the intentional pointing of a firearm by deputies;

2. The definition of proportionality and how that can affect a deputy's duty to intervene if they witness excessive force by another deputy;

3. The guidance regarding de-escalation and force reduction principles;

4. DOJ's position that the Department include the definition of "Necessary Force" to non-lethal uses of force;

5. The definition of "totality of the circumstances";

6. The definition of improvised weapons and techniques, and the categorization, investigation, and adjudication of deputies' uses of force that involve the use of improved weapons and/or improvised techniques; and

7. Department members may display a drawn firearm if they reasonably believe it will help establish or maintain control in a potentially dangerous situation.


Policy Compliance: **Not in Compliance**

The Department is out of compliance for these and most SA-mandated UOF policy requirements. Although the Department had ample time to do so, seven years, it chose to unilaterally implement its UOF policy without approval by the DOJ and the Monitors, which is mandated by SA Paragraph 160.


Training Compliance: **Not in Compliance**

The Department remains out of compliance with the SA's UOF training requirements, which are governed by SA Paragraph 119. (See Appendix D, Paragraph 119.)


Implementation Compliance: **Out of Compliance**

The Department remains out of compliance with the implementation of the requirements of the SA preface associated with the revision of a UOF policy.

The Department is out of compliance with SA Paragraph 160 because it unilaterally implemented its UOF policy without submitting it to the Monitors and DOJ for approval.

<u>Overall Assessment of Progress Toward Compliance</u>

Significant issues remain unresolved, including the Department's lack of a clear policy associated with the categorization, reporting, documentation, investigation, and adjudication of uses of force that involve the intentional pointing of a firearm by a Department employee at a person, which is required by the California Commission on Peace Officers Standards on Training (POST) Standard No. 6; as well as other concerns described above including, but not limited to, de-escalation and force reduction; the use and investigation of improvisational techniques and weapons by deputies; the inclusion of a definition of "Necessary Force" for non-lethal uses-of-force; and the definition of "totality of the circumstances."

<u>Recommendation(s) to Achieve Full Compliance</u>

The Department and the Parties will require additional discussions to resolve the remaining deficiencies with its UOF policy. The Department will then need to publish the updated policy and provide training to ensure that all AV staff have been successfully trained in it.

The Department has been negligent in the development of a UOF policy that complies with the agreed upon terms and conditions of the SA. Sheriff Luna, who has just been elected, must take an active role in the Department achieving SA compliance and ensure that the Department executive management of the entities that have functional control over achieving SA compliance, including Training Bureau and Field Operations Support Division and Audit and Accountability Bureau (AAB), be held accountable for providing the leadership and direction needed to achieve compliance with the SA requirements under their areas of responsibility.

<u>Work to Be Completed During the Next Reporting Period</u>

The Department, DOJ and Monitors need to further attempt to resolve the remaining UOF policy issues. In the event that cannot be achieved SA Paragraph 162 requires: "If LASD, DOJ, and the Monitor do not all agree that the policy, training curriculum or lesson plan is consistent with this Agreement, legal requirements, and best practices, either Party or the Monitor will provide the rationale for its objection in writing and the Parties and Monitor will attempt to confer to resolve the Agreement. If the disagreement remains unresolved, either Party or the Monitor may petition the Court thereafter to resolve."

**SA Paragraphs 102, 104, 105 and 106g (Use of Force)**

*LASD agrees to continue to prohibit the use of force above [compliant] handcuffing to overcome passive resistance, except where physical removal is permitted as necessary and objectively reasonable. (Paragraph 102)*

*LASD agrees to clarify that Antelope Valley deputies may not use force against individuals who may be exhibiting resistive behavior, but who are under control and do not pose a threat to the public safety, themselves, or to other deputies. LASD agrees to continue to require that Antelope Valley deputies assess the threat of an individual prior to using force and emphasize that a use of force must be proportional to the threat or resistance of the subject. If a threat or resistance no longer exists, deputies cannot justify the use of force against a subject. (Paragraph 104)*

*LASD agrees to explicitly prohibit the use of retaliatory force, particularly against subjects who express criticism of, or disrespect for, LASD Antelope Valley deputies. (Paragraph 105)*

*LASD agrees to explicitly prohibit interfering, threatening, intimidating, blocking or otherwise discouraging a member of the public, who is not violating any other law, from taking photographs or recording video (including photographs or video of police activities) in any place the member of the public is lawfully present. Such prohibited interference includes: Using force upon that person; (Paragraph 106g)*

<u>Work Conducted</u>

No new UOF audits were conducted in the most recent reporting period. However, independent of a formal audit, during this six-month period, the MT reviewed three Category 3 UOF cases that were evaluated by the Department's Executive Force Review Committee (EFRC) and one that was assessed by a Critical Incident Review Panel (CIRP).[30] Monitors have provided the Department with many recommendations in how the EFRC process can be improved and have noted improvements.

<u>Policy Compliance:</u> **Not in Compliance**

The Department is out of compliance for these and most SA-mandated UOF policy requirements. (See Appendix D, UOF Preface and Paragraph160.)

---

[30] The three EFRC cases were held on July 26, September 15, and December 8, 2022. The CIRP case was held on September 14, 2022.

Training Compliance: **Not in Compliance**

The Department's remains out of compliance with the SA's UOF training requirements, which are governed by SA Paragraph 119. (See Appendix D, Paragraph 119.)

Implementation Compliance: **Partial Compliance**

The Department has achieved implementation compliance with SA Paragraphs 102, 104, and 105 for Category 1 and 2 uses of force, but not Category 3 uses of force.[31]

- In our first (2018) Categories 1 and 2 UOF audit, no cases were found out of compliance with these provisions.

- In our second (2021) Categories 1 and 2 UOF audit, the MT found four uses of force that were not objectively reasonable. However, 95% of the cases reviewed were assessed as objectively reasonable and in compliance, meeting the minimum compliance threshold.

- In the MT's (2019) Category 3 UOF audit, the MT found two cases violated SA Paragraphs 102 (use of objectively reasonable force) and 104 (force used for resistive behavior). The MT also found one case out of compliance with SA Paragraph 105 in which LASD failed to "explicitly prohibit the use of retaliatory force" resulting in a compliance rate of 92%, below the approved standard of 95%.

The Department has achieved implementation compliance for Category 1, 2, and 3 uses of force for SA Paragraph 106g. (No cases in the MT UOF audits violated this specific provision.)

The Department is in partial compliance for policy and training compliance for SA Paragraphs 102, 104, 105, and 106g due to the continued lack of an approved UOF policy and related training.

Overall Assessment of Progress Toward Compliance

Though we have found several Category 1 and 2 uses of force where AV deputies have used excessive force, and/or force that was in violation of Department policy, which was not addressed by Department management, our audits so far have found that the Categories 1 and 2 force used by AV deputies has been sufficiently compliant with established compliance

---

[31] In 2018, Category 1 force was split into two categories: non-categorized force incidents (NCIs) and Category 1; the definition of Category 1 remained the same except that the lowest levels of force were now categorized as NCI. The MT's first Category 1 and 2 audit (2018) was conducted before this change. The second MT Category 1 and 2 audit (2021) evaluate and discuss NCIs and Category 1 force separately but combine them in determinations of compliance.

metrics. However, our audit of the use of Category 3 force, which involves the most significant level of force used or injuries sustained, found the Department out of compliance. Furthermore, our future audits will include the review of body-worn camera footage, which can provide more information than was previously available for auditing.


Recommendation(s) to Achieve Full Compliance

The Parties and the MT will require additional discussions to hopefully resolve the remaining deficiencies with its UOF policy (see UOF preface and SA Paragraph 160).


Work to Be Completed During the Next Reporting Period

The scheduling of a NCI, Category 1, and 2 UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit and audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample including body worn camera recordings is provided to the audit team. Discussions associated with the Monitors' assessments of Category 3 uses of force are underway between the parties.

The MT will meet with the Department and discuss the steps the Department needs to complete in order to achieve full compliance with these paragraphs.


**SA Paragraph 103**

*Deputies shall use advisements, warnings, and verbal persuasion, when possible, before resorting to force; and de-escalate force immediately as resistance decreases.*


Work Conducted

Monitors have conducted two audits of the Department's Category 1 and 2 UOF investigations and one audit of the most serious uses of force, Category 3. (See Appendix D, UOF Preface and Paragraph 160.)

No new UOF audits were conducted or released in the most recent reporting period.

Paragraph 103 is tied to the requirement that LASD "use force as a last resort and de-escalate the use of force at the earliest possible moment" (UOF Preface, SA page 24). The MT audits assessed Paragraph 103 with regard to both the use of de-escalation techniques whenever possible before resorting to force and, when force is used, reducing the level of force as control is achieved.

Policy Compliance: **Not in Compliance**

The Department is out of compliance for these and most SA-mandated UOF policy requirements. (See Appendix D, UOF Preface and Paragraph160.)

Training Compliance: **Not in Compliance**

The Department's remains out of compliance with the SA's UOF training requirements governed by SA Paragraph 119. (See Appendix D, Paragraph 119.)

Implementation Compliance: **Partial Compliance**

Both the October 2018 and July 2021 Categories 1 and 2 UOF audits found the Department in compliance with SA Paragraph 103, but the November 2019, Category 3 UOF audit found the Department out of compliance with that paragraph.[32]

- The first Categories 1 and 2 UOF audit found two instances in violation of this provision, resulting in a 96% compliance rate, exceeding the approved standard.

- The second Categories 1 and 2 UOF audit found six instances where de-escalation or force reduction techniques should have been used but were not, resulting in a 92% compliance rate, which nonetheless exceeded the approved minimum standard of 90%.

- The Category 3 UOF force audit found two cases where deputies failed to apply de-escalation technique before using force and failed to reduce the force as control was achieved. This resulted in 85% (two of 11 cases) being out of compliance, below the approved minimum standard of 95%.

The Department is in partial compliance with SA Paragraph 103.

---

[32] In 2018, Category 1 force was split into two categories: non-categorized force incidents (NCIs) and Category 1; the definition of Category 1 remained the same except that the lowest levels of force were now categorized as NCI. The MT's first Category 1 and 2 audit (2018) was conducted before this change. The second MT Category 1 and 2 audit (2021) evaluate and discuss NCIs and Category 1 force separately but combine them in determinations of compliance.

Overall Assessment of Progress Toward Compliance

While the Department was found to be in compliance for the de-escalation of force in Categories 1 and 2 uses of force, it was found out of compliance for the de-escalation of Category 3 uses of force, which are the more serious uses of force. Since compliance for this provision requires compliance across all types of force, the Department has not achieved implementation, policy or training compliance with SA Paragraph 103.

There are several factors the MT has identified contributing to the delay in the Department reaching compliance here. The MT and DOJ review of the current UOF training identified that the training did not place enough emphasis on the de-escalation of tense and evolving incidents with the goal of resolving those incidents without having to resort to the UOF. Monitors also identified that there was some confusion in the training about the term "de-escalation" as it applies to avoiding using force versus the reduction of force as control is achieved.

Recommendation(s) to Achieve Full Compliance

The Department needs to complete and implement an updated UOF policy that is approved by the Monitors and DOJ, and then update its UOF training and increase its supervisory and managerial focus on deputies' use of de-escalation techniques such as the use of time, tone, distance, staff switching, and available resources to resolve tense and evolving incidents without having to use force, and when that is not feasible to use proportional and objectively reasonable force.

Supervisorial and managerial review of UOF investigations should give increased attention to the use or non-use of de-escalation strategies, and adjudications should include corrective action when necessary. Furthermore, Department executive management needs to build a culture where de-escalation is valued, evaluated and consistently reinforced.

Work to Be Completed During the Next Reporting Period

The scheduling of a Category 1 and 2 UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit and audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample including body worn camera recordings is provided to the audit team. Monitors have also virtually attended all of the EFRC hearings that took place between July 1, 2022 and December 31, 2022, and will prepare and submit a report to the Department and DOJ with our findings.

The Monitors will continue to work with the Department, DOJ and County Counsel in the development of an updated UOF policy and training that satisfies SA mandates.

**SA Paragraph 107**

*LASD will continue to require, and emphasize in its training, that a hard strike to the head with any impact weapon, including a baton, is prohibited unless deadly force is justified. Unintentional or mistaken blows to these areas must be reported to ensure that all reasonable care was taken to avoid them.*

Work Conducted

Monitors have conducted two audits of the Department's Category 1 and 2 UOF investigations and one audit of the most serious uses of force, Category 3. (See description in Appendix D, UOF Preface, and Paragraphs 109 and 160.)

No new UOF audits were conducted or released in the most recent reporting period. However, independent of a formal audit, the MT reviewed three Category 3 UOF cases that were evaluated by an EFRC and one that was assessed by a CIRP. Monitors noted a significant improvement in those processes.

Policy Compliance: **Not in Compliance**

The Department is out of compliance for these and most SA-mandated UOF policy requirements. (See explanation in Appendix D, UOF Preface and Paragraph160.)

Training Compliance: **Not in Compliance**

The Department's remains out of compliance with the SA's UOF training requirements governed by SA Paragraph 119. (See Appendix D, Paragraph 119).

Implementation Compliance: **In Compliance**

All of our audits and assessments have documented that AV deputies rarely use impact weapons, and when one is used, it is usually a flashlight in a defensive manner to deflect a suspect's punches. As a matter of fact, in all of our reviews, there has not been one case where a deputy has used a baton. The Department has achieved implementation compliance, but not policy or training compliance with SA Paragraph 107.

Overall Assessment of Progress Toward Compliance

While the Department has achieved implementation compliance, it is fortunate that AV deputies have organically complied with this paragraph of the SA, and significant work remains to be completed with the Department's UOF policy and training.

Recommendation(s) to Achieve Full Compliance

The Parties and the MT will require additional discussions to resolve the remaining deficiencies with its UOF policy (See UOF Preface and SA Paragraph 160).

Work to Be Completed During the Next Reporting Period

The scheduling of another UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit and audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample, including body worn camera recordings, is provided to the audit team. Discussions associated with the Monitors' assessments of Category 3 uses of force are underway between the parties. Monitors will continue to work with the Department and make recommendations for the Department to improve its UOF policy and training so it can achieve full SA compliance.

**SA Paragraphs 108 and 110**

*LASD agrees to continue to require deputies to report all uses of force above un-resisted handcuffing. LASD shall continue to require Antelope Valley deputies to completely and accurately describe the force used or observed, including describing in detail the actions of the suspect necessitating the use of force and the specific force used in response to the suspect's actions, any injuries or complaint of injuries, and any medical treatment or refusal of medical treatment. (Paragraph 108)*

*LASD agrees to continue to require deputies who use or observe force to notify their supervisors immediately following any reportable use of force incident or upon receipt of an allegation of unreasonable or unreported use of force by any deputy. (Paragraph 110)*

Work Conducted

No new Category 1 and 2 audits were conducted during this time period. However, Monitors have previously conducted two audits of the Department's Category 1 and 2 UOF investigations

and one audit of the most serious uses of force, Category 3. (See description in Appendix D, UOF Preface and Paragraph 160.)

Independent of a formal audit, the MT reviewed three Category 3 UOF cases that were evaluated by an EFRC and one that was assessed by a CIRP. Monitors have provided the Department with many recommendations in how the EFRC process can be improved and have noted improvements.

Policy Compliance: **Not in Compliance**

The Department is out of compliance for these and most SA-mandated UOF policy requirements. (See explanation in Appendix C, UOF Preface and Paragraph160.)

Training Compliance: **Not in Compliance**

The Department's remains out of compliance with the SA's UOF training requirements governed by SA Paragraph 119. (See Appendix D, Paragraph 119.)

Implementation Compliance: **In Compliance**

The October 2018 and July 2021, Categories 1 and 2 UOF audits found the Department in compliance with SA Paragraphs 108 and 110, as did the November 2019, Category 3 UOF audit, as did our evaluations of the Category 3 UOF cases that have been assessed by the Department's EFRC or CIRP processes this year. In all of these reviews, there has not been any indication of the slightest hesitancy by deputies to immediately report a UOF, regardless of how minor it may be, or for deputies who witness a UOF to immediately notify their supervisors. The Department has achieved implementation compliance with SA Paragraphs 108 and 110.

Overall Assessment of Progress Toward Compliance

AV deputies do an excellent job of immediately notifying a supervisor when they are involved in or witnesses a UOF by other deputies. Therefore, the Department has achieved implementation compliance of SA Paragraphs 108 and 110. In order to achieve full compliance, the Department must finish the development of its updated UOF policy, then it has to be reviewed and approved by the DOJ and Monitors. The Department will then have to satisfactorily train AV personnel on that policy.

Recommendation(s) to Achieve Full Compliance

The Parties and the MT will require additional discussions to hopefully resolve the remaining deficiencies with its UOF policy and training. The Department will then need to publish the updated UOF policy and provide training to ensure that all AV staff have been trained in it.

Work to Be Completed During the Next Reporting Period

The scheduling of a Category 1 and 2 UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit and audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample, including BWC recordings, is provided to the audit team. Monitors have also virtually attended all of the EFRC hearings that took place between July 1, 2022, and December 31, 2022, and will prepare and submit a report to the Department and DOJ with our findings. The MT will work with the Department and continue to make specific recommendations to help the Department develop a UOF policy and training that will better equip its deputies, to serve the community and satisfy the SA's agreed-upon mandates.

**SA Paragraph 109**

*The use of force reporting policy shall explicitly prohibit the use of conclusory statements without supporting detail, including "boilerplate" language in all statements and reports documenting use of force. Deputies shall be held accountable for material omissions or inaccuracies in their UOF statements, which may include being subject to disciplinary action. (SA Paragraph 109)*

Work Conducted

While the Department's UOF policy has failed to meet many significant mandates of the of the SA, Policy Section 3-10/100.00 on the use of boiler plate language does:

> *"Use of force documentation shall not contain conclusions without supporting information. Conclusions shall be based on facts revealed during the force investigation. Generic or 'boilerplate' language shall not be used, and each UOF report and investigation shall contain individualized language specific to that event. Department members shall be held accountable, which may include being subject to disciplinary action, for material omissions or inaccuracies in their use of force reporting."*

As previously discussed, monitors have conducted two audits of the Department's Category 1 and 2 UOF investigations and one audit of the most serious uses of force, Category 3. Both of the Category 1 and 2 audits found the Department in compliance with SA Paragraph 109;

however, the Category 3 audit found the Department out of compliance with SA Paragraph 109.[33]

- The MT's first audit of Categories 1 and 2 uses of force was published in October 2018. It included a detailed review of 49 investigations of uses of force that occurred between January 1 and March 31, 2017.

- The second audit of Categories 1 and 2 uses of force was published in July 2021 and addressed 73 uses of force that occurred between October 1 and December 31, 2019.

- The Monitors conducted a separate audit of Category 3 uses of force. Category 3 cases involve the most significant uses of force, including deputy-involved shootings and/or significant injuries sustained by the subject of the force, and they are investigated, reviewed, and adjudicated in an entirely different process from Categories 1 and 2, so the audit methodology is specifically designed to evaluate that process. That audit was submitted to the Department in November 2019. Since Category 3 uses of force are rarer than Categories 1 and 2, that audit used an extended audit population time period, from January 1, 2015, through March 31, 2018, and included 13 cases.

No new UOF audits were conducted or released in the most recent reporting period. However, independent of a formal audit, the MT reviewed three Category 3 UOF cases that were evaluated by the Department's Executive Force Review Committee (EFRC) and one that was assessed by a Critical Incident Review Panel. Monitors have provided the Department with many recommendations in how the EFRC process can be improved and have noted improvements.

Policy Compliance: **Partial Compliance**

While the Department remains out of compliance for many of the critical SA mandates associated with its UOF, the policy adequately addresses the SA's requirements of SA Paragraph 109.

Training Compliance: **Not in Compliance**

The Department remains out of compliance with the SA's UOF training requirements, which are governed by SA Paragraph 119. (See Appendix D, Paragraph 119.)

---

[33] In 2018, Category 1 force was split into two categories: non-categorized force incidents (NCIs) and Category 1; the definition of Category 1 remained the same except that the lowest levels of force were now categorized as NCI. The MT's first Category 1 and 2 audit (2018) was conducted before this change. The second MT Category 1 and 2 audit (2021) evaluate and discuss NCIs and Category 1 force separately but combine them in determinations of compliance.

Implementation Compliance: **Partial Compliance**

The Department was found in compliance for SA 109 in the 2017 and 2019 Categories 1 and 2 audits. However, it was found out of compliance for SA 109 in the 2018 Category 3/EFRC audit.

Overall Assessment of Progress for Compliance

While the Department's response to the SA mandates of its UOF policy has been entirely inadequate, its updated policy has nonetheless been an improvement and has adequately addressed the SA's policy mandates associated with Paragraph 109.

Recommendation(s) to Achieve Full Compliance

The Department has achieved full implementation compliance for SA Paragraph 109 for Category 1 and 2 uses of force, but not for Category 3 uses of force. Monitors have provided the Department with many recommendations in how the EFRC process can be improved and have noted improvements.

Work to Be Completed in the Next Reporting Period

The scheduling of a Category 1 and 2 UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit and audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample including body worn camera recordings is provided to the audit team. Monitors have also virtually attended all of the EFRC hearings that took place between July 1, 2022, and December 31, 2022, and will prepare and submit a report to the Department and DOJ with our findings.

**SA Paragraphs 111–113**

*The following SA paragraphs govern the supervisory investigations of the UOF.*

*For all reportable uses of force, the investigating supervisor shall conduct a thorough investigation. This investigation will require supervisors to:*

a. *respond to the scene, examine the subject of the force for injury, interview the subject for complaints of pain, and ensure that the subject receives medical attention from an appropriate medical provider*
b. *identify and collect all relevant evidence;*

c.  *canvass for, and interview, civilian witnesses;*
d.  *collect statements from witness deputies; and,*
e.  *review all deputy UOF statements for adequacy, accuracy, and completeness. (Paragraph 111)*

*Following the investigation, each supervisor shall continue to complete a supervisory investigation documented in a "Supervisor's Report on UOF." This Report shall include:*

a.  *the supervisor's narrative description of the incident, including a complete and comprehensive description of the evidence that either justifies or fails to justify the deputy's conduct based on the supervisor's independent review of the facts and circumstances of the incident;*
b.  *documentation of all evidence;*
c.  *identities of all deputies witnessing the force;*
d.  *the investigating supervisor's evaluation of force, including a determination of whether the deputy's actions appear to be within LASD policy and consistent with state and federal law, and an assessment of the incident for tactical and training implications; and,*
e.  *documentation of any training or tactical concerns, and/or corrective action taken or recommended. (Paragraph 112)*

*Upon completion of the Supervisor's Report on Use of Force, the investigating supervisor shall forward the report through their chain of command (Paragraph 113- Part 1), which will review the report to ensure that it is thorough and complete, and that the analysis and findings are supported by a preponderance of the evidence. (Paragraph 113- Part 2)*


<u>Work Conducted</u>

No new UOF audits were conducted or released in the most recent reporting period. Monitors have previously conducted two audits of the Department's Category 1 and 2 UOF investigations and one audit of the most serious uses of force, Category 3. (See description in Appendix D, UOF Preface and Paragraph 160.)


<u>Policy Compliance</u>: **Not in Compliance**

The Department is out of compliance for these and most SA-mandated UOF policy requirements. (See explanation in Appendix D, UOF Preface 0and Paragraph 160.)


<u>Training Compliance</u>: **Not in Compliance**

The Department's remains out of compliance with the SA's UOF training requirements governed by SA Paragraph 119. (See Appendix D, Paragraph 119.)

Implementation Compliance: **Partial Compliance**

- The Department was found in compliance for SA Paragraph 111a–d for the first Categories 1 and 2 audit but not the second.[34] The Department was found in compliance for SA 111a–d for the Category 3 audit.

- The Department was found in compliance for SA Paragraph 111e for the first Categories 1 and 2 audit but not the second. It was also not in compliance for the Category 3 audit.

- The Department was found out of compliance for SA Paragraph 112a for both Category 1 and 2 audits; however, it was in compliance for the Category 3 audit.

- The Department was found in compliance for SA Paragraph 112b–e for the first Categories 1 and 2 audit but not for the second. However, it was in compliance for the Category 3 audit.

- The Department was found in compliance for SA Paragraph 113 Part-1 for both Categories 1 and 2 audits and the Category 3 audit.

- The Department was found in compliance for SA 113 Part 2 for the first Categories 1 and 2 audit, but out of compliance for the second Categories 1 and 2 audit. The Department was also found out of compliance for the SA Paragraph 113 Part 2 for the Category 3 audit.

Overall Assessment of Progress Toward Compliance

The Department has achieved compliance for SA 113, Part 1, because the UOF investigations are routinely forwarded through the chain of command. Our first Categories 1 and 2 UOF audit documented that the Department was in compliance with many of the UOF investigation requirements of the SA. However, our second Categories 1 and 2 UOF audit showed a regression in the completeness of AV UOF investigations. For example, eight of the cases in the audit population (11%) documented a critical deficiency. Six of those eight cases (75%) were because the investigating supervisor did not initiate a Service Comment Report (SCR) when the subject of the force clearly and specifically alleged allegations misconduct by deputies.

---

[34] In 2018, Category 1 force was split into two categories: non-categorized force incidents (NCIs) and Category 1; the definition of Category 1 remained the same except that the lowest levels of force were now categorized as NCI. The MT's first Category 1 and 2 audit (2018) was conducted before this change. The second MT Category 1 and 2 audit (2021) evaluate and discuss NCIs and Category 1 force separately but combine them in determinations of compliance.

Recommendation(s) to Achieve Full Compliance

North Patrol Division should provide UOF investigation training to AV supervisors. Additionally, NPD should provide closer management scrutiny of supervisory UOF investigations, and require AV watch commanders and station captains to follow Department policy and initiate SCRs for allegations of misconduct that are discovered during the UOF investigation and review process.

Work to Be Completed During the Next Reporting Period

The Parties and the MT will require additional discussions to resolve the remaining deficiencies with its UOF policy (See SA Preface).

The scheduling of a Category 1 and 2 UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit and audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample, including body worn camera recordings, is provided to the audit team. Discussions associated with the Monitors' assessments of Category 3 uses of force are underway between the parties.

**SA Paragraphs 114 and 181**

*114. LASD agrees to continue to require that the Executive Force Review Committee review use-of-force incidents requiring response by the IAB Force/Shooting Response Team under current policy, and to review the incidents for any policy, training, or tactical concerns and/or violations.*

*181. To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the County. The Monitor shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related trainings, meetings, and reviews such as critical incident reviews, executive force review committee meetings, and disciplinary hearings.*

Work Conducted

Category 3 uses of force involve the most significant types of force, including deputy-involved shootings, skeletal fractures, and/or force resulting in significant injury. They are investigated, reviewed, and adjudicated in a process that is entirely different than Category 1 and 2 uses of force. In November 2019, the Monitors published the first audit of Category 3 uses of force. Since Category 3 uses of force are rare, the audit period was just over three years, which captured 13 Category 3 UOF cases that occurred in the AV. That audit identified several significant flaws in the review of these cases resulting in the Department being found out of compliance with SA Paragraph 114 (see implementation compliance below).

Since publishing the first audit, the MT has continued to monitor each EFRC involving AV deputies use of force. We have also monitored Critical Incident Review Panel (CIRP) reviews which are held within a week or two of a critical incident to identify issues, if any, that need to be addressed quickly.

During this period, the MT monitored three EFRCs and one CIRP, which was held for a deputy-involved shooting that occurred in September. The CIRP's review was much more thorough than prior hearings, and the panel identified several critical training issues. We did note that the division commander's synopsis of the incident, which was prepared a day after the event, concluded that the "response, limited use of force, safe apprehension and immediate rendering of aid were commendable." That conclusion was reached when the investigation had only just begun.

The three EFRCs included a shooting, a use of force resulting in serious injury, and an in-custody death. In the shooting review, we noted the process is improving and members' questions were more probing than in the past. But the EFRC did not ask why the shooting deputy, who had only been in the field one month, was assigned to work with a deputy who was not a Field Training Officer. The EFRC also did not probe the evidence that seemed to show the deputy fired seven rounds without having target acquisition as required by Department policy (MPP 3-10/050.15). Those observations were communicated to Department managers afterward.

The force incident also involved an apparent policy violation that was not probed by the EFRC. The deputy was alone when he confronted a man pushing a shopping cart covered by a blanket that may have concealed a bat. The deputy drew his handgun and pointed it at the man while giving him several orders to stop. The man ignored the deputy and kept walking by him. Department policy appropriately limits pointing a firearm at someone to situations in which the person presents an imminent threat. The EFRC should have probed to determine whether the imminent threat threshold was met in this case.

The fourth case involved an in-custody death that occurred on February 3, 2018. The decedent had been terrorizing his neighbors and their children for some time. Deputies took crime reports for criminal threats and threatening phone calls. The detective assigned those cases came to a patrol briefing and informed deputies of the crime reports and that they could arrest the suspect if they saw him outside his residence. After roll call, a sergeant instructed the two deputies assigned to the car patrolling the decedent's neighborhood to conduct patrol checks. If they saw him outside, they were to call the sergeant and make the arrest. The deputies went to the neighborhood and saw the man in his backyard. The deputies notified the sergeant and, while the sergeant was responding, the decedent went back into his house. A few minutes later, the decedent came out into his backyard again. So, the deputies climbed over the decedent's fence and tried to take him into custody. A protracted altercation ensued, during which a neighbor came to the deputies' aid by pulling the decedent off them. The deputies eventually got the decedent handcuffed and applied a leg restraint. But the decedent kept thrashing about and kicked one of the deputies in the face, so the deputies applied a Total Appendage Restraint Procedure (TARP) in which the leg restraint is affixed to the handcuff chain. The deputies tried

several times to keep the decedent on his side, but he kept fighting and moving onto his stomach. After a few minutes the decedent stopped breathing and neither the deputies nor the responding medical personnel could revive him.

The death was investigated by Homicide Bureau, and when they completed their investigation it was submitted to the District Attorney's Justice System Integrity Division (JSID). On February 24, 2022, <u>four years after the incident</u>, JSID issued their finding that the deputies used reasonable force and were not criminally responsible for the death. The investigation was then transferred to IAB, but by this time one of the two deputies was no longer working for the Department and did not respond to repeated requests for an IAB interview. The other involved deputy, the sergeant, and several key witnesses also had difficulty recalling specifics for an event that occurred nearly five years earlier.

In December 2022, the case was reviewed by the EFRC—now <u>five years after the incident</u>. They concluded that the two deputies violated Department policy by entering the enclosed yard of the residence and not keeping the decedent on his side, and they made a penalty recommendation for that violation. They never addressed that the sergeant assigned the task of arresting this formidable man to a deputy with a year in the field and his trainee partner without a Ramey Warrant and without a tactical plan. They also did not address the sergeant's failure to clarify his direction, "if you see the suspect outside . . . arrest him," which is what the deputies did.

This was also an opportune case for the EFRC to raise concerns about a 1991 Settlement Agreement with ALADS whereby administrative investigations like this are delayed for years.[35] In this case, as in many others we have seen, when IAB was finally allowed to conduct their investigation witnesses could not be located and/or memories, including those of the involved deputies, had faded to the point of being meaningless. Those lengthy delays eliminate the Department's ability to conduct thorough investigations and if warranted administer discipline in a timely manner. Corrective action taken five years after the incident eliminates its effectiveness and is grossly unfair to the involved parties. The vast majority of law enforcement agencies in California do not have such lengthy delays in adjudicating cases like this. Either their

---

[35] 1991 ALADS Settlement Agreement: https://pars.lasd.org/Viewer/Manuals/16084/Content/16209. Regarding the concurrent investigations, the ALADS agreement states:

> *When a deputy is concurrently the subject of a criminal investigation and an administrative investigation arising from the same incident, act, or omission, or has criminal charges pending from an incident, act, or omission that is also the subject of an administration investigation, the Department shall not require or compel said deputy to submit to an interview in that administrative investigation, until one of the following occurs.*
> 1. *LASD, or another law enforcement agency with jurisdiction over the criminal offense, determines that criminal charges will not be sought against said deputy. LASD's determination that criminal charges will not be sought against said deputy is irrevocable at the point said deputy is compelled to submit to administrative interrogation.*
> 2. *The prosecuting attorney's office rejects (declines to file) a criminal complaint against said deputy.*
> 3. *Said deputy is arraigned on the criminal charges.*
> 4. *Said deputy requests a continuance on the criminal charge(s).*

district attorney's office moves quicker or they conduct the administrative investigation while the criminal investigation is pending.

Policy Compliance: **In Compliance**

The Department has effective policies in place for the reviews of critical incidents by the EFRC including a review by the CIRP within a week or two of occurrence. The Department is in compliance with this provision.

Training Compliance: **In Compliance**

The commanders who comprise these boards are very familiar with the process and they are always chaired by an experienced commander; therefore, the Department is in compliance with this provision.

Implementation Compliance: **Not in Compliance**

In the MT's audit of Category 3 cases, we found substantial shortcomings in the EFRC review process. That resulted in a compliance rate of 85% for the requirements of Paragraph 114, which is below the 95% standard agreed upon by the Parties. Additionally, our audit found that four of the 13 cases we reviewed (31%) contained significant allegations of misconduct, including excessive force, vandalism, racial profanity, and racially motivated excessive force. However, only the allegation of vandalism, which a bystander recorded and then was played on social media and the news, was investigated and adjudicated.

Since that audit, the Monitors have reviewed 11 Category 3 uses of force that were evaluated by the EFRC and three by the CIRP. While we have noted some improvement in those reviews, we are still finding major policy issues unaddressed. That includes violations of the Department's policy requiring target acquisition before shooting and its policy prohibiting the pointing of a handgun at someone unless that person poses an imminent threat.

Settlement Agreement Paragraph 114 requires that the EFRC review these extremely important incidents for, "**any** policy, training, or tactical concerns and/or violations" (emphasis added). That includes policies requiring that trainees be assigned to a FTO and that deputies may only point a firearm at someone when that person is an imminent threat. It is the responsibility of the EFRC and all the other managers reviewing these incidents to ensure that all Department policies are being followed, but that is just not occurring.

Our November 2019 audit of the EFRC process found the Department out of compliance with SA Paragraph 114, and though the process has improved somewhat, it is still non-compliant with the agreement.

Overall Assessment of Progress Toward Compliance

The management review process for Category 3 uses of force has improved, albeit inconsistently, and is still non-compliant with the SA's requirement to review these incidents for "policy, training, or tactical concerns and/or violations."

Recommendation(s) to Achieve Full Compliance

The EFRC needs to improve its critical review these incidents so they identify and address any policy issue that arises during these incidents.

Work to Be Completed During the Next Reporting Period

We will continue to monitor EFRC and CIRP reviews and submit a report on our findings every six months. We will also provide the AV Deputy Chief with our comments following each EFRC review.

**SA Paragraph 117**

*LASD and Antelope Valley unit commanders will be responsible for identifying and reporting force trends and for taking preventive steps to curb problematic trends, including issuing or revising policies, directives, training bulletins, or providing additional mentoring and supervision to individual deputies. (Paragraph 117)*

Work Conducted

The Department conducts quarterly Risk Management Forum (RMF) meetings for each of its field commands. The RMF for NPD includes Lancaster and Palmdale stations. In addition to various activities including arrests and complaints, the RMF reviews uses of force for each command, including deputy-involved shootings and unintentional discharges. The MT continues to attended AV RMF meetings and is communicating our assessments of the RMF process to Department management in an ongoing basis.

Policy Compliance: **Unable to Determine**

The Monitors are unable to make a determination as to compliance with Paragraph 117 at this time pending our formal review of the RMF process and the agreement of a compliance metric by the Parties.

Training Compliance: **NA**

The Monitors are unable to make a determination as to training compliance at this time. After formal review of the RMF process and the establishment of compliances metrics approved by the parties, the Monitors will be able to make a training compliance determination.

Implementation Compliance: **Not in Compliance**

The Department has not provided the MT documentation of efforts to identify, track, or respond to concerning force trends for the purpose of compliance with this provision.

Overall Assessment of Progress Toward Compliance

The Department's RMF and quarterly reports both address UOF issues.

Recommendation(s) to Achieve Full Compliance

The Department's RMF needs to specifically address the mandates of SA Paragraph 117 during its reviews of Lancaster and Palmdale stations. Completing the UOF analysis required in Paragraphs 120–123 will also help to fulfill Paragraph 117.

Work to Be Completed During the Next Reporting Period

The MT will complete an assessment and report of the Department's RMF review of Lancaster and Palmdale station captain.

**SA Paragraph 118**

*LASD and Antelope Valley unit commanders will regularly review and track "training and tactical review" related findings, recommendations, and comments to ensure that informal supervisory feedback does not replace the need for formal discipline. LASD will ensure that the supervisory feedback, including feedback documented in the "training and tactical review" portion of a Supervisor's Report on Use of Force, is documented in the PPI. (Paragraph 118)*

Work Conducted

Monitors have conducted two audits of the Department's Category 1 and 2 UOF investigations and one audit of the most serious uses of force, Category 3. (See description in Appendix D, UOF Preface, and Paragraph 160.)

No new UOF audits were conducted or released in the most recent reporting period. However, independent of a formal audit, the MT reviewed three Category 3 UOF cases that were evaluated by an EFRC and one that was assessed by a CIRP. Monitors have provided the Department with many recommendations in how the EFRC process can be improved and have noted improvements

On November 1, 2022, the Monitors and DOJ met with the Department for the regularly scheduled parties onsite meeting. During that time, we discussed several cases recently identified by the DOJ involving Deputies that were identified in the Department's most recent Quarterly Report. Those cases include, but were not limited to the following cases that document clear violations of SA 118:

This case involves a clear instance of excessive force, that was nonetheless approved by the watch commander, station captain, and North Patrol Division as being in policy. Lancaster station deputies responded to a radio call that the suspect from an earlier robbery was in the area. They detained the suspect, handcuffed him and placed him in the back seat of a patrol vehicle with the window down. As the deputies interviewed the subject he realized he was going to jail and became uncooperative and stuck his head out of the patrol vehicle window. He refused the deputy's order to pull his head back in the patrol vehicle. The deputy included boilerplate language in his report when he stated he was concerned the man might escape, which was not reasonable as the suspect was a middle-aged man who was handcuffed and multiple deputies were in the immediate vicinity of the open patrol vehicle window. The deputy warned the irrational, handcuffed suspect to pull his head back in the window, and when he refused the deputy sprayed him four consecutive times with OC spray, allowing no time for the OC to take effect. With absolutely no mention in the supervisor's investigative report, or in any of the deputies' reports, the approving watch commander opined that the UOF was justified because the incident occurred near a large apartment complex where "many of the residents have been openly hostile to deputies." The body worn camera recordings clearly document that there were no hostile activities taking place at the location at that time and the few people who were present were peaceful. The watch commander's baseless opinion was followed by another completely speculative opinion when he opined that, "Deputy (name) likely suffered from stress induced time distortion where time appeared to speed up and the effects of the OC were not occurring fast enough." The watch commander's statement that the deputy experienced a stress induced time distortion was not supported by any statement from involved deputy, nor were there any indicia that the deputy was experiencing a high level of stress or anything that could cause such a condition. The station captain and North Patrol Division management agreed with the watch commander and approved his findings. However, during the onsite meeting, after the DOJ and Monitors' presentation, which included viewing the deputy's BWC recording of the

incident, the NPD Chief and the Assistant Sheriff of Patrol Operations agreed the UOF was out of policy.

Monitors subsequently forwarded a request to the Department asking if the Department was going to reclassify the UOF and what actions would be taken for the policy violation and failures in the watch commander and management adjudication of the clearly excessive use of force. The Department's responded that the matter has been referred to North Patrol Division. As of the date of this report there has been no additional response from the Department. Additionally, because North Patrol Division approved this UOF as in policy, it is a conflict of interest for North Patrol Division to conduct the review, so the review process should be conducted by the Assistant Sheriff of Patrol Operations.

Another case presented during the onsite meeting involved a UOF and arrest of a traffic violator that documented multiple opportunities for the deputies to use de-escalation techniques to lower the intensity of an evolving situation and resolve it without having to resort to the use of force. Two Lancaster deputies were part of a speeding enforcement task force. The subject was stopped for driving 56 mph in a 45-mph zone. One of the deputies, newly assigned to patrol duties, contacted the subject, who was argumentative and reluctantly provided her driver license. The deputy returned to the patrol car to prepare a citation. His training officer partner stood closely next to the driver's door asked her if she had insurance. She rolled her window up without answering. Then she pushed the door open which bumped into the deputy. He pulled the door open so "she could not push the door into me again." The subject began recording on her phone and directed profanities at the deputy. Then she reached out and tried to pull the door closed which bumped into the deputy. The deputy took the phone from her hand to take her into custody, but did not communicate that to her. A minor UOF subsequently occurred when she stood up to retrieve the phone, and as she did so, the deputy tried to grab the subject's arm, and she pulled away. The subject was placed under arrest for 2800(a) VC as well as speeding and not having car insurance, then released at scene.[36] A review of the deputy's BWC documented that the subject was verbally caustic toward the deputy. The deputy initially was composed, but then he failed to alter his tone and slow things down and use tone, time and distance to de-escalate the tense and evolving situation which is the core principle of de-escalation. The watch commander, station captain and NPD all approved the report without addressing the deputy's failure to attempt deescalate the situation and use alternative tactics to resolve it.

This case involved the clear out-of-policy pointing of a firearm by a deputy, which was not addressed by the watch commander, station captain, or North Patrol Division. A Palmdale station deputy conducted a DUI investigation of a suspect he believed to be a gang member. He told the suspect to exit his vehicle. The suspect refused and the deputy told him that "things are going to go really bad for you."

---

[36] 2800 (a) VC. It is unlawful to willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, when that peace officer is in uniform and is performing duties pursuant to any of the provisions of this code, or to refuse to submit to a lawful inspection pursuant to this code.

The suspect told the deputy he was not going to exit his vehicle, so the deputy grabbed his arm,

*"While maintaining my firm grip on (suspect's name)' left arm, I unholstered my firearm and pointed it at (suspect's name) with the intention of de-escalating him and gaining his compliance to exit the vehicle. While pointing my firearm at (suspect's name) I gave (suspect's name) additional commands to exit the vehicle. Despite having my firearm pointed at (suspect's name) continued to refuse to cooperate and would not exit the vehicle. I subsequently re-holstered my firearm."*

Apart from the incredibly poor and dangerous tactics, the deputy's rationale for pointing of his firearm at the suspect was a clear violation of Department Policy 3-10/045.00:

*Department members are expected to exercise sound judgment and critical decision making when choosing to display a firearm or point it at a person.*

- *When a Department member un-holsters their firearm, in the absence of an imminent threat but where a potential threat exists, members should generally point their firearm in a safe direction without pointing it directly at a person, or*
- *In situations where a Department member reasonably believes an imminent threat exists based on the totality of the circumstances, that member may point their firearm at the threatening person or animal until they no longer perceive the threat.*

After the deputy re-holstered his firearm a significant use of force occurred involving the suspect and multiple deputies. That use-of-force resulted in an Internal Affairs investigation; however, the unnecessary and inappropriate pointing of firearm was not mentioned or addressed in the adjudication of the investigation.

Policy Compliance: **In Compliance**

The Department policies governing the review and tracking of "training and tactical review" related findings are adequate. Therefore, the Department is in policy compliance for SA Paragraph 118.

Training Compliance: **Not in Compliance**

The Department has not achieved training compliance. Our audits and assessments have repeatedly documented a significant need to train Department supervisors, watch commanders, station captains and executive management in the completion and review of UOF investigations to ensure that tactical and training reviews are accurately completed and entered into the Department's PRMS database and the quarterly reports, and that informal supervisory feedback does not replace the need for formal discipline.

Implementation Compliance: **Not in Compliance**

Our audits have determined that the Department's PRMS system, formally PPI, does not have the capacity to store the training and tactical review section of UOF reports. As reported in our last six-month report, the Department has indicated that it will research an alternative method of storing that information, but still has not done so.

When the July 2021 Categories 1 and 2 audit was conducted, the Department was found out of compliance for SA Paragraph 118. It was also found out of compliance for SA Paragraph 118 for the November 2019 Category 3 UOF investigations audit because In three cases the EFRC recommended specific training for the involved deputies and that training was not provided in one of those cases for a compliance rate of 67%.

Our audits and ongoing reviews indicate that there are concerns with the accuracy of UOF data on the Department's quarterly reports. The Quarterly Report provides the file number for each UOF occurring during the quarter and indicates if there were any "training/tactics" concerns. The information for training and/or tactical concerns is derived from question 47 of the Supervisor's Report of UOF. So, regardless of any critique that may be expressed elsewhere in the report, or other concerns subsequently raised by the reviewing managers (be that the lieutenant, captain, or commander), if that information is not included in question 47 of the Supervisor's Report of UOF, and that question toggled in the affirmative, the quarterly report data will reflect there were "no issues" with the UOF.[37] It is concerning that the Department was purportedly unaware of this system failure and that is has never been identified in the Department's internal audits, as it renders the data associated with the training and tactical review of UOF incidents in the Department's PRMS database unreliable.

Overall Assessment of Progress Toward Compliance

Department executive management needs to take a leadership role and become more actively and competently involved in the review of UOF investigations.

Recommendation(s) to Achieve Full Compliance

The Department needs to increase its supervisory training and management accountability associated with the investigation and review of uses of force, ensure that training and tactical review commentaries are included under question 47 of the Supervisor's Report on the UOF, and develop an automated system with the capacity to reliably store the training and tactical review portion of Supervisor's Report on the UOF. Additionally, AAB needs to ensure it is testing the reliability of UOF data in its audits of the Department use-of-force investigations.

---

[37] Monitors have made the Department aware of this issue and the audit methodology for our next UOF audit will include a specific assessment to determine if the Department has addressed this issue.

<u>Work to Be Completed During the Next Reporting Period</u>

The scheduling of a Category 1 and 2 UOF audit has been delayed because the Monitors and DOJ were hopeful that an agreement would be soon reached on a revised Department UOF policy that would satisfy SA mandates. Since that has not occurred, Monitors will submit an audit workplan to the parties in the first quarter of 2023, and the audit field work will begin as soon as the audit sample, including body worn camera recordings, is provided to the audit team. Additionally, Monitors have already reviewed the Category 3 uses of force that were reviewed by the Department's EFRC between July 1, 2022 and December 31, 2022, and will submit a report with our findings during the first quarter of 2023.

**SA Paragraph 119a–e**

*119: LASD shall provide all Antelope Valley deputies with annual or biennial use-of-force training. The topics will include the following:*

a. *proper use-of-force decision making, including when force may be unnecessary in response to minor resistance (biennial);*
b. *role-playing scenarios and interactive exercises that illustrate proper UOF decision making, including training deputies on the importance and impact of ethical decision making and peer intervention (annual);*
c. *principles of procedural justice, and avoiding the use of force in response to minor resistance (biennial);*
d. *de-escalation techniques that encourage deputies to make arrests without using force (annual);*
e. *threat assessment, including how race can impact deputies' threat assessments (biennial);*

<u>Work Conducted</u>

As we have previously reported, the MT has been working with the Department to revise its UOF training for more than two and a half years. In our last six-month report, we recommended that the Department develop training that is consistent with its UOF policy and SA mandates and we said, "To achieve SA compliance, the Department needs to dramatically increase the active involvement of the entities that oversee the SA's agreed-upon mandates, which include, but are not limited to, Training Bureau and Field Operations Support Services (FOSS)." Unfortunately, little has been accomplished since our last six-month report and the Department's Training Bureau has not addressed the recommendations of the Monitors and DOJ to improve its UOF related training in order to achieve SA compliance, and more importantly to better equip deputies to effectively deescalate and use objectively reasonable and proportional force. Monitors and the DOJ have made multiple recommendations for the Department to improve its UOF training, which clearly could have been accomplished in the last six months, but inexcusably was not. The Monitors' recommendations include but are not limited to the following.

- *Recommendation No.1*: The case and statutory law update should be developed and presented by County Counsel, which could potentially be done via video format.[38]

- *Recommendation No. 2*: The instruction on Department's policy for the lethal use of force should be further developed and provided by a Department Executive, which is something that could be done in video format.

- *Recommendation No. 3*: A comprehensive lesson plan(s) and video module(s) of instruction should be developed with an emphasis on de-escalating tense and evolving incidents. A Department executive should participate in the video to demonstrate and reinforce the Department's emphasis on the de-escalation.

- *Recommendation No. 4*: Additional instruction associated with causal factors of what is called "excited delirium," and the symptomology of "excited delirium" should be added to the presentation. The material should include: (1) that the state of "excited delirium" can be a life threatening, and potentially fatal, medical emergency, (2) "excited delirium" deaths are associated proximal to restraint, (3) such deaths have not been found to be a phenomenon experienced solely by public safety personnel (but also in psychiatric and geriatric care facilities), and (4) acknowledgment should be given to the AMA's stance that current evidence does not support "excited delirium" as an official diagnosis, and even opposes it being cited as a sole justification or cause of death until a clear set of diagnostic criteria has been established.

- *Recommendation No. 5*: The Department should consult with County Counsel to obtain legal advice for the use of carotid restraints in lethal UOF force scenarios that is consistent with State law, and/or seek a position from the California Attorney General's Office on this matter.

- *Recommendation No. 6*: A comprehensive lesson plan should be developed on the use of impact weapons and the subject adequately addressed in the course.

- *Recommendation No. 7*: Expanded the UOF training to 16 hours.

- *Recommendation No. 8*: The Department instruction in the use of personal weapons should be consistent with the Department's policy, and emphasize the use of palm strikes instead of punches whenever possible and practical.

- *Recommendation No. 9*: A comprehensive lesson plan on the Department's policy associated with deputies duty to intercede when witnessing a clearly excessive UOF incident should be developed and included in the instruction.

---

[38] The Department indicated it agreed with recommendations 1, 2, and 5, but they have not been implemented.

- *Recommendation No. 10*: Students in the class should be reminded to think critically about their current practices and consider if they meet current legal and policy standards.

- *Recommendation No. 11*: Incorporate a formal test to the course as a means of measuring understanding and retention of the critical information. [39]

- *Recommendation No. 12*: The Department should develop role playing/situational simulations that encourage and develop a deputy's abilities to de-escalate tense and evolving incidents with the goal of resolving those incidents without having to resort to the use of force.[40]

Policy Compliance: **Not in Compliance**

The Department is out of compliance for most SA-mandated UOF policy requirements. (See description in Appendix D, UOF Preface, Paragraphs 109 and 160.)

Training Compliance: **Not in Compliance**

- *SA Paragraph 119 (a)* requires that the Department's UOF training include "proper UOF decision making, including when force may be unnecessary in response to minor resistance." That training requirement has not been included in the Department's UOF training.

- *SA Paragraph 119 (b)* requires that the Department's UOF training include "role-playing scenarios and interactive exercises that illustrate proper UOF decision making, including training deputies on the importance and impact of ethical decision making and peer intervention." That training requirement has not been included in the Department's UOF training.

- *SA Paragraph 119 (c)* requires that the Department's UOF training include "principles of procedural justice, and avoiding the use of force in response to minor resistance." That training requirement has not been included in the Department's UOF training.

- *SA Paragraph 119 (d)* requires that the Department's UOF training include "de-escalation techniques that encourage deputies to make arrests without using force." Throughout the course of this training, the instructor repeatedly

---

[39] Required by the Commission Peace Officers Standards and Training.

[40] The MT provided the Department with three role playing/situational simulations examples that are based on actual AV deputies UOF incidents.

referenced the need for deputies to "de-escalate" the amount of force they use once they are able to gain control of a combative suspect, which is, of course, good. However, there was very little time dedicated to providing instruction on the skills, techniques, resources, or expectations to de-escalate tense and evolving incidents with the purpose of avoiding having to use force whenever feasible. Additionally, there appears to be confusion or lack of awareness surrounding the importance of using terminology that serves to clearly distinguish the difference between de- escalation efforts, which should be undertaken to avoid or reduce the need for force, versus the expectation that the amount of force used be reduced once the subject is under control. That training requirement has not been included in the Department's UOF training.

- *SA Paragraph 119 (e)* requires that the Department's UOF training include "threat assessment, including how race can impact deputies' threat assessments." That training requirement has not been included in the Department's UOF training.

The Department remains out of training compliance for this paragraph and all SA paragraphs associated with UOF training. However, according to the Compliance Unit the Department is in the final phases of the development of its use-of-force training that will cover SA 119 a–e. The Compliance Unit has met with the LASD Training staff in November, and Training Bureau executives in December 2022, and they agreed to make the development and completion of this training a priority for 2023. This training will include both updated Department UOF policy and a CA laws update.

Implementation Compliance: **Not in Compliance**

The Department remains out of implementation compliance for SA Paragraphs 119a–e.

Overall Assessment of Progress Toward Compliance

The Department's Training Bureau instructors are doing their best under the circumstances, and our comments are not intended to question their abilities. The Training Bureau instructors are teaching what they are told to teach by Training Bureau management in the time allotted, and achieving SA compliance has clearly not been a priority. The Monitors and DOJ recognize that the Compliance Unit and NPD do not have control over the Department's Training Bureau, whose duties include Department-wide training responsibilities. However, Sheriff Luna, who was just elected, does have control over Department-wide operations and needs to take an active leadership role in ensuring that the Department's executive management team takes the mandates of the SA seriously and accomplish the SA's mandates that fall under their areas of responsibility.

The Department remains out of policy with training and implementation compliance for this paragraph and **all** SA UOF training requirements.

Recommendation(s) to Achieve Full Compliance

To achieve SA compliance, the Department needs to dramatically increase the active involvement of the entities that oversee the SA's agreed-upon mandates, which include, but are not limited to, Training Bureau and Field Operations Support Services (FOSS).

Work to Be Completed During the Next Reporting Period

Monitors will diligently work with the Department in developing a UOF policy and training that achieves SA mandates, and communicate our concerns and the Department's progress, or lack thereof, to Sheriff Luna.

## SA Paragraph 119f–g

*The SA contains numerous provisions requiring that AV deputies and their supervisors receive specific training on the UOF The requirements outlined in SA Paragraph 119 F & G are:*

f.  *LASD-AV deputies will attend LASD's Tactics and Survival (TAS), also known as the Laser Village tactical firearms training (biennial); and,*
g.  *supervisors shall receive initial and annual refresher training on conducting use of force investigations, how to effectively direct deputies to minimize uses of force and to intervene effectively to prevent or stop unreasonable force, using LASD's accountability and disciplinary systems after encountering a potentially unreasonable use of force, and supporting deputies who report unreasonable or unreported force, or who are retaliated against for using only reasonable force or attempting to prevent unreasonable force (annual).*

Work Conducted

With the Department now in the seventh year of the SA, it has still not updated its training to comply with SA 119f–g. Once it has done so, the training will be evaluated for completeness and SA compliance and attendance of AV deputies and supervisors. The ultimate goal is to work with the Department's Advanced Officer Training Bureau to develop the initial training and an annual refresher training by the end of 2023 that will be used department wide.

Policy Compliance: **Not in Compliance**

The Department is out of compliance for most SA-mandated UOF policy requirements. (See description in Appendix D, UOF Preface, Paragraphs 109 and 160.)

Training Compliance: **Not in Compliance**

The Department remains out of training compliance for SA Paragraphs 119f–g.

Implementation Compliance: **Not in Compliance**

The Department remains out of implementation compliance for SA Paragraphs 119f–g.

Overall Assessment of Progress Toward Compliance

North Patrol Division needs to ensure that the Department has provided the required training and submit documentation to the Monitors for audit.

Recommendation(s) to Achieve Full Compliance

The Department needs to submit documentation of the training required by SA 119f–g.

Work to Be Completed During the Next Reporting Period

As previously stated, the development of this training relies on the Department's completion of the UOF policy, **which has not been a Department priority**. According to the Compliance Unit, Department management plans to meet with the Training Bureau in February 2023 to start developing a revised expanded course outline and Power Point presentation. Once the Department provides the training documents associated with SA 119f–g, they will be evaluated to determine if they contain the required data points for audit. If they do document the required data for audit, an audit workplan will be developed and submitted to the parties for input and the field work will be initiated. If they do not contain sufficient data for audit, a report will be prepared notifying the Department of the steps it needs to take.

**SA Paragraphs 120–122: UOF Data Analysis**

*The following SA paragraphs establish the requirements for this objective.*

*Within one year of the Effective Date and at least annually thereafter, LASD will analyze the Antelope Valley stations' force data, including the force-related outcome data, to identify significant trends, and identify and correct deficiencies revealed by this analysis. (Paragraph 120)*

*LASD-AV's force analysis will include assessment of the frequency and nature of uses of force that are: referred to IAB for investigation; the subject of misconduct complaints; the subject of civil suits; related to criminal obstruction- or resisting-arrest-type charges that are dismissed or declined by the prosecutor; or involve repeat-deputies or units. (Paragraph 121)*

*LASD will determine whether policy or training curricula changes must be made as a result of its analysis of use of force incidents. (Paragraph 122)*

*LASD will document the results of the use of force analysis in a public report. (Paragraph 123)*

Work Conducted

As previously reported, on November 9, 2021, LASD provided a 2020 force analysis plan with tables to the Monitor and DOJ. The Monitor and DOJ provided comments on December 3, 2021. On December 7, 2021, indicated that it had already moved forward with its 2020 force data collection plan, despite it not being approved by the Monitor or DOJ. As of December 31, 2022, the Department has not provided that analysis or report.

Policy Compliance: **NA**

Not applicable

Training Compliance: **NA**

Not applicable

Implementation Compliance: **Not in Compliance**

The Department remains out of compliance with SA Paragraphs 120, 121, 122 and 123.

Recommendation(s) to Achieve Full Compliance

The Department's needs to dramatically increase the active involvement of entities, such as its Audit and Accountability Bureau, that are tasked with providing leadership or major contributions over SA-related mandates.


Work to Be Completed During the Next Reporting Period

The Department needs to provide the 2020 and 2021 force analysis reports for evaluation. Once they do, the Monitors will evaluate the reports for SA compliance. In the interim, the Department will remain out of compliance with SA Paragraphs 120, 121 and 122.


## G. PERSONNEL COMPLAINTS

### Preface to Complaint Section

*The County will ensure that all allegations of personnel misconduct are received and are fully and fairly investigated, and that all personnel who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. To achieve these outcomes, LASD and the County agree to implement the requirements below.*


Work Conducted

The MT has conducted two in-depth audits of public complaints, and in both cases the Department has failed to comply with the SA's fundamental requirement that complaints from the public are willingly received, fairly investigated, adjudicated using a preponderance of evidence, and deputies are held accountable when found to have committed misconduct. In the first audit, the Department was in compliance with only three (of 17) SA paragraphs : distinguish between service and personnel complaints (p. 128), identify everyone at scene (p. 134), and obtain full statements (p. 135). In the second audit, the Department again was in compliance with three paragraphs: identify everyone and obtain statements (p. 134 and 135) and obtain LEP language assistance when necessary (p. 125).

As a result of the second audit and after much discussion, the Department agreed to revise its process for handling public complaints. It was agreed that the process of updating its handling of public complaints would start with a revision to the SCR Handbook. For the next two years, the Monitors, DOJ, and the Department exchanged drafts until agreement was reached in December 2021. DOJ expressed their concerns with the revised handbook and in a November 2021 email laid out those concerns but also stated, "DOJ is willing to agree to not withhold approval of the SCR Handbook pursuant to Paragraphs 160–163 with the understanding that the Parties will revisit these structural concerns and revise SCR policies and the SCR Handbook

should future Monitor audits (i.e., those after the Handbook goes into effect) reveal that LASD is out of compliance with provisions of Paragraphs 127–132." In December 2021, LASD agreed to this compromise.

The Department has not yet published the SCR handbook but has submitted drafts of a revised Administrative Investigations Handbook and Department Manual sections, both of which differed in several material areas from the language agreed upon in the SCR Handbook.


Policy Compliance: Partial Compliance

The AV stations and NPD issued local directives revising AV public complaint policies to comply with most of the SA's requirements, but Department-wide policies have not been revised to reflect the SA's requirements. (This is discussed in more detail under each subsequent SA paragraph.)


Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on most of the SA's requirements for public complaints, but the Department has not trained personnel beyond the AV on the changes needed to comply with the SA. (This also is discussed in more detail under each subsequent SA paragraph.)


Implementation Compliance: **Not in Compliance**

Two detailed audits of the Department's handling of public complaints have shown that the Department is not complying with the SA's requirements. We have examined public complaints during our three UOF audits and found that egregious complaints made during the cases reviewed for those audits did not result in a personnel complaint. In one case, the subject of a use of force investigated by the IAB alleged that a deputy used a racial epithet, but that did not result in the initiation of a personnel complaint even when it was reviewed by the EFRC.


Overall Assessment of Progress Toward Compliance

The Department continues to struggle with the requirement that public complaints are willingly accepted, adequately investigated, fairly adjudicated and that personnel who commit misconduct are held accountable. While publication of the SCR Handbook will dramatically revise the process for handling public complaints and remove the barrier to revising other policy documents, Department managers must be accountable for any failure within their commands to receive, investigate, and adjudicate public complaints.

Recommendation(s) to Achieve Full Compliance

Department managers must exercise diligence in carrying out their responsibilities related to the investigation of complaints; when these obligations are not met the responsible managers must be held accountable by the Department's executive staff. Additionally, the pace of internal approvals for policies already finalized by the Parties and MT continues to create undue delays. Executive leadership should shepherd these documents through the system as much as possible.

Work to Be Completed During the Next Reporting Period

LASD needs to ensure alignment is achieved between the Department Manual and Administrative Investigations Handbook with the SCR Handbook, then publish those documents and train their personnel on the requirements.

**Complaint Paragraph 124**

*LASD shall continue to make personnel complaint forms and informational materials, including brochures and posters, available at appropriate County or municipal properties in the Antelope Valley, including, at a minimum, LASD stations, courts, county libraries, and LASD websites, and make them available to community groups upon request.*

Work Conducted

Compliance with Paragraph 124 was assessed in the MT's first audit of public complaints, and the Department was found to be out of compliance with this paragraph. The MT was unable to assess compliance in the second audit due to COVID-19 restrictions.

Policy Compliance: Partial Compliance

Both AV station commanders issued a directive in June 2018 requiring that complaint material be on display as required by the SA. While this paragraph is AV-specific, the revised SCR Handbook will also require that a supply of complaint brochures and forms be maintained at every sheriff's station and that they be made easily accessible to the public in each station's public lobby. we are awaiting publication of the SCR Handbook to determine full compliance.

Training Compliance: **Partial Compliance**

During orientation sessions, the AV stations provide each new watch commander and supervisor with a copy of the unit order that includes the requirement to make complaint information readily available to the public.

Implementation Compliance: **Partial Compliance**

Our first audit of public complaints showed the Department was not complying with this requirement. We were unable to reassess compliance in the second audit due to COVID-19 restrictions. Our recent inspection of the enumerated facilities showed the material was on display as required. We will review this in our third audit, after which we will assess whether the Department has achieved full compliance.

Overall Assessment of Progress Toward Compliance

Our first audit of public complaints showed the Department was not complying with this requirement, then we were unable to reassess compliance in the second audit due to COVID-19 restrictions. Our recent ad hoc inspection of the enumerated facilities showed the material on display as required at each station and in six of the seven non-Department facilities. We will review this in our third audit, after which we will assess if the Department is in full compliance.

Recommendation(s) to Achieve Full Compliance

The Department is making progress in their efforts to achieve compliance with this requirement. Staff need to be more attentive to having the required complaint materials available in the enumerated locations.

Work to Be Completed During the Next Reporting Period

When the SCR Handbook is published and training has occurred, we will discuss with the Parties a plan for conducting our third audit of public complaints and assess compliance with this paragraph and the rest of the section. Meanwhile, the Department needs to maintain focus on having the required complaint material available in the enumerated locations.

**Complaint Paragraph 125**

a. *LASD will continue to accept all personnel complaints, including anonymous and third-party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or electronic mail, as well as in the field.*
b. *Any Limited English Proficient (LEP) individual who wishes to file a complaint about a LASD deputy or employee shall be provided with a complaint form and informational materials in the appropriate non-English language and/or be provided appropriate translation services in order to file a complaint.*

<u>Work Conducted</u>

The MT conducted two earlier audits of public complaints (in January 2018 and December 2020). In both audits, the Department failed to comply with the requirement that they accept complaints from the public. The audit identified several UOF investigations, claims for damages, and incidents documented on watch commander logs where the public clearly alleged misconduct, but no complaint was initiated. Additionally, the MT made covert phone calls to both AV stations, primarily in Spanish, to make complaints and found a number of those calls were not handled appropriately. We also identified several cases during our UOF audits where allegations of misconduct did not result in the initiation of a complaint and were not investigated. In one UOF case investigated by the IAB, the subject of the force clearly alleged the deputies uttered a racial profanity, but the IAB investigator did not initiate a complaint nor did the EFRC adjudicate the incident.

The MT's first audit of public complaints found the Department out of compliance with the LEP requirement, but the second audit found the Department in compliance. Additionally, the MT's three UOF audits found that adequate translation services were being provided to non-English speaking parties.

<u>Policy Compliance: Partial Compliance</u>

The AV stations and NPD issued directives in June 2018 establishing procedures that are intended to achieve compliance with the SA, including the requirement to accept complaints and provide translation services to LEP persons. While that is an adequate interim solution for AV commands, these paragraphs require Department-wide implementation because they have to be included in the revised SCR Handbook, the revised drafts of the Department Manual and Administrative Investigations Handbook. Full compliance cannot be achieved until those documents are published.

<u>Training Compliance: **Partial Compliance**</u>

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Employees have been told that when they become aware of a misconduct complaint, they are to notify a supervisor without unnecessary delay. Personnel complaints are then investigated by the watch commander. Existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **Partial Compliance**

*Not in Compliance 125a Complaint Intake*. The MT's two audits of public complaints have shown that the public complaints of misconduct are not being accepted, as required by the SA. Use-of-force investigations, including those investigated by the Department's Internal Affairs Bureau, contain unaddressed allegations of misconduct. Many of the MT's phone calls to the two stations were not handled appropriately. Several claims for damages and lawsuits containing allegations of misconduct did not result in the initiation of a personnel complaint.

*Partial Compliance 125b LEP*. The LEP provision was found out of compliance in the MT's first complaint audit, but in compliance in the second complaint audit (December 15, 2020).

Overall Assessment of Progress Toward Compliance

The MT's two complaint audits, coupled with findings in our three UOF audits, clearly show that the Department is not always initiating a complaint investigation when an allegation of misconduct is made. That even includes UOF investigations conducted by the IAB, as well as Category 3 uses of force reviewed by Department executives. The Department must take public complaints seriously and initiate a personnel investigation whenever it becomes aware of alleged misconduct, regardless of the medium in which it appears.

The LEP provision, on the other hand, appears to have taken hold, and compliance with its provisions seems to be occurring. However, we should assess this via one more audit to be confident it is occurring regularly.

Recommendation(s) to Achieve Full Compliance

Our audits have shown that line level employees generally notify a supervisor when someone alleges misconduct, but supervisors and managers are not consistently initiating a personnel investigation as required.

Publication of handbooks and revising manual sections aside, the Department needs to hold managers accountable whenever an allegation of misconduct is made and a complaint is not initiated.

Work to Be Completed During the Next Reporting Period Reporting Period

LASD must publish the SCR Handbook, complaint Manual section and Administrative Investigations Handbook and then provide training to support the implementation of all requirements. Supervisors and managers must be consistently held accountable for complying with standards and expectations established in those guides. Once an appropriate amount of

time has been provided for LASD to train staff on the new handbook, the MT will assess implementation and outcomes. The requirement to accept all personnel complaints will also be assessed in our other monitoring activities, including input from community surveys and input from the station CACs.

**Complaint Paragraph 126**

*The refusal to accept a personnel complaint, discouraging the filing of a complaint, or providing false or misleading information about filing a complaint, shall be grounds for discipline, up to and including termination.*

Work Conducted

In our first audit of public complaints, the MT identified nine cases in which a complainant indicated a deputy had discouraged or inhibited making a complaint. Three of those allegations were investigated, but six (67%) were not. In our second audit of public complaints, the MT identified four cases in which a complainant indicated an employee discouraged or inhibited making a complaint. One of those allegations was investigated and adjudicated, but the other three (75%) were not.

In the second audit of public complaints, 21 of the 52 cases (40%) we audited showed a sergeant had been present at the scene of an incident that later resulted in the watch commander initiating a personnel complaint, but the sergeant on scene did not initiate an SCR or make an entry in the Watch Commander Log as required by the NPD order. Field sergeants who are made aware of alleged misconduct and fail to initiate an investigation and managers who fail to address their failure will be a specific focus in our third audit of public complaints.

Policy Compliance: Partial Compliance

The AV stations and NPD have issued directives revising public complaint policies specific to the AV to comply with the SA which the MT determined to be a compliant interim solution for the AV. However, Department-wide policies providing guidance on this provision are pending publication of the SCR Handbook, and revision of the Department Manual and Administrative Investigation Handbook

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on the directives regarding AV public complaint policies to comply with the SA which the MT determined to be a compliant interim solution for the AV. However, Departmental policies and training providing guidance on this

provision have not been revised as required by the SA.

Implementation Compliance: **Unable to Determine**

Paragraph 126 was not in compliance for the first audit. In the second audit, there were no cases in the audit sample with indicia that someone impeded the filing of a complaint, so discipline was not an option. If no such cases arise in the next audit, the Parties and MT will discuss how to proceed with compliance assessment. Training is monitored in Paragraphs 138–139. Meanwhile, we will continue to monitor this through public input, such as our Community Survey and via input from CAC members,

Overall Assessment of Progress Toward Compliance

The Department needs to hold managers accountable for failure to investigate and adjudicate every allegation of inhibiting a complaint.

Recommendation(s) to Achieve Full Compliance

The AV policies are in place and watch commanders have been trained on what they need to do. Now, managers must be held accountable for failure to comply with the directives. Also, sergeants at the scene of an incident that later results in the watch commander initiating a personnel complaint need to be interviewed to determine if they should have initiated a personnel complaint.

Work to Be Completed During the Next Reporting Period

LASD must publish the SCR Handbook, revised Department Manual section on complaints, and Administrative Investigations Handbook, then provide training to implement their requirements. Once a sufficient time has passed for this to take hold, the MT will conduct a third audit of public complaints. Meanwhile, the MT will continue to monitor activity in this area during its review of other cases, such as EFRC and CIRP force reviews and input from the public through our Community Survey and input from the station CACs.

**Complaint Paragraph 127**

*LASD will revise its complaint investigation related policies, including MPP 3-04 and its Service Comment Report (SCR) and Internal Affairs Bureau (IAB) policy manuals, to ensure that they are complete, clear and consistent. LASD will implement mechanisms to ensure that all personnel allegations are accurately classified at all investigative stages, from intake through resolution, so*

*that each allegation receives the appropriate level of review required under policy.*

Work Conducted

In February 2018, the MT and DOJ began working with the Department on aligning the public complaint policy and procedure directives. Initially, efforts were made to revise the SCR Handbook and the Manual simultaneously. After several failed attempts it was mutually agreed to concentrate on the SCR Handbook first as it contained the broadest procedures for handling complaints. Once approved, that language could be imported into the other documents.

For nearly five years now we have been trying to get the Department's policies to be consistent with the SA's requirements for public complaints. That effort was aided by two complaint audits by the Monitors, which clearly showed the Department to be out of compliance with all but a few of the relevant SA requirements. Finally, on November 2, 2021, the draft SCR Handbook was approved by the Monitors and DOJ. The Department subsequently indicated they needed to make some additional changes. Those changes, which were produced by LASD on August 9, 2022, turned out to be wholly cosmetic. DOJ and the Monitors approved the SCR Handbook on August 23 and 24, 2022, respectively.

Department staff subsequently stated they wanted to revise the Department Manual and Administrative Investigations Handbook so these could all be published together. On August 12, 2022, the Department submitted a revised manual section on complaints. On August 29, 2022, the Monitor returned the draft to the Department pointing out that the classification of complaints (e.g., sustained, not sustained, exonerated and unfounded) were materially inconsistent with the definitions agreed upon for the SCR Handbook as well as the language in the California Penal Code. We also pointed out several other inconsistencies, such as those dealing with the standard to assess witness credibility and the use of the preponderance of evidence standard for complaint dispositions. LASD circulated revisions on November 28, 2022. DOJ provided comments on December 9, and the Monitors provided comments on December 14, 2022.

On October 27, 2022, the Department submitted a revised version of the Administrative Investigations Handbook. On November 10, 2022, the Monitors returned the draft, pointing out that, once again, the draft did not have the same complaint classification definitions agreed to for the SCR Handbook, did not include standards for assessing credibility and did not include the agreed-upon language for using the preponderance of evidence standard to adjudicate complaints. Additionally, the draft proposed using the same criteria the Department has always used to identify cases requiring an administrative investigation and cases that must be handled by IAB rather than at the unit level. Bringing those criteria into compliance with SA Paragraph 129 will require several meetings with the parties. DOJ provided additional comments regarding the AI Handbook on November 25, 2022.

Meanwhile, on November 11, 2022, the Department provided the Monitor with a list of current projects and expected due dates to update/finalize them. For complaints, that included:

- *December 15, 2022*: Update/finalize the complaint policy (MPP)
- *January 27, 2023*: Finalize the Administrative Investigations Handbook
- *April 20, 2023*: Start training on the new complaint policies and procedures

This list provided no expected date to publish the SCR handbook, Department Manual and Administrative Investigations Handbook. It did commit to **begin** training on the new procedures, which would be **1½ years** after the Monitor and DOJ approved them.

Policy Compliance: **Not in Compliance**

It has been nearly five years since the effort began to bring the Department's complaint related policies into compliance with the SA and it still is not done.

Training Compliance: **Not in Compliance**

The Department has indicated it plans to **begin** training on revised complaint policies and procedures on April 20, 2023, nearly **1½ years** after the SCR Handbook was first approved.

Implementation Compliance: **Not in Compliance**

The SCR Handbook has been approved but the other two documents—Department Manual and Administrative Investigations Handbook—have not.

Overall Assessment of Progress Toward Compliance

Progress on this requirement has been painstakingly slow. Failure to bring the Department Manual and Administrative Investigations Handbook into alignment with the approved SCR Handbook is holding up compliance with this provision.

Recommendation(s) to Achieve Full Compliance

The Department needs to bring the Department Manual and Administrative Investigations Handbook into alignment with the SCR Handbook

Work to Be Completed During the Next Reporting Period

We will continue to review drafts of the Manal Section and Administrative Investigations Handbook to assess their compliance with the SA and approved SCR Handbook. We will also begin reviewing other "policy Manuals" such as the Guide to Discipline, to assess their consistency with the SA.

**Complaint Paragraph 128**

*LASD will ensure that personnel complaints are not misclassified as service complaints.*

Work Conducted

The MT has conducted two audits of public complaints, both of which reviewed complaints to determine if they were appropriately classified. In the first audit, we found that complaints were appropriately classified. But in the second audit, we found three complaints classified as personnel complaints when they were actually service complaints, and one complaint classified as a service complaint when it was actually a personnel complaint.

Policy Compliance: Partial Compliance

The AV stations and NPD have issued directives revising public complaint policies specific to the AV to comply with the SA that the MT determined to be a compliant interim solution for the AV. However, Department-wide policies providing guidance on this provision have not been revised as required by the SA.

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained the AV personnel on the directives regarding AV public complaint policies. The MT determined this to be a compliant interim solution for the AV. However, departmental policies and training providing guidance on this provision have not been revised as required by the SA.

Implementation Compliance: **Not in Compliance**

The MT has conducted two audits of complaints. In the first audit, the Department was in compliance with this requirement, but in the second it was not. The second audit found that four of the complaints were misclassified: three service complaints misclassified as personnel complaints and one personnel complaint misclassified as a service complaint.

<u>Overall Assessment of Progress Toward Compliance</u>

The determination and ability to distinguish between what constitutes a personnel complaint (e.g., alleging an employee committed misconduct) and a service complaint (e.g., complaining about Department policies or procedures) is something that should be quite clear to management staff. However, one Department manager was unable to make that distinction consistently in his adjudication of complaints. More importantly, that failure was not corrected when those complaint misclassifications were approved at the Divisional level.

<u>Recommendation(s) to Achieve Full Compliance</u>

Managers must be held accountable for their failure to follow Department policies and procedures for adjudicating public complaints.

<u>Work to Be Completed During the Next Reporting Period</u>

LASD must publish the complaint-related policy and procedure directives and provide training to implement its requirements Meanwhile, the MT will continue to review cases that arise, such as through the EFRC and CIRP and input from our Community Survey and CACs.

**Complaint Paragraph 129**

*In consultation with the Monitor and subject to DOJ approval, LASD will revise policies to clarify and strengthen requirements related to: a) which allegations of inappropriate behavior by LASD personnel, if true, would require imposition of discipline, as opposed to non-disciplinary action, to address the misconduct; b) what types of personnel complaints must be investigated as administrative investigations rather than handled exclusively as Service Comment Reviews; and, c) what types of administrative investigations must be handled by IAB rather than at the unit level.*

<u>Work Conducted</u>

The most recent version of the Administrative Investigations Handbook proposes to use the same criteria the Department has always used for making these determinations. That is unacceptable and will require discussion with the parties to resolve the matter. Meanwhile, revisions to the publications that may contain Paragraph 129 issues, including the Guidelines for Discipline and Education-Based Alternatives, have yet to be submitted to the Monitors and DOJ for approval.

Policy Compliance: **Not in Compliance**

The issues required by this paragraph have not been addressed in the related policy documents.

Training Compliance: **Not in Compliance**

A training program cannot be developed until the criteria for making these decisions is approved.

Implementation Compliance: **Not in Compliance**

The Department has not provided a satisfactory remedy to these requirements.

Overall Assessment of Progress Toward Compliance

Progress on this requirement has been painstakingly slow. The requirements of this paragraph are contained in the Administrative Investigations Handbook and the draft submitted proposes to continue using the same criteria that were found to be deficient in the DOJ investigation leading to this SA.

Recommendation(s) to Achieve Full Compliance

The Monitor and parties must meet to discuss these issues and reach agreement. If agreement cannot be reached in a timely manner, the SA's impasse provision may be necessary (Paragraph 204 et seq).

Work to Be Completed During the Next Reporting Period

The Department needs to revise the Administrative Investigations Handbook, to clearly identify:

- Which allegations of inappropriate behavior by LASD personnel, if true, would require imposition of discipline, as opposed to non-disciplinary action, to address the misconduct;

- What types of personnel complaints must be investigated as administrative investigations rather than handled exclusively as Service Comment Reviews; and,

- What types of administrative investigations must be handled by IAB rather than at the unit level.

**Complaint Paragraph 130**

a.  *Antelope Valley unit commanders shall be responsible for appropriately classifying each allegation and personnel complaint raised at the outset or during the investigation/review of a complaint.*
b.  *LASD shall investigate every allegation of misconduct that arises during an investigation even if an allegation is not specifically articulated as such by the complainant.*

<u>Work Conducted</u>

The MT has conducted two detailed audits of public complaints (January 2018 and December 2020). In both audits, the Department failed to comply with the requirement that they appropriately classify each allegation and investigate each substantive allegation, even if the complainant did not specifically allege it. In the first audit, 11 of the 49 cases audited (22%) contained a substantive allegation of misconduct that was not identified, investigated. or adjudicated. In the second audit, five of the 52 cases audited (10%) contained a significant allegation of misconduct that was not identified, investigated, or adjudicated. Six UOF investigations reviewed to validate the complaint population for the second audit contained allegations of misconduct that did not result in the initiation of an SCR.

<u>Policy Compliance: Partial Compliance</u>

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA. While that is an adequate interim solution for AV commands, these paragraphs require Department-wide implementation, so these requirements have been included in the revised SCR Handbook which will be followed by revisions to the Department Manual and Administrative Investigations Handbook. Full compliance cannot be achieved until those policy revisions are made.

<u>Training Compliance: **Partial Compliance**</u>

The AV station captains and watch commanders have been trained on the SA's requirements for public complaints. Existing watch commanders received this training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **Not in Compliance**

The MT has conducted two detailed audits of public complaints, and in both audits, the Department failed to properly classify complaints and investigate all substantive allegations. In the first audit, 11 of the 49 cases audited (22%) were deficient, and in the second audit, five of the 52 cases audited (10%) were deficient. While the second audit showed improvement, two of the five non-compliant complaints (40%) involved allegations that, if true, constituted serious misconduct.

Overall Assessment of Progress Toward Compliance

The expectation that managers appropriately classify complaints and investigate substantive allegations is hardly new and certainly did not arise just from the SA. It is concerning that this is not being done consistently in the AV, especially when serious misconduct is being overlooked.

Recommendation(s) to Achieve Full Compliance

The MT strongly recommends that LASD publish the SCR Handbook and incorporate its agreed-upon provisions into the other IAB policy manuals for review and approval by the Monitors and DOJ. However, publishing directives will not bring the Department into compliance with a requirement as fundamental as properly classifying complaints and investigating all substantive allegations. LASD must ensure this is corrected and hold accountable those managers who fail in that responsibility.

Work to Be Completed During the Next Reporting Period

LASD must publish the SCR Handbook and align the other complaint documents with the revised SCR Handbook. Once a sufficient time has passed for this to take hold, the MT will conduct a third audit of public complaints. Meanwhile, the MT will continue to monitor this area through public input via the CAC and Community Survey.

**Complaint Paragraph 131**

*All investigations of Antelope Valley personnel complaints, including reviews, shall be as thorough as necessary to reach reliable and complete findings. In each investigation, LASD shall consider all relevant evidence, including circumstantial, direct and physical evidence, as appropriate, and make credibility determinations based upon that evidence. There will be no automatic preference for a deputy's statement over a non-deputy's statement, nor will LASD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. LASD shall make efforts to resolve material inconsistencies between witness statements.*

<u>Work Conducted</u>

The MT has conducted two detailed audits of public complaint (January 2018 and December 2020). In both audits, the Department failed to comply with the requirement that complaint investigations be as thorough as necessary to support reliable findings. In the first complaint audit, the MT identified 11 of the 49 cases audited that were not thoroughly investigated, and in the second audit, the MT identified six of the 52 cases audited that were not thoroughly investigated. In four of those six cases, overreliance on the deputy's statement was the only rationale for the Department's determination that the deputy's conduct was reasonable. Two of the six deficient cases in the second audit involved allegations that, if true, constituted serious misconduct.

<u>Policy Compliance: Partial Compliance</u>

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that investigations be sufficient to support a reliable investigation. While that is an adequate interim solution for AV commands, these paragraphs require Department-wide implementation, so these requirements have been included in the revised SCR Handbook, Department Manual and other IAB policy manuals. Full compliance cannot be achieved until those policy revisions are made.

<u>Training Compliance: **Partial Compliance**</u>

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by watch commander, so existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

<u>Implementation Compliance: **Not in Compliance**</u>

The MT's two audits of public complaints have found that a number of these investigations were not thorough enough to support a reliable finding. To some extent, that is the fault of the investigating supervisor, but equal responsibility rests with the adjudicating unit commander and the reviewing division commander who must ensure that complaints are adequately investigated. The two cases where serous misconduct was ignored are especially troubling examples of this.

Overall Assessment of Progress Toward Compliance

The MT's two audits of public complaints clearly shows that too many complaints are not being investigated adequately. Responsibility for that failure falls on the unit commander adjudicating the complaints and the division commander reviewing them. Again, directives alone will not correct the deficiency. Managers who fail to ensure that complaints are adequately investigated need to be held accountable.

Recommendation(s) to Achieve Full Compliance

Ensuring that an investigation is thorough enough to support a reliable adjudication is not a new requirement brought about by a SA. It is a fundamental component of a disciplinary system that is fair and just. The Department needs to hold managers accountable whenever a complaint investigation does not provide sufficient information to support a reliable and complete adjudication.

Work to Be Completed During the Next Reporting Period

LASD must publish the SCR Handbook, Department Manual section and Administrative Investigations Handbook then provide training to implement its requirements. Once an appropriate amount of time has been provided for LASD to train staff on the new handbook, the MT will assess implementation and outcomes.

**Complaint Paragraph 132**

*LASD agrees to continue to require station commanders in the Antelope Valley to refer alleged incidents of misconduct to the IAB or ICIB for further investigation or review consistent with the Administrative Investigations Handbook. If the case proceeds criminally, the Division Chief over the Antelope Valley will review the matter with the unit commander of IAB to determine whether the administrative investigation may proceed on a parallel track. The Division Chief or unit commander of IAB may consult with the prosecuting agency for its input. If the matter proceeds on a parallel track, any compelled interview of the subject deputies may be delayed. The Division Chief shall document the reasons for the decision.*

Work Conducted

The MT has conducted two detailed audits of public complaints (January 2018 and December 2020). In the first audit, there were no cases in the audit population that should have been referred to IAB or ICIB. But in the second audit, the MT identified two cases where the allegations were very serious (a possible CORI violation and a pattern of discourtesy/

out-of-policy use of force) and, if true, constituted serious misconduct. Neither of those cases was referred to IAB or ICIB. In fact, both cases were not even elevated to an Administrative Investigation allowing for the imposition of formal discipline.

Policy Compliance: Partial Compliance

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that station commanders comply with the Department's long-standing requirement regarding the referral of cases to IAB or ICIB. While that is an adequate interim solution for AV commands, these paragraphs require department-wide implementation, so these requirements have been included in the revised SCR Handbook, which will be followed by revisions to the Department Manual and other IAB policy manuals. Full compliance cannot be achieved until those policy revisions are made.SA.

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by watch commander and adjudicated by the station commander, so existing watch commanders, and station commanders received training when the directives were first issued in 2018. New watch commanders and station commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **Not in Compliance**

The MT's 2020 audit of public complaints identified two cases that should have been elevated to an Administrative Investigation and referred to IAB or ICIB. The fact that those two cases involving serous misconduct were ignored is very troubling.

Overall Assessment of Progress Toward Compliance

Responsibility for compliance with this paragraph falls on the unit commander adjudicating the complaints and the division commander reviewing them. The requirement to refer cases to IAB and ICIB is long-standing Department policy, so more directives will not correct the deficiency. Managers who fail to ensure that complaints are referred to IAB or ICIB when required need to be held accountable.

Recommendation(s) to Achieve Full Compliance

Managers need to ensure that cases of this nature are referred to IAB and/or ICIB as required.

Work to Be Completed During the Next Reporting Period

LASD must hold managers accountable for failures in this area.

**Complaint Paragraph 133**

*LASD will not permit any involved supervisor, or any supervisor who authorized the conduct that led to the complaint, to conduct a complaint investigation.*

Work Conducted

The MT has conducted two detailed audits of public complaints (January 2018 and December 2020). In the first audit, three complaints were investigated by a supervisor who was involved in the conduct leading to the complaint. In the second audit, the MT found only one case in which the supervisor investigating the complaint was involved in the conduct leading to the complaint. Ensuring that an impartial supervisor investigates the complaint is one area in which the Department has complied with the SA.

Policy Compliance: Partial Compliance

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that investigations be conducted by a supervisor who was not involved in the conduct leading to the complaint. While that is an adequate interim solution for AV commands, this paragraph requires Department-wide implementation, so these requirements have been included in the revised SCR Handbook which will be followed by revisions to the Department Manual and other IAB policy manuals. Full policy compliance cannot be achieved until those policy revisions are made.

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by watch commanders, so existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach

to training for all the SA's public complaint requirements.

Implementation Compliance: **In Compliance**

The MT's second complaint audit found that the vast majority of complaint investigations were being conducted by a supervisor who was not involved in the conduct leading to the complaint. So it appears the AV is complying with this requirement as of December 15, 2020. This requirement has been included in the SCR Handbook and will be included in other IAB manuals.

Overall Assessment of Progress Toward Compliance

The AV commanders appear to be in compliance with this requirement, but the SCR Handbook needs to be published so work can begin on updating the MPP and other IAB manuals and the MT can continue assessing compliance.

Recommendation(s) to Achieve Full Compliance

The Department needs to publish the SCR Handbook and provide training on its requirements, then revise the other IAB manuals to achieve compliance with this requirement.

Work to Be Completed During the Next Reporting Period

LASD must publish the SCR Handbook and provide training to implement its requirements. Then supervisors and managers must be held accountable for complying with its provisions. Once an appropriate amount of time has been provided for LASD to train staff on the new handbook, the MT will assess implementation and outcomes.

**Complaint Paragraph 134**

*The misconduct investigator shall seek to identify all persons at the scene giving rise to a misconduct allegation, including all LASD deputies. The investigator shall note in the investigative report the identities of all deputies and other witnesses who were on the scene but assert they did not witness and were not involved in the incident. The investigator shall conduct further investigation of any such assertions that appear unsupported by the evidence.*

Work Conducted

The MT has conducted two detailed audits of public complaints (January 2018 and

December 2020). In both audits, the Department was in compliance with the requirement that the investigator identify all persons at scene. In the first audit, the MT found that nearly everyone involved in the audited complaints was interviewed. There were a few exceptions, but they were generally peripheral witnesses. In the second audit, the MT identified three cases in which potential witnesses were not interviewed. In two of those cases, the evidence was overwhelming, so failure to interview those witnesses did not affect the quality of the investigation. But in the third case, the omission was a critical failure. However, that was one witness in one case out of the 52 cases audited. There were no cases in either audit where a deputy or witness who was at the scene asserted they did not witness and were not involved in the incident.

Policy Compliance: Partial Compliance

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that investigators identify and interview all witnesses and not anyone who was at scene but asserts they did not witness the incident. While that is an adequate interim solution for AV commands, these paragraphs require Department-wide implementation, so these requirements have been included in the revised SCR Handbook which will be followed by revisions to the Department Manual and other IAB policy manuals. Full compliance cannot be achieved until those policy revisions are made.

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by watch commander, so existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **In Compliance**

While the AV investigations were found to be in compliance with this requirement on December 15, 2020, the Department needs to publish the SCR Handbook, train personnel Department-wide on its provisions, and ensure that the new requirements are being complied with Department-wide.

Overall Assessment of Progress Toward Compliance

The MT's two complaint audits show that investigators in the AV are complying with this

requirement. However, the Department needs to publish the SCR Handbook so work can begin updating the other IAB manuals and the MT can continue assessing compliance.

Recommendation(s) to Achieve Full Compliance

The Department needs to publish the SCR Handbook and the other IAB manuals so the MT can continue assessing compliance.

Work to Be Completed During the Next Reporting Period

LASD must publish the SCR Handbook and provide training to implement its requirements. Then supervisors and managers must be held accountable for complying with its provisions. Once an appropriate amount of time has been provided for LASD to train staff on the new handbook, the MT will assess implementation and outcomes.

## Complaint Paragraph 135

*All witnesses, including deputies witnessing or involved in an incident that becomes the subject of a personnel complaint, shall provide a written statement regarding the incident or be interviewed as described below.*

Work Conducted

The MT has conducted two detailed audits of public complaint (January 2018 and December 2020). In the first audit, the Department was in compliance with the requirement that the investigator obtain a statement from all persons at scene. But in the second audit, the MT found that only 40 of the 52 cases audited (77%) met this requirement.

Policy Compliance: Partial Compliance

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that investigators obtain a statement from everyone who witnessed the incident. While that is an adequate interim solution for AV commands, these paragraphs require Department-wide implementation, so these requirements have been included in the revised SCR Handbook which will be followed by revisions to the Department Manual and other IAB policy manuals. Full compliance cannot be achieved until those policy revisions are made.

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by a watch commander, so existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **Not in Compliance**

The MT's first audit found the Department in compliance, but the second audit did not. Managers at the unit and division level need to review complaint investigations more thoroughly and ensure that a statement is obtained from every material witness. Meanwhile, the Department needs to publish the SCR Handbook, train personnel Department-wide on its provisions, and ensure that the new requirements are being complied with Department-wide. Full compliance can only be achieved once those requirements are met.

Overall Assessment of Progress Toward Compliance

Unit and division managers reviewing personnel complaints need to ensure that a statement was obtained from all material witnesses or that the investigation contains information on why that was not possible.

Recommendation(s) to Achieve Full Compliance

Unit and division managers who repeatedly fail to adequately review personnel complaint investigations need to be held accountable. Meanwhile, the Department needs to publish the SCR Handbook along with the other IAB policy documents once they are revised to reflect the changes in the SCR Handbook and SA requirements.

Work to Be Completed During the Next Reporting Period

The approved SCR Handbook and other IAB Policy documents need to be published. Once training has been approved and provided to implement those requirements, the MT can identify an audit population for a third audit of public complaints.

**Complaint Paragraph 136**

*The SCR complaint investigator shall interview each complainant in person, if practical. Misconduct investigators will conduct additional interviews as necessary to reach reliable and complete findings. Interviews shall be recorded in their entirety, absent documented extraordinary circumstances.*

Work Conducted

The MT has conducted two detailed audits of public complaints (January 2018 and December 2020). In the first audit, the Department was not in compliance with these requirements because key witnesses were not interviewed, and few complainants were interviewed in person with no reason documented in the report. In the second audit, auditors found that most key witnesses were interviewed, but investigators were encountering resistance when they tried to interview some complainants. Specifically, several complainants thought the investigator was trying to trick them because they were already thoroughly interviewed during the complaint intake. (Auditors found no evidence to support trickery.) So, auditors recommended to the Parties that the investigator be allowed to rely on the intake interview, provided it was recorded and that it covered all the relevant issues. The second audit classified compliance as "unable to determine" pending resolution of this issue.

Policy Compliance: Unable to Determine

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that investigators conduct the necessary interviews and interview complainants in person. The requirement that the investigator interview the complainant in person resulted in unintended consequences, so auditors have recommended the investigator be allowed to rely on the intake interview, provided it is recorded and thorough. Resolution of that issue is pending.

This paragraph requires Department-wide implementation, so these requirements have been included in the revised SCR Handbook which are being incorporated into the Department Manual and other IAB policy manuals. Full compliance cannot be achieved until those policy revisions are made.

Training Compliance: **Unable to Determine**

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by watch commander, so existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment.

However, the Parties need to resolve the recommendation that the investigator be allowed to rely on the intake interview if it is recorded and thorough. Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **Unable to Determine**

The MT's first audit found the Department out of compliance, but the second audit was "unable to determine," and we recommended that the investigator be allowed to rely on the intake interview provided it is recorded and thorough. That issue needs to be resolved by the Parties. Meanwhile, the Department needs to publish the SCR Handbook, revise the other IA policy manuals, train personnel Department-wide on its provisions, and ensure that the new requirements are being complied with Department-wide. Full compliance can only be achieved once those requirements are met.

Overall Assessment of Progress Toward Compliance

The Parties need to decide if the investigator can rely on the intake interview, provided it was recorded and adequately addressed the issues. The Department also needs to publish the SCR Handbook and revise the other IAB manuals.

Recommendation(s) to Achieve Full Compliance

The parties need to resolve the issue of the investigator relying on a thorough intake interview and publish the SCR Handbook so work can continue with assessing compliance.

Work to Be Completed During the Next Reporting Period

The parties need to resolve the issue of the investigator relying on a thorough intake interview. The Department needs to, publish the SCR Handbook, and incorporate its provisions in the other IAB manuals and submit them to the Monitors and DOJ for approval. Once training has been approved and provided to implement the SCR Handbook's requirements, the MT can identify an audit population for a third audit of public complaints.

**Complaint Paragraph 137**

a.  *Consistent with current policy, interviews shall be conducted separately.*
b.  *An interpreter not involved in the underlying complaint will be used when taking statements or conducting interviews of any LEP complainant or witness.*

Work Conducted

The MT has conducted two detailed audits of public complaint (January 2018 and December 2020). In the first audit, the Department was not in compliance with these requirements. In the second audit, the MT again found a lack of documentation that deputies were interviewed separately in nine of the 52 cases audited (17%). In eight of those nine cases (89%), the complaint investigator relied heavily on the UOF investigation, but the investigation did not document that the deputies were interviewed separately. In the second audit, there was one witness who spoke only Spanish, so an uninvolved deputy was brought to the scene to take a statement from the LEP witness.

Policy Compliance: Partial Compliance

The AV stations and NPD issued directives in June 2018 establishing procedures to comply with the SA, including the requirement that investigators interview all witnesses separately and obtain an uninvolved interpreter for any LEP person. While that is an adequate interim solution for AV commands, these paragraphs require Department-wide implementation so these requirements have been included in the revised SCR Handbook which will be followed by revisions to the Department Manual and other IAB policy manuals. Full compliance cannot be achieved until those policy revisions are made.

Training Compliance: **Partial Compliance**

The AV stations and NPD have trained AV personnel on the SA's requirements for public complaints. Personnel complaints are investigated by watch commander, so existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. Watch commanders have also been reminded to ensure that UOF investigations being used for a personnel complaint document that separate interviews were conducted. While that is sufficient for the AV, Department-wide implementation will require a broader approach to training for all the SA's public complaint requirements.

Implementation Compliance: **Partial Compliance**

*137a: Not in compliance* for separate interviews. Both of the MT's audits found the Department out of compliance with this requirement. Managers at the unit and division level need to review complaint investigations more thoroughly and ensure they document that separate interviews were conducted.

*137b: In compliance* for uninvolved interpreter. The first audit found non-compliance, but the second audit found the Department in compliance with this requirement on December 15, 2020.

Overall Assessment of Progress Toward Compliance

Unit and division managers reviewing personnel complaints need to ensure that separate interviews were conducted and that an uninvolved interpreter was used for any LEP person. The Department also needs to publish the SCR Handbook and submit revised drafts of the other IAB documents to the Monitors and DOJ for review and approval.

Recommendation(s) to Achieve Full Compliance

Unit and division managers who repeatedly fail to adequately review personnel complaint investigations need to be held accountable. Meanwhile, the Department needs to publish the SCR Handbook and provide the Monitors and DOJ with drafts of the other IAB policy documents revised to reflect the changes in the SCR Handbook.

Work to Be Completed During the Next Reporting Period

The Department needs to publish the SCR Handbook and revise the other IAB manuals and submit them to the Monitors and DOJ for approval. Once training has been approved and provided to implement the SCR Handbook's requirements, the MT can identify an audit population for a third audit of public complaints.

**Complaint Paragraph 138**

*LASD agrees to provide updated and revised training to Antelope Valley deputies and supervisors about proper complaint intake, classification, and investigation techniques. LASD will provide training about how to record complete and thorough complaints from individuals, including how to obtain complaints from individuals who may not be proficient in English, and the consequences for failing to properly take complaints.*

Work Conducted

Personnel complaints are investigated only by watch commanders, who are almost invariably lieutenants. When the NPD and unit orders implementing the SA's requirements were issued in 2018, existing watch commanders received training from their captains and NPD on SA requirements. Since then, new watch commanders receive orientation on the SA's requirements at the start of their assignment. These one-on-one training sessions are not monitored, but the results are.

Policy Compliance: **NA**

This is exclusively a training requirement; no policy involved.


Training Compliance: **Partial Compliance**

The AV stations and NPD have issued directives on the SA's requirements for public complaints. Personnel complaints are investigated by watch commanders. The Department is in partial compliance because existing watch commanders received training when the directives were first issued in 2018, and new watch commanders receive an orientation on SA requirements at the start of their assignment. The training will have to be reviewed and updated based on the revised SCR handbook.


Implementation Compliance: **Partial Compliance**

This is a training requirement; the interim directives were issued, and watch commanders trained on conducting personnel investigations, hence the partial compliance status. When the Department is ready, the training will be assessed against the revised SCR handbook.


Overall Assessment of Progress Toward Compliance

The AV stations and NPD issued directives in 2018 on the SA's requirements for public complaints, and the watch commanders responsible for investigating complaints have received training. The training is evident in the investigations reviewed in our audits. That is not to say all complaints comply with all SA requirements, but watch commanders clearly know what they are required to do. After publishing of the SCR handbook, the MT will assess whether any changes need to be made to annual and refresher trainings and will verify that all appropriate personnel have received those trainings. Training is monitored in Paragraphs 138–139.


Recommendation(s) to Achieve Full Compliance

LASD needs to review its training based on the revised SCR handbook and then work with the DOJ and MT to finalize the training so it can be implemented.


Work to Be Completed During the Next Reporting Period

LASD needs to review its training based on the revised SCR handbook and provide the MT and DOJ with curricula and a plan for annual and refresher training for review. Once training is approved and implemented, the MT will verify required personnel receive the training.

While this is an AV-specific requirement (i.e., "provide updated and revised training to Antelope Valley deputies and supervisors"), publication of the SCR Handbook will require Department-wide training to implement the new requirements, whether that happens in the next reporting period or later.

**Complaint Paragraph 139**

*All personnel conducting Service Comment Reviews and unit level administrative investigations in the Antelope Valley shall receive initial training regarding conducting deputy misconduct investigations and shall receive refresher training each year. This training shall include instruction in: a. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; b. the particular challenges of personnel complaint reviews/investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation, properly weighing credibility of civilian witnesses against deputies, using objective evidence to resolve inconsistent statements, and the proper application of the preponderance of the evidence standard; c. relevant state, local, and federal law, including state employment law related to deputies and the rights of public employees, as well as criminal discovery rules such as those set out in Garrity v. New Jersey, 385 U.S. 20 493 (1967), and Brady v. Maryland, 373 U. S. 83 (1963); and, d. LASD rules and policies, including the requirements of this Agreement, and protocols related to criminal and administrative investigations of alleged deputy misconduct.*

Work Conducted

Personnel complaints are investigated only by watch commanders who are almost invariably lieutenants. When the NPD and unit orders implementing the SA's requirements were issued in 2018, existing watch commanders received training from their captains and NPD on SA requirements. Since then, new watch commanders receive orientation on the SA's requirements at the start of their assignment. These one-on-one training sessions are not monitored, but the results are.

Policy Compliance: **NA**

Training Compliance: **Partial Compliance**

See Appendix D, Paragraph 138.

Implementation Compliance: **Partial Compliance**

See Appendix D, Paragraph 138.


Overall Assessment of Progress Toward Compliance

See Appendix D, Paragraph 138.


Recommendation(s) to Achieve Full Compliance

See Appendix D, Paragraph 138.


Work to Be Completed During the Next Reporting Period

See Appendix D, Paragraph 138.


**Complaint Paragraph 140**

*LASD shall conduct a semiannual, randomized audit of LASD-AV's complaint intake, classification, and investigations. This audit will assess whether complaints are accepted and classified consistent with policy, investigations are complete, and complaint dispositions are consistent with a preponderance of the evidence.*


Work Conducted

The Department assigned the AAB the responsibility for conducting these audits. The AAB published its first audit on August 30, 2016, which included complaints made for both Lancaster and Palmdale stations. Part of the Monitors' feedback on that audit was that AAB should submit a detailed audit work plan before starting SA audits in order to ensure each audit will meet the SA's requirements. Since then, the MT has conducted two detailed audits of public complaints (January 2018 and December 2020). In the first audit, the Monitors reiterated its finding in the Monitors' fourth semi-annual report that the AAB has published several audits citing various SA paragraphs, but it has not performed any of the audits required for evaluating the Department's compliance with the SA requirements for handling public complaints made by the AV community. The Monitors found the Department out of compliance with this paragraph.

In the second MT audit, the MT reviewed two audits submitted by AAB to comply with this paragraph, one for each AV station. Both audits were limited to three objectives—intake, classification and investigation—ignoring the paragraph's requirement that the audit determine if "complaint dispositions are consistent with a preponderance of the evidence." Once again, the

Monitors found the Department out of compliance with this paragraph.

Over the years, the MT has met with the Compliance Unit and AAB many times. Initially, we encountered AAB resistance to collaboration and even more so to the idea that the MT or Compliance Unit would provide the AAB direction. AAB very much values its independence and its direct link to the office of the undersheriff. The MT appreciates this perspective, but it has resulted in failure to comply with this paragraph.

Every other year since 2017, the AAB has submitted a work plan for Monitor and DOJ review (September 22, 2017, and June 19, 2019). In each case, the Monitors and DOJ have provided timely feedback on the audit plans, identifying ways in which it could be brought into compliance with the SA (October 1, 2017, and June 25, 2019). In each case, the Monitors and DOJ requested that the AAB modify the work plan and resubmit it for approval to ensure it would result in an audit that complied with the SA. However, no modified work plans were submitted. Subsequently, when the audit reports were submitted (May 23, 2018, and January 30, 2020), they predictably did not comply with the SA requirements. <u>In every case, the material that caused the out-of-compliance finding had been identified in MT and DOJ feedback to the audit plan.</u>

Last reporting period, the AAB submitted a complaint audit work plan for Palmdale complaints (May 10, 2022). The Monitors and DOJ provided feedback identifying the areas needing to be modified in order to comply with the SA (May 18, 2022). A conference call was also held with the MT, DOJ, Compliance Unit and AAB (May 19, 2022) to discuss DOJ and Monitor concerns. At the conclusion of the meeting, AAB announced the agreed-upon methodology hammered out at the meeting would be used for the next complaint audit, not the one they are now conducting, completely ignoring the substantial changes that will occur when, and if, the SCR Handbook is published.

The Department has not submitted any complaint audit workplans (or any other audit workplans for that matter) this reporting period nor has it submitted any complaint audits (or any others) during this reporting period.

Policy Compliance: **NA**

Training Compliance: **NA**

Implementation Compliance: **Not in Compliance**

The Department has not yet submitted a complaint audit that meets the SA's requirements since the SA was established seven years ago. The Department has submitted no complaint audit workplans (or any other audit workplans for that matter) this reporting period nor have they submitted any complaint audits (or any others) during this reporting period.

Overall Assessment of Progress Toward Compliance

The MT is profoundly disappointed with LASD's lack of progress with this provision. We consider this to be low-hanging fruit. A healthy and well-functioning policing organization has regular and ongoing internal audits and assessments to identify areas of needed growth and will devote attention to nurturing a relationship with the community that promotes transparency and accountability. It has been our hope that we would be able to include AAB audits by now in the MT's assessment of compliance, and ultimately it is our expectation that the Parties and the public would be able to rely upon the AAB to conduct these audits rather than having them done externally. However, the fact is that the Department has yet to complete a single audit of public complaints that complies with this requirement. AAB has yet to conduct any of the required semiannual audits. All indications are that it is not likely to do so in the foreseeable future.

Recommendation(s) to Achieve Full Compliance

MT recommends that Department executives direct the AAB produce a work plan and submit it for compliance feedback from DOJ and MT.

Work to Be Completed During the Next Reporting Period

LASD needs to incorporate feedback from DOJ and the MT that was provided at the May 19, 2022, meeting, for the complaint audit it anticipated conducting. LASD also needs to follow that work plan and conduct a SA-compliant audit of complaints for both stations in the next reporting period and semi-annually thereafter.

## H. ACCOUNTABILITY

## Paragraph 141

a. *LASD will continue to implement and modify (PRMS) and expects that it will be complete within three years. (PRMS) will continue to serve as an LASD-wide decision support system in matters related to risk management and service reviews.*
b. *LASD will modify (PRMS) so that it can make peer comparisons between deputies and units. If (PRMS) is not modified to make such comparisons during the compliance period, the comparisons will be made through an alternative process.*
c. *Antelope Valley unit commanders and supervisors will conduct periodic reviews of all deputies and units under their command to identify potential trends.*

Work Conducted

The MT has utilized extracts of data and information from PRMS in conducting each of its five audits (two for public complaints and three for uses of force) and during reviews of the semi-annual RMF meetings, as well as the quarterly reports produced by AV commands since August 30, 2019. The Department uses PRMS for many purposes, including to provide data for the quarterly reports, the Sheriff's 11, performance evaluations, and the RMF.

PRMS does not have the flexibility to "make peer comparisons between deputies and units" or to facilitate some other SA requirements. To compensate for this, AV stations have developed their own processes, including electronic databases that provide data that is compiled manually for SA-required comparisons, such as the quarterly reports and RMF. North Patrol Division published an order in 2019 requiring each AV unit commander to prepare a quarterly report listing deputies who exceed certain thresholds for risk-management factors including uses of force and personnel complaint designed to satisfy the elements of Paragraphs 141–143 not provided for by PRMS. The Quarterly Report (formally known as the Employee Quarterly Review) is a significant development made directly in response to the SA and intended to be the Department's "alternative process" to address several Paragraph 141–143 requirements, in particular reviewing the performance of individual deputies, supervisors and units.

The quarterly reports were developed by LASD and, after a period of review and comment, received the approval of the MT and DOJ. Now that the quarterly reports have been in place for some time and the processes for their preparation and application are maturing. The MT conducted two compliance assessment reviews and provided the Parties with a detailed report on the results of our reviews. However, as discussed below, those internal systems are time-intensive and appear to be impractical as a Department-wide alternative for risk management support purposes.

The MT has reviewed the fourth-quarter 2021 and first-quarter 2022 reports and has made recommendations to improve the process. The MT's reviews as well as a review by DOJ found data reliability issues with the source materials for the reports, e.g., UOF investigation reports and PRMS. shown that a number of UOF reports inaccurately reflect what actually occurred. For example, a review of 12 selected use-of-force cases from the fourth-quarter 2021 reports showed that two of them (17%) should have indicated that deficient tactics were corrected by training, but both were reported as having "no issues." Additional policy, procedures, or training may be necessary to address this issue.

Policy Compliance: Partial Compliance

The process for the quarterly reports was codified in North Patrol Division Order 19-01, which was issued on August 30, 2019, and reissued on February 19, 2020. However, Paragraph 141 requires that PRMS serve as an "LASD-wide decision support system in matters related to risk management and service reviews." So, PRMS or "an alternative process" must be implemented

to provide that support mechanism Department-wide, not only in the NPD,

Training Compliance: **Partial Compliance**

AV commands were engaged in the development of the quarterly report system, and station personnel were trained in how to use that process to compile data and complete their quarterly reports.

AV personnel have been trained on compiling the quarterly reports. Overall, the MT review found the staff who are involved in preparing these reports to be diligent and conscientious, and we commend them for their efforts. However, it is clear this process is labor-intensive and although each station developed detailed instructions on where to obtain and how to compile the data, the process will be unnecessarily cumbersome in the long term without, at least, some automation and improvement in the interoperability of the data systems. Also, more attention needs to be devoted to ensuring the quality and reliability of that data which is discussed in detail under Paragraph 143.

Implementation Compliance: **Partial Compliance**

The Department has acknowledged that PRMS is not capable of meeting this requirement and initially indicated that upgrading PRMS or implementing a new system to address these provisions is cost prohibitive. However, now the Department has decided to pursue revising its early warning system. Meanwhile, the SA does provide that the Department can develop an "alternative process." The MT has found the quarterly report system to be a significant step forward toward achieving compliance with this provision. It appears to be a viable framework for serving as an alternative process, notwithstanding the fact that the process is largely manual, time-intensive and, according to station managers' assessment and MT observation, appears to be impractical, especially as a Department-wide alternative for risk management support purposes. The Department has indicated it is exploring the possibility of purchasing and implementing software to automate some of the processes required to produce the quarterly reports. The Department must decide whether the quarterly report process can be used throughout the agency or if it will elect to utilize a different solution.

Overall Assessment of Progress Toward Compliance

The "alternative process" for risk-management data developed by the AV commands appears to be a viable alternative to PRMS, but it is very labor-intensive and may not be viable Department-wide. Department-wide implementation will require executive management action from those with the authority to implement programs Department-wide.

Recommendation(s) to Achieve Full Compliance

For seven years now, the Department has been suggesting it is considering data system upgrades. The Department should prioritize a decision and actions to acquire and implement new software solutions to automate the processes required to produce the quarterly reports. The Department's exploration of options should include software products on the market that could fully automate the production of the quarterly reports as well as data tabulations for other crucial activities like the CMF, RMF, disparity analyses, efficacy assessments, and UOF analysis. (See Appendix C, Paragraphs 46, 90, 81–86, 120–123). Once that decision is made, the Department needs to determine the alternative process that will be employed to provide "peer comparisons between deputies **and units**."

Pending approval from the Parties and the MT, the Department should review and act on the recommendations in the MT's reports on the quarterly report system and should propose its own improvements.

Work to Be Completed During the Next Reporting Period

The Department needs to determine how it can best compensate for the data analysis shortcomings of the PRMS and the Quarterly Report and find a solution that can be implemented. Meanwhile, NPD should address the comments and suggestions provided in the MT's reports, including, for example, potentially modifying the quarterly report process to ensure attention is focused on identifying trends or patterns related to risk concerns that may be found among supervisors and work units.

The Parties and the MT will discuss the MT's recommendations in the MT's reports on the quarterly report system. Future MT reviews will assess (1) if the quarterly reports adequately and effectively address all of the Accountability section requirements; (2) if other alternative processes exist or need to be developed to address any requirements found not to be addressed by the quarterly reports; (3) if station managers are effectively using these various sources to identify issues and implementing appropriate interventions; and (4) if divisional managers are adequately tracking this work at the stations as part of an effective accountability system. These reviews will also address data accuracy and reliability factors as well as the PMP.

**Paragraph 142**

a.  *LASD will modify PRMS (and capture through an alternative process pending PRMS modification) to be able to access and report additional data relevant to determining compliance with the Agreement, including but not limited to data about stops, searches, and arrests (described in the Data Collection and Analysis Section), individual compliance with community engagement requirements, and criminal obstruction arrests.*

b.  *LASD will modify its procedure for Performance Log Entries so that all entries are maintained in an electronic format and noted in PRMS.*

c.  *LASD-AV will ensure that PRMS data is accurate and hold responsible Antelope Valley personnel accountable for inaccuracies in any data entered.*


<u>Work Conducted</u>

The MT has utilized extracts of data and information from PRMS in each of its five audits (two for public complaints and three for uses of force) and during our reviews of the semi-annual RMF and the quarterly reports.

MT audits for other SA sections have found PRMS to be consistently unreliable primarily due to errors in key data entered into it. For example, until recently, PRMS could accept only one disposition for each employee accused of misconduct regardless of how many allegations were made and any variation in the disposition for those allegations. For several months, the Department also unilaterally decided not to enter Non-Categorized Incidents (NCI) uses of force into PRMS, thereby skewing PRMS's UOF data.

But even if the data were pristine, PRMS does not have the flexibility to "make peer comparisons between deputies and units" or to provide all of the functionality the SA requires or, for that matter, that Department managers need to support an effective accountability system.

AV stations have developed their own local databases and processes, which could be used for SA-required comparisons, such as the quarterly reports, RMF, and CMF. As described in the appendix for Paragraph 141. But those internal systems are time-intensive and may be impractical as a Department-wide alternative.

We also found evidence in our review of quarterly reports that critical information was not being reported or captured accurately. For example, our first review of quarterly reports showed that critical data are not being reported accurately in the Department's investigative reports. For example, an incident was classified on the Quarterly Report as having "no issues" even though the watch commander said the force used was out of policy. We found similar errors in our second review of quarterly reports. But most telling was two reports identified by DOJ in their quarterly report review where the BWC showed that both uses of force were clearly out-of-policy but classified as consistent with Department standards in the Department's reports.

With respect to PLEs and their maintenance in an electronic format, in our first audit of public complaints, we found that Palmdale kept PLEs in a three-ring binder referred to as the "Black Book." The Black Book was kept in a locked cabinet, and the watch commander had the only key. In Lancaster, PLEs were kept in a designated password-protected electronic folder. In our second audit of public complaints, we were informed that both commands now maintain the PLEs electronically, and we saw documentation of PLEs from both stations that were clearly computer generated. However, PLEs are not available through PRMS.

Policy Compliance: Partial Compliance

See the policy compliance discussion in Appendix D, Paragraph 141.


Training Compliance: **Partial Compliance**

See the training compliance discussion in Appendix D, Paragraph 141


Implementation Compliance: **Partial Compliance**

*Partial Compliance on PRMS (142a).* The Department has acknowledged that PRMS cannot meet this standard and has indicated they are going to pursue a new system to address these provisions.. Meanwhile, the SA allows the Department to develop an "alternative process," which has been done to produce the quarterly reports. The MT finds the quarterly reports to be a significant step toward compliance with this provision, but they do require a great deal of time to prepare. Additionally, failure to ensure that critical data are accurately provided (e.g., the out-of-policy finding on a use of force that was reported as "no issue") raises an issue regarding data accuracy.

*Partial Compliance on PLEs (142b).* Based on the documentation we have received, it appears the Department has automated the PLE entries; however, PLEs are not available in PRMS.

*No determination on accuracy (142c).* While we have identified concerns about data accuracy in ad hoc reviews, as described above, we defer a compliance determination in this area until such time as audits related to the use of force, public complaints, or other matters using PRMS data can be compared.


Overall Assessment of Progress Toward Compliance

The AV stations have been diligent in their efforts to make effective use of the existing data systems; however, those systems are not integrated. The data that is required for assessing compliance should be integrated and readily available. Currently, multiple steps are required to assemble the data, which limits management's ability to readily review and analyze results. For example, stops data are accessed through CAD, community engagement is accessed through each station's Community Engagement Tracker, and obstruction arrests are accessed through the Obstruction Arrest Tracker database. Data accuracy also continues to be a problem. While a full review of PRMS and Quarterly Report data accuracy is required to fully assess this issue, in the near term, accuracy can be improved through closer scrutiny of the data and the reports issued.

Recommendation(s) to Achieve Full Compliance

The Department should acquire and implement a software solution to automate some of the processes required to produce the quarterly reports. Meanwhile, AV stations need to ensure that data presented in the quarterly reports is complete and accurate.

Pending approval from the Parties and the MT, the Department should review and act on the recommendations in the MT's reports on the Quarterly Report system and should propose its own improvements.

Work to Be Completed During the Next Reporting Period.

The Department needs to determine how it can best compensate for PRMS's shortcomings and find a practical solution. Meanwhile, stations need to review the way data are captured for the quarterly reports to ensure accuracy and thoroughness.

The Parties and the MT will discuss the MT's recommendations in the MT's report on the Quarterly Report system. Future MT reviews will assess (1) if the quarterly reports adequately and effectively address all of the Accountability section requirements; (2) if other alternative processes exist or need to be developed to address any requirements found not to be addressed by the quarterly reports; (3) if station managers are effectively using these various sources to identify issues and implementing appropriate interventions; and (4) if divisional managers are adequately tracking this work at the stations as part of an effective accountability system. These reviews will also address data accuracy and reliability factors as well as the PMP.

**Paragraph 143**

*In consultation with the Monitor, LASD will develop a plan, to be approved by DOJ, to periodically review how the Antelope Valley stations analyze [PRMS] to respond to concerns unique to their stations, such as trends identified through civilian complaints, the CAC, community survey, or other means.*

Work Conducted

The Quarterly Report is the primary method for reviewing the performance of individual deputies, supervisors and work groups. The semi-annual RMF compares the Department's four patrol divisions with one another, then compares data from the stations within the patrol division under review during that meeting. The quarterly CMF includes in-depth reviews of each NPD station. Each of these can serve as vehicles by which the Department can address the specific requirements in the Accountability section. Currently, none of these provides a formalized process by which the Community Survey or CAC information is addressed. The CMF

has recently begun to address some community concerns, but thus far it has not addressed trends identified through the CAC or Community Survey.

The primary source of information for the quarterly reports is the Department's Sheriff's 11 Report. The Sheriff's 11 Report consists of 11 separate reports drawing on information entered into PRMS. Commands throughout the Department generate the Sheriff's 11 Report for their deputies and use it to identify and address risk management patterns. The 11 reports identify deputies who exceed the Department's minimum threshold in areas including deputy-involved shootings, other uses of force, lawsuits, claims, or personnel complaints that occurred during the preceding 24 months. Because of the thresholds established by the Department for the Sheriff's 11 Report, it would not be unusual for a deputy meeting a single criterion to be on the Sheriff's 11 Report for two or more years. For example, a deputy involved in a shooting, Category 3 use of force, or lawsuit would be on the report for at least two years even if the deputy was not involved in any other risk behavior during that entire timeframe. The Quarterly Report is based on the Sheriff's 11 Report data, but it has different thresholds intended to focus attention on those individuals whose performance is seen as posing greater risk. Now that the quarterly reports have been in place for some time and the processes for their preparation and application are maturing, the MT has begun compliance assessments.

Policy Compliance: Partial Compliance

See the policy compliance discussion in Appendix D, Paragraph 141.

Training Compliance: **To be Determined**

See the training compliance discussion in Appendix D, Paragraph 141.

Implementation Compliance: **Partial Compliance**

The quarterly reports are a useful tool facilitating a more comprehensive review of individual deputies, their supervisors and work groups. They contain the key risk management elements and provide a ready overview of deputies whose performance may require improvement. It is also a valuable tool to identify and correct discrepancies between databases. However, as discussed in the appendix for Paragraphs 141 and 142, we have not seen evidence of sufficient attention being focused on units, shifts, or supervisors, nor of managers questioning any potentially flawed data being presented to them in those reports. As described in the appendix for Paragraph 141, there are also data accuracy concerns.

<u>Overall Assessment of Progress Toward Compliance</u>

The AV has made good progress through the implementation of the Quarterly Report system. Automated support is needed to sustain it, and constant attention must be given to ensuring the accuracy of the data.


<u>Recommendation(s) to Achieve Full Compliance</u>

Our recent analysis of the quarterly reports provided several recommendations to improve it and help the Department in achieving compliance with this paragraph. These recommendations include removing the NCI uses of force from the calculations for the Quarterly Report thresholds to focus more attention on higher risk exposures; listing the number of consecutive quarters a deputy has been on the quarterly reports; indicating if the deputy is in a leadership position or new to patrol; providing more information on obstruction arrests; and indicating if deputies on performance mentoring are improving or not and, if not, what steps are being taken to gain that improvement. We will assess if these and other improvements have been made and their impact in upcoming compliance assessments. For implementation of any change to how the quarterly reports address NCI uses of force, the Parties will need to agree to the plan and a revised unit order, to include the new thresholds for inclusion in the report for each type of force.

Pending approval from DOJ and the MT, the Department should review and act on the recommendations in the MT's reports on the Quarterly Report system and should propose its own improvements. Meanwhile, automated support needs to replace the labor-intensive system now used to produce these reports.


<u>Work to Be Completed During the Next Reporting Period</u>

The Department should move forward with changes to the Quarterly Report that are approved by the MT and DOJ. Meanwhile, automated support needs to replace the labor-intensive system now being used to produce these reports. Additionally, the stations, in consultation with the MT and DOJ, should develop a plan or system to consider and integrate external input, such as feedback based on the Community Survey and CAC input, into its policing strategies. The MT will continue to observe and comment on each CMF and RMF and will conduct the Quarterly Report reviews discussed in the appendices for Paragraphs 141 and 142.


**Paragraph 144**

*LASD will continue to provide mentorship to deputies in the North Patrol Division's locally based Performance Mentoring Program (PMP), as well as through LASD's department-wide PMP, based upon appropriate determination of eligibility. To increase the effectiveness of the remedies and corrective action used to address a deputy's behavior, LASD will support and implement a plan to*

*ensure that the LASD- wide PMP program provides mentoring of AV personnel within 30 days after the need for mentoring is identified, and that appropriate procedures are in place for supervising deputies whose performance fails to improve subsequent to mentoring.*

<u>Work Conducted</u>

In 2018, the MT met with the Compliance Unit, the NPD chief, and the AV station captains to review how AV stations conduct oversight in the course of carrying out the accountability provisions and requirements in the SA. This included a review of the PMP process. This provided the MT and the Parties with a shared understanding as a basis for future reviews. During this reporting period, the MT began its review of the Unit and Department Performance Mentoring Program.

<u>Policy Compliance: Partial Compliance</u>

The performance mentoring process is operational, and we have begun our review of the program to assess its compliance with these SA requirements. We expect to have that review completed in the next reporting period.

<u>Training Compliance: **To be Determined**</u>

This will be assessed in our review of PMP.

<u>Implementation Compliance: **Partial Compliance**</u>

This will be assessed in our review of PMP.

<u>Overall Assessment of Progress Toward Compliance</u>

The program is in place and is being used and the MT has begun its evaluation of the PMP. The recent MT review of the quarterly reports identified concerns with the length of time some deputies remain on the reports. Among other factors, this could be related to the process for placing deputies on PMP or on the effectiveness of the PMP program.

<u>Recommendation(s) to Achieve Full Compliance **To be determined**</u>

This will be assessed in our review of PMP.

Work to Be Completed During the Next Reporting Period

The MT will continue to evaluate compliance with this paragraph during the next reporting period. An assessment of the PMP process and its effectiveness will be conducted.


**Paragraph 145**

*LASD will ensure that the Department-wide PMP and the North Patrol Division's PMP coordinate as appropriate with each other and share information about deputies and their individual mentoring programs.*


Work Conducted

The MT has initiated a review of the Unit and Department Performance Mentoring Programs. We expect to have that review completed during the next reporting period.


Policy Compliance: Partial Compliance

The performance mentoring process has long been operational, and we are now reviewing the current versions of the handbook which covers Unit and Department PMP.


Training Compliance: **To be Determined**

This will be assessed in our review of PMP.


Implementation Compliance: **Partial Compliance**

This will be assessed in our review of PMP.


Overall Assessment of Progress Toward Compliance

The policies appear to be in place and are being used and the MT has begun its evaluation of the PMP.


Recommendation(s) to Achieve Full Compliance

This will be addressed in our review of PMP.

<u>Work to Be Completed During the Next Reporting Period</u>

The MT is conducting a review of the Unit and Department Performance Mentoring Programs. We expect to have that review completed during the next reporting period.