1  OFFICE OF COUNTY COUNSEL
   Dawyn Harrison (173855)
2  County Counsel
     *dharrison@counsel.lacounty.gov*
3  Carrie Clarke (150031)
   Senior Deputy County Counsel
4    *cclarke@counsel.lacounty.gov*
   Jonathan McCaverty (210922)
5  Assistant County Counsel
     *jmcaverty@counsel.lacounty.gov*
6  500 West Temple St., Floor 6
   Los Angeles, California 90012
7  Telephone: (213) 631-8374
   Facsimile: (213) 626-2105
8

9  KENDALL BRILL & KELLY LLP
   Robert E. Dugdale (167258)
10   *rdugdale@kbkfirm.com*
   10100 Santa Monica Boulevard, Suite 2500
11 Los Angeles, CA 90067
   Telephone: (310 272-7904
12 Facsimile: (310) 556-2705

13
   Counsel for Defendants
14 The County of Los Angeles and the
   Los Angeles County Sheriff's Department
15

16              **UNITED STATES DISTRICT COURT**

17     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18

19 UNITED STATES OF AMERICA,          Case No. 15-CV-03174-JFW-FFM

20              Plaintiff,            **SUBMISSION OF MONITORS'
                                      TWENTIETH SEMI-ANNUAL
21         v.                         REPORT**

22 THE COUNTY OF LOS ANGELES
   and THE LOS ANGELES COUNTY
23 SHERIFF'S DEPARTMENT,

24              Defendants.

25

26

27

28

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

SUBMISSION OF MONITORS' TWENTIETH SEMI-ANNUAL REPORT

On May 1, 2015, the Court approved and entered the parties' Settlement Agreement (the "Agreement") to resolve the United States' claims in this matter against the County of Los Angeles and the Los Angeles County Sheriff's Department pursuant to 42 U.S.C. § 14141 (re-codified at 34 U.S.C. § 12601) and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

Paragraph 171 of the Agreement requires the Monitors to publicly issue a report every six months that details the Parties' progress in implementing the Agreement and achieving compliance with the Agreement. To that end, the parties submit the Monitors' Twentieth Semi-Annual Report.

DATED: July 25, 2025                    KENDALL BRILL & KELLY LLP

By: _____

Robert E. Dugdale
Attorneys for Defendants
The County of Los Angeles and the
Los Angeles County Sheriff's Department

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

1
SUBMISSION OF MONITORS' TWENTIETH SEMI-ANNUAL REPORT

# Antelope Valley Monitoring Team
# 20th Semi-Annual Report



## June 2025

## CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Work to Date ................................................................................................................ 3

        A.      Monitoring Activities in This Reporting Period ........................................... 3

        B.      Stops, Seizures, and Searches ........................................................................ 5

        C.      Bias-Free Policing ......................................................................................... 28

        D.      Enforcement of Section 8 Compliance ....................................................... 36

        E.      Data Collection and Analysis ....................................................................... 38

        F.      Community Engagement ............................................................................... 42

        G.      Use of Force ................................................................................................. 55

        H.      Personnel Complaint Review ....................................................................... 68

        I.      Accountability .............................................................................................. 78


        Appendix A: Monitoring Team and Website ..................................................................... A1

        Appendix B: Settlement Agreement Compliance .............................................................. B1

## TABLES

Table 1: Stops, Seizures, and Searches Compliance Status

Table 2: Bias-Free Policing Compliance Status

Table 3: Enforcement of Section 8 Compliance Status Table

Table 4: Data Collection and Analysis Compliance Status

Table 5: Community Engagement Compliance Status

Table 6: Use-of-Force Compliance Status

Table 7: Personnel Complaint Review Compliance Status

Table 8: Accountability Compliance Status

## I.  INTRODUCTION

This is the 20th semi-annual report issued by the Antelope Valley Monitors. It describes the observations of the Monitoring Team (MT) on progress made by Los Angeles County and the Los Angeles County Sheriff's Department (LASD or the Department) in meeting the requirements of their Settlement Agreement (SA) with the US Department of Justice (DOJ) for the Antelope Valley (AV).[1] This report focuses on work conducted between January and June 2025.

As this report marks the ten-year anniversary of federal monitoring of LASD-AV, it's important to acknowledge our collective goal was compliance in a much shorter timeframe. Over the past ten years, the work toward compliance with constitutional policing practices has been marked by uneven progress at times, but much improved during this current administration. Previously, outside of the Compliance Unit we most often observed inconsistencies, reticence, and pushback. The work was marked by slow and siloed responses to SA requirements, with some occasional progress typically followed by months or years of stagnation or backsliding. However, under the leadership of Sheriff Luna, the principles of constitutional policing and 21st century policing have been seeded in the AV and we are seeing signs those efforts are spreading throughout the department. Important resources have been allocated to much needed training and support for deputies. Critical policies and training have been developed and approved and productive technology is now at the fingertips of station supervisors and managers. Progress has been de-siloed, coordinated, and is consistently moving forward now under a steady hand guiding these efforts. Palmdale and Lancaster CACs and the youth council are flourishing, with engaged and creative members actively pursuing new ways to reach and hear from more community members and to build community rapport and collaboration with the stations.

The accelerated changes in compliance status we are now observing are in many cases the result of concerted efforts undertaken in the most recent reporting periods, such as the implementation of the two-captain model at the AV stations or those associated with the development and refinement of data tools that were recognized and acknowledged as sorely needed and overdue. The monitors are confident that had the current efforts been underway and applied in years past, LASD would most likely now be in compliance with most, if not the entirety, of the SA.

The years of setbacks were unfortunate. Resistance to constitutional policing practices and a lack of accountability harms everyone from those community members who are impacted by substandard policing tactics or practices to the deputies themselves, who suffer from inadequate training, inconsistent guidance and standards, and poor relationships and unnecessary conflict with various communities they interact with and whose support they must rely upon to achieve their goals. In previous reports, the Monitors have noted systemic issues in LASD's management oversight which resulted in problematic behaviors going unchecked until issues escalated significantly, putting both community relations and deputy careers at risk (see our 10th through 18th semi-annual reports). Those issues and concerns have significantly diminished of late and this can be attributed to the increased attention that is being devoted to improving management accountability and establishing higher performance expectations.

---

[1] Settlement Agreement, No. CV 15-03174, *United States v. Los Angeles County et al.* (D.C. Cal. Apr. 28, 2015).

## A.  Progress Toward Compliance

As a result of hard work over the past year, LASD is now in partial compliance or in compliance on all areas of the SA except for complaints. The MT expects compliance in multiple additional areas in the next reporting period, which is clearly possible given the recent progress that has been documented. We also believe that sustained compliance—that is, compliance maintained for at least one year—will be forthcoming in the next 12 to 18 months in most of the areas recently brought into compliance.

We continue to be impressed by LASD's strong and unwavering commitment to implementation of constitutional-based policing under Sheriff Luna's administration. LASD has made significant compliance gains in most sections of the SA and the following serve as a few examples of notable achievements:

- Procurement of a new CAD system;
- Draft of the first semi-annual stops report;
- Development and increasing use of data dashboards for use across the SA;
- Compliance in nearly every community engagement provision;
- Near compliance with development of required community engagement training;
- Approved UOF training;
- Publicly available UOF analysis report;
- Reductions in UOF;
- Compliance on nearly every UOF provision;
- Ongoing production of high-quality AAB audits.

## B.  Remaining Milestones

Even with the progress described in this report, there remain critical gaps that need to be filled. Most of these are on the verge of compliance but need that extra push to be fully approved and implemented. These include but are not limited to:

- Finish the complaints related policies, most of which are now in meet and confer.
- Finish the community engagement training and integrate community policing and problem-solving policing into station practices.
- Fully integrate data-driven decision making into station operations, oversight, and accountability, including regularly reviewing deputy and unit performance and regularly assessing patterns and trends to identify and respond to potential unintended impacts of law enforcement activities. This includes Department executives and NPD supporting station managers in terms of clear policies and guidance and sufficient resources as well as messaging regarding the value a culture of self-assessment and accountability provides to all personnel.
- Complete and implement the revamped PMP program.

The monitors reflect on this anniversary with optimism based on the substantial progress that is becoming increasingly evident while also urging caution given the history and experiences with the backsliding that too typically happened in past years. The Department, and community, can ill afford a return to that modus operandi, as the consequences for LA County residents and the Department's workforce, and the costs to remedy such missteps, would be grave and unnecessary and are clearly avoidable.

## II.  WORK TO DATE

### A.  Monitoring Activities in This Reporting Period

To further our responsibilities regarding SA compliance assessment and providing technical assistance, the Monitoring Team continued to conduct various work activities in this reporting period. We participated in regular virtual meetings with the Parties (LA County, LASD, and DOJ), the CACs, and community members; participated in site visit meetings at the Hall of Justice and at the AV stations and in numerous smaller in-person meetings, including with Sheriff Luna and the director of the Department's OCP; participated in ride-alongs and roll call briefings and trainings; engaged in ongoing telephone and electronic communications with the Compliance Unit, AV station and NPD leadership, various LASD bureaus, OCP, DOJ, and community members; and provided feedback on our observations of management performance based on station visits and meetings held to review critical incidents and risk management issues.[2] Further examples of the specific activities undertaken for various sections of the SA are provided below.

1.  Stops and Bias-Free Policing

- Met and regularly communicated with LASD AAB to review 2025 stops audits and related workplans.
- Reviewed LASD's verifications of attendance at roll call trainings and full-day training sessions for the fourth quarter of 2024 and the first quarter of 2025.
- Regularly met with LASD staff to provide feedback and technical assistance (TA) on the development of their new online stops and risk management dashboards and other data issues.
- Observed training for compliance with the SA stops and bias free provisions of the SA
- Continued to provide TA to LASD regarding crime prevention strategies by reviewing documents, providing feedback, and meeting with station captains. Observed the Crime Management and Risk Management Forum for the AV stations.
- Reviewed the results of the Center for Policing Equity (CPE) study of stops and UOF in the AV.

---

[2] See the Monitors' previous semi-annual reports and, in particular, the 15 Semi-Annual Report, Appendix D Only.pdf, under Documents and Reports at our website, Monitoring of the Antelope Valley Settlement Agreement (http://www.antelopevalleysettlementmonitoring.info/) for more detailed information about the work history for each SA paragraph.

- Conducted meetings with leadership at the AV stations, and attended community meetings in the AV.

2. <u>Data Analysis</u>

- Reviewed draft of first semi-annual report on stops in the AV.
- Provided technical assistance related to data collection and analysis. Observed a variety of meetings where data was applied and discussed.

3. <u>Community Engagement</u>

- Sustained regular communication with CAC members and other community members.
- Reviewed AV stations' crime prevention strategies, Community Engagement Reports, and other documents and reports.
- Observed presentations by the OCP on community engagement activities and plans.
- Attended CAC, town hall, and other community meetings.
- Met and maintained ongoing communication with LASD leadership regarding the CACs, community engagement efforts, and community concerns.
- Attended and provided feedback to the Department on the Crime Management Forum (CMF) and Risk Management Forum (RMF).
- Reviewed documentation, observed presentation, and provided feedback on LASD's plan to revamp the CMF and RMF.
- Continued reviewing and providing feedback on the Department's proposed Community Engagement training, Guidebook, and revised attendance plan.

4. <u>Use of Force</u>

- Continued to meet and collaborated with AAB staff in the development of a series of mini use-of-force (UOF) audit workplans.
- Consulted with AAB staff and provided technical assistance with AV mini use-of-force audits that were in process.
- Reviewed AAB use-of-force audit reports and provided feedback.
- Virtually attended NPD Category 2 use-of-force reviews.
- Conducted a review of Category-3 uses of force reviewed by the EFRC from May 2024 through April 2025. Prepared a report on our findings and submitted it to the parties for review and comment.
- Continued to monitor and provide feedback on Executive Force Review Committee (EFRC) and Critical Incident Review Panel (CIRP) cases heard during the second half of 2024.
- Consulted with the Compliance Unit to identify the audit population and received related materials for the MT's AV use-of-force audit.

- Continued conducting the MT's audit of Palmdale and Lancaster NCI, Category 1 and Category 2 uses of force
- Reviewed LASD's UOF analysis report

5. <u>Complaints</u>

- Met and worked with AAB and the Compliance Unit on several occasions to finalize AAB's 2024 audit of public complaints,
- Worked with AAB to refine its audit strategy, with a focus of utilizing larger, more generalizable sampling methodologies.
- Worked with AAB and the Compliance Unit to develop AAB's 2025 annual work plan
- Worked with AAB to finalize its first 2025 complaint audit report
- Monitored LASD's processing of several community complaints, which were brought to our attention by community members.

6. <u>Accountability</u>

- Continued to work with the OCP, RMB, and the commanders who form the Performance Mentoring Program (PMP) Panel on revising the PMP program.
- Reviewed and commented on five draft directives developed to guide the new PMP process.

## B. Stops, Seizures, and Searches

The AV stations continued to make significant strides in the areas of stop, searches, and seizures in this reporting period. This was due to a clear and consistent leadership and prioritization of SA-related tasks by LASD executives, the implementation of new technology, and coordinated efforts among personnel in multiple units including the stations, Compliance Unit, AAB, the Business Process Improvement Group, and the OCP. The AV stations have continued engagement on the review of reports, development and implementation of station crime strategies, using available data to monitor the performance of staff, and significant effort towards the full implementation of SA provisions related to stops and enforcement activity in the AV and, in many areas, departmentwide.

Changes in compliance assessments in this reporting period include the following.

- LASD has achieved partial compliance with five stops-related provisions related to proper conduct of backseat detentions (BSDs) and supervisory review (Paragraphs 48, 59, 60, 61, and 63).
- LASD has achieved compliance with six provisions documenting stops, assessments of probation and parole searches, complaints related to BSDs, and the proper conduct of searches (Paragraphs 44, 46, 49, 50, 51, and 56).

This moves LASD to at least partial compliance and in many cases full or sustained compliance with all the SA stops provisions.

1. <u>Training</u>

*a. Constitutional Policing Training*

- The Department remains in sustained compliance with the delivery of the approved full-day constitutional policing training (SA Paragraph 57).

LASD continued to be in sustained compliance for providing the full-day constitutional policing training during this period for LASD-AV deputies and embedded units.[3] The Constitutional Policing training was provided by LASD to AV deputies again on March 12, 2025, which resulted in the stations remaining above the 95% threshold needed for compliance with this provision.

*b. Quarterly Refresher Roll Call Training*

- The Department is now in sustained compliance with quarterly roll-call trainings (SA Paragraph 71).

LASD is now in sustained compliance with the requirement to provide AV deputies with quarterly refresher roll call training addressing constitutional policing, bias-free policing, and housing investigations (SA Paragraph 71). Sustained compliance required 1) continued provision of quarterly briefings and 2) updating the briefings in order to increase their relevance and engagement with deputies. LASD continued to provide this training throughout 2024 and in the first quarter of 2025. The briefings have been updated via the use of an external vendor. The MT and DOJ observed a demonstration of this vendor's training platform and approved it for use, which began in this reporting period. The quarterly briefings used for the past several years are being replaced by trainings offered through the vendor; this process of regular reviewing and, when necessary, updating training is in keeping with SA requirements and thus the Department has maintained compliance—and now sustained compliance—with SA paragraph 71.

The vendor offers a catalog of briefings, with new trainings produced regularly, on a variety of topics including: US and California law, new rulings, deputy wellness, officer safety, use of force, de-escalation, bias-free policing, investigations, community policing, community engagement, community perspectives, professionalism, procedural justice, and custody-related issues. Supervisors are provided materials to assist them in leading discussions after deputies view a video. The use of the new training platform is a significant step forward for LASD because it will provide deputies with timely and relevant briefings beyond those required by SA paragraph 71, including other SA-related topics and non-SA

---

[3] Roll call training is provided quarterly but attendance is assessed for compliance on an annual basis. In the past, the MT cross-checked training attendance rosters to station rosters in order to verify deputy training attendance, but the MT has now found the LASD tracking methods to be reliable for that purpose. The MT will no longer conduct its own verification processes on the constitutional policing, bias-free policing, or roll call trainings unless there are indications that further review is needed.

topics that LASD managers choose to prioritize.

*c. Procedural Justice Training*

- LASD remains in compliance with SA Paragraph 42.

Despite LASD providing AV deputies approved procedural justice training for several years, the 2023 MT stops audit and subsequent AAB audits found that LASD deputies were not consistently engaging with members of the Antelope Valley community according to the principles of procedural justice, which includes, among other things, the importance of introducing themselves, explaining the reason for the engagement (whenever feasible), and consistently interacting in a respectful and professional manner. To ensure training takes hold and is reflected in routine practice, it is imperative that the principles being taught are routinely reinforced at the stations, that deputy activities are reviewed for alignment with the training, and that supervisors are held accountable for monitoring deputy behavior and providing corrective action when needed. To that end the AV station captains have worked to ensure all staff understand their expectations regarding procedural justice. Recent AAB audits have found that AV deputies now more consistently meet those expectations. This is a significant step forward and illustrates what a sustained focus by leadership and AV deputies can accomplish. Respectful interaction with the AV community will bring about higher levels of trust and cooperation while ensuring LASD and the community together achieve their public safety goals and desired outcomes.

The MT found the Department in compliance with Paragraph 42 in December 2024. To reach one year of sustained compliance with this paragraph, the MT expects (1) continued inclusion of procedural justice principles in LASD training, (2) continued AAB reviews of stops assessing compliance with the provision, and (3) continued focus by the AV station captains and NPD command staff on holding personnel accountable for adhering to the principles of procedural justice. LASD is currently on course to reach sustained compliance in December, 2025.

*d. Supervisor and Management Training*

In years past, case reviews and audits conducted by the MT identified failures by supervisors to identify substandard performance and address it with their employees in a timely fashion. Subsequent AAB reviews had similar findings. Over the last year, however, the AV station captains have applied concerted effort to directly address and correct these shortcomings. These efforts have already had positive impacts in the areas of complaint and UOF reviews and investigations; the MT expects similar progress toward compliance in supervisory and management review of stops (SA paragraphs 58–63). The AV station captains have personally provided supervisors and lieutenants with training about departmental expectations regarding their reviews of deputy performance and ways they hold their deputies accountable. Through emails, in person meetings, and formal written feedback, the station captains have provided training and guidance to ensure supervisors conduct appropriate reviews, mentor, and hold deputies accountable, and address concerning performance and trends before they become risk management issues. The ongoing engagement and training by the station captains has paid significant dividends as described below in the discussions of use of data and supervisory reviews.

LASD has expanded their efforts to engage more managers—lieutenants and above—in participating in professional development efforts and courses offered by groups such as the Police Executive Research Forum (PERF), the FBI's National Academy (NA), Law Enforcement Executive Development Seminar (LEEDS), the DC Police Leadership Academy, the California Police Chiefs Executive Training program, and the Peace Officers Standards on Training (POST) Command College, among others. These external training endeavors ensure LASD leadership is benefitting from broader exposure to evolving policing practices in the industry. In addition, newly promoted captains attend an internally conducted five-day course that now has enhanced coverage of the topics of leadership and accountability practices.

*e.  LASD Training Bureau Consultation with External Experts*

Over the last two years, LASD has been engaged with the US Department of Justice Collaborative Reform Initiative-Technical Assistance Center (CRI-TAC). This program is administered by the US DOJ Cops Office. As a part of the CRI-TAC assistance, a group of training experts conducted interviews, reviewed training documents, and observed trainings. CRI-TAC reviewed training documents related to use of force, community policing, bias-free policing, crisis intervention training, the LASD ROAR model of response to intense incidents that can easily escalate, and related policies governing the handling of such incidents. The team also observed training delivered by LASD training staff as part of the perishable skills program. The engagement with CRI-TAC required a considerable amount of time and coordination on the part of LASD. CRI-TAC's report, provided to the MT and DOJ in April 2025, offered several recommendations, some of which include:

- Integrate a response model across all courses, such as LASD's ROAR de-escalation and crisis stabilization model.
- Ensure all curriculum is consistent with LASD policy and guidance for the topics of de-escalation, duty to intervene, implicit bias, and procedural justice principles.
- Improve training delivery, both online and in-person.

Additionally, to address the significant challenges LASD faces in providing training to such a large organization across a wide geographic area, the CRI-TAC experts suggested LASD provide mobile training teams to reach the stations, use a train-the-trainer program for instructors at each station, prioritize critical and required training topics, and centralize a training approval process to ensure training continuity and consistency. The MT believes these are sound recommendations and recommends LASD prioritize implementation Departmentwide. LASD has begun taking steps to implement the recommendations, including providing use of force training to deputies at the stations (a more efficient option than having deputies travel to the training center) and revising curricula to implement the ROAR response model across training courses. The LASD has stated they will continue to prioritize these recommendations over the next reporting period.

2. Stops Data Systems and Dashboards

*a. Data Recordation*

- LASD is now in compliance with SA Paragraph 44, which requires stops to be accurately documented in MDC patrol logs.

LASD has enhanced the SACRS data collection system to document and compile all the data required by the SA, in particular SA paragraphs 44 and 81. This change was one of the final hurdles necessary to reach compliance with paragraph 44 after the MT stops audit found issues with the reliability of CAD data used for supervisory review, auditing, and analysis purposes. Note that some of the qualitative aspects of paragraph 44 are measured in other paragraphs (e.g., sufficiency of BSD narratives is measured in SA 47, accuracy of the data is measured via SA 63 and 142). This change places the Department in compliance with SA paragraph 44.[4] It will also support compliance efforts across a wide grouping of SA supervision and analysis requirements and will facilitate reliable MT and AAB audits. Sustained compliance will be determined based on a review of whether LASD deputies enter stops information properly in the system.

*b. Progress on Other Data Needs: New CAD and Reporting Systems*

LASD's CAD system has become increasingly unreliable over the last year and has shut down completely at times. LASD has a vendor developing a new CAD system, but it is at least several months away from implementation. Although CAD isn't being used to track the required stops information, CAD is a critical system for other types of data used in assessments for other SA areas, such as dispatch information provided to deputies responding to calls, location data, the dispositions of calls, response times, and other important information. LASD will keep the MT informed of the progress of the CAD replacement process.

The Department has made strides in their efforts to implement an upgraded platform to process incident reports, investigative reports, and administrative documents. The current reports are largely paper-based, with documents sent through the chain of review and then later data-entered into a system so information can be displayed on the risk dashboards. This type of system is slow, inefficient, and prone to error. There can be significant data entry delays which can hinder the Department's ability to identify and address risk management and mitigation efforts in a timely fashion. While a comprehensive solution is being sought, LASD implemented a preliminary data entry (PDE) system to capture the initial entry of data at the stations.[5] This provides station and division commanders with helpful information even as further reporting and investigation is underway. LASD has indicated a

---

[4] An important recent upgrade was including the length of any BSDs for each person stopped. LASD added four specific pages displaying data related to BSDs. As of mid-February, deputies began capturing the length of the BSD, which will help determine which types of stops are leading to lengthy detentions and to identify if any deputies are leaving detainees in BSDs for long durations without explanation.

[5] LASD reports it is working to procure a new comprehensive reporting system that will have an initial data entry component that will replace the current PDE process.

reporting system is being researched, and they hope to be able to identify a vendor soon. (See further discussion in the MT's 19th Semi-Annual Report.)

3.  <u>Timely and Ongoing Review of Data to Inform Practice</u>

The preface to the Stops section states:

> *LASD shall ensure that investigatory stops and searches are part of an effective overall crime prevention strategy, do not contribute to counter-productive divisions between LASD and the community, and are adequately documented for tracking and supervision purposes.* (SA p. 7, Section III)

There are numerous SA paragraphs that require station and division managers to regularly review and assess data and to use the findings to inform and improve law enforcement practices and to evaluate deputy and unit performance. These include the preface and paragraph 46 in this SA section, as well as paragraphs 61, 62, 63, 68, 82, 83, 84, 85, 90, 117, 118, 120–123, 141–143 in other sections. The Department is currently in at least partial compliance with these provisions. Sometime these provisions specifically require data analysis and sometimes data review is essential to completing the tasks required. Over the last two years, LASD has focused a significant amount of personnel and effort to increase their capacity to collect and utilize this data and the AV stations have displayed a strong interest in and willingness to use data to inform their police practices and strategies.

a.  *Dashboards*

The following dashboards are some that the AV captains have been utilizing to help manage their stations:

> *Administrative and Reporting: (1) crime report completion, Sheriff's Automated Contact Reporting System (SACRS, a.k.a. RIPA) compliance, body-worn camera compliance; (2) risk management data tracking (Performance Recording and Monitoring System, or PRMS); (3) overdue crime report completion by deputies; (4) overdue use-of-force and complaint investigations; and (5) overtime worked report.*

> *Analytics Reports: (1) internal stops report and deputy productivity, (2) performance oversight information tracker (POINT), (3) force statistics, (4) traffic collision statistics, (5) crime statistics.*

> *Miscellaneous Reports: (1) body-worn camera dashboard, (2) firearm statistics compliance.*

Some of these dashboards were launched last year by LASD's Business Process Improvement Group. Data can be sorted and compared in a variety of ways, including by time period and by department, division, station, work groups, or individual deputies. The developers continue to seek feedback to be used to improve the dashboards to better support the station captains. To ensure analyses are conducted using the most reliable data available, the stops dashboards use the SACRS data.

*b.  Progress in Use of Data to Inform Practice at Stations*

At numerous points during this reporting period, the MT has observed the station captains discuss their use of the stops dashboards to review the stops and enforcement activities of deputies in the AV.

Station managers are now using the dashboards, and other sources of information such as crime patterns, demographic data, and input received from the community through engagement activities and surveys, to conduct ongoing assessment of their enforcement activities. In this reporting period, the station captains have been using dashboard data to assess whether station activities are furthering the goals of their now established crime reduction strategies (see discussion below) and to identify deputies whose activity may warrant further review. Another important purpose of these assessments is to identify any potential unintended impacts of LASD activities that may lead to a counterproductive relationship with the community. For example, BSDs and parole and probation searches during stops play a legitimate role in law enforcement activities, but they can also have a significant impact on community perceptions. Captains can use the dashboards to ensure particular tactics and enforcement strategies are being used appropriately and to assess their effectiveness in furthering crime suppression and deterrence objectives.

*c.  LASD Plan to Enhance the Use of Data for Management and Supervisory Review*

During a virtual meeting in June 2024, LASD provided MT members with a preview of their plans to automate the processes supporting and documenting manager and supervisor review of data and other information. The objective of the plan is to replace the Quarterly Reports and the current DDWS reviews and to facilitate compliance with other SA data review requirements. In summary, the plan involves station personnel regularly completing an online form describing reviews they have completed and any corrective action taken. The form will be created and distributed by the Business Process Improvement Group, and will include automated reminders, with further action taken when necessary to ensure completion. The reviews will use SACRS data, dashboards, BWC video, and other reports. The Department will be providing the MT and DOJ a written description of the plan and the specific SA paragraphs to be addressed. In previous semi-annual reports, the MT has provided recommendations and examples of the types of data analysis and assessment needed to reach compliance with these provisions: the LASD team will be considering those recommendations in their final plan. The plan is expected to be further refined and implemented in the next reporting period.

The MT found the draft plan to be very promising and were impressed that the department so quickly followed through on its proposals stemming from the May 2025 site visit. The capable team assigned to this project has led other successful development projects that enabled LASD to reach compliance in other areas, including collecting all the SA-required data for LASD-AV stops and switching to using SACRS data for analysis, auditing, and reporting purposes. If implemented on schedule and if the processes function as intended and the conduct and documentation of management and supervisory reviews are shown to have improved as expected, this will help establish compliance and/or sustained compliance on several SA paragraphs in the next reporting period.

4. <u>LASD Audit and Accountability Bureau (AAB) Stops Audits</u>

AAB continues to conduct high quality audits related to stops and other SA areas. During this reporting period, AAB submitted and received approval for reports on mini-audits conducted in 2024 addressing backseat detentions, backseat detentions involving domestic violence, consent searches, probation and parole searches, and supervisory review. In addition to the primary objectives, each audit also addressed other recurring topics such as proper BWC activation and procedural justice. As reported in the 19th semi-annual report, the mini-audits have smaller samples taken from shorter time periods than a full audit. They allow for more timely and actionable feedback to be provided to the AV captains. The AAB and station captains work together to ensure the audit findings can be and are used to inform station practices. Additionally, the AAB auditors have now switched to pulling data from the SACRS system for stops rather than the less complete and reliable CAD data. The mini-audit approach has played a significant role in recent progress meeting the requirements of LASD policy and SA provisions. The DOJ and MT provided review and comments on the mini-audit plans and reports.

SA paragraph 149 allows the MT to consider AAB audit findings as part of our SA compliance assessments. In this reporting period, the AAB developed plans for larger sample audits specifically designed to be used for compliance determination. The parties have agreed that audits conducted according to these approved plans, along with any needed MT verification of findings, can be used in compliance assessments. The MT looks forward to reviewing the draft audit reports when completed and being able to definitively use the findings in making compliance determinations.

In the meantime, MT continues to consider AAB mini-audits in our compliance determinations for some provisions, particularly when there were several sources of information for us to review and to verify audit findings, such as MT audits, AAB audits, other reports and reviews, and direct observation. The stops paragraphs status discussion that follows references numerous instances where AAB audits have played a valuable role in the MT and DOJ compliance determinations.

5. <u>Compliance Status</u>

An overview of compliance status for stops-related provisions, including changes to status during this reporting period, follows. Factors contributing to MT determinations of compliance include the MT stops audit, the AAB audits (see below), and MT observations and reviews of case files over the past years.

*a. Backseat Detentions*

- LASD remains in partial compliance with SA Paragraph 47, which requires deputies have individualized justification and can articulate safety concerns for backseat detentions and that supervisors understand how to assess the reasonableness of a BSD.

- LASD is now in partial compliance with SA Paragraph 48, which requires that backseat detentions not be conducted as a matter of course during routine traffic stops or domestic violence situations.

- LASD is now in compliance with SA Paragraph 49, which requires deputies to call a supervisor to the scene when there is a complaint about a backseat detention.

Partial compliance on SA paragraphs 47 and 48 is based on several factors. The 2023 MT stops audit showed the Department was not in compliance with BSDs in traffic stops due to deputies not consistently providing a reason for the BSD and supervisors not identifying or responding to those violations. The MT was unable to assess BSDs related to domestic violence calls due to insufficient data. However, LASD has subsequently largely addressed the issues the MT experienced identifying an audit population of BSDs involving DV. This was done through the use of SACRS instead of CAD data and required extensive effort on the part of the AAB auditors to identify and assess BSDs occurring at domestic calls. Subsequent AAB mini-audits of stops involving a BSD found improvement on the part of AV deputies but not enough improvement for compliance.[6] The MT notes that in many cases the BWC video shows the BSDs are done according to policy but the documentation is inadequate; proper documentation is essential for tracking and supervisory review, so those cases were found to be in partial compliance but not compliance. On a related note, LASD-AV has experienced an overall drop in BSDs but a rise in curbside detentions, which can have a similar impact on the community as BSDs. While not specifically SA-required, stations will need to monitor curbside detentions and, in particular, assess whether curbside detentions are being used in lieu of BSDs.[7]

The Department is now in compliance with SA paragraph 49 because the MT has never found evidence of violations of this provision in the stops and complaint audits we have conducted or in other observations and reviews.[8] To reach sustained compliance, the LASD will need to institute a way to track whether and when these incidents occur, so they can be audited by the AAB or MT.

*b. Searches*

- LASD is now in compliance with SA Paragraph 50 and 51, which require deputies not conduct arbitrary searches and not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s).

---

[6] The most recent mini-audit of general BSDS reviewed 64 stops across both AV stations (LASD AAB Audit 2024-48-A). The audit found 69% compliance for providing a reason for the BSD to the person stopped and 80% compliance for articulating the reason for the BSD in the documentation. The compliance standard is 90% for both categories. The most recent mini-audit of BSDs involving DV reviewed 30 BSDs at domestic violence calls across both AV stations (LASD AAB Audit 2024-61-A). The audit found 77% compliance for providing a reason for the BSD to the person stopped and 53% compliance for articulating the reason for the BSD in the documentation. These findings were each below the 90% compliance standard.

[7] There has been a steep decline in BSD's conducted by AV deputies. In 2023, there were 4392 BSDs and in 2024 there were 3280. As of May 28, 2025, there were only 753 BSDs conducted in the AV. The MT was told there has been significant increases in the number of curbside detentions as the number of BSDs have dropped. The MT stops audit discussed curbside detentions in detail and identified them as an important activity to monitor. The MT recommends the AAB to schedule an audit of curbside detentions.

[8] Failure to file a complaint in other circumstances, apart from BSDs, is addressed in the Complaint section.

- LASD is now in partial compliance with SA paragraph 52a, which requires LASD deputies to record requests for consent searches.
- LASD remains in compliance with SA paragraph 52b and sustained compliance with 52c, which require consent be established in the appropriate language for LEP individuals and that the Department does outreach to the community about their right to refuse consent.

The Department is now in compliance with SA paragraphs 50 and 51 based on several factors. These provisions apply to consent searches and other types of discretionary searches (e.g., person, vehicle, and home-based probation or parole searches). The 2023 MT stops audit found the Department in compliance for consent searches but the MT was unable to assess the other types of searches. Now, SACRS data provides more complete data on searches, allowing for a more complete review of this provision. The MT has reviewed the processes and reporting for home-based searches as part of probation and parole checks and found numerous safeguards for tracking, reporting statistics, and protecting against the likelihood of bias based on protected class status in those activities. AAB mini-audits found compliance for stops-related consent searches and did not find violations of this provision in other types of consent searches. Also, AAB mini-audits of parole and probation searches found the department to be in compliance with having a reason to conduct the search and having confirmation of the parole/probation search conditions prior to conducting the search.[9]

Regarding SA paragraph 52a, the MT 2023 stops audit showed the Department was not in compliance with the requirement that deputies record the request for a consent search and the response. The AV station captains have begun to remind deputies of the requirements of this provision and have seen higher levels of compliance. Partial compliance is established based on recent AAB mini-audits which found improved levels of compliance and MT ad hoc reviews of stops that have not seen violations.

*c. Probation and Parole Searches*

- LASD is now in compliance with SA Paragraph 46, which requires LASD to assess the efficacy and community impact of probation and parole searches.
- LASD is now in compliance with Paragraph 56 which requires the LASD AV deputies to establish knowledge of probation or parole search conditions prior to conducting a search.

SA paragraph 46 is one of the provisions that require regular use of data; the Department has achieved compliance in this reporting period through a variety of efforts. Thorough documentation of probation and parole searches was an area of shortcoming in the CAD system that was resolved with the switch to

---

[9] The most recent mini-audit reviewed 20 stops involving consent searches across both AV stations (LASD AAB Audit 2024-62-A). The SA requires a person stopped to be asked for consent and the person's response to the question must be recorded on the BWC. The audit found 88% of the person's consent searches contained the request for the search and the person's response. The auditors determined 82% of the requests to conduct a consent search were reasonable. The audit found 90% of the vehicle consent searches contained the request for the search and the person's response. The auditors determined 80% of the requests to conduct a consent search were reasonable. For all consent searches, the auditors found 60% properly articulated or documented the consent search correctly as required by policy. Although the compliance percentages were high in all but one category, none of the categories met the required compliance percentages of 90 or 95%.

SACRS. The new dashboards allow AV commanders to monitor the use of parole and probation searches by deputy and unit and the MT has observed AV station captains discussing those statistics in management meetings. The LASD's CMF/RMF data also contains stops and search trend information for AV stations, information that is reviewed by LASD managers and executives. Sustained compliance requires the LASD to continue collecting parole and probation search information and formalizing a process to document assessments of this data via the stops dashboard.

The MT finds compliance has been achieved with SA paragraph 56 on the basis of four 2024 AAB audits[10] finding that deputies have the required knowledge of the parole and probation conditions prior to conducting the search.[11] MT has also noted the pre-search knowledge of status for home-based searches related to probation or parole checks by the specialized Parole Compliance Team working in the AV.

*d. Home-Based Searches*

- LASD is now in compliance with SA paragraph 52d, which requires deputies notify a supervisor before conducting a home-based search.
- LASD remains in partial compliance with SA paragraphs 53 and 55 and compliance with 54, which address appropriate conduct of home-based searches.

With regard to Section 8 housing–related searches, the Department remains in compliance with SA paragraph 52d and sustained compliance with 54. With regard to other types of home-based searches, the MT was unable to assess this provision in its 2023 stops audit due to insufficient data. LASD still needs to improve how it tracks when deputies notify a supervisor prior to a home-based consent search, but AAB audits found no violations and the MT has not observed any violations of this provision in ad hoc reviews. The MT notes home-based searches are rare and mainly occur related to probation and parole checks, which are planned in advance with supervisor approval.

*e. Supervisory and Management Reviews and Oversight*

- LASD remains in partial compliance with SA paragraphs 58 and 62, which require additional stops accountability practices and, specifically, that AV station commanders and supervisors track repeated violations and deficiencies and any corrective action taken.

---

[10] Audits 2024-11, 2024-15, 2024-30, and 2024-63, published May 5, 2025.

[11] The most recent mini-audit reviewed 20 stops involving probation and parole searches across both AV stations (LASD AAB Audit 2024-63-A). The SA requires a deputy conducting a probation or parole search to have knowledge of the probation or parole conditions, document the search conditions, and verify the search conditions. The audit found 100% of the deputies had knowledge of probation or parole search conditions. The audit found 95% of deputies documented the search conditions. The audit found 100% of deputies verified the parole or probation search conditions prior to the search. All the categories met the required threshold of 90% compliance.

- LASD is now in partial compliance with SA paragraphs 59, 60, and 61, which require supervisors to review deputy stops documentation in reports and citations and at least one CAD log per deputy per week and to appropriately address all violations and deficiencies.

- LASD is also now in partial compliance with SA paragraph 63, which requires that supervisors and commanders are held accountable to SA paragraphs 58–62.

The AV stations are in partial compliance with SA paragraphs 59, 60, and 61. This has been determined based on several factors and findings. The MT 2023 Stops Audit found the Department in compliance with regard to reports and citations, but our audit and an AAB audit conducted in 2024 found that LASD-AV supervisors did not provide the required number of reviews, that the reviews that were conducted were insufficiently thorough, and issues identified were often not addressed.[12] Additionally, with supervisors not meeting compliance with regular or thorough reviews, this means it is highly likely that many errors and violations are not identified in the first place. The stations have processes for completing the necessary reviews and they are completed in some cases. The AV station captains have taken steps to improve compliance, including assigning administrative sergeants to conduct the requisite reviews, and there are indications their efforts are taking hold. As described above, LASD reports it is developing a semi-automated system for supervisors to review SACRS data in place of CAD which, when implemented, will assist in conducting the routine reviews required for compliance. We also note that other processes involve reviews and corrective action regarding stops, such as Performance Log Entries (PLEs), PMP reviews, BWC activation compliance and other audits, and investigations of complaints and uses of force, although these processes do not address all violations or corrective action.

Regarding SA paragraph 63, the MT stops audit found the Department had failed to institute thorough and reliable practices whereby divisional managers hold unit commanders accountable, and station managers hold supervisors accountable to SA stops review requirements. As described throughout this section, since the assignment of two station captains the MT has observed increased accountability at all levels of command including the prioritization of effective supervisory review. For compliance, LASD will need to ensure oversight processes are in place and documented by and through the chain of command.

6. <u>Body-Worn Camera Policy and Reviews by Station Supervisors</u>

LASD scrutinizes BWC footage as part of regular reviews of use of force and complaints, through audits conducted by the AAB, when a supervisor determines the need to review BWC as part of their approval for an incident report or other document, and in the course of brief reviews to ensure deputies properly

---

[12] In 2024, the AAB only conducted one audit of the SA supervisory and management provisions for Stops (SA Provisions 58-63). This was a significant undertaking for AAB, and the audit found low levels of compliance in many areas. The AAB Supervisory Audit was explained in detail in the MT's 19th Semi-Annual Report. In short, the auditors found supervisors were not conducting the required DDWS reviews, there were shortfalls with CAD collecting the stops data, and a lack of systems to ensure repeated violations during stops by LASD deputies. Since the audit findings were reported, the AV station captains implemented increased management oversight of these requirements and the station captains believe they have taken appropriate measures to address the issues.

activate their cameras in accordance with policy. However, current LASD policy does not allow for random review of stops for supervisory review purposes. Audits and reviews conducted by the MT, DOJ, and the AAB have all shown the value of random review of stops. Supervisors at the stations should also have the ability to review random stops. We understand that a revised BWC policy has been developed that will address this shortfall and is currently in the meet and confer process with labor unions. The MT stresses the importance of this policy and urges timely approval and implementation.


7.   Progress Toward a Culture of Accountability and Management Oversight

The Department's is now in partial compliance in all of the supervisory review provisions and there are many signs that compliance will be reached soon. In fact, there are numerous indicators that management review and oversight functions are improving with regard to the stops and bias-free policing sections as well as others such as use of force, complaints, and accountability.

Along with the more ready access to multiple dashboards of current stops and risk information, a number of behavioral changes are contributing to a stronger culture of accountability at the stations, including:

- Captains clearly messaging the importance of the regular conduct of proper reviews and of taking corrective action when appropriate,
- Captains personally training and mentoring staff in how to conduct proper reviews,
- Captains holding lieutenants and sergeants accountable to holding their direct reports accountable,
- Supervisors and lieutenants conducting better reviews of high-risk events and holding deputies accountable for related issues,
- Supervisors and managers conducting better investigations of force and complaints,
- Managers conducting better PMP reviews,
- Supervisors conducting more regular reviews of BWC and, as described below, LASD has developed a new BWC policy to allow for more regular and random sampling of videos by supervisors.

The captains have continued to use the stops dashboards to understand the enforcement activities of staff. In one instance at a station crime meeting, the station captain noted BSDs are down overall, but supervisors still need to ensure deputies are adequately recording and documenting their BSDs. In a meeting with a station captain, they opened up the dashboards and discussed the activity of specific deputies. Although the stations are still realizing the full capabilities of the dashboards, the captains are using them to review the activities of staff. The station captains are also providing application developers with specific recommendations to improve the usefulness to station commanders. These changes will be implemented and made available to other AV stations. These efforts will continue to build institutional capacity to ensure documents are reviewed thoroughly and improvements are implemented where necessary.

The AV station captains have been fully engaged with the Audit and Accountability Bureau's numerous stops audits. The captains have worked to put systems in place to correct the identified issues and

shortfalls in compliance. The audits have resulted in station level changes in review practices, additional training for deputies, and meetings with specific deputies to provide very specific feedback. It is not easy to be under constant audits, but the AV captains have embraced the audits as important to their overall strategy for improvement at the stations. This effort on the part of the AV captains has led to increased compliance across the stops requirements.

Recent supervisory reviews of uses of force and pursuits more thoroughly review the entire event, which has implications for not just risk management issues but for routine deputy patrol activities. Supervisors clearly outline the positive and negative aspects of the incident as well as the steps they have taken to address issues with the deputies. As the quality of reviews has improved via increased scrutiny by supervisors, the deputies appear to be more diligent in explaining their reasoning for the initial stop or contact. Deputies now know that the justification for the stop and other important elements of the contact will be scrutinized as part of other reviews of their activity. SA paragraphs 58–63 require more regular review of deputy performance during all kinds of stops, not just those involving force or pursuits, but this represents a noticeable shift in behaviors and an indication of the captains' efforts to establish a culture of accountability at the stations.

Finally, the AV station captains have continued to provide thoughtful review of use of force, pursuits, and other reports. In a recent site visit, MT discussed the station review process with the captains. The station captains all noted there has been a significant shift in accountability. The supervisors at the line level identify and address substandard performance, areas for improvement, and even instances of exemplary actions on the part of the deputies. The station captains provided examples of improvement in the reports. Notably, the use of force section provides details of a recent MT audit to support this observation. In the past, critical comments were identified and added at the captain's level of review. The sustained commitment to review and accountability by the station captains is evidence of a shifting culture towards professionalism and accountability.

8. <u>Crime Reduction Strategies</u>

*a.   Incorporating Crime Strategies into Station Processes*

In 2024, the AV captains developed strategic plans for their respective stations which focus on crime reduction. This was the first time since the inception of the SA that the AV stations actually developed formal plans to comply. The MT provided technical assistance throughout the process. As discussed in several previous MT reports, these plans were necessary because they identify clear priorities and expectations relative to crime reduction tactics and community engagement expectations for all staff. In this reporting period, the AV station captains reported significant progress in the implementation of their strategies. As discussed below, they have instituted regular discussions of priorities during roll call briefings and regular meetings amongst station leadership to coordinate efforts and adjust strategies as necessary. They also include updates on these priorities and plans during divisional CMF meetings. To assess the progress on implementing their respective crime reduction efforts, the MT conducted site visits in the AV and has observed station staff meetings, roll call sessions, and CMF/RMF meetings.

The Palmdale station now has regular meetings with lieutenants and sergeants to discuss their goals and ongoing progress in the implementation of their strategic plan. In these meetings, the station

captains are provided updates from staff and have detailed conversations about crime trends, tactics being employed and their effectiveness. The station captains have assigned staff to document the proceedings of each meeting and use that information to follow up on items in subsequent meetings. In a Palmdale meeting observed by the MT, the captain discussed the findings of AAB audits of stops and stressed the importance of thorough documentation of stops as required by LASD policy so the Department can fully track and assess station practices. The group also discussed options for efficient and effective tracking of station activities in support of specific crime reduction priorities. For example, a sergeant present suggested a CAD entry could be made to document any work on station crime priorities by deputies in the field, and the CAD information could be put into a regular report.

The Lancaster station also has regular internal crime meetings to discuss their efforts. They also began documenting their meetings during this reporting period. In a Lancaster station meeting observed by the MT, the operations captain used the meeting to discuss crime trends and priorities for the stations and to coordinate efforts for the subsequent month. The station community policing deputies discussed their projects and outreach activities. The captain stressed the need to use the SARA process to address larger crime trends.

These types of discussions and problem solving activities at both stations are important components in their efforts to reduce crime and improve their responsiveness to community concerns and priorities.

### b. Gathering Community Input

In addition to direct contact during community engagement activities, both of the AV stations use surveys to gather feedback from the community. The station captains solicit feedback from the community and utilize such data and information when developing their crime priorities. The surveys are accessible via a QR code link and advertised through LASD social media, posted in the stations, and shared at community meetings. This survey program, created in the AV, has now been applied across all LASD contract cities. (See also the Community Engagement section below.)

### c. Virtual Deputy Program

Additionally, AV stations have also instituted a virtual deputy program. This program was created by the captains at the Palmdale Station in response to community concerns about the long wait times the public experiences having their calls for service handled. The program is meant to provide another venue for community members to reach out to the Department with reports of some types of crime, safety concerns, and other non-emergency issues and questions and to free up deputies to respond to more urgent calls in the field. The system can also be used to provide input to the station on community concerns and priorities, although complaints are submitted through a different process. The deputies have taken numerous reports from community members. LASD reports the meetings have been very effective, especially when taking time-consuming identity theft or financial crime cases. This has helped free up time for patrol deputies to respond to urgent and priority crimes. Based on the program's success in the AV, other LASD patrol stations will begin offering this service. This is another

example of the AV station's improvements and innovation, providing a great example for all LASD stations.

*d.   Use of SARA Process*

Over the years, the MT has provided significant levels of technical assistance to LASD on the implementation of the SARA process, which is utilized to address ongoing criminal activity and repeat calls for service at specific locations and when dealing with individuals who are repeat offenders or victims. We now see evidence of the SARA process being used more widely at AV stations. The stations have created written plans for each of the SARA projects. In the station's crime strategy meetings described above, SARA projects are identified and updates provided, and AV captains continue to discuss their use of SARA during the CMF meetings. Other stations in the NPD are also doing this, so the use and documentation of the SARA process has become a key feature when conducting routine assessments of the stations' crime reduction strategies. Among other benefits, this allows the captains to track the progress of the plans, to improve upon their conduct and effectiveness, as needed, and to assess whether they may have unintended consequences, such as a potentially adverse impact on fair treatment and community trust (see preface to SA Stops section and Paragraph 68).

9.   Next Steps

*a.   LASD*

- Finalize the BWC policy.
- AAB will complete audits using the approved 2025 Audit Work Plans. The audits will continue to be posted on LASD's website for transparency.
- Continue to refine and implement strategic plans/crime reduction strategies at AV stations. The AV stations will continue to hold regular bi-weekly or monthly crime meetings to discuss progress on these strategies.
- Update training and practices as needed based on the ongoing audits by AAB; keep DOJ and MT updated on progress in this regard, and, when appropriate, submit documentation for feedback and compliance assessment.
- Provide updates on the implementation of external CRI-TAC training recommendations.
- Provide additional training to managers and supervisors in the use of the new stops dashboards. Ensure new managers and supervisors assigned to the AV stations receive the necessary training to use the dashboards.
- Ensure recommendations from stops audits are reviewed to ensure station managers and supervisors consistently conduct the stop reviews required under Paragraphs 58–63.
- Create and implement a process to audit deputy stops using the SACRS system as a replacement of the existing DDWS process to meet the requirements of Paragraph 59.
- Continue work to incorporate data into daily processes, including modernizing data systems, implementing data dashboards and early intervention systems, and follow through with the application and utilization of the SARA problem-solving model in the AV stations and in the CMF.

- Provide the MT and DOJ with analysis plans, updates to progress, and any further reports completed by CPE. Inform us of plans for future work, and LASD's response to recommendations.

b. *The MT*

- Complete a focused review of the work of the Parole Compliance Team who conduct stops and enforcement in the AV and provisions not addressed in the MT stops audit, particularly home-based searches.
- Provide timely reviews and feedback on documents submitted by the Department to the MT.
- Provide technical assistance on the implementation of crime reduction strategies in the AV and the use of data to assess the effectiveness of the strategies.
- Review any new training curricula and observe sessions.
- Continue to participate in meetings and provide technical assistance on data systems, dashboards, data analysis, and application to practice.
- Conduct station observations and ride-alongs in the AV to observe activity and performance of deputies and supervisors in the field.

10. <u>Stops Compliance Status Table</u>

Table 1 provides the compliance status for each paragraph in the Stops section.

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| **STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **41** | Stops and detentions are based on reasonable suspicion. | Yes 05/15/17 | Yes 01/01/24 | Yes 09/01/23 | Yes 6/30/25 |
| | **Notes:** The MT 2023 stops audit showed the Department is in compliance with this provision and Paragraph 43. The MT audit, AAB 2024 mini-audits, and other MT reviews have found no issues with this provision or with Paragraph 43. See the discussion text for a more detailed discussion of compliance. The delivery of the training is measured in SA Paragraphs 57, 70, and 71. | | | | |
| **42** | Elements of procedural justice are incorporated into training. | NA | Yes 01/01/24 | Yes 12/24 | No |
| | **Notes:** The principles of procedural justice are incorporated in the eight-hour bias-free policing training. The delivery of the training is measured in Paragraph 70. The MT audit and the first round of AAB mini-audits found poor results for this provision, but the second round of mini-audits later in 2024 found significant improvement. See the discussion text for a more detailed discussion of compliance. | | | | |
| **43** | LASD-AV does not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation as a factor in establishing reasonable suspicion or probable cause, except as part of actual and credible description(s) of a specific suspect or suspects. | Yes 05/15/17 | Yes 01/01/24 | Yes 09/01/23 | Yes 12/24 |
| | **Notes:** See Paragraph 41. | | | | |
| **44** | Stops are accurately and thoroughly documented in MDC patrol logs. | Yes 05/17/17 | Yes 08/16/18 | Yes 04/2025 | No |
| | **Notes:** LASD has upgraded the SACRS data collection system to capture all the elements of this paragraph, bringing the Department into compliance. Some of the qualitative aspects of this provision are measured in other paragraphs (e.g., sufficiency of BSD narratives is measured in SA 47, accuracy of the data via SA 63 and 142). | | | | |
| **45** | Accurate and specific descriptive language (non-boilerplate) is used in reports. | Yes 05/03/16 | Yes 08/16/18 | Yes 09/01/23 | No |
| | **Notes:** The MT stops audit showed the Department is in compliance with this provision. | | | | |
| **46** | Efficacy and impact on the community of searches based on probation and parole are assessed. | NA | NA | Yes 06/2025 | No |
| | **Notes:** LASD has periodically produced tabulations of statistics related to the number of parole and probation searches. The Department has created dashboards for the AV commanders to monitor the use of parole and probation searches. The MT has seen evidence of AV commanders discussing this information in management meetings. | | | | |

| TABLE 1<br><br>STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **47** | Backseat detentions require reasonable suspicion and reasonable safety concerns. | Yes 05/15/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** The MT stops audit showed the Department was in partial compliance with this provision with regard to implementation. The switch to using SACRS has increased reliability of the AAB audits, which have found improvement on the part of LASD-AV deputies as well as fewer BSDs overall. | | | | |
| **48** | Backseat detentions are not conducted as a matter of course during routine traffic stops or domestic violence situations. | Yes 05/17/17 | Yes 08/16/18 | Partial | No |
| | **Notes:** The MT stops audit showed the Department was not in compliance with BSDs in traffic stops, and the MT was unable to assess BSDs related to domestic violence calls due to insufficient data. However, the change to using SACRS data and AAB's extensive search of the stops data to increase the likelihood of identifying all the BSD occurring at domestic calls has made assessment more reliable. AAB's subsequent mini-audits of stops involving a BSD found improvement on the part of AV deputies. | | | | |
| **49** | Deputies respond to complaints about backseat detentions by calling supervisor. | Yes 05/15/17 | Yes 08/16/18 | Yes 06/2025 | No |
| | **Notes:** The MT has not seen cases in violation of this provision in stops audit, complaints audits, and other MT observations and reviews. There is no specific tracking method currently available to determine if LASD deputies summon a supervisor to the scene for complaints about backseat detentions, but LASD is working on a way to track these cases if they arise. | | | | |
| **50** | Deputies do not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s). | Yes 05/17/17 | Yes 01/01/24 | Yes 06/2025 | No |
| | **Notes:** This provision refers to discretionary searches, which include consent searches and other types of searches (e.g., home-based probation or parole searches). MT and AAB audits did not find violations of this provision. The use of SACRS to track all searches will greatly enhance the reliability of the audit findings and the SACRS management dashboards will also provide station leadership with the ability to regularly monitor search activity by AV deputies. | | | | |

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| **STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS** | | | | | |
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **51** | Deputies do not conduct arbitrary searches. | Yes 05/17/17 | Yes 08/16/18 | Yes 06/2025 | No |
| | **Notes:** In previous periods, the MT was unable to assess the full provision regarding all discretionary searches due to insufficiencies in the data, primarily because CAD can only list a single search reason so all consent searches cannot be reliably identified and not all types of searches are included, e.g., home-based searches. The use of SACRS to track all searches will greatly enhance the reliability of the audit findings and the SACRS management dashboards will also provide station leadership with the ability to regularly monitor search activity by AV deputies. | | | | |
| **52a** | Deputies equipped with BWCs record requests for consent to search. | Yes 05/03/16 | Yes 08/16/18 | Partial | No |
| | **Notes:** The MT stops audit showed the Department was not in compliance with the requirement that deputies record the request for a consent search and the response. The AAB mini-audits have found improved compliance as it relates to deputies' requirements for consent searches. The use of SACRS to track all consent searches will greatly enhance the reliability of the audit findings. The MT will continue to monitor compliance with this provision. | | | | |
| **52b** | Individuals with limited English proficiency (LEP) are informed in an appropriate non-English language. | Yes 04/08/18 | Yes 08/17/18 | Yes 12/2024 | No |
| | **Notes:** LASD implemented the SA-compliant LEP plan on April 8, 2018. The Department was found in compliance based on previous complaint reviews, ride-alongs, and community input. Moving forward, better tracking of instances where translation services are requested in the field would facilitate more efficient monitoring of this provision. The use of SACRS to track all searches will greatly enhance the reliability of the audit findings, because there is a specific field to capture non-English speakers stopped by AV deputies. | | | | |
| **52c** | Outreach is conducted about the right to refuse or revoke consent. | NA | NA | Yes 02/2019 | Yes 02/2020 |
| | **Notes:** This requirement was completed with the CACs' assistance and a brochure that is written in English and Spanish. | | | | |

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **TABLE 1** <br><br> **STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS** | | | | | |
| **52d** | Supervisors are notified before home-based searches. | Yes 05/15/17 | Yes 08/16/18 | Yes 06/2025 | No |
| | **Notes:** With regard to Section 8 housing–related searches, the Department is in compliance with this provision. With regard to other types of home-based searches, the MT was unable to assess this provision in its stops audit due to insufficient data. Although LASD does not track home-based consent searches, the MT did not observe any violation of this provision. In communications with LASD personnel at the stations, they have consistently reported not being involved in or aware of any home-based consent searches. LASD is exploring ways to track home-based consent searches. The delivery of the training is measured in SA Paragraph 57. | | | | |
| **53** | A reasonable number of deputies are present at a search. | Yes 05/03/16 | Yes 08/16/18 | Partial | No |
| | **Notes:** With regard to Section 8 housing–related searches, the Department is in compliance with this provision. With regard to other types of home-based searches, the MT was unable to assess this provision in its stops audit due to insufficient data. Although LASD does not track home-based searches, the MT did not observe any violation of this provision during site visits, reviews of body camera footage. Additionally, the AAB audits of stops have not observed any violations of this provision. The delivery of the training is measured in Paragraphs 57 and 70. | | | | |
| **54** | Section 8 compliance checks require articulated safety concerns. | Yes 03/14/18 | Yes 08/16/18 | Yes 05/2019 | Yes 02/2022 |
| | **Notes:** LASD-AV included this requirement in policy and training and continues to be in implementation compliance based on the lack of any indication of housing-related enforcement activity. See the Housing section for more information. The delivery of the training is measured in Paragraphs 57 and 70. | | | | |
| **55** | During home searches, individualized suspicion or probable cause determines who, besides the subject of search, is subject to detention or search and for how long they are detained. | Yes 05/03/16 | Yes 08/16/18 | Partial | No |
| | **Notes:** MT determines LASD to be in partial compliance because in ad hoc reviews of stops data, ride-alongs, community input, and BWC video, the MT did not observe violations of this provision but was unable to assess this provision in its stops audit due to insufficient data. The MT has not observed instances of home-based consent searches, but LASD does not track when there are instances of these searches. The parties will meet in the next reporting period to determine a clear path forward for compliance. The delivery of the training is measured in Paragraphs 57 and 70. | | | | |

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **56** | Probation and parole searches are carried out only when search conditions are established and in accordance with the Stops section. | Yes 05/15/17 | Yes 08/16/18 | Yes 06/2025 | No |
| | **Notes:** The MT finds compliance due to AAB mini-audits finding improved compliance and the MT has not seen violations of this provision. MT has noted the pre-search knowledge of probation or parole status for home-based searches related to probation or parole checks. The use of SACRS will enhance LASD's ability to identify and audit stops involving parole and probation searches. | | | | |
| **57** | Constitutional policing training is provided. | NA | Yes 06/14/17 | Yes 06/2022 | Yes 03/2024 |
| | **Notes:** The Department has been in compliance with delivery of this training since August 16, 2018, for deputies assigned to the AV stations, and since June 14, 2022, for embedded deputies from specialized units. The outcome of this training is measured through the practice provisions of this section of the SA. In response to issues apparent in recent audits, reviews, and observations, the Department is conducting an assessment and may implement revisions to how the constitutional policing principles will be delivered to staff. | | | | |
| **58** | Additional accountability and supervision to ensure unlawful stops and searches are detected and addressed. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** Outcomes for the policy required under this paragraph are addressed in SA Paragraphs 59–63, most of which the MT stops audit found to be out of compliance. A recent AAB mini-audit of the requirements from this provision found significant shortfalls. As noted in other sections, the MT has serious concerns about LASD's use of CAD data as the primary source to audit deputy stops. The Department will need to develop and implement a reliable process for meeting the requirements of Paragraphs 58–63 and then train supervisors and managers. | | | | |
| **59** | Supervisors review CAD logs. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** The MT and AAB audit found that LASD-AV supervisors did not provide the required number of reviews, and the reviews that were conducted were insufficiently thorough. The AV Station Captains reported taking steps to ensure the required reviews take place. In this reporting period, LASD switched to SACRS to document stops to capture the required SA information. LASD continued to review CAD stops but will be implementing a semi-automated system for supervisors to review SACRS data in place of CAD. This will significantly assist LASD in ensuring stops reports will be consistently tracked and available for review by supervisors. The MT has observed supervisors reviewing CAD logs during site visits. | | | | |
| **60** | Supervisors review justification for stops and searches. | Yes 05/03/16 | Partial | Partial | No |

| TABLE 1<br><br>STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| | **Notes:** The MT and AAB audit found that LASD-AV supervisors did not provide the required number of reviews, and the reviews that were conducted were insufficiently thorough. The AV Station Captains reported taking steps to ensure the required reviews take place. In this reporting period, LASD switched to SACRS to document stops to capture the required SA information. LASD continued to review CAD stops but will be implementing a system for supervisors to review SACRS data in place of CAD. This will significantly assist LASD in ensuring stops reports will be consistently tracked and available for review by supervisors. The MT has observed supervisors reviewing CAD logs during site visits. The MT also observed watch sergeants at the AV stations conducting reviews of all reports and citations. Supervisors also review stops as part of other processes; such as complaints, BWC activation compliance audits, and use of force cases. | | | | |
| **61** | Supervisors and station commanders address all violations and deficiencies in stops and searches. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** The MT stops audit found that appropriate corrective action was taken in 32 (91%) of 35 cases where supervisors identified errors, which is below the approved 95% compliance metric. The AAB found improvement at one of the AV stations, but shortfalls remain. The MT has observed supervisors reviewing CAD logs during site visits. The MT also observed watch sergeants at the AV stations conducting reviews of all reports and citations. Supervisors also review stops as part of other processes, such as complaints, BWC activation compliance audits, and use of force cases. LASD has documentation to show how they address violations when a supervisor completes some type of report about an incident, a Performance Log Entry (PLE), and/or a review of a deputy's work as part of the PMP process, but they do not track all instances of addressing deficiencies in stops and seizures. | | | | |
| **62** | Supervisors and station commanders track repeated violations of this SA and take corrective action. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** The MT stops audit found that the Department has various processes in place to track repeated violations, but those processes are not thorough or effective. AV station captains have been providing leadership and clarity about their expectations for LASD-AV deputies. The MT has suggested LASD determine a uniform way to track repeated violations of SA provisions and corrective action taken as a result. | | | | |
| **63** | AV supervisors and commanders are held accountable for reviewing reports and requiring deputies to articulate sufficient rationale for stops and searches under law and LASD policy. | Yes 05/03/16 | Partial | Partial | No |
| | **Notes:** The MT stops audit found the Department has failed to institute thorough and reliable practices whereby divisional managers hold unit commanders accountable, and station managers hold supervisors accountable. Since the assignment of two station captains, the MT has observed increased accountability at all levels of command. The captains' expectations for supervisory review are more clear and in more recent observations at the stations and in reviews of reports, the MT has observed sergeants and lieutenants have often independently identified and addressed issues early in the process, which was rarely seen in the past. LASD will need to ensure the station practices and tracking adequately document the reviews completed by the supervisors and lieutenants. | | | | |

#### C. Bias-Free Policing

In this reporting period, the Department made progress regarding the SA provisions related to bias-free policing, especially in the area of data analysis and review. (Several bias-free policing provisions align with those in the Stops section and have been discussed there.) At this point in time LASD has achieved partial compliance with SA Paragraph 67. LASD is now in partial compliance or sustained compliance with all of the SA Bias-Free Policing provisions.

1. Training

*a. Bias-Free Policing Training*

- The Department remains in sustained compliance with the full-day bias-free policing training (SA Paragraph 70).

LASD continued to be in sustained compliance for providing the full-day bias-free policing training during this period for LASD-AV deputies and embedded units. The course was provided by LASD on March 13, 2025 and maintained the Department's status as having over 95% of AV personnel trained.[13]

*b. Quarterly Refresher Roll Call Training*

- The Department is now in sustained compliance with quarterly roll-call trainings (SA Paragraph 71).

In this reporting period, LASD moved to sustained compliance with the requirement to provide AV deputies with quarterly refresher roll call training addressing constitutional policing, bias-free policing, and housing requirements (SA Paragraph 71). As detailed in the stops section, LASD provided the approved roll call training scenarios for LASD-AV deputies in 2024. The Department has also contracted with an external vendor to provide updated briefings moving forward, which was necessary to maintain sustained compliance.

*c. Consultation with External Experts*

- The Department remains in compliance with SA paragraph 65.

SA paragraph 65 requires the LASD to consult with outside experts on bias-free policing and related topics. This can be accomplished in a variety of ways, such as by hiring an outside expert to review LASD curriculum and provide their recommendations, or by attending outside training courses on

---

[13] Roll call training delivery and attendance is reported quarterly, but compliance is assessed annually based on the calendar year. In the past, the MT cross-checked training attendance rosters to station rosters in order to verify deputy training attendance, but the MT has now found the LASD tracking methods to be reliable for that purpose. The MT will no longer conduct its own verification processes on the constitutional policing, bias-free policing, or roll call trainings unless there are indications that further review is needed.

bias-free topics and considering related additions or changes to improve LASD courses. Compliance with this provision has been established through several avenues. The Department has continued engaging the Center for Policing Equity (CPE) to assist in this area. LASD has also been utilizing resources provided by USDOJ's COPS Office through their CRI-TAC (technical assistance) program and incorporating recommendations provided to them. As reported in the Community Engagement section below, LASD has incorporated a curriculum developed by California POST into its community engagement training. Also, OCP and station community engagement personnel attendance at the Professionalizing Law Enforcement – Community Engagement Training conference in 2024 and plans to attend in 2025. Sustained compliance will require efforts like these to continue.

2.  Deputy Communication with LEP Individuals

- The Department remains in compliance with SA paragraph 66.

SA paragraph 66 requires LASD provide effective communication and access to services for all AV community members, including LEP individuals. The Department implemented a DOJ and MT approved LEP plan in 2018. In MT audits for stops and complaints, direct observation in ride alongs, and through input from community members, the MT has not found evidence of systemic issues related to communication and access to services. Recordation of stops in SACRS includes tracking when translation services are requested, which will assist the Department in identifying and reviewing the outcomes of those instances moving forward. For sustained compliance, the MT will assess whether the LASD-AV stations have conducted reviews of these cases and whether any significant and unaddressed issues have arisen.

3.  Equal Protection

- The Department remains in partial compliance with SA paragraph 64.

SA paragraph 64 states:

> *In conducting its activities, LASD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies shall not initiate stops or other field contacts because of an individual's actual or perceived immigration status. (Paragraph 64)*

SA paragraph 64 is a foundational requirement of the SA. It requires the Department ensure all law enforcement-related actions by LASD personnel are conducted according to the Constitution and are applied equally regardless of individual characteristics like gender, age, race/ethnicity, national origin, religion, or sexual orientation. This applies to all activities including but not limited to stops and enforcement, community engagement, uses of force, and receiving and investigating complaints. Because it is an overarching and critical feature of the SA, compliance with this provision depends on monitoring and evaluating 1) the conduct of individual stops and calls for service as well as 2) examining patterns and trends across a broad range of law enforcement activities that are routinely

conducted. Compliance with SA paragraph 64 thus requires compliance with numerous other provisions in this and other SA sections. LASD is in partial compliance with SA paragraph 64 because it has reached compliance with several important related provisions, including SA paragraphs 41 (reasonable suspicion for stops), 46 (efficacy of probation and parole searches), 50 (legal searches), the training provisions 57, 70, and 71, receiving community input (87 and 88), and 110-123 (UOF data analysis). However, supervisory review (SA paragraphs 58-63), data analysis provisions (68, 82-86), responding to UOF trends (117), and accountability and PMP (141, 143, 144) will need to improve for the MT to determine compliance for SA paragraph 64. One of the key purposes of each of those provisions is to identify and address any concerning trends in deputy or unit activities that may violate the Constitutional protections in SA paragraph 64.

Importantly, the Department remains in compliance with the second part of SA paragraph 64 which prohibits AV deputies from stopping a person based on their actual or perceived immigration status. The MT has not observed any violations of this SA requirement during ride alongs or in document reviews. As discussed later in Community Engagement section of the report, the LASD has increased efforts to engage with Spanish-speaking immigrant communities in response to community concerns and fears around current immigration issues.

4.  <u>Disparity Analysis</u>

- The Department remains in partial compliance with the provision that requires an annual review and assessment of their programs, initiatives, and activities for any possible disparate impact (SA Paragraph 68).

LASD continues to make progress toward having the capacity and processes in place to meet SA paragraph 68. We note that much of the discussion above surrounding SA paragraph 64 also applies to paragraph 68.[14] As the MT has expressed throughout the monitoring process, SA paragraph 68 does not require extensive data analysis of every station activity. Some practices do require such analysis, but others can be assessed more informally, such as through contextual review of the nature and scope of the activities or through station managers' use of dashboards.[15] Each of these approaches will require ongoing attention by station leadership and a willingness to objectively examine data and consider community feedback in order to identify and discuss possible disparities or other issues. The parties continue to discuss the level of review necessary and documentation that is required.

In the last reporting period, LASD received a completed report from the Center for Policing Equity (CPE) with the findings of their disparity analysis. The report does not address <u>all</u> programs, initiatives, and activities at the AV stations but it does include analysis of some of the most important policing practices. The report analyzed LASD deputy stops, calls for service, and use of force in the AV. In this reporting period, LASD provided CPE and the parties with their comments and feedback to the CPE

---

[14] To meet SA requirements for the Data Collection and Analysis section, these types of analyses will need to be done on a semi-annual basis.[14]

[15] The plan for semi-automated processes to assist station review of stops and other data described in Stops can also contribute to compliance with SA paragraphs 64 and 68.

report. The MT looks forward to reviewing LASD's plans for next steps, including the incorporation of community input on the findings.


5.    <u>Incorporation of Bias-Free Policing Requirements into Personnel Evaluations</u>

- The Department is now in partial compliance regarding the incorporation of bias-free policing and equal protection requirements into the personnel performance evaluation process (SA Paragraph 67).

While some requirements for SA paragraph 67 have not been achieved, the MT has noted progress by the Department to hold deputies accountable for practicing bias-free policing and ensuring equal protection of all people in the AV community. The Stops, Complaints, Use of Force, and Accountability sections contain and discuss more details on these developments, including observations about improved reviews of deputy and unit performance by station captains, lieutenants, and sergeants, improved reviews through the revised performance mentoring program, and an evolving culture of improved performance and accountability at the stations. To reach compliance here, the LASD will need to develop and implement a policy or guidelines for performance appraisals that will establish how LASD performance assessment processes and practices can integrate these requirements as a regular part of each deputy's performance appraisals.


6.    <u>Next Steps</u>

a.    *LASD*

- Continue to provide the required full-day bias-free policing training and quarterly roll call briefings.

- Implement the new system for quarterly roll call training.

- Continue to consult with experts on stereotypes or bias and to ensure that LASD training, including the new Community Engagement training, provides clear guidance to AV deputies on influences of bias and stereotype threat.

- Keep the MT and DOJ advised of progress and confer as appropriate on the training development process. For all training related to the SA, the Department will provide course materials for DOJ and the MT to review and approve prior to implementation.

- Continue working with CPE to meet the objectives identified in their scope of work related to stops activities and community work. The Department will provide updates, analysis plans, and reports to the MT and DOJ for review and discussion.

- Continue to provide documentation to the MT and DOJ showing how data are used to evaluate and inform practice and respond to any identified disparities in enforcement when warranted.

- Continue to refine and train LASD-AV managers and supervisors on the use of the new internal dashboards.

*b. The MT*

- Provide TA to LASD for the effective use of data and analysis to assess the work of deputies and crime reduction programs in the AV as required by the SA.
- Provide TA to LASD on proposed reporting to comply with the required SA data and law enforcement activity analysis.
- Continue to monitor compliance with the training provisions and provide review of new proposed training sessions.

7. <u>Bias-Free Policing Compliance Status Table</u>

Table 2 provides the compliance status for each paragraph in the Bias-Free Policing section.

| TABLE 2 | | | | | |
|---|---|---|---|---|---|
| **BIAS-FREE POLICING COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **64** | Members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies do not initiate stops or other field contacts because of an individual's actual or perceived immigration status. | Yes 05/15/17 | Yes 01/1/24 | Partial | No |
| | **Notes:** The MT 2023 stops and bias-free policing audit and subsequent AAB audits have found that the Department is in partial compliance with this provision based on there being no indication of recurring or systematic violations of this provision in the cases reviewed. The MT audit also found the Department to be in compliance with not using immigration status as a reason to initiate stops. However, full compliance assessment for this provision requires additional assessment beyond the audits, including quantitative and qualitative reviews of stops measured across multiple data sources and in LASD's required disparity analyses. | | | | |
| **65** | Museum of Tolerance and other experts are consulted on prohibited conduct, bias-free policing, implicit bias, and stereotype threat. | NA | NA | Yes 12/24 | No |
| | **Notes:** LASD has been working with CPE since March 2023 after the MT and DOJ agreed the Department could work with them instead of the Museum of Tolerance. With the CPE disparity assessment reports nearly finalized, the MT will be tracking how CPE and LASD work together to use the information to inform any changes to policy, training, supervision, and practice. LASD is also working with other external organizations for training and consultation purposes, including CRI-TAC consultants and training experts. | | | | |
| **66** | Effective communication and access to police services is provided to all AV members, including those with limited English proficiency (LEP). | Yes 04/08/18 | Yes 08/16/18 | Yes 12/24 | No |
| | **Notes:** LASD implemented the SA-compliant LEP plan on April 8, 2018. MT ride-alongs, reviews of complaints, and discussions with community have found the Department in compliance. Moving forward, better tracking of instances where translation services are requested in the field will facilitate more efficient monitoring of this provision. | | | | |

| TABLE 2 | | | | | |
|---|---|---|---|---|---|
| **BIAS-FREE POLICING COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **67** | Bias-free policing and equal protection requirements are incorporated into the personnel performance evaluation process. | Yes 05/03/16 | NA | Partial | No |
| | **Notes:** The Department is in partial compliance with this provision on the basis of increased attention being paid to deputy performance related to bias-free policing at the stations. A formal process for meeting this provision will need to be established, but in the meantime, with the implementation of the Stops dashboards, LASD AV station captains have begun to use stops information while interacting with staff and providing feedback on their performance. This type of information is also reviewed and documented as part of PMP processes. LASD continues to develop their awareness and use of the data. | | | | |
| **68** | All LASD-AV programs, initiatives, and activities are analyzed annually for disparities. | NA | NA | Partial | No |
| | **Notes:** LASD has new dashboards with stops, complaints, uses of force, and other sources for station commanders to use to assess potential disparities in the AV. LASD now has the foundation pieces to begin conducting these important assessments. LASD has yet to conduct the required analysis for each activity, but most interactions between deputies and the community happen during stops, so CPE's stops and UOF disparity assessment represents substantial progress on this provision. LASD has also made progress by discussing disparity in enforcement activity by deputies during the new CMF/RMF meetings, but much work remains to be done in this area with regard to ensuring all activities are reviewed and appropriate corrective action is taken when warranted. | | | | |
| **69** | Annual organizational culture and climate study, including using experts and the Community Survey to study organizational climate and culture in the AV station to aid in developing the requirements of this section. Personnel will be allowed to confidentially provide information for the study. | NA | NA | Partial | No |
| | **Notes:** Deputy surveys have been completed twice. The parties are now discussing how this requirement can be effectively met with outcomes that are useful to the stations while also meeting SA intentions. (SA paragraph 69 and 72 were reported on in the Community Engagement sections of prior reports.) | | | | |
| **70** | Bias-free policing training is provided. | NA | Yes 08/16/18 | Yes 06/15/22 | Yes 03/13/24 |
| | **Notes:** The Department has been in compliance with the delivery of this training since June 15, 2022, for deputies assigned to the AV stations and for embedded deputies from specialized units. The outcome of this training is measured through the practice provisions of this section of the SA. Based on recent audits, case reviews, and training observations, the Department has made revisions and is currently reviewing the training and considering further revisions or replacement of training. | | | | |

| TABLE 2 | | | | | |
|---|---|---|---|---|---|
| **BIAS-FREE POLICING COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **71** | Quarterly roll call briefings on preventing discriminatory policing are provided. | NA | Yes 02/01/19 | Yes 01/01/24 | Yes 06/2025 |
| | **Notes:** Approved briefings began February 1, 2019, but were not delivered consistently until 2023. Compliance for this is measured annually. The Department met the requirements for providing the approved training throughout 2023. LASD has reached sustained compliance because they offered the training in 2024. | | | | |
| **72** | LASD agrees to use experts and a survey to study organizational climate and culture in the AV stations to aid in developing bias-free policing training requirements. | NA | NA | Partial | No |
| | **Notes:** See Paragraph 69. (SA paragraph 69 and 72 were reported on in the Community Engagement sections of prior reports.) | | | | |

**D.  Enforcement of Section 8 Compliance**

In February of 2022, the Department was deemed to have achieved sustained compliance with the SA housing provisions. With that determination, absent evidence to the contrary the MT will no longer monitor SA Paragraphs 73–80 and Paragraph 164 as it pertains to housing-related training.[16]

Training for this section is monitored via SA Paragraphs 70 and 71. The Department reached compliance for Paragraph 70 in 2022 and for Paragraph 71 in this reporting period.

1.  Housing Compliance Status Table

Table 3 provides the compliance status for each paragraph in the Housing section.

---

[16] Pursuant to the DOJ and LASD approval of MT SA Paragraph 150 Recommendation re. Housing Paragraphs 73–80 and 164 v2-28-22.

| TABLE 3 ENFORCEMENT OF SECTION 8 COMPLIANCE STATUS | | COMPLIANCE | | | | |
|---|---|---|---|---|---|---|
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED | PARAGRAPH 150 |
| 73 | New housing nondiscrimination (HND) policy is implemented. | Yes 2/23/18 | Yes 01/01/24 | Yes 05/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| 74 | All current deputies acknowledge receipt and understanding of HND policy. | Yes 2/23/18 | Yes 01/01/24 | Yes 5/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| 75 | All newly assigned deputies acknowledge receipt and understanding of HND policy within 15 days. | Yes 2/23/18 | Yes 01/01/24 | Yes 5/31/18 | Yes 09/14/20 | Yes 02/28/22 |
| 76 | Policies regarding the review of requests from a housing authority for deputy accompaniment are revised. | Yes 03/14/18 | Yes 01/01/24 | Yes 5/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| 77 | Accompaniment policy regarding LASD housing investigations is implemented. | Yes 03/14/18 | Yes 01/01/24 | Yes 05/15/18 | Yes 05/31/19 | Yes 02/28/22 |
| 78 | Deputies document all voucher holder compliance checks using Stat Code 787. | Yes 03/14/18 | Yes 01/01/24 | Yes 05/31/18 | Yes 05/31/19 | Yes 02/28/22 |
| | **Notes:** The Parties and MT agreed that if there was no indication that LASD participated in housing-related enforcement actions, including Section 8 compliance checks, they would be found in compliance with Paragraphs 78, 79, and 80. On this basis, the MT found the Department in compliance after review of several years of community input and Department documentation of stops, arrests, and other actions indicated no such actions occurred. | | | | | |
| 79 | Deputies document each independent investigation for fraud based on voucher holder compliance with the voucher holder contract using Stat Code 787. | Yes 03/14/18 | Yes 01/01/24 | Yes 5/31/18 | Yes 5/31/19 | Yes 02/28/22 |
| 80 | Deputies document housing-related activity using Stat Code 787 and do not inquire into an individual's Section 8 status. | Yes 03/14/18 | Yes 01/01/24 | Yes 05/31/18 | Yes 5/31/19 | Yes 02/28/22 |

**Table Notes:**

- The MT submitted a memo dated February 28, 2022, subsequently approved by the Parties, invoking Paragraph 150 for Paragraphs 73–80.

- The SA-mandated training related to housing is monitored in the bias-free policing training (Paragraph 70, in compliance) and the quarterly roll call training, Preventing Discriminatory Policing Parts A–G (Paragraph 71, in compliance).

**E. Data Collection and Analysis**

The requirements of the Data Collection and Analysis section run parallel to the data-related activities required to meet compliance with several other SA sections, including Stops, Bias-Free Policing, Use of Force, and Accountability. See those sections for further discussion.

1. Progress on Data Collection and Analysis Provisions

- LASD remains in compliance with SA Paragraph 81.
- LASD is now in compliance with SA paragraph 83a regarding reliable data.
- LASD remains in partial compliance with SA Paragraphs 82, 83b, 84, and 85.
- The Department is now in partial compliance with the reporting requirements in SA Paragraph 86.

The Department has continued to make progress in each of this section's subject areas, including continuing work to modernize and improve the reliability of its data systems; implementing and expanding the use of its internal stops dashboards and generally expanding its use of data and data analysis to drive self-assessment and decision making at the stations and NPD; and continuing its partnership with CPE, including the initial release of CPE data analysis reports for both stations.

Notably, LASD submitted a draft of the required semi-annual stops audit for MT feedback. The MT is reviewing the report and assessing whether all the variables required by SA paragraph 82–85 were analyzed and reviewed for potential disparities, that any potentially concerning trends are discussed along with remedies as required by the SA.[17]

In summary, progress in this reporting period included the following.

- Maintained compliance with the data collection requirement (SA Paragraph 81) and achieved compliance with the data reliability provision (SA Paragraph 83a) as a result of switching to SACRS and conducting reliability checks and audits of the data systems and correcting errors and systemic issues as needed.
- Continued to improve capacity to analyze and apply data to inform practice partial compliance with Paragraphs 83b and 85, signifying the Department is in partial compliance with all four provisions that require data analysis and the application of data to inform practice in this section.
- Continued to develop the station managers' use of the various recently developed dashboards for stops, force, complaints, and other risk management as well as administrative information.

---

[17] LASD will need to provide documentation of its analysis process, which should include: (1) analyses conducted (82a–g), (2) LASD interpretation of findings (e.g., What factors are contributing to the disparity? Are there alternatives? etc.), (3) any actions taken by the stations in response to the findings (e.g., briefings, training, policy revisions, supervision, mentoring, etc.), and (4) outcomes and lessons learned since the previous analysis. In the next reporting period, the parties will further discuss the content and format of the documentation.

- Reviewed reports and planned for the roll out of CPE's report on the results of regressions and other analyses conducted to assess whether LASD practices have a disparate impact on communities of color or other unintended impacts (SA Paragraphs 83b).

- Drafted a report on stops and detentions for the AV as required by paragraph 86 and submitted it for MT feedback.


2. <u>Next Steps</u>

- LASD will continue each of the activities described above related to data collection, data analysis, and the use of data to inform practice as part of this and other SA sections.

- In consultation with the MT and DOJ, LASD will develop reasonable methods for memorializing its various analyses, assessments, and resulting actions.

- LASD will publish the work resulting from the CPE partnership, develop plans for next steps regarding taking corrective action where needed and regarding additional or follow-up analyses, and engage with the community regarding the findings and next steps.

- The MT will provide feedback and technical assistance as appropriate.


3. <u>Data Collection and Analysis Compliance Status Table</u>

Table 4 provides the compliance status for each paragraph in this section.

| TABLE 4 |||||
|---|---|---|---|---|
| **DATA COLLECTION AND ANALYSIS COMPLIANCE STATUS** |||||
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** |||
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **81** | LASD collects data related to bicycle stops, backseat detentions, probation and parole stops and searches, consent searches, and vehicle impoundments. | NA | NA | Yes 12/24 | No |
| | **Notes:** LASD has been collecting the required data for several years. The approved plan to rely on SACRS data rather than CAD for recording and reviewing stops information will expand the thoroughness and usefulness of the data collected. To reach sustained compliance, the SACRS plan needs to be implemented and other current data collection processes need to be followed for another year. |||||
| **82** | LASD conducts semi-annual analysis of various data documenting stops, searches, seizures, backseat detentions, arrests, vehicle impoundments, uses of force, civilian complaints, and Section 8 voucher compliance checks. | NA | NA | Partial | No |
| | **Notes:** LASD has taken various steps toward compliance with this provision, including improving processes for gathering the needed data, establishing methods for stations to readily access and review data, and building capacity and expertise for using the data to inform practice. CPE has submitted a draft data analysis report for review and discussion, and the MT is reviewing it for compliance ramifications. Compliance will require that all data analyses laid out in Paragraph 82 are conducted at least semi-annually, whether through the CPE analysis or in some other way. |||||
| **83a** | LASD uses accurate, complete, and reliable data. | NA | NA | Yes 06/2025 | No |
| | **Notes:** Reliability of the CAD data has been an issue, but the switch to SACRS data addressed these concerns. The Department has established various checks on PDE and PRMS data reliability. For sustained compliance with data reliability, LASD will need to continue thorough internal data checks to include corrective action as needed. AAB and MT audits will continue to assess data integrity. |||||
| **83b** | LASD's semi-annual data analysis includes regressions, including appropriate controls, to determine whether law enforcement activity has a disparate impact on any racial or ethnic group. | NA | NA | Partial | No |
| | **Notes:** LASD partnered with CPE to conduct analysis and produce a report that includes regressions and other analyses to assess whether LASD practices have a disparate impact. The report is currently being reviewed by LASD and will be made public in the next reporting period. The MT is reviewing the report for compliance ramifications, including whether all 83a–d analyses were conducted as required. In consultation with the MT and DOJ, LASD will need to develop a long-term plan to conduct and report on similar analyses to achieve and maintain compliance. |||||

| TABLE 4 | | | | |
|---|---|---|---|---|
| **DATA COLLECTION AND ANALYSIS COMPLIANCE STATUS** | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **84** | From the analysis in Paragraphs 82–83, LASD identifies any concerning trends or issues and assesses whether any practices, policies, training, etc., need to be changed to ensure adherence to constitutional and/or effective policing. | NA | NA | Partial | No |
| | **Notes:** LASD has taken steps toward compliance with this provision. The AV stations continue to build capacity for identifying concerning issues and taking corrective action through various avenues, such as the dashboards, quarterly reports, weekly Cat-2 force reviews, MT or AAB audits, and RMF/CMF. For compliance, the stations will need to routinize and document these processes (as described in Notes for Paragraph 82). | | | | |
| **85** | LASD's analysis identifies any problematic trends among reporting districts or deputies and takes appropriate corrective action. LASD conducts these reviews regularly, and the analysis is incorporated into routine operational decisions. | NA | NA | Partial | No |
| | **Notes:** LASD has taken steps toward compliance with this provision. The dashboards provide analysis by deputy and reporting district, and the stations are using these analyses in the CMF/RMF. The CPE analysis also included geography as a factor; any actions taken in response to the CPE report will be assessed in the next reporting period. For compliance, the stations will need to routinize and document these processes (as described in Notes for Paragraph 82). | | | | |
| **86** | LASD produces a semi-annual report summarizing the results of the analysis and steps taken to correct problems and build on successes. The report is publicly available in English and Spanish and posted on LASD's website. | NA | NA | Partial | No |
| | **Notes:** The MT and DOJ will review the CPE reports to assess the extent to which they meet the requirements of this section. LASD will need to provide its assessment of the CPE findings and any actions taken in response. The final reports will need to be published in English and Spanish. | | | | |

## F. Community Engagement

The Lancaster and Palmdale stations continued and improved their community engagement efforts this reporting period. In particular, they have shown prioritization of relationship building with diverse stakeholders, to include historically marginalized communities. Every provision is now in compliance or sustained compliance except for the community engagement paragraph which is close to completion. [18]

1. Community Engagement Training

- LASD is in partial compliance with providing deputies with the community engagement training required by SA Paragraph 89.

LASD has nearly completed development of an 8-hour Community Engagement training designed to comply with SA paragraph 89, which requires in-service training on community engagement and community policing. With the training in active development coupled with other efforts described below, the LASD is in partial compliance with this provision.

The training is largely built around POST's Principled Policing in the Community training which discusses problem solving, procedural justice, implicit bias, and historical and current events that impact the relationship between law enforcement and the public. The LASD has created the full curriculum and these documents are currently under review. The MT and DOJ have provided periodic feedback during this development. We appreciate the Training Bureau's receptivity to suggestions and their expertise and considerable effort to ensuring this training complies with SA requirements. Once the SA paragraph 89 training is approved and implemented, MT will work with LASD to establish a tracking process and ensure that all appropriate personnel receive training.

Other efforts related to training included:

- Both stations developed and implemented briefings which provide guidance to AV deputies on participation in community meetings and 755s.
- To assist in institutionalizing community engagement practices across the Department, LASD has published and distributed to all stations its Community Engagement Resource Guide. As we reported in the 19th Semi-Annual Report, the purpose of the guide is to provide a baseline knowledge of best practices and enhance community engagement activities in a comprehensive and consistent manner throughout the Department.

Members of the OCP, the Compliance Unit, and both AV stations attended the "Professionalizing Law Enforcement – Community Engagement Training" (PLECET) conference. The stated purpose of the June 2025 national conference was "to professionalize the emerging community engagement sector of policing by instituting an annual specialized training networking...."[19] LASD personnel also attended the PLECET conference in May 2024 and the MT has observed personnel applying these learnings to

---

[18] Note that SA paragraphs 69 and 72 that had been assessed here in past reports are found in the Bias-Free section above.

[19] PLECET Conference |

community engagement practices including in the development of the Community Engagement Resource Guide.

2.  <u>Community Advisory Councils (CACs)</u>

- LASD remains in sustained compliance with SA Paragraphs 87c, 92, 93, 96, and 97, which relate to the facilitation of the CACs and dissemination of the SA.
- The Department remains in compliance with SA Paragraph 94, which requires representative CAC membership and quarterly public meetings.
- LASD is now in sustained compliance with SA Paragraph 95, which requires the Department to post CACs' reports and respond to recommendations.[20]

a.  *CAC Membership*

The Department reached compliance with SA paragraph 94 in December 2024 and is expected to be found in sustained compliance in December 2025 based on continued success in growing and strengthening the CACs and youth advisory council. The AV CACs continue to meet monthly. In the last year, both AV CACs have strengthened their processes by drafting and adopting by-laws to assist them continue working for their communities in a sustainable and effective manner. Both CACs also continue to maintain an active social media presence.[21]

LASD has continued to maintain and improve the composition of the CAC for active participation and representativeness of diverse groups, including youth. The MT continues to hear positive feedback from members of both CACs on their working relationship with the Department. For instance, Palmdale CAC members recently expressed appreciation for the Palmdale captains having deputies accompany the AV Pride Walk. And the appreciation is mutual: The AV station operations captains have similarly expressed their appreciation for the participation and perspectives of the members, including those representing the LGBTQ+, unhoused, mental health, and Spanish speaking communities.

The AV Youth Advisory Committee (AVYAC) continues to meet and provide valuable perspectives to the AV stations. After the AVYAC shared concerns regarding a perceived disconnect between the youth and deputies, the Lancaster station implemented a couple of the group's suggestions including launching monthly "Snow Cone with a Deputy" events at local parks, and "Dunk a Deputy" deputies participate in a dunk tank at a community event.

In Palmdale, the station operations captain has demonstrated a strong commitment to building trust and bridging cultural and language gaps to improve public safety for all residents, regardless of immigration status. In particular, he has focused on Spanish-speaking and immigrant communities in

---

[20] https://lasd.org/antelopevalleycomplianceunit/#community_advisory_reports

[21] Palmdale Community Advisory Committee (@palmdalecac) • Instagram photos and videos, Palmdale Community Advisory Committee - Palmdale CAC | Facebook, Lancaster Sheriff's Station CAC | Facebook, Lancaster Sheriff's CAC (@lsscac) • Instagram photos and videos

the Palmdale area through active collaboration with local advocacy organizations such as SALVA and LULAC (League of United Latin American Citizens). The Palmdale captain participated in a SALVA podcast where he made the effort to communicate with the audience by conversing in Spanish—an effort that was warmly received by listeners and appreciated by community members as a gesture of respect and inclusion. In Lancaster, station operations captain station is bilingual and regularly includes community outreach in Spanish at community events. He has also worked more closely with community-based and faith-based organizations, including in some of the events described below.

b.  *Receiving AV Community Input*

- LASD is now in sustained compliance for SA paragraph 87b regarding receiving and tracking community input.

The MT has observed the AV station managers consistently make themselves available to hear and act on feedback from the community. As a result, their compliance with SA paragraph 87b has changed from "compliance" to "sustained compliance." In addition to in-person and online meetings and events, station managers receive community input through a variety of other avenues, including the new Community Survey described below, the Virtual Deputy program, and short feedback surveys described in the Stops section. While the stations report they are still developing a standardized system for recording and tracking all the community input received, the MT notes that community input is documented in a variety of ways, including in the annual CAC report, through the online recordation of the QR code surveys given out by both stations personnel, by youth members of the youth council, in the minutes kept from each stations' regular crime meeting, and in the stations' Community Engagement reports. Also, the CACs report their input is being heard and responded to more consistently than in years past.

c.  *Deputy Participation in Community Engagement Activities*

- LASD remains in sustained compliance for deputy participation in community meetings (SA Paragraph 87a).

LASD remains in sustained compliance with SA provision 87a, which requires staff to actively participate in community engagement efforts, including community meetings. The mechanisms for deputy participation in community engagement efforts have been in place since 2021, with the extent and quality of that participation measured in SA paragraph 88. The stations continue to track each deputies' participation at community events, including some of those discussed in the CAC and LASD Community Meetings and Events section below, and in engagement encounters with individual community members (aka 755s). The MT will be assessing 2024 755s for compliance.

d.  *CAC and LASD Community Meetings and Events*

- The Department remains in compliance for deputy community engagement and enhancing relationships with particular groups, including youth and communities of color (a component of SA Paragraph 88).

The CACs meet regularly to gather community input, providing a venue to hear and discuss local concerns to be shared with and addressed by the AV stations, and periodically provide updates on the Monitors' semi-annual reports. The Department also holds independent meetings and larger community engagement events as well as participates in community meetings and events held by other organizations. The MT attended several of these meetings and events in this reporting period, which are described in the CAC Meetings and Other Departmental Meetings sections below.

   *i.*   *CAC Meetings*

At a regular CAC meeting scheduled in May 2025, the CAC and Lancaster Station agreed to add to the agenda a discussion regarding a highly publicized incident involving a UOF which was ultimately criminally prosecuted. Community members shared their concerns particularly regarding LASD's willingness to hold deputies accountable for inappropriate behaviors. In response, deputies shared insights into their training that include state-mandated POST (Peace Officer Standards and Training) training, policies, case law, and department protocols. While community members in attendance reported that the answers provided were not completely satisfying, progress was nevertheless made by the open discussion. LASD leadership reported to the MT that although this exchange was difficult and tense, they knew it was important to make themselves available to the public and to provide additional transparency. The station captain stated he thought it was important for deputies to hear directly from the community to better understand their perspectives and vice versa.

Station leadership have helped lead a series of immigration-focused town hall meetings, particularly with the Spanish-speaking community, aimed at informing community members of their rights and the Department's role in federal enforcement activities. A Spanish-language town hall was held on May 19, 2025, co-hosted by the CAC and the Palmdale station, with the in-person participation of just three community members along with LASD staff and a member of the MT. The meeting was also streamed live on Facebook to broaden its reach. Emphasizing key messages such as "no victim should be silent" and affirming that LASD will not ask questions about immigration status of victims of crime or of community members with concerns or complaints. Designed to address the concerns of the Spanish-speaking immigrant community, the forum focused on encouraging open communication with law enforcement.

   *ii.*   *Other Departmental Meetings*

On March 27, 2025, the Los Angeles County Sheriff Civilian Oversight Commission (COC) convened a scheduled 2.5-hour public meeting. The meeting was attended in person by a member of the MT and a US DOJ attorney, along with Captains from the Lancaster and Palmdale stations. Approximately 50 community members participated. At the meeting, a community leader expressed a sentiment shared by many community members present when he commended the leadership of Sheriff Luna and praised the four AV station captains, stating the department had shown marked improvement under their command. However, community members also expressed concern about future transitions, questioning what might happen when the current captains move on. This sentiment highlighted the community's high regard for the current leadership team and the two-captain per station model.

iii.    *Station Events*

Lastly, Palmdale and Lancaster stations organize a variety of community engagement events and meetings that are designed to encourage frank interaction between AV deputies and community members from diverse backgrounds. The MT has observed station captains personally modeling how to interact in an accessible manner with the public.

Examples of Lancaster's events included the "Lancaster 1st Annual Car and Motorcycle Show," the "Black History and Leadership Celebration," and the "Prayer March." Palmdale's events included "Haunted Jailhouse Open House", "AV Pride Walk", "Gun Buyback program," and Community Dialogues with Game Changers, which helped facilitate community dialogues aimed at engaging with hard-to-reach communities. Both stations collaborate with SALVA and L.A. Care to host events for the Spanish-speaking community, including the meetings described above and Lancaster's food distribution partnership with SALVA during a Hispanic Heritage Month event.[22]

AV station personnel engaged this reporting period in places like restaurants, where community members can interact with law enforcement in an unstructured and casual environment. For instance, on May 14, 2025, LASD hosted the "Tip-A-Cop" event at Black Angus Steakhouse in Lancaster in collaboration with Special Olympics Southern California. The event featured LASD deputies serving alongside athletes with disabilities in a fundraiser and outreach event. A member of the MT attended and observed the event, which was designed to showcase positive, meaningful interactions between law enforcement and the community.

3.  Departmentwide Community Feedback Survey

- LASD remains in sustained compliance with Paragraphs 98, 99, 100, 101, which require LASD to support the activities related to the community survey and to post the survey on the LASD-AV website.

As of May 16, 2025, LASD launched a departmentwide online community feedback survey.[23] In addition to displaying posters, with QR codes, in station public areas, LASD's outreach includes social media, the Department website, CACs, community groups, and city governments. The survey, in which is available in both English and Spanish and typically takes approximately five minutes to complete, consists of 21 questions aimed at gathering meaningful and honest input from the public. LASD leadership reports that this is the first time the Department has developed a departmentwide survey specifically designed for broad community engagement. They intend to use survey responses to help inform the CMF/RMF, crime strategies, CACs interactions, community engagement efforts, and broader law enforcement activities. (The AV stations report they will also continue to use their shorter surveys for more immediate feedback on AV specific issues.)

---

[22] LASD's annual community engagement reports can be accessed at
https://lasd.org/antelopevalleycomplianceunit/#public_reports_on_av.

[23] COMMUNITY FEEDBACK SURVEY | Los Angeles County Sheriff's Department

At the May 2025 site visit, there was support from the MT and DOJ for LASD to use this online survey in place of the more traditional paper community survey (SA paragraphs 98–101). To maintain compliance with the SA community survey paragraphs, the MT expects that the Department will periodically review respondent demographics and adjust outreach strategies as needed to ensure a representative group of community members are aware of and participate in the survey. The parties will also discuss how survey results will be made available to the public; the previously administered surveys included a report and online data access.

4. AV Community Engagement Reports

- LASD remains in sustained compliance for producing annual Community Engagement Reports (SA Paragraph 91).

During this reporting period, the Antelope Valley stations published their 2024 community engagement reports, highlighting each station's efforts to strengthen relationships with all members of the community (SA paragraph 91). The purpose of these reports is to demonstrate the Department's ongoing commitment to transparency and meaningful engagement. They describe station and Department engagement events held over the year. Both stations' reports identified successes, lessons learned, future opportunities, and recommendations to consider for improving their ongoing engagement efforts. The MT and DOJ approved the reports while also providing feedback to refine the content of future reports.

5. Diversion

- The Department is in sustained compliance regarding working with the community to develop diversion programs (SA Paragraph 87d).

The MT found the Department in sustained compliance in 2022 with the SA Paragraph 87 requirement that LASD actively engage in the development of a diversion program for AV youth. As noted in previous reports, LASD has found the Department in compliance with the diversion program provision through the review of LASD documentation, direct observation, and discussion with community members since 2021.

6. Institutionalizing Community Engagement Practices Countywide

The Monitors note that the Department is not limiting its community engagement efforts to the AV but is working to incorporate and standardize these practices throughout the county. At a recent Department-level Executive Leadership Conference, each LASD station captain was provided with posters promoting the new online community survey, a printed Community Engagement Guide for station personnel, and other community engagement materials, such as English- and Spanish-language

brochures providing the public with information on filing complaints or commendations.[24] The distribution of materials and resources provided by LASD leadership to station captains is meant to reflect LASD's commitment to transparency, accountability, and improving public trust. The MT has found that these efforts assist in promoting accessible and inclusive communication with the public and demystifying the complaints process for community members who engage with the Department. The MT also commends the Department for providing complaints materials in the context of community engagement activities. The complaints process is another way the Department can demonstrate that they are open to community issues and concerns and are committed to responding in an appropriate and timely manner.

7.  Crime Management Forum and Risk Management Forum

- The Department is now in compliance with SA Paragraph 90.

The content and depth of discussion taking place in CMF/RMF meetings has continued to improve in this reporting period. LASD has reached compliance with SA paragraph 90.

In the February RMF/CMF meeting, MT observed captains now relying upon more thorough and timely data as a result of the improvements in data analytics and the dashboards that have been developed by LASD staff. Some examples of the strategies, tactics, and outcomes that are being analyzed by station and executive leadership during these forums include:

- Crime trends and arrests – utilizing mapping and concentration of activity
- Calls for service and deputy-initiated activities stemming from field observations
- Complaints and commendations – including categorical breakdown
- Risk management mitigation efforts
- Stops by demographics
- Community concerns, priorities, and engagement
- Current crime prevention and reduction strategies
- Station problem-solving priorities (such as efforts in Palmdale to reduce delays in response times, property crimes, and fatal collisions and in Lancaster addressing auto theft, traffic collisions and retail theft
- BWC compliance

In the CMF/RMF discussions, the captains review their enforcement activities with increased attention devoted to monitoring any impacts, both intended and unintended, on the community. This is an important consideration when assessing the overall results of crime reduction strategies and enforcement tactics. Due to the number of stations under review and the amount of activity that is

---

[24] Entitled "How Do I File a Complaint or Submit a Commendation?" and "Como Puedo Presentar Una Queja o Recomendacion?" these brochures provide four ways to file (online, by phone, in-person, by mail) and FAQs as well as contact information for the Office of the Inspector General.

covered, it is impossible to thoroughly cover all relevant topics in these forums. However, the data and reports are reviewed prior to the meeting by LASD executive leaders who then have the opportunity to probe areas of greatest concern and examine questions about enforcement disparities identified in the data or concerns about trends. Documenting this work and connecting it to other provisions such as the data analysis report in paragraph 85 is an important next step.

The Monitors note that there is an increased depth of analysis by the station captains and NPD staff, and demonstrably more willingness to have substantive discussions about the enforcement efforts undertaken as well as impacts on the community. LASD leadership has indicated they will continue to improve these meetings. The MT and DOJ have been in support of the Department exploring and utilizing systems and processes that would require less workload for preparation for the meetings; LASD has indicated that its IT department could assist in this endeavor.

As the MT and DOJ discussed with LASD at the May site visit, one important way that LASD should continue to improve these efforts is with the incorporation of more community input and problem-solving efforts. This is something that can be achieved through ongoing solicitation and documentation of feedback gleaned through community surveys and input obtained from the CACs or neighborhood groups. This also opens the door to more directly and actively engaging the community in a meaningful role as a partner and co-producer of public safety. Achieving sustained compliance will depend on continued improvement of these reviews and establishing formalized, sustainable processes.

8. <u>Next Steps</u>

a. *LASD*

- Continue to maintain, enhance, and broaden community engagement events and outreach initiatives.
- Continue facilitating and participating in CAC meetings and working with the CACs to ensure broad representation and participation with hard-to-reach and historically marginalized populations.
- Continue to review responses to the Department's community survey and use them to help inform law enforcement priorities and community engagement activities.
- Continue incorporating appropriate feedback from the MT and DOJ on submitted content and materials for the community engagement training required in SA paragraph 89.
- Enhance processes for tracking community input, capturing the type and source of feedback, collaboration efforts with community members on solutions, actions taken by the Department and/or community members, resulting outcomes and insights gained through feedback loops.
- Establish a process to assign tasks to stations, including data reviews, written assessments, and follow-ups to ensure compliance with SA paragraph 90.

b. *The MT*

- Continue to observe LASD community engagement activities and the CACs, offering ongoing feedback for improvement.

- Maintain active engagement with the CACs and broader community to better understand their concerns, perceptions, and expectations regarding progress toward the outcomes outlined in the SA.
- Continue to review and provide feedback to LASD on their submitted content and materials related to the training required in SA paragraph 89.
- Continue to observe and provide feedback on the CMF and RMF integration.
- Work with LASD to ensure their online community survey meets requirements for SA paragraphs 98–101.

9. Community Engagement Compliance Status Table[25]

Table 5 provides the compliance status for each paragraph in the Community Engagement section.

---

[25] SA paragraph 69 and 72 are now reported on in the Bias-Free Policing section.

| TABLE 5<br><br>COMMUNITY ENGAGEMENT COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 87a | Actively participate in community engagement efforts, including community meetings. | Yes 12/11/19 | NA | Yes 09/21 | Yes 12/22 |
| | **Notes:** The mechanisms for deputy participation in community engagement efforts have been in place since 2021; the extent and quality of that participation are measured in Paragraph 88. | | | | |
| 87b | Be available for community feedback. | Yes 12/11/19 | NA | Yes 06/24 | Yes 06/25 |
| | **Notes:** As described in this section, the MT has observed and learned about Department managers making themselves available to feedback and that stations are implementing a tracking system to review community concerns and a new Virtual Deputy program at both AV stations. The eventual community engagement training (Paragraph 89) will address productive Department–community interactions. Compliance was established in June 2024 and reached sustained compliance due to their continued good work through this reporting period. | | | | |
| 87c | Develop CACs. | Yes 12/11/19 | NA | Yes 06/16 | Yes 06/17 |
| | **Notes:** The CACs existed before the SA but were implemented in accordance with the SA in 2016 and have been maintained ever since. | | | | |
| 87d | Work with the community to develop diversion programs. | Yes 12/11/19 | NA | Yes 09/21 | Yes 12/22 |
| | **Notes:** Since 2021, the MT has found the Department in compliance with the diversion program provision through the review of LASD documentation, direct observation, and discussion with community members. | | | | |
| 88 | Ensure all sworn personnel attend community meetings and events and take into account the need to enhance relationships with particular groups within the community including, but not limited to, youth and communities of color. | Yes 1/10/19 | Partial | Yes 12/24 | No |
| | Notes:<br>• In compliance for deputy participation in community events and/or independent engagement with community members for 2023. Deputy attendance is reviewed on an annual basis; 2024 will be assessed in the next report.<br>• In compliance with the qualitative requirements to account for the need to enhance relationships with particular groups. LASD's outreach to particular groups continues to increase, and LASD personnel have developed a practice of assessing what is and what is not working, and then making adjustments. Continued progress was made in this reporting period toward increasing the extent and quality of the AV stations' engagement with the community, to include working more closely and intentionally with grassroot organizations, the AVYAC, and faith-based organizations. Briefings have been developed for stations to provide guidance on participation in community meetings and 755s to achieve partial training compliance (see also SA Paragraph 89). | | | | |

| TABLE 5 COMMUNITY ENGAGEMENT COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| | • LASD is in compliance with using the annual Community Survey data to inform the attendance plan. LASD published an approved Attendance Work Plan (January 10, 2019; revised April 1, 2020); both have now updated those plans.<br>• Sustained compliance with this paragraph mainly depends on the institutionalization of practices so they can be sustained through leadership and staffing changes – the include stations' attendance plans, formalized POP project processes, ongoing LASD self-assessment of compliant deputy engagement at events and 755s, and surveys. | | | | |
| 89 | In-service training on community policing and problem-oriented policing is provided to all AV personnel. | NA | No | Partial | No |
| | **Notes:** The Department is now in partial compliance with this provision given that its community engagement training is actively in development. The MT and DOJ are reviewing it and providing feedback as training segments are received. Partial compliance is further based on the stations' developing briefings to provide guidance on participation in community meetings and 755s. MT needs to review these briefings. Once training is approved and implemented, the MT will work with LASD to develop a process for tracking that all appropriate personnel receive training. | | | | |
| 90 | Revise content of CMF and RMF to include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them using techniques to better support and measure community and problem-solving policing efforts. | NA | NA | Yes 06/25 | No |
| | **Notes:** The Department was found in compliance with this provision this reporting period. The MT has observed every RMF and CMF and found that the meetings reflect progress with the usage of data, examination of trends, probing of responses, and expectations for follow-up to be conducted; however, better documentation of such effort will be required for sustained compliance. LASD will develop a process to address the greater need for documentation. The Department has yet to fully integrate the CMF into the RMF. Sustained compliance will be assessed based on continued improvements including the need to reflect a higher level of incorporation of community input and problem-solving, e.g., additional documentation and reporting on community input/concerns, examples of strategizing/collaborating with the community based on those concerns, POP projects, details on particular issues or key projects, and follow-up on items discussed earlier and lessons learned. | | | | |
| 91 | Complete annual reports on the impact of community engagement efforts, identifying successes, obstacles, and recommendations for future improvement in order to continually improve LASD–community partnerships. | NA | NA | Yes 12/22 | Yes 06/24 |

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| | **TABLE 5** **COMMUNITY ENGAGEMENT COMPLIANCE STATUS** | | | | |
| | **Notes:** The AV stations' Community Engagement reports continue to improve both in the range of activities and in the presentation of those activities in the reports. The MT and DOJ support LASD's use of a department-wide online community survey in place of the previously used traditional survey. LASD stated their intention to use the survey responses to inform the CMF/RMF, crime strategies, with the CACs, community engagement activities, and station activities. | | | | |
| 92 | Seek community assistance in disseminating SA. | NA | NA | Yes 06/17 | Yes 06/18 |
| 93 | Support and work with CACs to help them meet their mission to leverage the insights and expertise of the community to address policing concerns, including but not limited to racial or ethnic profiling and access to law enforcement services, and to promote greater transparency and public understanding of LASD. | Yes 9/27/14 2/11/15 | NA | Yes 06/20 | Yes 12/24 |
| | **Notes:** The Department continues to support and work with the CACs and must continue to assess this work and make improvements as needed to remain in compliance and to ensure the CACs effectively function in the manner envisioned by the SA. Station management continues documenting CAC input and providing follow-up. | | | | |
| 94 | Memorialize CACs and facilitate quarterly meetings. | Yes 02/11/15 | NA | Yes 12/24 | No |
| | **Notes:** LASD has continued to invigorate the composition of the CAC for participation and representativeness, including youth in the AVYAC. LASD may achieve sustained compliance on 12/2025 assuming continued success of growing and strengthening the CACs and AVYAC. | | | | |
| 95 | Post CAC reports on LASD-AV website and respond to recommendations. | NA | NA | Yes 12/23 | Yes 06/25 |
| 96 | Provide administrative support and meeting space for CACs. | Yes | NA | Yes 06/17 | Yes 06/18 |
| 97 | Ensure CACs have no access to nonpublic information. | Yes | NA | Yes 06/17 | Yes 06/18 |
| 98 | Assist the Monitors in annual Community Survey. | NA | NA | Yes 12/18 | Yes 12/20 |
| | **Notes:** The Department has now implemented a countywide online community survey. If found to be compliant with SA requirements, this will permanently replace the previously administered surveys. In the meantime, the Department's remains in sustained compliance. | | | | |
| 99 | Cooperate with independent researcher in conducting annual Community Survey and Deputy Survey. | NA | NA | Yes 12/18 | Yes 12/20 |

| TABLE 5 | | | | | |
|---------|---|---|---|---|---|
| **COMMUNITY ENGAGEMENT COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **100** | Cooperate with administration of the annual Community Survey. | NA | NA | Yes 12/18 | Yes 12/20 |
| **101** | Post annual Community Survey report on LASD-AV website. | NA | NA | Yes 12/18 | Yes 12/20 |

## G. Use of Force

In our last report we documented that the LASD was in compliance with its policies on use of force (UOF) and conducted energy (CEW) weapons and that the CEW training was in compliance. Two audits and other reviews conducted in this reporting period found significant progress on almost every area of this section, including compliant training and compliance on every provision related to the conduct, investigation, and adjudication of force. Also, in another milestone achievement, the UOF training has been approved; compliance will be assessed through verification that all appropriate personnel receive the training.

1. Use-of-Force Training

- LASD is now in partial compliance for UOF training (SA Paragraph 119). The UOF training courses themselves have been approved; compliance can be achieved once all LASD-AV personnel have received the required courses and the MT verifies this has been documented.

The following provisions govern the SA's UOF-related training mandates (SA paragraph 119):

*LASD shall provide all Antelope Valley deputies with annual or biennial use of force training. The topics will include the following:*

a. *Proper use of force decision making… (biennial);*

b. *Role-playing scenarios … that illustrate proper UOF decision making, (annual);*

c. *Principles of procedural justice… (biennial);*

d. *De-escalation techniques … (annual);*

e. *Threat assessment… (biennial);*

f. *LASD's Tactics and Survival (TAS)… (biennial); and*

g. *Supervisors shall receive initial and annual refresher training on conducting use of force investigations, how to effectively direct deputies to minimize uses of force and to intervene effectively to prevent or stop unreasonable force … (annual).*

In this reporting period, the MT and DOJ assessed the Department's expanded course outlines (ECOs), lesson plans, and audio-visual materials associated with the Supervisor's UOF Investigation Course, Supervisors Arrest and Control Course, and the two-part Deputies UOF Policy Update. We also attended the Department's updated 8-hour UOF-related training which included Ground Control Tactics, Arrest and Control, and De-escalation. Among other required elements, the courses included proper use of force decision making, adult experiential exercises, principles of procedural justice, and de-escalation techniques. We found the course materials and the delivery of the observed trainings to be significant improvements over courses we had reviewed in the past. Together, the course adequately addressed each of the SA paragraph 119 provisions.

In particular, the MT found the Ground Control Tactics training to be exceptional, a best practice, and as it is implemented department-wide it will serve LASD and the communities it serves well. We also found

the Department's Taser 10 training, which we observed on two occasions in the last reporting period, to be exceptional.

Therefore, the MT has found the Department in partial compliance with SA paragraphs 119a–g.[26] Compliance will be determined once the MT has verified that AV deputies and supervisors have attended the approved training courses they are required to take according to the SA-defined schedule see SA paragraph 119 above).[27]

2.  Monitors' Audits of Deputies UOF in the AV

The MT produced two audits of UOF in this reporting period.

- First, on May 20, 2025, Monitors submitted to the Department and DOJ a comprehensive performance audit on the use, investigation, review and adjudication of Non-Categorized Force Incidents (NCI) and Categories 1 and 2 force by AV deputies.[28]
- Second, on June 11, the MT submitted an audit of Category 3 uses of force to the Parties. Category 3 force involves the most serious level of force and includes deputy involved shootings, force resulting in hospitalization, head strikes and canine bites.

a.  *Background for MT audits*

i.  *Audit of NCI and Categories 1 and 2 force*

To assess changes implemented since the implementation of the two-captain model in the AV, the MT selected the month of February 2024 as the audit period. We reviewed every UOF investigations initiated during that period. That resulted in an audit population of 36 cases: 22 from Lancaster and 14 from Palmdale. [29]

---

[26] There is no SA paragraph that specifically addresses CEW/Taser training. However, the CEW/Taser training touches on the following SA paragraphs: 103 (warnings), 104, 105 (objective reasonableness), 108, 109 (reporting) 110 (supervisory notification), 111 (supervisor response and investigation), 112 (supervisor reporting), 113 (chain of command review), 115 (holding deputies accountable), 116 (holding supervisors accountable), 118 (supervisory review by station commanders), and 119 (biennial training).

[27] Monitors are currently in discussion with the commanding officer of Audit and Accountability Bureau to develop a plan to assess AV deputies and supervisors' attendance to the required training courses.

[28] NCI force includes very minor uses of force where there are no injuries or complaints. Category 1 force includes control holds, takedowns and the use of OC spray. Category 2 force includes any force that results in an identifiable injury or an injury that is attributed to the UOF that does not rise to the Category 3 level.

[29] We noted that in the February 2024 audit period, Lancaster had two Category-3 UOF and Palmdale had one Category-3 use of force. These were outside the scope of this audit and not part of our audit sample.

*ii.   Audit of Category 3 force*

Previously, in November 2019, the MT published our first Category 3 uses of force audit report. When we conducted that audit we became aware of excessive delays of well over a year from the time of the UOF incident until such time as the incident is finally reviewed and adjudicated by the Executive Force Review Committee (EFRC).[30] Those delays are pursuant to the Gates/Johnson Settlement Agreement, which requires that the EFRC on deputy involved shootings cannot take place until "The prosecuting attorney's office rejects (declines to file) a criminal charge against a deputy."[31] With this information, the MT realized the most effective way to monitor the EFRC process was to monitor each review regardless of when the incident may have occurred. Subsequently, in November 2020 the MT began tracking all Category 3 uses of force and monitoring the management reviews for each incident. This includes the initial risk-management review by the Critical Incident Review Panel (CIRP) as well as the EFRC. The MT reviews each case to assess the degree to which it complied with the law, LASD policy, and the SA's provisions governing the reporting, investigation, and adjudication of force.

On April 16, 2024, the EFRC Chair Commander issued a directive meant to address deficiencies that had been noted in the EFRC process. Those changes, effective May 2, 2024, were designed to strengthen the Department's policy and tactical reviews of Category 3 uses of force and promote a robust discussion between the concerned Division Chief, Unit Commander, EFRC Panel, Office of Inspector General (OIG), and County Counsel. The changes included but were not limited to:

- The meetings require in-person attendance by the concerned Division Chief, Unit Commander, EFRC Panel, IAB, OIG, and County Counsel.
- Pre-EFRC Wednesday meetings were discontinued unless requested for a specific case by the EFRC Panel, OIG, or County Counsel.
- Training Bureau no longer provides an assessment but is available to field questions related to the incident should they be called upon to share their expertise related to training and/or tactics. Training Bureau is also available to assist in identifying remedial training recommendations.
- The most significant change was to have the Unit Commander provide a detailed analysis of the incident after the investigator summarized the incident. Unit Commanders are uniquely qualified to discuss these incidents, their impact on the community and station, and the work history of the people involved. This has proven to be extremely insightful and helpful in achieving the EFRC's stated purpose.

Recognizing the significance of these changes and now having observed improvements in the process, the MT proposed, and the Parties approved, a plan to prepare an audit report based on our reviews of the ten EFRCs that were held since implementation in May 2024. The MT observed each of the ten, half in person and half remotely.

The summary below combines the two audits, and thus reports on (1) the Non-Categorized Force Incidents (NCIs), and Categories 1 and 2 uses of force and (2) Category 3 uses of force (and the EFRC

---

[30] That audit is available at http://www.antelopevalleysettlementmonitoring.info.

[31] https://pars.lasd.org/Viewer/Manuals/16084/Content/16209#!

process).[32] While the two audit reports are finalized and prepared for publishing on the Monitors'
website, we are including the significant findings here in order to document and acknowledge the
recent notable improvements that have taken place in this arena [33]

### b. Audit Methodologies

The audits were designed to assess the degree to which the LASD is complying with the SA provisions
governing the use, investigation and adjudication of deputies' force in the AV. Specifically, the audits
assessed whether:

- The force used by AV deputies was necessary, proportional and consistent with policy (¶102, ¶104
  ¶105, ¶106g);
- Appropriate tactics were used, including the use of advisements, warnings, and verbal persuasion to
  defuse and de-escalate evolving situations and to reduce the UOF as control is achieved (¶103);
- The force used involved a hard strike to the head with an impact weapon (¶107);
- Force incidents were accurately reported to a supervisor in a timely manner (¶108, ¶109, ¶110);
- The UOF was thoroughly investigated (¶111, ¶112);
- The investigations' findings and conclusions were supported by a preponderance of evidence
  (¶113);
- Unit commanders reviewed training and tactical review findings to ensure that informal supervisory
  feedback did not replace the need for formal discipline (¶118a);
- Effective management oversight occurred, managers held deputies accountable for violations of
  Department policy and supervisors accountable for responding to force that was unreasonable or
  otherwise contrary to Department policy and/or the law, and cases were referred to IAB and/or ICIB
  as appropriate (¶113, ¶115, ¶116); and,
- Service Comment Reports (SCRs) were initiated when allegations of misconduct arose during a UOF
  investigation (¶130).

### c. Summary of Audits Findings

The audit's findings indicated significant improvements in SA compliance over our previous
assessments. Key findings included the following.

---

[32] Uses of force are grouped for the purposes of investigation, with Category 3 force the most severe (those involving serious
injury or death, shootings, canine bites, and head strikes with impact weapon) and NCI, Category 1 and Category 2
representing types of lesser force.

[33] http://www.antelopevalleysettlementmonitoring.info.

*i.  The Use of Force*

- The Department is now in compliance with SA ¶102 and 104. In the NCI and Category 1 and 2 audit, the MT found only one of the 36 cases in the audit population to be out of compliance for the force used. In the Category 3 audit, there was one of the 12 cases where the UOF was inconsistent with Department policy, but the EFRC addressed it and took appropriate corrective action.

- The Department is now in sustained compliance with SA ¶105. There were no cases in these audits with any indicia of retaliatory force nor has the Department been found out of compliance for retaliatory force in any of our previous audits.

- The Department remains in sustained compliance with SA ¶106g. There were no cases in these audits population or in any of our prior audits that involved a Department member interfering with or prohibiting anyone from lawfully recording deputies.

- The Department remains in sustained compliance with SA ¶107. There were no cases in these audits or in any of our previous audits where a subject was struck in the head with an impact weapon.

*ii.  Tactics and De-Escalation*

- The Department is now in compliance with SA ¶103. In the NCI and Category 1 and 2 audit, the MT found just two of the 36 cases out of compliance.34

- The Department is now in compliance with SA ¶103. In the Category 3 audit, there was one case in which it appears that force was used prematurely, but the EFRC addressed it and took appropriate corrective action. In the other nine cases, de-escalation was used appropriately, including the three where non-force tactics were found to be out of policy.

*iii.  Reporting the Use of Force*

- The Department remains in sustained compliance with the UOF reporting requirements of SA ¶108 Part 1 and 110 Part 1. In these and in all our previous UOF audits there have been no instances with any indicia that a deputy failed to report a UOF. [35]

- The Department is now in compliance with SA ¶108 Part 2 for NCI and Categories 1–3 uses of force. There were no cases in the audit populations where the suspect's actions were not accurately described.

- The Department is now in compliance with SA ¶109 Part 1. In just one case the deputy used boilerplate language.[36]

---

[34] These same two cases were found out of compliance in the objectives to follow.

[35] SA ¶110 Part 2 requires that deputies notify their supervisors of any allegations of excessive force and that, if they fail to do so, they are subject to discipline up to and including termination. This provision is assessed during MT and AAB complaints audits; however, the MT notes that there were no cases in the audit sample with an unaddressed allegation.

[36] This case was in the NCI and Categories 1 and 2 audit.

- The Department is now in compliance with SA ¶109 Part 2. There was one case in the audit population where a deputy omitted relevant information from his report; however, that issue was identified and addressed during the captain's review.

### iv.  Use-of-Force Investigations

The Department is now in compliance with SA ¶111 and 112. All of the Category 3 cases and 33 out of 36 NCI, Category 1, or Category 3 cases were assessed by the MT as having no critical or non-critical deficiencies which were not corrected during the management review.[37]

### v.  Management Review and Oversight

The Department is now in compliance with SA ¶113, 115 and 116. All of the Category 3 cases and 34 out of 36 NCI, Category 1, or Category 3 cases were assessed by the MT as having no critical or non-critical deficiencies that raised noteworthy concerns or that contained errors or omissions that were not addressed during the review process or that affected the completeness of the UOF investigations.

### d.  Other Significant Audit Findings

### i.  PRMS Data Accuracy

SA paragraph 142 requires that LASD ensures that PRMS data is accurate and hold AV personnel accountable for inaccuracies in any data entered. There were no indicia of inaccuracies in the PRMS data for any case in the audit population.

### ii.  Case with Exemplary Professionalism

Our review of a Palmdale UOF case revealed exemplary professionalism on the part of Palmdale Station deputies and an off-duty deputy from an adjacent county. During a spousal assault radio call, the deputies tactics and quick actions very well may have saved a seriously injured victim's life. The investigation and review processes were thorough and the UOF was appropriately adjudicated as in policy.

### iii.  Reductions in the Number of UOFs

While validating the population for this audit, the MT found that there had been a 25 percent decrease in the number of UOF incidents in the AV. There was a total of 155 UOF incidents in the AV in the fourth

---

[37] There were no unaddressed complaint allegations in the audit sample. However, compliance with paragraph 130, initiating a personnel complaint, is assessed in the audits of public complaints.

quarter of 2023 as compared to 116 UOF incidents in the second quarter of 2024. The Department's Transparency Page use of force data shows similar results over the most recent one year period, with a 20% drop between first quarter 2024 (138) and first quarter 2025 (111). This decrease in the UOF coincides with the selection and assignment of the current AV unit commanders which occurred in December 2023, and we want to acknowledge the results that are now being experienced as a result of their leadership in this area.

3. <u>Executive Force Review Committee (EFRC) and Critical Incident Review Panel (CIRP) Reviews</u>

- LASD is now in compliance for the EFRC review of Category 3 force (SA Paragraph 114).

As the audit findings and MT observations of the UOF review processes have shown over time, dramatic improvements have been made to the EFRC in the last year and the EFRC reviews are in compliance with the SA.

4. <u>Additional LASD Management Use-of-Force Reviews</u>

- LASD is remains in partial compliance with tracking and responding as need to UOF trends (SA Paragraph 117).

AV unit commanders continues to improve the quality and regularity of their efforts to identify, track, and, when warranted, respond to concerning UOF trends among individual deputies and units. The availability and use of dashboards, improved coverage in CMF/RMF, reduction of backlog in investigations, and growing cultures of accountability at both stations all assist in this regard. The parties continue to discuss ways the various avenues by which SA paragraph 117 is addressed can be standardized and documented.

As we have previously reported, an important and impressive recent advancement in this regard is the NPD weekly management accountability reviews which facilitate prompt assessments and ensure adequate attention is being devoted to all Category 2 UOF incidents that occur in the NPD. The purpose of this process is to provide a timely initial assessment of all Category 2 uses of force, identify and address concerning issues, and acknowledge commendable behaviors and tactics by deputies. NPD executive staff lead the meetings, which are virtually attended by all NPD station captains and select station personnel. Station operations staff, watch commanders, and/or field sergeants present all Category 2 uses of force that took place in the most recent week. Topics discussed include but are not limited to: review of deputies' professionalism and tactics; feasibility and implementation of de-escalation strategies; policy and training considerations; investigative and review guidance; and risk management concerns.

If any concerns are identified during a review of a UOF case, that case is prioritized for investigation completion and review. MT staff virtually attend these meetings, which are well run, hold station managers accountable, and have clearly been a significant contributory factor in the decrease of UOF incidents in the AV, and a dramatic improvement in how UOF investigations are reviewed and adjudicated.

5. <u>Use-of-Force Data Analysis</u>

- LASD is now in compliance for UOF data analysis and reporting (SA Paragraph 120–123).

In this reporting period, LASD continued to make progress in regularly conducting analysis of force data. LASD produced a draft UOF data analysis report which the MT and DOJ reviewed. The report addressed most of the specific analysis requirements laid out in SA paragraphs 120–122. The Department is currently revising the report in response to MT and DOJ feedback.

With the use of force, stops, and risk management dashboards now in use as well as the weekly Category 2 force reviews being conducted, the MT has observed evidence that station captains are more consistently tracking trends, assessing performance, and providing clear direction and supervision to personnel under their command.

During this reporting period, LASD published a UOF analysis report which is available, as per SA Paragraph 123, on LASD transparence website. MT provided feedback to the report which will be incorporated during the next semi-annual UOF report. To maintain compliance, LASD will need to enhance the report by incorporating more detail on managerial evaluation of the findings, any issues identified, and any corrective action taken in response.

The Department also provides publicly available UOF data online. This is a valuable resource for gaining a better understanding of the nature and frequency of force used in the AV and across the county.[38]


6. <u>LASD AAB Use-of-Force Internal Audit Process</u>

As discussed throughout this report, the improvements in the Department's internal audit process continues. During this reporting period, MT staff met with the AAB captain and his staff on several occasions to further develop the LASD's internal audit process, audit planning, sampling methodologies, findings, recommendations, and reporting. AAB continues to be responsive to feedback and we have found the Department's internal audit process is leading to improved accountability and efficiency.

Toward that end, the AAB has recently produced a comprehensive UOF audit report summarizing their three 2024 mini-audits associated with:

- De-escalation and Use-of-Force Assessments;
- Supervisory Investigations and Management Oversite; and,
- Use of Force Training and Oversite of Public Recordings.

The comprehensive report was well done and achieved its stated objectives of providing AV station captains with timely information and helpful insights to improve UOF-related processes. We believe that the recent steps by AAB has positioned them such that their audits can be utilized in MT assessments of

---

[38] https://lasd.org/transparency/public-force-statistics

LASD's SA compliance.[39] As with stops and complaints audits, for these to be used for MT compliance assessment purposes, they will need to be conducted according to work plans approved by the parties.

7. <u>Next Steps</u>

*a.  LASD*

- North Patrol Division will continue to conduct weekly meetings to perform preliminary assessments of Category 2 uses of force and will continue to hold CIRs and EFRCs as needed.
- The Department will fully implement the approved UOF policy, finish providing the approved UOF trainings, and will hold employees accountable to the policy's mandates.
- Audit and Accountability Bureau will work in conjunction with the Monitors and prepare a plan to verify attendance at SA required training.

*b.  MT*

- MT staff will publish the recent AV UOF audits on the Monitor's website.
- MT staff will continue to collaborate with AAB staff in its SA-related auditing processes.
- MT staff will continue to monitor and comment on CIRP and EFRC reviews.
- MT staff will continue to meet and collaborate with AV unit commanders and the AAB captain to provide consultation toward the Department achieving SA compliance.

8. <u>Compliance Status Table</u>

Table 6 provides the compliance status for each paragraph in the UOF section.

---

[39] SA Paragraph 149: *"Where appropriate, the monitor will make use of audits conducted by . . . Audit and Accountability Command . . . taking into account the importance of internal auditing capacity and independent assessment of this agreement."*

| TABLE 6 | | | | | |
|---|---|---|---|---|---|
| **USE-OF-FORCE COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **102, 104, 105** | The reasonableness of the use of force. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes:** The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |
| **103** | Use de-escalation techniques before resorting to force and reduce force as resistance decreases. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes**. Same as above. | | | | |
| **106g** | Prohibit using force on a person legally recording an incident. | Yes | No | Cat 1 and 2: Yes Cat 3: Yes | Yes |
| | **Notes:** The Department is in sustained compliance with Paragraph 106g because there have been no cases in any of the six UOF audits (beginning in October 2018) where a deputy in any way prevented a person from recording an incident. | | | | |
| **107** | Prohibit head strike with impact weapon unless deadly force is justified, and report unintentional head strikes. | Yes | No | Cat 1 and 2: Yes Cat 3: Yes | Yes |
| | **Notes:** The Department is in sustained compliance with Paragraph 107 because there have been no cases in any of the six UOF audits (beginning October 2018) where a deputy delivered a head strike with an impact weapon to a person's head. | | | | |
| **108a** | Deputies will report force incidents. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | Yes |
| | **Notes:** The Department is in sustained compliance with Paragraph 108a because there have been no indications of unreported force in any of the six UOF audits (beginning October 2018). | | | | |
| **108b** | Deputy reports will completely and accurately describe the force used or observed. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes:** The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |
| **109** | UOF reports will be without boilerplate language, and deputies held accountable for omissions or inaccuracies. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes:** The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |

| TABLE 6 | | | | | |
|---|---|---|---|---|---|
| **USE-OF-FORCE COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **110a** | Deputies will notify supervisors immediately of the use of force. | Yes | No | Cat 1 and 2: Yes Cat 3: Yes | Yes |
| | **Notes:** The Department is in sustained compliance with Paragraph 110a because in every audit case in the six UOF audits (beginning October 2018), the force was immediately reported to a supervisor. | | | | |
| **110b** | Deputies will notify supervisors immediately of any allegations of excessive force. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes:** Paragraph 110b will be assessed in the next MT complaints audit, but there were no unaddressed allegations of unreported or excessive force in the MT force audits. | | | | |
| **111a–d** | Perform thorough UOF investigations. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| **111e** | Supervisors will thoroughly review deputies' UOF reports. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes:** The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |
| **112a** | Independent supervisory use-of-force investigations. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| **112b–e** | Supervisor's UOF investigation reports will be complete. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes:** The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |
| **113** | Management will review thoroughness of UOF investigations. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes**. The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |
| **114** | Executive Force Review Committee will thoroughly review Category 3 force. | Yes | Yes | Yes | No |
| | **Notes:** The recent MT Category 3 UOF audit found that the changes to the EFRC in 2024 have led to compliance with this provision. (Paragraph 114 does not apply to Category 1 or 2 uses of force.) | | | | |
| **115** | Deputies held accountable for force that violates policy. | Yes | Partial | Cat 1 and 2: Yes Cat 3: Yes | No |
| | **Notes**. The recent MT UOF audits found compliance. Sustained compliance will be assessed using additional audits with larger samples. | | | | |

| | | COMPLIANCE | | | |
|---|---|---|---|---|---|

**TABLE 6**

**USE-OF-FORCE COMPLIANCE STATUS**

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **116** | Supervisors held accountable for inadequate investigation. | Yes | Partial | Cat 1 and 2: Yes<br>Cat 3: Yes | No |
| | **Notes**. Same as above. | | | | |
| **117** | AV commanders identify and curb problematic UOF trends. | NA | NA | Partial | No |
| | **Notes:** NPD's RMF track uses of force. The station managers are using the POINT risk management system and other dashboards to track force data. AAB is conducting mini-audits of UOF. The stations have weekly Cat 2 force reviews. The AV captains have begun taking, and documenting, corrective action through briefings, training, supervision, mentoring, and PLEs. The Parties and MT should meet to establish a compliance metric for Paragraph 117. Compliance will require documentation of these analyses and corrective action taken as well as audits to measure outcomes. | | | | |
| **118** | LASD and AV unit commanders will regularly review and track "training and tactical reviews." | Yes | Partial | Partial | No |
| | **Notes:** The MT has not found any indication that informal supervisory feedback was replacing the need for formal discipline, but the first three UOF audits found that LASD data systems were not able to store the training and tactical review section of UOF reports. This item was not assessed in the fourth audit. Compliance will require further documentation of the tracking process and outcomes, and that audits finding the processes are functioning as intended. | | | | |
| **119** | Updated UOF training is provided. | Yes | Yes<br>06/2025 | Partial | No |
| | **Notes:** The Department now offers approved UOF training; compliance will be determined through verification that personnel have attended as required. The MT and DOJ assessed the Department's updated UOF course materials and observed recent trainings and had previously observed the Taser 10 training. | | | | |
| **120** | LASD to conduct an annual analysis of UOF data and trends and correct deficiencies identified by the analysis. | NA | NA | Yes<br>06/2024 | No |
| | **Notes:** With the Quarterly Reports, POINT risk management system, and other dashboards, and with the CPE analysis, the Department has begun to regularly review UOF data for individual deputies and units. In addition, LASD has produced and published a UOF analysis report. To reach sustained compliance, the stations will have to document their reviews to include the analysis conducted and findings; station managers' assessment of the findings, including any trends and deficiencies identified (or lack thereof); any corrective action taken; and outcome of that action. | | | | |

| TABLE 6 | | | | | | |
|---|---|---|---|---|---|---|
| **USE-OF-FORCE COMPLIANCE STATUS** | | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** | |
| **121** | LASD's UOF analysis to include frequency and nature of UOF referred to IAB, subject of complaints or civil suits, related to obstruction or resisting arrest charges, and involving repeat deputies or units. | NA | NA | Yes 06/2024 | No | |
| | **Notes:** LASD has produced and published a UOF analysis report. Further, the stations have continued to expand and improve their regular review of force data using the POINT risk management dashboard and other sources of data and information. To reach compliance, the stations will need to document their use of data as described above in the notes for Paragraph 120, including documentation of the specific reviews listed in SA Paragraph 121, e.g., frequency and nature of force incidents that are referred to Internal Affairs, that involve misconduct complaints, etc. | | | | | |
| **122** | LASD to assess whether changes to UOF policy or training are needed based on analysis. | NA | NA | Yes 06/2024 | No | |
| | **Notes:** NPD regularly conducts reviews of Cat 2 UOF to assess if there are any immediate policy or training issues. The stations are also using force data to determine whether any changes need to be made to policy or training. To reach sustained compliance, the stations will need to document these reviews, to include the analysis conducted, the findings that revealed potential issues (or the lack thereof), actions taken, and the outcomes of those actions. | | | | | |
| **123** | LASD to produce annual public report on UOF data and trends. | NA | NA | Yes 06/2024 | No | |
| | **Notes:** LASD has produced and published a UOF analysis report. To reach sustained compliance LASD needs to continue to improve the reports in alignment with feedback from MT and document the Department's assessments of those findings, and any corrective action taken. See also the notes for Paragraph 120. | | | | | |

## H. Personnel Complaint Review

With the complaint policies approved in 2021 remaining in the "meet and confer" process with labor unions and continued deficiencies found that have not been corrected in some key aspects of an effective complaint process—in particular, a failure to accept all complaints and not consistently conducting thorough and reliable investigations—there was insufficient progress to be deemed compliance on several important paragraphs of the SA. That said, we understand that progress is being made in the discussions with labor and, if that continues and the policy changes are finalized and implemented, LASD can potentially be found in compliance for three of the main policies in the next reporting period. The Department remains in compliance in several other areas of SA complaints requirements and AAB audits continue to be a highlight of work in this area.

1. <u>LASD Complaint Policies and Training</u>

- The Department is now in partial policy compliance with SA paragraph 127 which requires that complaint investigation-related policies and manuals be revised to ensure they are complete, clear, and consistent.
- The Department is not in compliance with SA paragraph 129 which requires that Department policy identify which allegations require formal discipline, which require a full administrative investigation, and which must be investigated by Internal Affairs.
- The Department remains in partial compliance with the SA's complaint-related training provisions (SA Paragraphs 138 and 139).

Over three years ago, the MT and DOJ approved drafts of the three complaint policies addressed in SA paragraph 127, yet those policies have not been implemented. On November 3, 2021, agreement was reached by the parties that, with certain caveats, the Department could publish and implement a revised chapter on complaints in the Manual of Policies and Procedures (MPP), new Service Comment Report Handbook, and new Administrative Investigations Handbook.[40] Since then, the three policies have been in "meet and confer" with the labor unions. We have been informed that those discussions are going well, revisions have been minimal, and approval may soon be forthcoming from labor unions, hopefully in the next reporting period. Due to this progress, the MT and DOJ now consider the

---

[40] The agreement makes approval of the SCR Handbook, the Complaints chapter of the MPP, and the AI Handbook contingent on three interrelated DOJ and MT concerns. First, nearly every complaint is currently handled as a "service comment," for which only non-disciplinary dispositions are available; complaints are rarely elevated to an administrative investigation, which allows for stronger responses when dealing with misconduct. The Parties agreed to revisit this structural concern and to revise these policies should future Monitor or AAB audits reveal noncompliance with SA Paragraphs 127–132. Second, some complaints are currently assessed with abbreviated investigations called Pre-Disposition Settlement Agreements (PDSAs), which may not identify all the critical information needed to make a reliable adjudication. This aspect of the policies may also be revised if future MT or AAB audits identify issues with PDSA investigations. Third, none of the three policies sufficiently address SA Paragraph 129, which requires that LASD policies clearly specify (1) which allegations of misconduct, if found to be true, <u>require</u> discipline; (2) what types of complaints <u>must</u> be subject to administrative investigations as opposed to SCRs; and (3) which administrative investigations <u>must</u> be handled by IAB rather than at the unit level. If the revisions to the final (fourth) complaint document, Guidelines for Discipline and Education-Based Alternatives, do not address Paragraph 129, the Parties may need to revisit the other policies in order for compliance to be met.

Department in partial policy compliance with SA paragraph 127.

For compliance with SA paragraph 127, a number of steps need to be taken. First, the MT and DOJ need to be provided and review any changes made to the three policies based on the meet and confer process to ensure alignment with the SA. When the policies are approved, the Department will need to develop and implement training so that supervisors and managers can accurately apply the new policies to their intake, investigation, and adjudication of complaints. Then, when the policy has been implemented and training provided, the Department will be evaluated for policy, training, and implementation compliance with SA paragraph 127.

For compliance with SA paragraph 129, the three policies in meet and confer as well as a fourth complaint policy document, the Guidelines for Discipline and Education-Based Alternatives, will need to be revised, approved, and implemented. As part of the November 2022 agreement, it was agreed that the requirements for paragraph 129, which include identifying the allegations that would require discipline, the types of complaints that must be handled as an administrative investigation, and the investigations that must be conducted by IAB rather than the stations, will be included in the Guidelines for Discipline. It is the Department's responsibility to submit a revised Guidelines for Discipline and Education-Based Alternatives, which incorporates the requirements of paragraph 129, to the Monitors and DOJ for review and approval. The MT will provide technical assistance if requested.

Compliance with SA paragraphs 138 and 139 will require revised, approved, and implemented training for deputies and supervisors that incorporate all four complaints policies. This can be done incrementally as each policy is approved so the approved policies can be used in practice as soon as possible. Paragraphs 138 and 139 are currently in partial compliance because, in 2018, the Department issued directives exclusive to the AV addressing SA complaint requirements and AV supervisors and watch commanders have been trained in those directives.

We note that after policy and training implementation, compliance audits to ensure the polices are being followed in practice will begin but only after sufficient time has passed to allow for the new rules to take hold. Thus, the delay in publication only further delays a compliance determination.


2.  AAB Audits of Public Complaints

- The Department continues to be in compliance with the requirement that it conduct semi-annual audits of public complaints (paragraph 140).

LASD is completing the SA requirement for conducting two complaints audits per year. In fact, the MT has found the AAB personnel complaint audits to be sufficiently thorough and reliable to include them in our determination of SA compliance.[41] AAB audits could be considered for more provisions if not for sampling limitations caused by a significant backlog of overdue personnel complaint investigations that were unfortunately inherited by the current AV station captains. After over a year of diligent work, the

---

[41] SA Paragraph 149 states: "Where appropriate, the monitor will make use of audits conducted by [AAB,] taking into account the importance of internal auditing capacity and independent assessment of this agreement."

stations have largely eliminated that backlog with the important exception of Lancaster's complaint investigations.[42] The remaining backlog of complaint investigations in Lancaster inhibits AAB's (or any auditor's) ability to select a statistically valid and representative sample of contemporaneous cases for their audits, which skews the ability to conduct an accurate and reliable assessment of compliance with the some of the SA's complaints provisions, namely those that address the complaint investigation and adjudication.[43] Therefore, the MT did not use AAB's audits for compliance assessments on provisions that require completed complaint investigations. However, other provisions assessed in AAB audits that are not dependent on a completed investigation, such as the display of complaint material and complaint intake, were considered in MT compliance assessments.

We note that AAB audits are designed to assess performance AV-wide and the sample is drawn from the eligible cases across both stations, so the Lancaster backlog inhibits use of the audits for compliance assessment for both Lancaster and Palmdale. If the backlog should continue to be an issue, the parties can discuss AAB conducting separate audits by station.

Sustained compliance for SA paragraph 140 will require eliminating the backlog of complaints investigations so that AAB's audits can use statistically valid samples that ensure the audits reflect the entire population of complaints.

For other complaints provisions found to be in compliance, the parties will discuss the auditing plans for determining sustained compliance, including whether AAB or the MT will conduct those audits and what sampling methodologies will be utilized.

Meanwhile, AAB work product continues to be high quality and professional and, importantly, the audit function is being institutionalized within the Department. The best example of that is a comment made by one of the AV captains during an on-site meeting when he expressed concern that AAB had not released its most recent audit because he relied heavily on AAB's findings to assess his command's performance. Importantly, AAB audits use the SA-required complaint policies (the directives established in the AV and the policies now in meet and confer process) rather than the former policies. AAB works with the station captains to ensure the audits help facilitate improvements in the intake and handling of complaints. The MT believes that this partnership between the AV station captains and AAB, along with other changes at the stations, such as use of the POINT risk management dashboard and progress with PMP (see the Accountability section), are crucial factors in the Department bringing their complaints processes into compliance with the SA's requirements.

---

[42] Apart from its impact on auditing, there are also other significant practical concerns with delayed investigations, including community members waiting long periods for resolution, deputies potentially not being disciplined in a timely manner for years-old cases, and Department managers not being able to accurately track deputy and station risk management trends. The AV station managers, NPD, and the OCP recognize these issues and continue to prioritize eliminating the backlog of complaint investigations and keeping both stations current in submitting these investigations in the future.

[43] Complaint investigators understandably tend to undertake the most straightforward cases first and/or finish them more quickly. This, in effect, leaves cases most likely to have the most complications and to be the most difficult to thoroughly investigate pending for longer periods. A sample selected before all investigations are completed in a given audit period would therefore risk skewing the sample toward the simpler cases with fewer potential compliance issues in the investigation and adjudication phase.

3.   <u>Areas of Compliance</u>

The compliance status table at the end of this section identifies the level of compliance with each SA complaint paragraph. It shows that the Department has demonstrated compliance, and in some cases has achieved sustained compliance, in several areas:

- *Availability of Complaint Material*. Every audit and inspection for the past two years has shown that complaint material is available in the designated locations (SA paragraph 124).

- Providing *translation services when needed*. To date, there has not been a case in an MT or AAB audit where the complainant needed translation. (SA paragraph 125b, 137b).

- Distinguishing *service from personnel complaints*. Personnel complaints are not being misclassified as service complaints (SA paragraph 128).[44]

- Referring *cases to the Internal Affairs Bureau or the Internal Criminal Investigations Bureau when appropriate*. Cases are being referred when appropriate (SA paragraph 132).

- Investigations *conducted by uninvolved supervisors*. In each case the investigator was not involved in the underlying incident (SA paragraph 133).

- Interviewing *witnesses separately and obtaining statements from everyone present*. The investigations include the identity and statement of all percipient witnesses (SA paragraphs 135, 137a).

- *Training* deputies *and supervisors*. AV deputies and supervisors have been trained in AV policies regarding personnel complaints. The Department is in partial compliance for SA paragraphs 138 and 139; for compliance, new training will need to be implemented following finalization of the policies.

- *Conducting complaints audits*. As described above, AAB's complaints audits have brought the Department into compliance with SA paragraph 140a.


4.   <u>Areas of Non-Compliance</u>

In addition to the yet-to-be-implemented policies in SA paragraph 127 and 129, the Department remains in non-compliance with some of the most important provisions, including the following.

- *Accept all personnel complaints*. It is a fundamental responsibility of any law enforcement agency to willingly accept and process personnel complaints from the public it serves. Yet, the Department continues to struggle with this requirement. Audits have shown that phone calls from complainants, especially those who speak Spanish, are being disconnected and lieutenant watch commanders and field sergeants are not initiating complaints when clearly being told about allegations of misconduct. Confirming the audit findings of previous MT audits, the three complaint audits conducted by AAB in 2024[45] showed that only 26% of the complaints made to a watch commander resulted in the initiation of a complaint or a log entry explaining why a complaint was not initiated.

---

[44] Service complaints address departmental practices, processes, or policies whereas personnel complaints address deputy conduct and performance.

[45] AAB Public Complaint Audit Part II 2024-43-A finalized on February 11, 2025.

Those same three audits showed that just 67% of the personnel complaints made to a field supervisor resulted in the initiation of a complaint investigation, even when the complainant was recorded on the supervisor's BWC. (SA paragraphs 125a ,126)

- *Investigate* every *substantive allegation whether it is specifically alleged by the complaint or not.* Complainants may not always use precise terms (e.g., specifically saying "complaint" or "allegation") to describe their concerns, so it is incumbent on the intake supervisor to identify the substantive allegations. If the intake supervisor misses something, then the investigator needs to catch and address it. Even with the audit limitations which can skew the sample to more straightforward cases, the Department continues to flounder with this requirement. The three AAB audits conducted in 2024 showed that only 71% of the cases met this standard confirming the finding of non-compliance in previous MT audits. (SA paragraph 130)

- *Ensure that investigations are thorough enough to reach reliable and complete findings.* Each personnel investigation needs to contain sufficient facts to support a reliable adjudication. It is incumbent on the adjudicator to make that determination and, if the investigation is found to be deficient, return it for additional work. Even with the audit limitations, the three AAB audits showed that only 75% of the complaint investigations met this standard, confirming findings of previous MT audits. (SA paragraph 131)

- *Adjudicate complaints using a preponderance of evidence.* Often referred to as the "50% plus 1" standard, allegations should be sustained if all of the evidence taken together shows that the allegation is more likely true than not true. Even with the audit limitations, the three AAB audits conducted in 2024 showed that only 71% of the adjudications met this standard, confirming the findings of previous MT audits. (SA paragraph 140b)


5. <u>MT Monitoring of Public Complaints</u>

We continue to make ourselves available to members of the public who wish to express concerns or complaints directly to the Monitors. During this period, the Monitors received two complaints from the public. One via the Monitor's website consisted of a vague expression of dissatisfaction. The Monitors responded to the sender's message, but the sender did not respond to repeated requests for contact. The other was determined to be from a complainant who has contacted the Monitors multiple times over the year. Using a pseudonym, he made no specific complaint and did not respond to inquiries regarding his true identity.


6. <u>Next Steps</u>

a. *LASD*

- Hold supervisors and watch commanders accountable for failure to initiate a personnel complaint investigation when appropriate.

- Eliminate the backlog of complaint investigations in Lancaster, and prevent any backlogs from occurring in the future.

- Publish the MPP chapter on complaints, Administrative Investigations Handbook, and SCR Handbook.

- Submit a training plan and curricula for MT and DOJ review and approval.
- Once approved, train personnel responsible for implementation of the revised complaint process.
- Continue to conduct audits that evaluate compliance with SA requirements.
- Submit a revised Guidelines for Discipline for review and approval.

b. *The MT*

- Review and provide feedback on Guidelines for Discipline.
- Review and provide feedback on revised training plan and curricula.
- Monitor the implementation of the policy and training plan.
- After the revised directives are published, training has been provided, and sufficient time has passed for the new processes to take hold, discuss with the Parties the initiation of a third audit of public complaints.
- Provide LASD and AAB with technical assistance as needed.
- Review AAB audit plans and audit reports.
- At a time agreed to by the parties, conduct MT audits after providing audit plans for review.

7. <u>Complaints Compliance Status Table</u>

Table 7 provides the compliance status for each paragraph in the Complaints section.

| TABLE 7 | | | | | |
|---|---|---|---|---|---|
| **PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENT** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **Preface** | Complaints are fully and fairly investigated, and personnel are held accountable. | Partial | Partial | No | No |
| | **Notes:** The Department has not met this standard in any MT or AAB audit. Policy implementation is in partial compliance for most provisions because directives were issued at the AV stations in the interim while the departmentwide policies are developed and implemented. | | | | |
| **124** | Public has access to complaint forms and information. | Partial | Partial | Yes 12/24 | No |
| | **Notes:** The MT's site visit in March 2024 documented that complaint forms were available at six of seven locations. The two AAB audits conducted in 2024 have found the required material is regularly made available to the public at all seven AV locations. Sustained compliance will be assessed with MT or AAB audits. | | | | |
| **125a** | Accept all complaints. | Partial | Partial | No | No |
| | **Notes:** LASD was not in compliance with the requirement to accept all complaints in either MT audit. AAB's 2024 audits found that in many cases field sergeants did not initiate a complaint upon becoming aware of alleged misconduct and several watch commanders did not initiate a complaint when required. Also, complainants who call the 800 phone line, which is designed to provide complainants an alternative to calling the station directly, are routinely directed to the station. | | | | |
| **125b** | LEP language assistance. | Partial | Partial | Yes 12/24 | No |
| | **Notes:** LASD was not in compliance for providing language assistance in the first MT audit but was in compliance in the second MT audit, subsequent MT reviews, and the AAB audits. Sustained compliance will be assessed with MT or AAB audits. | | | | |
| **126** | Refusal to accept a complaint or discouraging or providing false information about filing a complaint is grounds for discipline. | Partial | Partial | Yes 12/24 | No |
| | **Notes:** The second MT audit and subsequent MT reviews, as well as the AAB audits, did not identify any SCR in which a complainant alleged that a Department employee refused to accept, discouraged or provided false information about filing of a complaint. Sustained compliance will be assessed with MT or AAB audits using statistically valid samples and will require approved and implemented complaints policies. | | | | |
| **127** | Revise MPP, SCR, and IAB manuals so they are complete, clear, and consistent. | Partial | No | No | No |
| | **Notes:** On November 3, 2021, the Monitors and DOJ authorized the Department to move forward with publishing and implementing the MPP, SCR Handbook, and IA Handbook. Three and a half years later none of them have been published but reports are that the meet and confer is making progress. Also, a revised Guidelines for Discipline has not been submitted for Monitor and DOJ review and approval. | | | | |

| TABLE 7 |
|---|
| **PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS** |

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENT | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **128** | Ensure personnel complaints are not misclassified as service complaints. | Partial | Partial | Yes 12/24 | No |
| | **Notes:** LASD was found to be in compliance for the first MT audit but not in compliance for the second MT audit. AAB's 2024 audits have shown compliance with this requirement. Sustained compliance will be assessed with MT or AAB audits using statistically valid samples. | | | | |
| **129** | Revise policies for allegations requiring IAB investigation and behavior requiring formal discipline. | No | No | No | No |
| | **Notes:** This is awaiting publication of the three policies in SA paragraph 127 and a revised Guidelines for Discipline. | | | | |
| **130** | Ensure each complaint is appropriately classified at outset and review. | Partial | Partial | No | No |
| | Investigate every allegation even if the complainant did not specifically articulate it. | Partial | Partial | No | No |
| | **Notes:** Not in compliance in the MT audits or AAB's 2024 audits. | | | | |
| **131** | Investigations are as thorough as necessary to reach reliable and complete findings. | Partial | Partial | No | No |
| | **Notes:** This has been a critical shortcoming in every MT or AAB audit. | | | | |
| **132** | Refer appropriate cases to IAB or ICIB. | Partial | Partial | Yes 12/24 | No |
| | **Notes:** Compliance could not be determined in the first MT audit because there were no relevant cases in the audit population. There were two such cases in the second MT audit and neither was referred as required, but subsequent MT reviews and AAB audits since then have not identified any complaints that should have been referred to IAB or ICIB and were not. Sustained compliance will be assessed with MT or AAB audits using statistically valid samples and will require an approved and implemented Guidelines for Discipline. | | | | |
| **133** | Investigation conducted by uninvolved supervisor. | Partial | Partial | Yes 12/20 | Yes 12/24 |
| | **Notes:** The second MT audit and the 2024 AAB audits have shown that an uninvolved supervisor is consistently being assigned to conduct complaint investigations. | | | | |
| **134** | Identify all persons at scene. | Partial | Partial | No | No |
| | **Notes**: Prior MT audits found the Department in compliance, but the three AAB complaint audits conducted in 2024 showed a cumulative total of 63% which is non-compliant. | | | | |

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENT | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **135** | Obtain a full statement from all persons at scene. | Partial | Partial | Yes 12/24 | No |
| | **Notes**: The first MT audit found compliance with this requirement while the second MT audit found non-compliance.[46] Subsequent MT reviews and the 2024 AAB audits since then found compliance. Sustained compliance will be assessed with MT or AAB audits using statistically valid samples. | | | | |
| **136** | Investigator interviews complainant in person or gives justification. | Partial | Partial | No | No |
| | **Notes:** The first MT audit found non-compliance and the second found Unable to Determine. AAB's 2024 audits found 35% compliance with this requirement. | | | | |
| **137** | Interview witnesses separately. | Partial | Partial | Yes 12/24 | No |
| | Use uninvolved interpreter for people with LEP. | Partial | Partial | Yes 12/20 | Yes 06/24 |
| | **Notes:** MT audits found non-compliance, but subsequent MT reviews and the 2024 AAB audits have shown that witnesses are being interviewed separately and that an uninvolved interpreter has been provided consistently when needed. Sustained compliance will be assessed with MT or AAB audits using statistically valid samples. | | | | |
| **138** | Provide supervisor and deputy training on intake and investigations. | NA | Partial | Partial | No |
| | **Notes:** Directives exclusive to the AV were issued in 2018 and watch commanders have been trained in those directives. New training will be required after publishing the SCR Handbook, the MPP section, and the Administrative Investigation Handbook. | | | | |
| **139** | Provide supervisor training on misconduct investigations. | NA | Partial | Partial | No |
| | **Notes:** See Paragraph 138. | | | | |
| **140a** | Conduct semi-annual audits of public complaints. | Yes | Yes | Yes 12/24 | No |
| | **Notes:** The Department conducted and published two approved complaint audits in 2024 (of complaints occurring in 2023), bringing it into compliance with this paragraph. However, sustained compliance is contingent on eliminating the backlog of complaints investigations so reliable samples can be taken in order to ensure that audits reflect the entire population. | | | | |

Table heading:

**TABLE 7**

**PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS**

---

[46] The MT does not consider it a violation of SA paragraph 134 if not everyone at the scene was interviewed but BWC footage and other evidence clearly indicates anyone not interviewed was inconsequential to the investigation.

| TABLE 7 | | | | | |
|---|---|---|---|---|---|
| **PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENT** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **140b** | Complaint dispositions are consistent with preponderance of evidence standard. | Partial | Partial | No | No |
| | **Notes:** MT audits and the AAB 2024 audits found the Department out of compliance with the requirement that adjudications meet the preponderance of evidence standard. | | | | |

## I.  Accountability

The Department is well on its way to revitalizing its accountability systems. Line level managers now have access to real-time information on their deputies' risk-management behaviors and they are able to easily make peer-to-peer and unit-to-unit comparisons. The AV captains along with NPD are developing a simpler and more efficient way to conduct periodic risk-management reviews of the employees in their commands and the Department is developing a plan for replacing the cumbersome Quarterly Reports. The PMP process is being completely revamped and the efforts undertaken to improve access to and use of data systems will streamline monitoring of at-risk employees. While compliance status has not changed, the Monitors expect that the progress made in this reporting period will bring about improvements in other related areas and contribute to compliance findings over the next six months.

1.  <u>PRMS Functionality and Reliability</u>

- LASD is in compliance with Paragraph 141a concerning the use of PRMS as a Department-wide decision support system that allows for peer-to-peer and unit comparisons.
- LASD is now in compliance with paragraph 142, ensuring the accuracy of PRMS data.

Over the last year the Department has made great strides in providing line-level managers access to risk management data. The dashboards that have been built allow managers to more readily access and assess their employees' work histories including personnel complaints, uses of force, stops data, arrests where obstruction was the sole charge, and body-worn camera activations. Managers are able to access this data in "real time" and make peer-to-peer as well as unit-to-unit comparisons. For example, one AV captain was able to show a deputy he had the highest number of personnel complaints of anyone in the entire Department. The impact and benefit that resulted from having been confronted with such specific information has changed the deputy's behavior in the field and even around the station.

We were informed several months ago that over 1,000 personnel complaints and uses of force had not been entered into PRMS because they were awaiting correction after being rejected at the Preliminary Data Entry (PDE) stage. The data dashboards developed to give managers real-time access to risk management information rely heavily on timely PDE data. Such a large backlog would raise serious concerns about the reliability of the risk management data used for several key programs including the Risk Management Forum, Quarterly Reports, and Performance Mentoring. AAB agreed to conduct a review of the PDE error-rejection rate and process. We received the AAB report at the close of this period and it showed that the actual backlog for AV investigations was far less and, in fact, most likely has no impact on the reliability of PRMS or the POINT system used by station commanders to assess deputy and work group performance.

Now that PRMS has shown itself to be reliable and accessible, the focus must shift to ensuring the accuracy of the reports used to populate it. For example, completed use-of-force and complaint investigations are sent to the Discovery Unit where the final information is entered into PRMS. Our audits have shown that Discovery is very adept at entering the information captured on the face sheets of those reports. In fact, they rarely make an error. But the information captured on the face sheets is not as reliable. A recent audit of personnel complaints found 71% accuracy for the critical information

entered on the SCR forms and 54% accuracy of the noncritical information. This simply must improve if the Department's accountability systems are expected to rely on PRMS for critical risk management information.


2.  Backlogged Complaint Investigations

As we discussed in the Complaints section and in previous reports, the AV captains have spent a great deal of time in the last year dealing with the extremely large backlog of use-of-force and complaint investigations they inherited from their predecessors. Both stations have eliminated their use-of-force backlog and Palmdale has caught up on personnel complaints. The only hurdle remaining is the backlogged personnel complaints at Lancaster. As detailed in the Complaint section above, this significantly impacts the ability of AAB or MT audits to provide reliable and timely reviews of the AV complaints process and precludes using current AAB audits to assess compliance. It also has ramifications for holding personnel accountable, tracking trends, and having a fair and effective complaint process for both complainants and deputies. It is clear that the Department understands these issues and is engaged in ongoing efforts to address them. We are hopeful this issue will be resolved in the next reporting period and that processes will be put in place to avoid similar backlogs in the future.


3.  Quarterly Reports

• LASD remains in partial compliance with SA Paragraph 141b regarding unit commanders and supervisors conducting periodic reviews of all deputies and work units.

The Quarterly Reports were designed to meet the SA Paragraph 141 requirement for periodic review of all deputies and units (SA Paragraph 141a). They were meant to serve as an interim measure until the Department procured and/or developed modern records management systems that would provide more efficient and reliable report preparation, review, and tracking. Since they were instituted, the parties have agreed that the largely manual process of preparing and processing the Quarterly Reports was a heavy burden. The AV captains, in concert with NPD and IT, are currently developing an alternative approach that should satisfy the requirement for periodic review of deputies and work units which the Quarterly Reports had been intended to meet. This will likely incorporate POINT and the other dashboards that dramatically reduce the time required to retrieve and analyze data, including improvements in the ability to make peer-to-peer and unit-to-unit comparisons. Meanwhile, as reported above in Stops, the Department continues its efforts to procure a new records management system that will automate much of the data used to compile these types of reports.

In late September 2024, we received the quarterly reports for the fourth quarter 2023 and first quarter 2024. Those reports were generally thorough and provided good insight into patterns of force and personnel complaints, stops, and obstruction arrests. We reviewed those reports and provided the AV captains with feedback. Subsequently, the parties agreed LASD would discontinue the Quarterly Reports in their current form as they sought an alternative approach.

Lessons learned from the Quarterly Reports are relevant to other SA-required accountability practices.

The MT continues to express our concern that the methodology used to assign deputies to the Quarterly Report was too broad, leading to an unmanageable number of deputies on the report. The unintended result was that the sheer number of deputies listed in the reports could obfuscate the activities of deputies who may be most in need of additional supervisory and managerial attention. This risk is of particular concern for deputies in sensitive or peer-leadership positions such as field training officers (FTOs), detectives, and school resource deputies (SRDs). In several risk management processes, deputies rise to managers' attention according to "thresholds" that have been established and which are meant to balance limiting the number of deputies under consideration with the need to cast a wide enough net to ensure those needing attention are, in fact, identified. Currently, the Department needs to develop more meaningful and effective thresholds, including determining specific and most relevant performance measures and establishing an appropriate and well-reasoned numeric cut-off for inclusion. Importantly, thresholds are not only needed for the replacement for the Quarterly Reports but also for aspects of the PMP program and the Risk Management Forum. While the actual thresholds for each may be somewhat different depending on the specific objectives of those activities, the MT encourages the Department to standardize their approach to establishing those measures so that they can build off each other and each play their part in an integrated risk management and accountability system.[47] The MT has expressed its belief that relatively simple Top Five or Top Ten lists of deputies in each agreed-upon high-risk category, with emphasis on those deputies on more than one such list, is a useful starting point for this discussion. We look forward to reviewing the proposal for an alternative to the Quarterly Reports and how it will be integrated with the closely related Risk Management Forum as well as the Performance Mentoring Program reviews.

4. <u>Performance Mentoring Program</u>

- LASD remains in partial compliance with paragraphs 144 and 145 regarding the PMP program.

Throughout this reporting period, the Department did devote much attention on revamping the PMP program to meet the SA paragraphs 144 and 145.

Previously, the Department's long-standing approach to identifying and managing at-risk employees was for Risk Management Bureau (RMB) to provide station commanders with a quarterly list of deputies who met certain criteria based on the antiquated "Sheriff's 11" report. Station managers then evaluated the employees on that list and provided RMB with recommendations on which employees should be placed on unit or Department performance mentoring.

The MT's 2022–23 audit of the Performance Mentoring Program (PMP) identified several fatal flaws with

---

[47] As an example, many of the deputies on the Quarterly Reports are there based on how many NCI uses of force are on their record. NCIs are the least severe uses of force and are typically among the most common and the least problematic. Also, a deputy will be counted as having a UOF, including an NCI, even arriving to a scene to serve in a back-up role for other deputies already engaged in an altercation. We in no way condone the use of unnecessary force at any level and we recognize that deputies who use NCI force more than their peers may need attention and, so this information does need to be tracked. As we have discussed in several semi-annual reports, we also believe the inclusion of NCI force in these reports contributes to the excessive numbers of deputies on them and have encouraged the Department to modify the thresholds with regard to NCIs.

this approach.

- First, the Sheriff' 11 report was comprised only of completed investigations, investigations that have been approved by the division chief and entered into PRMS. That process often takes over a year and sometimes several years to complete. As a result, the Department's "early warning system" was populated by data which was often several years old.
- Secondly, neither AV station had a written PMP plan as required by the Department's PMP Handbook. So there were no formalized procedures at either station for dealing with deputies who were placed on unit level PMP.
- Finally, the "top down" approach, where RMB provided the list of deputies that station managers were to evaluate, did not hold managers accountable for identifying and addressing their at-risk personnel. Also, station managers had no access to automated real-time data so they were completely dependent on the reports they received from RMB. Managers often took the position of explaining why the deputies on the RMB list did not need further attention and, with little information at their disposal, did not, in turn, identify deputies who did.

Based on the these findings, the Department began completely revamping its Early Warning System (EWS) and approach to performance mentoring. One major change has been the shift from using completed investigations identifying patterns to using information entered during Preliminary Data Entry (PDE). Unlike the old system, which captured events that were often several years old, PDE captures most events within a day or two of occurrence. This provides a much more robust and timely view of emerging risk management concerns. To capitalize on that approach, the Department also developed the dashboards to provide line-level managers with the ability to access and analyze risk-management data including uses of force, personnel complaints, stops, and other areas. As mentioned above and described in detail in the Stops section, the dashboards have greatly improved the ability of station commanders to track data, identify risk management issues and hold employees and their supervisors accountable for their performance.

This access to real-time risk management information has also improved the Department's approach to Performance Mentoring. The Department has developed an efficient and robust electronic tracking system to monitor the entire PMP process. The new automated system tracks an employee/mentee through every stage of the program, with accountability built in for each role: mentor, mentee, unit commander, division commander, and PMP Commanders Panel. Performance measures and progress notes are recorded at each stage. The Department has also created a dedicated mentoring resource site which contains training aids and guides.

In another major step, the PMP Handbook has been completely revised and the following five supporting guides have been developed:

- PMP Reference Guide;
- PMP User Guide;
- PMP Scripts, which help promote consistency during PM meetings and standardize workflow;
- PMP Commander Panel User Guide; and
- Unit Commander Presentation Outline, to ensure all relevant issues are addressed.

The Monitors and DOJ have reviewed these documents and provided input. We expect the updated guides to be finalized soon. We summarize some of their key elements here.

- Responsibility for identifying and addressing at-risk employees rests with each unit commander.
- RMB will function as a "back stop" to ensure at-risk employees are being identified and addressed by their unit commanders.
- RMB along with the PMP Commanders' Panel will continue to coordinate both unit-level and Department-level performance mentoring using the PMP application suite to track each case
- An employee will be on unit-level PMP for a minimum of six months, and not to exceed one year. Along with expanded supervisorial engagement, the employee will be scheduled for a minimum of two training sessions in their identified area(s) of need and will participate in at least one community engagement event. If the employee continues engaging in risky behavior, the commander's panel can elevate them to Department-level PMP.
- Department-level mentoring is more rigorous and requires the employee to engage in at least four training sessions in their identified area(s) of need and attend a minimum of four community engagement events. Participation in Department-level PMP is for a minimum of one year but not exceeding two years.
- Unit-level and Department-level mentoring conclude with a Completion Assessment conducted by the mentor, a mentee survey, and an exit discussion between the mentee and the unit commander. Placement in unit- or Department-level performance mentoring or a determination of successful completion of the mentoring program only occurs with the final approval of the Commanders Panel.

In addition to these improvements to the PMP program, each AV station has assigned a sergeant as the station's full-time PMP coordinator. This is an excellent measure to ensure that deputies receive the attention and support they need. The AV stations are also prioritizing supervisor consistency for deputies on PMP—an important culture shift.

Compliance with this provision will require the finalization of the new handbooks and related documents and then evidence of it producing the intended outcomes. Once it has time to function we will initiate an audit to assess compliance with the SA.

5.  <u>Coveted Positions</u>

In our last report, we reiterated our concern regarding the number of AV deputies with concerning risk-management patterns who are also serving in prestigious assignments, most notably detectives and FTOs. We were unable to continue our monitoring in that area due to the temporary suspension of the quarterly reports that went into effect right after the first quarter of 2024. We will resume monitoring this trend once the new periodic review system is in place and remain hopeful that the Department will identify a solution to this trend.

6. <u>Next Steps</u>

*a. LASD*

- Develop a replacement for the quarterly reports and submit it for Monitor and DOJ approval.
- Finalize the PMP directives and, once approved, fully implement the new PMP system.
- Continue to monitor and assess the reliability of data contained in PRMS and other data systems.
- Continue to refine the dashboards to capture and analyze critical risk-management information as part of the Department's Early Warning System.

*b. The Parties and MT*

- Review and approve the plan for conducting periodic reviews of employees and work units.
- Review and approve the revised PMP directives.

*c. The MT*

- At an appropriate time, work with parties to develop an auditing plan and re-initiate the PMP audit.
- Continue to provide technical assistance, as requested, on the PMP, data systems, and other topics.

7. <u>Accountability Compliance Table</u>

Table 8 provides the compliance status for each paragraph in the Accountability section.

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| | **TABLE 8** **ACCOUNTABILITY COMPLIANCE STATUS** | | | | |
| **141a** | • PRMS serves as LASD-wide decision support system. <br> • Modify system to allow peer-to-peer comparisons of deputies and units. | Partial | Partial | Yes 12/24 | No |
| | **Notes:** PRMS is used Department-wide. The new dashboards provide for peer-to-peer and unit comparisons. LASD is currently discussing the thresholds for informing peer-to-peer comparisons. This demonstrates that LASD recognizes that, although compliance may be achieved, further improvement is still expected. | | | | |
| **141b** | AV commanders will conduct periodic reviews of all personnel to identify trends. | Partial | Partial | Partial | No |
| | **Notes:** With the advent of the new dashboards, LASD is exploring ways the topics covered in the quarterly reports can be addressed in a more efficient way moving forward. The AV captains, in consultation with NPD, are developing a proposal to accomplish that. Pending approval of an alternative proposal the Department remains in partial compliance with this requirement. | | | | |
| **142** | • Modify PRMS to access additional info. <br> • Maintain PLEs in electronic format. <br> • Ensure PRMS is accurate and that there is accountability for errors. | Partial | Partial | Yes 06/2025 | No |
| | **Notes:** The dashboards provide ready access to PRMS and LASD has various important data checks in place to ensure the data is reliable. In fact, we have found extremely low error rate in Discovery's data entry process. Sustained compliance will require continued checks and reliability audits, corrections to systemic or process issues identified, and employees held accountable to inaccuracies in data entry. | | | | |
| **143** | LASD will establish a plan for periodic review of trends at stations. | Partial | TBD | Partial | No |
| | **Notes:** See 141b. | | | | |
| **144** | Make modifications to Performance Mentoring Program (PMP); ensure 30-day turnaround. | Partial | Partial | Partial | No |
| | **Notes:** The Department has completely revamped its PMP process, including rewriting the PMP handbook. The MT has provided feedback on further refinements to the handbook and we are awaiting a final draft. | | | | |
| **145** | Coordinate between Department-wide and unit PMP. | Partial | Partial | Partial | No |
| | **Notes:** See Paragraph 144. | | | | |

**APPENDIX A: MONITORING TEAM AND WEBSITE**

**Monitoring Team**

The Court-appointed Monitors—Dr. Angie Wolf and Joseph Brann—have assembled an experienced team with credentials and skills uniquely suited to the SA work. The membership of the MT was finalized in March 2016. The two Monitors and seven team members have extensive expertise and experience in monitoring, auditing, and evaluation work in policing and corrections.

Additionally, most of the MT members have served in law enforcement, several in the Los Angeles area. Several have served in leadership positions in law enforcement or corrections agencies during the implementation of the compliance period of a settlement agreement or consent decree and therefore understand the unique challenges that large organizations face in those circumstances. The MT members also have expertise in dealing with the diverse issues addressed in the SA, such as those related to UOF, training, the Fair Housing Act, data collection and analysis, survey methods, and the complexities of community engagement.

**Antelope Valley Monitoring Website**

This website allows AV community members to learn more about the SA, the backgrounds of MT members, and the monitoring activities; access documents related to the monitoring work, including each semi-annual report, each Community Survey report, MT audits, and MT data analyses; follow links to LASD's homepage and other relevant websites; and, importantly, submit questions and comments directly to the MT.

The website's URL is www.antelopevalleysettlementmonitoring.info

**APPENDIX B: SETTLEMENT AGREEMENT COMPLIANCE**

Much of the SA involves developing or revising policies, procedures, and training; putting into place various processes (such as a plan for ensuring all new AV deputies receive training mandated by the SA or additional accountability mechanisms to facilitate peer comparisons); assessing data and information to guide the implementation of required reforms and to determine their effects; and striving to more effectively engage with community organizations and entities, such as the Community Advisory Committees (CACs). This work is usually done collaboratively among the Parties and the MT, with documentation of the change (new policy, revised training, etc.) eventually being formally submitted to the MT and DOJ for approval.

For most provisions, several steps are involved before the Department can reach full <u>implementation</u> (SA Paragraph 20) and thus achieve the status of being in full compliance. Paragraph 149 states, "Compliance with, or implementation of, a material requirement of this Agreement means that LASD has: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice."

Any approved policies related to the SA must be distributed to every deputy according to SA-required procedures and, as necessary, incorporated into training curricula. An approved training curriculum will require documentation that appropriate personnel received the training. New procedures and processes must be successfully instituted. Most importantly, each of the established improvements must be proven effective and practical in the real world—that is, they are assessed through MT activities such as reviews, audits, interviews, observation, and data analysis to establish whether they are successfully reflected in law enforcement practices and achieve the intended qualitative and quantitative impacts on the AV community. Paragraph 153 lays out several qualitative and quantitative outcome assessments the MT will do "to measure whether LASD's implementation of this Agreement has eliminated practices that resulted in DOJ's finding a pattern and practice of constitutional violations."

Changes to policy and practice also must be incorporated into LASD-AV's accountability practices. The reviews, analyses, studies, and audits that the SA requires LASD to conduct must use appropriate methodologies, and, in turn, their findings must be used effectively to inform policies and practices.[48] Finally, this level of performance must be sustained for one year to achieve <u>full and effective compliance</u> and to satisfy the terms of the SA (Paragraph 205). In some cases, the SA requires ongoing improvement in the delivery of services (Paragraph 15).

This process of achieving compliance is laid out in various provisions of the SA, especially through the

---

[48] Paragraph 171b gives a summary of the stepwise process by which the Monitors assess compliance and document their findings. Each provision of the SA needs to be "(1) incorporated into policy; (2) the subject of sufficient training for all relevant LASD deputies and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitor to have been fully implemented in practice."

following paragraphs.

- In Paragraph 20, implementation is defined as "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice." What is meant by "consistent and verified performance" is to be laid out in compliance metrics for each provision.
- According to Paragraph 205, the terms of the SA will have been met when "the County has achieved full and effective compliance with the Agreement and maintained such compliance for no less than one year."
- In Paragraph 15, full and effective compliance is defined as "achieving both sustained compliance with all material requirements of this Agreement and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to the Agreement's outcome measures."

Compliance metrics or measures represent the specific quantitative and qualitative criteria by which the MT will assess compliance with each SA provision. The written metrics reflect the language of the SA, but they also ensure the Parties and the MT agree on how the SA language translates into workable and measurable standards for LASD-AV policy and practice and for assessing compliance.

It is important to note that the SA was not written in a "check the box" fashion that would require or allow each provision to stand separately such that it would then be evaluated based on a single, straightforward compliance metric for each provision. The assessment work that is required to evaluate the intended outcome for one provision is sometimes dependent upon the activities of and relationship to other provisions, and therefore they are interconnected. For example, the Department cannot draw conclusions about the potential disparity in its programs and activities (SA Paragraph 68) without completing the assessments required of deputy performance, stops, community input, uses of force, and complaints (SA Paragraphs 67, 82–86, 88, 120–123, 140). Similarly, the MT's compliance assessment for one provision may partially depend on the compliance assessment for another. In short, in some cases, as long as the Department is not in compliance with one provision, it necessarily will be out of compliance with one or more other provisions.