OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
*dharrison@counsel.lacounty.gov*
Carrie Clarke (150031)
Senior Deputy County Counsel
*cclarke@counsel.lacounty.gov*
Jonathan McCaverty (210922)
Assistant County Counsel
*jmcaverty@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone: (213) 631-8374
Facsimile: (213) 626-2105

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
*rdugdale@kbkfirm.com*
10100 Santa Monica Boulevard, Suite 2500
Los Angeles, CA 90067
Telephone: (310 272-7904
Facsimile: (310) 556-2705

Counsel for Defendants
The County of Los Angeles and the
Los Angeles County Sheriff's Department

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>THE COUNTY OF LOS ANGELES and THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT,<br><br>                    Defendants. | Case No. 15-CV-03174-JFW-FFM<br><br>**SUBMISSION OF MONITORS' TWENTY-FIRST SEMI-ANNUAL REPORT** |

**Kendall Brill**
**& Kelly LLP**
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604485716

On May 1, 2015, the Court approved and entered the parties' Settlement Agreement (the "Agreement") to resolve the United States' claims in this matter against the County of Los Angeles and the Los Angeles County Sheriff's Department pursuant to 42 U.S.C. § 14141 (re-codified at 34 U.S.C. § 12601) and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

Paragraph 171 of the Agreement requires the Monitors to publicly issue a report every six months that details the Parties' progress in implementing the Agreement and achieving compliance with the Agreement.  To that end, the parties submit the Monitors' Twenty-First Semi-Annual Report.

DATED:  January 26, 2026          KENDALL BRILL & KELLY LLP

By:        /s/ Robert E. Dugdale
Robert E. Dugdale
Counsel for Defendants
The County of Los Angeles and the
Los Angeles County Sheriff's Department

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 2500
Los Angeles, CA 90067

604485716

2

SUBMISSION OF MONITORS' TWENTY-FIRST SEMI-ANNUAL REPORT

# Antelope Valley Monitoring Team
# 21st Semi-Annual Report



## December 2025

**CONTENTS**

I.       Introduction...........................................................................................................................1

II.      Work to Date........................................................................................................................2

         A.      Monitoring Activities in This Reporting Period ..................................................2

         B.      Stops, Seizures, and Searches...............................................................................5

         C.      Bias-Free Policing .................................................................................................21

         D.      Enforcement of Section 8 Compliance...............................................................21

         E.      Data Collection and Analysis................................................................................32

         F.      Community Engagement........................................................................................32

         G.      Use of Force...........................................................................................................36

         H.      Personnel Complaint Review................................................................................48

         I.      Accountability ........................................................................................................66


Appendix A: Monitoring Team and Website.........................................................................A1

Appendix B: Settlement Agreement Compliance..................................................................B1

**TABLES**

Table 1: Stops, Seizures, and Searches Compliance Status

Table 2: Bias-Free Policing Compliance Status

Table 3: Enforcement of Section 8 Compliance Status Table

Table 4: Data Collection and Analysis Compliance Status

Table 5: Community Engagement Compliance Status

Table 6: Use-of-Force Compliance Status

Table 7: Personnel Complaint Review Compliance Status

Table 8: Accountability Compliance Status

## I.  INTRODUCTION

This is the 21st semi-annual report issued by the Antelope Valley Monitors. It describes the observations of the Monitoring Team (MT) on progress made by Los Angeles County and the Los Angeles County Sheriff's Department (LASD or the Department) in meeting the requirements of their Settlement Agreement (SA) with the US Department of Justice (DOJ) for the Antelope Valley (AV).[1] This report focuses on work conducted between July and December 2025.

Through their diligent efforts, LASD has maintained steady progress toward compliance throughout the SA, with the most notable gains made in the areas of complaints, stops, and accountability. We have heard from many AV community members that they are noticing changes in the way Department personnel interact with individuals in the community and in the stations' openness to input. We note that some law enforcement activities that have the highest potential for having a negative impact on community trust—such as uses of force and backseat detentions—have reduced in number and, when they do occur, are being conducted in a professional and respectful manner. Indeed, LASD is in the home stretch of the SA, having achieved compliance with most of the provisions and with a significant number of provisions now in sustained compliance. We join LASD in acknowledging their impressive progress and yet caution the Department against "taking their foot off the gas." Maintaining success is hard, particularly so when considering ongoing staffing challenges, budget constraints, and shifting priorities that inevitably arise.

### A.  Progress Toward Compliance

As a result of their conscientious efforts over the past three years, LASD is compliance with the significant majority of provisions in the SA. Perhaps the most significant turning point for LASD in this reporting period was the implementation of several new processes to utilize data to inform policing and management practices, adding to those developed earlier. As a result of Department managers utilizing these new tools, LASD has achieved compliance in many data-related paragraphs across the SA. There are additional needs that can be achieved through ongoing investments in and upgrading of technology and data systems. It is critical that LASD continues to invest in modernizing and enhancing its key data systems, including computer-assisted dispatch, records management and reporting, and data retrieval capabilities, in order to maintain compliance and ensure the hard-fought gains recently made are sustained. We are confident that if LASD is able to continue to improve their technology systems and to institutionalize the new management review processes, then sustained compliance— that is, compliance maintained for at least one year—will be forthcoming in the next six to 12 months for those areas recently brought into compliance. Perhaps more importantly, LASD systems need to and, with further improvements, will support modern policing practices.

We also stress that there is more work to be done. We note that in several areas, LASD has achieved success largely due to the hard work of the individuals currently assigned to key positions, including management and staff in the Office of Constitutional Policing (OCP), North Patrol Division (NPD), AV stations, Compliance Unit (CU), Audit and Accountability Bureau (AAB), and Data Analytics and

---

[1] Settlement Agreement, No. CV 15-03174, *United States v. Los Angeles County et al.* (D.C. Cal. Apr. 28, 2015).

Technology (DATA) Team. To achieve sustained compliance, LASD must focus on continued examination and documentation of outcomes and making adjustments when needed, continued communication and collaboration with the Antelope Valley community, and, crucially, memorialization of the various processes put in place to achieve SA compliance.

### B.   Remaining Milestones

Even with the substantial progress described in this report, there remain critical gaps in some areas that need to be filled. Most of these are on the verge of compliance but need that extra push to be fully approved and implemented. These include but are not limited to the following.

- Finalize the complaints-related policies, most of which are now in meet and confer.
- Finish the rollout of community engagement training and fully integrate community policing and problem-solving policing into station practices.
- Continue to improve and integrate data-driven decision making into station operations, oversight, and accountability, including regularly reviewing deputy and unit performance and regularly assessing patterns and trends to identify and respond to potential unintended impacts of law enforcement activities. This includes Department executives and NPD management providing support to station managers in terms of clear policies, clear expectations and guidance, and sufficient resources, as well as reinforcing the messaging regarding the value that a culture of self-assessment and accountability provides to <u>all</u> personnel.
- Work with the MT to evaluate the effectiveness of the Performance Mentoring Program (PMP) and the Quarterly Report, and to make adjustments if necessary.
- Lastly, codify and document the various processes that are currently driven by the hard work and commitment of individuals.

It is also critically important that SA reforms put in place are sustainable into the future. New processes take time to mature and be fully integrated into Departmental practice and culture. Therefore, the Department must continue to press for sustained compliance with SA provisions that have reached compliance.

## II.   WORK TO DATE

### A.   Monitoring Activities in This Reporting Period

To further our responsibilities regarding SA compliance assessment and providing technical assistance, the Monitoring Team continued to conduct various work activities in this reporting period. We participated in regular meetings with the Parties (LA County, LASD, and DOJ), the Community Advisory Committees (CACs), and community members; conducted site visits; engaged in ongoing telephone and electronic communications with Compliance Unit, AV station and NPD leadership, various LASD bureaus, OCP, DOJ, and community members; and provided feedback on our observations of management performance based on station visits and meetings held to review critical incidents and risk

management issues.[2] Examples of the specific activities undertaken for various sections of the SA are discussed in more detail below.

1. <u>General</u>

Attended meetings at the Hall of Justice, the Compliance Unit and Sherman Block Building in Monterey Park, training facilities, and at the AV stations; held smaller in-person meetings with Sheriff Robert Luna, the Director of the Department's Office of Constitutional Policing, Compliance Unit personnel, AAB, and station managers; participated in regular virtual meetings; and shared daily electronic correspondence.

2. <u>Stops and Bias-Free Policing</u>

- Met and regularly communicated with LASD AAB to review 2025 stops audits and related work plans.
- Reviewed the curriculum and observed pilot session of LASD's Principled Community Policing for Patrol course.
- Observed training sessions for compliance with the SA stops and bias-free provisions.
- Regularly met with LASD staff to provide feedback and technical assistance (TA) on the development and enhancement of their online stops and risk management dashboards and tools.
- Reviewed and verified the use of LASD's SACR Supervisor Review Application and Deputy Report or Citation Rejection Form.
- Continued to provide TA to LASD regarding crime prevention strategies by reviewing documents, providing feedback, and meeting with station captains.
- Reviewed the results of the Center for Policing Equity (CPE) study of stops and UOF in the AV. Discussed the findings with AV station commanders and attended the community rollout meeting for the report.
- Conducted meetings with leadership at the AV stations, and attended community meetings in the AV.
- Reviewed AAB audit plans and reports related to the stops provisions.
- The MT conducted in-depth reviews and verifications of AAB stops audits and discussed with AAB personnel audit methodologies, results, and related training considerations.

3. <u>Data Analysis</u>

- Reviewed draft of LASD's second semi-annual report on stops in the AV for the period of January through June 2025.

---

[2] See the Monitors' previous semi-annual reports and, in particular, the 15th Semi-Annual Report, Appendix D Only.pdf, under Documents and Reports at our website, http://www.antelopevalleysettlementmonitoring.info, for more detailed information about the work history for each SA paragraph.

- Observed a variety of meetings where data were applied and discussed and provided feedback on those activities.

4. <u>Community Engagement</u>

- Observed presentations by the OCP on community engagement activities and plans.
- Attended CAC, town hall, and other community meetings, including CPE's report rollout to the community.
- Met and maintained ongoing communication with LASD leadership regarding the CACs, community engagement efforts, and community concerns.
- Sustained regular communication with CAC members and other community members.
- Reviewed AV stations' crime prevention strategies and other documents and reports.
- Reviewed individual deputy community engagements (755s) for the year 2025 and assessed for compliance.
- Reviewed documentation, observed presentation, and provided feedback on LASD's Crime Management Forum (CMF) and Risk Management Forum (RMF).
- Continued reviewing and providing feedback on the Department's community engagement training, guidebook, and attendance plan.
- Attended the Department's pilot community engagement training and provided them with feedback.
- Attended and gave a presentation to the Los Angeles County Sheriff Civilian Oversight Commission regarding the general status of LASD's compliance with the SA.

5. <u>Use of Force</u>

- Conducted the 7th MT AV UOF Audit and submitted the draft report to the Department and DOJ.
- Assessed AAB UOF Reassessment Audit (August 2025).
- Consulted with AAB auditors and reviewed the AAB SA Paragraph 106 audit.
- Reviewed AAB's limited-scope audits addressing SA Paragraph 112 regarding supervisory review of force.
- Reviewed the Department's Taser 10 training lesson plans.

6. <u>Complaints</u>

- Worked with AAB to refine its audit strategy, with a focus on utilizing larger, more representative audit populations.
- Worked with AAB to finalize its second and third 2025 complaint audit work plans and audit reports.
- Worked with AAB and CU on addressing Administrative Investigations that were part of an audit sample.

- Assisted AAB in developing a strategy to review the accuracy of the Performance Recording and Monitoring System (PRMS) and Preliminary Data Entry (PDE) data, then reviewed the report and prepared a summary.
- Researched a complaint brought to the Monitors' attention by a community member.
- Met with NPD Commander Justin Diez to discuss ways in which the AV stations could improve their handling of public complaints.

7. Accountability

- Reviewed and commented on the draft PMP Handbook and five supporting directives developed to guide the new PMP process.
- Attended demonstration on the Performance Oversight Information Tracker (POINT) and the systems that comprise its dashboard and provide feedback.
- Attended demonstration and worked with LASD on new Captain's Quarterly Review.
- Received and conducted initial review of Captain's Quarterly Review reports for the third quarter 2025.

**B. Stops, Seizures, and Searches**

The AV stations have now reached compliance or sustained compliance in 21 of the 23 SA paragraphs on stops, searches, and seizures. These milestones have been reached because of a concerted effort and ongoing commitment from AV station leadership, Office of Constitutional Policing, AAB, and deputies working in the AV.

1. Training

a. *Constitutional Policing Training*

- The Department remains in sustained compliance with the delivery of the approved full-day constitutional policing training (SA Paragraph 57).

LASD continued to be in sustained compliance for providing the full-day constitutional policing training for LASD-AV deputies and embedded units.[3] The constitutional policing training was provided by LASD to AV deputies again on August 13, 2025, which resulted in the stations remaining above the 95% threshold needed for compliance with this provision.

---

[3] Roll call training is provided quarterly, but attendance is assessed for compliance on an annual basis. In the past, the MT cross-checked training attendance rosters to station rosters in order to verify deputy training attendance, but the MT has now found the LASD tracking methods to be reliable for that purpose. The MT will no longer conduct its own verification processes on the constitutional policing, bias-free policing, or roll call trainings unless there are indications that further review is needed.

Due to the retirement of the current external instructor, LASD will assign a new instructor from LASD training staff to ensure this training is continued. The MT will work with LASD to ensure any related changes to the curriculum or training delivery remain compliant with the SA.

*b.   Quarterly Refresher Roll Call Training*

- The Department remains in sustained compliance with quarterly roll call trainings (SA Paragraph 71).

LASD remains in sustained compliance with the requirement to provide AV deputies with quarterly refresher roll call training addressing constitutional policing, bias-free policing, and housing investigations (Paragraph 71). LASD acquired a new training platform that allows station leadership to provide deputies with timely and relevant briefings beyond those required by Paragraph 71, including other SA-related topics as well as non-SA topics that the captains or NPD may want to emphasize. The training sergeant at each station will be required to train incoming sergeants on how to use the new platform and track who has received the SA-required training. LASD should continue to consider any possible training ramifications stemming from the findings of AAB and MT audits.

*c.   Procedural Justice Training*

- LASD is now in sustained compliance with SA Paragraph 42.

LASD has continued to meet the training requirements of this provision, but, as discussed in previous reports, the MT's 2023 stops audit and AAB audits that followed revealed ongoing issues with deputies displaying professionalism and the principles of procedural justice in the field. In response to those findings, the leadership at the stations worked to reinforce procedural justice and hold deputies accountable to this provision. Recent AAB audits have shown this effort has paid off, and in the two MT reviews of AAB audits this reporting period (consent search and probation and parole; see below), we confirmed that this progress has continued, and sustained compliance has since been established. Cases with issues in this regard identified in audits continue to be sent to the stations to address the issues directly with the deputies and their supervisors.

*d.   Supervisor and Management Training*

In previous reports, the MT expressed a need for additional supervision and management training to ensure that substandard performance is identified and addressed effectively. Subsequently, the AV station captains have been working hard to offer mentoring and training to staff at the stations.

LASD has continued to provide external training opportunities for more managers—lieutenants and above—to participate in professional development efforts and courses offered by groups such as the Police Executive Research Forum (PERF), the FBI's National Academy (NA), Law Enforcement Executive Development Seminar (LEEDS), the DC Police Leadership Academy, the California Police Chiefs Executive Training program, and the Peace Officers Standards on Training (POST) Command College, among others. Finally, newly appointed captains attend an in-house captain's course where they discuss

management, accountability, and supervision training. LASD also provided a use-of-force investigation course for supervisors that was approved by the MT in this reporting period. (See the UOF section for additional information.)

*e.   LASD Training Bureau Consultation With External Experts*

As noted in the 20th Semi-Annual Report, LASD received a report from the US Department of Justice Collaborative Reform Initiative Technical Assistance Center (CRI-TAC). The MT has observed that several recommendations from that report have been implemented. LASD has integrated their Respond, Observe, Assess, React (ROAR) model across training courses, such as the community engagement course and the use-of-force courses, among others. Additionally, the new online delivery of roll call training launched this year is another significant new feature that improves training capabilities for LASD.

2.   <u>Stops Data Systems and Dashboards</u>

*a.   Data Recordation*

- LASD remains in compliance with SA Paragraph 44, which requires stops to be accurately documented in Mobile Digital Computer (MDC) patrol logs.

In April 2025, LASD enhanced the SACR data collection system to document and compile all the data required by the SA, achieving compliance with SA Paragraph 44 (and Paragraph 81).[4]

Since then, the MT has reviewed data from the SACR system and numerous SACR reports as part of stops audits. The system is being used, but it relies on deputies recording stops correctly on the forms. Recent AAB audits found numerous errors between what is entered on the SACR form as compared to what is seen in body-worn camera (BWC) footage. AAB alerts the stations to these findings so the stations can address the issues with the deputies and provide additional training. Also, the newly instituted SACR supervisory review process will ensure that supervisors regularly conduct quality control checks of deputy stops documentation (see below). The MT will track LASD's progress to increase the quality of SACR completion by the deputies.

*b.   Progress Toward Procurement of New CAD and Reporting Systems*

As has been extensively documented in previous MT reports, LASD is in dire need of a replacement system for their computer-aided dispatch (CAD) system and records management system. Current systems are outdated and unreliable and have slowed progress toward compliance with SA reporting requirements. Fortunately, LASD has selected a vendor and started development of a replacement

---

[4] Note that some of the qualitative aspects of Paragraph 44 are measured in other paragraphs (e.g., sufficiency of backseat detention narratives is measured in Paragraph 47, and accuracy of the data is measured via Paragraphs 63 and 142).

system for the current CAD system. LASD has also been interviewing vendors for a new risk management reporting system to replace the largely paper-driven system currently in place. This system will be used for the tracking, completion, and storage of use-of-force investigations, Internal Affairs cases, pursuit reports, and other administrative reports. Having all the reports in one system will streamline the report completion and approval process and provide real-time management reports on the status of each case. Finally, LASD plans to upgrade the system used to complete and track crime reports. The current system is another that has largely been paper driven and will now be moved to a computer-based system. These improvements will help streamline the workflow across the AV stations and departmentwide.

3.  <u>LASD Audit and Accountability Bureau Stops Audits</u>

SA Paragraph 149 allows the MT to consider AAB audit findings as part of our SA compliance assessments. The parties have agreed that audits conducted according to approved plans, along with any needed MT verification of findings, can be used in compliance assessments. In this reporting period, AAB developed audit plans that were approved by the Monitors and DOJ that included larger samples specifically designed to be used for compliance determination.

In this reporting period, AAB conducted two rounds of stops audits (submitted June and December 2025) addressing the following:

- Consent search (two audits);
- Probation and parole (two audits);
- Backseat detentions (two audits)
- Backseat detentions (domestic violence [DV] incidents) (two audits); and
- Supervisor review of Deputy's Daily Worksheet (one audit)

The MT did follow-up verification assessments of two of the AAB audits from the first round, probation and parole and consent searches, and considered them in our compliance determinations. In our follow-up assessments, the MT reviewed AAB audit workpapers, reports, and a selection of case materials, including CAD/SACR entries, reports, and BWC videos. We found that the two audits were thorough and professional, followed the approved plans, showed strong knowledge of the approved compliance metrics, and included clear documentation of rationales for all findings. The MT did not do follow-up verification reviews of the other audits because those audits largely demonstrated a lack of compliance.

The second round of audit reports is still under review by the MT. Our initial review of the reports for the second round found they again followed the approved methods and the reports are clear and professional. The findings of the second round are largely consistent with the first.

The results of AAB audits and of MT follow-up reviews are included in discussions of relevant SA provisions in the remainder of this section.

AV Semi-Annual Report XXI July – December 2025                                                    8

4. Boilerplate Language

- LASD is now in sustained compliance with SA Paragraph 45, which requires LASD deputies not to rely on "boilerplate" language used in reports documenting investigatory stops, detentions, and searches.

The MT found LASD in compliance with this requirement in the MT audit of stops conducted in 2023, and AAB and the MT have not observed patterns or systematic violations of this provision in subsequent audits and case reviews. LASD's new SACR Supervisory Review process and Deputy Report or Citation Reject form allow supervisors and managers to track reporting issues, including boilerplate language, and any corrective action taken.

5. Backseat Detentions

- LASD remains in partial compliance with SA Paragraph 47, which requires deputies to have individualized justification and to articulate safety concerns for backseat detentions (BSDs) and that supervisors understand how to assess the reasonableness of a BSD.
- LASD remains in partial compliance with SA Paragraph 48, which requires that BSDs not be conducted as a matter of course during routine traffic stops or domestic violence situations and that deputies have an objectively reasonable basis for conducting each BSD, explain the reason for the BSD to the person detained, and sufficiently document each BSD.
- LASD remains in compliance with SA Paragraph 49, which requires deputies to call a supervisor to the scene when there is a complaint about a BSD.

While compliance has been achieved for SA Paragraph 49 regarding sergeants responding to individuals with complaints about a BSD in the field, achieving compliance with SA Paragraphs 47 and 48 continues to be a challenge for the Department.

*a. BSDs*

In this reporting period, AAB finalized two audits of BSDs occurring in the field using statistically valid samples of the populations. Although the MT did not conduct detailed follow-up case reviews for these audits, the MT reviewed the workpapers and reports and found the auditors conducted the audits according to the approved methods.

In a positive finding, the reasonableness of the BSDs rose from 87% to 96% in the two AAB audits. Additionally, the MT does not see patterns or trends showing LASD deputies use BSDs as a matter of course. In fact, the use of BSDs in the AV dropped from 4,413 in 2023 to 1,659 in 2025 (a 62% decrease).[5] This is a laudable change, as BSD is a practice that, while sometimes necessary, carries with it

---

[5] Drawn from LASD public stops dashboards on December 17, 2025.

potential for negatively impacting community trust.

However, AAB's audits found LASD continues to fall short of compliance with (1) explanation of the reason for the BSD to the community member (14% and 31% compliance in 2025 AAB audits), (2) articulation of the reason for the BSD in stops documentation (55% and 78% compliance), and (3) accurately documenting the length of the BSD (67% and 71% compliance). As is their practice, AAB communicated these issues to the AV station captains, and deputies have subsequently been provided with additional training and guidance, including Performance Log Entries (PLEs) in some cases.[6] Nevertheless, these issues are lingering and require more attention on the part of the AV stations. The MT plans to conduct a BSD audit in the next reporting period.

*b.  BSDs With DV*

In two 2025 audits, AAB auditors conducted audits specifically of BSDs associated with domestic violence (an element of SA Paragraph 48). The MT is still reviewing the most recent audit, but the MT believes the low numbers of BSDs occurring at domestic violence scenes is evidence LASD deputies are not conducting BSDs as a matter of course in those situations. As with BSDs in other types of stops, the findings include low compliance rates for (1) providing an explanation of the backseat detention to the subjects and (2) documentation of the BSD and articulation of the reason for the BSD. The Monitors determined the stations to be in compliance with recording the duration of the BSD and for the reasonableness of the BSD.

The Monitors note that the low number of BSDs occurring at the scene of a DV (six BSDs among 66 DV cases during the audit period) means that violations associated with a single case could have significant compliance ramifications. Given the low number of DV cases involving BSDs and that the BSDs are not being used as a matter of course at DV incidents, AAB asked to discontinue that line of auditing so they can deploy their auditing resources on other important SA items and on stations outside of the AV, as part of the Department's efforts to expand the SA reforms across the Department. The MT and DOJ have agreed to this change.

*c.  BSD Field Complaints*

For SA Paragraph 49, the Department remains in compliance because the MT has never found evidence of violations of this provision in the stops and complaint audits conducted or in other observations and reviews.[7] During a review of an audit of probation and parole searches, the MT observed one case where a person complained about a backseat detention. The deputy immediately called a supervisor to the scene. As requested, the supervisor responded to the scene and spoke to the individual; the individual subsequently indicated they would make a complaint at the station. Sustained compliance

---

[6] At the stations, each deputy has a Performance Log in which supervisors make entries to document deputy commendations and deficiencies and any actions taken by supervisors.

[7] Failure to file a complaint in other circumstances, apart from BSDs, is addressed in the Complaints section.

will require additional examination confirming in-compliance practices have continued.


6.  Searches

- LASD remains in compliance with SA Paragraphs 50 and 51, which require that deputies not conduct arbitrary searches and not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s).
- LASD is now in compliance with SA Paragraph 52a, which requires LASD deputies equipped with BWCs to record requests for consent searches.
- LASD is now in sustained compliance with SA Paragraph 52b and remains in sustained compliance with 52c, which require that consent be established in the appropriate language for limited English proficiency (LEP) individuals and that the Department do outreach to the community about their right to refuse consent.

In its audit of consent searches completed and reviewed in this reporting period, AAB's findings established the following compliance rates.

- Recording the request for consent search of person and response: 92%.
- Reasonableness of consent search of persons: 97%.
- Recording the request for the consent search of vehicles and the response: 100%.
- Reasonableness of the request for vehicle search: 100%.
- Documentation of consent searches for vehicles and persons: 66%.

In the MT's review of AAB's audit, we agreed with their compliance assessments in every case.[8] The lower compliance for documentation of the searches will be discussed with LASD, as it could relate to issues with the narratives entered as part of the SACR form implemented this year. Also, we determined there may be some confusion about what constitutes a request for consent, what constitutes consent, and how these concepts are trained. We have asked for a discussion with the parties on these topics prior to further AAB auditing of consent searches.


7.  Probation and Parole Searches

- LASD remains in compliance with SA Paragraph 46, which requires LASD to assess the efficacy and community impact of probation and parole searches.

---

[8] From AAB workpapers, the MT chose 18 cases for review. The cases involved multiple enforcement actions, cases where there was disagreement with the AAB auditors on compliance, or cases indicating other unique circumstances of warranting review.

- LASD remains in compliance with Paragraph 56, which requires LASD-AV deputies to establish knowledge of probation or parole search conditions prior to conducting a search and only conduct such searches in accordance with the SA.

To maintain compliance with SA Paragraph 46, first established in June 2025, LASD-AV managers continued to assess deputy use of probation and parole searches through a variety of means, including the stops and risk management dashboards and LASD's semi-annual stops and detention reports. During site visits, the MT has observed the AV station captains discussing this information with staff at the stations and with their superiors during CMF/RMF meetings. LASD's new SACR Supervisory Review and Captain's Quarterly Report processes will further assist in these reviews (see below). Sustained compliance will require LASD to maintain the current reporting and processes through at least June 2026.

In its audit of SA Paragraph 56 completed in this reporting period, AAB found 97% compliance for conducting the search only after knowledge and verification of probation and parole search conditions and 93% compliance for articulation of the search, both sufficient for compliance on SA Paragraph 56. In the MT's follow-up review of that audit, we agreed with AAB's compliance assessments in each case.[9]

8. <u>Home-Based Searches</u>

- LASD remains in compliance with SA Paragraph 52d, which requires deputies notify a supervisor before conducting a home-based search.
- LASD is now in compliance with SA Paragraphs 53 and 55 and remains in sustained compliance with Paragraph 54, which address appropriate conduct of home-based searches.

During this reporting period, the MT completed a review of home-based searches conducted by LASD-AV's Parole Compliance Team (PCT), a specialized unit that conducts compliance checks on parolees or probationers to ensure they are following the requirements of their release conditions. The team also locates parolees or probationers wanted on arrest warrants.[10] The MT reviewed 19 cases involving the PCT, nine from the third quarter of 2023 and 10 from the third quarter of 2024. The MT intentionally selected cases with a variety of activities and outcomes in order to provide an opportunity to view the PCT work being conducted under different enforcement scenarios.[11] The MT did not find any cases violating these provisions of the SA. The MT has briefed the Parties on this review and will send a detailed memorandum.

---

[9] The MT reviewed 14 cases (seven from each station).

[10] The team conducts operations in both Lancaster and Palmdale as well as other LASD jurisdictions. The MT chose to look at this specific group because they are involved in enforcement stops in the AV, are not supervised by the station captains (they are assigned to NPD with their command located at South Los Angeles Sheriff's Station), and conduct searches. In particular, they conduct home-based searches that are addressed in the SA but are not typically a part of patrol activities.

[11] We focused on cases involving searches of homes when the probationer or parolee was present and included cases where only the person/s on supervised release were stopped, instances where people other than persons on supervised release were detained, and instances where deputies conducted a search of a residence when the person under supervised release was not home.

LASD does not currently track home-based consent searches, but LASD reports that these types of searches are rare, and many AV personnel indicated they could not recall an instance in the last two years. The MT did identify one case of a consent search of a home at the scene of an associated parole search. In this case, the supervisor was present while the deputy obtained written consent to search the home. For future tracking and reviews, LASD staff have created a new home consent search form. The new form will document which supervisor provided approval for the home-based search and will be stored in the records management system.

The MT once again found no indication that LASD-AV deputies conduct Section 8 housing–related searches, so the Department remains in sustained compliance with that aspect of SA Paragraphs 53–55.

9.  Supervisory Review

- LASD is now in compliance with SA Paragraphs 58 and 62, which require additional stops accountability practices and, specifically, that AV station commanders and supervisors track repeated violations and deficiencies and any corrective action taken.
- LASD is now in compliance with SA Paragraphs 59, 60, and 61, which require supervisors to review deputy stops documentation in reports and citations and at least one CAD log per deputy per week, and to appropriately address all violations and deficiencies.
- LASD is also now in compliance with SA Paragraph 63, which requires that supervisors and commanders are held accountable to SA Paragraphs 58–62.

In the 20th Semi-Annual Report, the MT reported on LASD's accomplishments in creating a culture of heightened accountability at the AV stations for carrying out the SA requirements related to supervisory and management reviews of stops. The cultural changes were largely the result of the greater attention and efforts made by the station captains currently assigned to the AV and their emphasis on holding all employees accountable for adhering to professional standards. While these changes represented significant progress, the Department remained in partial compliance with SA Paragraphs 58–63 because the processes were not formalized and lacked consistent documentation, tracking, and procedures to ensure uniform and ongoing application in the future. In particular, the processes used for SA-required review of reports, citations, and CAD/SACR entries were paper driven, cumbersome, and simply did not work to facilitate LASD meeting the SA requirements. However, in this reporting period, LASD developed and implemented important new tools that have helped standardize and institutionalize these processes and thus have achieved compliance in each supervisory review provision.

For reports and citations, while station supervisors did review each of these documents, there has not been a process for electronically tracking errors and violations or any corrections made. In this reporting period, LASD created what they call a "Deputy Report or Citation Rejection Form" for supervisors to complete, which will capture the information electronically. This allows station leadership to track the reasons reports are sent back to deputies for additional work and to identify stops found to be conducted in violation of policy.

For CAD reviews, LASD assigned staff from the Office of Constitutional Policing to build a system to automatically assign one stop per week per deputy to sergeants for review, now referred to as the SACR Supervisory Review system. The Monitors and DOJ gave feedback on the system and eventually

approved it for use. The system establishes a semi-automated, step-by-step process by which supervisors evaluate one stop per deputy per week. Sergeants are required to review the SACR report and the BWC footage for the stop. If a shortfall is identified, the supervisors may also review any associated citations, evidence, or written reports for the incident. Supervisors document any violations or errors and corrective action taken. The system also automatically provides the supervisor with any recent history of violations by the deputy under review. Station leadership receive real-time reports to ensure the sergeants are completing their required reviews. While the new system requires just one stop be reviewed each week rather than a day's worth of stops, the MT finds that, unlike the previous process, the new system provides for a sufficiently thorough and consistent level of scrutiny of deputy stops, including potential for efficient review of BWC footage and other reports, and thus meets SA Paragraph 59 requirements. While station managers can currently review the findings of the supervisory reviews, that part of the process remains cumbersome. However, LASD has agreed to enhance the system to include a simplified report accessible to the station captains via a Power BI dashboard. This will provide a key tool for leaders to track patterns and trends. Leadership can use this information to provide training or other intervention for a specific deputy or provide stationwide guidance and training.

Additionally, LASD is now meeting the requirement of SA Paragraph 62 to track repeated violations or deficiencies and the corrective action taken. The Department uses a variety of processes for tracking, including the new SACR Supervisory Review system, the new Deputy Report or Citation Rejection Form, the summary report of issues and corrective action provided to station captains, and the pending Captain's Quarterly Review (see the Accountability section).

The MT notes that these new practices are being integrated with previously established review and accountability processes related to stops, such as PLEs, the PMP, the CMF/RMF, and AAB audits. Also, station managers continue to evaluate stops as part of their reviews of complaints, uses of force, and pursuits; the documentation of stops-related violations identified in those reviews are tracked, and the captains provide regular email reminders to staff and discuss SA stops requirements. We also note that the NPD plays an important role in accountability and oversight for the AV stations, and NPD leadership can use the same systems and processes to hold AV station captains accountable for ensuring compliance with the SA stops provisions.

Sustained compliance will require AAB and/or MT audits to assess whether the AV station supervisors, lieutenants, and captains utilize the systems to thoroughly review reports and documentation related to stops, searches, and seizures; ensure deputies articulate sufficient rationale for their actions under law and LASD policy; and ensure corrective action is taken wherever necessary. This also requires the North Patrol Division leadership to ensure the AV stations' top leadership are held accountable for these provisions.

10. Body-Worn Camera Policy and Reviews by Station Supervisors

LASD's current BWC policy does not allow supervisors to conduct random reviews of deputy BWC footage. A new policy has been drafted to allow supervisors to do such reviews; it currently remains under review internally and with employee unions. In this reporting period, LASD has implemented a new review process for the SACR forms where one stop per deputy is selected for review each week.

The review includes a requirement for the supervisor to watch the BWC footage for the incident. This is a significant step in the right direction, and the completed policy will allow for the possibility of an expanded program to also randomly review BWC footage not connected to a stop. This is an important tool for supervisors when there is an identified issue at a station.

11. Crime Reduction Strategies

The AV station captains have continued to hold regular meetings with staff to discuss crime strategies. This helps ensure deputies receive regular crime updates from the station analysts and follow up on necessary tasks being assigned and carried out in order to accomplish the goals identified in the station strategic plans. The AV stations continue to use the Scanning, Analysis, Response, and Assessment (SARA) process to plan and document their responses to crime and analysis of the results of the efforts. Among other benefits, this promotes closer tracking of the progress being made and ongoing assessments that can identify any unintended consequences that might be incurred, such as potentially adverse results that could give rise to a decline in community trust or a loss of confidence in the stations' crime reduction strategies (see the preface to the SA Stops section and Paragraph 68). The stations have also continued to seek community input via surveys and have found success using a QR code for a quick link to the survey.

12. Virtual Deputy Program

On October 22, 2025, LASD expanded its Virtual Deputy program with the launching of the Palmdale station's Spanish-language version of this program. This is now an option for the other eight stations that currently have the Virtual Deputy program in place; however, it has not yet been launched in the other stations due to lack of finding qualified personnel to fill time slots. Also, Palmdale leadership is working with LASD's Sheriff's Information Bureau to produce a Spanish-language version of their current informal video to raise community awareness of the Virtual Deputy program, an additional way to express concerns and to receive assistance and services from LASD.

13. Next Steps

a. *LASD*

- AAB will complete development of a 2026 audit schedule and provide the audit work plans prior to conducting the stops audit, which they want the MT to consider for compliance.
- Provide the MT with updated strategic plans/crime reduction strategies at AV stations. The AV stations will continue to hold regular bi-weekly or monthly crime meetings to discuss progress on these strategies.
- Update training and practices as needed based on the ongoing audits by AAB; keep DOJ and MT updated on progress in this regard, and, when appropriate, submit documentation for feedback and compliance assessment.

- Ensure new managers and supervisors assigned to the AV stations receive the necessary training to use the dashboards.
- Ensure recommendations from stops audits are reviewed and carried out so that station managers and supervisors consistently conduct the stop reviews required under Paragraphs 58–63.
- Monitor the use of the newly implemented SACR Supervisor Review to ensure those reviews meet the requirements of Paragraph 59.
- Continue work to incorporate data into daily processes, including modernizing data systems, implementing data dashboards and early intervention systems, and follow through with the application and utilization of the SARA problem-solving model in the AV stations and in the CMF.

b. *The MT*

- Continue the reviews of AAB audit plans for select AAB stops audits, and provide AAB with timely feedback.
- Provide timely reviews and feedback on documents, trainings, tools, and other materials submitted by the Department to the MT.
- Provide technical assistance on the implementation of crime reduction strategies in the AV and the use of data to assess the effectiveness of the strategies.
- Provide schedule and work plan for MT audit of BSDs for parties' discussion.
- Provide LASD with technical assistance to build the updated bias-free policing, fair housing, and constitutional policing courses.
- Continue to participate in meetings and provide technical assistance on data systems, dashboards, data analysis, and application to practice.
- Conduct station observations and ride-alongs in the AV to observe activity and performance of deputies and supervisors in the field.

14. Stops Compliance Status Table

Table 1 provides the compliance status for each paragraph in the Stops section.

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| **STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **41** | Stops and detentions are based on reasonable suspicion. | Yes 05/17 | Yes 01/24 | Yes 09/23 | Yes 6/25 |
| | **Notes:** The MT 2023 stops audit showed the Department is in compliance with this provision and Paragraph 43. The MT audit, AAB 2024 limited-scope audits, and other MT reviews have found no issues with this provision or with Paragraph 43. | | | | |
| **42** | Elements of procedural justice are incorporated into training. | NA | Yes 01/24 | Yes 12/24 | Yes 12/25 |
| | **Notes:** The principles of procedural justice are incorporated in the eight-hour bias-free policing training. The delivery of the training is measured in Paragraph 70. The MT audit and the first round of AAB limited-scope audits found poor results for this provision, but subsequent  limited-scope audits in 2024, formal AAB audits in 2025, and MT reviews found significant improvement. | | | | |
| **43** | LASD-AV does not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation as a factor in establishing reasonable suspicion or probable cause, except as part of actual and credible description(s) of a specific suspect or suspects. | Yes 05/17 | Yes 01/24 | Yes 09/23 | Yes 12/24 |
| | **Notes:** See Paragraph 41. | | | | |
| **44** | Stops are accurately and thoroughly documented in MDC patrol logs. | Yes 05/17 | Yes 08/18 | Yes 04/25 | No |
| | **Notes:** LASD has upgraded the SACR data collection system to capture all the elements of this paragraph, bringing the Department into compliance. Some of the qualitative aspects of this provision are measured in other paragraphs (e.g., sufficiency of BSD narratives is measured in Paragraph 47, accuracy of the data via Paragraphs 63 and 142). | | | | |
| **45** | Accurate and specific descriptive language (non-boilerplate) is used in reports. | Yes 05/16 | Yes 08/18 | Yes 09/23 | Yes 12/25 |
| | **Notes:** The 2023 MT stops audit found the Department in compliance with this provision. Since then, the MT has reviewed case files from two AAB audits, reviewed reports associated with probation and parole home-based searches, and reviewed numerous cases involving force and complaint investigations, but has found no patterns of violations. | | | | |
| **46** | Efficacy and impact on the community of searches based on probation and parole are assessed. | NA | NA | Yes 06/25 | No |
| | **Notes:** LASD has periodically produced tabulations of data related to the number of probation and parole searches. The Department has created dashboards for the AV commanders to monitor the use of probation and parole searches. The MT has observed AV commanders discussing this information in management meetings. | | | | |

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| **STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 47 | Backseat detentions require reasonable suspicion and reasonable safety concerns. | Yes 05/17 | Yes 08/18 | Partial | No |
| | **Notes:** The MT stops audit and AAB audits have found partial compliance. Based on audit findings, LASD managers continue to take steps with regard to training, supervision, and accountability measures. These have led to improved results. | | | | |
| 48 | Backseat detentions are not conducted as a matter of course during routine traffic stops or domestic violence situations. | Yes 05/17 | Yes 08/18 | Partial | No |
| | **Notes:** See notes for SA Paragraph 47 above. | | | | |
| 49 | Deputies respond to complaints about backseat detentions by calling supervisor. | Yes 05/17 | Yes 08/18 | Yes 06/25 | No |
| | **Notes:** The MT has not seen cases in violation of this provision in stops audit, complaints audits, and other MT observations and reviews. There is no specific tracking method currently available to determine if LASD deputies summon a supervisor to the scene for complaints about backseat detentions, but LASD is working on a way to track these cases if they arise. | | | | |
| 50 | Deputies do not use race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation in exercising discretion to conduct a search, except as part of an actual and credible description of specific suspect(s). | Yes 05/17 | Yes 01/24 | Yes 06/25 | No |
| | **Notes:** This provision refers to discretionary searches, which include consent searches and other types of searches (e.g., home-based probation or parole searches). MT and AAB audits did not find violations of this provision. For sustainability, the use of SACR data to track all searches will greatly enhance the reliability of the audit findings, and the SACR management dashboards will also provide station leadership with the ability to regularly monitor search activity by AV deputies. | | | | |
| 51 | Deputies do not conduct arbitrary searches. | Yes 05/17 | Yes 08/18 | Yes 06/25 | No |
| | **Notes:** In previous periods, the MT was unable to assess the full provision regarding all discretionary searches due to insufficiencies in the data, primarily because CAD can only list a single search reason, so consent searches cannot all be reliably identified and not all types of searches are included, such as home-based searches. The use of SACR to track all searches will greatly enhance the reliability of the audit findings, and the SACR management dashboards will also provide station leadership with the ability to regularly monitor search activity by AV deputies. | | | | |

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS | | | | | |
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| 52a | Deputies equipped with BWCs record requests for consent to search. | Yes 05/16 | Yes 08/18 | Yes 12/25 | No |
| | **Notes:** The MT stops audit showed noncompliance, but AAB limited-scope audits found improved compliance. The MT has now evaluated and approved an AAB audit that found LASD in compliance with this provision. | | | | |
| 52b | Individuals with limited English proficiency (LEP) are informed in an appropriate non-English language. | Yes 04/18 | Yes 08/18 | Yes 12/24 | Yes 12/25 |
| | **Notes:** LASD implemented the SA-compliant LEP plan in April 2018. The Department was found in compliance based on previous complaint reviews, ride-alongs, and community input. Moving forward, improved tracking of instances where translation services are requested in the field would provide for more efficient monitoring, and the use of SACR, which includes a field to capture non-English speakers stopped by AV deputies, would enhance the reliability of the audit findings. | | | | |
| 52c | Outreach is conducted about the right to refuse or revoke consent. | NA | NA | Yes 02/19 | Yes 02/20 |
| | **Notes:** This requirement was completed with the CACs' assistance and a brochure that is written in English and Spanish. | | | | |
| 52d | Supervisors are notified before home-based searches. | Yes 05/17 | Yes 08/18 | Yes 06/25 | No |
| | **Notes:** With regard to Section 8 housing–related searches, the Department has been in sustained compliance with this provision for several years. With regard to other types of home-based searches, the MT completed a review of home-based searches, particularly those conducted related to probation and parole activities, and found compliance. | | | | |
| 53 | A reasonable number of deputies are present at a search. | Yes 05/16 | Yes 08/18 | Yes 12/25 | No |
| | **Notes:** See Paragraph 52d. | | | | |
| 54 | Section 8 compliance checks require articulated safety concerns. | Yes 03/18 | Yes 08/18 | Yes 05/19 | Yes 02/22 |
| | **Notes:** LASD-AV included this requirement in policy and training and continues to be in implementation compliance based on the lack of any indication of housing-related enforcement activity. See the Housing section for more information. | | | | |
| 55 | During home searches, individualized suspicion or probable cause determines who, besides the subject of search, is subject to detention or search and for how long they are detained. | Yes 05/16 | Yes 08/18 | Yes 12/25 | No |
| | **Notes:** See Paragraph 52d. | | | | |

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| **STOPS, SEIZURES, AND SEARCHES COMPLIANCE STATUS** | | | | | |
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| 56 | Probation and parole searches are carried out only when search conditions are established and in accordance with the Stops section. | Yes 05/17 | Yes 08/18 | Yes 06/25 | No |
| | **Notes:** The MT finds compliance due to AAB limited-scope audits and MT follow-up review of AAB audits. | | | | |
| 57 | Constitutional policing training is provided. | NA | Yes 06/17 | Yes 06/22 | Yes 03/24 |
| | **Notes:** The Department has been in compliance with delivery of this training since August 16, 2018, for deputies assigned to the AV stations, and since June 14, 2022, for embedded deputies from specialized units. | | | | |
| 58 | Additional accountability and supervision to ensure unlawful stops and searches are detected and addressed. | Yes 05/16 | Yes 12/25 | Yes 12/25 | No |
| | **Notes:** The Department has implemented a new semi-automated system to ensure a reliable process for meeting the requirements of Paragraphs 58–63. The Department has trained supervisors and managers in the use of the new system. The Department is now in compliance with SA Paragraphs 58–63. For sustained compliance, LASD will need to provide documentation that these systems continue to be consistently and effectively used in the supervision of staff. | | | | |
| 59 | Supervisors review CAD logs. | Yes 05/16 | Yes 12/25 | Yes 12/25 | No |
| | **Notes:** See Paragraph 58. | | | | |
| 60 | Supervisors review justification for stops and searches. | Yes 05/16 | Yes 12/25 | Yes 12/25 | No |
| | **Notes:** See notes for SA Paragraph 58. | | | | |
| 61 | Supervisors and station commanders address all violations and deficiencies in stops and searches. | Yes 05/16 | Yes 12/25 | Yes 12/25 | No |
| | **Notes:** See Paragraph 58. | | | | |
| 62 | Supervisors and station commanders track repeated violations of SA provisions and take corrective action. | Yes 05/16 | Yes 12/25 | Yes 12/25 | No |
| | **Notes:** See Paragraph 58. | | | | |
| 63 | AV supervisors and commanders are held accountable for reviewing reports and requiring deputies to articulate sufficient rationale for stops and searches under law and LASD policy. | Yes 05/16 | Yes 12/25 | Yes 12/25 | No |
| | **Notes:** See Paragraph 58. | | | | |

**C.  Bias-Free Policing**

In this reporting period, the Department made impressive progress regarding the SA provisions related to bias-free policing, especially in the area of data analysis and review. LASD is now in compliance or sustained compliance with all of the nine SA Bias-Free Policing paragraphs.

1.  Training

*a.  Bias-Free Policing Training*

*   The Department remains in sustained compliance with the full-day bias-free policing training (SA Paragraph 70).

LASD continued to be in sustained compliance for providing the full-day bias-free policing training during this period for LASD-AV deputies and embedded units. The course was provided by LASD on August 14, 2025, and maintained the Department's status as having over 95% of AV personnel trained.[12]

*b.  Quarterly Refresher Roll Call Training*

*   The Department remains in sustained compliance with quarterly roll call trainings (SA Paragraph 71).

In the last reporting period, LASD moved to sustained compliance with the requirement to provide AV deputies with quarterly refresher roll call training addressing constitutional policing, bias-free policing, and housing requirements (SA Paragraph 71). As detailed in the stops section, LASD continued to provide the approved roll call training scenarios for LASD-AV deputies through 2025. In the last reporting period, LASD submitted and the Monitors and DOJ approved a plan to revamp both the content and delivery of the quarterly trainings, including the use of an external vendor. These new quarterly trainings will begin in January 2026. Sustained compliance will be maintained through this transition.

*c.  Consultation With External Experts*

*   The Department is now in sustained compliance with SA Paragraph 65.

SA Paragraph 65 requires LASD to consult with outside experts on bias-free policing and related topics. This can be accomplished in a variety of ways, such as by hiring an outside expert to review LASD curriculum and provide their recommendations, or by attending outside training courses on

---

[12] Roll call training delivery and attendance is reported quarterly, but compliance is assessed annually based on the calendar year. In the past, the MT cross-checked training attendance rosters to station rosters in order to verify deputy training attendance, but the MT has now found the LASD tracking methods to be reliable for that purpose. The MT will no longer conduct its own verification processes on the constitutional policing, bias-free policing, or roll call trainings unless there are indications that further review is needed.

bias-free topics and using aspects of those courses to improve LASD trainings. For the second consecutive year, LASD AV personnel attended the Professionalizing Law Enforcement—Community Engagement Training conference (July 2025). This conference brings together law enforcement personnel from around the country to discuss successful community engagement stories and share information. LASD continued to engage with the Center for Policing Equity to assess and better understand their stops and enforcement efforts in the community. In another example of incorporating external expertise, in this reporting period LASD's Principled Community Policing for Patrol course was approved. (See the Community Engagement section.) LASD's Training Bureau developed the curriculum based on material originally developed by the California Commission on Peace Officer Standards and Training (POST) and a panel of external experts. The training included concepts of procedural justice, which is covered in the full-day bias-free policing training course.

2.  Equal Protection

- The Department is now in compliance with SA Paragraph 64.

SA Paragraph 64 states:

> *In conducting its activities, LASD agrees to ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies shall not initiate stops or other field contacts because of an individual's actual or perceived immigration status. (Paragraph 64)*

SA Paragraph 64 is a foundational requirement of the SA. It requires the Department to ensure all law enforcement–related actions by LASD personnel are conducted according to the Constitution and are applied equally regardless of individual characteristics like gender, age, race/ethnicity, national origin, religion, or sexual orientation. Because it is an overarching and critical feature of the SA, compliance with this provision is assessed through both (1) the conduct of individual stops and calls for service (CFSs) as well as (2) analysis of patterns and trends across not only stops and CFSs but a broad range of law enforcement activities. MT and AAB audits focus on the conduct of individual stops. Other MT and LASD reviews assess the broader element of patterns and trends that may indicate problems and, importantly, corrective action taken by LASD when such issues are identified. As we have said in past reports, compliance with SA Paragraph 64 thus requires compliance with numerous other SA provisions, including those that require Department managers to regularly review the information available to them and identify and address any concerning trends or patterns in deputy or unit activities that may violate constitutional protections. As this report shows, LASD is now in compliance with most of those SA paragraphs, including, but not limited to, 41 (reasonable suspicion for stops); 46 (efficacy of probation and parole searches); 50 (legal searches); 42, 57, 70, 71, 89, and 119 (training); 58–63 (supervisory review); 68 and 82–85 (data analysis and disparity reviews); 87 and 88 (receiving and responding to community input); 117 and 120–123 (UOF review); and 141, 143, 144, and 145 (deputy and unit reviews and PMP). Also, the Department remains in compliance with the element of SA Paragraph 64 that precludes LASD deputies from stopping a person based on their actual or perceived immigration status.

The Monitors do not see evidence of patterns of violations of this provision, and, if issues do arise, LASD has systems in place to identify and respond. LASD managers are utilizing new systems and processes to assess performance and patterns and to identify issues. LASD supervisors and managers are using the accountability processes in place to take corrective action and work to alleviate any problematic trends or patterns identified. Therefore, the Monitors find the Department in compliance with SA Paragraph 64. The MT will continue to monitor that these review processes are consistently and effectively applied.

3.    Deputy Communication With LEP Individuals

- The Department is now in sustained compliance with SA Paragraph 66.

SA Paragraph 66 requires LASD to provide effective communication and access to services for all AV community members, including LEP individuals. The Department implemented a DOJ- and MT-approved LEP plan in 2018. Throughout the monitoring period, the MT has continued to track comments at community meetings, observe at the stations and on ride-alongs, review complaints, and review stops as part of cases, including BWC video, as part of our own audits and in our verification of AAB audits, for indications of language access issues. In this reporting period, we reviewed BWC video for dozens of cases as part of our audits on UOF, for probation and parole searches, and during verification of AAB audits on stops. The MT has not identified or observed any systematic issues related to communication or access to these services. (Any issues related to complaint intake are addressed in the Complaints section.) The AV stations both report having a high percentage of Spanish-speaking deputies and are generally able to have a deputy translate in the field when necessary. Language Lines are also available for field and station use. There is still no systematic way to audit when needed services are not provided in alternate languages, but the use of SACR data for stops analysis improves LASD's ability to identify when deputies do use language services and the MT continues to monitor for significant or unaddressed issues.

4.    Disparity Analysis

- The Department is now in compliance with SA Paragraph 68

SA Paragraph 68 requires an annual review and assessment of their programs, initiatives, and activities for any possible disparate impact or unintended consequences that may erode community trust. If any such detrimental consequences are identified, station managers should consider alternative strategies, programs, or practices that would help minimize or eliminate those consequences while still meeting Department mandates and community expectations for ensuring public safety. LASD is now conducting these reviews through a combination of practices that also serve other purposes, including the LASD-AV Semi-Annual Stops and Detentions Report (especially its analyses of law enforcement activities by demographics and stops in relation to crime prevention strategies), the new Captain's Quarterly Reviews, CMF/RMF meetings, and collaboration with external experts like CPE.

In the last reporting period, LASD worked with the Center for Policing Equity (CPE) to produce a report on LASD deputy stops, calls for service, and use of force in the AV. In this reporting period, LASD

provided CPE and the parties with their comments and feedback to the CPE report. On September 17, 2025, the MT attended a community meeting where the CPE released the report findings to the community. The report was also made available to the community on a public website (https://justicenavigator.org/). As LASD reported in their recent Antelope Valley Semi-Annual Stops and Detention Report (October 2025), the AV stations took various steps in response to their work with CPE and the report recommendations. LASD reviewed their dashboards and enhanced them as needed to present similar information as provided in the CPE report, thus allowing station managers to quickly analyze the data and conduct in-depth reviews of deputy and unit trends in a timelier manner. They are also conducting more thorough assessments of uses of force at the station levels and are better able to identify and follow up with deputies on performance issues that require closer attention. The MT is also aware that station managers were provided with the CPE report and briefed on those findings, and since then they have included it in discussions with their own staff. Importantly, the Department has also shared the CPE report and had related discussions with community members. The MT will continue to monitor LASD efforts to use the findings from CPE.

At this stage, the dashboards do not incorporate algorithms or regressions that could be used for station managers to readily see the results of detailed analyses similar to those provided in the CPE report and discussed in SA Paragraph 83. These can include factoring in such information as crime trends, location, and population demographic data that can help better explain any identified patterns and trends. As use of the dashboards becomes even more integrated into routine practice, the MT recommends the Department explore these sorts of enhancements. (See the Data Collection and Analysis section.)

Over the last two years, the AV captains have worked to formulate and implement strategic plans to provide greater focus and direction for AV deputies regarding station and community priorities. The station captains host monthly meetings to set up the crime reduction priorities and assign tasks to both patrol deputies and specialized enforcement units. The station captains keep notes for each of the assignments in the meetings. Without documented crime reduction and problem-solving efforts, the captains are extremely limited in how they can assess them to implement changes if there is a disparity of enforcement identified using the dashboards or various stops reports produced for their use. Without strategic and regular meetings with staff to track their efforts, the captains would be forced to speculate as to the causes behind any disparity noted or spend a significant amount of time creating research methods to better understand the reasons for the disparity and, if warranted, designing appropriate interventions. Strategic plans and documentation of crime reduction efforts at regular intervals, along with use of real time dashboards and regular stops reports, are essential tools that station captains must have to effectively address crime in the community and then be able to continuously check so as to determine whether the efforts undertaken are inadvertently creating disparities and possibly harming their relations with specific communities. Said another way, this allows the station captains to more fully assess how enforcement is impacting crime as well as to assess potential unintended consequences in relation to these efforts. Additionally, the station captains have increased their efforts to gather more community input about LASD performance relating to enforcement activities and areas that are being affected (see the Community Engagement Section).

In the new Captain's Quarterly Review reports (described in detail in the Accountability section), the AV station captains include an analysis and discussion of stops/enforcement activity and specialized units, including their impact on particular community groups. The station commanders link the enforcement

data to efforts to reduce crime in the AV. (See the Accountability section.) During the Risk Management/Crime Management Forum meetings, the North Patrol Division leadership and assistant sheriff review the Semi-Annual Stops and Detention Reports to query the station captains about their crime reduction priorities and strategies. This requires the captains to prepare/anticipate possible questions about their efforts from LASD leadership. The quarterly reports and semi-annual CMF/RMF meetings ensure systems are in place for the station captains to regularly engage with the important data to assess their efforts.

Through this combination of activities, compliance has been achieved for SA Paragraph 68. Sustained compliance will require the AV station supervisors, lieutenants, and captains to utilize the systems to assess and monitor their deputies' ability to effectively practice bias-free policing. Additionally, any additional issues identified in these reviews, in audits, or through station and departmental reviews such as the weekly AV force reviews or the CMF/RMF need to be effectively addressed by supervisors, lieutenants, and station captains.

5.  Incorporation of Bias-Free Policing Requirements Into Personnel Evaluations

The Department is now in compliance regarding the incorporation of bias-free policing and equal protection requirements into the personnel performance evaluation process (SA Paragraph 67).

In this period, LASD has submitted and received approval for a process to use for each deputy's annual appraisal at the AV stations and is now in compliance with SA paragraph 67. The process will be completed by the sergeants and includes a review of the following categories:

- Use of force;
- Administrative investigations;
- Personnel complaints;
- Traffic collisions;
- Obstruction arrests;
- PRMS;
- Compliance dashboards; and
- STOPS data

At the conclusion of the reviews, the supervisor will determine if there is a need to refer the deputy to the PMP process, assigning a mentor to help them address the areas of concern, counsel the deputy regarding specific observations, or monitor the deputy's activity to continually assess progress.

Sustained compliance with SA Paragraph 67 will require the AV station supervisors, lieutenants, and captains to consistently and effectively use the systems to identify any issues related to a deputy's ability to effectively practice bias-free policing and to take effective corrective action when needed. The MT will monitor these activities closely.

The MT notes that the new performance evaluation process described above is not the only way the

station managers assess deputy performance with regard to bias-free policing. In this reporting period, LASD has produced a new Antelope Valley Semi-Annual Stops and Detentions Report. This is the second such report completed by LASD and reflects their commitment to using stops data to inform their practice. LASD has also created a significant number of dashboards to show all the stops data collected in the SACR system. The station captains have been using these data and meeting with specific deputies who have been identified based on trends identified through use of the dashboards. For example, one station captain met with a member to review the high number of consent searches with a low recovery rate. The captain used the dashboards to talk through the stops and set expectations for when the searches should or should not be used in the field. Finally, the stops information is used in the Captain's Quarterly Reports. LASD now has the data necessary to assess deputy patterns in their stops and enforcement activity in real time. LASD is also able track complaints related to discrimination and/or stops by LASD AV deputies.

6.  Deputy Survey

- The Department is now in compliance with the deputy survey (SA Paragraphs 69 and 72).

To meet the requirements of SA Paragraphs 69 and 72, LASD developed a new deputy survey to study organizational climate and culture. After providing feedback, the Monitors and DOJ approved the survey instrument and methods. The Department has conducted its initial administration of the new survey and provided the MT and Monitors with the results, including, importantly, the Department's assessment of the findings and next steps. When the previous deputy surveys were conducted in 2019 and 2020, the Department did not meet SA requirements that station managers use the survey results to inform the way it was implementing the training and other requirements of the Bias-Free Policing section as well as community engagement activities. The Monitors find that the Department is now embracing those expectations and is integrating information gleaned from the surveys into practice. In the materials provided, the Department acknowledged that participation in the survey was thus far limited and described plans to increase the number of deputies who respond in the future. The MT will track these efforts as well as the implementation of the stations' next steps.

7.  Next Steps

a. *LASD*

- Continue to provide the required full-day bias-free policing training and implement the new quarterly roll call briefings.
- Continue to consult with experts on stereotypes or bias and to ensure that LASD training, including the new community engagement training, provides clear guidance to AV deputies on the influences of bias and stereotype threat.
- Keep the MT and DOJ advised of progress and confer as appropriate on training development and delivery processes. For all training related to the SA, the Department will provide course materials for DOJ and the MT to review and approve prior to implementation.

- Continue to produce the Captain's Quarterly Reports to include stops data statistics and the captain's analysis of the data.
- Continue to produce the Antelope Valley Semi-Annual Stops and Detentions Reports.
- Continue to provide documentation to the MT and DOJ showing how data are used to evaluate and inform practice and respond to any identified disparities or unintended impacts in enforcement when warranted.
- Continue to provide feedback to OCP on the design and content of the dashboards, continue to train staff in their use, and continue to refine and expand their use by AV managers and supervisors.

b. *The MT*

- Provide TA to LASD for the effective use of data and analysis to assess the work of deputies and crime reduction programs in the AV as required by the SA.
- Provide TA to LASD on proposed reporting to comply with the required SA data and law enforcement activity analyses.
- Continue to monitor compliance with the training provisions and provide review of new proposed training sessions.

8. Bias-Free Policing Compliance Status Table

Table 2 provides the compliance status for each paragraph in the Bias-Free Policing section.

| TABLE 2 | | | | | |
|---|---|---|---|---|---|
| **BIAS-FREE POLICING COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 64 | Members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation, and in accordance with the rights secured or protected by the Constitution or laws of the United States. Deputies do not initiate stops or other field contacts because of an individual's actual or perceived immigration status. | Yes 05/17 | Yes 01/24 | Yes 12/25 | No |
| | **Notes:** Compliance with this provision is assessed through both (1) the conduct of individual stops and calls for service (CFS) as well as (2) analysis of patterns and trends across not only stops and CFSs but a broad range of law enforcement activities and (3) qualitative assessment. The Monitors see no evidence of patterns of violations. The Department now has systems and practices in place to identify issues and respond as needed. | | | | |
| 65 | Museum of Tolerance and other experts are consulted on prohibited conduct, bias-free policing, implicit bias, and stereotype threat. | NA | NA | Yes 12/24 | Yes 12/25 |
| | **Notes:** LASD has met this requirement through a variety of activities involving external experts, including the disparity assessment with CPE and the US DOJ COPS Office training consultation. LASD also adapted the California POST Principled Policing in the Community course to meet the SA's community engagement training requirement. | | | | |
| 66 | Effective communication and access to police services is provided to all AV members, including those with limited English proficiency (LEP). | Yes 04/18 | Yes 08/18 | Yes 12/24 | Yes 12/25 |
| | **Notes:** LASD implemented the SA-compliant LEP plan in 2018. MT ride-alongs, reviews of complaints, and discussions with community have found the Department in compliance. Moving forward, better tracking of instances where translation services are requested in the field will facilitate more efficient monitoring of this provision. | | | | |
| 67 | Bias-free policing and equal protection requirements are incorporated into the personnel performance evaluation process. | Yes 05/16 | NA | Yes 12/25 | No |
| | **Notes:** The Department is now in compliance with this provision on the basis of increased attention being paid to deputy performance related to bias-free policing at the stations and implementation of an approved formal process for supervisors to assess LASD-AV deputies as part of their annual appraisal. | | | | |

| TABLE 2 | | | | | |
|---|---|---|---|---|---|
| **BIAS-FREE POLICING COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 68 | All LASD-AV programs, initiatives, and activities are analyzed annually for disparities. | NA | NA | Yes 12/25 | No |
| | **Notes:** The Department has begun conducting these important reviews through several activities, including the CPE disparity assessment, LASD's Antelope Valley Semi-Annual Stops and Detentions Report, the discussion of disparity in enforcement activity by deputies during CMF/RMF meetings and in Captain's Quarterly Reports, and in station manager reviews of dashboards. | | | | |
| 69 | Annual organizational culture and climate study, including using experts and the Community Survey to study organizational climate and culture in the AV stations to aid in developing the requirements of this section. Personnel will be allowed to confidentially provide information for the study. | NA | NA | Yes 12/25 | No |
| | **Notes:** Deputy surveys were completed twice in 2019 and 2020. LASD has now updated the deputy survey and, in late 2025, administered it to staff according to the approved plan. The MT has reviewed survey results and the manner in which the AV stations have begun using the results to inform practice. (SA Paragraphs 69 and 72 were reported on in the Community Engagement sections of prior reports.) | | | | |
| 70 | Bias-free policing training is provided. | NA | Yes 08/18 | Yes 06/22 | Yes 03/24 |
| | **Notes:** The Department has been in compliance with the delivery of this training since June 15, 2022, for deputies assigned to the AV stations and for embedded deputies from specialized units. | | | | |
| 71 | Quarterly roll call briefings on preventing discriminatory policing are provided. | NA | Yes 02/19 | Yes 01/24 | Yes 06/2025 |
| | **Notes:** Approved briefings were provided throughout 2023 and 2024 and have continued through 2025. | | | | |
| 72 | LASD agrees to use experts and a survey to study organizational climate and culture in the AV stations to aid in developing bias-free policing training requirements. | NA | NA | Yes 12/25 | No |
| | **Notes:** See Paragraph 69. | | | | |

## D. Enforcement of Section 8 Compliance

In February 2022, the Department was deemed to have achieved sustained compliance with each of the eight SA housing provisions. With that determination, absent evidence to the contrary, the MT will no longer monitor SA Paragraphs 73–80, or Paragraph 164 as it pertains to housing-related training.[13]

Training for this section is monitored via SA Paragraphs 70 and 71. The Department reached compliance for Paragraph 70 in 2022 and for Paragraph 71 in this reporting period.

1. Housing Compliance Status Table

Table 3 provides the compliance status for each paragraph in the Housing section.

---

[13] Pursuant to DOJ and LASD approval of MT SA Paragraph 150 Recommendation re. Housing Paragraphs 73–80 and 164 v2-28-22.

| TABLE 3 ENFORCEMENT OF SECTION 8 COMPLIANCE STATUS | | | | | | |
|---|---|---|---|---|---|---|
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED | PARAGRAPH 150 |
| 73 | New housing nondiscrimination (HND) policy is implemented. | Yes 02/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |
| 74 | All current deputies acknowledge receipt and understanding of HND policy. | Yes 02/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |
| 75 | All newly assigned deputies acknowledge receipt and understanding of HND policy within 15 days. | Yes 02/18 | Yes 01/24 | Yes 05/18 | Yes 09/20 | Yes 02/22 |
| 76 | Policies regarding the review of requests from a housing authority for deputy accompaniment are revised. | Yes 03/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |
| 77 | Accompaniment policy regarding LASD housing investigations is implemented. | Yes 03/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |
| 78 | Deputies document all voucher holder compliance checks using Stat Code 787. | Yes 03/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |
| | **Notes:** The Parties and MT agreed that if there was no indication that LASD participated in housing-related enforcement actions, including Section 8 compliance checks, they would be found in compliance with Paragraphs 78, 79, and 80. On this basis, the MT found the Department in compliance after review of several years of community input and Department documentation of stops, arrests, and other actions indicated no such actions occurred. | | | | | |
| 79 | Deputies document each independent investigation for fraud based on voucher holder compliance with the voucher holder contract using Stat Code 787. | Yes 03/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |
| 80 | Deputies document housing-related activity using Stat Code 787 and do not inquire into an individual's Section 8 status. | Yes 03/18 | Yes 01/24 | Yes 05/18 | Yes 05/19 | Yes 02/22 |

**Table Notes:**

- The MT submitted a memo dated February 28, 2022, subsequently approved by the Parties, invoking Paragraph 150 for Paragraphs 73–80.

- The SA-mandated training related to housing is monitored in the bias-free policing training (Paragraph 70, in sustained compliance) and the quarterly roll call training, Preventing Discriminatory Policing Parts A–G (Paragraph 71, in sustained compliance).

**E.  Data Collection and Analysis**

The Department's efforts to make better use of data and conduct SA-required analyses and assessments has led to compliance or sustained compliance with each of the Data Collection and Analysis paragraphs.

The requirements of the Data Collection and Analysis section run parallel to the data-related activities required to meet compliance with several other SA sections, including Stops, Bias-Free Policing, Use of Force, and Accountability. See those sections for further discussion.

1.  Progress on Data Collection and Analysis Provisions

- LASD is in sustained compliance with SA Paragraph 81.
- LASD remains in compliance with SA Paragraph 83a regarding reliable data.
- LASD is now in compliance with SA Paragraphs 82, 83b, 84, 85, and 86.

The Department has continued to make progress in each of this section's subject areas, including: continuing work to modernize and improve the reliability of its data systems; implementing and expanding the use of its internal stops dashboards and the use of data and data analytics to drive self-assessment and decision making at the stations and NPD; and having relied upon the initial release of CPE data analysis reports for both stations, as well as an internally conducted analysis of stops, to provide the public and policy makers with a better understanding of the effects policing strategies in the AV are having.

In November 2025, LASD produced the Antelope Valley Semi-Annual Stops and Detentions Report, which provided an analysis of LASD stops data, including demographics of those stopped, for Palmdale and Lancaster stations as well as comparison to other department stations. Some of the categories examined include: (1) stops justifications, (2) stops outcomes, (3) race breakdown, (4) backseat detentions, (5) deputy action (force related contacts), (6) and deputy actions (non-force-related contacts). The report provided statistics and analysis of the enforcement efforts involving the following specialized units in the AV.

- School Resource Deputy Program
- DUI Checkpoints
- Lancaster Community Appreciation Program (LAN-CAP)
- Parole Compliance Team (PCT)
- "Bomber Cars" Enforcement Actions (deputies placed on special assignment for a set period to conduct stops and enforcement to address a specific crime problem.)
- Summer Crime Enforcement Program

The Semi-Annual Stops and Detention Report is a strong data report and a useful tool, especially when used in conjunction with assessments that relate the data to results of the stations' enforcement efforts. Also, these data reports are reviewed prior to Risk Management Forums, and LASD leadership may ask

questions of AV station commanders using the information from these reports. (See the Community Engagement section.) The MT will provide LASD with detailed feedback on ways to improve and/or strengthen future iterations of the report. Combined with the dashboards, the Captain's Quarterly Reports, and other station-level reviews, the MT finds that the Department managers now have timely access to the range of information they need to ensure their performance reviews, risk management, and crime prevention decisions are being driven by current and reliable data.

As noted in the introduction to this report, the Department's commitment to upgrading its technology and data systems has been critical to achieving compliance not only in this area but in stops, bias-free, complaints, UOF, and accountability.

2.  <u>Next Steps</u>

- LASD will continue each of the activities described above related to data collection, data analysis, and the use of data to inform and influence police practices as part of this and other SA sections.
- In consultation with the MT and DOJ, LASD will develop reasonable methods for memorializing its various analyses, assessments, and resulting actions.
- LASD will publish the work resulting from the CPE partnership, develop plans for next steps regarding taking corrective action where needed and regarding additional or follow-up analyses, and engage with the community regarding the findings and next steps.
- The MT will provide feedback and technical assistance as appropriate.

3.  <u>Data Collection and Analysis Compliance Status Table</u>

Table 4 provides the compliance status for each paragraph in this section.

| TABLE 4 DATA COLLECTION AND ANALYSIS COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 81 | LASD collects data related to bicycle stops, backseat detentions, probation and parole stops and searches, consent searches, and vehicle impoundments. | NA | NA | Yes 12/24 | Yes |
| | **Notes:** LASD has been collecting the required data for several years. The approved plan to rely on SACR data rather than CAD for recording and reviewing stops information will expand the thoroughness and usefulness of the data collected. LASD reached compliance in December 2024. With the implementation of the SACR plan and the continuation of data collection processes LASD is now in sustained compliance. | | | | |
| 82 | LASD conducts semi-annual analysis of various data documenting stops, searches, seizures, backseat detentions, arrests, vehicle impoundments, uses of force, civilian complaints, and Section 8 voucher compliance checks. | NA | NA | Yes 11/25 | No |
| | **Notes:** LASD has taken various steps toward compliance with this provision, including improving processes for gathering the needed data, establishing methods for stations to readily access and review data, and building capacity and expertise for using the data to inform practice. CPE produced a data analysis report for review and discussion in the 20th reporting period. LASD has since produced a report covering January to June 2025. | | | | |
| 83a | LASD uses accurate, complete, and reliable data. | NA | NA | Yes 06/25 | No |
| | **Notes:** Reliability of the CAD data has been an issue, but the switch to SACR data addressed these concerns. The Department has established various checks on PDE and PRMS data reliability. For sustained compliance with data reliability, LASD will need to continue thorough internal data checks to include corrective action as needed. AAB and MT audits will continue to assess data integrity. | | | | |
| 83b | LASD's semi-annual data analysis includes regressions, including appropriate controls, to determine whether law enforcement activity has a disparate impact on any racial or ethnic group. | NA | NA | Yes 11/25 | No |
| | **Notes:** LASD partnered with CPE to conduct analysis and produce a report that includes regressions and other analyses to assess whether LASD practices have a disparate impact. With the CPE report and the second stops report, combined with the use of dashboards, RMF, etc., LASD is meeting the basic requirements of assessing disparate impact of their enforcement strategies. | | | | |
| 84 | From the analysis in Paragraphs 82–83, LASD identifies any concerning trends or issues and assesses whether any practices, policies, training, etc., need to be changed to ensure adherence to constitutional and/or effective policing. | NA | NA | Yes 11/25 | No |
| | **Notes:** With the CPE report and the second stops report, combined with the use of dashboards, RMF, AAB audit, etc., LASD is meeting the basic requirements of assessing disparate impact of their enforcement strategies. For sustained compliance, the stations will need to routinize and document these processes (as described in Notes for Paragraph 82). | | | | |

| TABLE 4 DATA COLLECTION AND ANALYSIS COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| 85 | LASD's analysis identifies any problematic trends among reporting districts or deputies and takes appropriate corrective action. LASD conducts these reviews regularly, and the analysis is incorporated into routine operational decisions. | NA | NA | Yes 11/25 | No |
| | **Notes:** LASD has met the basic requirement of this provision. The dashboards provide analysis by deputy and reporting district, and the stations are using these analyses in the CMF/RMF. For continued and sustained compliance, the MT encourages increasing capacity to examine stops data from a variety of perspectives. | | | | |
| 86 | LASD produces a semi-annual report summarizing the results of the analysis and steps taken to correct problems and build on successes. The report is publicly available in English and Spanish and posted on LASD's website. | NA | NA | Yes 12/25 | No |
| | **Notes:.** The most recent report was published in English and Spanish and posted on the Department website. | | | | |

**F.  Community Engagement**

The Department has reached compliance or sustained compliance with all fifteen SA paragraphs in the Community Engagement area. The AV stations continue to build relationships and increase trust with AV communities, including youth, individuals with LEP, and historically marginalized groups.

1.  Community Engagement Training

- LASD has moved from "partial compliance" to "compliance" with providing deputies with the community engagement training required by SA Paragraph 89.

The MT and DOJ reviewed and provided feedback on LASD's eight-hour community engagement training, Principled Community Policing for Patrol, designed to comply with SA Paragraph 89. LASD's Training Bureau put extensive effort in the past year to developing the CE training and were very open to MT and DOJ input. The training is grounded in POST's Principled Policing in the Community training, which discusses problem solving, procedural justice, implicit bias, and historical and current events that impact the relationship between law enforcement and the public. On November 5, 2025, the MT and DOJ observed a pilot of the training and provided immediate verbal feedback. We also requested that LASD develop written talking points to be provided to the community representatives who will be called upon to participate in the training. These were subsequently provided, and the training was approved. LASD subsequently submitted their plan for delivering the training to all appropriate LASD-AV personnel, which the MT has approved.

Pursuant to these efforts, LASD has achieved compliance with SA Paragraph 89. To reach sustained compliance, LASD will need to provide the MT and DOJ with verification of training for all required personnel. Also, in the next reporting period, the parties will discuss annual refresher training following delivery of the initial training to all appropriate personnel.

In addition to the community engagement training for all deputies, on September 23, 2025, the MT and DOJ observed a pilot of LASD's training for the departmentwide Community Engagement Guidelines Handbook (Handbook). The Handbook was developed and provided to every station in order to provide baseline knowledge of best practices in community engagement and to help ensure station activities designed to build stronger relationships with the communities they serve are conducted in a consistent manner throughout the county. LASD has expressed the intent to continue the training and advised the MT that they are currently discussing how they will roll out more training on the Community Engagement Guidelines Handbook in 2026.

2.  Community Advisory Councils (CACs)

- The Department is now in sustained compliance with SA Paragraph 94, which requires representative CAC membership and quarterly public meetings.
- LASD remains in sustained compliance with SA Paragraphs 87c, 92, 93, 96, and 97, which relate to the facilitation of the CACs and dissemination of the SA.

- LASD remains in sustained compliance with SA Paragraph 95, which requires the Department to post CACs' reports and respond to recommendations.[14]

### a. CAC Membership

The Department reached sustained compliance with SA Paragraph 94 in December 2025 based on continued engagement and partnership with the CACs and the AV Youth Advisory Council (AVYAC). The Lancaster and Palmdale CACs continue to meet monthly and continue to receive interest from community members regarding membership. Currently, Palmdale has 12 members in their CAC and Lancaster has seven members, with interviews for new members scheduled for the next month. The Department is also beginning to process a large number of applications to the youth council that were received at a recent event. Both CACs also continue to maintain an active social media presence.

### b. CAC Meetings

The CACs continue to meet regularly and provide venues for community members to share concerns and learn about activities and events conducted by the AV stations, as well as provide updates on LASD's compliance with the SA. The Department also utilizes these meetings to share information with community leaders. The MT observed CAC meetings in which Palmdale and Lancaster station personnel shared crime statistics and dashboard data. In addition to SA-required quarterly town halls led by the CACs, Palmdale and Lancaster stations organize a variety of community engagement events to promote positive interaction between AV deputies and community members with diverse backgrounds. (See CAC and LASD Community Meetings and Events below.) More recently, AVYAC has not met consistently; however, the MT was informed that LASD Community Relations sergeants are working to resume regular in-person meetings with this group.

3. <u>Station and Deputy Community Engagement Activities</u>

- LASD remains in sustained compliance for deputy participation in community meetings (SA Paragraph 87a).
- LASD remains in sustained compliance for SA Paragraph 87b regarding receiving and tracking community input.
- The Department is now in sustained compliance for deputy community engagement and enhancing relationships with particular groups, including youth and communities of color (a component of SA Paragraph 88).
- LASD remains in sustained compliance with SA Paragraph 87a, which requires staff to actively participate in community engagement efforts.

---

[14] https://lasd.org/antelopevalleycomplianceunit/#community_advisory_reports

a. *Receiving Community Input*

LASD has continued to enhance their mechanisms for receiving and tracking community input (SA Paragraph 87b). In addition to in-person and online meetings and events, station managers receive community input through a variety of other avenues, including the annual CAC report, the online recordation of the QR code surveys given out by personnel from both stations, through discussion and communications with CAC members and youth members of the youth council, and in the minutes kept from each station's regular crime meeting. While not meant as a general avenue for community input, the Virtual Deputy program is another opportunity for the public to express concerns to the Department. We also note that CAC members have reported their input is being heard and responded to more consistently than in years past.

b. *Enhancing Relationships With Particular Groups*

The Department reached sustained compliance with SA Paragraph 88 in this reporting period through efforts to further institutionalize community engagement processes and activities, including continuing to use available data (the Community Survey, station-initiated surveys, input from CAC and community meetings, Shift Recap Forms, etc.) to inform community engagement strategies and enhance community relationships; tracking community input, incorporating feedback, developing related problem-oriented policing (POP) projects, and updating and further collaborating with the community; beginning to deliver an approved engagement training to AV deputies; and encouraging deputies who attend community meetings to be active participants. The Palmdale station expanded engagement with the Spanish-speaking community in 2025 and is exploring outreach strategies to connect with the African American and LGBTQ+ communities to broaden engagement and participation across and with the community.

c. *Community Events and Deputy Participation*

Station leadership has begun implementing a more interactive engagement approach to promote the exchange of information surrounding data, community concerns, and problem-solving efforts between community members and deputies. To illustrate, unlike Coffee With a Cop events in years past where deputies would go to a coffee stand and make themselves available for public engagement, the events using the new approach to Coffee With a Cop consists of deputies circulating among groups and individuals present to initiate conversations, discuss community needs, expectations, resources available, and crime data and statistics that are of interest and concern. This is done in an informal manner that is dialogue-focused to facilitate more community participation. The stations continue to emphasize not only participation in community engagement activities, but also the importance of meaningful interactions with community members—an approach critical to fostering sincerity and trust. Importantly, the AV captains have set the tone and through their examples they exhibit what is expected of their staff by modeling the desired conduct and through their attendance at various community meetings and events. In this reporting period, the MT observed deputies being more engaged when communicating with community members at events and meetings than in the past.

Each station continues to track their deputies' participation in community events, including those noted in the CAC and LASD Community Meetings and Events section discussed below, as well as singular encounters that routinely take place with individual community members (i.e., 755s). The MT reviewed a list of 662 engagement encounter entries (755s) covering the time frame from January 1 through December 1, 2025. The MT found that the types of engagements deputies were documenting as 755s met requirements that those encounters be self-initiated, positive community contacts.

d. *CAC and LASD Community Meetings and Events*

The MT also reviewed the types of events that can fulfill the requirement for deputy participation at community meetings and events. The number and type of events has expanded over time, providing deputies a wider range of options to utilize and document in terms of type of engagement, time, and location. According to station leadership, LASD-AV's community engagement events and meetings have increased by over 200 additional events in the last year.

LASD-AV stations participated in community meetings, often in collaboration with the CACs, and held several station community events in the latter half of 2025. Some of the larger events are as follows.

- LASD and the City of Lancaster each hosted separate National Night Out (NNO) events in August 2025. Advertising for this event included publicizing via social media, CACs, and community organizations. The Palmdale CAC had a booth at the NNO event where most of the CAC members attended and conversed with other community members about the CAC functions and the SA.

- In partnership with the Palmdale Department of Children and Family Services (DCFS) office, LASD participated in the Annual Caregiver Appreciation Event in November 2025. LASD deputies delivered a presentation to foster parents.

- LASD engaged in another collaboration with DCFS on programs specifically designed to support the Latine community. Deputies provided presentations during parenting classes on such topics as immigration-related concerns and tried to dispel the widespread misconception within the Latine community that local law enforcement in the AV works in partnership with ICE, a belief that contributes to heightened fear and distrust. LASD also developed an Immigration Information Guide that is distributed at public meetings.

- In October 2025, the Palmdale and Lancaster stations participated in the Faith and Blue event, a national initiative designed to strengthen trust and unity between law enforcement and local faith communities. Approximately 150-200 people attended this event in Palmdale and approximately 500 in Lancaster, including performers and the AVYAC, who assisted in this event and the station's Open House Car Show.

- On October 20, 2025, Palmdale station participated in a community meeting sponsored by the Palmdale CAC, Servicios y Asesoria Legal para la Vida el Ambienta (SALVA) (a representative of which now serves on the CAC), and LASD-AV. The meeting's focus was on addressing community questions and concerns relating to immigration and immigration enforcement, and residents were encouraged to share experiences and ideas to enhance community policing and engagement.

- In November 2025, LASD partnered with the Antelope Valley Union High School District, the AVYAC, and Future Leaders California to deliver the two-day Youth 4 Justice program.

- Lancaster station partnered with a local business owner who operates multiple 7-Eleven stores to distribute turkeys to community members in November 2025.

- In partnership with station boosters and Antelope Valley Transit Authority, LASD co-hosted a holiday toy and food distribution event in December 2025. This year, the booster organization increased its budget to approximately $50,000 to support the purchase of toys, turkeys, and holiday meal fixings.

- In December 2025, and in collaboration with Lancaster and Palmdale CACs, AV stations held a toy drive at a local radio station.

*e.  Los Angeles County Sheriff Civilian Oversight Commission (COC) Meeting*

For its October 16, 2025, meeting, the COC invited the MT to provide an update on LASD's progress toward compliance with the SA. An MT member attended virtually, along with captains from the Palmdale station and a Lieutenant from the OCP who attended in-person to provide updates on behalf of the Department. The MT member presented the COC with an overview of the MT's key findings, progress toward mandated requirements and deadlines, and work left to do to achieve full compliance with the SA. The MT also highlighted Sheriff Luna's leadership in prioritizing SA compliance, including providing necessary resources such as establishing the Office of Constitutional Policing, implementing a two-captain structure at the AV stations, and elevating the visibility and importance of community policing and engagement.

4.  Departmentwide Community Feedback Survey

- LASD remains in sustained compliance with Paragraphs 98, 99, 100, and 101, which require LASD to support the activities related to the community survey and to post the survey on the LASD-AV website.

As of May 16, 2025, LASD had launched a departmentwide online community feedback survey.[15] In addition to posting QR-coded flyers in public station areas, LASD is promoting the survey through social media, the Department website, CACs, community groups, and city representatives. At a May 2025 site visit, the MT and DOJ approved the use of the online community survey in place of the traditional format previously used. To maintain sustained compliance with the community survey requirements (SA Paragraphs 98–101), the MT emphasized the importance of LASD continuing to conduct a broad and varied outreach effort to encourage representative participation and the need to periodically review survey demographics and adjust outreach strategies as necessary.

The Department's goal for the first quarter of 2026 is to have a pubic-facing dashboard available on the LASD Transparency page with survey results that will include the ability to look at responses for individual stations and facilities. Reports on survey findings will also be shared and discussed in a variety of forms, including CMF/RMF meetings, at CAC meetings, and in the annual community

---

[15] COMMUNITY FEEDBACK SURVEY | Los Angeles County Sheriff's Department

engagement reports.

Apart from the online Community Survey, Lancaster station reported that the most helpful survey responses are those that are provided at the end of CAC town halls. These very short, station-specific surveys distributed to meeting attendees help guide the station regarding the topics and ideas that are most relevant to their community. In Palmdale, station leadership share survey results verbally at community meetings and at the CAC meetings. Station leadership shared with the MT that a common issue shared by the community is deputy response time and lack of visibility. These concerns led to several management practices aimed at reducing response times and call volume, as well as the creation of the Virtual Deputy program (discussed in more detail in this section).

The MT will continue to track LASD's implementation of their various surveys, including whether LASD puts appropriate effort into encouraging representative participation, shares survey results with the AV community, and uses the results to inform community engagement practices. If issues arise, the MT will share its observations with LASD and discuss solutions to be applied. While having the Community Survey online at all times has advantages, to increase participation and ensure the AV stations can make year-to-year comparisons as intended by the SA, the MT recommends the stations also consider making a concerted effort to encourage participation during a specific time period each year and to engage the CACs and other community partners in outreach.

5.  <u>AV Community Engagement Reports</u>

- LASD remains in sustained compliance for producing annual Community Engagement Reports (SA Paragraph 91).

The Antelope Valley stations published their 2024 community engagement reports in the previous reporting period. The 2025 reports are expected to be issued in the next reporting period. These reports identify and discuss each station's efforts to continue building trust and relationships with their communities.

6.  <u>Diversion</u>

- The Department is in sustained compliance regarding working with the community to develop diversion programs (SA Paragraph 87d).

The Department has continued to be in sustained compliance with SA Paragraph 87 since 2022. The MT determined compliance on the requirement that LASD actively engage in the development of a diversion program for AV youth through review of LASD documentation, direct observation, and discussions with community members.

7. <u>Crime Management Forum and Risk Management Forum</u>

- The Department remains in compliance with SA Paragraph 90, which was first established in June 2025.

The MT has observed continued improvements in each successive CMF/RMF. The MT observed station managers using dashboards to examine individual deputy behavior as well as work units, which is an important function of risk management that needs to continue to be incorporated.

On August 28, 2025, the MT and DOJ observed a CMF/RMF at the Hall of Justice. The MT found the meeting to provide the most thorough and thoughtful RMF to date. A key improvement resulted from the integration of risk management dashboard data into the presentation slides, which significantly reduced the preparation effort and allowed for greater flexibility in displaying information. The discussion also devoted more attention to community engagement, POP, and the potential unintended impacts of law enforcement activities, particularly around race and ethnic disparities related to stops. These areas can be further developed both in presentation of data and the depth of discussion.

Compliance for SA Paragraph 90 was achieved in June 2025. Sustained compliance will be assessed based on continued improvements, including the need to reflect a higher level of incorporation of community input and problem-solving efforts, such as additional documentation and reporting on community input and concerns, examples of strategizing and collaborating with the community based on those concerns, POP projects, details on particular issues or key projects and the results achieved, and documentation of follow up on items discussed earlier and lessons learned.

8. <u>Next Steps</u>

a. *LASD*

- Continue to maintain, enhance, and broaden community engagement events and outreach initiatives.
- Continue facilitating and participating in CAC meetings and working with the CACs to ensure broad representation and participation with hard-to-reach and historically marginalized populations.
- Continue to review responses to community surveys—those from the Department and/or their individual AV station—and use them to help inform law enforcement priorities and community engagement activities.
- Continue to strengthen systems for documenting community input, including the type and source of feedback, collaborative problem-solving efforts, actions taken by LASD and community partners in response to community input, outcomes achieved, and insights generated though ongoing feedback loops.

b. *The MT*

- Continue to observe LASD community engagement activities and the CACs, offering ongoing feedback for improvement.
- Continue maintaining active engagement with the CACs and the community at large to better understand their concerns, perceptions, and expectations regarding progress toward the outcomes outlined in the SA.
- Continue to track LASD's survey implementation, including whether LASD puts appropriate effort into encouraging representative participation.
- Continue to review and provide feedback on the AV stations' Community Engagement Reports.

9. Community Engagement Compliance Status Table

Table 5 provides the compliance status for each paragraph in the Community Engagement section.[16]

---

[16] SA Paragraphs 69 and 72 are now reported on in the Bias-Free Policing section.

| TABLE 5 | | | | | |
|---|---|---|---|---|---|
| **COMMUNITY ENGAGEMENT COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 87a | Actively participate in community engagement efforts, including community meetings. | Yes 12/19 | NA | Yes 09/21 | Yes 12/22 |
| 87a | **Notes:** The mechanisms for deputy participation in community engagement efforts have been in place since 2021; the extent and quality of that participation are measured in SA Paragraph 88. | | | | |
| 87b | Be available for community feedback. | Yes 12/19 | NA | Yes 06/24 | Yes 06/25 |
| 87b | **Notes:** Department managers make themselves available to feedback and ensure that stations are implementing a tracking system to review community concerns. Stations have a variety of means to receive community input, including the CAC, community events, the website, and the Virtual Deputy program at both AV stations. | | | | |
| 87c | Develop CACs. | Yes 12/19 | NA | Yes 06/16 | Yes 06/17 |
| 87c | **Notes:** The CACs existed before the SA but were implemented in accordance with the SA in 2016 and have been maintained ever since. | | | | |
| 87d | Work with the community to develop diversion programs. | Yes 12/19 | NA | Yes 09/21 | Yes 12/22 |
| 87d | **Notes:** Since 2021, the MT has found the Department in compliance with the diversion program provision through the review of LASD documentation, direct observation, and discussion with community members. | | | | |
| 88 | Ensure all sworn personnel attend community meetings and events and take into account the need to enhance relationships with particular groups within the community including, but not limited to, youth and communities of color. | Yes 1/19 | Yes | Yes 12/24 | Yes 12/25 |
| 88 | **Notes:** <ul><li>In compliance for deputy participation in community events and/or independent engagement with community members for 2023. Deputy attendance is reviewed on an annual basis; 2024 was assessed by the MT and found to be in compliance.</li><li>Continued progress was made in this reporting period toward increasing the extent and quality of the AV stations' engagement with the community and enhancing their relationships with particular groups, to include working more closely with the CACs, AVYAC, and the Spanish-speaking communities.</li><li>LASD published an approved Attendance Work Plan (January 10, 2019; revised April 1, 2020); both stations now have updated plans.</li><li>Reaching sustained compliance with this paragraph depended on LASD's institutionalization of practices so they can be sustained through leadership and staffing changes; these include but are not limited to stations' attendance plans, formalized POP project processes, ongoing LASD self-assessment of compliant deputy engagement at events and 755s, and surveys.</li></ul> | | | | |

| TABLE 5 | | | | | |
|---|---|---|---|---|---|
| **COMMUNITY ENGAGEMENT COMPLIANCE STATUS** | | | | | |
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| 89 | In-service training on community policing and problem-oriented policing is provided to all AV personnel. | NA | Yes 11/25 | Yes 11/25 | No |
| | **Notes:** LASD's community engagement training materials and pilot were approved by the Monitors and DOJ. Compliance was achieved with LASD developing a plan for delivering the training to all appropriate personnel. To achieve sustained compliance, LASD will need to provide the MT and DOJ with verification of training for all required personnel. | | | | |
| 90 | Revise content of CMF and RMF to include discussion and analysis of trends in misconduct complaints and community priorities to identify areas of concern, and to better develop interventions to address them using techniques to better support and measure community and problem-solving policing efforts. | NA | NA | Yes 06/25 | No |
| | **Notes:** The Department was found in compliance with this provision in this reporting period. The MT has observed every RMF and CMF and found that the meetings reflect progress with the usage of data, examination of trends, probing of responses, and expectations for follow-up to be conducted; however, better documentation of these efforts will be required for sustained compliance. The Department has yet to fully integrate the CMF into the RMF. Sustained compliance will be assessed based on continued improvements, including the need to reflect a higher level of incorporation and consideration of community input and problem-solving, such as additional documentation and reporting on community input/concerns, examples of strategizing/collaborating with the community based on those concerns, POP projects, details on particular issues or key projects, and follow-up on items discussed earlier and lessons learned. | | | | |
| 91 | Complete annual reports on the impact of community engagement efforts, identifying successes, obstacles, and recommendations for future improvement in order to continually improve LASD–community partnerships. | NA | NA | Yes 12/22 | Yes 06/24 |
| | **Notes:** The AV stations' Community Engagement reports continue to improve both in the range of activities and in the presentation of those activities in the reports. The next reports are expected in the next reporting period. | | | | |
| 92 | Seek community assistance in disseminating the SA. | NA | NA | Yes 06/17 | Yes 06/18 |

| TABLE 5 | | | | | |
|---|---|---|---|---|---|
| **COMMUNITY ENGAGEMENT COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 93 | Support and work with CACs to help them meet their mission to leverage the insights and expertise of the community to address policing concerns, including but not limited to racial or ethnic profiling and access to law enforcement services, and to promote greater transparency and public understanding of LASD. | Yes 9/14 2/15 | NA | Yes 06/20 | Yes 12/24 |
| | **Notes:** The Department continues to support and work with the CACs and must continue to assess this work and make improvements as needed to remain in compliance and to ensure the CACs effectively function in the manner envisioned by the SA. Station management continues documenting CAC input and providing follow-up. | | | | |
| 94 | Memorialize CACs and facilitate quarterly meetings. | Yes 02/15 | NA | Yes 12/24 | Yes 12/25 |
| | **Notes:** LASD has continued to invigorate the composition of the CAC for participation and representativeness, including youth in the AVYAC. LASD achieved sustained compliance in December 2025 given their continued success of growing and strengthening the CACs and AVYAC. | | | | |
| 95 | Post CAC reports on LASD-AV website and respond to recommendations. | NA | NA | Yes 12/23 | Yes 06/25 |
| 96 | Provide administrative support and meeting space for CACs. | Yes | NA | Yes 06/17 | Yes 06/18 |
| 97 | Ensure CACs have no access to nonpublic information. | Yes | NA | Yes 06/17 | Yes 06/18 |
| 98 | Assist the Monitors in annual Community Survey. | NA | NA | Yes 12/18 | Yes 12/20 |
| | **Notes:** The Department has now implemented a countywide online community survey. In September 2025, LASD began actively promoting the online survey. LASD stated their intention to use the survey responses to inform the CMF/RMF, crime strategies, with the CACs, community engagement activities, and station activities. LASD is developing a public dashboard presenting survey results. | | | | |
| 99 | Cooperate with independent researcher in conducting annual Community Survey and Deputy Survey. | NA | NA | Yes 12/18 | Yes 12/20 |
| | **Notes**: See Paragraph 98. | | | | |
| 100 | Cooperate with administration of the annual Community Survey. | NA | NA | Yes 12/18 | Yes 12/20 |
| | **Notes**: See Paragraph 98. | | | | |

| TABLE 5 | | | | | |
|---|---|---|---|---|---|
| COMMUNITY ENGAGEMENT COMPLIANCE STATUS | | | | | |
| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| 101 | Post annual Community Survey report on LASD-AV website. | NA | NA | Yes 12/18 | Yes 12/20 |
| | **Notes**: See Paragraph 98. | | | | |

## G.  Use of Force

LASD continues to maintain and expand upon their recent improvements in the use, investigation, and management review and adjudication of force. The Department is now in compliance or sustained compliance with each of the UOF paragraphs.

1.  Use-of-Force Training

- LASD is now in sustained compliance with use-of-force training (SA Paragraphs 119a–f).
- LASD is now in compliance with supervisory use-of-force training (SA Paragraph 119g).

SA Paragraphs 119a–f require that all Antelope Valley deputies receive annual or biennial use of force training addressing several topics: proper use-of-force decision making; role-playing scenarios that illustrate proper UOF decision making; principles of procedural justice; de-escalation techniques; threat assessment; and tactics and survival (TAS). The approved LASD training courses addressing these provisions include Arrest and Control (ARCON), Taser 10, and Ground Control.[17] The MT has reviewed training receipt rosters for these courses for the past three years, and the Department is now in sustained compliance.

SA Paragraph 119g requires that LASD-AV supervisors receive initial and annual refresher training on conducting use of force investigations, on how to effectively direct deputies to minimize uses of force and to intervene effectively to prevent or stop unreasonable force, and on addressing unreasonable force. These requirements are addressed in LASD's approved Supervisor's UOF Investigation and Supervisors Arrest and Control training. In this reporting period, the Department began providing these courses to supervisors according to an approved delivery plan, and the Department is now in compliance. We will continue to assess training receipt in the next reporting period.

2.  Monitors Audit of AV Deputies NCI and Categories 1 and 2 Uses of Force

In this reporting period, the MT conducted our seventh AV use-of-force audit, designed to assess the degree to which LASD is complying with the SA provisions governing the use, investigation, and adjudication of AV deputies' Non-Categorized Force Incidents (NCI) and Categories 1 and 2 force.[18]

The MT drew a statistically valid sample of 62 use-of-force cases that occurred in the AV in the first quarter of 2025. The audit was a follow-up to the Monitors' fifth UOF audit, which used a smaller

---

[17] There is no SA paragraph that specifically addresses CEW/Taser training. However, the CEW/Taser training touches on the following SA paragraphs: 103 (warnings), 104, 105 (objective reasonableness), 108, 109 (reporting) 110 (supervisory notification), 111 (supervisor response and investigation), 112 (supervisor reporting), 113 (chain of command review), 115 (holding deputies accountable), 116 (holding supervisors accountable), 118 (supervisory review by station commanders), and 119 (biennial training).

[18] NCI force includes very minor uses of force where there are no injuries or complaints. Category 1 force includes control holds, takedowns, and the use of oleoresin capsicum (OC) spray. Category 2 force includes any force that results in an identifiable injury or an injury that is attributed to the UOF that does not rise to the Category 3 level.

sample of NCI and Category 1 and 2 force cases from a year prior.[19] (Category 3 uses of force are audited separately.)

Specifically, the audits assessed whether:

- The force used by AV deputies was necessary, proportional, and consistent with policy (SA Paragraphs 102, 104, 105, and 106);
- Appropriate tactics were used, including the use of advisements, warnings, and verbal persuasion to defuse and de-escalate evolving situations and to reduce the UOF as control is achieved (Paragraph 103);
- The force used involved a hard strike to the head with an impact weapon (Paragraph 107);
- Force incidents were accurately reported to a supervisor in a timely manner (Paragraphs 108, 109, and 110);
- The UOF was thoroughly investigated (Paragraphs 111 and 112);
- The investigations' findings and conclusions were supported by a preponderance of evidence (Paragraph 113);
- Unit commanders reviewed training and tactical review findings to ensure that informal supervisory feedback did not replace the need for formal discipline and that supervisory feedback is documented (Paragraph 118);
- Effective management oversight occurred, managers held deputies accountable for violations of Department policy and supervisors accountable for responding to force that was unreasonable or otherwise contrary to Department policy and/or the law, and cases were referred to Internal Affairs Bureau (IAB) and/or Internal Criminal Investigations Bureau (ICIB) as appropriate (Paragraphs 113, 115, and 116); and
- Service Comment Reviews (SCRs) were initiated when allegations of misconduct arose during a UOF investigation (Paragraph 130).

The audit findings are as follows. LASD and DOJ have reviewed and accepted the Monitors' audit report. See Table 6 below for overall compliance status for the SA provisions addressed in the audit.

a. *The Use of Force and De-Escalation*

- The audit found compliance with SA Paragraphs 102 and 104. There was only one case out of the 62 cases in the audit sample where the Monitors found the use of force to be inconsistent with LASD policy and the SA, which equated to a 98% compliance finding.
- The audit found compliance with SA Paragraph 103. The Monitors found that only one of the 62 cases was inconsistent with the SA and Department policy for the de-escalation of the use of force by deputies, a 98% compliance finding.

---

[19] Monitors audit reports are posted at http://www.antelopevalleysettlementmonitoring.info.

- The audit found compliance with SA Paragraph 105. There were no cases in this audit with any indicia of retaliatory force. In fact, the Department has never been found out of compliance for retaliatory force in any MT audit.
- The audit found compliance with SA Paragraph 106g. In the seven MT AV use-of-force audits, there has never been any indicia that a deputy interfered with a person lawfully recording police activities. (See below regarding AAB's audit of Paragraph 106.)
- The audit found compliance with SA Paragraph 107. There has never been an incident in any of the seven AV MT use-of-force audits where a deputy struck a subject in the head with an impact weapon.

b. *Use-of-Force Reporting*

There were two of 62 cases with noncompliant deputy reporting: In one, a deputy used canned or boilerplate language in his report; in the other, a deputy did not document his inappropriate comments and tactics, which were inconsistent with the SA and Department policy, that led up to the use of force.

- The audit found compliance with the UOF reporting requirements of SA Paragraphs 108 Part 1 and 110 Part 1. In the seven MT AV use-of-force audits, there has never been any indicia that a deputy failed to report a UOF.[20]
- The audit found compliance with SA Paragraph 108 Part 2. In every case in the audit sample, the report accurately described the force used, the subject's actions, and any medical information. (Boilerplate language and omissions are addressed in SA Paragraph 109.)
- The audit found compliance with SA Paragraph 109 Part 1. Boilerplate language was used in only one of the 62 cases (referenced above). This equated to a 98% compliance finding.
- The audit found compliance with SA Paragraph 109 Part 2. In one of the 62 cases, a deputy omitted relevant information (referenced above). This equated to a 98% compliance finding.

c. *Use-of-Force Investigations*

- The audit found compliance with SA Paragraphs 111 and 112. There were no significant deficiencies in 60 of 62 investigations, equating to a 97% compliance finding. There were two cases, referenced above, with issues that should have been addressed in the supervisors' investigations but were not. Each of the two cases had a policy violation, and each of the two cases also had a reporting issue.
- The audit found compliance with SA Paragraph 130. Two cases in the audit sample had an allegation of misconduct; however, those allegations were clearly refuted by the BWC recordings, so an SCR was not required.

---

[20] SA Paragraph 110 Part 2 requires that deputies notify their supervisors of any allegations of excessive force and that, if they fail to do so, they are subject to discipline up to and including termination. This provision is assessed during MT and AAB complaints audits; however, the MT notes that there were no cases in the audit sample with an unaddressed allegation.

*d.   Management Review of Use-of-Force Investigations*

The audit found compliance with SA Paragraphs 113, 115, 116, and 118.[21] The Monitors found the management review and adjudication in 60 of the 62 cases to have no significant deficiencies, equating to a 97% compliance finding. The issues with the two cases referenced above should have been identified and addressed in the management review process.

*e.   PRMS Data Accuracy*

SA Paragraph 142 requires LASD to ensure that PRMS data are accurate and hold AV personnel accountable for inaccuracies in any data entered. This audit found no indicia of inaccuracies in the PRMS data for any case in the audit population. (See the Accountability section.)

*f.   Audit Cases With Exemplary Professionalism*

Two Lancaster UOF cases, both involving individuals in mental health crisis, represented exemplary professionalism on the part of Lancaster station personnel. In one, the leadership of the sergeant on scene and the deputies' de-escalation and force tactics were commendable and lifesaving. In the second, the deputies on scene effectively applied de-escalation so that minimal force had to be used. The deputies and the watch commander at the station acted in a commendable manner and showed great compassion and care throughout the incident.

3.   <u>Executive Force Review Committee (EFRC) and Critical Incident Review Panel (CIRP) Reviews</u>

- LASD remains in compliance with SA requirements for the management review of Category 3 force and the EFRC review process (Paragraph 114).

As noted in our last three semi-annual reports, LASD management review of the most serious uses of force (shootings and force resulting in serious injury) has improved dramatically since the Department revised the process in April 2024. In June 2025, the MT completed an EFRC audit that found the Department in compliance with Paragraph 114. The department remained in compliance this period, during which the Department conducted one CIRP and two EFRCs.

- *CIRP:* On September 24, 2025, a CIRP was held for an unintentional discharge that occurred on September 12, 2025. We found the station captain much more involved in providing the panel with input than we had seen in prior CIRPs. However, the firearm involved was not inspected by a firearms expert. In a previous case (2024), we raised the issue of having an expert examine the firearm and were informed that would occur from then on. However, it appears that the Professional

---

[21] Compliance with SA Paragraph 114, which governs the EFRC's review of Category 3 cases, was beyond the scope of this audit but will be subsequently addressed in this report. The Department's compliance with Paragraph 117, use-of-force trends, is evaluated in several additional MT assessments.

Standards Bureau Guidelines for Handling Unintentional Discharges had not been updated, so this firearm was not inspected by an expert. The oversight in this case was subsequently corrected (the firearm was inspected and found to be in good working order), and we understand the guidelines are being updated.

- *EFRC:* On August 14, 2025, an EFRC was held for a deputy-involved shooting that occurred on September 22, 2021. The EFRC was very thorough, including a very insightful presentation by the station commander assessing the incident and its impact on the community as well as the deputies involved. We were pleased to see that a Department psychiatrist has been added to the EFRC to assist them in assessing these incidents.

- *EFRC:* On September 11, 2025, an EFRC was held for a deputy-involved shooting that occurred on September 23, 2021. Again, the EFRC was very thorough, and the acting station commander provided the panel with a detailed analysis of the incident, availability of safety equipment, and training.

4.  <u>Additional LASD Management Use-of-Force Reviews</u>

- LASD is now in compliance with tracking and responding as needed to UOF trends (SA Paragraph 117).

AV unit commanders have continued to proactively improve the quality and frequency in the identification, tracking, and response to UOF trends. This progress is reflected in the increased use of dashboards, weekly Category 2 force reviews, improved coverage in CMF/RMF, and the new Captain's Quarterly Reports. Ensuring that accurate and timely data are used in these activities has been improved due to the dramatic reduction in the backlog of use-of-force investigations, which was achieved even while the AV stations were facing deployment shortages with sergeants and lieutenants.

As detailed in our last semi-annual report, the NPD chief continues to have weekly management accountability reviews of Category 2 uses of force, ensuring that prompt assessments are being made and adequate attention is devoted to UOF incidents that occur in the NPD. The Monitors and MT staff regularly virtually attend these meetings and have found that they are well run and that station managers are held accountable. These meetings and the subsequent actions being taken appear to be contributing to the decrease in the number of UOF incidents we have noted in the AV.

5.  <u>Use-of-Force Data Analysis</u>

- LASD remains in compliance for UOF data analysis and reporting (SA Paragraphs 120–123).

In this reporting period, LASD continued to make progress in regularly conducting analysis of force data. In the last reporting period, LASD produced a draft UOF data analysis report addressing most of the specific analysis requirements laid out in SA Paragraphs 120–122. LASD published a revised UOF analysis report, which is available, as per SA Paragraph 123, on the station websites. As required by the SA, LASD will need to ensure that future reports incorporate managerial evaluation of the findings, any issues identified, and any corrective action taken in response.

Station managers continue to use the force, stops, and risk management dashboards and to hold weekly Category 2 force reviews with NPD. The MT continues to observe evidence that station captains are more consistently tracking trends, assessing performance, and providing clear direction and supervision to personnel under their command.

The Department also provides publicly available UOF data online, also on the Transparency page. This is a valuable resource for gaining a better understanding of the nature and frequency of force used in the AV and across the county.[22]

6. AAB Audit of SA Paragraph 106

- The Department is now in sustained compliance with SA Paragraph 106.

In its audits of stops, force, and complaints, the MT has never found a lack of compliance with SA Paragraph 106, which requires that deputies not inhibit community members from lawfully recording law enforcement activities. In this reporting period, AAB finalized an extensive audit of SA Paragraph 106. The audit, which sampled cases from 2024, was found to have been conducted according to the approved audit plan and to have produced reliable results. As with the AAB audits of stops and complaints, this audit was used by the Monitors and DOJ to determine compliance. The audit found compliance with SA Paragraph 106, confirming the MT's prior observations and establishing sustained compliance.

Regarding the audit of SA Paragraph 106 and other audits, the MT met with the AAB captain and personnel on several occasions to provide consultation on LASD's internal audit process. AAB's continued development and contributions are certainly causal factors in the Department's improved accountability and efficiency that have been documented throughout this report.

7. Next Steps

a. *LASD*

- North Patrol Division will continue to conduct weekly meetings to perform preliminary assessments of Category 2 uses of force and will continue to hold CIRs and EFRCs as needed.
- The Department will fully implement the approved supervisory investigation training and will hold supervisors and employees accountable for the use, reporting and investigation of use-of-force incidents.
- Audit and Accountability Bureau will continue to work in conjunction with the Monitors in the development and implementation of SA related audits

.

---

[22] https://lasd.org/transparency/public-force-statistics

*b.  MT*

- MT staff will meet with the Department and DOJ and conduct an exit conference on the recent use-of-force audit cited in this section of the report.
- MT will publish the recent AV UOF audits on the Monitors' website.
- MT staff will continue to collaborate with AAB staff in its SA-related auditing processes.
- MT staff will continue to monitor and comment on CIRP and EFRC reviews.
- MT staff will continue to meet and collaborate with AV unit commanders and the AAB captain to provide consultation toward the Department achieving SA compliance.

8.  <u>Compliance Status Table</u>

Table 6 provides the compliance status for each paragraph in the UOF section.

| TABLE 6 | | | | | |
|---|---|---|---|---|---|
| **USE-OF-FORCE COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **102, 104, 105** | The reasonableness of the use of force. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: No |
| | **Notes:** For NCI, Category 1, and Category 2 force, the fifth MT UOF audit first found the Department in compliance with these paragraphs, and the seventh MT UOF audit established sustained compliance. For Category 3 force, compliance was first established in June 2025 with the sixth MT UOF Audit. Note: SA Paragraph 105 is in sustained compliance for all types of force. | | | | |
| **103** | Use de-escalation techniques before resorting to force and reduce force as resistance decreases. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: No |
| | **Notes**. Same as above. | | | | |
| **106g** | Prohibit using force on a person legally recording an incident. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/25 |
| | **Notes:** The Department is in sustained compliance with Paragraph 106g because there were no cases in MT audits or in the 2025 AAB audit of Paragraph 106 where a deputy in any way prevented a person from recording an incident. | | | | |
| **107** | Prohibit head strike with an impact weapon unless deadly force is justified, and report unintentional head strikes. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/23 |
| | **Notes:** The Department is in sustained compliance with Paragraph 107 because there have been no cases in any of the seven UOF audits (beginning October 2018) where a deputy delivered a head strike with an impact weapon to a person's head. | | | | |
| **108a** | Deputies will report force incidents. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/23 |
| | **Notes:** The Department is in sustained compliance with Paragraph 108a because there have been no indications of unreported force in any of the seven UOF audits (beginning October 2018). | | | | |
| **108b** | Deputy reports will completely and accurately describe the force used or observed. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/25 |
| | **Notes:** For NCI, Category 1, and Category 2 force, the fifth MT UOF audit found the Department in compliance with this provision, and the seventh MT UOF audit established sustained compliance. For Category 3 force, compliance was first established prior to 2024 through MT audits and reviews of EFRC proceedings, and the sixth MT UOF audit established sustained compliance. | | | | |
| **109** | UOF reports will be without boilerplate language, and deputies held accountable for omissions or inaccuracies. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: No |
| | **Notes:** See Paragraphs 102, 104, 105. | | | | |

| | **TABLE 6**<br><br>**USE-OF-FORCE COMPLIANCE STATUS** | | | | |
|---|---|---|---|---|---|
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **110a** | Deputies will notify supervisors immediately of the use of force. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/23 |
| | **Notes:** The Department is in sustained compliance with Paragraph 110a because in every audit case in the seven UOF audits (beginning October 2018), the force was immediately reported to a supervisor. | | | | |
| **110b** | Deputies will notify supervisors immediately of any allegations of excessive force. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/25 |
| | **Notes:** See Notes for SA Paragraph 108b above. | | | | |
| **111a–d** | Perform thorough UOF investigations. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/25 |
| | **Notes:** For NCI, Category 1, and Category 2 force, the fifth MT UOF audit first found the Department in compliance for this provision, and the seventh MT UOF audit established sustained compliance. For Category 3 force, compliance was first established in the MT 2019 EFRC audit, and the sixth MT UOF audit established sustained compliance. | | | | |
| **111e** | Supervisors will thoroughly review deputies' UOF reports. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: No |
| | **Notes:** See Paragraphs 102, 104, 105. | | | | |
| **112a** | Independent supervisory use-of-force investigations. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/25 |
| | **Notes:** For NCI, Category 1, and Category 2 force, the fourth MT UOF audit found the Department in compliance with this provision, and the fifth MT UOF audit established sustained compliance. For Category 3 force, compliance was first established in the MT 2019 EFRC audit, and the sixth MT UOF audit established sustained compliance. | | | | |
| **112b–e** | Supervisor's UOF investigation reports will be complete. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | Yes<br>12/25 |
| | **Notes:** See Paragraph 111a–d. | | | | |
| **113** | Management will review thoroughness of UOF investigations. | Yes | Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: Yes | NCI, Cat 1 & 2: Yes<br>Cat 3: No |
| | **Notes:** See Paragraphs 102, 104, 105. | | | | |
| **114** | Executive Force Review Committee will thoroughly review Category 3 force. | Yes | Yes | Yes<br>06/25 | No |
| | **Notes:** The June 2025 sixth MT UOF audit of Category 3 force found that the changes to the EFRC in 2024 led to compliance. (Paragraph 114 does not apply to Category 1 or 2 uses of force.) | | | | |

| TABLE 6 | | | | | |
|---|---|---|---|---|---|
| **USE-OF-FORCE COMPLIANCE STATUS** | | | | | |
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENTS** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| 115 | Deputies held accountable for force that violates policy. | Yes | Yes | NCI, Cat 1 & 2: Yes Cat 3: Yes | NCI, Cat 1 & 2: Yes Cat 3: No |
| 115 | **Notes:** See Paragraphs 102, 104, 105. | | | | |
| 116 | Supervisors held accountable for inadequate investigation. | Yes | Yes | NCI, Cat 1 & 2: Yes Cat 3: Yes | NCI, Cat 1 & 2: Yes Cat 3: No |
| 116 | **Notes:** See Paragraphs 102, 104, 105. | | | | |
| 117 | AV commanders identify and curb problematic UOF trends. | NA | Yes | Yes | No |
| 117 | **Notes:** NPD's RMF tracks uses of force. The station managers are using the POINT risk management system and other dashboards to track force data. AAB is conducting limited-scope audits of UOF. The stations have weekly Cat 2 force reviews. The AV captains have begun taking, and documenting, corrective action through briefings, training, supervision, mentoring, and PLEs. Sustained compliance will require documentation of these analyses and corrective action taken as well as audits to measure outcomes. | | | | |
| 118 | LASD and AV unit commanders will regularly review and track "training and tactical reviews." | Yes | Yes | Yes | No |
| 118 | **Notes:** See Paragraphs 102, 104, 105. | | | | |
| 119a-g | Updated UOF training is provided. | Yes | Yes | Yes | Yes: 119a–f No: 119g |
| 119a-g | **Notes:** The Department now offers approved UOF training that addresses SA Paragraphs 119a–g. Courses include ARCON, Ground Control, Taser 10, and supervisory UOF training. Regarding SA Paragraphs 119a–f, training delivery documentation reviewed by the MT shows that the Department is in sustained compliance with Paragraphs 119a–f. Regarding SA Paragraph 119g for supervisors, the Department is now delivering the training according to an approved plan. Sustained compliance with Paragraph 119g will require the Department to deliver the required training to AV supervisors. | | | | |
| 120 | LASD to conduct an annual analysis of UOF data and trends and correct deficiencies identified by the analysis. | NA | NA | Yes 06/25 | No |
| 120 | **Notes:** LASD produced a UOF analysis report in the last reporting period. Also, with the Quarterly Reports, POINT risk management system, and other dashboards, and with the CPE analysis, the Department has begun to regularly review UOF data for individual deputies and units. In addition, LASD has produced and published a UOF analysis report. To reach sustained compliance, the stations will have to document their reviews to include the analysis conducted and findings; station managers' assessment of the findings, including any trends and deficiencies identified (or lack thereof); any corrective action taken; and outcome of that action. | | | | |

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **121** | LASD's UOF analysis to include frequency and nature of UOF referred to IAB, subject of complaints or civil suits, related to obstruction or resisting arrest charges, and involving repeat deputies or units. | NA | NA | Yes 06/25 | No |
| | **Notes:** LASD has produced and published a UOF analysis report. Further, the stations have continued to expand and improve their regular review of force data using the POINT risk management dashboard and other sources of data and information. To reach compliance, the stations will need to document their use of data as described above in the notes for Paragraph 120, including documentation of the specific reviews listed in SA Paragraph 121, e.g., frequency and nature of force incidents that are referred to Internal Affairs, that involve misconduct complaints, etc. | | | | |
| **122** | LASD to assess whether changes to UOF policy or training are needed based on analysis. | NA | NA | Yes 06/25 | No |
| | **Notes:** See Paragraph 120. Also, NPD regularly conducts reviews of Cat 2 UOF to assess if there are any immediate policy or training issues. The stations are also using force data to determine whether any changes need to be made to policy or training. To reach sustained compliance, the stations will need to document these reviews, to include the analysis conducted, the findings that revealed potential issues (or the lack thereof), actions taken, and the outcomes of those actions. | | | | |
| **123** | LASD to produce annual public report on UOF data and trends. | NA | NA | Yes 06/25 | No |
| | **Notes:** LASD produced and published a UOF analysis report in the last reporting period. To reach sustained compliance, LASD needs to continue to improve the reports in alignment with feedback from MT and document the Department's assessments of those findings, and any corrective action taken. See also Paragraph 120. | | | | |

**Caption above table:** TABLE 6 — USE-OF-FORCE COMPLIANCE STATUS

**H. Personnel Complaint Review**

The AV stations have continued to make substantial improvements during this period in the quality and reliability of the investigation and adjudication of personnel complaints. As a result, 14 of 17 SA complaint paragraphs are in compliance or sustained compliance. Only departmentwide policies and the intake of complaints in the AV have not reached compliance.

1. Policy

- LASD remains in partial compliance with SA Paragraph 127, which requires that complaint investigation–related policies and manuals be revised to ensure they are complete, clear, and consistent.

- LASD remains out of compliance with SA Paragraph 129, which requires that Department policy identify the allegations that require formal discipline, those that require a full administrative investigation, and those that must be investigated by Internal Affairs.

To meet SA Paragraph 127, the Department has revised three documents: the Service Comment Review Handbook, the Department Manual section on complaints, and the Administrative Investigations Handbook. These were approved by the Monitors and DOJ in 2021 but have not been published as they undergo internal reviews and discussion with the employee unions. Any changes made to the policies since 2021 will need to be reviewed and approved by the Monitors and DOJ before publication. In the meantime, the Monitors find LASD in partial compliance with SA Paragraph 127 because the Department implemented interim policies addressing this provision that apply only to the AV stations.

The three approved policies do not address SA Paragraph 129, which requires the Department to identify allegations that require discipline, the types of complaints that must be handled as an administrative investigation, and the investigations that must be conducted by IAB rather than the station. In the next reporting period, the parties will discuss LASD's plan to address SA Paragraph 129.

Once these policies are finalized, the Department will need to revise, as necessary, the training provided to supervisors and managers to ensure the intake, investigation, and adjudication of complaints is consistently conducted in alignment with the new policies and procedures.

2. AAB Complaint Audits and MT Compliance Assessments

- The Department is now in sustained compliance with the requirement that it conduct semi-annual audits of public complaints (SA Paragraph 140a).

AAB submitted two complaint audits in 2025, both of which were approved by the Monitors and DOJ. This is the second consecutive year AAB's complaint audits have been approved by the Monitors and DOJ, bringing the Department into sustained compliance with SA Paragraph 140.

AAB continues to conduct its audits according to approved method plans and with professionalism, transparency, and integrity. MT reviews of AAB audit workpapers and case files find detailed

documentation of all steps taken, rationales for each decision, and a willingness to report the facts even if they are not flattering. This has given AAB and their audits credibility not only with the Monitors but with LASD personnel. LASD-AV managers have come to rely on AAB's work to measure their command's performance.

The Monitors and DOJ continue to find that AAB personnel complaint audits are conducted according to approved plans and are sufficiently thorough and reliable to include them in our determination of SA compliance.[23] Compliance determinations provided below are based on AAB audits along with MT follow-up reviews of audit methods, reports, workpapers, and, for a targeted sample of cases, case files and recordings.

A third AAB audit focusing on intake was submitted on December 17, 2025, which left insufficient time to thoroughly review the audit for compliance purposes. The MT will complete our review in the next reporting period.

3.   <u>Compliance Status</u>

- The Department is now in sustained compliance with SA Paragraphs 124, 125b, 126, 128, 132, 135, and 137a and remains in sustained compliance for SA Paragraphs 133, and 137b.
- The Department is now in compliance with SA Paragraphs 130, 131, 134, 136, 138, 139, and 140b.

Regarding provisions in sustained compliance: With one minor exception that the MT believed to be inadvertent, every audit and inspection for the past three years has shown that complaint material is available in the designated locations in AV and online. Appropriate translation service is being provided when needed. Each station accurately distinguishes service from personnel complaints, and cases are referred to IAB or ICIB when appropriate. Uninvolved supervisors are assigned to conduct personnel investigations, and witnesses are interviewed separately. Finally, training on complaint policies and procedures is being provided to deputies and supervisors.

Of the seven provisions that moved to compliance in this reporting period, the most critical measures include the following.

- The SA requires that managers identify and address every substantive allegation in a complaint whether or not the complainant identifies it as an allegation. AAB's first 2025 complaint audit found 100% compliance with this requirement, and their second 2025 audit found 97% compliance. That is a commendable improvement over past findings and brings the Department into compliance with this requirement (SA Paragraph 130).

---

[23] SA Paragraph 149 states: "Where appropriate, the monitor will make use of audits conducted by [AAB,] taking into account the importance of internal auditing capacity and independent assessment of this agreement."

AAB audits from 2023 and 2024 had to use limited sample populations due, primarily, to the backlog of investigations that the AV commands inherited from their predecessors. That backlog has now been reduced dramatically, allowing auditors to sample from a wide array of completed contemporaneous cases. In the last AAB audit, the audit population was so large that AAB used stratified random sampling for the first time.

- Every investigation needs to contain sufficient facts to support a reliable adjudication. AAB's first 2025 audit found that 94% of the personnel investigations met that standard, and its second audit found 97% reliability. Again, that is a commendable improvement over past findings and brings the Department into compliance with that provision (SA Paragraph 131).

- Finally, complaints must be adjudicated based on a preponderance of evidence, which is often referred to as the "50% plus 1" standard. The evidence gathered for each allegation needs to be weighed carefully to determine if the allegation is more likely true or not true. Both of AAB's 2025 audits found that 94% of the cases were adjudicated using a preponderance of evidence. That is also a significant improvement over past audits and brings the Department into compliance with this provision (SA Paragraphs 139 and 140b).

4.  Noncompliance: Complaint Intake

- The Department remains out of compliance with SA Paragraph 125a, which governs the intake of personnel complaints.

Unlike the other SA provisions that require complex departmentwide management action to implement, accepting complaints is relatively simple. For decades, Department policy has required employees to notify a supervisor whenever someone complains. Supervisors are then required to listen to the complainant and either initiate an SCR or document why they did not.

The intake of complaints has been found out of compliance on every audit, and it is evident that this is an area where the department continues to struggle. The first 2025 AAB audit showed just 75% of the calls to the Department's toll-free complaint line were handled properly; that decreased to 63% in the second 2025 audit. Watch commanders either accepting a complaint or making a log entry on why they decided not to do so was at 45% for the first audit and 82% in the second. Mail-in forms and emailed complaints were at 100% in the first audit, so they were not tested in the second.

Preliminary review of AAB's recently submitted third 2025 audit on intake found improvement in several areas, including desk personnel successfully transferring complainants to a supervisor and the supervisor accepting those complaints. The review of supervisory BWC videos identified only one case where someone complained. In that case the supervisor initiated an SCR as required, but this does not provide an adequate population for comparison. Future audit methodologies need to capture a larger population for a reliable review, particularly given the issue we have seen with the intake of complaints. We will include methodological suggestions when we submit our review of that audit.

5.  MT Monitoring of Public Complaints

We continue to make ourselves available to members of the public who wish to express concerns or complaints directly to the Monitors. During this period, the Monitors received only one complaint from the public. The complaint was received via the Monitors' website and involved a concern about county safety services not involving misconduct. Several return calls to the person were not returned and the matter was closed.

6. Next Steps

*a. LASD*

- Hold supervisors and watch commanders accountable for failure to initiate a personnel complaint investigation when appropriate.
- Publish the MPP chapter on complaints, Administrative Investigations Handbook, and SCR Handbook.
- Submit revised Guidelines for Discipline for review and approval.
- Submit a training plan and curricula on the new complaint policies for MT and DOJ review and approval. Once approved, ensure all appropriate personnel are trained and held responsible for implementation of the revised complaint process.
- Continue to conduct audits that evaluate compliance with SA requirements.

*b. The MT*

- Evaluate any changes to the SCR Handbook, MPP section and Administrative Investigation Guide and work with the parties to finalize.
- Review and provide feedback on the revised Guidelines for Discipline.
- Review and provide feedback on an associated training plan and curricula.
- Monitor the implementation of the policy and training plan.
- After the revised directives are published, training has been provided, and sufficient time has passed for the new processes to take hold, discuss with the Parties an auditing plan and schedule.
- Thoroughly review and comment on AAB's third 2025 complaint audit
- Provide LASD and AAB with technical assistance as needed.
- Review AAB audit plans and audit reports.

7. Complaints Compliance Status Table

Table 7 provides the compliance status for each paragraph in the Complaints section.

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENT | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **124** | Public has access to complaint forms and information. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes:** The MT's site visit in March 2024 documented that complaint forms were available at six of seven locations. AAB's two 2024 audits and two of the three 2025 audits have found that the required material is regularly made available to the public at all required locations. | | | | |
| **125a** | Accept all complaints. | Partial | Partial | No | No |
| | **Notes:**. In AAB's 2024 and 2025 audits, field sergeants did not initiate a complaint upon becoming aware of alleged misconduct, and several watch commanders did not initiate a complaint when required. Also, many complaints made via the 800 number and mail are not being handled properly. Recent AAB audits have shown improvement in some areas of intake, but overall the Department remains out of compliance. | | | | |
| **125b** | LEP language assistance. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes:** AAB's 2024 and 2025 audits show consistent compliance with this requirement. | | | | |
| **126** | Refusal to accept a complaint or discouraging or providing false information about filing a complaint is grounds for discipline. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes:** No incidents of this nature have been identified in any of the 2024 or 2025 audits. | | | | |
| **127** | Revise MPP, SCR, and IAB manuals so they are complete, clear, and consistent. | Partial | No | Partial | No |
| | **Notes:** The Department is in partial compliance because LASD-AV unit orders have been implemented addressing these requirements for the AV. On November 3, 2021, the Monitors and DOJ authorized the Department to move forward with publishing and implementing the agreed-upon revisions to the MPP, SCR Handbook, and IA Handbook, but these documents are not yet published. Also, a revised Guidelines for Discipline has not been submitted for Monitor and DOJ review and approval. | | | | |
| **128** | Ensure personnel complaints are not misclassified as service complaints. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes:** All the 2024 and 2025 audits have found compliance with this requirement. | | | | |
| **129** | Revise policies for allegations requiring IAB investigation and behavior requiring formal discipline. | No | No | No | No |
| | **Notes:** This is awaiting publication of the three policies in SA Paragraph 127 and a revised Guidelines for Discipline. | | | | |

TABLE 7

PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENT | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | POLICY | TRAINING | IMPLEMENTATION | SUSTAINED |
| **130** | Ensure each complaint is appropriately classified at outset and review. | Yes | Yes | Yes 12/25 | No |
| | Investigate every allegation even if the complainant did not specifically articulate it. | Yes | Yes | Yes 12/25 | No |
| | **Notes:** Both 2025 audits found compliance with this provision. | | | | |
| **131** | Investigations are as thorough as necessary to reach reliable and complete findings. | Yes | Yes | Yes 12/25 | No |
| | **Notes:** The first 2025 audit found 94% compliance, and the second found 97% compliance. | | | | |
| **132** | Refer appropriate cases to IAB or ICIB. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes:** The 2024 and 2025 audits have not identified any complaints that should have been referred to IAB or ICIB and were not. | | | | |
| **133** | Investigation conducted by uninvolved supervisor. | Yes | Yes | Yes 12/20 | Yes 12/24 |
| | **Notes:** The 2020 MT audit and all 2024 and 2025 AAB audits have confirmed that an uninvolved supervisor is consistently being assigned to conduct complaint investigations. | | | | |
| **134** | Identify all persons at scene. | Yes | Yes | Yes 12/25 | No |
| | **Notes**: The first 2025 audit showed 94% compliance, and the second showed 82% compliance. The Department remains in compliance, but the Monitors will discuss with LASD the reason for the drop in compliance in the second audit. | | | | |
| **135** | Obtain a full statement from all persons at scene. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes**: Both of the 2025 audits found full compliance with this requirement. | | | | |
| **136** | Investigator interviews complainant in person or gives justification. | Yes | Yes | Yes 12/25 | No |
| | **Notes:** The first 2025 audit found 88% compliance, and the second found 94% compliance with this requirement. | | | | |

**TABLE 7**

**PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS**

| TABLE 7 PERSONNEL COMPLAINT REVIEW COMPLIANCE STATUS | | | | | |
|---|---|---|---|---|---|
| **SA PARAGRAPH** | **SUMMARY OF SA REQUIREMENT** | **COMPLIANCE** | | | |
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **137** | Interview witnesses separately. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | Use uninvolved interpreter for people with LEP. | Yes | Yes | Yes 12/20 | Yes 06/24 |
| | **Notes:** The 2024 and 2025 AAB audits have confirmed that witnesses are being interviewed separately. The 2020 MT audit and the AAB audits found that an uninvolved interpreter has been provided consistently when needed. | | | | |
| **138** | Provide supervisor and deputy training on intake and investigations. | NA | Yes | Yes 12/25 | No |
| | **Notes:** Directives exclusive to the AV were issued in 2018, and the AV captains have provided their personnel with associated intake and investigative training. New training will be required after publishing the SCR Handbook, the MPP section, and the Administrative Investigation Handbook. | | | | |
| **139** | Provide supervisor training on misconduct investigations. | NA | Yes | Yes 12/25 | No |
| | **Notes:** See Paragraph 138. | | | | |
| **140a** | Conduct semi-annual audits of public complaints. | Yes | Yes | Yes 12/24 | Yes 12/25 |
| | **Notes:** The Department conducted and published two approved complaint audits in 2024, bringing it into compliance with this paragraph. In 2025, they published two more approved complaint audits, bringing it into sustained compliance. | | | | |
| **140b** | Complaint dispositions are consistent with preponderance of evidence standard. | Yes | Yes | Yes 12/25 | No |
| | **Notes:** Both of the 2025 audits found 94% compliance with this requirement. | | | | |

## I.   Accountability

The Department continued to improve and refine its accountability systems during this reporting period. These improvements have resulted in compliance or sustained compliance for all five accountability paragraphs.

1.   <u>PRMS Functionality and Reliability</u>

- LASD is now in sustained compliance with SA Paragraph 141a concerning the use of PRMS as a departmentwide decision support system that allows for peer-to-peer and unit comparisons.
- LASD is now in sustained compliance with SA Paragraph 142, ensuring the accuracy of PRMS data.

As mentioned in our last report, the Department has made great strides in providing line-level managers with improved access to risk management data through dashboards that enable managers to review their employees' work histories, including personnel complaints, uses of force, stops data, arrests where obstruction was the sole charge, and body-worn camera activations. Managers are able to conduct peer-to-peer as well as unit-to-unit comparisons.

In our previous report, we pointed out that increased attention must be given to ensuring the accuracy of the form being sent to the Discovery Unit for entry into PRMS. The MT consistently found that Discovery is very good at accurately entering the information provided by the stations on the face sheets of their reports. In fact, they rarely make an error. However, the information captured on the face sheets was not as reliable. In their first 2025 complaint audit, AAB found 88% accuracy for the critical information entered on the SCR forms and 81% accuracy of the noncritical information. In the second 2025 complaint audit, they found it remained 88% accurate in critical information entered and had improved to 94% accuracy for noncritical information.

Among our earlier concerns was the reliability of PRMS data as well as the timely entry of risk-management events. To assess this, AAB conducted a detailed review of the PDE process and reliability of PRMS data and submitted it for review late in the previous reporting period. The MT has since reviewed this report and found it to be conducted according to the approved plan and with professionalism, transparency, and thoroughness. We agreed with its findings that PRMS holds accurate and reliable data.

Based on the AAB findings as well as other data reliability assessments associated with stops and UOF audits, the Monitors and DOJ have found the Department continues to be in compliance with SA Paragraph 142. The scope of our and AAB's recent reviews, dating back almost two years, have led us to determine that compliance with SA Paragraph 142 was established in December 2024 (as opposed to June 2025, the date we previously reported) and that the Department is now in sustained compliance. With assurance that the data contained are reliable, station commanders as well as the Performance Mentoring Commanders' Panel can now evaluate risk and employee performance with confidence that the data available through these dashboards is accurate and timely. Also, MT and AAB audits that rely on PRMS data can be conducted with this added assurance.

2. <u>Quarterly Reviews</u>

- LASD is now in compliance with SA Paragraph 141b regarding unit commanders and supervisors conducting periodic reviews of all deputies and work units.
- LASD is now in compliance with SA Paragraph 143, which requires the Department to establish a plan for periodic reviews of trends at stations.

SA Paragraph 141a requires periodic review of all deputies and units, and SA Paragraph 143 requires periodic review of station trends. In practice, these provisions require station managers to conduct regular reviews to address various risk management concerns, such as deputy and unit trends in personnel complaints, uses of force, stops and searches, claims for damages/lawsuits, arrests where interfering is the sole charge, and PLEs. These reviews also need to identify and address deputies who may require further supervisory attention, such as for those who are disproportionately involved in high-risk incidents when compared to their peers or consistently identified as being on PMP.

The Department has developed a new reporting process designed to meet these requirements.[24] The Captain's Quarterly Review is a semi-automated process that incorporates Performance Oversight Information Tracker (POINT) and the other dashboards to facilitate each captain's analysis of their command, including peer-to-peer and unit-to-unit comparisons. The Department gave the Monitors and DOJ a demonstration of the process during a site visit and submitted related materials for review and comment. On November 17, 2025, the Department submitted quarterly reports for Lancaster and Palmdale produced from this new process. (In the first submission, the MT could not discern the accompanying dashboard information, but LASD subsequently submitted improved versions.)

Our preliminary review of the narrative portion of each report written by the captains with the help of their operations lieutenants indicated each analysis was thorough and thoughtful, addressing most if not all of the SA required areas. As we did with the earlier quarterly reports, we will continue to provide feedback to the Department on whether the reports address pertinent trends and are effective in meeting their intended purposes. To that end, in the next reporting period we will review the reports against the accompanying dashboard information.

The MT will also work with the Department to make any enhancements necessary to ensure the tool is capable of consistently providing the information and level of detail and analysis required to meet SA requirements. For instance, the current station captains, who helped develop the tool, have shown they can effectively use the new system to produce compliant reports. However, the questions that prompt the captain (or their designated staff) to conduct each of the specific assessments required must provide the specific information needed that will ensure the station captains and their staff can effectively identify and address the risk management issues of concern. It is also crucial that the reports remain consistent and thorough so that this system is maintained when rotations take place and new captains and staff take on these duties.

---

[24] The Department previously used the Quarterly Reports process to meet these requirements. That process, largely manual and quite burdensome, was meant to serve as an interim measure until the Department procured and/or developed modern records management systems that would provide more efficient and reliable report preparation, review, and tracking.

3.  <u>Performance Mentoring Program</u>

- LASD is now in compliance with the SA's PMP paragraphs (144 and 145).

For the past year, the Department has devoted a considerable and ongoing attention to revamping the PMP program. That work has come into fruition now, with the Monitors and DOJ determining the Department is in compliance with the PMP-related SA Paragraphs 144 and 145.

In our 20th semi-annual report, we described in detail the key changes instituted to the PMP program. In this reporting period, after the Department responded to feedback, the Monitors and DOJ approved the new PMP Handbook and accompanying materials. They also demonstrated the revised versions of the PMP tracking application and the online mentoring training and resource guide, and provided updates on current use of the new program at the AV stations. The Monitors and DOJ also met with the members of the PMP Commanders Panel, which oversees the program departmentwide, who described their case review processes and their expectations for the program moving forward.

We note that these improvements to PMP coincide with the implementation of the Department's risk-management dashboards. These provide the PMP Commanders' Panel and their staff with the full array of risk-management data for all employees and work units. Because the dashboards rely on data entered during Preliminary Data Entry (PDE), managers are able to see trends within a day or two of occurrence. This provides a much more robust and timely view of emerging risk management concerns. PMP will also benefit from the newly implemented Captain's Quarterly Reports. Decisions to review deputies for PMP are now primarily driven by unit commanders rather than the Risk Management Bureau, so the reports, along with the various other tracking and accountability processes in place, will help station managers identify and take action on at-risk deputies in a timely manner.

In the next reporting period, the MT will confer with the Parties to develop a plan and schedule to assess sustained compliance, which will be based on the effective operation and outcomes of the PMP program.

4.  <u>Next Steps</u>

a.  *LASD*

- Continue to refine the Captain's Quarterly Reports and integrate them into practice.
- Continue to apply, monitor, and refine the PMP process.
- Continue to monitor and assess the reliability of data contained in PRMS and other data systems.
- Continue to refine and expand the use of the dashboards to capture and analyze critical risk-management information as part of the Department's Early Warning System.

b.  *The MT*

- At an appropriate time, work with parties to develop an auditing plan and re-initiate the PMP audit.

- Work with LASD to further refine the Captain's Quarterly Reviews and to track their use and effectiveness.
- Continue to provide technical assistance, as requested, on the PMP, data systems, and other topics.


5. <u>Accountability Compliance Table</u>

Table 8 provides the compliance status for each paragraph in the Accountability section.

| SA PARAGRAPH | SUMMARY OF SA REQUIREMENTS | COMPLIANCE | | | |
|---|---|---|---|---|---|
| | | **POLICY** | **TRAINING** | **IMPLEMENTATION** | **SUSTAINED** |
| **141a** | • PRMS serves as LASD-wide decision support system.<br>• Modify system to allow peer-to-peer comparisons of deputies and units. | Yes | Yes | Yes<br>12/24 | Yes<br>12/25 |
| | **Notes:** PRMS is used departmentwide. PRMS data are used for the new dashboards, which enable peer-to-peer and unit-to-unit comparisons. Recent AAB and MT stops, complaints, and force audits have not found significant issues with data accuracy, and AAB's review of PRMS and Preliminary Data Entry showed the data to be very reliable. | | | | |
| **141b** | AV commanders will conduct periodic reviews of all personnel to identify trends. | Yes | Yes | Yes<br>12/25 | No |
| | **Notes:** With the advent of the new dashboards, LASD has developed a process for completing the quarterly reviews, bringing the Department into compliance. The MT will work with the Department to make any needed enhancements to ensure the quality of the reports can be maintained over time and staff changes. | | | | |
| **142** | • Modify PRMS to access additional info.<br>• Maintain PLEs in electronic format.<br>• Ensure PRMS is accurate and that there is accountability for errors. | Yes | Yes | Yes<br>12/24 | Yes<br>12/25 |
| | **Notes:** See SA Paragraph 141a. Also, we had previously indicated compliance for Paragraph 142 was established in June 2025, but a review of records found that the accuracy and reliability of PRMS was actually evident in December 2024 and has continued through this reporting period. Based on that information, the Monitors have determined the Department is in sustained compliance. | | | | |
| **143** | LASD will establish a plan for periodic reviews of trends at stations. | Yes | Yes | Yes<br>12/25 | No |
| | **Notes:** See 141b. | | | | |
| **144** | Make modifications to Performance Mentoring Program (PMP); ensure 30-day turnaround. | Yes | Yes | Yes<br>11/25 | No |
| | **Notes:** The Department has completely revamped its PMP process, including rewriting the PMP Handbook, which was approved by the Monitors and DOJ. The MT has established that the new PMP processes are functioning in the AV thus achieving compliance. In the next reporting period, the MT will work with the Parties to develop a plan to assess PMP outcomes in order to determine sustained compliance. | | | | |
| **145** | Coordinate between departmentwide and unit PMP. | Yes | Yes | Yes<br>11/25 | No |
| | **Notes:** See Paragraph 144. | | | | |

TABLE 8

ACCOUNTABILITY COMPLIANCE STATUS

**APPENDIX A: MONITORING TEAM AND WEBSITE**

**Monitoring Team**

The Court-appointed Monitors—Dr. Angie Wolf and Joseph Brann—have assembled an experienced team with credentials and skills uniquely suited to the SA work. The membership of the MT was finalized in March 2016. The two Monitors and seven team members have extensive expertise and experience in monitoring, auditing, and evaluation work in policing and corrections.

Additionally, most of the MT members have served in law enforcement, several in the Los Angeles area. Several have served in leadership positions in law enforcement or corrections agencies during the implementation of the compliance period of a settlement agreement or consent decree and therefore understand the unique challenges that large organizations face in those circumstances. The MT members also have expertise in dealing with the diverse issues addressed in the SA, such as those related to UOF, training, the Fair Housing Act, data collection and analysis, survey methods, and the complexities of community engagement.

**Antelope Valley Monitoring Website**

This website allows AV community members to learn more about the SA, the backgrounds of MT members, and the monitoring activities; access documents related to the monitoring work, including each semi-annual report, each Community Survey report, MT audits, and MT data analyses; follow links to LASD's homepage and other relevant websites; and, importantly, submit questions and comments directly to the MT.

The website's URL is www.antelopevalleysettlementmonitoring.info

**APPENDIX B: SETTLEMENT AGREEMENT COMPLIANCE**

Much of the SA involves developing or revising policies, procedures, and training; putting into place various processes (such as a plan for ensuring all new AV deputies receive training mandated by the SA or additional accountability mechanisms to facilitate peer comparisons); assessing data and information to guide the implementation of required reforms and to determine their effects; and striving to more effectively engage with community organizations and entities, such as the Community Advisory Committees (CACs). This work is usually done collaboratively among the Parties and the MT, with documentation of the change (new policy, revised training, etc.) eventually being formally submitted to the MT and DOJ for approval.

For most provisions, several steps are involved before the Department can reach full *implementation* (SA Paragraph 20) and thus achieve the status of being in full compliance. Paragraph 149 states, "Compliance with, or implementation of, a material requirement of this Agreement means that LASD has: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice."

Any approved policies related to the SA must be distributed to every deputy according to SA-required procedures and, as necessary, incorporated into training curricula. An approved training curriculum will require documentation that appropriate personnel received the training. New procedures and processes must be successfully instituted. Most importantly, each of the established improvements must be proven effective and practical in the real world—that is, they are assessed through MT activities such as reviews, audits, interviews, observation, and data analysis to establish whether they are successfully reflected in law enforcement practices and achieve the intended qualitative and quantitative impacts on the AV community. Paragraph 153 lays out several qualitative and quantitative outcome assessments the MT will do "to measure whether LASD's implementation of this Agreement has eliminated practices that resulted in DOJ's finding a pattern and practice of constitutional violations."

Changes to policy and practice also must be incorporated into LASD-AV's accountability practices. The reviews, analyses, studies, and audits that the SA requires LASD to conduct must use appropriate methodologies, and, in turn, their findings must be used effectively to inform policies and practices.[25] Finally, this level of performance must be sustained for one year to achieve *full and effective compliance* and to satisfy the terms of the SA (Paragraph 205). In some cases, the SA requires ongoing improvement in the delivery of services (Paragraph 15).

---

[25] Paragraph 171b gives a summary of the stepwise process by which the Monitors assess compliance and document their findings. Each provision of the SA needs to be "(1) incorporated into policy; (2) the subject of sufficient training for all relevant LASD deputies and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review or audit; and (4) found by the Monitor to have been fully implemented in practice."

This process of achieving compliance is laid out in various provisions of the SA, especially through the following paragraphs.

- In Paragraph 20, implementation is defined as "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice." What is meant by "consistent and verified performance" is to be laid out in compliance metrics for each provision.
- According to Paragraph 205, the terms of the SA will have been met when "the County has achieved full and effective compliance with the Agreement and maintained such compliance for no less than one year."
- In Paragraph 15, full and effective compliance is defined as "achieving both sustained compliance with all material requirements of this Agreement and sustained and continuing improvement in constitutional policing and public trust, as demonstrated pursuant to the Agreement's outcome measures."

Compliance metrics or measures represent the specific quantitative and qualitative criteria by which the MT will assess compliance with each SA provision. The written metrics reflect the language of the SA, but they also ensure the Parties and the MT agree on how the SA language translates into workable and measurable standards for LASD-AV policy and practice and for assessing compliance.

It is important to note that the SA was not written in a "check the box" fashion that would require or allow each provision to stand separately such that it would then be evaluated based on a single, straightforward compliance metric for each provision. The assessment work that is required to evaluate the intended outcome for one provision is sometimes dependent upon the activities of and relationship to other provisions, and therefore they are interconnected. For example, the Department cannot draw conclusions about the potential disparity in its programs and activities (SA Paragraph 68) without completing the assessments required of deputy performance, stops, community input, uses of force, and complaints (SA Paragraphs 67, 82–86, 88, 120–123, and 140). Similarly, the MT's compliance assessment for one provision may partially depend on the compliance assessment for another. In short, in some cases, as long as the Department is not in compliance with one provision, it necessarily will be out of compliance with one or more other provisions.